UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
CORRECTION OFFICERS' BENEVOLENT ASSOCIATION,
INC., TIFFANI DUBLIN, individually and on behalf of all
others similarly situated, ANTHONY ROMANO, individually
and on behalf of all others similarly situated, MATTHEW HINES,
individually and on behalf of all others similarly situated,
FRANCIS CASTRO, individually and on behalf of all others
similarly situated, and JOHN and JANE DOES 1 – 2,000

                            Plaintiffs,

                                                    **CLASS  ACTION**
                                                    **COMPLAINT  AND  JURY**
                                                    **DEMAND**

           -against-                                 Case No. 17-CV-XXX

THE CITY OF NEW YORK, MAYOR BILL DE BLASIO,
NEW YORK CITY DEPARTMENT OF CORRECTION, and
COMMISSIONER JOSEPH PONTE

                            Defendants.
------------------------------------------------------------------------X

### Complaint for Declaratory Judgment, Injunctive Relief, and Compensatory Damages

Plaintiff CORRECTION OFFICERS' BENEVOLENT ASSOCIATION, INC.

("COBA"), TIFFANI DUBLIN ("Plaintiff Dublin"), individually and on behalf of all others

similarly situated, ANTHONY ROMANO ("Plaintiff Romano"), individually and on behalf of

all others similarly situated, MATTHEW HINES ("Plaintiff Hines"), individually and on behalf

of all others similarly situated, FRANCIS CASTRO ("Plaintiff Castro"), individually and on

behalf of all others similarly situated, (collectively the "Individual Plaintiffs"), and Plaintiffs

JOHN and JANE DOES 1 – 2,000 (all collectively "Plaintiffs"), by their attorneys, Koehler &

Isaacs LLP, as and for a complaint in the above captioned civil action, aver and allege as

1

follows:

## INTRODUCTION

1. Since in or about 2015, Defendants CITY OF NEW YORK ("City"), MAYOR BILL DE BLASIO ("de Blasio"), the NEW YORK CITY DEPARTMENT OF CORRECTION ("DOC"), and COMMISSIONER JOSEPH PONTE ("Ponte") (collectively "Defendants") have continued, promulgated, implemented, adopted, or sanctioned certain policies, practices, and/or customs that have made sweeping changes in the City Jails. Ostensibly, these reforms seek to reduce violence and increase safety. However, these policies have placed a primacy on inmates' well-being, diminished accountability for their violent actions, and have shockingly neglected the safety of the hardworking men and women who serve as Correction Officers in the City Jails. In fact, Defendants' complicit actions and inactions have empowered the most violent inmates and increased the threat they pose to officers far beyond what is considered a typical risk of exposure to violence that is inherent in the work of a Correction Officer. The situation has become so dire that Correction Officers have, with greater frequency than ever before, been punched, kicked, slashed, splashed with urine, feces or saliva, stabbed, head-butted, held hostage, been beaten severely, or sexually assaulted by inmates. Indeed, by Defendants' own admission, violence in the City jails has increased 18%. Further, the recently issued Third Report of the Federal Monitor overseeing reform measures in the City Jails confirms that staff injuries are on the rise. Specifically, approximately 1,337 Correction Officers were injured between November 2015 and December 2016. Inmates, who are now housed by gang status, frequently organize collectively against Correction Officers in stand-offs. This increase in violence has also victimized supervisory personnel

2

including a DOC Chief who was prevented from leaving a housing area by inmates who ignored her direct orders and surrounded her. Indeed the proverbial saying "the inmates are running the asylum" is now becoming a literal reality and it is only a matter of time before the City witnesses an inmate uprising and outcome similar to the recent 18 hour siege at Delaware's Vaughn Correction Center that resulted in the death of a Correction Officer, mass resignations of custody and medical personnel, and lawsuits.

2. In December 2016, Plaintiff Hines was slashed at work by inmate Bashid McLean --- a convicted murderer who dismembered his mother and took a selfie with her decapitated head. In re-arresting McLean for attacking Officer Hines, Bronx District Attorney Darcel Clark stated unequivocally that "Our public servants should not have to face danger when they go to work each day." Sadly, this is not the case for the thousands of Correction Officers who go to work every day in an unsafe workplace that is full of violent inmates, like McLean, who threaten their very existence. In the past week alone, two Correction Officers were severely assaulted by inmates resulting in a broken nose for one and a broken jaw for the other necessitating surgery. Another correction officer was assaulted and sustained multiple injuries including a hole in his top lip, while yet another correction officer was dragged by three inmates down a flight of stairs and beaten. Despite the prevalence of these assaults on Correction Officers, Defendants are slow to take any punitive actions against inmates or fail to take any action at all. That was the case when the same violent inmate assaulted Plaintiff Romano twice within a span of four (4) days after the Defendants failed to take action after the first assault. When measures are taken, they are ineffective and fail not only to hold inmates accountable for their actions, but

also fail to deter repeated violence. That was true in the case of Plaintiff Castro who was assaulted by an inmate who went through one of Defendants' punitive segregation alternative programs which failed to curb his violent tendencies.

3. The assaults happening now result from Defendants' collective actions that have created or increased the dangers Correction Officers face in the workplace. By voluntarily removing or limiting proven violence deterrence measures like punitive segregation, implementing alternative therapeutic and security programs that fail to provide any level of accountability for inmates' actions, failing to use all available measures to curb inmate violence including Pre-hearing Detention, altering inmate housing practices, failing to provide adequate training and retraining -- especially for dealing with mentally ill inmates, refusing to provide/use much needed safety equipment, and adopting a cumbersome and unclear Use of Force policy which has been haphazardly implemented, Defendants have collectively created a substantial and imminent risk that Correction Officers will continue to be seriously injured -- or even killed. To mask the reality of this fact, Defendants -- who are now under the watchful eye of the Department of Justice and a Federal Monitor, have embraced policies, practices and/or customs that include misreporting or underreporting of the violence occurring against Correction Officers in the City Jails.    Plaintiff Dublin fell victim to this practice when after being punched several times by an inmate and sustaining severe spinal chord injuries, the attack on her was categorized administratively as a mere "Log Book Entry" instead of an "Assault on Staff".

4. The Fourteenth Amendment of the United States Constitution affirms District Attorney Clark's statement. It guarantees public employees a substantive due process right to be

free from state created danger. That is, a right to be free from any governmental/employer policies, practices and/or customs that increase the risk of bodily harm or death from third parties like violent inmates. Defendants' policies, practices and/or customs continued, adopted, promulgated, implemented or sanctioned under the rubric of a so-called "Reform Agenda" values the lives of inmates over the lives of Correction Officers and thus evinces a deliberate indifference to officer safety. Their conduct has created or increased certain dangers in the workplace which present a substantial and imminent risk of serious bodily injury, including the possible death of Correction Officers.

5. Plaintiffs COBA, the Individual Plaintiffs, and Plaintiffs John and Jane Does 1 – 2000, bring this civil rights action to challenge Defendants' policies, practices and/or customs that have created extremely dangerous conditions in the workplace and/or increased the risk of harm to the Plaintiffs. They seek declaratory judgment, injunctive relief, compensatory damages, an award of attorneys' fees and costs, and such other relief as this Court deems equitable and just, to remedy the ongoing and continuous violation of COBA members' rights, the rights of the Individual Plaintiffs, and the class members as secured by 42 U.S.C. § 1983 and the Fourteenth Amendment to the United States Constitution.

6. To properly remedy these ongoing and continuous constitutional violations, the Individual Plaintiffs seek to represent a certified class of affected plaintiffs. The Individual Plaintiffs, individually and on behalf of the class, seek a class-wide judgment declaring that Defendants' policies, practices and/or customs described herein have and continue to, given the totality of circumstances, violate the constitutional rights of the class members.

The Individual Plaintiffs further request a class-wide injunction preventing the Defendants from continuing such policies, practices and/or customs. In addition, Plaintiffs seek compensatory damages, an award of attorneys' fees and costs, and such other relief as this Court deems equitable and just.

## PARTIES

7. Plaintiff COBA is, at all times relevant to this matter, the duly certified exclusive bargaining representative for the approximately 9,000 employees holding the title of "Correction Officer" employed by Defendants City and DOC and has associational standing to bring this suit.

8. Plaintiff Tiffani Dublin, at all times relevant to this matter, over the age of 18, and a Correction Officer employed by the Defendants City and DOC.

9. Plaintiff Anthony Romano, at all times relevant to this matter, over the age of 18, and a Correction Officer employed by the Defendants City and DOC.

10. Plaintiff Matthew Hines is, at all times relevant to this matter, over the age of 18, and a Correction Officer employed by the Defendants City and DOC.

11. Plaintiff Francis Castro at all times relevant to this matter, over the age of 18, and a Correction Officer employed by the Defendants City and DOC.

12. Plaintiffs John Doe and Jane Doe Nos. 1 to 2000 are individuals currently, formerly, and to be employed by Defendants City and DOC residing throughout the United States, and sustained harm as a result of the Defendants' unconstitutional policies, practices and customs described herein.

