# Third Report of the *Nunez* Independent Monitor

**Third Monitoring Period**
**August 1, 2016 through December 31, 2016**

Team expects that these things will reduce Inmate misconduct and the consequent use of force. While many of these tools are available for the 16- to 17-year-old Inmate population as well, the development of some of them lags behind (*e.g.*, the group incentive program has not yet been implemented at RNDC; Direct Supervision training has not yet begun), also discussed in subsequent sections of this report. Furthermore, a review of quarterly use of force data with Inmates involved in five or more uses of force in each quarter confirmed that incidents involving a UOF are concentrated among a relatively small number of Inmates. In 2016, just 97 inmates accounted for 846 uses of force, which is 18% of the total 4,652 uses of force. These data suggest that Department's UOF reduction efforts should include strategies to address chronic behavior problems among Inmates who are involved in disproportionate numbers of uses of force.

The Department's UOF reduction efforts will also benefit from examining Staff characteristics to identify subgroups of Staff who should be prioritized for training or for more intensive skill-building efforts. Characteristics could include probationary status, tenure, shift, and overtime, among others. If Staff in these groups are involved in disproportionate numbers of uses of force, specific training or coaching to address key gaps in knowledge or to enhance techniques could be deployed. This is the same strategy used in the Department's efforts to develop an Early Warning System, with the fruits of that analysis used in a proactive, rather than reactive, fashion.

*Reasons for the Use of Force*

Understanding the reason that Staff use physical force with an Inmate is a key facet of the effort to identify strategies to reduce the use of excessive and unnecessary force. As an initial matter, physical force by Staff in a correctional setting is at times necessary to maintain order,

year-old Inmates, but may also be due to differences in the way the referral process operates at the two Facilities. For example, it is possible that RNDC casts a wider net when referring Inmates to the programs, admitting Inmates who would not be considered for the programs at GMDC. Furthermore, a significantly larger proportion of Inmates at RNDC had multiple exposures to the programs than at GMDC (36% versus 17%, respectively). The reasons for these multiple admissions should be examined more closely by the Department as they suggest that the Inmate's violent behavior persisted, even after exposure to the SCHU and TRU programs' services.

The Monitoring Team conducted several analyses to assess whether Inmates with violent infractions were being properly referred to the alternative programs. First, a list of Inmates with three or more violent infractions between March 1 and August 31, 2016 and a list of Inmates who had been admitted to SCHU and TRU during the same time period were compared. Given the more recent tenure of the Secure and YA-ESH programs, a similar analysis on the target population was not conducted. The TRU/SCHU comparison revealed that, for the most part, Inmates who engaged in repeated violent misconduct were being identified and placed in the programs, in accordance with stated eligibility criteria. Of the 29 Inmates aged 16, 17 and 18 with three+ violent infractions, 24 (83%) had been admitted to either SCHU or TRU.

The Department also provided the Monitoring Team with a list of Inmates with repeated uses of force for a similar time period (five+ uses of force between March 1 and September 30, 2016). Among the 92 adolescents and young adults on this list, only 49 (53%) had been in either SCHU or TRU. While they may have been exposed to some other sort of intervention (*e.g.*, mental health services), it was surprising to the Monitoring Team that so many of the "high-fliers" had not been exposed to either of the two programs. Given what is known about the reasons for the use of force discussed in the introduction to this report, it is very possible that Inmates were involved in a use of force for a behavior that would not make them eligible for either SCHU or TRU (*e.g.*, disobeying a direct order). Notably, five of the 43 Inmates who had not been exposed to the program accounted for 73 uses of force over a six-month period.

In summary, the SCHU and TRU programs appear to be admitting most of the Inmates who are exhibiting frequent violent misconduct. However, the Department is encouraged to examine the group of Inmates with repeated violent misconduct and/or frequent uses of force to identify why they were not referred to the alternative programs and/or whether they were exposed to other interventions designed to address this behavior (*e.g.*, mental health treatment; other interventions provided by Program Counselors; Punitive Segregation, while it was operational).

- ***Program Fidelity***

Programs designed to modify Inmates' behavior must be guided by a plan for the delivery of services. Most often, the guide takes the form of an individualized plan that identifies problem behaviors, specifies goals, and prescribes services to assist the Inmate in meeting those goals. In the

- Creating a service plan for youth that describes the services the youth will receive while solo housed and the specific steps to be taken to return to a unit where the Inmate can interact with peers;
- Articulating how the release/transfer decision from the unit is made.

To the extent that the Department wants to continue to use Solo Housing, the Monitoring Team will continue to work with the Department to refine the policy. Furthermore, the number of Inmates placed in solo housing, the reasons for it, and the duration will continue to be tracked.

- *Mid-level Infractions*

As discussed in both the First and Second Monitor's Reports, the Department's continuum of responses to infractions requires expansion to address mid-level misconduct, such as threatening Staff, episodic aggression or horseplay where no one is seriously injured, property destruction or theft, or continuous disruption to Facility operations such that services to other Inmates are compromised. Data from the Inmate Fight Tracker suggests that episodic aggression is a frequent occurrence—that many Inmates engage in a single fight and thus may not warrant the intervention of SCHU or TRU, but still require some form of accountability. Currently, the only options to address these behaviors are a reprimand and/or surcharge of $25 from the Adjudication Captain, and these are only imposed *if* the Staff write an infraction and it navigates the adjudication process. Otherwise, it appears that many Inmates do not face meaningful accountability measures for their mid-level misconduct, which contributes to the overall lack of safety at the Facilities. The Monitoring Team emphasizes this recommendation yet again, both to ensure proper accountability and order in the Facility, and as part of an overall strategy to address Inmate misconduct before it escalates to a level that would lead to placement in one of the alternative disciplinary programs. The Monitoring Team's experience suggests that responses that involve both a skill-building element and a restorative element are most effective in catalyzing behavior change and sending a message to both Staff and Inmates that misconduct is not tolerated. The Monitoring Team supports the Department's concept of *Repairs* and has also discussed a variety of other ideas in-person and in writing. The Monitoring Team encourages the Department to accelerate progress in this area.

The Department has made clear progress in expanding the range of disciplinary options to replace Punitive Segregation. Quality implementation of programs to change Inmates' behavior is a complex, incremental process. Now that the Department has implemented the core strategies, it will need to finalize policies, improve the goal-focus of the various programs, monitor implementation and program fidelity, and assess effectiveness. Furthermore, the Department needs to continue to address the practice of solo housing and to develop a range of mid-range accountability measures for behaviors that do not warrant placement in one of the alternative programs.

| COMPLIANCE RATING | ¶ 4. Partial Compliance |
| --- | --- |
|  | ¶ 6. Partial Compliance |