# First Report of the *Nunez* Independent Monitor

**First Monitoring Period**
**October 22, 2015 through February 29, 2016**

Monitoring Team determined that the Department is in Substantial Compliance with a provision, it should be presumed that the Department must maintain its current practices to maintain Substantial Compliance going forward. The language of the Consent Judgment provisions are embedded in the assessment of compliance for ease of reference.

*Monitor Recommendation Regarding Training Academy*

In this First Monitoring Period, the Monitoring Team identified a fundamental challenge to the Department's efforts to advance reforms that the Monitor believes merits the Court's and City's attention. The Monitoring Team found the Department's Training Academy space and condition to be severely lacking, and are concerned that this deficiency may inhibit the Department's ability to reliably and consistently train its Staff. The Department has developed creative interim strategies to increase available space so that the training programs required under *Nunez* can be provided;[8] however, a long-term sustainable solution is needed.

While the issue in question is not specifically addressed in the Consent Judgment, given that adequate training is fundamental to transforming Staffs' and supervisors' practices regarding the use of force and enhancing Staffs' ability to conduct their duties safely and responsibly, the Monitoring Team outlines the concerns regarding this matter in the Training section of this report.

## Section-by-Section Analysis of Compliance

1. USE OF FORCE POLICY (CONSENT JUDGMENT § IV)

The Use of Force Policy is one of the most important policies in a correctional setting and is critical to the reduction of violence in confinement settings. A corrections system must have a clear and

---

[8] Current Staff will receive the In-Service classroom based training required under *Nunez* in trailers based on Rikers Island. Physical skills training will be provided in designated sprung structures on Rikers Island that are retrofitted with mats and padding.

appropriate expectations for adolescents and young adult inmates, "catching inmates doing right," and consciously avoiding power struggles by applying a lower-level of intervention when managing conflict). In the Monitoring Team's estimation, the curriculum development is nearly complete.

| COMPLIANCE RATING | ¶ 4. Partial Compliance<br>¶ 4(a). Partial Compliance<br>¶ 4(b). Requirement has not come due |
|---|---|

### Monitor Recommendation Regarding the Training Academy

As explained in the Introduction to the Monitor's Report, the Monitoring Team is concerned about the lack of space and poor condition of the Department's Training Academy. Quality training is fundamental to transforming and enhancing practices by Staff and supervisors regarding the use of force. Without it, they do not develop into professionals equipped with the necessary academic and tactical knowledge to conduct their duties safely and responsibly. Accordingly, the physical space where training is held is critical to the Department's overall goal of preparing Staff to meet the demands of their jobs. The Monitoring Team visited the Department's Training Academy located in Middle Village, Queens on at least six different days during the First Monitoring Period to observe trainings and meet with Staff in the Training Academy. The Monitoring Team was surprised by the limited amount of space and the poor physical condition of the building allocated to the Department for use as a Training Academy. The Monitoring Team is familiar with training facilities used by correctional systems around the nation and found this space and location to be severely lacking in comparison with facilities maintained by peer institutions and systems.

The Training Academy space is currently dedicated solely to the instruction of new recruits given the Department's unprecedented class sizes of approximately 600 officers. As such, the Training Academy cannot accommodate any In-Service or Refresher training. The Training Academy provides instruction during two consecutive tours (approximately 16-hours-per-day). Given the space limitations,

the Department also provides limited instruction on a third tour. This means the Academy is often in full use 24-hours-per-day.

The Training Academy occupies two floors in an office building below a roof-top parking garage, with 12 windowless classrooms that are each designed to accommodate approximately 20 students, connected by narrow hallways. The Defensive Tactics Training for recruits is taught in a basement gym. The mat space is so small that students have to be extremely cautious to remain on the mats when performing drills. These conditions create a risk of injury to the students. Limited space for the physical components of the class also restricts the opportunities for students to practice the skills being taught.

The Training Academy also has limited support facilities. For instance, the main floor has one bathroom for each gender, designed to accommodate one or two people at a time. A large break-out room once served as a cafeteria; food is no longer served, and the areas has only vending machines, tables, and chairs. This space is crowded, making it difficult to move between the tables. The food preparation area has a single household-style electric stove and is inadequate to address the food preparation needs of students.

As part of the Monitoring Team's assessment of the Training Academy, the Monitoring Team visited the NYPD's new training academy in College Point, Queens. The NYPD Academy, by contrast, is impressive. It is a state-of-the art space that provides for both classroom and tactical instruction in a modern, spacious facility with the newest in technology to aid in educational practices, emphasizing the importance and critical linkage of training and good law enforcement. In comparison, the conditions and lack of space at the DOC Training Academy send a troubling message to Staff about the importance of their training and level of professionalism, and the value of their public service. The conditions at the

Training Academy inhibit students' ability to practice and learn techniques freely and to experience the instruction with the full impact of the lesson plan.

The DOC and its Staff need and deserve appropriate space for the delivery of training. The City reported to the Monitoring Team that it made initial efforts to identify appropriate space and funds to establish a new Training Academy. As this process will take tremendous effort and time, the Monitoring Team recommends that the City increase its attention to this issue to ensure that the Department has all the necessary resources to sustain this unprecedented reform effort.

4. ANONYMOUS REPORTING SYSTEM (CONSENT JUDGMENT § VI)

This Section of the Consent Judgment requires the Department, in consultation with the Monitor, to establish a centralized system for Staff to anonymously report use of force policy violations. The Monitoring Team did not evaluate the Department's efforts to achieve compliance with this section during the First Monitoring Period.

5. VIDEO SURVEILLANCE (CONSENT JUDGMENT § IX)

The provisions in the Video Surveillance section of the Consent Judgment require video surveillance throughout the DOC facilities in order to more reliably detect and reduce levels of violence. The obligations related to video surveillance apply to three different types of video surveillance mediums, each having their own corresponding requirements under the Consent Judgment: stationary, wall-mounted surveillance cameras, handheld cameras, and body-worn cameras. The Video Surveillance section of the Consent Judgment requires the Department to install sufficient stationary cameras throughout the jails to ensure complete camera coverage of each facility (¶ 1); develop policies and procedures related to the maintenance of those stationary cameras (¶ 3); develop and analyze a pilot project to introduce body-worn cameras in the jails (¶ 2(a-c)); develop, adopt, and implement policies and procedures regarding the use of handheld video cameras (¶ 2(d-f)); and preserve video from all sources for at least 90 days (¶ 4).