UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------------------X
CORRECTION OFFICERS' BENEVOLENT ASSOCIATION,
INC., TIFFANI DUBLIN, individually and on behalf of all
others similarly situated, ANTHONY ROMANO, individually
and on behalf of all others similarly situated, MATHEW HINES,
individually and on behalf of all others similarly situated, and
FRANCIS CASTRO, individually and on behalf of all others                    17 Civ. 2899 (LTS)(JCF)
similarly situated, JOHN and JANE DOES 1 – 2,000

                        Plaintiffs,


                        -against-

THE CITY OF NEW YORK, MAYOR BILL DE BLASIO,
NEW YORK CITY DEPARTMENT OF CORRECTION, and
COMMISSIONER JOSEPH PONTE

                        Defendants.
-------------------------------------------------------------------------------X


## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS


**KOEHLER & ISAACS LLP**
Attorneys for Plaintiffs
61 Broadway, 25th Floor
New York, N.Y. 10006
(917) 551-1300

Attorney of Record: Cynthia Devasia, Esq. (CD0320)

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................. 4

INTRODUCTION ............................................................................................... 1

STATEMENT OF FACTS ................................................................................... 3

The Individual Plaintiffs ..................................................................................... 3

The Nine Policies That Create/Increase Workplace Danger ................................ 5

STANDARD OF REVIEW ................................................................................ 12

ARGUMENT ................................................................................................... 13

POINT I ......................................................................................................... 13
    THIS COURT SHOULD DENY THE MOTION TO DISMISS BECAUSE THE
    COMPLAINT DEMONSTRATES THAT DEFENDANTS UNCONSTITUTIONALLY
    EXPOSED PLAINTIFFS TO STATE CREATED/INCREASED DANGER ........................ 13

    A. State Created/Increased Danger in the Workplace is a Well Established Basis for ........ 14
    Substantive Due Process Violations. ................................................................. 14
        1. The Complaint Plausibly Establishes That Defendants Created/Increased Danger. .... 18
        2. The Complaint's Allegations of Fact Cannot Be Determined on a Motion to Dismiss 19

    B. On the Continuum of Culpable Conduct, Defendants' Intentional, Deliberate .............. 20
    Indifference Constitutes a Violation of Substantive Due Process. ....................... 20
        1. The Shocks the Conscience Test ..................................................................... 20
        2. Deliberate Indifference Is the Standard For Establishing § 1983 Municipal Liability. 24
        3. Even If the "Shocks the Conscience" Standard Applies, Culpable Conduct Is Not ..... 25
        Limited To An "Intent to Harm". .................................................................... 25
        4. The Complaint Alleges Deliberately Indifferent Conduct that is Conscience Shocking.
        ...................................................................................................................... 27

    C. The Remaining Arguments Are Without Merit or Irrelevant and Should Be Rejected ... 30
        1. Defendants' Arguments Based on Its Role as Policymaker Are Specious at Best ....... 30
        2. Defendants' Role as an Employer Does Not Immunize It From the Reach of the ....... 31
        Constitution or the Federal Courts. ................................................................... 31
        3. Defendants' Policies Are the Direct and Proximate Cause of the Injuries Alleged. .... 34
        4. Other Lawsuits Are Irrelevant To Determining the Merits of This Motion to Dismiss.
        ...................................................................................................................... 34

**POINT II**.................................................................................................... **34**

**PLAINTIFFS, ALTERNATIVELY, REQUEST THIS COURT'S PERMISSION TO AMEND THE COMPLAINT IN THE EVENT THE COURT FINDS IT INSUFFICIENT.** .................................................................................................... **35**

**CONCLUSION** ...................................................................................... **35**

## TABLE OF AUTHORITIES

**CASES**

Archie v. City of Racine, 847 F.2d 1211 (7th Cir. 1988) .............................................. 27

Armijo By & Through Chavez v. Wagon Mound Pub. Sch., 159 F.3d 1253 (10th Cir. 1998).... 16

Ashcroft v. Iqbal, 556 U.S. 662 (2009)..................................................................... 12

Bd. of Cty. Comm'rs of Bryan Cty., Okl. v. Brown, 520 U.S. 397 (1997).................................. 24

Bell Atl. Corp. v. Twombly, 550 U.S. 544 (2007) ......................................................... 12

Briscoe v. Potter, 355 F.Supp. 2d 30 (D.D.C. 2004)............................................. 14, 19, 28

Brown v. Commonwealth of Pennsylvania, et. al., 318 F.3d 473 (3d Cir. 2003)................... 16, 22

Chavez v. Martinez, 538 U.S. 760 (2003) ................................................................. 23

City of Canton v. Harris, 489 U.S. 378 (1989) ........................................................... 24

Cleveland v. Caplaw Enters, 448 F.3d 518, 521 (2d Cir. 2006)........................................... 12

Collins v. City of Harker Heights, 503 U.S. 115 (1992) ......................................... 15, 17, 32

Conley v. Gibson, 355 U.S. 41 (1957)....................................................................... 12

County of Sacramento v. Lewis, 523 U.S. 833 (1998)............................................... passim

Daniels v. Williams, 474 U.S. 327 (1986)............................................................. 14, 20

DeShaney v. Winnebago Cty. Dep't of Soc. Servs., 489 U.S. 189 (1989) ..................... 14, 15, 16

DiStiso v. Cook, 691 F.3d 226 (2d Cir. 2012)............................................................. 24

Doe v. Dep't of Soc. Srvs., 649 F.2d 134 (2d Cir.1981)............................................ 23, 24

Doe v. Vill. of Arlington Heights, 782 F.3d 911 (7th Cir. 2015) ......................................... 16

Dwares v. City of New York, 985 F.2d 94 (2d Cir.1993). ..................................... 13, 14, 16, 23

Estate of Phillips v. District of Columbia, 455 F. 3d 397 (D.C. Cir. 2006)................................. 14

Estelle v. Gamble, 429 U.S. 97 (1976) ................................................................... 24

Fagan v. City of Vineland, 22 F.3d 1296 (3d Cir. 1994)................................................... 22

Farmer v. Brennan, 511 U.S. 825 (1994)................................................................... 24

Foman v. Davis, 371 U.S. 178 (1962)....................................................................... 35

Gantt v. Ferrara, No. 15-CV-7661 (KMK), 2017 WL 1192889 (S.D.N.Y. Mar. 29, 2017)......... 31

Geiler v. Petrocelli, 616 F.2d 636 (2d Cir. 1980). ....................................................... 13

Gormley v. Wood-El, 93 A.3d 344 (NJ Sup. Ct. 2014)..................................................... 18

Hawkins v. Freeman, 195 F.3d 732 (4th Cir. 1999) ....................................................... 22

Helseth v. Burch, 258 F.3d 867 (8th Cir. 2001) ........................................................... 22

Hunt v. Sycamore Cmty. Sch. Dist. Bd. of Educ., 542 F.3d 529 (6th Cir. 2008)......................... 18

Jin v. Metro. Life Ins. Co., 310 F.3d 84 (2d Cir. 2002).................................................... 35

Johnson v. City of Seattle, 474 F.3d 634 (9th Cir. 2007) ................................................. 16

Jones v. Town of E. Haven, 691 F.3d 72 (2d Cir. 2012)................................................... 24

Kaucher v. County of Bucks, 455 F.3d 418 (3d Cir. 2006)........................................... 15, 18

Khan v. Gallitano, 180 F.3d 829 (7th Cir. 1999) ......................................................... 23

Kia P. v. McIntyre, 235 F.3d 749 (2d Cir.2000).......................................................... 23

Koulta v. Merciez, 477 F.3d 442 (6th Cir. 2007) ......................................................... 16

Kowaleski v. Lewis, 643 F. Supp. 2d 259 (N.D.N.Y. 2009)......................................... 15, 28

L.W. v. Grubbs (Grubbs I), 974 F.2d 119 (9th Cir. 1992)................................................. 15

Lesperance v. Cty. of St. Lawrence, No. 7:10-CV-01273, 2011 WL 3651161 (N.D.N.Y. Aug. 18, 2011) ................................................................................................................................ 28

Lombardi v. Whitman, 485 F.3d 73 (2d Cir. 2007) ...................................... 16, 28, 30, 34

Matican v. City of New York, 524 F.3d 151 (2d Cir. 2008) .................................. 16

McClary v. O'Hare, 786 F.2d 83 (1986) ................................................................ 32

Nunez, et. al. v. City of New York, et. al., 11 Civ. 5845 (S.D.N.Y.)................1, 2, 8, 29, 33

Okin v. Village of Cornwall–on–Hudson Police Dep't., 577 F.3d 415 (2d Cir. 2009)16, 18, 23, 27

Pauluk v. Savage, 836 F.3d 1117 (9th Cir. 2016)................................................. 14, 17

Pembaur v. City of Cincinnati, 475 U.S. 469 (1986)................................................ 24

Pena v. DePrisco, 432 F.3d 98 (2d Cir. 2005) ................................................. passim

Ramos–Pinero v. Puerto Rico, 453 F.3d 48 (1st Cir. 2006) ....................................... 18

Rivera v. Rhode Island, 402 F.3d 27 (1st Cir. 2005) ............................................. 26

Rochin v. California, 342 U.S. 165 (1952)........................................................... 20

