UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------x

CORRECTION OFFICERS' BENEVOLENT
ASSOCIATION, INC., TIFFANI DUBLIN,
individually and on behalf of all others
similarly situated, ANTHONY ROMANO,
individually and on behalf of all others
similarly situated, MATTHEW HINES,
individually and on behalf of all others
similarly situated, FRANCIS CASTRO,
individually and on behalf of all others
similarly situated, JOHN AND JANE DOES
1-2,000,

       Plaintiffs,

   -v-                                No. 17 CV 2899-LTS

THE CITY OF NEW YORK, MAYOR BILL
DE BLASIO, NEW YORK CITY
DEPARTMENT OF CORRECTION, and
COMMISSIONER CYNTHIA BRANN[1],

       Defendants.

-------------------------------------------------------x

<u>MEMORANDUM OPINION AND ORDER</u>

       Plaintiff Correction Officers' Benevolent Association, Inc. ("COBA"), the exclusive bargaining representative for all employees of the New York City Department of Correction ("DOC") holding the title of "Correction Officer" ("CO"), and COs Tiffani Dublin, Anthony Romano, Matthew Hines, and Francis Castro (collectively "Plaintiffs") bring this

---

[1] Pursuant to Federal Rule of Civil Procedure 25(d), Commissioner Cynthia Brann is substituted for Defendant Commissioner Joseph Ponte, who was named as a party to this action in his official capacity. See Phillip v. Schriro, No. 12-CV-8349-RA, 2014 WL 4184816, at *9 (S.D.N.Y. Aug. 22, 2014); (Compl. ¶ 16). The Clerk of Court is directed to amend the caption as set forth above.

action, in the case of the named COs, both individually and on behalf of others similarly situated, against the City of New York (the "City"), its mayor, Bill De Blasio, the DOC, and Cynthia Brann, the DOC Commissioner (collectively "Defendants").  Plaintiffs claim that Defendants have violated 42 U.S.C. section 1983 ("Section 1983") by subjecting them to a state-created danger in derogation of their substantive due process rights guaranteed by the Fourteenth Amendment.  (Compl., Docket Entry No. 1, ¶ 7.)  Defendants move pursuant to Federal Rule of Procedure 12(b)(6) to dismiss Plaintiffs' Complaint for failure to state a claim upon which relief can be granted.  (Docket Entry No. 35.)

The Court has subject matter jurisdiction of this action pursuant to 28 U.S.C. sections 1331 and 1343(a)(3).

The Court has reviewed the parties' submissions carefully and, for the following reasons, grants Defendants' motion to dismiss Plaintiffs' Complaint in its entirety.

BACKGROUND

The following facts are drawn from the Complaint.  The Court takes these facts as true for the purposes of this motion to dismiss.

Defendant DOC is an agency of the City of New York charged with the administration of the City's jail system, which includes 10 facilities located on Rikers Island in addition to other facilities throughout the City and within two City hospitals.  (Compl. ¶ 15.)  The inmate population of the DOC facilities consists of pretrial detainees who have not been convicted or sentenced, and sentenced inmates serving a term of one year or less.  (Id.)  To effectuate its mission "to ensure the care, custody, and control of persons housed within its facilities," DOC employs approximately 9,000 COs, who are represented by COBA for bargaining purposes.  (Id. ¶¶ 7, 15.)

Following a two and one-half year investigation into conditions at City jails, the United States Department of Justice ("DOJ") issued a report in August 2014 citing DOC for "rampant violations" and mandating certain reforms. (Id. ¶ 21.) The DOJ then intervened in Nunez v. City of New York, a then-pending class action lawsuit alleging that DOC was violating the rights of its inmates through the excessive use of force against them. (Compl. ¶ 21; see Nunez, 11-cv-5845-LTS-JCF (S.D.N.Y.), Second Am. Compl., Docket Entry No. 34.) On October 21, 2015, the Court entered a consent judgment in Nunez which mandated changes in, inter alia, the DOC use of force protocol, discipline of the DOC uniformed staff, staff training, and other policies relating to inmate safety and supervision. (See Nunez Consent Judgment, Docket Entry No. 1-12.)