13. Defendant City is, at all times relevant to this matter, a governmental and municipal corporation of the State of New York, a sovereign State of the United States of America.

The City is, at all times relevant to this matter, subject to the Constitution of the United States of America.

14. Defendant Bill de Blasio is, at all times relevant to this matter, the chief executive officer of Defendant City, and a natural person and agent of the City holding the title of Mayor. As such, he is a final policy maker who has adopted, promulgated, implemented, sanctioned or continued the detrimental policies, practices and/or customs at issue here. Defendant de Blasio is being sued in his official capacity.

15. Defendant DOC is, at all times relevant to this matter, an agency of the City and charged with the responsibility and delegated the power, under New York State law, the New York City Charter, and the New York City Administrative Code, to ensure the care, custody, and control of persons housed within its facilities that are accused of crimes or convicted and sentenced to one year or less of jail time. The DOC maintains jail facilities throughout the City ("City Jails"), including approximately ten facilities on Riker's Island, as well as facilities within the boroughs, county courts and two City hospitals.

16. Defendant Joseph Ponte ("Ponte") is, at all times relevant to this matter, a natural person and agent of the City holding the title of DOC Commissioner. As such, he is also a final policy maker who has adopted, promulgated, implemented, sanctioned or continued the detrimental policies, practices and/or customs at issue here.  Defendant Ponte is being sued in his official capacity.

## JURISDICTION

17. This action is brought pursuant to 42 U.S.C. § 1983 and the Fourteenth Amendment to the United States Constitution.

7

18. This Court possesses subject matter jurisdiction under 28 USC §§ 1331 and 1343(3) by virtue of the federal questions raised here in.

19. This Court is authorized to grant declaratory and injunctive relief under 28 U.S.C. §§ 2201 and 2202, and Rules 57 and 65 of the Federal Rules of Civil Procedure.

## VENUE

20. Venue is proper under 28 USC § 1391(b) and (c) in the United States District Court for the Southern District of New York because the Defendants conduct business (and is subject to the court's personal jurisdiction) in such District, Plaintiff COBA conducts business in such District, and the events complained of are occurring in the City Jails, most of which are located in the Southern District of New York.

## GENERAL FACTUAL ALLEGATIONS

21. In August 2014, the United States Department of Justice ("DOJ") issued the Defendants a bad report card. A two and one-half year investigation into the conditions of inmate confinement in the City Jails found rampant violations and mandated several reforms. The DOJ even moved to intervene in a class action lawsuit pending at the time captioned Nunez, et al. v. City of New York, et. al., 11 Civ. 5845 (S.D.N.Y.), which was brought by several inmates alleging various violations of their federal constitutional rights while confined in the City Jails. In response to this, Defendants began promulgating a variety of policies and initiatives related to the DOJ's concerns.

22. In March 2015, Defendants, through de Blasio and Ponte, announced a formal fourteen point reform plan ("14 point Plan") seeking to reduce violence in the City Jails. The initiatives within the 14 Point Plan and other policies, practices and/or customs Defendants adopted before and after the announcement of the 14 Point Plan, constitute a

reform agenda ("Reform Agenda") that places a primacy on the safety of inmates in the City Jails but eschews any similar level of concern for the safety of DOC staff, namely Correction Officers like the Individual Plaintiffs who make up Plaintiff COBA's membership.

23. **Plaintiffs are not opposed to meaningful and appropriate reform**. However, collectively, Defendants' current Reform Agenda has impermissibly created or increased the danger faced by Correction Officers in the workplace and constitutes unconstitutional state created dangers. These policies, practices and/or customs, and the harm they have caused, or are substantially and imminently likely to cause, are discussed more fully below.

### Defendants' Removal of Punitive Segregation For Young Inmates and Replacement with Non-Punitive and Ineffective Alternative Programs Creates/ Increases Workplace Danger

24. Starting in or about December 2014 and thereafter, Defendants implemented various policies eliminating the use of the Central Punitive Segregation Unit ("CPSU") for adolescent and young adult inmates between and including the ages of 16 to 21 years old.

25. Punitive segregation is the practice of segregating inmates that have been found guilty of violating certain facility rules, i.e., infractions like assaulting staff or other inmates, or possessing and/or using contraband, including weapons capable of killing staff. Said inmates are housed for specified periods of time after adjudication confirms their culpability. Those in Punitive Segregation, depending on the seriousness of their infraction, still interact with others and are eligible to receive services.

26. Because of the enhanced security measures, punitive segregation is a proven method of

9

deterring inmate violence.

27. DOC Directive 4501R-D governs the process by which inmates are transferred to CPSU. See Attached Exhibit A, a true and accurate copy of Directive 4501R-D. Upon information and belief, most inmates housed in CPSU have assaulted other inmates, staff, or both.  Enhanced security measures are thus required to guard against these inmates and the dangers they present.

28. Upon information and belief, the elimination of punitive segregation as a tool to deter violence among young inmates has led to an increase in assaults, including against staff.

29. Indeed, Defendants have admitted as much in the 2017 Preliminary Mayor's Management Report ("Mayor's Report") wherein it is stated "the elimination of punitive segregation…has contributed to initial spikes in violence." See Exhibit B, a true and accurate copy of the Mayor's Report Excerpt. This is no surprise considering the Report further admits that "young adults have also been involved in disproportionately more violent incidents…" Id. This general increase in violence has also resulted in an increase in attacks[1] on Correction Officers.

30. According to the 2017 Mayor's Report, (1) the number of "fights/assaults infractions" rose from 8,827 in 2014 to 11,240 in  2016 (id. at p. 74); (2) violent inmate-on-inmate incidents rose from 32.9 per 1000 inmates in 2014 to 47.8 in 2016 (id); (3) inmate assault on staff monthly rate rose from 5.9 per 1000 inmates in 2014 to 7.9 per 1000 inmates in 2016 (id.); (4) uses of force rose from 3,779 for 2014 to 4,756 for 2016 (id); (5) uses of force on adolescents for a four month period rose from 189 in 2016 to 282 in 2017 (id);

---

[1] The term attacks used herein includes, but is not limited to, grabbing, punching, kicking, head-butting, slashing, stabbing, and splashing of urine, feces, saliva or other liquid, and sexual assault.

and (6) serious injury to staff from an inmate assault monthly rate rose from 0.31 per 1000 inmates in 2016 to 0.38 in 2017, for a period of four months (id.).

31. As part of its Reform Agenda, Defendants have implemented a number of programs as alternatives to punitive segregation. Upon information and belief, these programs include, but are not limited to, Transitional Restorative Unit ("TRU"), Second Chance Housing Unit ("Second Chance"), Secure Unit ("Secure Unit"), and Enhanced Security Housing ("ESH"). For inmates with mental illnesses there exists the Restricted Housing Unit ("RHU"), Clinical Alternatives to Punitive Segregation ("CAPS") and Program to Accelerate Clinical Effectiveness ("PACE").

32. Upon information and belief, these programs have been detrimental to Correction Officers' safety. They have no punitive element and, as confirmed by the statistics in the 2017 Mayor's report and the Federal Monitor's report, fail to deter violence in the City Jails. Rather, they increase violence. Most of the inmates housed in these alternative programs continue to assault staff or other inmates while in these programs. Furthermore, it is believed these programs are ineffective in rehabilitating these offenders.    For example, most inmates who have gone through the Secure Unit have subsequently been involved in assaults, including slashings, once released. Additionally, it is not uncommon for inmates in the Second Chance and TRU programs, among others, to go through multiple admissions to these programs --- a phenomenon that the Federal Monitor observes is indicative that an "Inmate's violent behavior persisted even after exposure to the SCHU [Second Chance] and TRU programs' services." See Exhibit C, a true and accurate copy of Excerpts from the Federal Monitor's Third Report at p. 227.

33. Upon information and belief, on November 3, 2015, four young adult inmates, Darnell Green (age 19), William Whitfield (age 18), Joseph Ordonez (age 19) and Dave Johnson (age 18) ganged up on Correction Officer Raymond Calderon and slashed him multiple times at the George Motchan Detention Center ("GMDC"). Green, under false pretenses, baited Officer Calderon to open his cell. Once Calderon did so, Green grabbed him in a chokehold while Whitfield advanced with a sharp weapon. Whitfield began slashing Officer Calderon and continued to do so even after Green and Calderon fell to the ground. See Attached Exhibit D, a true and accurate copy of NY Daily News' Article Regarding the Calderon Slashing dated 11/06/15.

34. Officer Calderon sustained multiple cuts to his arm and face.  He also received a gash across the side of his face ---- a long jagged cut starting from his forehead, proceeding down to his cheek and ear. Officer Calderon required 20-plus stitches and his face will be permanently disfigured. Id.

35. Upon information and belief, inmates Green, Whitfield, Ordonez and Johnson were all housed in one of the alternative programs to punitive segregation. Id.