S.S. v. McMullen, 225 F.3d 960 (8th Cir. 2000) .................................................. 16

Stevenson ex rel. Stevenson v. Martin Cty. Bd. of Educ., 3 F. App'x 25 (4th Cir. 2001)............ 16

Uhlrig v. Harder, 64 F.3d 567, 574 (10th Cir. 1995)............................................... 22

United States v. Stein, 495 F. Supp. 2d 390 (S.D.N.Y. 2007)....................................... 23

Woodward v. City of Worland, 977 F.2d 1392 (10th Cir.1992) .................................... 27

## OTHER AUTHORITIES

2A Moore's Federal Practice ¶ 12.14 (2d ed. 1989)................................................ 35

## RULES

Fed. R. Civ. P. 12(b)(6)............................................................................ 12

Fed. R. Civ. P. 15(a) .............................................................................. 35

Fed. R. Civ. P. 8(a)(2)............................................................................. 12,35

## CONSTITUTIONAL PROVISIONS

U.S. Const. amend. XIV ......................................................................... passim

## INTRODUCTION

Every day thousands of New York City Correction Officers go to work tasked with the toughest job in civil service: the care, custody and control of inmates housed within the New York City Jails. They perform their duties diligently to ensure the safety and security of the inmates, the jail staff and facilities, and the public at large. Working in one of the toughest environments, Correction Officers expect to face danger in the workplace — to some degree — from the inmates within their care. What they face in reality though is the unexpected: dangers in the workplace that have been created or increased by their employer. Indeed, under the guise of a "Reform Agenda", the City of New York ("City"), Department of Correction ("DOC"), Mayor Bill de Blasio ("de Blasio") and Commissioner Joseph Ponte ("Ponte")(collectively "Defendants") have implemented nine policies, practices and/or customs ("Nine Policies")[1] that have, in their totality, created/increased danger faced by Correction Officers in the workplace and their vulnerability to attack by inmates. This is not the job Correction Officers signed up for; nor is this the kind of workplace that passes Constitutional muster.

Plaintiffs, the Correction Officers Benevolent Association ("COBA"), Tiffani Dublin ("Dublin"), Anthony Romano ("Romano"), Matthew Hines ("Hines"), Francis Castro ("Castro"), individually and on behalf of a similarly situated class of Correction Officers, as well as unnamed John and Jane Does 1 - 2000 who were, are, or will be Correction Officers injured by the Defendants' actions (collectively "Plaintiffs") bring this action pursuant to 42 U.S.C. § 1983 alleging that Defendants violated Correction Officers' right to be free from state created or increased dangers[2] as guaranteed under the Fourteenth Amendment of the U.S. Constitution.

---

[1] The term "Policies" as used throughout this Memorandum includes the terms "customs" and/or "practices."
[2] Reference to "state created danger" also includes reference to "state increased danger" herein.

That is, the right to be free from governmental policies that create or increase a substantial and imminent risk of serious bodily harm or death from third parties, like inmates.

This Memorandum of Law is submitted in Opposition to Defendants' Motion to Dismiss which misleadingly describes the instant action as a collateral attack on this Court's Consent Judgment in <u>Nunez, et. al. v. City of New York, et. al.</u>, 11 Civ. 5845 (S.D.N.Y.). Trivializing this matter as such is simply a convenient red herring that should be ignored. At best, only one of the Nine Policies overlaps between this action and <u>Nunez</u>, with some challenged policies arising even before the Consent Judgment. Moreover, contrary to Defendants' assertions, Plaintiffs are neither anti-reform nor argue that reform should prioritize only officer safety.  Rather, Plaintiffs endorse meaningful reform that protects ***all constituencies*** within the City Jails. However, the Nine Policies, arising under an ostensible "Reform Agenda" have done the opposite. Valuing only the safety and lives of inmates, the Nine Policies have empowered the most violent inmates and reduced their accountability.  As a result, by Defendants' own admission, violence in the City Jails has increased 18% and the Federal Monitor appointed pursuant per the <u>Nunez</u> Consent Judgment also confirms that staff injuries are on the rise.  Indeed, the proverbial saying "the inmates are running the asylum" is becoming a reality; it is only a matter of time before an inmate uprising similar to the recent 18 hour siege at Delaware's Vaughn Correction Center that resulted in the death of a Correction Officer occurs in the City Jails.

The issue in this case is simple: Did the Defendants' implementation of the Nine Policies, in the totality, create or increase danger in the workplace faced by Correction Officers? Defendants argue the Complaint should be dismissed primarily on the grounds that there is no constitutional basis to redress workplace danger, that the only requisite state of mind for a substantive due process violation is an "intent to harm" that "shocks the conscience" and not that of "deliberate

indifference," and that the Defendants' role as a government employer insulates it from liability. These arguments, as discussed more fully below, are meritless. Defendants also offer a litany of minor, equally unpersuasive arguments related to causation, the role of federal courts reviewing employment related claims, and other litigation filed by Plaintiff COBA. Defendants also raise questions of fact that simply cannot be answered on a Motion to Dismiss. For the reasons set forth below, Defendants' motion should be denied and Defendants should be ordered to serve an Answer to the Complaint. Alternatively, if the Court determines any essential factual allegations are lacking, Plaintiffs respectfully request leave to amend the Complaint.

## STATEMENT OF FACTS[3]
### The Individual Plaintiffs

On May 3, 2016 Plaintiff Castro was attacked by inmate Lloyd Revell for unknown reasons while working in the Anna M. Cross Center ("AMKC"). Castro's jaw broke. As part of the so-called Reform Agenda, Defendants implemented a number of programs as alternatives to punitive segregation which they claim reduce inmate violence effectively. However, Revell participated in one of the alternate programs a number of times prior to attacking Castro.

On June 9, 2016, Plaintiff Romano was assaulted by inmate Sentwali Laviscount at the Manhattan Detention Center ("MDC") while he searched the inmate prior to a court appearance. Romano sustained lacerations to his arm, neck and face, a forehead contusion, and concussion-like symptoms. Despite this assault, Defendants did not infract Laviscount and subject him to Pre-Hearing Detention ("PHD") which would have removed him from MDC to Rikers Island.[4] Consequently, on June 13, 2017, Laviscount attacked Romano at MDC a second time giving him

---

[3] All facts are restated here from the Complaint and the Exhibits attached thereto.
[4] Under Directive 4501R-D, inmates charged with rule violations, like assaulting an officer, can be subject to PHD and removed to separate housing pending outcome of charges.

a fractured nose, an eight stitch lip laceration, and a head contusion. The second attack would not have occurred if Laviscount had been removed to Rikers under PHD after the first attack.

On October 14, 2016, Plaintiff Dublin was working at the Eric M. Taylor Center ("EMTC") on Rikers' Island when she was attacked by inmate Jose Hernandez without provocation. Hernandez came up to Dublin and started throwing multiple punches, hitting her above the left eyebrow, above the right eye, on her left then right cheek, and on her mouth and chin, knocking her out. Dublin sustained two black eyes, a concussion, and permanent injuries to her cervical and thoracic spine including several bulging discs and inversion of the cervical spine. The punches "shook her brain"; if she is hit again she will become paralyzed. Astoundingly, Defendants listed this heinous attack under the administrative designation of "Log Book Entry," and not under the more accurate "Assault on Staff" label.

On December 12, 2016, inmate Bashid McLean attacked Plaintiff Hines at West Facility - a facility that was historically designed and used to hold inmates with communicable diseases instead of highly assaultive ones like it holds now. McLean — a convicted murderer notorious for taking a selfie with his mother's decapitated head—had been sentenced to 25 years to life the previous week. After refusing to lock into his cell, McLean slashed Hines using a sharp metal tool over his right eye and proceeded to beat him. Hines sustained a fractured nose requiring surgery and several stitches above his eye. Notably, just the week before the attack Hines had requested additional training to deal with the new breed of violent inmates housed at West Facility and in the use of OC (pepper) spray. ***None was given***.

Violence in the City Jails is on the rise; there is no denying it despite Defendants' efforts to do so. The stories of the four Individual Plaintiffs are, sadly, not uncommon[5] and are only a few

---

[5] More than ever, everyday Correction Officers are being punched, kicked, slashed, splashed with urine, semen, feces or saliva, stabbed, head-butted, held hostage, beaten severely, or sexually assaulted by inmates.

examples of the rampant violence against Correction Officers at the hands of the most dangerous inmates incarcerated within the City Jails. Their stories are also prime examples of the serious physical harms already suffered by officers as a direct and proximate result of the Nine Policies challenged herein that have created/increased workplace danger and the potential harms to come.

## The Nine Policies That Create/Increase Workplace Danger

**Policy #1:** Punitive segregation—the practice of segregating inmates that have been found guilty of violating certain facility rules like assaulting staff or other inmates—is a proven method of deterring inmate violence. Defendants created/increased workplace danger by eliminating punitive segregation for Young Adult Inmates (ages 18-21) and replacing it with non-punitive, alternative therapeutic and security programs for them and Adolescent Inmates (ages 16-17).[6] As confirmed by the statistics in the 2017 Mayor's Report and the Federal Monitor's Report, this policy of eliminating punitive segregation for the most violent segment of inmates has failed to deter violence in the City Jails. Rather, it has led to a confirmed increase in assaults against inmates and staff. See Complaint ("Cmplt."), Exhibits ("Ex.") B,C.