In March 2015, the City announced a "14 Point Plan" and a series of initiatives, policies, practices, and customs to reduce violence against inmates within city jails. (Compl. ¶¶ 21-22.) Plaintiffs allege that these reforms prioritized the safety of inmates at the expense of the safety of the COs and other staff members. (Id. ¶¶ 1, 4, 22, 50, 125.) Plaintiffs have identified the following nine particular policies or practices[2] that they allege have increased the COs' exposure to physical danger or even death: (1) The discontinuation of the use of punitive segregation, a practice in which an inmate found guilty of violating certain rules, including assaulting staff, is housed in a higher-security unit, for young inmates in favor of alternative programs with no punitive element, such as the Transition Restorative Unit, the Second Chance Housing Unit, the Secure Unit, and the Enhanced Security Housing Unit (id. ¶¶ 24-32); (2) limiting the use of punitive segregation among the adult inmate population in favor of an

---

[2] Some of the challenged policies and procedures were implemented prior to the announcement of the 14 Point Plan. (See Compl. ¶¶ 21-22, 24.)

increased reliance on non-punitive programs and failing to use punitive segregation even to the extent authorized by this reformed policy (id. ¶¶ 47-53, 60-62); (3) DOC's failure to transfer inmates under investigation for violence against DOC staff to Pre-Hearing Detention as authorized by Directive 4501R-D (id. ¶¶ 65-68); (4) the promulgation and implementation of a new Use of Force Policy to comply with the Nunez consent judgment, requiring the exhaustion of an allegedly burdensome set of prerequisite actions before necessary force can be used and prohibiting the use of force in other dangerous situations (id. ¶¶ 75-84; Use of Force Directive 5006R-D, effective November, 20, 2015, Docket Entry No. 1-14); (5) inadequate training and training facilities (Compl. ¶¶ 85-104); (6) DOC's housing of "high security risk inmates" at the West Facility, a facility originally designed to house inmates with communicable diseases, without adequate DOC staff (id. ¶¶ 105-107, 117); (7) DOC's inmate classification system, the use of which results in a concentration of gang-affiliated inmates being housed together (id. ¶¶ 119-121, 124); (8) DOC's failure to provide COs with necessary equipment, including "batons, helmets, gloves, mechanical restraints, spit masks, . . . arm and shin guards," and body scanners, which could detect weapons concealed on inmates (id. ¶¶ 131-133, 135, 137-138); and (9) the intentional underreporting and misclassification of acts of violence against DOC staff (id. ¶¶ 142, 144-148, 153-157, 159).

Plaintiffs allege that violence in city jails increased 18%, as reported in May 2017, and injuries to DOC staff increased to approximately 1,337, in the period between November 2015 and December 2016. (Id. ¶¶ 1, 50.) Plaintiffs proffer graphic allegations detailing inmate violence against and abuse of DOC staff. (See generally Compl. ¶¶ 28-154.) Plaintiffs also allege that these specific incidents and the alleged increase in the rate of violence against DOC staff are attributable to Defendants' aforementioned policies and practices. (Id. ¶¶

32, 41-42, 45, 51-52, 64, 70, 72, 74, 79, 81-82, 84, 95-96, 98-99, 104-105, 108, 117, 119, 121-122, 124, 129-130, 137-138, 140-141.) According to Plaintiffs, DOC's alleged underreporting and mischaracterizations of violent encounters between inmates and staff present a misleading impression of the safety at DOC facilities and "give a false sense of security to the thousands of Correction Officers in the Jails." (Id. ¶ 158.) COBA has notified DOC that its punitive segregation policies are "dangerous and caus[ed] harm to Correction Officers on several occasions" and that its training facilities are inadequate. (Id. ¶¶ 64, 101.)

## DISCUSSION

In determining whether a plaintiff has set forth the "short and plain statement of the claim showing that [it is] entitled to relief" required by the Federal Rules (see Fed. R. Civ. P. 8(a)(2)), the Court looks to whether the allegations in the complaint establish the "facial plausibility" of the plaintiff's claims. Ashcroft v. Iqbal, 556 U.S. 662, 678-79 (2009). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678 (citing Bell Atl. Corp. v. Twombly, 550 U.S. 544, 556 (2007)). Such a showing "must be enough to raise a right to relief above the speculative level," requiring "more than labels and conclusions, [or] a formulaic recitation of the elements of a cause of action." Twombly, 550 U.S. at 555 (internal quotation marks omitted). In deciding a Rule 12(b)(6) motion to dismiss, the Court assumes the truth of the facts asserted in the complaint and draws all reasonable inferences from those facts in favor of the plaintiff. See Harris v. Mills, 572 F.3d 66, 71 (2d Cir. 2009). "In adjudicating a motion to dismiss, a court may consider only the complaint, any written instrument attached to the complaint as an exhibit, any statements or documents incorporated in it by reference, and any document upon which the complaint heavily relies."