36. Upon information and belief, another attack against Correction Officers took place within the TRU in the Robert N. Davoren Center ("RNDC") on or about January 4, 2017. At this time, multiple teenage inmates were involved and five Correction Officers were sent to the hospital with various injuries. One officer's nose was fractured, another two suffered severe bruises to their faces, and a fourth had the top bone of his foot crushed.  The incident started when one inmate refused an officer's direct order to lock in and attacked the officer. Other inmates then joined in. See Attached Exhibit E, a true and accurate copy of ABC News 7's Article Regarding the Inmate Attack on Five Officers dated

01/07/17.

37. Upon information and belief, another attack by young adult inmates in alternative programming occurred on September 13, 2016, when two inmates conspired behind a partition minutes before launching simultaneous attacks against Correction Officers at the George R. Vierno ("GRVC"). Inmate Tyquan Lesane (age 20) assaulted Correction Officer Ernesto Grands while inmate Ibrahim Doombouya (age 18) attacked Correction Officer Timothy Edmund. Officer Edmund suffered a gash on his left cheek which required three stitches; Officer Brands suffered a badly swollen eye. See Attached Exhibit F, a true and accurate copy of NY Daily News' Article Regarding the Attacks on Brands and Edmund dated 09/13/16.

38. Most recently, upon information and belief, Correction Officer Richy Herrera was attacked by inmate Tariq Hargrove (age 20), an accused murderer with a long history of violence both inside and outside the jail system. As a result, he suffered a broken jaw and had to undergo surgery. Despite the fact that Hargrove was part of an alternative program in GMDC, his violent tendencies remain unabated.

39. Such was also the case at the Anna M. Cross Center ("AMKC") on May 3, 2016 when accused rapist, inmate Lloyd Revell assaulted Plaintiff Castro in the face breaking his jaw. Once again, Defendants alternative program missed the mark. See Attached Exhibit G, a true and accurate copy of NY Daily News' Article Regarding the Attack on Castro dated 05/3/16.

40. Upon information and belief, Defendants' policies fail to recognize the fatal flaw in these alternative programs to punitive segregation: they have no punitive element to them.

Unlike punitive segregation, inmates who are sent to some of these programs are not locked in their cells and are allowed to roam freely.  In other programs, even if there is a lock-in policy it has not effectively curbed violence.  Additionally, inmates are still allowed to have visits, go to the commissary, and retain TV privileges in these programs while having even greater access to inmate services.

41. Thus, an inmate that is sent to one of these units for assaulting a Correction Officer is actually rewarded with greater benefits. This lack of accountability not only encourages continued violence, but also increases workplace danger for Correction Officers --- a fact recognized in the Federal Monitor's Third Report which states, "…many Inmates do not face meaningful accountability measures for their mid-level misconduct, which contributes to the overall lack of safety at the Facilities." See Exhibit C at p. 233.

42. Furthermore, upon information and belief, if an inmate assaults staff a second time while in some or all of these programs, he is not punished at all or in a manner that effectively deters against future assaults. It is also believed that some of these programs will "kick out" such inmates which mean releasing them back into the general population where they continue their violent streak with impunity. This sends a clear message to highly assaultive inmates that the Defendants will not punish them in any meaningful way no matter how many times they assault a Correction Officer.

43. In a March 10, 2016, statement before the City Council's Committee on Fire and Criminal Justice Services, Defendant Ponte admitted that "young adults represent our most violent population; they are 10% of our daily population but are involved in more than 30% of our violent incidents." See Attached Exhibit H, a true and accurate copy of Defendant Ponte's March 10, 2016 Statement.

44. In an April 2016 Press Release, Defendants de Blasio and Ponte admitted that programs like the ESH are "non-punitive" programs meant for "persistently violent inmates." See Attached Exhibit I, a true and accurate copy of Defendants' de Blasio and Ponte's Statement. Indeed, a flyer issued by Defendant DOC regarding ESH states "ESH is designed to prevent rule violations, not respond to them." See Attached Exhibit J, a true and accurate copy of Defendants' ESH flyer.

45. Thus, Defendants' decision to place volatile inmates in therapeutic programs, that have no punitive element, despite recognizing the threat posed by these inmates, demonstrates a deliberate indifference to Correction Officer safety and creates a substantial and imminent risk of serious bodily injury or death.

46. This is the very definition of an unconstitutional state created danger.

**Defendants' Practice of Limiting the Use of Punitive Segregation for the Adult Inmate Population Creates/Increases Workplace Dangers**

47. Upon information and belief, Defendants' policies to curtail the use of punitive segregation against the adult inmate population (aged 22 and above), including against some of the most violent offenders who have a repeated history of assault on other inmates and staff, has contributed to increased workplace danger faced by Correction Officers.

48. For example, and upon information and belief, Defendants have eliminated the use of punitive segregation for low-level infractions. Additionally, Defendants eliminated punitive segregation "time owed" by inmates that was accrued during a previous incarceration. They have also limited punitive segregation stays from 90 days to 30

15

continuous days, or 60 total days during a six month period.

49. In an April 2016 Press Release, Defendants de Blasio and Ponte touted these punitive segregation restriction and elimination policies and specifically heralded the use of ESH as a "non-punitive measure" for "persistently violent inmates." See Exhibit H.  In fact, a separate flyer Defendants issued about ESH states that while it  is "designed for inmates with demonstrated histories of serious jail-based violence", "ESH is not punitive segregation" and goes on to reassure that inmates have time out of their cells, will receive all their services and that ESH is "designed to prevent rule violations, not respond to them." See Exhibit I.

50. If seriously violent inmates with a known history of jail based violence are subject only to admittedly, non-punitive programs like ESH, it is clear that Defendants' Reform Agenda values the comfort of these repeatedly violent inmates over the safety of Correction Officers. Unsurprisingly, in March 2017, Defendant DOC issued a report confirming that stabbing and slashings increased 18% in the City Jails.

51. Furthermore, upon information and belief, the limits on the use of punitive segregation adopted by the Defendants signals to inmates that they can engage in violence with impunity. For example, one of Defendants' policies is to limit the stays in punitive segregation to 60 days total within a rolling 6 month period. As a result, there are hundreds of inmates who accrue "time owed" for punitive segregation but never serve it. For example, if a highly assaultive inmate who has served 60 days already has 180 days "time owed", he knows there is a chance that he will never serve this time for two reasons: 1) he can only serve this time once every 6 months and only 60 days at a time; and 2) as it commonly happens, he will likely be released from DOC custody before he is

sent back to punitive segregation. In other words, because of the 60 days within 6 months limitation, it becomes a simple game of numbers for inmates who know that they will never be held accountable for any accrued punitive segregation time. They can continue to perpetrate violence on others with impunity -- all the while racking up more punitive segregation time they will never serve.

52. Upon information and belief, adding to the backlog is the fact that the current punitive segregation facilities are unable to accommodate the high number of inmates with punitive segregation time accrued. Thus, these inmates are left to their violent devices within the general population.

53. Upon information and belief, adding to the danger is Defendants' failure, and in some cases refusal, to utilize the full panoply of punitive and deterrence measures available to them against highly assaultive inmates. The Federal Monitor's Third Report noted that only 97 inmates accounted for 18% of the total uses of force in 2016 and called for Defendant Department to "implement strategies to address chronic behavior problems among Inmates who are involved in disproportionate numbers of uses of force." See Exhibit C at pg. 24.

54. No greater example of Defendants' deliberate indifference to Correction Officer safety with respect to repeated assaults by the chronically violent inmates exists than the story of inmate Steven Sidbury a/k/a "John Doe".

55. Upon information and belief, Sidbury, a known member of the Bloods gang facing murder, arson and weapons charges, has had approximately 100 violent incidents with staff and other inmates since 2010. His assaults of Correction Officers have been

perpetrated with and without weapons. He has punched, kicked, bit, spat, and head-butted officers. He has also assaulted officers by throwing dangerous bodily fluids like urine and feces on them -- which is considered to be a Class E Felony under New York Law. In fact, he chronically flings urine and feces at Correction Officers. He has also set multiple fires in his cell and destroyed DOC property in order to draw attention to himself and instigate confrontations with Correction Officers. Sidbury is so violent, he has destroyed magnetometers, cameras, a holding cell window, door, and light fixtures in order to make weapons.

56. In 2014 "John Doe" was involved in a force incident with officers while being transferred to a hospital prison ward and almost took hold of a Correction Officer's service firearm. He informed Correction Officers that he would have "splattered their brains all over the hospital walls because he has nothing else to lose."

57. In 2015, Sidbury was transferred to the Albany County Jail, but returned after he slashed an inmate there with a shiv hidden inside of his rectum. A subsequent x-ray revealed he was hiding a second knife in his body cavity.

58. On April 11, 2016, Sidbury set a fire in his cell. An extraction team - suited up in protective equipment appropriate for a highly assaultive inmate -- extracted the inmate and escorted him to the mini-clinic to tend to any wounds sustained due to the fire he set. There, he was left to be supervised by a Correction Officer with less than 2 years of seniority, who did not know of Sidbury's propensities, and did not have special equipment or training.

59. Sidbury thereafter attacked the Correction Officer, punching him squarely in the face. As a result of the ensuing force incident, several Correction Officers had to be taken to the emergency room.