Most of the inmates housed in the alternative programs are not punished at all nor in a manner that prevents future assaults. Thus, they continue to assault staff or other inmates even while in these programs or when they are "kicked out" and placed back in the general population where they continue their violence with impunity. The Federal Monitor observed that these programs are also ineffective in rehabilitating offenders who have gone through multiple program admissions. See Cmplt., Ex. C. Unsurprisingly, most inmates admitted to the Secure Unit have been involved in assaults, including slashings, once released to general population.

---

[6] For example, there is the Transitional Restorative Unit ("TRU"), Second Chance Housing Unit ("Second Chance"), Secure Unit ("Secure Unit"), and Enhanced Security Housing ("ESH"). For inmates with mental illnesses, there are programs like the Restricted Housing Unit ("RHU"), Clinical Alternatives to Punitive Segregation ("CAPS") and Program to Accelerate Clinical Effectiveness ("PACE").

The direct and proximate result of this policy is that inmates within these programs increasingly attack Correction Officers.   On November 3, 2015, four young adult inmates between ages 18 and 19 attacked Officer Raymond Calderon at the George Motchan Detention Center ("GMDC"), slashing him multiple times on his arms and face. Calderon required 20-plus stitches and his face will be permanently disfigured. On September 13, 2016, two young adult inmates aged 18 and 20 years launched simultaneous attacks against Officers Timothy Edmonds and Ernesto Brands at the George R. Vierno Center ("GRVC"). Edmonds suffered a gash on his left cheek requiring three stitches; Brands suffered a badly swollen eye.   On January 4, 2017, multiple teenage inmates attacked officers within the TRU in the Robert N. Davoren Center ("RNDC"). Five officers were sent to the hospital with various injuries including bruises, a nose fracture and crushed foot bone. In April 2017, Officer Richy Herrera was attacked by 20 year old inmate Tariq Hargrove, an accused murderer with a long history of violence inside and outside of jail. Herrera suffered a broken jaw requiring surgery.   Plaintiffs have long notified Defendants that these programs are ineffective and dangerous to officers but their efforts have been ignored.

**Policy #2:**  Defendants also implemented policies curtailing the use of punitive segregation against the adult inmate population (age 22 and above), including against some of the most violent offenders who have a repeated history of assault on other inmates and staff.  Defendants eliminated the use of punitive segregation for low-level infractions, eliminated punitive segregation "time owed" by inmates accrued during a previous incarceration and limited punitive segregation stays from 90 days to 30 continuous days, or 60 total days during a six month period. Because the City Jails, unlike prisons, are designed for shorter inmate stays, these policies signal to the most highly assaultive inmates that they can engage in violence without consequences; They accrue "time owed,"  and never serve it before being released from custody.

6

Adding to the danger is Defendants' failure, and in some cases refusal, to use all available punitive and deterrence measures against highly assaultive inmates like Malik Ellis, Tariq Hargrove and the notorious Steven Sidbury a/k/a "John Doe." Sidbury, a known member of the Bloods gang facing murder, arson and weapons charges, has had approximately 100 violent incidents with staff and other inmates. Despite this, Defendants failed to use punitive segregation and disciplinary measures against Sidbury to the fullest extent possible, including imposing administrative overrides on some of the punitive segregation limitations. In fact, it took judicial intervention to lockdown Sidbury, which included prohibiting visits and phone access. Defendants could have done so without a court order but did not.

To be clear, Plaintiffs do not advocate for the use of punitive segregation for every inmate; it should, at minimum, be used against highly assaultive inmates without hesitation. Plaintiffs notified Defendants that their punitive segregation restriction and elimination policies were dangerous and causing harm to officers on several occasions including by letter dated August 3, 2016. Cmplt., Ex. K. Plaintiffs even proposed alternative practices that DOC could implement to ensure Correction Officer safety, but those pleas fell, and continue to fall, on deaf ears.

**Policy #3:** Defendants' failure to take immediate remedial steps against an inmate after an officer is assaulted has created/increased workplace danger. Plaintiff Romano's story is illustrative of this. Despite a severe assault on an officer, Defendants did not classify and process inmate Laviscount under Pre-Hearing Detention status, pursuant to Directive 4501R-D, which would have also meant a transfer out of MDC to Rikers Island. This failure was the direct and proximate cause of Laviscount's second attack on Romano in four days.

**Policy #4:** Defendants' policies arising out of a new Use of Force Policy (Directive 5006R-D) has created/increased danger faced by Correction Officers by imposing certain limitations,

prohibitions, prerequisites and employment consequences that inhibit an officer's ability to adequately defend himself or others.[7] Directive 5006R-D purports to be drafted in accordance with terms of the Consent Judgment, and to that extent includes wholesale, verbatim paragraphs from it, but it also includes additional changes that were not required by the Consent Judgment.[8]

Directive 5006R-D's terms have created and increased danger by disregarding the practicalities of dealing with volatile inmates.  It imposes a number of "prerequisites" prior to when an officer is allowed to use force. If faced with a threatening inmate, an officer must use a scripted dialogue first, stop to request the assistance of a supervisor or make other observations. This formulaic checklist of prerequisites is impractical given the split second nature under which force incidents typically arise in a correctional setting; now there is increased time available for an inmate to attack a Correction Officer.

Directive 5006R-D also increases danger by prohibiting staff from using force "[i]n response to an inmate's verbal insults, threats or swearing" which fails to take into consideration the fact that insults, threats and swearing may reasonably be determined by an officer to be a clear and present precursor to a violent attack. Lastly, recent testimony during Plaintiff COBA'S OCB Improper Practice charge reveals that Defendants have prematurely implemented the policy and provided contradictory training to staff. The policy's haphazard implementation has created confusion amongst supervisory staff who are directing officers to refrain from using force and officers who believe they must be attacked first before using force.

---

[7] The 60-plus page <u>Nunez</u> Consent Judgment required Defendants to draft/implement a new Use of Force policy and mandates changes in how Uses of Force are conducted, reported, monitored and reviewed, and how staff involved in same is disciplined. Plaintiffs were not a party to this settlement.

[8] Directive 5006R-D impacts Correction Officers' terms and conditions employment which Defendants were obligated to negotiate with Plaintiff COBA prior to implementation. This failure is currently subject to an improper practice charge at the City Office of Collective Bargaining ("OCB"). Although the "official" implementation date was postponed a number of times and is currently September 2017, as adduced during the OCB proceeding, Defendants have, in practice, implemented its provisions.

**Policy #5:**   Defendants created/increased workplace danger by failing to provide proper, timely and adequate training as well as sufficient training facilities. After initial training in the Academy, there is very little in-service training. Re-training that is provided is untimely and certifications are allowed to expire. Defendants provide insufficient training in certain areas and minimal training in others. One of the most notably deficient areas concerns mentally ill inmates. Although Correction Officers are not mental health professionals—who train for years—they are expected to act like them under the Board of Corrections' minimum guidelines and Directive 4018R.  Despite these mandates, officers are not given the requisite training to properly deal with the approximate 40% of inmates who are mentally challenged. Most of the training is  theoretical and officers are no longer taught certain historically effective defensive tactics and holds.

The current training facility, in contrast to the state of the art facility Defendants maintain for the NYPD, is an antiquated academy recognized by the Federal Monitor not only to be insufficient for training purposes but also to be a safety hazard. See Cmplt., Ex. Q. The Monitor described the Training Academy as "**severely** lacking" (emphasis supplied) and a space that is "in poor physical condition" that impedes the ability to train officers and is dangerous to the extent its limited conditions "create a risk of injury" to officers, "inhibit" their ability to learn necessary skills and devalues their service. Id. Like the other challenged policies, Plaintiff COBA has repeatedly brought the training and facility deficiencies to Defendants' attention but also like the other challenged policies, their concerns have been ignored. See Cmplt., Ex. R.

**Policy #6:** Defendants adopted a policy whereby they started housing high security risk inmates at West Facility – a facility originally designed and used to house inmates who have communicable diseases. Despite this change, West Facility officers were not provided with additional training or equipment against these dangerous and highly assaultive inmates. As a

direct and proximate result, assaults on officers at West Facility have increased. Plaintiff Hines' slashing is a primary example and could have been prevented if he had been given the training and equipment he requested. Sadly, he is not the only officer assaulted at West Facility. On August 7, 2016, an inmate knocked Officer Malik Medina unconscious and then slashed Officer Corey Hughes with a scalpel, creating a gash requiring at least 16 stitches. The night before, the same inmate assaulted Officer Brian Nurse, causing his face to hit a cell door.

Adding to the danger faced by officers at West Facility is the fact that it is the only facility without a dedicated emergency response team. This increases danger, likelihood of harm or even death, when, for example, Officer Hutchinson was assaulted and had to wait over 25 minutes for a response team from another facility. Like the other challenged policies, Defendants have been on notice of the severe, obvious safety risks in West Facility, which violate even minimum correctional standards. Plaintiffs requested these practices stop several times. They have not.

**Policy #7:** Defendants have increased/created workplace danger through their policy of housing inmates of same gang affiliation together, despite the fact that Defendants are well aware of the threats that gangs pose within the City Jails. This policy has emboldened the gang hierarchy, created gang strongholds within each housing unit, and facilitated communication and concerted activity among gang members who regularly coordinate attacks against officers.