Geron v. Seyfarth Shaw LLP (In re Thelen LLP), 736 F.3d 213, 219 (2d Cir. 2013) (citing Chambers v. Time Warner, Inc., 282 F.3d 147, 152-53 (2d Cir. 2002)).

Plaintiffs bring suit under Section 1983, which authorizes civil actions against individual state actors for relief from a "deprivation of any rights, privileges, or immunities secured by the Constitution." 42 U.S.C.S. § 1983 (LexisNexis 2013). Under the principles enunciated by the Supreme Court in Monell v. Dep't of Soc. Servs., 436 U.S. 658, 690-91 (1978), municipal governmental entities may be held liable under Section 1983 if the deprivation is the product of a municipal policy or custom. Plaintiffs assert that they are being subjected to a deprivation of their rights to substantive due process, specifically that they have a constitutional right "to be free from governmental policies that create or increase a substantial and imminent risk of serious bodily harm or death from third parties, like inmates" (Pls.' Mem. Of Law in Opp'n to Defs.' Mot. to Dismiss, Docket Entry No. 41, at 2), and that Defendants have implemented jail reform policies with deliberate indifference to COs' safety, thereby increasing the COs' risk of physical injury or even death at the hands of the City's inmates. See Pena v. Deprisco, 432 F.3d 98, 108 (2d Cir. 2005) ("a state created danger can be the basis of a substantive due process violation"). The Due Process Clause of the 14th Amendment to the Constitution of the United States provides that "'[n]o State shall . . . deprive any person of life, liberty, or property, without due process of the law.' . . . It has been read 'to guarantee more than a fair process . . . and to cover a substantive sphere as well, barring certain government actions regardless of the fairness of the procedure used to implement them.'" Pena, 432 F.3d at 98 (citations omitted).

Generally, neither the Fifth nor Fourteenth Amendment mandates that a governmental entity or agent affirmatively act to protect the life, liberty, property, or safety of a

member of the public.  Deshaney v. Winnebago County Dep't of Social Services, 489 U.S. 189, 196-97 (1989).  A government may, however, owe such a duty to a person who enjoys a special relationship with the state, such as a prisoner, id. at 197-200, or, under certain circumstances, if the state created the particular danger to the person's life or safety, Pena, 432 F.3d at 108.  The Supreme Court has nonetheless cautioned that the Due Process Clause of the Constitution "does not transform every tort committed by a state actor into a constitutional violation." Deshaney, 489 U.S. at 202.  A court must "screen[] out all but the most significant constitutional violations, lest the Constitution be demoted to a font of tort law." Matican v. City of New York, 524 F.3d 151, 155 (2d Cir. 2008) (quoting County of Sacramento v. Lewis, 523 U.S. 833, 848 n.8 (1988) (internal quotation marks and alterations omitted)).

Plaintiffs do not claim that they are in a "special relationship" with Defendants that is sufficient to give rise to an affirmative duty to protect them and support a viable substantive due process claim.  Rather, Plaintiffs' substantive due process claim is premised on the assertion that Plaintiffs are being subjected to dangers created by the government entities.  Plaintiffs assert that Defendants' actions here constituted deliberate indifference to Plaintiffs' asserted right to be free from the risk of an increase in state-created danger, insofar as Defendants knew of the risks to the COs of increased exposure to inmate violence that their policies entailed and enacted the policies anyway.[3]

---

[3]  The Second Circuit treats special relationships and state-created dangers "as separate and distinct theories of liability." Pena, 432 F.3d at 109.