60. Upon information and belief, despite the fact that inmate Sidbury has a long and well documented history of violence during his incarceration, Defendants have failed to utilize punitive segregation and disciplinary measures against him to the fullest extent possible. For example, Defendant DOC can choose to place Sidbury in punitive segregation for 30 days and, applying a lawfully mandated variance, extend it to 60 days depending on the nature of the violation. However, they have failed to do this at all times possible.

61. Defendants could also choose to administratively override some of the limitations on the use of punitive segregation on a highly assaultive inmate like Sidbury and, upon information and belief, have failed to do so at all times possible.

62. In fact, on or about March 24, 2017, it took DA Clark obtaining a Court Order to get Defendants to properly lock-down Sidbury after he slashed an inmate. Justice Steven Barrett ordered an immediate lockdown, which includes no visits, no interactions with other inmates, and no phone access. Upon information and belief, Defendants could have effected these measures without a Court Order and failed to do so.

63. Plaintiffs do not advocate for the use of punitive segregation for every inmate; it should, at minimum, be used against highly assaultive inmates without hesitation.  The truth is, without an effective means of punishment, or at the very least the threat of it, the  most violent of  inmates like Sidbury -- who admits he has "nothing to lose" -- will continue their violent propensities and cause serious bodily harm or death to a Correction Officer.

19

Although an inmate disciplinary system does exist, in its current form it is still woefully inadequate to serve as a violence deterrence tool.

64. Plaintiffs notified Defendants that their punitive segregation restriction and elimination policies, especially as it related to highly assaultive inmates, were dangerous and causing harm to Correction Officers on several occasions including by letter dated August 3, 2016. See Attached as Exhibit K, a true and accurate copy of COBA President Husamudeen's August 3, 2016 Letter. Plaintiffs even proposed alternative practices that the Defendant DOC could implement to ensure Correction Officer safety, but those pleas fell, and continue to fall, on deaf years.   Defendants' callous disregard of Correction Officer safety in the face of known dangers caused by their own limitation of, elimination of, or refusal to employ to the fullest extent, violence deterrence measures evinces a deliberate indifference to Correction Officer safety.

### Defendants' Failure to Hold Violent Inmates Accountable Under Pre-Hearing Detention Creates/Increases Workplace Dangers

65. Another example of Defendants' failure to utilize all available practices for curbing violence against Correction Officers, is their failure to take immediate remedial steps against an inmate after an Officer is assaulted.

66. Pursuant to Directive 4501R-D, inmates who are under investigation for, or charged with, various offenses may be placed into Pre-Hearing Detention ("PHD") Status. This means the inmate will be transferred to PHD housing with an infraction hearing conducted within three (3) business days. Notwithstanding this, PHD stays are limited to seven (7) business days.

67. Offenses that can subject an inmate to PHD include assaults on staff, criminal acts, possession of weapons, inmate fights or melees, gang assaults, serious incidents resulting in injury, or any other serious incident that threatens the safety and security of the DOC.

68. Despite this clear directive, upon information and belief, Defendants continually fail to segregate violent inmates that assault Correction Officers into PHD status.

69. On or about June 9, 2016, Plaintiff Romano was assaulted by inmate Sentwali Laviscount at the Manhattan Detention Center ("MDC"). Plaintiff Romano attempted to conduct a search of Laviscount prior to a court appearance. However, Laviscount ignored multiple orders and became hostile, striking Plaintiff Romano in the face. Romano then grabbed onto the inmate and wrestled him down to the ground. As a result, Plaintiff Romano sustained lacerations to his arm, neck, and face, a knot on forehead (contusion) and ultimately had to be treated for concussion-like symptoms.

70. Despite this assault on staff with injuries, Defendants did not classify and process Laviscount under Pre-Hearing Detention which would have also meant a transfer out of MDC to Rikers. Instead, Laviscount was still allowed to attend court and stay in MDC This decision directly led to a second and more serious assault by Laviscount on Romano just a few days later.

71. On or about June 13, 2017, Plaintiff Romano went to use the restroom in the MDC clinic. As he was leaving the clinic, Laviscount was being checked out by a doctor. Upon seeing Romano, Laviscount ran up to him and punched him in the face. Caught off guard, Plaintiff Romano could not fight back. He fell to the ground and the inmate continued to assault him until a captain intervened. As a result, Plaintiff Romano sustained a fractured

nose, laceration to lip requiring 8 stitches, and a head contusion.

72. But for the Defendants' failure to categorize Laviscount as PHD after the first assault on Romano and transfer him to PHD detention on Rikers, the second assault on Romano would not have occurred.

73. Sadly, and upon information and belief, the Defendants' failure to take any punitive measures against Laviscount after he initially assaulted Plaintiff Romano is not the exception, it seems to be the new rule. Since Defendants' adoption of its so-called Reform Agenda, Defendants have scaled back on employing measures they are legally allowed to use to punish violent inmates for jail offenses. Instead, Defendants leave this responsibility to the District Attorney and the Courts. It is unrealistic or, in some cases, factually impossible for the District Attorney's office to prosecute every inmate that assaults a Correction Officer. That responsibility, at least in terms of the first response, falls on the Defendants who are nowadays more concerned about making sure they do nothing against inmates for fear of backlash from prisoner rights groups.

74. Defendants' failure or delay in taking punitive measure against inmates who assault Correction Officers and hold them accountable for their actions, can only be described as deliberate indifference to Correction Officer safety.

### Defendants' Agreement to, and Implementation of, the Nunez Consent Judgment and Changes to the Use of Force Policy Creates/Increases Workplace Dangers

75. In or about October 2015, Defendants entered into a consent judgment settling the federal court litigation captioned Nunez, et al. v. City of New York, et. al., 11 Civ. 5845 (S.D.N.Y.) ("Consent Judgment"). See Exhibit L, a true and accurate copy of the Consent

Judgment. Plaintiffs were not a party to this settlement.

76. The 60 plus page Consent Judgment mandates significant changes in DOC protocols as it relates to a number of subjects including, but not limited to, Uses of Force, Staff Discipline, Staff Recruitment, Training, Supervision of Inmates and Video Surveillance. The Consent Judgment also requires the appointment of a Federal Monitor who will assess compliance with the agreement and file periodic reports with the Court.

77. The Consent Judgment required the Defendants to draft and implement a new Use of Force policy required to use specific language contained within the Consent Judgment itself. Further, the Consent Judgment required Defendants to alter the manner in which Uses of Force are conducted, reported, monitored and reviewed as well as impose mandatory penalties on staff who are involved with Uses of Force.

78. In or about November 2015, Defendants issued a new Use of Force policy, labelled "Directive 5006R-D",  which replaced the prior policy labelled "Directive 5006R-C". See Exhibit M, a true and accurate copy of Directive 5006R-C; Exhibit N, a true and accurate copy of Directive 5006R-D. Directive 5006R-D purports to be drafted in accordance with terms of the Consent Judgement, and to that extent includes wholesale, verbatim paragraphs from it, but it also includes additional changes that were not required by the Consent Judgment.[2]

79. **Plaintiffs do not challenge the ability of Defendants to enter into the Consent**

---

[2] Directive 5006R-D impacts the terms and conditions of employment for Correction Officers and Defendants were obligated to negotiate said changes with Plaintiff COBA prior to its implementation. DOC's failure to do so is currently subject to an improper practice charge at the City Office of Collective Bargaining ("OCB"). Although the "official" implementation date of the policy has been postponed a number of times and is currently September 2017, as adduced during the OCB proceeding, Defendants have, in practice, implemented its provisions.

**Judgment except to the extent that doing so violates their rights.** The sweeping changes imposed by the Consent Judgment and new Directive 5006R-D with respect to Uses of Force have increased the danger in the workplace faced by Correction Officers by making it extraordinarily difficult for them to defend themselves, inmates and co-workers.

80. Directive 5006R-D's terms disregard the practicalities of dealing with volatile inmates. For example, the new Directive imposes a number of "prerequisites" prior to when a Correction Officer is allowed to use force. If faced with a threatening inmate, an officer must use what is essentially a scripted dialogue first and then stop to request the assistance of supervisor or staff. Exhibit N at ¶ VI (A)(1). An officer must also employ a wait and see approach or call a supervisor before using force. Id. at ¶ VI(A)(1),(2). In some cases, where there is going to be an Anticipated Use of Force, an officer must stop and summon a mental health professional. Compare Exhibit M at ¶ IV(C) with N at ¶ VI(A)(4)(a). In other cases, Correction Officers are required to make certain medical observations and take other steps prior to using force. Exhibit N at ¶ VI. Notably, some of these "prerequisites" are in excess of what even the Consent Judgment requires, Compare Exhibits L and N.

81. Notwithstanding the fact that every Correction Officer knows that he or she is to use their interpersonal communication skills where appropriate and, if applying force, use only the appropriate and minimum level depending on the situation, the Directive's imposition of a formulaic set of "prerequisites" is impractical given the split second nature under which force incidents typically arise in a correctional setting. While the Directive's checklist looks good on paper, what is does in reality is increase the time available for an inmate to

attack a Correction Officer. As a result of these policies, Plaintiff COBA has uncovered, a wide spread belief among Correction Officers that they must now be attacked first before using force.