As a direct and proximate result, the number of gang affiliated stabbings/slashings on Rikers has increased markedly. In 2011 there were approximately 32; in 2015 there were approximately 68. The increase in standoffs between officers and gang affiliated inmates is also telling. In December 2016, Crips gang members at OBCC rose up against an officer and Department Chiefs, Martin Murphy and Turhan Gumusdere. They ignored orders given, relenting only when told they would not be punished. On March 16, 2017, West Facility inmates with the Mac Balla

Brims—a subset of the Bloods gang—rose up against officers for intervening while they attacked another inmate. The inmates ignored the Captain's orders; they stood down only when ***gang leader*** Larry Calderon told them to, thus demonstrating who is truly in charge in City Jails.

**Policy #8:** Defendants failure to properly equip officers and use all available safety equipment created/increased workplace danger. When officers are provided with some safety equipment, the equipment is worn, outdated or ill fitting. The safest way to ensure inmates do not assault officers with metal weapons, like knives or makeshift shivs, is to use body scanners. However, Defendants have refused to use them despite the fact that the City currently possesses them. A body scanner could have prevented several attacks against officers by metal weapon wielding inmates including the attack by inmate Lugo that took place on July 26, 2016, at OBCC when he reached through a food tray slot in his cell door and slashed an officer's face. The officer required several stitches. Despite the fact that Defendants could simply hire or train personnel to operate the body scanners – a quick and easy solution Plaintiff COBA proposed on numerous occasions to the licensing hurdle Defendants' have claimed – they have refused.

**Policy # 9:** Defendants have engaged in a policy of either misreporting or underreporting violence against Correction Officers which creates/increases workplace danger.   Plaintiff Dublin's attack discussed above is only one example. On March 3, 2015, an attempted rape of a female Correction Officer was initially labeled as a "Use of Force" instead of a "Sexual Assault" until Plaintiff COBA got involved. In 2015, Defendants de Blasio and the City issued conflicting statistics on the number of serious assaults against officers. On October 4, 2016, the slashing of an officer who intervened in a gang related attack on another inmate was listed as "Serious Assault" instead "Slashing" which more accurately reflects the severity of the incident. From 2015 onward, DOC documented at least 374 incidents of inmates spitting on officers (without a

11

physical altercation) under the misleadingly innocuous label of "Log Book Entry" instead of "Assaults on Staff." Characterizing spitting incidents as mere "Log Book" entries belies the assaultive nature of this abhorrent act. Despite the fact that Plaintiff COBA has addressed these mischaracterizations on a number of occasions, Defendants purposely continue to apply a classification system to violent incidents that, by design, downplays true danger and gives an illusion of increased safety in the City Jails.

## STANDARD OF REVIEW

In reviewing a motion to dismiss pursuant to Rule 12(b)(6), this Court must construe the complaint liberally, "accept the factual allegations set forth as true and draw all reasonable inferences in favor of the plaintiff." Fed. R. Civ. P. 12(b)(6); see also Cleveland v. Caplaw Enters., 448 F.3d 518, 521 (2d Cir. 2006). The complaint need only provide "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2).   Id. As long as the complaint provides a defendant with " 'fair notice of what the ... claim is and the grounds upon which it rests,' " it meets Rule 8(a)(2)'s liberal notice pleading standards. Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) quoting Conley v. Gibson, 355 U.S. 41, 47 (1957). Moreover, any allegations asserted need only be "enough to raise a right to relief above the speculative level." Twombly, 550 U.S. at 556. Indeed, a complaint will be not be dismissed if the factual allegations, if credited, make the claim "plausible." Id.; Ashcroft v. Iqbal, 556 U.S. 662, 667 (2009). Facial plausibility is established when the plaintiff pleads factual content that allows the court to draw a reasonable inference that the defendant is liable for the misconduct alleged. Iqbal, 556 U.S. at 678. Notably, the plausibility standard is not akin to a "probability requirement." Twombly, 550 U.S. at 556.  At the pleading stage, the complaint need only allege "enough fact[s] to raise a reasonable expectation that discovery will reveal evidence" to prove

the claim. Id. What is assessed is the legal feasibility of the complaint, not the weight of evidence that may be offered in support. See Geiler v. Petrocelli, 616 F.2d 636, 639 (2d Cir. 1980). Here, the Complaint sets forth detailed allegations demonstrating more than "enough facts to state a claim to relief that is plausible on its face." Twombly, 550 U.S. at 570 (2007). Supporting Plaintiffs' claims are statistics, reports and numerous examples of inmate-on-officer assaults that confirm violence against officers is rising. Accepting these facts as true and drawing all reasonable inferences and conclusions, the Complaint shows the Nine Policies violate Plaintiffs' substantive due process right to be free from state created or increased dangers in the workplace and increased their vulnerability to attack at the hands of inmates. See Dwares v. City of New York, 985 F.2d 94 (2d Cir. 1993).

## ARGUMENT
## POINT I

### THIS COURT SHOULD DENY THE MOTION TO DISMISS BECAUSE THE COMPLAINT DEMONSTRATES THAT DEFENDANTS UNCONSTITUTIONALLY EXPOSED PLAINTIFFS TO STATE CREATED/INCREASED DANGER

42 U.S.C. § 1983, in relevant part, provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress[.]

42. U.S.C. § 1983 (U.S.C.A.) It is well settled that a municipality will be found liable under § 1983 where its municipal custom, practice or policy was "the moving force of the constitutional violation." Monell v. Dep't of Soc. Servs. of the City of New York, 436 U.S. 658, 694 (1978). The constitutional violation herein arises under the Fourteenth Amendment which prohibits government from depriving an individual of life, liberty, or property without due process of law.

U.S. Const. amend. XIV. In addition to procedural due process protections, substantive due process rights protect against arbitrary and oppressive government actions regardless of the fairness of the procedures used to implement them. Daniels v. Williams, 474 U.S. 327, 331 (1986). Substantive due process includes the well settled right of an individual to be free from state created or increased dangers, i.e., governmental policies that create/increase the likelihood of substantial harm or death at the hands of a third party. DeShaney v. Winnebago Cty. Dep't of Soc. Servs., 489 U.S. 189 (1989); Dwares v. City of New York, 985 F.2d 94 (2d Cir. 1993).

## A. State Created/Increased Danger in the Workplace is a Well Established Basis for Substantive Due Process Violations.

Defendants argue that substantive due process does not impose an affirmative duty on government to guarantee a minimal level of occupational safety or redress for workplace dangers. While due process may not establish a minimum as it relates to work related policies, it does impose a limit as to the policies and conduct that government employers can permissibly embrace.  A vast body of case law recognizes this notion in Due Process Clause cases that protect employees' safety where the employer is the cause, in whole or in part, of newly created/ increased danger in the workplace. See, e.g., Pauluk v. Savage, 836 F.3d 1117 (9th Cir. 2016) (state created danger theory recognized in suit filed by widow of employee subject to toxic occupational exposure); Briscoe v. Potter, 355 F.Supp. 2d 30 (D.D.C. 2004) (state created danger claim recognized in suit filed by postal workers exposed to anthrax); Estate of Phillips v. District of Columbia, 455 F. 3d 397 (D.C. Cir. 2006) (recognizing the validity of state endangerment theory in suit filed by firefighters and estate of firefighters). In particular, the state created danger theory has been advanced and recognized as a valid basis for constitutional claims when, as is the case here, brought by prison/jail employees. See Kowaleski v. Lewis, 643 F. Supp. 2d 259 (N.D.N.Y. 2009) (recognizing validity of former employee's state created danger claim against

prison officials and allowing claim to survive summary judgment); L.W. v. Grubbs (Grubbs I), 974 F.2d 119 (9th Cir. 1992) (allowing state created danger suit against custodial institution where nurse was raped and terrorized by inmate whose violent propensities were known to officials); Kaucher v. County of Bucks, 455 F.3d 418 (3d Cir. 2006) (recognizing viability of state created danger claim where correction officers filed suit against prison officials for creating unsanitary and dangerous conditions).

The plausibility of Plaintiffs' claims within the workplace context is clear when considering the genesis of the state created danger theory and its intersection with the Supreme Court's decision in Collins v. City of Harker Heights, 503 U.S. 115 (1992). The general rule recognized by Federal Courts is that the Due Process Clause does not impose a constitutional obligation on the state to protect its citizens from private harms ("General Rule"). DeShaney v. Winnebago Cty. Dep't of Soc. Servs., 489 U.S. 189 (1989). In DeShaney, the Supreme Court first recognized the state could be found liable for failure to protect individuals when it plays a part in inflicting the harm in question. Id.  Consistent with the General Rule, the DeShaney Court held that despite the fact that the state was aware of a father's prior history of abusing of his child, the Due Process Clause did not impose an affirmative duty on the state to protect the petitioner-child from his father's beatings. Id. at 201-02. The Court observed that "[w]hile the State may have been aware of the dangers that [petitioner] faced in the free world, it played no part in their creation, nor did it do anything to render him any more vulnerable to them." Id. at 201. In Footnote 9, the DeShaney Court speculated that if the state had taken the child into custody, a special relationship may have arisen justifying an affirmative duty to protect. Id. at n.9.