To succeed on a state-created danger substantive due process violation claim, a plaintiff must establish that the defendant caused the plaintiff to suffer harm[4] through an affirmative action that was of such character as to shock the conscience. See Lombardi v. Whitman, 485 F.3d 73, 79, 81, 81 n.5 (2d Cir. 2007). "Government action resulting in bodily harm is not a substantive due process violation unless the government action was so egregious, so outrageous, [or arbitrary, in a constitutional sense] that it may fairly be said to shock the contemporary conscience." See id. at 79, 85 (quoting Pena, 432 F.3d at 112 and citing Collins v. City of Harker Heights, Tex, 503 U.S. 115, 129 (1992)) (internal quotation marks and citations omitted). A determination as to whether a state-sanctioned action shocks the conscience requires a careful evaluation of the particular circumstances of the case, including the nature of the state action, the magnitude and form of the harm inflicted on the plaintiff, and the state of mind of the defendants. Lewis, 523 U.S. at 850-54; cf. Pena, 432 F.3d at 114 (finding that police officials' implicit condonation of heavy drinking by off-duty officers shocked the conscience because it extended over a long period of time, presented an obvious risk, and resulted in grave danger to the public).

The poles of the range of states of mind that can support a determination that an executive actor's conduct shocks the conscience and can therefore constitute a substantive due process violation are clear. "[C]onduct intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level." Lewis, 523 U.S. at 849. Negligently inflicted harm, on the other hand, cannot, as a categorical matter, shock the conscience in a constitutional sense. Lewis at 848-49. Between

---

[4] A plaintiff may state a claim under the state-created danger doctrine where, as here, the defendant's actions allegedly enhanced or increased the risk of harm. See Okin v. Village of Cornwall-On-Hudson Police Dept., 577 F.3d 415, 427-28 (2d Cir. 2009).

intentionally and negligently inflicted harm lies injury caused through a defendant's deliberate indifference, a state of mind that, akin to recklessness, requires that a defendant knew of the risk and deliberately assumed or disregarded it.  Pena, 432 F.3d at 114 (defining deliberate indifference); see Matican, 524 F.3d at 158 (observing that deliberate indifference is situated between the two poles of negligence and the intentional infliction of harm).  Whether a defendant's deliberate indifference is sufficiently egregious to shock the conscience is dependent on the particular circumstances of the violative conduct, such as the nature of the government action and the harm inflicted.  Lewis, 523 U.S. at 850; cf. Pena, 432 F.3d at 114.  Here, Plaintiffs' claims are premised on allegations that Defendants acted, not with the intent to harm COs, but in a manner that was deliberately indifferent to increased risks of harm to COs as a consequence of measures designed to improve to conditions for inmates.  (See Compl., ¶¶ 1, 4, 22, 50, 125.)

Courts have recognized that a government actor's deliberate indifference may shock the conscience and thereby support a substantive due process claim where the government actor created or increased the danger to an individual and had sufficient "time to make unhurried judgments, upon the chance for repeated reflection, largely uncomplicated by the pulls of competing obligations" or public goals.  Lewis, 523 U.S. at 853; see Lombardi, 485 F.3d at 83; see also Pena, 432 F.3d at 112-14.  Courts have acknowledged, however, that government action often necessitates decisions that inherently involve weighing the risk to the safety and welfare of one group against that of another or the advancement of other public policy goals.  Collins, 503 U.S., at 128-29; Lombardi 485 F.3d at 83-85.  The Second Circuit, recognizing a government's need to make such difficult decisions, has held that deliberately indifferent policy actions of government actors cannot shock the conscience in a constitutional sense where they seek to

accommodate competing governmental interests even if the decision-making official, aware of the risks to a particular group, makes a poor choice resulting in grave consequences. Lombardi 48 F.3d at 83-85. Thus, liability cannot be imposed under the deliberate indifference standard when a governmental entity acts subject to the pull of competing governmental obligations. See id. at 85. In such circumstances, a substantive due process violation cannot be found unless the government action was undertaken arbitrarily or with the intent to harm. See also Benzman v. Whitman, 523 F.3d 119, 128 (2d Cir. 2008) (finding that, in light of competing public policy considerations, a state-created danger claim could only succeed if plaintiff alleged that the government "acted with intent to harm").

In Lombardi, the plaintiffs alleged that, following the terrorist attacks of September 11, 2001, the United States Environmental Protection Agency ("EPA") violated rescue and clean-up workers' substantive due process rights by issuing false statements indicating that the air surrounding the former World Trade Center site was safe, thus inducing the workers to continue to work at the site with inadequate protective equipment. 485 F.3d at 74-77. The Second Circuit upheld the dismissal of the complaint, finding that the alleged conduct did not shock the conscience and reasoning that "substantive due process liability should not be allowed to inhibit or control policy decisions of government agencies, even if some decisions could be made to seem gravely erroneous in retrospect," especially where a government is entrusted to prioritize risks to one group relative to another group or the advancement of a public goal. Id. at 84-85.