82. Directive 5006R-D also increases danger faced by a Correction Officer by prohibiting staff from using force "[i]n response to an inmate's verbal insults, threats or swearing." Exhibit N at ¶ V (B)(1)(b). This prohibition was not in the prior Directive and also fails to take into consideration the practicalities of dealing with inmates in a Jail setting. Insults, threats and swearing may reasonably be determined by an officer to be a clear and present precursor to a violent attack.

83. Lastly, upon information and belief, Defendants' haphazard implementation of Directive 5006R-D has increased danger faced by Correction Officers. Despite the fact that the Directive is not effective until September 2017, recent testimony adduced during Plaintiff COBA'S OCB Improper Practice charge reveals that Defendants have prematurely implemented the policy and provided contradictory training to staff. Additionally, it was revealed that the new policy has created confusion amongst even supervisory staff who are directing Correction Officers to refrain from using force.

84. In sum, Defendants' new policies, practices and customs arising out of the Consent Judgment and Directive 5006R-D have created and increased danger faced by Correction Officers by imposing certain limitations, prohibitions, prerequisites and employment consequences that inhibit an officer's ability to adequately defend himself or others. Compare Exhibits N & M. These policies place Correction Officers at a greater risk of injury or exacerbation of injury as they are now likely to delay or forego defense of self

and others in order to meet these onerous requirements. This hesitation in a jail setting is dangerous – even lethal. The Defendants' haphazard implementation of these policies has also creates an environment of confusion and contradiction that have increased the imminent risk of serious bodily injury or death to Correction Officers. Defendants actions are therefore are tantamount to deliberate indifference to Correction Officer safety.

### Defendants' Abject Failure to Provide Adequate Training Creates/Increases Workplace Dangers

85. Defendants have violated Plaintiffs' constitutional right to be free from state created or enhanced dangers in the workplace by failing to provide proper, timely and adequate training.

86. Correction Officers are trained in various disciplines in the academy at the beginning of their employment. After the initial Academy training, there is very little re-training for Correction Officers while in-service.

87. Upon information and belief, the training provided, whether in the Academy or in-service, is insufficient in scope, methodology, and frequency, thus failing to adequately prepare Correction Officers to the perform their duties, protect inmates, civilian staff, other officers and themselves.

88. Upon information and belief, with respect to the scope of training,  Defendants fail to provide sufficient training in certain areas including, but not limited to, defensive tactics, escorting inmates, crisis intervention, conflict resolution,  and use of OC spray.

89. Further, upon information and belief, Defendants only provide a minimal amount of training in certain areas life Fire Safety, First Aid and, most notably, how to effectively

deal with mentally ill inmates.

90. Upon information and belief, approximately 40% of the inmates housed in the City Jails have some form of mental illness; that is they have psychological and/or psychiatric conditions.

91. Mentally ill inmates pose a unique threat to officer safety. There are a number of challenges to communicating and interacting with and caring for these types of prisoners.

92. Notably, the individuals who are best equipped to deal with mentally ill persons -- the mental health professionals -- study and train for years, obtaining higher education degrees in order to adequately identify and treat mentally ill persons.

93. Correction Officers are not mental health professionals, yet Defendants' policies, practices and/or customs require them to act like they are. DOC Directive 4018R entitled "Referral of Inmates to Mental Health Services" sets forth the procedures that Correction Officers are to follow for the "early identification and assessment of inmates with possible emotional disorders..." See Attached Exhibit O, a true and accurate copy of Directive 4018R. The check-list of issues in Directive 4018R requires Correction Officers to evaluate inmates for a number of mental health issues including identifying whether an inmate is "depressed." Id.

94. The New York City Board of Corrections ("BOC") – the entity charged with performing oversight of Defendant DOC – has established minimum standards that require correction staff to receive the **same training** as "medical services professionals." Indeed Correction Officers are to receive training in: 1) the recognition of signs and symptoms of mental and emotional disorder; 2) the recognition of signs of chemical dependence and the

27

symptoms of narcotic and alcohol withdrawal; 3) the recognition of adverse reactions to psychotropic medication; 4) the recognition of signs of developmental disability, particularly mental retardation; 5) types of potential mental health emergencies, and how to approach inmates to intervene in these crises; 6) identification and referral of medical problems of mental health inmates; 7) suicide prevention; and 8) referral of inmates to mental health services for further evaluation, and the procedures governing such referrals. See Attached Exhibit P, a true and accurate copy of BOC's Mental Health Minimum Standards.

95. Despite the mandates in Directive 4018R and the BOC's Minimum Standards, upon information and belief, Correction Officers are not given the requisite training to properly deal with a mentally challenged inmate populace. This not only increases the dangers faced by Correction Officers in the workplace, but also creates a substantial and imminent risk of serious bodily injury or death.

96. Upon information and belief, with respect to deficiencies in the manner and methodologies of training, the danger is that most of what Correction Officers are taught is theoretical. That is, there are very little hands on training opportunities to implement what is being taught in the classroom. An example of this is the training related to the new Use of Force policy to the extent Correction Officers are not able to have an adequate hands-on experience learning how to properly use force under the new policy. Adding to the deficiency in training is the fact that, as adduced through testimony during a hearing adjudicating Plaintiff COBA's improper practice petition at the OCB, the training related to Uses of Force now prohibits the use of certain types of defensive tactics and holds that have proven to be effective in deescalating and controlling violent

situations.

97. Upon information and belief, with respect to the frequency of training, as indicated above, Defendants fail to provide consistent and prolonged in-service training. Additionally, Defendants fail to provide any available re-training in a timely manner such that several of the training certifications are allowed to expire.

98. One excuse Defendant DOC has given for failure to provide adequate training across the board is because the current training facility is an antiquated academy ill equipped to accommodate the high number of officers requiring training. In fact the Federal Monitor confirmed the Defendant's Training Academy "space and condition to be **severely** lacking" (emphasis supplied) describing it as "limited" and "in poor physical condition." See Attached Exhibit Q, a true and accurate copy of Excerpts from the Federal Monitor's First Report. The Monitoring Team opined they were "concerned that this deficiency may inhibit the Department's ability to reliably and consistently train its Staff." Id. The Report recognizes that adequate training is "fundamental" for correctional staff to "conduct their duties safely and responsibly" otherwise they do not develop into "professionals equipped with the necessary academic and tactical knowledge" to combat dangers in the workplace. Id.

99. Notably, the Monitoring Team identified that the limited conditions of the Training Academy "create a risk of injury" to Correction Officers, "inhibit" their ability to learn necessary skills, and "send[s] a troubling message to Staff about the importance of their training and level of professionalism, and the value of their public service." Id.

100. In contrast to the woeful training facilities for Correction Officers, Defendant City and

de Blasio maintain a state of the art, expansive training facility in Queens for New York City Police Officers.  The approximately 700,000-plus square-foot academy includes a running track, scuba pool, multiple gyms, and mock environments, like a New York City street, deli, and Jail. Under these conditions Police Officers, unlike Correction Officers, are able to effectively and accurately learn the skills, including defensive tactics, that allow them to not only perform their duties, but ensure their safety and that of the public. Defendants have made the deliberate decision to not provide Correction Officers with the same training opportunities as Police Officers despite the fact that Correction Officers are the ones who end up guarding the same violent criminals 24 hours a day, 7 days a week, 365 days a year.

101. Like the insufficiencies in training scope, frequency and methodology, Plaintiff COBA has repeatedly requested the Defendants to correct facility deficiencies in relation to the Training Academy and on Riker's Island in general. On June 15, 2016. Plaintiff COBA's President Elias Husamudeen specifically addressed both training content and the facility deficiencies in a letter addressing another ongoing issue – the astronomical increase of consecutive overtime shifts resulting in a fatigued workforce whose health, lives and safety are being adversely impacted.  See Exhibit R, a true and accurate copy of COBA President Husamudeen's June 2016 Letter.

102. To date, Defendants have failed to locate and secure adequate training facilities, in both quality and size, capable of accommodating the thousands of Correction Officers needing training.

103. Plaintiffs submit the inadequate Training Academy's  deficiencies, Defendants' failure to correct this defect, and Defendants allowing Correction Officers to continue working

in a dangerous workplace, ill-equipped to adequately defend themselves, inmates or others sends another message: Defendants are deliberately indifferent to Correction Officer safety.

104. Defendants' failure to correct the deficiencies in its current training practices thus constitutes a state created danger increasing the substantial and imminent harm of serious physical injury –or death––to a Correction Officer.

### Defendants' Policy Changes with Respect to Inmate Housing at West Facility Creates/Increases Workplace Danger

105. Defendants have implemented certain changes to inmate housing that create and/or increase the danger to Correction Officers.

106. West Facility is one of approximately 10 inmate housing dorms on Riker's Island. Historically, it has been used for housing inmates who have communicable diseases. See Attached Exhibit S, a true an accurate copy of Defendants' Facilities Overview.