Relying on the DeShaney language, the vast majority of federal courts recognize two exceptions to the General Rule establishing that the government has a duty to protect its citizens

1) where there is a special relationship; or 2) where there is state created or increased danger. See Matican v. City of New York, 524 F.3d 151, 155 (2d Cir. 2008); see also Brown v. Commonwealth of Pennsylvania, et. al., 318 F.3d 473, 478 (3d Cir. 2003); Stevenson ex rel. Stevenson v. Martin Cty. Bd. of Educ., 3 Fed. Appx 25, 30 (4th Cir. 2001); Koulta v. Merciez, 477 F.3d 442 (6th Cir. 2007); Doe v. Vill. of Arlington Heights, 782 F.3d 911, 917 (7th Cir. 2015); S.S. v. McMullen, 225 F.3d 960, n. 3 (8th Cir. 2000); Johnson v. City of Seattle, 474 F.3d 634, 639 (9th Cir. 2007); Armijo By & Through Chavez v. Wagon Mound Pub. Sch., 159 F.3d 1253, 1260 (10th Cir. 1998). Under these two circumstances, it is well settled that a state's failure to protect individuals from third party harm is a violation of substantive due process.

The Second Circuit first embraced the state created danger theory in Dwares v. City of New York which opined that a due process violation exists where the state "in some way had assisted in creating or increasing the danger to the victim..." 985 F.2d at 99, overruled on other grounds by Leatherman v. Tarrant County Narcotics Intell. & Coordination Unit, 507 U.S. 163, 164 (1993). The Circuit further refined the contours of the doctrine finding liability under the state created danger theory where both actions and inactions rise to the level of affirmative acts that "create an opportunity for a third party to harm a victim (or increases the risk of such harm)." Lombardi v. Whitman, 485 F.3d 73, 80 (2d Cir. 2007). Culpable conduct that affirmatively creates or enhances the danger of private violence also includes action that "communicates, explicitly or implicitly, official sanction of private violence," Okin v. Village of Cornwall–on–Hudson Police Dep't., 577 F.3d 415, 429 (2d Cir. 2009) or "repeated, sustained inaction by government officials, in the face of potential acts of violence" Id.; see also Pena v. DePrisco, 432 F.3d 98 (2d Cir. 2005).

Contrary to Defendants' contentions, the fact that the Complaint alleges actions within a workplace context does not change the foregoing analysis or outcome. See Pauluk v. Savage, 836 F.3d 1117, 1123–24 (9th Cir. 2016).  In Collins v. City of Harker Heights, 503 U.S. 115 (1992), the Supreme Court declined to find a general due process constitutional right to a safe workplace in a suit brought by the widow of a sanitation worker who had died of asphyxia after entering a manhole.   In Pauluk, the Ninth Circuit directly addressed the intersection between this holding in Collins and the state created danger theory. 836 F.3d at 1123–24. There, the state created danger claim arose out of a deceased employee's transfer to a work location polluted by toxic mold. Id. at 1119-21. The court recognized that Collins was simply an application of the General Rule (that the state does not have an affirmative due process duty to protect its citizens) to the workplace context. Id. at 1123–24. Thus, the Pauluk court logically held, "It follows that the exceptions to the general rule, such as the state-created danger doctrine, should also apply to workplace safety cases." Id. at 1124.  This outcome, the Pauluk court noted, was supported by Collins itself which noted that had the plaintiff alleged a state created danger theory rather than a constitutional claim for minimum workplace safety the result may have differed. Id., at 1123.

Unlike Collins, the instant action ***does not allege a general due process claim that Defendants are required to provide minimum levels of safety in the workplace.*** Rather, it asserts a due process claim under the state created danger doctrine where the government employer's conduct has created/increased danger in the workplace. Collins does not bar this action. In fact, several other courts have specifically recognized that workplace victims may premise due process liability on a state created danger theory notwithstanding Collins. See Kaucher v. County of Bucks, 455 F.3d 418, 424–25 (3d Cir. 2006); see also Hunt v. Sycamore

Cmty. Sch. Dist. Bd. of Educ., 542 F.3d 529, 537 (6th Cir. 2008); Ramos–Pinero v. Puerto Rico, 453 F.3d 48, 55 (1st Cir. 2006); Gormley v. Wood-El, 93 A.3d 344, 362-63 (N.J. Sup. Ct. 2014).

**1. The Complaint Plausibly Establishes That Defendants Created/Increased Danger.**

Here, Plaintiffs' Complaint alleges a series of affirmative acts that, when liberally construed, demonstrate that Defendants have, with deliberate indifference, created/increased workplace danger. For example, the decision to house highly assaultive inmates at West Facility, which was structurally designed to house inmates with communicable diseases, increased officers' vulnerability to attack. Proof of the increased danger is found in Plaintiff Hines' and Officer Hughes' slashings as well as the attacks on Officers Medina and Nurse. When officers are attacked at West Facility, they must, like Officer Hutchinson, continue to risk their lives waiting for help from another facility's emergency response team. Additionally, the increased danger in housing inmates with same gang affiliation is clear given the frequent standoffs between inmate gangs and uniformed staff like the incidents in OBCC and West Facility which show inmates only listen to their gang leaders. Furthermore, Defendants' failure to properly train, re-train and equip officers is the type of inaction that has increased the likelihood that officers have and will continue to be seriously harmed by inmates. See Pena v. DePrisco, 432 F.3d 98 (2d Cir. 2005).

Defendants' policies that eliminated punitive segregation for the most volatile group of inmates (Young Inmates, age 18-21), replaced same with non-punitive programs for them and Adolescent Inmates (age 16-17), and limited punitive segregation for the Adult Inmate population, fail to meaningfully punish inmate violence and are state created dangers that signal to inmates that they can behave with impunity. See Okin, supra. Defendants' actions are tantamount to condoning violence and encouraging repeated attacks on officers. That is why inmates like Ellis, Sidbury and Hargrove repeatedly and persistently engage in volatile behavior

and commit assaults on officers and even other inmates. That is also why Young Adult Inmates in alternative programs continue to assault correction officers as seen Officer Calderon's slashing and beatings of Officers Brands, Edmonds, Herrera and Plaintiff Castro. No greater example of encouraging repeat attacks exists than Defendants' failure to use PHD as a punitive/violence deterrence measure after inmate Laviscount assaulted Plaintiff Romano which then led directly to him assaulting Romano a second time in four days. Defendants' haphazard implementation of an overly restrictive Use of Force policy has also increased danger, including increasing inmates' time to attack officers as well as handicapping their abilities to defend themselves and others.

Significantly, statistics reported by the Mayor's Office, the DOC and the Federal Monitor confirm that violence in the City Jails is on the rise. These numbers only scratch the surface; the Complaint details a number of instances where Defendants have misreported the violence occurring in the Jails like characterizing Plaintiff Dublin's assault as a mere administrative "Log Book" entry. Defendants' misleading reporting is exactly kind of conduct found culpable under the state created danger theory. See Briscoe v. Potter, 355 F.Supp.2d 30 (D.D.C. 2004) (finding liability where supervisors misled employees regarding facility safety after anthrax exposure).

**2. The Complaint's Allegations of Fact Cannot Be Determined on a Motion to Dismiss.**

To the extent the Complaint alleges that some of the policies have explicitly or implicitly encouraged increased inmate violence by signaling that their misconduct will be tolerated or go unpunished, Plaintiffs are entitled to discovery and their claim should be allowed to continue. Pena v. DePrisco, 432 F.3d 98, 111 (2d Cir. 2005). In Pena, the court noted that if officials "communicate to a private person that he or she will not be arrested, punished, or otherwise interfered with while engaging in misconduct that is likely to endanger the life, liberty or property of others, those officials can be held liable under § 1983 for injury caused by the

misconduct." Id. The court further stated, "Whether such [deliberate silence] silence in this particular case—or in future cases—did in fact communicate permission is a factual determination which we decline to resolve on a 12(b)(6) motion to dismiss." Id. at 112. Accordingly, based on these allegations alone Defendants' Motion to Dismiss should be denied. Additional factual issues precluding dismissal of the Complaint are discussed further below.

### B. On the Continuum of Culpable Conduct, Defendants' Intentional, Deliberate Indifference Constitutes a Violation of Substantive Due Process.

Substantive due process claims challenge deprivations of life, liberty and property arising out of legislative enactments or government officials' executive action. See Daniels v. Williams, 474 U.S. 327, 331-32 (1986). The jurisprudence in this area has been, at best, nebulous— employing a variety of standards and tests to determine whether government conduct is arbitrary or oppressive at the Supreme Court and in the lower courts. Defendants argue that the requisite liability standard for all substantive due process claims, including based on state created danger, is conduct that "shocks the conscience." They further argue that "only" an "intent to harm" qualifies as conscience shocking conduct. Both arguments are flawed and should be rejected.

With respect to the "shocks the conscience" standard, while Plaintiffs recognize that several substantive due process cases embrace this standard, it has been applied inconsistently, its validity has been questioned, and it is based on a fundamental misreading of Supreme Court precedent in County of Sacramento v. Lewis, 523 U.S. 833 (1998). We therefore respectfully urge this Court to find that "deliberate indifference" rather than "shocks the conscience" is the appropriate standard for establishing substantive due process liability under the Fourteenth Amendment in the non-emergent policy making context based on the state created danger theory.