Here, Plaintiffs allege that Defendants prioritized the safety of DOC's inmates over that of the COs and violated Plaintiffs' right to substantive due process through deliberate indifference to the implications CO safety of their policy changes. Although the COs perform

vital work in an inherently dangerous environment, this attention to the safety of DOC's inmates, who themselves enjoy a special relationship with the City entitling them to protection pursuant to the Due Process Clause,[5] is exactly the type of competing obligation that makes liability based on the deliberate indifference standard inappropriate. See Benzman, 523 F.3d at 128 (rejecting a deliberate indifference claim where EPA misrepresentations induced residents to return to lower Manhattan following the World Trade Center attacks even though the competing interest was not as weighty as the EPA's interest in encouraging the rescue and recovery work that was at issue in Lombardi). Recognition of a viable cause of action based on that standard in this context would essentially impose constitutional liability on the DOC for any policy that foreseeably and markedly increased the risks to the safety of either DOC staff or DOC inmates, thereby effectively paralyzing the agency in any action designed to protect either group.[6] Furthermore, Plaintiffs acknowledge that some of the DOC reforms are necessary in order for Defendants to comply with their obligations under the Nunez consent judgment, which represents still another competing obligation. (See Compl. ¶¶ 78-79 (asserting that compliance with the Nunez consent judgment increased workplace danger).)

Plaintiffs contend that a claim based on deliberate indifference is appropriate in these circumstances simply because Defendants implemented their reform policies in an

---

[5] Prisoners enjoy a special relationship with the state entitling them to protection through the substantive due process doctrine because the state has deprived them of the ability to provide for their own care and safety by virtue of their confinement. See Matican, 524 F.3d 155-56 (discussing the establishment of a special relationship).

[6] In light of its determination that Plaintiffs may not proceed under a theory of deliberate indifference, the Court need not consider whether any particular increase or combination of increases of the already significant and ever-present risks COs face on a daily basis is sufficient to shock the conscience.

unhurried and deliberative manner.[7] Although the Second Circuit, in rejecting the deliberate indifference claim in Lombardi, observed that exigent circumstances had compelled the EPA to act in a hasty manner, it discounted this consideration and held the deliberate indifference standard insufficient to support a finding of conscience shocking behavior solely because the EPA's responsibility to shield response workers from harm was subject to a competing public interest, namely to facilitate the clean-up and recovery of the World Trade Center site.[8] Lombardi, 485 F.3d at 82-83; see also Matican, 524 F.3d at 158-59 (observing that the Lombardi court did not rely on the EPA's need to act quickly). The parties have not cited, and the Court's research has not disclosed, any precedent in which another court has held the deliberate indifference standard sufficient to support a substantive due process claim where a valid and articulated competing government obligation was a factor in the challenged conduct. See Lombardi, 485 F.3d at 83 ("In previous cases in which we recognized a state created danger, government officials were not subject to the pull of competing obligations."); Pena, 432 F.3d at 114 ("Not condoning egregious drunk driving 'does not ordinarily clash with other equally important governmental responsibilities.'") (quoting Lewis, 523 U.S. at 852); cf. Kowaleski v. Lewis, 643 F. Supp. 2d 259, 271-74 (N.D.N.Y. 2009) (upholding a claim under the deliberate indifference standard where a plaintiff prison guard was subjected to harassment and other behavior that increased her risk of harm, after she reported misbehavior by other prison

---

[7] Plaintiffs do not explicitly allege the manner in which these policies and practices were formulated and implemented. Plaintiffs do, however, allege that they were implemented through new DOC programs, policies, and directives, from which the Court can infer that a formal, deliberative, and reflective process was followed. See Doe v. Columbia Univ., 831 F.3d 46, 48-49 (2d Cir. 2016) (stating that, in considering a motion to dismiss, all reasonable inferences must be resolved in favor of the plaintiff).