107. In or about 2015, Defendants adopted a policy whereby they started housing high security risk inmates at West Facility. Despite this change, Correction Officers staffing West Facility were not provided with additional training or equipment to deal with these more dangerous and highly assaultive inmate. Furthermore, because West Facility was meant to detain inmates with communicable diseases, inmates routinely trash and destroy the cells which do not have concrete walls or cemented fixtures. These rampages are common and cause thousands of dollars of damage. See Attached as Exhibit T, a true and accurate copy of NBC News' Report on Inmate Rampage at West Facility dated 10/05/16.

108. As a result, the violence against Correction Officers in West Facility has increased. Specifically, at least two Correction Officers in West Facility were slashed by highly assaultive inmates.

109. In or about August 7, 2016, Correction Officer Corey Hughes was attacked by inmate Matthew Whittington. Whittington, who was incarcerated on several charges including assault and arson, sucker punched Officer Malik Medina who was attempting to retrieve a breakfast tray from the inmate's cell. Medina was knocked unconscious and Officer Hughes went to assist. See Attached as Exhibit U, a true and accurate copy of NY Daily News' Article Regarding the Hughes' Slashing dated 09/01/16.

110. Whittington whipped out a scalpel and slashed Hughes across his right arm creating a gash so big it required at least 16 stitches. Id.

111. The very night before this incident, Whittington had assaulted another Correction Officer, Brian Nurse, punching him and causing his face to hit the cell door. Id.

112. On December 12, 2016, inmate Bashid McLean attacked Plaintiff Hines at West Facility. See Attached as Exhibit V, WPIX News 11's Article Regarding the Hines Slashing dated 12/15/16.

113. McLean had been convicted of murdering and dismembering his mother. He had also taken a selfie with his dead mother's decapitated head. The week prior to his attack on Hines, McLean had been sentenced to 25 years to life for the murder and 1 and 1/3 - 4 years for the dismemberment; a 100 year criminal order of protection was issued against McLean on behalf of the person on whom McLean tried to pin his crime. Id.

114. On the day of the incident, McLean refused to lock in in his cell despite the fact that Plaintiff Hines ordered him to do so. Instead, McLean used a sharp metal tool and slashed Plaintiff Hines over his right eye.  He then proceeded to beat Hines. Id.

115. As a result of this attack, Hines required several stiches above his eye and had a fractured nose that required surgery. Id.

116. Upon information and belief, this attack could have been easily prevented. Indeed, no less than a week before the attack, Plaintiff Hines had requested additional training to deal with the new breed of violent inmates in West Facility. None was provided. Nor was Hines given training in, or a  can of, pepper spray ("OC Spray"), which would have undoubtedly prevented or minimized the attack. Moreover, there was no reason for McLean, who was sentenced the week prior, to still be present in the City Jails. Defendant DOC's failure to immediately transfer a notorious, murderous felon ---who no doubt would be extremely upset by his life sentence – from the City Jails caused Plaintiff Hines serious injury.

117. Adding to the danger faced by Correction Officers at West Facility is the fact that the Defendants have failed to install a dedicated emergency response team at this facility, despite the fact that it started housing highly assaultive inmates there. Upon information and belief, all other facilities housing highly assaultive inmates have their own dedicated response team which expedites response time in the event of an emergency. The Correction Officers at West Facility, however, must wait for a probe team to arrive from another facility which wastes precious time and increases the likelihood of harm or even death.  Such was almost the case for Correction Officer Hutchinson who was assaulted by

an inmate and it took over 25 minutes for a response team to come from another facility located on Riker's island -- the Otis Bantum Correctional Center ("OBCC").

118. Plaintiff COBA has, on several occasions, requested this dangerous practice be corrected and Defendants have failed to do so, continuing to exhibit deliberate indifference to Correction Officer safety at West Facility.

### Defendants' Policy Changes with Respect to Housing Gang Affiliated Inmates Creates/Increases Workplace Danger

119. Similarly, Defendants' policies related to housing inmates according to certain classifications have increased the danger to Correction Officers.

120. Upon admission, inmates are processed and assessed for particular characteristics including gang affiliation. Those who self-identify or are known to be members of gangs are labeled as being part of a Security Risk Group ("SRG").

121. Upon information and belief, Defendants house inmates according to their SRG, specifically, gang classification. Indeed certain facilities have become known for housing certain gangs and subsects. This grouping of notoriously violent inmates along the lines of gang affiliation increases the danger posed to Correction Officers.

122. The threats these gangs pose to Correction Officers is well documented. In 2014, jail officials at AMKC confiscated a "hit list" created by an inmate affiliated with the Bloods gang. This list identified the "Top 10" Correction Officers and supervisors that were to be attacked "Starting May 1." In a sick and twisted game, the Bloods also offered "50 points" each for attacking any "yard officer" or "security officer." A second "hit-list" was also discovered that identified nurses, doctors and social workers. See Attached as

Exhibit W, New York Post Article Regarding Bloods' Hit List dated 05/02/14.

123. Furthermore, upon information and belief, the number of gang affiliated stabbings and slashings on Rikers has increased markedly. In 2011 there were approximately 32; in 2015 there were approximately 68.

124. Defendants' policy of housing according to gang affiliation increases the violence between inmates and officers. This new housing protocol only facilitates communication and concerted activity among same gang members to devise and launch coordinated attacks against Correction Officers. It emboldens the gang hierarchy and provides them with ample access to create strongholds within each housing unit.

125. Once again, Defendants have placed inmate safety before the safety of Correction Officers.

126. As a result of this gang housing policy, the proverbial statement that the "inmates are running the asylum" has come true. Two examples are illustrative of this.

127. Upon information and belief, in or about December 2016, a member of the Crips gang at OBCC was caught with a weapon. He was removed from his cell and during a special team search, other members of the Crips rose up in defiance of their brother being removed and against the search.   The inmates decided to take stand collectively and started to cover their faces with sheets and shirts; they threw liquid on the floor to ward off any responding officers. The inmates ignored commands given by Correction Officer to stand down. Two Department Chiefs, Martin Murphy and Turhan Gumusdere, who happened to be present at OBCC, also responded.  The Chiefs were only able to get the inmates to stand down on a promise they would not be punished for their actions. Thus,

despite the inmates' refusal to be searched and the stand-off, no one was punished.

128. Recently, on March 16, 2017, West Facility inmates belonging to the Mac Balla Brims - a subset of the Bloods – ganged together in a coordinated show of force against Correction Officers who intervened while they assaulted another inmate. The probe team was called and Correction Officer Richards and Captain Grinnage had to threaten the Mac Balla inmates with OC spray to get them to stop the assault. The inmate being assaulted was extracted. Captain Grinnage then ordered the remaining five to six Mac Balla members to step behind a door; they refused. It was not until inmate and Mac Balla "leader" Larry Calderon gave an order to the inmates to put their hands on the wall that the inmates complied.

129. There is no doubt that the Crips and the Mac Balla inmates in the above examples were emboldened by the fact that they were housed with their fellow gang members. The fact that the Mac Balla inmates only responded to the order from their leader and not the Captain in charge is a harbinger of an inmate uprising the likes of the Delaware uprising.

130. To the extent that Defendants are well aware of the dangers posed by gangs and now have chosen to deliberately house gang members together, contrary to the best practices used in other jails across the County and thus giving them strength in numbers against what is usually one to a few Correction Officers, they evince a deliberate indifference to Correction Officer safety and have increased the substantial and imminent risk of physical harm or death.

## Defendants' Refusal to Provide or Utilize Necessary Safety Equipment Creates/Increases Workplace Danger

131. Defendants have refused to provide Correction Officers with the necessary equipment to protect themselves and others against highly assaultive inmates and violated the Plaintiffs right to be free from state created danger.

132. Upon information and belief, specifically, Defendants have failed to provide Correction Officers with adequate equipment like batons, helmets, gloves, mechanical restraints, spit masks, and arm and shin guards. In fact, Plaintiff Hines was not provided with OC spray, despite the fact that he asked for that and training one week prior to being slashed by notorious murderer McLean. Even when officers are provided with some safety equipment, the equipment is worn, outdated or ill fitting.

133. No greater example of Defendants' failure to properly equip Correction Officers and thus endanger them exists than the story of two notorious inmates with long histories of violent attacks on Correction Officers. Inmate Steven Sidbury's (a.k.a."John Doe") history is discussed supra at ¶¶54 - 63. Like Sidbury, inmate Malik Ellis, who has been in custody since 2012, is a known member of the Bloods gang that has repeatedly assaulted Correction Officers, with or without weapons, and frequently throws dangerous bodily fluids at Correction Officers.

134. Despite the fact that inmates like Sidbury and Ellis have a long and notorious track record of violence, especially against Correction Officers, Defendants have continually failed to utilize all available security tools and technology to ensure Correction Officer safety.

135. Defendants failed to provide line officers, who are charged with the supervision of the Sidburys and Ellises in the City Jails, with equipment like body armor, helmets, chest-protectors, arm and shin guards, mechanical restraints, spit masks and stun shields. This type of equipment, if given at all, is given to members of the emergency probe or extraction teams. Defendants' decision not to provide proper equipment to Correction Officers who have to deal with the likes of violent inmates like Sidbury and Ellis is deliberate indifference.