### 1. The Shocks the Conscience Test.

The "shocks the conscience" test was first employed in Rochin v. California, 342 U.S. 165

20

(1952), when the Supreme Court held that Due Process rights to bodily integrity were violated when the police pumped a criminal suspect's stomach in search of evidence. In County of Sacramento v. Lewis, the Supreme Court further clarified that "shocks the conscience" is the applicable standard when reviewing executive action while a different test exists for violations based on legislative conduct (whether there is a fundamental liberty interest, and if so, whether it passes strict scrutiny). 523 U.S. at 846-47. However, the Lewis decision itself, and its progeny, cast doubt on whether "shocks the conscience" is the appropriate standard in this case.

In Lewis, a substantive due process claim was brought by the family of a motorcycle passenger who had been killed as a result of a high speed police chase. 523 U.S. at 836. The Ninth Circuit Court of Appeals found in favor of the Plaintiffs holding that deliberate indifference was the appropriate standard in a hot pursuit case. Id. at 838. The Supreme Court granted certiorari, for a very narrow and limited issue: "to resolve a conflict among the Circuits over the standard of culpability on the part of a law enforcement officer for violating substantive due process in a pursuit case." Id. at 839. The Court reversed the Ninth Circuit decision, stating the deliberate indifference standard was inappropriate in the context of high-speed chases where there is no time for deliberation. Id. Instead, the Court held that "high-speed chases with no intent to harm suspects physically or to worsen their legal plight" do not "shock the conscience" and fail to rise to a due process violation. Id. at 854. The Court clarified that the "shocks the conscience" standard is appropriate where the state actor does not have time to deliberate and that the deliberative indifference test is "sensibly employed ... when actual deliberation is practical." Id. at 851. As discussed infra in section B.3, the Court also established a culpability continuum addressing the different types of conduct that could rise to conscience shocking level.

Notably, the <u>Lewis</u> Court did not find that "deliberate indifference" is an improper standard in **all** substantive due process claims. Rather, the Court held it was improper in a narrow set of circumstances where state action is taken in haste or under emergency conditions without the benefit of time to deliberate. 523 U.S. at 852. Accordingly, the "shocks the conscience" test's applicability should be limited to similar circumstances where there is urgency or high pressure situations requiring immediate action. <u>See also</u> <u>Brown v. Commonwealth of Pennsylvania, et. al.</u>, 318 F.3d 473, 480 (3d Cir. 2003) (holding that shocks the conscience standard should apply in all substantive due process cases where state actor acts with urgency); <u>Helseth v. Burch</u>, 258 F.3d 867, 871 (8th Cir. 2001) (noting that since <u>Lewis</u>, "all other circuits…have applied the intent-to-harm standard in high-speed police pursuits cases"). Thus, the "shocks the conscience" standard should not apply in the absence of emergent circumstances, where culpable conduct arises in the form of policy making subject to the luxury of time and deliberation. Here, undoubtedly, the Nine Policies result from lengthy deliberation over a period of time, rather than split-second or hasty decision making. Absent urgency and with the benefit of deliberation, a higher "shocks the conscience" standard of culpability is not warranted here. <u>See</u> <u>Lewis</u>, <u>supra.</u>

Tellingly, the <u>Lewis</u> Court itself recognized the limits of the "shocks the conscience" test, stating it is "no calibrated yardstick," and that it merely "points the way." <u>Lewis</u>, 523 U.S. at 847. Justice Kennedy's dissent warned the test should be viewed with great suspicion, <u>Id.</u> at 858, and since then several Circuit courts have. <u>See</u> <u>Fagan v. City of Vineland</u>, 22 F.3d 1296, 1308 (3d Cir. 1994) (calling the test amorphous and imprecise); <u>see also</u> <u>Hawkins v. Freeman</u>, 195 F.3d 732, 742 (4th Cir. 1999) (stating "shocks the conscience" test is admittedly imprecise in formulation); <u>Uhlrig v. Harder</u>, 64 F.3d 567, 574 (10th Cir. 1995) (noting that conscience shocking behavior cannot be precisely defined). The viability of <u>Lewis'</u> dual framework for

reviewing legislative and executive action has also been subsequently questioned by the Supreme Court. See Chavez v. Martinez, 538 U.S. 760, 774-76 (2003) (where Court analyzed a substantive due process claim under § 1983 under both the "shocks the conscience" test and the fundamental liberty interest test); See also United States v. Stein, 495 F.Supp. 2d 390,411-12 (S.D.N.Y. 2007) (noting Supreme Court's and Second Circuit's uncertainty in using "shocks the conscience" test).

Since Lewis, courts have recognized ***substantive due process*** violations without regard to whether conduct is shocking to the conscience. The Second Circuit used "deliberate indifference" instead of a "shocks the conscience" standard in claims involving the abuse of children in foster care. See Doe v. Dep't of Soc. Srvs., 649 F.2d 134 (2d Cir.1981). In Kia P. v. McIntyre, 235 F.3d 749 (2d Cir.2000) the Circuit analyzed family integrity claims against a hospital social worker without reference to "shocks the conscience." Moreover, in Dwares, supra, the Circuit did not discuss conscience shocking conduct at all when first recognizing the state created danger theory. Lastly, in Okin, supra, the Circuit found government conduct actionable under state created danger and acknowledged the "shocks the conscience" standard. 577 F.3d 415. However, it further elaborated, that where deliberation time is available to the official, a "deliberate indifference" standard is applied, which requires showing "willful disregard" of the "obvious risks," "serious implications," and likelihood of harm. Id. at 432.

Given the foregoing, it is evident that the "shocks the conscience" test does not apply to **all** substantive due process claims as Defendants would argue.  See Khan v. Gallitano, 180 F.3d 829, 836 (7th Cir. 1999) (noting the Lewis Court made clear that its shocks the conscience analysis was not generally applicable to all substantive due process claims). We respectfully urge this court to adopt the standard of deliberate indifference when, as in the instant case, workplace

danger is created/increased within the non-emergent policy making context, which is consistent with long standing § 1983 jurisprudence.

**2. Deliberate Indifference Is the Standard For Establishing § 1983 Municipal Liability.**

Eschewing the "shocks the conscience" standard, under the facts at bar, is consistent with well settled law that premises § 1983 municipal liability under the deliberate indifference standard. City of Canton v. Harris, 489 U.S. 378, 388 (1989); Pembaur v. City of Cincinnati, 475 U.S. 469, 483–84 (1986). That is, municipal liability attaches "where—and only where—a deliberate choice to follow a course of action is made from among various alternatives by the official or officials…" Pembaur, 475 U.S. at 483-84. Liability attaches if defendants "acted or failed to act despite [their] knowledge of a substantial risk of serious harm," Farmer v. Brennan, 511 U.S. 825, 842 (1994), or with deliberate indifference "to its known or obvious consequences." Bd. of Cty. Comm'rs of Bryan Cty., Okl. v. Brown, 520 U.S. 397, 407 (1997).

The Supreme Court has applied the deliberate indifference standard in § 1983 claims arising in a variety of different constitutional contexts. See City of Canton v. Harris, 489 U.S. 378, 389 (applied in Fourteenth Amendment Due Process case); Estelle v. Gamble, 429 U.S. 97 (1976)(objective deliberate indifference applied in Eighth Amendment case); Farmer v. Brennan, 511 U.S. 825, 847 (1994)(subjective deliberate indifference applied in Eighth Amendment case). The Second Circuit has also followed suit. See Jones v. Town of E. Haven, 691 F.3d 72, 75 (2d Cir. 2012) (acknowledging standard in claims under Fourth, Fifth and Fourteenth Amendments); DiStiso v. Cook, 691 F.3d 226 (2d Cir. 2012)(recognizing standard in Equal Protection case). The instant claim arising under a substantive due process theory should be treated no differently; this Court should again apply the deliberate indifference standard. See Doe v. Dep't of Soc. Srvs., 649 F.2d 134 (2d Cir.1981) (applying standard in foster care context).

### 3. Even If the "Shocks the Conscience" Standard Applies, Culpable Conduct Is Not Limited To An "Intent to Harm".

Even if Plaintiffs are required to demonstrate conduct that "shocks the conscience," the Supreme Court recognized that, depending on the circumstances, deliberate indifference satisfies "shock the conscience". County of Sacramento v. Lewis, 523 U.S. 833, 851(1998). Defendants argue that "only" an allegation of an "intent to harm" rises to the conscience shocking level. This proposition is wrong and the Second Circuit has rejected it. See Pena v. DePrisco, supra.

The Lewis Court identified a culpability spectrum of different conduct that could rise to the "shocking the conscience" level. 523 U.S. 833. Negligent acts on one end are not actionable, but intent to injure conduct on the other end is. Id. at 849-50. The Court noted that while conduct that intends to harm is "most likely to rise to the conscience-shocking level," other acts with less than an intent to injure, such as deliberate indifference, could also shock the conscience. Id. Government acts that fall in the middle of this spectrum may be actionable under the Fourteenth Amendment. Id. Characterizing the mid-spectrum conduct as "closer calls," the Court held that depending on the circumstances, deliberate indifference, recklessness, and even gross negligence may rise to a conscience-shocking level. Id. The Court carefully noted that whether conduct rises to conscience-shocking level depends on the context and circumstances because "deliberate indifference that shocks in one environment may not be so patently egregious in another," Id.