[8] Because the Lombardi court did not rely on the government's need to act quickly following the attacks, the Court declines Plaintiffs' invitation to construe the holding in Lombardi as limited to government actions in the aftermath of a disaster.

personnel, but without a finding of any competing government obligation). Notwithstanding the very real and palpable danger that the COs labor under in caring for and securing the City's inmates, Plaintiffs have provided no authority that would support a constitutional claim for state-created danger based on Defendants' deliberate policy determinations here, where inmate and CO welfare considerations are acknowledged in the Amended Complaint, and there is no allegation that Defendants acted with an intent to inflict harm on the COs in a way that is unjustified by any legitimate government interest.[9] See Lewis, 523 U.S. at 849 (stating that intentional injury "unjustifiable by any government interest" is the most likely type to rise to conscience-shocking levels); see also Benzman, 523 F.3d at 128 (finding that in light of competing public policy considerations, a state-created danger claim could only succeed if plaintiff alleged that the government "acted with intent to harm").

        Plaintiffs cite the Supreme Court's decision in Lewis, in support of their argument that the deliberate indifference standard is generally appropriate in a prison setting. The Lewis Court, however, used a prison staff's deliberate indifference to the welfare of a prisoner as an example of conscience-shocking behavior precisely because no "substantial countervailing interest excuse[s] the State from making provision for the decent care and protection of those it locks up." 523 U.S. at 851-52 (internal quotation marks and citations omitted).

        Plaintiffs also point to a passage in Gantt v. Ferrara, No. 15-CV-7661 (KMK), 2017 WL 1192889, at *12 (S.D.N.Y. Mar. 29, 2017), for the proposition that a court may find

---

[9]     Plaintiffs argue that deliberate indifference qualifies as an intent to cause harm and thus shocks the conscience because the deliberate indifference standard requires a defendant to act after intentionally disregarding risks to a plaintiff. This argument is without merit because courts have analogized deliberate indifference to recklessness and distinguished it from intent to purposefully cause harm. See Pena, 432 F.3d at 114.

deliberate indifference conscience-shocking when a state actor engages in harmful behavior over an extended period of time notwithstanding competing governmental obligations.  Plaintiffs' reliance on Gantt is misplaced.  The Gantt court was characterizing two Second Circuit decisions, Pena, 432 F.3d at 113-14, and Okin v. Village of Cornwall-On-Hudson Police Dept., 577 F.3d 415, 432 (2d Cir. 2009), each of which concluded that there was no countervailing government interest before finding that the deliberately indifferent behavior shocked the conscience and neither of which indicates that a competing obligation is overcome if a defendant engages in harmful conduct over an extended period of time.  In Gantt itself, the court found that there was no factual basis in the complaint for a finding that the defendants in that case had even been aware of the risk to which the plaintiff claimed that they had deliberately been indifferent.  See Gantt, 2017 WL 1192889, at *13.

Plaintiffs thus fail to state claims upon which relief may be granted with respect to the first eight challenged polices or practices.

Defendants' remaining claim, that the alleged practice of deliberately underreporting and misreporting violence in their jails is shocking to the contemporary conscience, fails to state a claim because Plaintiffs allege no facts showing how such false reporting increases the COs' exposure to physical harm.  Cf. Lombardi, 485 F.3d at 81, 81 n.5 (taking the plaintiffs' allegations as true, assuming and setting aside the question of a causal connection between the government action and the harm suffered by the plaintiffs).  Although Plaintiffs argue that these misrepresentations are intended to make the DOC facilities appear safer than they actually are, Plaintiffs provide no factual allegations tying the allegedly false reports of violence against COs or among inmates to any of the alleged injuries to a CO.  The claim must therefore be dismissed, and the Court need not consider whether Defendants' alleged

behavior in this regard could be actionable as conscience-shocking under the Due Process Clause.

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss the Complaint is granted in its entirety. This dismissal is without prejudice to the filing of a motion pursuant to Federal Rule of Civil Procedure 15(a) for leave to amend the Complaint.

Any such motion must be filed by **July 2, 2018** and must be accompanied by a memorandum of law and a copy of the proposed amended complaint that is blacklined to identify the proposed changes. Failure to make a timely motion for leave to amend, or to demonstrate in such a motion that amendment would not be futile, will result in dismissal of this action with prejudice and without further advance notice.

This Memorandum Opinion and Order resolves Docket Entry No. 35.

SO ORDERED.

Dated: New York, New York
       May 30, 2018

                                          /s/ Laura Taylor Swain
                                          LAURA TAYLOR SWAIN
                                          United States District Judge