136. In contrast to the equipment deficiencies plaguing Correction Officers, inmates like Sidbury and Ellis are always well equipped to attack Correction Officers. The influx of contraband into the City Jails, items that are weapons (i.e. knives and razors) or can be shaped into weapons (i.e. toothbrushes), is a system wide epidemic and scourge to the safety of Correction Officers. Additionally, inmates also convert permissible items into weapons (i.e. hot pots containing boiling liquids). Defendants have failed to adequately protect Correction Officers from assaults with these weapons.

137. The safest way to ensure inmates do not possess weapons, at least of the metal variety like the knives or makeshift shivs, is to use body scanners. However, in an act of deliberate indifference to Correction Officer safety, Defendants have refused to use them despite the fact that the City has purchased and currently possesses them.

138. A body scanner could have prevented several attacks against Correction Officers by metal weapon wielding inmates. One such attack took place on July 26, 2016, at OBCC. Inmate Jimmy Lugo reached through a food tray slot and slashed a Correction Officer in his face while talking to him through the cell door. This startling incident was captured on video. The officer required several stitches to his face. See Exhibit X, a true and

accurate copy of the NY Daily News Article Regarding the Lugo Slashing dated 07/27/16.

139. It is anticipated that Defendants will claim they are unable to operate the body scanners because its employees do not have the requisite operation licenses under the law. However, Plaintiff COBA has asked Defendants to, and nothing prevents them, from hiring new personnel licensed to operate the scanners or to train existing employees to do the same.

140. The fact that Defendants refused to simply hire or train personnel to operate the body scanners – a virtually quick and easy solution to the licensing hurdle – demonstrates their deliberate indifference to Correction Officer safety.

141. The failure to properly equip Correction Officers and utilize all available safety equipment creates a substantial and imminent risk that Correction Officers will be subject to serious bodily harm or death.

**Defendants' Misreporting and Underreporting of Violence in the Jails Creates/Increases Workplace Danger**

142. In order to preserve the illusion that their Reform Agenda is effective in reducing violence in the City Jails, Defendants have engaged in a policy, practice and custom of either misreporting or not reporting the many vast and numerous incidents of violence involving Correction Officers.

143. For example, on March 3, 2015, and upon information and belief, a female Correction Officer was assaulted by an inmate who was able to break into the "control bubble" where she was stationed. The inmate, Raleek Young, who was convicted for raping a 13

year old girl, accessed the control room under the false pretense that he needed to pick up a mattress from another unit. Once near the Bubble, he broke in, pulled down his pants and began masturbating while choking the officer, preventing her from opening the security door.  He also forcibly placed his lips on her face and lips. He then dragged the officer into adjacent bathroom intent on continuing his sexual attack. Ultimately, the officer was rescued before she was raped. See Exhibit Y, a true and accurate copy of the NY Daily News Article Regarding Attempted Rape dated 03/03/15.

144. This brutal and heinous incident was caught on video tape and despite the clear sexual nature of the attack, the Defendants initially labeled it as a "Use of Force" instead of a "Sexual Assault." It was only after Plaintiff COBA demanded a correction that the attack was properly designated. Id.

145. In December 2015, Defendant de Blasio stood before a graduating class of nearly 600 Correction Officers and claimed that serious assaults against officers was down 11%, from 77 to 69 attacks from the previous year. See Attached Exhibit Z, a true and accurate copy of the New York Post's Article Regarding "Fudging" of Statistics dated 12/05/15.

146. Upon information and belief, this is untrue. At that time, serious injuries to staffers by inmates were up nearly 30% from 216 to 280 incidents. Id.

147. Adding to the confusion, Defendant City later stated that the drop in incidents was 19%, which even if true, contradicts what Defendant de Blasio originally claimed. Id.

148. Upon information and belief, Defendants purposely apply a classification system to violence incidents in the Jails that, by design, gives an illusion of increased safety in the jail.

149. Two incidents from October 2016 are illustrative of this deception.

150. First, on or about October 4, 2016, a Correction Officer, who intervened in a fight between inmates, was slashed by an inmate affiliated with the Bloods. Defendant DOC listed the incident as "Serious Assault" instead of "Slashing." See Attached Exhibit AA, WPIX News 11's Report on Misclassification dated 10/5/16.

151. Second, on October 14, 2016, Plaintiff Dublin was attacked by inmate Jose Hernandez in the Eric M. Taylor Center ("EMTC"). Officer Dublin and Hernandez had passed each other without incident earlier in the day on his way to recreation. Upon his return from recreation, Hernandez came up to Officer Dublin, and without any provocation attacked her by throwing multiple punches. First he punched her above the left eyebrow, then he punched her above the right eye. The next punch landed on her left cheek, followed by another punch to her right cheek. Then he punched her in her mouth and chin, knocking her out.

152. As a result of this attack Officer Dublin, she sustained two black eyes, a concussion and permanent injuries to her cervical and thoracic spine including several bulging discs and inversion of the cervical spine. According to Officer Dublin's doctors, Hernandez' punches "shook her brain" and they have warned that if she is hit again she will become paralyzed.

153.  Despite the heinous nature of this attack on Officer Dublin, Defendants categorized this assault as a mere "Log Book Entry" instead of "Assault on Staff."

154. A further example of this misreporting is the fact that the Defendants characterize incidences of inmates spitting on Correction Officers as a "Log Book Entry" instead of "Assault on Staff." From a period of 2015 onward, there were at least 374 incidences of

inmates spitting on officers (without a physical altercation). These were designated under the more misleadingly innocuous label of "Log Book Entry" instead of "Assaults on Staff."

155. Under New York Penal Law Section 240.32 it is a Class E felony for an inmate to cause a Correction Officer to come into contact with blood, seminal fluid, urine, feces, or the contents of a toilet bowl. The spitting on Correction Officers by inmates is no less abhorrent than these other forms of "splashings." Often spitting is the first step of aggression employed by an unruly inmate or one who is looking to bait officers into a physical confrontation. Characterizing these incidents as mere "Log Book" entries belies the true level of danger faced by Correction Officers every day.  Said practices can only be described as fraudulent misreporting and underreporting.

156. Despite the obvious violent nature of spitting, Defendants wholly ignore these incidents and have taken no steps to identify and curb the problem. By letter dated February 2, 2016 – Plaintiff COBA requested Defendants to provide statistics on spitting incidents and use of spit masks on inmates who are chronic offenders. The Defendants' response was that they do not even keep this information because it is too "labor intensive."

157. Defendants' purposeful decision to not treat spitting incidents like the true violent acts they are for the sake of administrative convenience, demonstrates deliberate indifference to Correction Officer safety. As does the Defendants' failure to use a relatively easy solution like spit masks on inmates that have a chronic history of spitting.

158. The above examples demonstrate Defendants' deliberate indifference to Correction Officer safety. To the extent that the Defendants' claims of increased safety in the City Jails are based on calculated mischaracterizations of violence incidents, they are

misleading and give a false sense of security to the thousands of Correction Officers in the Jails.

159. Defendants' practices, which are now subject to scrutiny by a Federal Monitor, demonstrate their deliberate indifference to officer safety, which now takes a back seat to their primary goal of getting a better report card the next time the DOJ conducts a review. This is not surprising at it was Defendants' poor track record of record keeping and misreporting of violence in the City Jails that was at issue in the Nunez litigation and drew the attention of the DOJ in the first place.

## CLASS ALLEGATIONS

160. The individual Plaintiffs Dublin, Romano, Hines and Castro, bring this action individually and on behalf of all others similarly situated, pursuant to Rule 23 of the Federal Rules of Civil Procedure.

161. This action is properly maintained as a class action because the requirements of Rules 23(a) and 23(b) of the Federal Rules of Criminal Procedure are met, as explained in further detail below.

162. **Numerosity -** The class for whose benefits this action is brought is so numerous that joinder of all class members is impracticable. The number of Correction Officers, who are, were or will be employed by Defendants who have been, or during the course of this suit will be, harmed pursuant to the Defendants' policies, practices and/or customs complained of within, is difficult to ascertain and, upon information and belief, will number in the thousands.