To further illustrate the distinction, the Lewis Court compared two circumstances under which differing levels of culpability might be considered conscience-shocking within the context of substantive due process claims: 1) those arising out of pretrial custody; and 2) those arising out of police pursuits. Id. at 851-52. The Court noted that deliberate indifference was sufficient to violate due process in the former while the latter category requires an intent to injure. Id. The critical difference between the two scenarios is time and pressure. Deliberate indifference is

"sensibly employed only when actual deliberation is practical, and in the custodial situation of a prison, forethought about an inmate's welfare is not only feasible but obligatory under a regime that incapacitates a prisoner to exercise ordinary responsibility for his own welfare." Id. at 851. The Court distinguished that a higher standard of intent to harm must be used in police chases where decisions involving a vast number of competing factors are made hastily and under pressure. Id. at 852-53. The distinction, the Court elaborated was having the "luxury" or time to make "unhurried judgments" and when "such extended opportunities to do better are teamed with protracted failure even to care, indifference is truly shocking." Id. at 853. Thus, the appropriate legal test turns on the urgency of the situation which is absent from the instant case.

Following suit, the Second Circuit has held that deliberate indifference or recklessness – not only an "intent to harm" – suffices to establish a substantive due process violation under the state created danger theory. Pena v. DePrisco, 432 F.3d 98 (2d Cir. 2005). In Pena, the family members of deceased pedestrians killed by an intoxicated police officer brought a state created danger claim pursuant to § 1983 against the officers' co-workers for condoning his drinking and driving. Id. at 103-04. Although the complaint did not allege defendants acted with specific intent or desire to cause physical injury, the court found their conduct created a serious danger to which they acted with deliberate indifference. Id. at 114. In the context of a substantive due process claim, " 'situations where actors have an opportunity to reflect and make reasoned and rational decisions, deliberately indifferent behavior may suffice to shock the conscience.' " Pena v. DePrisco, 432 F.3d at 113 quoting Rivera v. Rhode Island, 402 F.3d 27, 36 (1st Cir. 2005). Contrary to Defendants' claim, the Second Circuit did not, generally, hold in Lombardi v. Whitman that only intent to cause harm arbitrarily shocks the conscience. The ruling was expressly limited to "disaster" related, urgent circumstances. 485 F.3d 73, 74–75 (2d Cir. 2007);

see also Okin, 577 F.3d 415 (2d Cir. 2009) (holding inaction culpable under state created danger theory despite absence of an intent to harm).

To the extent intentional conduct is required to sustain a claim for state created danger, Plaintiffs submit that ***deliberate indifference is a form of intent*** where certain risks are identified and intentionally disregarded. The Pena court put it succinctly, "Whether termed 'deliberate indifference' or 'recklessness,' this mental state is sufficient to establish liability in such cases 'because it requires proof that the defendant focused upon the risk of unconstitutional conduct and deliberately assumed or acquiesced in such risk.' " Id. at 114 quoting Woodward v. City of Worland, 977 F.2d 1392, 1399 n. 11 (10th Cir.1992), see also Archie v. City of Racine, 847 F.2d 1211, 1219 (7th Cir. 1988) (noting "[R]eckless disregard of a great risk is a form of knowledge or intent"). Thus, government acts shockingly where it had time to deliberate and but still took dangerous action. In that context, the shocking conduct would also be deliberately indifferent.

Lastly, having established that culpable conduct is not limited only to an "intent to harm" and whether deliberate indifference can "shock the conscience" is a fact specific inquiry, Plaintiffs are entitled to discovery into Defendants' state of mind when implementing the Nine Policies.

### 4. The Complaint Alleges Deliberately Indifferent Conduct that is Conscience Shocking.

Here, viewing the facts alleged in the Complaint in the light most favorable to the Plaintiff, Defendants' intentional actions and inactions rise to the level of deliberate indifference that not only justifies § 1983 municipal liability, but would also meet the conscience shocking standard. Given the increase in inmate attacks on Correction Officers and the culture of violence and vulnerability to same created by the Defendants, it is hard to imagine a setting that is more shocking to the conscience. Moreover, Plaintiff COBA has for ***years*** brought the dangers alleged in the Complaint to Defendants' attention, have begged for change, and even proposed potential

solutions. However, despite being aware of the Nine Policies' "serious implications," "likelihood of harm," and "obvious risks," Defendants willfully and intentionally disregarded these dangers.

Defendants' deliberate indifference is punctuated by the fact that the Nine Policies were not implemented under time-sensitive, emergent or hasty circumstances. Rather, Defendants have had days, months and even years to review the impact of these policies and the safety risks to all jail constituencies, including officers. Defendants had actual time for deliberation, were aware of the risks and dangers to officers in implementing the policies and knowingly acquiesced to the risks. Indeed, Defendants have demonstrated " 'a gross disregard for a dangerous situation in which actual deliberation was practical.'" Lombardi, , 485 F.3d at 83, quoting Briscoe v. Potter, 355 F.Supp.2d at 46. Further, not only did Defendants know of these dangers, they also had the ability to prevent the resulting harms to the Plaintiffs. ***They haven't.*** Defendants' deliberate failure to remedy this situation, despite being placed on notice about these conditions and the serious consequences, shocks the conscience. See Lesperance v. Cty. of St. Lawrence, No. 7:10-CV-01273, 2011 WL 3651161, at *6 (N.D.N.Y. Aug. 18, 2011) ("Deliberate indifference to the welfare of a private citizen may rise to the level of conscious shocking conduct when government officials have the knowledge of and the ability to prevent impending harm."). Additionally, the Second Circuit has recognized that deliberate indifference to the health and safety of government workers shocks the conscience, if the government exhibits gross disregard for dangerous situations where deliberation is practical. Lombardi, 485 F.3d 73.

Adding to these shocking circumstances, courts recognize matters that risk safety in prisons, specifically conduct that disregards known dangers or increases danger, suffices to shock the conscience. See Kowaleski v. Lewis, 643 F. Supp. 2d 259, 272 (N.D.N.Y. 2009). In Kowaleski, a former correction officer sued under the state created danger theory alleging supervisors and

other prison employees perpetrated, aided and abetted in harassing her and thus increased danger to her and the facility. Id. In denying summary judgment and allowing the claim to proceed, the court was persuaded by the number of incidents placing Kowaleski and inmates in jeopardy. Id. at 272. The court stated succinctly, "risking safety in prison suffices to shock the conscience." Id.

Lastly, Plaintiffs' allegations that Defendants are underreporting the violence occurring in the City Jails to perpetuate an illusion that their reform measures are succeeding is so shocking to the conscience that it could, even on its own, survive dismissal. Lombardi v. Whitman, 485 F.3d at 81 (2d Cir. 2007)(noting substantive due process can be violated where individual "derives a false sense of security from an intentional misrepresentation"). After the DOJ intervened in Nunez, Defendants were issued a bad "report card" for their inability to maintain jail safety. Now, under the watchful eye of a Federal Monitor, Defendants are pressured to get a better report card the next time they are evaluated. Despite a responsibility to accurately report jail safety, Defendants have not done so in hopes of making the Jails seem safer than they are. That a governmental entity would intentionally circulate false information is in and of itself, and should be, shocking. There is no legitimate governmental purpose in making these misrepresentations. Adding the eight other policies where Defendants show recklessness or deliberate indifference to officer safety, the Complaint easily surpasses the "shocking the conscience" threshold.

The allegations in the Complaint plausibly demonstrate that Defendants acted with a culpable state of mind. This demonstration precludes dismissal at this stage. Plaintiffs are entitled to discovery regarding the facts surrounding Defendants' refusal to acknowledge the increased violence against officers, Defendants' state of mind when implementing the Nine Policies, and whether the Defendants were "tainted by an improper or malicious motive." Lewis, 523 U.S. at 855. Accordingly, the Motion to Dismiss should be denied. See Iqbal., supra.

29

**C. The Remaining Arguments Are Without Merit or Irrelevant and Should Be Rejected.**

**1. Defendants' Arguments Based on Its Role as Policymaker Are Specious at Best.**

Defendants rely heavily on <u>Lombardi v. Whitman</u>, 485 F.3d 73 (2d Cir. 2007) to argue that its policy decisions cannot shock the conscience because government must always balance competing interests and considerations. Further, they assert courts should refrain from imposing constitutional liability on government officials who may be inhibited by the threat of lawsuits or who simply made "incorrect", "ill-advised" policy mistakes. Not only are these arguments specious, they are insufficient to challenge the Complaint's facial plausibility.

As a preliminary matter, the facts and circumstances in <u>Lombardi</u> are inapposite to the case at bar. In <u>Lombardi</u>, Plaintiff rescue workers alleged that defendant municipal agencies and their agents disregarded serious health risks and falsely represented that the air at the World Trade Center was safe after the 2001 terrorist attacks. 485 F.3d at 75-77. Accordingly, the rescuers worked without certain safety equipment. <u>Id.</u> The Second Circuit rejected state created danger liability because the agencies' representations were not made in "unhurried" fashion. <u>Id.</u> at 82-83. The court was further persuaded because the agencies made "public health and safety decisions quickly, and without all of the data that decision-makers would normally desire." <u>Id.</u>

Defendants argue that like <u>Lombardi</u>, they are faced with the "pull of competing obligations" and thus any choice they make, even if it is a wrong or mistaken choice, cannot shock the conscience.  This claim is suspect. First, Defendants claim they are caught between certain "obligations" when making policy decisions is a self-serving statement to which Plaintiffs are entitled to have fact discovery to confirm or refute.  The veracity of this statement is belied by: 1) <u>Lombardi</u> itself which recognized that unlike police officers in high speed chase, prison officials are not subject to the hasty pull of competing obligations, <u>Id.</u> at 82; 2) Defendants own

contradictory statement in their motion papers that the <u>only</u> consideration of constitutional weight in their policy making was that of inmate safety and there were no other "counterveiling" interests they considered; and 3) unlike the emergent circumstances in <u>Lombardi</u>, there is no hasty pull of competing obligations when Defendants had enough time to ponder policy making.