163. **Commonality -** There are questions of law and fact common to the class that predominates over any questions affecting only the individual members. Questions of fact and law include, but are not limited to:

a. Whether Defendants' policies, practices and/or customs eliminating and/or limiting the use of punitive segregation has created or increased workplace danger.

b. Whether Defendants' policies, practices and/or customs in establishing alternative programs including, but not limited to,  the TRU, Second Chance, Secure Unit, ESH, RHU, CAPS, and PACE have created or increased workplace danger.

c. Whether Defendants' policies, practices and/or customs in relation to their limitation or elimination of punitive segregation use against the Adult Inmate population has created or increased workplace danger.

d. Whether Defendants' policies, practices and/or customs with respect to their failure to use all available punitive measures against violent inmates including Pre-Hearing Detention has created or increased workplace danger.

e. Whether Defendants' policies, practices and/or customs related to the change in West Facility created or increased workplace danger.

f. Whether Defendants' policies, practices and/or customs related to entering and implementing the Nunez Consent Judgment including the changes made to the Use of Force policy created or increase workplace danger.

g. Whether Defendants' policies, practices and/or customs related to the change in housing inmates by gang affiliation created or increased workplace danger.

h. Whether Defendants' policies, practices and/or customs related to their failure to properly equip Correction Officers and use all available safety including body scanners creates or increased workplace danger.

i. Whether Defendants' policies, practices and/or customs have collectively created or increased workplace danger.

j. Whether the Individual Plaintiffs and class members are at imminent risk of irreparable harm (i.e. serious bodily injury or death) if Defendants are allowed to continue the afore described policies, practices, and/or customs

k. Whether the Individual Plaintiffs and class members are entitled to a declaration that Defendants have, through their continuous and ongoing actions, invaded their constitutional right to be safe from state created danger.

l. Whether the Individual Plaintiffs and class members are entitled to a declaration that Defendants have, through their continuous and ongoing actions, invaded their constitutional right to be safe from governmental policies that increase the risk of harm including possible death.

m. Whether the Individual Plaintiffs and class members are entitled to injunctive relief restraining Defendants from continuing the afore described policies, practices, and/or customs.

n. Whether the Individual Plaintiffs and class members are entitled to compensatory damages.

o. Whether the Individual Plaintiffs and class members are entitled to attorneys fees under Section 1983.

164. **Typicality** - The claims of the Individual Plaintiffs are typical of the claims of the class. All members of the class sustained, or are in substantial and imminent risk of sustaining, injuries and damages arising out of and caused by common course of conduct arising from Defendants' ongoing and continuous policies, practices, and/or customs that have either created or enhanced danger in the workplace.

165. **Adequacy** –The Individual Plaintiffs will fairly and adequately protect the interests of the class. The Individual Plaintiffs are committed to the prosecution of this action and, to that end, the Individual Plaintiffs are represented by a law firm competent and experienced in representing the interests of Correction Officers for over twenty years.

166. Additionally, class certification is proper because the criteria set forth under Rule 23(b) is met in whole or, at minimum, in part.

167. This action is properly maintained as a class action under Rule 23(b)(1) of the Federal Rules of Civil Procedures because prosecuting separate actions by or against individual class members would create a risk of (1) inconsistent or varying adjudications that would establish incompatible standards of conduct for the party opposing the class; and (2) adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests.

168. This action is also properly maintained as a class action under Rule 23(b)(2) of the Federal Rules of Civil Procedure because Defendants have acted or refused to act on grounds generally applicable to the class, thereby making appropriate injunctive relief or corresponding declaratory relief with respect to the Individual Plaintiffs and the class as a

whole. The class members are entitled to injunctive relief to end Defendants' policies, practices, and/or customs.

169. This action is also properly maintained as a class action under Rule 23(b)(3) of the Federal Rules of Civil Procedure because questions of law or fact common to class members overwhelmingly predominate over any questions affecting only individual members. A class action is superior to other available methods for fairly and efficiently adjudicating the issues raised herein.

170. Specifically, the individual claims of the class members may be relatively modest compared with the expense of litigating the claim, thereby making it impracticable, unduly burdensome, and expensive—if not totally impossible—to justify individual actions.

171. Class action treatment will allow a large number of similarly situated persons to prosecute their common claims in a single forum, simultaneously, efficiently, and economically without the unnecessary duplication of effort and expense if these claims were brought individually.

172. Individual joinder of the parties is impracticable and  class members' interests in individually controlling the prosecution of separate actions is outweighed by their interest in efficient resolution by single class action

173. There are no unusual difficulties that are likely to be encountered in this class action's management because all the legal and factual questions are common to the class members.

174. Finally, if class treatment of these claims is not available, Defendants will not be deterred. Defendants will continue their wrongful conduct, and will continue to harm Correction Officers by forcing them to work in an environment where the public employer has created and/or enhanced the risk of serious bodily harm or death to Correction Officers.

### AS AND FOR A FIRST CLAIM FOR RELIEF
#### (Against the City and DOC)

175. Plaintiffs repeat and re-alleges as if stated in full herein the allegations contained in paragraphs "1" through "174" above.

176. The Fourteenth Amendment guarantees a substantive due process right to be from state created dangers.

177. This constitutionally guaranteed right includes the consequential right to be free from governmental policies that create or increase the risk of serious bodily harm or death from third parties.

178. At all times relevant herein, Defendants adopted, promulgated, implemented and/or sanctioned various policies, practices, and/or customs, as described above, that created or increased dangers faced by Correction Officers in the workplace.

179. Said policies, practices, and/or customs exhibit a deliberate indifference to COBA members' and the individual Plaintiffs' safety and constitutional right to be from dangers in the workplace that are created or increased by the public employer in violation of the due process clause of the Fourteenth Amendment to the United States Constitution for which the City and DOC are liable under Section 1983.

180. As a direct and proximate result of this conduct, Plaintiffs have suffered a constitutional deprivation, resulting in serious and permanent injuries, damages and losses as specified herein.

## AS AND FOR A SECOND CLAIM FOR RELIEF
### (Against Defendant Bill de Blasio)

181. Plaintiffs repeat and re-alleges as if stated in full herein the allegations contained in paragraphs "1" through "180" above.

182. At all times relevant herein, Mayor de Blasio is the Chief Executive Officer of Defendant City. Accordingly, he is a final policy maker imbued with the authority to promulgate rules, regulations, or directives relative to the administration and management of Defendant City including its agencies like Defendant DOC.

183. Defendant de Blasio knew or should have known that adopting, promulgating, implementing and/or sanctioning the various policies, practices, and/or customs, as described above, created a substantial and unreasonable risk of injury to Plaintiffs, including that of death.

184. Defendant de Blasio demonstrated a deliberate indifference to Plaintiffs' right to be free from state created dangers in violation of the due process clause of the Fourteenth Amendment to the United States Constitution for which Defendant de Blasio is liable under Section 1983.

185. As a direct and proximate result of this conduct, Plaintiffs have suffered a constitutional deprivation, resulting in serious and permanent injuries, damages and losses as specified herein.

## AS AND FOR A THIRD CLAIM FOR RELIEF
### (Against Defendant Joseph Ponte)

186. Plaintiffs repeat and re-alleges as if stated in full herein the allegations contained in paragraphs "1" through "185" above.

187. At all times relevant herein, Commissioner Ponte is the Chief Executive Officer of the DOC. Accordingly, he is final policy maker imbued with the authority to promulgate rules, regulation, or directives relative to the administration and management of Defendant DOC.

188. Defendant Ponte knew or should have known that adopting, promulgating, implementing and/or sanctioning the various policies, practices, and/or customs, as described above, created a substantial and unreasonable risk of injury to Plaintiffs, including that of death.

189. Defendant Ponte demonstrated a deliberate indifference to Plaintiffs' right to be free from state created dangers in violation of the due process clause of the Fourteenth Amendment to the United States Constitution for which Defendant Ponte is liable under Section 1983.

190. As a direct and proximate result of this conduct, Plaintiffs have suffered a constitutional deprivation, resulting in serious and permanent injuries, damages and losses as specified herein.

### IRREPARABLE HARM

191. If Defendants' ongoing and continuous policies, practices, and/or customs which have collectively created or increased dangers continue, Plaintiff COBA's members and class members will be subjected to real, immediate and irreparable injury for which no

adequate remedy at law exists in that members of the plaintiff class will suffer continued violations of their rights under the Fourteenth Amendment to the United States Constitution.

192. Plaintiffs hereby demand a jury trial.

**WHEREFORE**, Plaintiff COBA, on behalf of its members, and Plaintiff Hines, individually and on behalf of class members, respectfully pray that this Court:

    a.  Certify this action as a class action on behalf of the proposed class pursuant to Rules 23(a) and 23(b) of the Federal Rules of Civil Procedure, consisting of a class of all persons who are subject to Defendants' constitutionally impermissible policies, practices, and/or customs described herein;

    b.  Declare that the Defendants' policies, practices, and/or customs described herein have deprived the Individual Plaintiff and class members of their rights under the Fourteenth Amendment to the United States Constitution;

    c.  Award compensatory damages as is deemed appropriate;

    d.  Order all appropriate injunctive relief as warranted, including but not limited to, ordering Defendants to immediately cease violations of all Plaintiffs' rights and the monitoring of Defendants' conduct going forward;

    e.  Award reasonable attorneys fees and costs to be paid by Defendants pursuant to 42 U.S.C. § 1983; and

    f.  Grant such other and further relief as the Court deems just and equitable.

Dated: April 21, 2017
      New York, New York

 

                                      KOEHLER & ISAACS LLP
                                       *Counsel for Plaintiffs*

                                      By: _____
                                        Cynthia Devasia, Esq. (CD0320)
                                        61 Broadway - 25th Floor
                                        New York, New York 10006
                                        Office: (917) 551-1325