Lastly, in <u>Gantt v. Ferrara</u>, No. 15-CV-7661 (KMK), 2017 WL 1192889 (S.D.N.Y. Mar. 29, 2017) this Court recently rejected the notion that policymaking should not be hindered by the threat of lawsuits. The court stated, "if the alleged behavior of ... defendants [took place] over an extended period of time and in the face of action that presented an obvious risk of severe consequences and extreme danger," said conduct is shocking to the conscience and still forms the basis of a constitutional violation. <u>Id.</u> at *12. Moreover, if Defendants' argument is credited and drawn to its logical conclusion, then no public agency could ever violate substantive due process because there could, arguably, be competing considerations of any number and variety at all times that are subject to "second guessing." That would render the Fourteenth Amendment a nullity as it applied to local governments. Here, the so called "incorrect", "ill-advised", "mistakes" that knowingly disregard obvious risks can result in ***death***; nothing is more shocking.

### 2. Defendants' Role as an Employer Does Not Immunize It From the Reach of the Constitution or the Federal Courts.

Defendants raise a number of arguments suggesting its role as an employer insulates it from liability. Defendants assert there is no constitutional violation where the harm is inflicted on a voluntary employee as opposed to a member of the public being oppressed by government or someone subject to government's control and custody. They also argue that Federal Courts and Judges should not intervene in public employment "labor relations", tort claims, or matters of occupational safety or prison management. These arguments are all of no moment.

First, the Supreme Court stated in <u>Collins</u> that "The First Amendment, the Equal Protection and Due Process Clauses of the Fourteenth Amendment, and other provisions of the Federal Constitution afford protection to employees who serve the government as well as to those who are served by them, and § 1983 provides a cause of action for all citizens injured by an abridgment of those protections." 503 U.S. at 119-20. The <u>Collins</u> Court expressly noted that petitioner-decedent's role as government employee was insufficient to deny a § 1983 claim. <u>Id.</u> Thus, Defendants' reliance on <u>McClary v. O'Hare</u>, 786 F.2d 83 (1986) in support is unavailing.

In <u>McClary</u>, plaintiff brought suit under § 1983 to remedy her husband's death on the basis of, *inter alia*, general substantive due process grounds, not a due process claim based on state created danger. 786 F.2d at 84-85.  Contrary to Defendants' assertion, the <u>McClary</u> Court did not make a blanket determination that there can be no substantive due process violations where the government acts as an employer. In fact, the Court explicitly rejected this idea, noting in footnote 6, "Nor do we view this decision as a grant of immunity to government employers acting as such." <u>Id.</u> at 89, n.6. The Court elaborated its decision does not apply to gross negligence, reckless, or intentional abuses of governmental authority. <u>Id.</u> Where "harms caused by government employers to their employees are attributable to the abuse of the government's authority rather than to an ordinary tort, such harms would be actionable under section 1983." <u>Id.</u>

Second, Plaintiffs' do not allege mere tort claims or "labor relation" issues, they allege ***constitutional violations/injuries.*** Defendants gravely misunderstand the role of Federal Courts which routinely review and remedy constitutional violations within the employment context. Public employment is subject to various rights and privileges on state, local and federal levels which public employers regularly take into consideration when implementing occupational rules. These vary from First Amendment freedoms of speech, association, and religion rights to Fourth

Amendment rights against employers who conduct searches and seizures (i.e., drug testing). They also include the Fifth Amendment right against self-incrimination that may arise within the scope of a disciplinary interview (i.e. Garrity rights), Fourteenth Amendment due process protections (i.e., limits on termination right) or Equal Protection Rights (i.e., discrimination in employment). Occupational safety rules and regulations impacting terms and conditions of employment are also routinely enforced by the federal government and courts (i.e. Occupational Health and Safety Act of 1970, Family Medical Leave Act, and Patient Protection and Affordable Care Act). Nor is it improper for courts to get involved with prison administration when constitutional rights are at stake. In fact, this Court and its appointed Federal Monitor, are currently enmeshed in prison administration as a result of the Nunez Consent Judgment (and in numerous past prisoner rights cases) which seeks to remedy alleged constitutional violations. Thus, federal court involvement in protecting constitutional rights within the context of prison administration is no less appropriate in the face of substantive due process violations.

Third, Defendants' claim that due process protects only those within the government's custody (i.e. with prisoners) or control is a distinction without a difference in the Second Circuit. In Pena v. DePrisco, the court held (unlike some Circuits) that a special relationship is not required in a claim under the state created danger theory. 432 F.3d 98, 109 (2d Cir.2005) (noting "special relationships and state created dangers as separate and distinct theories of liability."). The court recognized that state created danger liability "arises from the relationship between the state and the private assailant" and not the state and the victim. Id. In analyzing the relationship between the state and assailant, the facts alleged demonstrate that Defendants have empowered the most violent inmates and increased danger. Thus, a due process obligation to protect officer-victims, even if they are voluntary government employees, exists.

33

**3. Defendants' Policies Are the Direct and Proximate Cause of the Injuries Alleged.**

Defendants argue for dismissal on causation grounds claiming inmate attacks are random, intervening causes that are not a foreseeable and direct consequence of the Nine Policies. On this motion, the Court is required to take the allegations that the Nine Policies caused Plaintiffs' injuries as true. See Lombardi v. Whitman, 485 F.3d 73, 81 (stating "Taking the allegations of the complaint as true, as we must, we assume that a sufficient causal connection exists" between defendants' statements and plaintiffs' claimed injury). When evaluating the Nine Policies, the causation line between deprivation and injury is clear and not attenuated. For example, it is beyond plausible that Defendants' failures to train, re-train and adequately equip correction officers has/would lead to new or increased danger in the workplace. Plaintiff Hines' and Officer Hughes' West Facility slashings prove this. It is also plausible that implementing non-punitive programs that fail to punish violent inmates will result in increased violence. Not only are the attacks on Officers Calderon, Brands, Edmonds, and others proof of this, but Defendants concede in the Mayor's Report that jail violence spiked amongst Young Adult inmates after changes to punitive segregation. No greater example of causation exists than between Defendants' decision not to PHD inmate Laviscount and Plaintiff Romano's second assault.

**4. Other Lawsuits Are Irrelevant To Determining the Merits of This Motion to Dismiss.**

Defendants' arguments regarding other lawsuits filed by COBA[9] are all irrelevant in a motion to dismiss where the Complaint's allegations are deemed to be true and reviewed for facial plausibility. At best, only two of the Nine Policies are subject to other proceedings. Regardless, those proceedings raise different claims (i.e., failure to bargain) with different remedies. There is no cumulative/redundant litigation nor any res judicata or collateral estoppel issues.

**POINT II**

---

[9] Errors in the OCB case numbers /descriptions of other lawsuits described in Defendants' Motion are overlooked.

**PLAINTIFFS, ALTERNATIVELY, REQUEST THIS COURT'S PERMISSION TO AMEND THE COMPLAINT IN THE EVENT THE COURT FINDS IT INSUFFICIENT.**

If this Court determines Plaintiffs' Complaint does not pass Rule 8's standards, we request leave to amend. Federal Rule 15(a) requires that "leave [to amend] shall be freely given when justice so requires." Fed. R. Civ. P. 15(a); see Foman v. Davis, 371 U.S. 178, 182 (1962).  When a motion to dismiss is granted, "the usual practice is to grant leave to amend the complaint" 2A Moore's Federal Practice ¶ 12.14 at 12-99 (2d ed. 1989).  Denying leave, while discretionary, must be based on good reason. Jin v. Metro. Life Ins. Co., 310 F.3d 84 (2d Cir. 2002).

## CONCLUSION

For the foregoing reasons, the Defendants' Motion to Dismiss is fatally flawed and must be denied. The Complaint sets forth a plausible claim for violation of Plaintiffs' Fourteenth Amendment substantive due process right to be free from state created danger. Defendants' arguments are inaccurate, irrelevant or beyond the scope of this motion. Plaintiffs are entitled to discovery on fact issues including what state of mind/level of intent existed when implementing the Nine Policies, whether competing obligations existed during policy making, whether the Nine Policies explicitly or implicitly encouraged inmate violence by signaling misconduct will be tolerated/unpunished, and the circumstances surrounding Defendants' refusal to acknowledge the increased violence against Correction Officers and misrepresentation of violence in the Jails.

Dated: New York, NY
      August 18, 2017

           **KOEHLER & ISAACS LLP**
           *Attorneys for Plaintiffs*
           61 Broadway, 25th Floor
           New York, N.Y. 10006
           (917) 551-1300

      By: _____
             Cynthia Devasia, Esq. (CD0320)