# Exhibit A
## of the Proposed First Amended and Supplemental Complaint


Menu



Search

About DOCNewsFacilitiesContact DOC

| Select ⌄ |
|---|

- In the News
- News Releases and Other Information

Statement before the
# New York City Council

### Committee on Fire and Criminal Justice Services

Elizabeth Crowley, Chairperson

By Joseph Ponte, Commissioner
# NYC Department of Correction

March 10, 2016

Good morning, Chair Crowley and members of the Fire and Criminal Justice Services committee. I am Joseph Ponte, Commissioner of the New York City Department of Correction. I thank the Council for the opportunity to testify here today and for their continued support as we work to ensure the safety of our staff and those entrusted to our care.

# The 14-Point Anti-Violence Reform Agenda

Since we last spoke, the Department has been continuing our rapid pace of reform. We have been implementing our 14-point Anti-Violence Reform Agenda, which I spoke to you about last year. The agenda focuses on reducing violence by improving security policies, upgrading our infrastructure and systems, and fostering cultural change, included through expanded training and programming. We have instituted Department-wide changes that we believe will improve inmate and staff satisfaction and safety. We have improved our processes for recruiting and vetting staff to ensure that we have a capable and well-qualified pool of recruits for our Academy. We have improved our data assessment and analysis to target hot spots – specific housing areas where violence is flaring up. We have also created the Housing Unit Builder (HUB) to better classify and house inmates to ensure that we are providing appropriate housing, staffing and programming to inmates who pose various levels of risk of violence. We are committed to this comprehensive strategy and expanding our reforms that we have piloted with specific populations or in specific housing units department-wide.

Today I'd like to highlight the progress we have made on the core elements of our Anti-Violence Plan.

## Reforms Targeting Special Populations

We have made significant progress on this ambitious agenda, especially in implementing reforms for some of our most difficult and vulnerable populations — namely the seriously mentally ill, adolescents, and young adults.

For the seriously mentally ill, we created and then expanded therapeutic units, Clinical Alternative to Punitive Segregation (CAPS) and Program for Accelerated Clinical Effectiveness (PACE), which serve as national models for dealing with their unique challenges. These units operate as clinical settings, with correction officers and health staff on the units together during the day. The units are designed around tight collaboration

between clinical staff and uniformed staff with improved strategies for dealing with the behavioral issues triggered by mental illness. Violence on these units have been extraordinarily low since they opened and we are excited to be able to expand this model to get better treatment to more inmates.

For 16 and 17 year olds, we have lowered housing area censuses and increased staffing ratios, eliminated punitive segregation, created non-punitive, therapeutic alternatives for managing their behavior, and expanded programming. Expansions include new indoor recreation spaces and innovative programs, such as the Rikers Rovers program.

For the 18 to 21 year olds in our custody, we are in the process of creating an age-appropriate facility that addresses the unique developmental needs and safety challenges associated with the transition from adolescence to adulthood. In this newly dedicated facility, we will provide developmentally-appropriate programming and management to this population. The Nunez/DOJ consent judgment only requires DOC to modify staffing (increase staffing ratios, assign more steady officers, provide specific training) in areas with the 16 to 18 year old population. Because these reforms will help us to safely address the needs of young adults, however, we have elected to expand these reforms to all 1,100 young adults in our custody.

Also as part of our Young Adult Plan, we are phasing out the use of punitive segregation with 18 to 21 year olds -- making us the first jail in the nation to do so. Punitive segregation is being replaced with a continuum of alternative disciplinary sanctions for infractions. The first of these alternative areas, our Second Chance housing, has already been opened. In addition to disciplinary sanctions, positive behavior will be formally incentivized through additional programming, vocational training, enhanced visits and recreation time. This will apply to both individual behavior and whole housing areas. This is particularly important because young adults represent our most violent population; they are 10% of our daily population but are involved in more than 30% of our violent incidents. We are implementing a holistic approach to behavior management, which better serves the inmates and our officers by introducing measures designed to reduce incidents of violence.

## Punitive Segregation Reforms

Let me take a moment to expand on our broader punitive segregation reforms. We have fundamentally transformed the use of punitive segregation within the Department. When I first started we had close to 600 people in punitive segregation, and we had hundreds of inmates who owed thousands of days. We

have reduced the use of punitive segregation by roughly 70% and now have 180 individuals in punitive segregation. We expect this number to come down even further as we eliminate punitive segregation for 18 to 21 year olds, as I discussed earlier.

With few exceptions, we have capped the maximum sentence to thirty days and have set length of stay limits. Adolescents no longer serve punitive segregation. We have eliminated time owed from previous incarcerations and we have introduced a lower level of punitive segregation that provides for seven hours of out of cell time each day. We are more judiciously using punitive segregation and introducing more incentive-based models.

## Expanded Camera Coverage

We have also made tremendous strides in expanding camera coverage. Currently, we have 100% camera coverage in our adolescent facility, our young adult facility, and our model facility that I will describe in more detail later on. We initially focused on installing cameras in the facilities where we house some of our most difficult to manage populations. We are now working on expanding camera coverage to all of our facilities and our goal is to complete this work by the end of December.

## Safely Reducing Uses of Force

A key focus of cultural reform has been around changing the way that the Department approaches the use of force. We have revised our Use of Force (UOF) policy and will be training all current and incoming staff on the new policy. New reporting, tracking, monitoring, and components of the early warning system are being put in place now. We have also doubled staffing in both our Investigation Division (ID) and our Trials and Litigation unit,

created a new recruitment process for ID, and are putting investigators in the facilities. All of these changes will enhance Use of Force monitoring and ensure compliance.

All of these changes to how we approach the use of force, as well as many of the other reforms under the 14-Point Anti-Violence plan are also reflected in the Nunez/DOJ consent judgment. This is not surprising given that both were developed after an extensive review of the challenges facing the Department with respect to violence. More importantly, this overlap has allowed the Department to begin its work with the federal monitor in a proactive and productive manner, with many of the pieces of the consent judgment already underway.

## Expanded Training & Recruiting

We are not just expanding Use of Force training but also dramatically increasing other types of in-service training for current staff. Over the next few years, staff will receive the following in-service training:

- Crisis Intervention and Conflict Resolution,

- Defensive Tactics

- Direct Supervision and Safe Crisis Management for those working with adolescents and young adults
- Probe Team Tactics for those working in intake area

- Cell Extraction

- Crisis Intervention Training; and,

- Additional specific trainings for those working with special populations, such as mental observation areas and high custody adolescent and young adult areas

Recruitment has also been a top priority since I came to the department, not only to ensure safe coverage of our jails, but to also reduce overtime with new, qualified officers. We have improved our vetting process by more than doubling the number of staff in the Applicant Investigation Unit (AIU). We raised our vetting standards to match NYPD's standards. Due to years of neglect, we have developed a large officer deficit and rely heavily on overtime. This is especially true when serving our specialty populations. To address this, we have heightened recruitment. Approximately 1,000 new officers have graduated since the last time I saw you. We aim to have roughly 600 recruits from this next graduating class, and will be focusing on graduating over 600 from the class after that, breaking the class size records we set last year.

We do face some operational hurdles as we increase the amount of training AND increase the number of recruits we bring in to the Department. Our academy was never designed to support such large recruit classes while also offering expanded in-service training. Increased training imposes significant operational demands since, in addition to space, we must bring on the appropriate trainers, resources, and materials in a timely manner. Furthermore, safely pulling out staff from facilities to participate in training impacts overtime. Through careful planning, we are working on minimizing the impact of having staff out for training on those officers who remain working in our jails. We are also working with our agency partners and City Hall to identify suitable spaces to accommodate our Academy and expanded training needs.

## Improving Programming and Housing

We are actively seeking to increase available programming for each inmate, with a goal of offering five hours of available programming each day. Increasing programming serves two important functions: it reduces violence by reducing idle time, and it better prepares inmates to return to the community, so that they do not come back to our custody.

We have expanded the school day for adolescents in RNDC. We have opened program-driven housing areas for young adults in GMDC. We are putting full-time program

coordinators in adolescent and young adult housing units to assess inmates' needs and help them build skills in preparation for reentry into society.

We are also developing programming options for adults. We are specifically looking at programming around re-entry services, substance abuse, behavioral health, services for incarcerated veterans, and female gender responsive programming. We have established a more robust process for evaluating programming needs and have started implementing that process within the young adult population. We will be implementing a similar procedure for adults. Each inmate will be interviewed for programming interests as part of the new admission process and these preferences are factors the HUB considers in making housing determinations, so that we can build programming-focused housing units, similar to the young adult houses.

# Working with Our Partners: Healthcare and PREA Compliance

As I have discussed, DOC has made significant investments in new training, policies, housing and programming that are all geared towards lowering violence, and keeping our officers and inmates safe. There are a number of areas where we must continue to devote significant resources and collaborate with key partners to maximize the returns on our investment in violence reduction.

## Healthcare Services

We are working very closely with our partners at New York City Health + Hospitals to better support and manage those in our custody. As everyone knows, the City ended its contract with Corizon in December 2015. New York City Health + Hospitals is now the manager and provider of correctional health services.

New York City Health + Hospitals has been an essential partner as we develop alternatives to punitive segregation and more targeted programming. The best example of this partnership has been our joint expansion of the clinical models to ensure better care for inmates with severe mental illness. The Clinical Alternative to Punitive Segregation (CAPS) and the Program for Accelerated Clinical Effectiveness (PACE) are specialized units that

Department of Correction

focus on managing and treating these inmates. As I mentioned earlier, these units have had low rates of violence and injury.

There has been a significant increase in coordination between DOC and Correctional Health Services since New York City Health + Hospitals became the provider. We continue to work closely with New

York City Health + Hospitals to find ways to expand our coordination in order to improve the correctional health model.

## PREA

As part of our efforts to voluntarily bring our Department in compliance with the federal Prison Rape Elimination Act (PREA), we have been working with our federally-funded consultants, the MOSS Group. Since we last met, at the recommendation of the MOSS Group, we completed training of uniformed staff to serve as PREA compliance managers for all of our facilities. We will begin facility-wide training in mid-March throughout three of our facilities, including our female facility, the Rose M. Singer Complex.

## <u>Officer Safety</u>

We believe that the combined impact of all our reforms will lower violence, and keep our officers and inmates safe. We must invest in our officers, who are central to all of the work that we do. That investment goes beyond expanding training or improving facilities. It includes recourse against those inmates who assault officers and isolating those inmates who consistently assault and harm other inmates by bringing contraband and weapons into the jails. There were 1,100 inmate arrests last year. Those represent inmate arrests for possession of weapons and other contraband, inmate on inmate assaults, and assaults on our staff. We have been working collaboratively with the new Bronx DA to identify ways to more efficiently handle and process re-arrests so that we can have swift and certain punishment for those who commit acts of violence. We have a tough jail population with a

Department of Correction

high percentage of gang members in our facilities, so we are working with the Bronx DA and the NYPD to better identify and share information about those gangs, connecting all agencies' knowledge to make everyone safer.

# The Future of the 14-Point Plan: Expanding on DOC's "Model Facility"

As I close, I want to highlight one facility where we have concentrated our attention and rolled out our 14-point agenda – the George R. Vierno Center (GRVC). This serves as our "model facility." Some of our reforms, such as camera installation and improved front-gate security, have been implemented in all
of our jails. In GRVC, we have made infrastructure changes to housing areas, rehoused inmates using the HUB, dramatically increased available programming, steadied and increased staff, and revamped incident responses. These changes will eventually be rolled out department-wide.

Since standing up the model facility in September, ten housing units have been "re-started" with an average daily population of 350-375 inmates. Within those "re-start" units, there has only been one "A" use of force and only twenty-five incidents overall, during a time period when, in the past, there might have been more than ninety with the same number of inmates.

Ultimately, the most important component of these changes is that officers are empowered to take control of their houses by using basic correctional practices and engaging with inmates on a daily basis. This is the combination of policy, resources, and support that will ultimately change the culture throughout this Department. I look forward to reporting more on these advances and successes in the future.

I now turn the floor over to Frank Doka, our Deputy Commissioner of Financial, Facility, and Fleet Administration, to discuss the FY17 Preliminary Budget.

Department of Correction                                    Page 10 of 15

# Financial and Facility Section

Good Morning, thank you for the opportunity to report on the Department's FY17
Preliminary Expense and Capital Budgets.

# FY17 Preliminary Budget and Its Impact on DOC (January Plan)

The Department's Fiscal Year 2017 Expense Budget is $1.31 billion. The vast majority of
this, 87%, is allocated for Personal Services, and 13% for Other than Personal Services.
The Fiscal Year 2017 budget is $7.7 million less than this year's budget of $1.32 billion. This
decrease is mainly due to initiatives and grant funding allocated to the current fiscal year
only.

Included in the Preliminary Budget is, an additional $65.3 million in Fiscal Year 2016, $107.8
million in Fiscal Year 2017, $98.7 million in Fiscal Year 2018 and $94 million beginning in
Fiscal Year 2019.

The following are some highlights of the major programs that were funded:

- DOJ/Nunez Settlement –$39 million in FY16, $58.3 million in FY17, $53.2 million in FY18
  and

  $48.5 million beginning in FY19 was provided for an additional 298 uniformed and
  131 civilian positions and associated OTPS items, to facilitate the Department
  achieving compliance with the terms outlined in the DOJ/Nunez agreement. Various
  commands within the Department require additional support as a result of the
  agreement, due to substantial use-of-force tracking and reporting requirements; use
  of force investigation protocols; improved applicant investigation measures to ensure
  the Department recruits the most qualified Correction Officer candidates; enhanced
  staff screening for post assignments to specialized housing units; supervision of the
  inmate population between the ages of 16 through 19; and an expanded training

Department of Correction

curriculum in areas such as use-of-force policy, crisis intervention/conflict resolution and defensive tactics.

- 14 Point Plan Reform Agenda - $20.9 million in FY16, $41.3 million in FY17 and $37.3 million beginning in FY18 was provided for an additional 218 uniformed and 101 civilian positions and associated OTPS items to continue the Department's efforts to decrease violence and eliminate contraband entering in our facilities.  The funding provided in this financial plan will continue to help with work already begun for establishing comprehensive security camera coverage, creating an integrated classification and housing strategy, idleness reduction among our adult inmate population, keeping weapons and drugs out of Rikers, and staff training.

- 2015 City Council Reporting Bills - $1.2 million in FY16 and $800,000 beginning in FY17 was provided for 4 uniformed and 4 civilian positions as well as funding for IT application development to comply with data reporting on Enhanced Supervision Housing units, inmates who await housing placement into RHU and CAPS, creation of the inmate bill of rights and quarterly reporting of inmate population demographics.

- PREA Compliance –$255,000 in FY16 and $1 million beginning in FY17 was provided for 12 civilian positions needed as the Department actively moves forward to achieve federal PREA compliance.  In addition to receiving two federal grants over the past three years, which funded the sexual safety assessment of our facilities and development of training curriculum for our staff, the Department began hiring compliance managers to work directly with the staff in our facilities in order to meet mandated PREA compliance throughout the agency.

- Arrest Unit – approximately $800,000 beginning in FY16 was provided for 7 uniformed and 2 civilian positions and associated OTPS items to work in conjunction with the Bronx District Attorney's office for the arrest and swift prosecution of inmates found to have committed either inmate-on-staff or inmate-on-inmate violent offenses within our facilities.

Department of Correction

- Rikers Island Co-Generation Plant Maintenance and Support Contracts - $1.8 million in FY16 and $3.7 million beginning in FY17 to fund service and maintenance contracts for the solar turbines, compressors and control systems within the plant.

- Engineering Audit and Stormwater Water Compliance – approximately $500,000 beginning in FY17 was provided to fund 5 Civilian positions that satisfy recommendations in the Comptroller's April 2015 audit report of DOC's Engineering Audit Office's Compliance with Directive #7, as well as to meet requirements under the State's Small Municipal Stormwater Sewer Systems (MS4) permit.

# Capital Funding

With regard to capital funding, the Fiscal Year 2017 Preliminary Capital Budget and Commitment Plan totals $1.7 billion, which covers Fiscal Years 2016 through 2020. Between the September and January capital commitment plans, more than $200 million was allocated for critical infrastructure upgrades of

Rikers Island facilities, information technology enhancements, and replacement of equipment past its lifecycle.

Additional funding provided by OMB includes:

- $68 million for facades, windows, roofs and other structural improvements

- $67 million for air handling units, duct work, heating, cooling and ventilation equipment

- $34 million for fire safety

- $20 million for classroom and programmatic space for our young adult, adult inmate and high classification populations
- $8 million for the replacement and repair of gang cell release doors at RNDC, and

  $7.7 million for IT and telecommunications equipment, radio console replacement at the Transportation Division, asbestos abatement and shower reconstruction

Thanks to the Administration's capital investments since the FY16 Executive Budget, the Department is moving forward with the necessary infrastructure modifications needed at both our on-island and off- island facilities.  Our facilities must be brought up to a state of good repair to ensure the utmost safety of our staff and inmate population.  Additionally, as we reach our compliance goals of having operational fire alarm systems (Phase I) in all facilities, we can now move forward with designing and implementing Fire Life Safety Phase II.  Work for Fire Life Safety Phase II will include installation of sprinklers, construction of separation barriers to limit the spread of fire and smoke and upgrade all related systems associated with fire-protection work at our facilities.

Along with the state of good repair projects, a number of initiatives included as part of the Department's 14-Point Anti-Violence Reform Agenda are underway.  The designs for all IP camera installations are complete, and contracted construction work at two of our facilities began last month with another three facilities to follow this month. Our internal facility maintenance forces continues to install cameras at six other facilities.  The plan is to have all camera installation for these facilities completed by the end of December 2016.

As part of our redesign for the Emergency Services Unit, the design phase for the new K-9 facility, which will be able to house up to 80 canines in a state-of-the-art compound, has been initiated, construction is expected to commence in September 2016 and be completed the following year.

To further our commitment to keeping dangerous contraband out of our facilities, procurement is almost complete on the purchase of 16 dual-view x-ray machines for the front entrances of our facilities.  The

technology of these new machines will allow our front-gate officers to better screen, view and detect hidden contraband being brought into our facilities. .

# Headcount

The following is a summary of the changes to Department's civilian and uniformed authorized staffing levels included in the January Plan:

- The full-time civilian authorized headcount increased by 256 positions in FY16 and 255 beginning in FY17.  The decrease of one funded position is related to grant funding that is added to the Department's budget on an annual basis.  The number of authorized full-time civilian positions is 2,145 in FY16 and 2,144 in FY17.

- The uniformed authorized headcount is increased by 542 positions to 10,195 for FY16, and further increases by another 25 positions to 10,220 beginning in FY17.  The average uniformed headcount is estimated to be 9,243 in FY16, which represents an increase of 447 compared to an average of 8,796 in FY 2015.

- The FY16 2nd Quarter Civilianization Report provided to the City Council identified 98 uniformed staff working in civilian functions.  The Department is committed to bringing that number down by backfilling previously funded vacated civilianized positions. Additionally, the Department will continue working to identify additional positions that could be civilianized and address funding requirements with OMB at the appropriate time.

Thank you again for the opportunity to testify today and for your continued support.  The Commissioner and I are happy to answer any questions that you may have.

# Exhibit B
## of the Proposed First Amended and Supplemental Complaint



THE CITY OF NEW YORK
OFFICE OF THE MAYOR
NEW YORK, NY 10007

**FOR IMMEDIATE RELEASE**: March 12, 2015
**CONTACT**: pressoffice@cityhall.nyc.gov, (212) 788-2958
Contact: E.J. Kessler (718) 546-0636 eve.kessler@doc.nyc.gov
Jack Ryan (718) 546-0921 Jack.Ryan@doc.nyc.gov

### MAYOR DE BLASIO, COMMISSIONER PONTE ANNOUNCE 14-POINT RIKERS ANTI-VIOLENCE AGENDA

*Five Main Initiatives to Target Growing Inmate-on-Inmate Violence*

**NEW YORK**–Mayor Bill de Blasio and Correction Commissioner Joe Ponte today announced a 14-point plan to aggressively combat violence and promote a culture of safety on Rikers Island, including five main initiatives to target inmate-on-inmate violence. This plan represents the administration's continued commitment to reform Rikers Island after decades of neglect.

At the heart of the plan are five major initiatives to reduce inmate-on-inmate violence:
- Keeping weapons, drugs and contraband out of Rikers, including visitor reforms
- Creating an integrated classification and housing strategy to more safely house inmates
- Providing comprehensive security camera coverage
- Designing effective inmate education opportunities and services to reduce idle time
- Developing crisis intervention teams to respond more quickly to inmate-on-inmate violence.

Inmate-on-inmate violence has been on the rise at Rikers Island over the past decade, representing 71 percent of all violent incidents for 2014. Thus far in 2015, 711 inmates were involved in an attack on another inmate.

"Today we are taking aggressive steps to move Rikers Island from a culture of violence to a culture of safety. From changing the visitor policy to intercept contraband to smartly placing inmates to avoid conflict to providing our inmates with expanded educational opportunities and services, we are taking on the growing number of violent incidents at Rikers from every angle," said **Mayor Bill de Blasio**. "As we move forward, this 14-point agenda will help us rebuild Rikers as a safer institution for officers and inmates alike."

"We will aggressively tackle inmate-on-inmate violence by stopping the flow of weapons and drugs into our jails and stanching the flow of information that enables gang members to commit violent acts across facilities," **Commissioner Ponte** said. "These steps will help us stop violence before it enters our gates."

**Keeping weapons, drugs and contraband out of Rikers** will be accomplished through a number of policy changes, including new rules for visitors that DOC will seek from the Board of Correction, its oversight body. These rules will seek to limit the physical contact inmates may have with visitors, broaden the criteria for restricting visitors, and establish a visitor registry. The goal is to create a common sense approach to visiting policy that reviews visits on a case by case basis and limits potential for contraband flow and crime, while respecting the ability of inmates to maintain legitimate ties with family members and the community. These changes would bring DOC policy closer in line with other large jail systems such as Los Angeles, Cook County (Chicago), and Philadelphia, which either place limitations on physical contact between inmates and visitors, or restrict visitors based on security and safety concerns.

Additional contraband policy initiatives include:

- Implementing K-9 capabilities for searches and investigations by June 2016
- Building more, new secure entrances for each facility by December 2018
- Training 100% of existing front entrance staff in enhanced TSA-style procedures by December 2015

**Creating an integrated classification and housing strategy** will ensure that the toughest, most violent inmates of Rikers are housed with each other, and will separate warring gangs and warring factions within gangs. Presently, some inmates with gang affiliations are housed together, while others are sprinkled throughout the general population.

This integrated classification and housing strategy includes:

- Refining the inmate classification process by April 2015
- Launching initial Housing/Classification pilots in select facilities by October 2015
- Stand-up Housing/Classification Unit to direct Department-wide housing and classification system by January 2016
- Rolling out a new housing and classification system and plan to all facilities by April 2016

**Comprehensive security camera coverage** will ensure there is active monitoring of jail activities in real time, to deter and respond in a timely manner to violence, and for intelligence purposes, to prevent violence altogether. DOC has installed full camera coverage in adolescent facilities and installed camera coverage in nine of the housing units dedicated to 18-21-year-olds; DOC will add full video and camera coverage within all facilities on Rikers Island by February 2018.

**Designing effective inmate education opportunities and services** will result in a comprehensive idleness reduction program that envisions an expansion of non-school classes and other activities such as fatherhood initiatives or workforce development, so that all inmates will have the option of attending a minimum of five hours of classes or programming daily, from one hour now. The department expects this should help stop violence by keeping inmates focused on priorities that assist rehabilitation.

The department expects to provide access to a minimum of 5 hours of non-school programming a day to adolescent (16-17) inmates by August 2015; a minimum of 5 hours of programming a day to young adult (18-21) inmates by December 2015; and a minimum of 5 hours of programming a day to adult (22+) inmates by March 2016.

**Redefining first line incident responses** will more quickly end violent incidents by training over 300 Emergency Services Unit officers on non-lethal force technique and jointly developing Crisis Intervention Teams, involving training 1,000 officers with DOHMH and implementation of teams by July 2015.

Additional initiatives will help move DOC toward a culture of safety. DOC will create and expand common-sense managerial and operational practices to strengthen performance, accountability, ownership and transparency through the following nine initiatives:

- Improve leadership development and culture
- Redefine the Investigations Division
- Design a recruitment, hiring and staff selection plan
- Design a performance management plan
- Implement operational performance metrics and analysis
- Create a well-defined supply distribution process
- Expand targeted training of officers and non-uniformed staff
- Raise facilities to a state of good repair
- Improve custody management

Background on Visitor Policy

From November 14 through January 31, DOC seized 10 weapons and 69 contraband drugs from 26 visitors who were trying to enter jails to visit gang members. Those individuals were arrested.

The new rules would bring DOC policy closer into line with that of other large jail systems such as Los Angeles, Cook County (Chicago), and Philadelphia, which limit physical contact between inmates and visitors, or restrict visitors based on safety and security concerns. These policies are considered best practices in the correction field. DOC will propose the rule changes at BOC's next meeting in May and, if approved, would implement them by August.

Philadelphia and Los Angeles both limit contact visits. New York State, Los Angeles, and Cook County all maintain visitor registries, and Cook County and Los Angeles may even deny visits based on certain security criteria, such as criminal history.

About the New York City Department of Correction

The New York City Department of Correction (DOC) manages the jail system for New York City. It operates Rikers Island, which houses 10 individual facilities, four borough-based jails and two hospital prison wards, as well as court pens in all five boroughs. In FY 2014, DOC had 77,141 admissions involving 56,218 individuals.

Its Average Daily Population is about 11,400, over 80 percent of whom are housed on Rikers Island. Most of the inmates in DOC custody are being detained pending the resolution of charges against them; about 15 percent are city-sentenced inmates who are serving sentences of one year or less.

"Mayor de Blasio and Commissioner Ponte's 14-point plan to reform Rikers Island is a strong step towards changing the prison's culture of violence. I applaud the Mayor for addressing the severity of the issue of inmate-on-inmate violence. We have a responsibility to ensure that everyone in the City, including those incarcerated, remains safe and that our correctional system works effectively. The Mayor's plan will help make Rikers Island a more secure environment where inmates can begin to turn their lives around," **Congressman Charlie Rangel**.

"This common-sense approach is a good step in the right direction to extinguish inmate violence and the smuggling of illegal weapons and contraband in Rikers Island. This plan also seeks to address violence perpetrated against juveniles in the correctional system, an urgent problem that must be fixed immediately. Mayor de Blasio and all involved should be commended for their leadership and commitment on this issue," said **Congressman Hakeem Jeffries**.

"For decades, Rikers Island has maintained a toxic culture of violence. In conjunction with Correction Commisioner Joe Ponte, Mayor de Blasio is taking concrete action to change this culture of violence into one of safety, making Rikers Island safer for correction officers and inmates. In addition, by expanding educational and development services, the Mayor is transforming Rikers Island to be more rehabilitative. I applaud Mayor de Blasio and Commissioner Ponte for their development of this 14-point plan and look forward to its full implementation," said **Congressman Gregory Meeks**.

"With this comprehensive plan, the Mayor is keeping his promise to aggressively address the problem of inmate violence that has plagued Rikers Island for years and to fix New York City's broken jail system. A reformed Rikers Island will ensure a safer environment for inmates and officers alike, which will result in a stronger correctional facility better able to serve its purpose of helping criminals change their behavior. The initiatives announced today will ultimately help us put in place a prison system that promotes the rehabilitation of inmates so that they can return to society as responsible individuals that want to contribute to their communities," said **Congressman José E. Serrano**.

"I am pleased to learn that the administration is broadening its efforts to tackle the issue of violence on Rikers Island," said **Council Member Daniel Dromm**. "Providing inmates with educational opportunities and time to be introspective will benefit everyone. Reducing idle time by offering detainees opportunities for self-improvement activities is an important part of the anti-violence program. I am pleased to see this renewed effort to reduce inmate on inmate violence in our city jails."

<center>###</center>

# Exhibit C
## of the Proposed First Amended and Supplemental Complaint

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------- X

MARK NUNEZ, et al.,

             Plaintiffs,

 - against -

CITY OF NEW YORK, et al.,

             Defendants.

-------------------------------------------------- X

    11 Civ. 5845 (LTS)(JCF)

UNITED STATES OF AMERICA,

             Plaintiff-Intervenor,

 - against -

CITY OF NEW YORK and NEW YORK CITY
DEPARTMENT OF CORRECTION,

             Defendants.

-------------------------------------------------- X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 10-21-2015

## CONSENT JUDGMENT

# TABLE OF CONTENTS

Page

I.      Background.................................................................................................... 1

II.     Jurisdiction, Venue, And Revised Class Definition.......................................... 2

III.    Definitions...................................................................................................... 2

IV.     Use of Force Policy......................................................................................... 5

V.      Use of Force Reporting and Tracking............................................................. 10

VI.     Anonymous Reporting System....................................................................... 15

VII.    Use of Force Investigations........................................................................... 15

VIII.   Staff Discipline and Accountability................................................................ 25

IX.     Video Surveillance........................................................................................ 28

X.      Risk Management.......................................................................................... 31

XI.     Staff Recruitment and Selection.................................................................... 33

XII.    Screening and Assignment of Staff................................................................ 33

XIII.   Training........................................................................................................ 35

XIV.    Arrests of Inmates........................................................................................ 40

XV.     Safety and Supervision of Inmates Under the Age of 19................................. 40

XVI.    Inmate Discipline.......................................................................................... 44

XVII.   Housing Plan for Inmates Under the Age of 18............................................... 46

XVIII.  Implementation............................................................................................ 47

XIX.    Reporting Requirements and Parties' Right of Access..................................... 47

XX.     Monitoring.................................................................................................... 51

XXI.    Compliance, Termination, and Construction................................................... 57

XXII.   Stipulation Pursuant to the  Prison Litigation Reform Act, 18 U.S.C. § 3626.... 58

XXIII.  Release by the Plaintiff Class........................................................................ 59

XXIV.   Attorneys' Fees, Costs, and Disbursements................................................... 59

XXV.    Notifications................................................................................................. 60

I.   BACKGROUND

This Consent Judgment ("Agreement") is entered by and among the Plaintiff Class (as defined herein), Plaintiff the United States of America (the "United States"), and Defendants the City of New York (the "City") and the New York City Department of Correction (the "Department" or "DOC") (the City and the Department are collectively referred to herein as the "Defendants").

WHEREAS, the purpose of this Agreement is to protect the constitutional rights of the inmates confined in jails operated by the Department. The terms and requirements of this Agreement will be interpreted to be consistent with the measures necessary to protect the constitutional rights of inmates and are not meant to expand or contract the constitutional rights of inmates at the jails operated by the Department;

WHEREAS, on or about May 24, 2012, the Amended Complaint was filed, and on or about September 4, 2012, the Second Amended Complaint was filed by four Plaintiff Class representatives and eight individual Plaintiffs (collectively, the "Named Plaintiffs"). The First and Second Amended Complaints alleged that the Department engaged in a pattern and practice of using unnecessary and excessive force against inmates in violation of their rights, and the rights of the members of the Plaintiff Class, under the Eighth and Fourteenth Amendments to the United States Constitution and the Constitution and laws of the State of New York. The Plaintiff Class representatives sought injunctive and declaratory relief on behalf of themselves and the Plaintiff Class. In addition, the Named Plaintiffs sought monetary damages related to specific incidents allegedly involving the excessive use of force against them;

WHEREAS, by Order dated January 7, 2013, the Court certified the Plaintiff Class pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(1)(A) and 23(b)(2). The certified Plaintiff Class is defined as: "all present and future inmates confined in jails operated by [the Department], except for the Eric M. Taylor Center and the Elmhurst and Bellevue Prison Wards." As set forth in Paragraph 2 of Section II (Jurisdiction, Venue, and Revised Class Definition), for purposes of this Agreement, the certified Plaintiff Class shall be expanded to include all present and future inmates confined in the Eric M. Taylor Center;

WHEREAS, prior to entering this Agreement, the Plaintiff Class and Defendants engaged in extensive discovery, including depositions of numerous Department employees and the production of more than one million pages of documents;

WHEREAS, beginning in 2012, the United States Attorney's Office for the Southern District of New York ("SDNY") conducted an investigation into the treatment of young male inmates, between the ages of 16 and 18, at jails located on Rikers Island pursuant to the Civil Rights of Institutionalized Persons Act ("CRIPA"), 42 U.S.C. § 1997, and Section 14141 of the Violent Crime Control and Law Enforcement Act of 1994, 42 U.S.C. §14141. At the time of the investigation, most of these young male inmates were housed at the Robert N. Davoren Complex and the Eric M. Taylor Center;

WHEREAS, on August 4, 2014, the SDNY and the Department of Justice ("DOJ") issued a findings letter pursuant to CRIPA that concluded that young male inmates,

between the ages of 16 and 18, were being subjected to unconstitutional conditions of confinement. In particular, the findings letter asserted that the City had engaged in a pattern and practice of: (a) subjecting these inmates to excessive and unnecessary use of force; (b) failing to adequately protect them from violence inflicted by other inmates; and (c) placing them in punitive segregation at an alarming rate and for excessive periods of time;

WHEREAS, on December 18, 2014, the United States filed an unopposed motion to intervene in this action, which was granted by the Court on December 23, 2014; and

WHEREAS, the Plaintiff Class, the United States, and Defendants will jointly petition the Court for approval of this Agreement;

NOW, THEREFORE, the Parties stipulate and agree, and IT IS HEREBY ORDERED, ADJUDGED, AND DECREED as follows:

## II.   JURISDICTION, VENUE, AND REVISED CLASS DEFINITION

1.   The Court has jurisdiction over this action under 28 U.S.C. §§ 1331, 1343, 1345, and 1367. Venue is proper in the United States District Court for the Southern District of New York pursuant to 28 U.S.C. § 1391(b).

2.   Plaintiff Class's Counsel and Defendants agree for purposes of this Agreement that the certified Plaintiff Class shall be expanded to include all present and future inmates confined in the Eric M. Taylor Center. Accordingly, the revised certified Plaintiff Class is defined as "all present and future inmates confined in jails operated by the Department, except for the Elmhurst and Bellevue Prison Wards."

## III.   DEFINITIONS

1.   The term "Anticipated Use of Force" means a situation, including but not limited to cell extractions, in which it is apparent that Staff Members will likely need to use force to address the situation and there is time to prepare a plan of action prior to using force.

2.   The term "Business Day" means a day which is not a Saturday or Sunday or legal holiday on which banks are authorized or required to close in New York, New York.

3.   The term "Class A" refers to a classification used by DOC to describe Use of Force Incidents that require medical treatment beyond the prescription of over-the-counter analgesics or the administration of minor first aid, including Use of Force Incidents resulting in one or more of the following treatments/injuries: multiple abrasions and/or contusions, a chipped or cracked tooth, loss of a tooth, a laceration, a puncture, a fracture, loss of consciousness, a concussion, a suture, internal injuries (*e.g.*, ruptured spleen, perforated eardrum, etc.), or admission to a hospital. Such injuries are referred to as "Class A Injuries" in this Agreement.

2

4.   The term "Class B" refers to a classification used by DOC to describe Use of Force Incidents that:  (a) do not require hospitalization or medical treatment beyond the prescription of over-the-counter analgesics or the administration of minor first aid (e.g., Use of Force Incidents that result in a superficial bruise, scrape, scratch, or minor swelling); or (b) involve the forcible use of mechanical restraints in a confrontational situation that results in no or minor injury.

5.   The term "Class C" refers to a classification used by DOC to describe Use of Force Incidents that result in no injury to Staff Members or Inmates, including but not limited to Use of Force Incidents where the use of Oleoresin Capsicum ("OC") spray results in no injury, beyond irritation that can be addressed through decontamination.

6.   The term "Class P" refers to a classification used by DOC to describe Use of Force Incidents that have yet to be classified as Class A, B, or C.

7.   The term "Commissioner" means the Commissioner of DOC.

8.   The term "Complete Camera Coverage" means fixed camera coverage sufficient to capture the activities and movement of all persons in a given area of a Facility, with the exception of toilets, the interiors of cells, the interiors of shower areas (although there must be fixed camera coverage of the ingress and egress of shower areas), and areas located within clinics and mini-clinics that are used exclusively to provide medical treatment to Inmates and Staff Members in a private setting, such as designated treatment rooms or cubicles (although there must be fixed camera coverage of the ingress and egress of such areas).  "Complete Camera Coverage" shall not include small, isolated blind spots caused by technological and/or mechanical limitations or the design of interior spaces.

9.   The term "Corrections Health Care Provider" means the agency or entity that is responsible for providing medical and mental health care services to Inmates.

10.   "Days" are measured in calendar days; weekend days are included.

11.   The "Direct Supervision Model" or "Direct Supervision" means a style of supervising and managing Inmates that includes the following elements:  (a) the assigned correction officer is stationed in the dayroom or other congregate area of the unit so that he or she is among the Inmates when they are out of their cells; (b) an emphasis on frequent, informal interactions and communications between the assigned officer and the Inmates; (c) an emphasis on early intervention to avoid potential inmate-on-inmate conflicts or crisis situations; and (d) the assigned officer and front-line supervisor are afforded substantial authority so that they feel responsible for the effective management and supervision of the unit.

12.   The term "DOI" means the New York City Department of Investigation.

13.   The term "Effective Date" means the date this Agreement is approved and entered by the Court.

3

14. The term "Facility" means any DOC command or institution.

15. The term "ICO" means an Integrity Control Officer.

16. The term "ID" means the Investigation Division of the Department.

17. To "implement" a policy, procedure, system, or other remedial measure means putting in place the policy, procedure, system, or other remedial measure, including informing, instructing, or training all appropriate personnel as needed or as required by this Agreement, and consistently following, applying, or using the policy, procedure, system, or other remedial measure.

18. The term "include" or "including" means "include, but is not limited to" or "including, but not limited to."

19. The term "Inmate" means any individual detained at, or otherwise housed, held, or confined in one of the Facilities.

20. The term "Isolation" means any type of involuntary confinement in a locked room or cell for at least three consecutive hours during the day (excluding overnight lock-in and other lock-in periods that are applicable to the general population, such as lock-ins for count, shift changes, contraband sweeps, or emergency situations involving security concerns). "Isolation" shall not include suicide watch, the confinement of an Inmate to prevent the spread of disease, or "Seclusion" in compliance with the procedures set forth in 40 NYCRR § 2-06.

21. The term "Monitor" means the person appointed pursuant to this Agreement who shall be responsible for assessing compliance with this Agreement.

22. The term "Non-DOC Staff" or "Non-DOC Staff Member" means any person not employed by DOC who is employed by the City or contracted by the City to provide medical and/or mental health care, social services, counseling, or educational services to Inmates.

23. The term "Parties" shall refer to the Plaintiff Class, the United States, and Defendants, collectively.

24. The term "Plaintiff Class's Counsel" means the attorneys representing the Plaintiff Class from The Legal Aid Society, Emery Celli Brinckerhoff & Abady, and Ropes & Gray LLP.

25. The term "Plaintiffs' Counsel" means the United States Attorney's Office for the Southern District of New York, which represents the United States, and Plaintiff Class's Counsel, which represents the Plaintiff Class.

26. The term "Punitive Segregation" means the segregation of an Inmate from the general population pursuant to a disciplinary sanction imposed after a hearing.

27. The term "RNDC" means the Robert N. Davoren Complex.

28. The term "Special Unit" means Enhanced Supervision Housing, Transitional Restorative Units, Second Chance Housing, Restrictive Housing Units, and any Punitive Segregation or mental health units. This term includes any equivalent future units as established by the Department.

29. The term "Staff" or "Staff Member" means any uniformed individual employed by the Department.

30. The term "Supervisor" means a Staff Member at the rank of Captain or higher.

31. The term "Use of Force" means an instance where Staff use their hands or other parts of their body, objects, instruments, chemical agents, electric devices, firearm, or any other physical method to restrain, subdue, or compel an Inmate to act in a particular way, or stop acting in a particular way. This term shall not include moving, escorting, transporting, or applying restraints to a compliant Inmate.

32. The term "Use of Force Incident" means any incident in which Staff engages in the Use of Force, or is alleged to have engaged in the Use of Force, against an Inmate.

33. The term "Young Inmate" means any Inmate under the age of 19 years old.

34. The term "Young Inmate Housing Areas" means all housing areas, including common areas within such housing areas, in Facilities used to house Young Inmates.


IV.   USE OF FORCE POLICY

1. Within 30 days of the Effective Date, in consultation with the Monitor, the Department shall develop, adopt, and implement a new comprehensive use of force policy with particular emphasis on permissible and impermissible uses of force ("New Use of Force Directive"). The New Use of Force Directive shall be subject to the approval of the Monitor.

2. The New Use of Force Directive shall be written and organized in a manner that is clear and capable of being readily understood by Staff.

3. The New Use of Force Directive shall include all of the following:

   a. A statement at the beginning of the New Use of Force Directive that sets forth the following general principles: "(i) the force used shall always be the minimum amount necessary, and must be proportional to the resistance or threat encountered; (ii) the use of excessive and unnecessary force is expressly prohibited; (iii) the Department has a zero tolerance policy for excessive and unnecessary force; and (iv) the best and safest way to manage potential Use of Force situations is to prevent or resolve them without physical force."

5

b.   An explicit prohibition on the use of high impact force, including the following statement: "(i) strikes or blows to the head, face, groin, neck, kidneys, and spinal column; (ii) kicks: and (iii) choke holds, carotid restraint holds, and other neck restraints; subject to the following exception: In a situation in which a Staff Member or other person is in imminent danger of death or serious bodily injury, and where lesser means are impractical or ineffective, Staff Members may use any necessary means readily available to stop or control the situation."

c.   An explicit prohibition on the following:

   i.   The Use of Force to punish, discipline, assault, or retaliate against an Inmate.

   ii.   The Use of Force in response to an Inmate's verbal insults, threats, or swearing.

   iii.   The Use of Force after control of an Inmate has been already established.

   iv.   Subjecting an Inmate to harassment or public humiliation.

   v.   The use of racial, ethnic, or homophobic slurs towards Inmates.

   vi.   Provoking Inmates to commit an assault in order to justify the Use of Force.

   vii.   The use of unnecessarily painful escort or restraint techniques.

   viii.   Causing or facilitating inmate-on-inmate violence.

   ix.   Pressuring or coercing Inmates, Staff, or Non-DOC Staff not to report a Use of Force Incident.

d.   An explicit requirement that Staff may use force only when reasonably necessary to:

   i.   "Prevent physical harm to Staff, visitors, Inmates, or other persons, as a last resort and where there is no practical alternative available;

   ii.   Prevent or stop the commission of crimes, including riot, assault, escape, or hostage taking;

   iii.   Enforce Departmental or Facility rules, policies, regulations, and court orders where lesser means have proven ineffective and there is an immediate need for compliance; or

   iv.   Prevent destruction of property that raises a safety or security risk."

e.   An explicit requirement stating that "all force shall cease when control of the Inmate has been established."

f.   A requirement that Staff shall summon a Supervisor to the scene as soon as possible when there is a Use of Force Incident underway or the potential for the Use of Force.

g.   Clear and adequate direction on when different levels of force and Use of Force techniques are permitted, including but not limited to the following requirements:

   i.   Staff shall start with the minimum amount of force that appears reasonable and may escalate the force used if necessary to stop or control the Inmate. Staff are not obligated to start at the lowest force levels nor to exhaust every lesser level in escalating to an effective level. The level of force used may increase as the situation becomes more dangerous or threatening and decrease as the situation comes under control.

   ii.   The level of force that may be used is determined by the type and amount of resistance exhibited by the Inmate.

   iii.   Staff shall first try to defuse the situation by talking to the Inmate, if time and circumstances permit.

   iv.   In situations where physical force must be used, Staff shall consider using non-contact control techniques, such as hand-held chemical agents or the Electronic Mobilization Shield. If other physical force is necessary, Staff must consider control holds, pain compliance holds, and take down-techniques as the lowest levels of force.

   v.   Only when the options in (g)(iii) and (g)(iv) above are impractical or ineffective to immobilize or neutralize an attack or aggression, and subject to the provisions of Paragraph 3(b) above, Staff may, as a defensive measure, apply a combination of blocks and/or strikes to non-vital areas of the Inmate's body. Blows or strikes shall never be utilized if control holds, grasping, or pushing would be effective in restraining an Inmate.

h.   A requirement that, where practicable, physical force shall not be used until the following conditions have been met:

   i.   A warning or command has been given, and if practical, repeated.

   ii.   The Inmate has had time to comply with the warning or command.

   iii.   It appears that the Inmate is going to continue to resist the order or the Staff's effort to control the situation.

   iv.   Additional non-force alternatives, including crisis intervention methods and specific defusing techniques, are not reasonably available, or have been unsuccessful, and the situation cannot be reasonably allowed to continue.

7

i.  A requirement that all Staff and Inmates who used force or upon whom force was used shall receive medical attention as soon as possible following any Use of Force Incident.

j.  A requirement that under normal circumstances no Staff involved in a Use of Force Incident participate in escorting the Inmate away from the scene, including to the medical clinic or holding area. Where practicable, the Staff who escort an Inmate shall be Staff who were least directly involved in the Use of Force Incident.

k.  Clear and adequate direction on how to utilize alternative non-forceful methods of resolving conflicts and confrontations when circumstances do not require immediate physical intervention.

l.  A statement that "all Staff who witness a clearly excessive Use of Force (*e.g.,* force used for the sole purpose of causing harm) are required to attempt to stop or reduce the force being used where practicable and consistent with safety and security."

m.  A statement that "all Staff have a duty to protect Inmates from harm, and have a responsibility to intervene to de-escalate confrontations as soon as it is practicable and reasonably safe to do so."

n.  Clear and adequate direction on how to conduct an Anticipated Use of Force, including but not limited to the following requirements:

   i.  Any Anticipated Use of Force must be under the direction of a Supervisor at the scene, who shall continually assess the well-being of both Staff and Inmates during the Anticipated Use of Force.

   ii.  No Anticipated Use of Force may occur absent approval from the Tour Commander or a higher ranking manager.

   iii.  Staff must utilize appropriate non-force alternatives to attempt to resolve the situation before using force.

   iv.  The first Use of Force shall be the use of chemical agents, unless circumstances dictate otherwise (*e.g.,* an Inmate due to mental impairment is unable to conform to verbal directives). Unless circumstances dictate otherwise, Staff shall wait a minimum of 60 - 120 seconds to allow the chemical agents to take full effect before applying additional chemical agents or initiating some other level of force.

   v.  Prior to the Use of Force, a Supervisor shall confer with a medical care staff member to gather pertinent information about the Inmate's medical condition and mental health status to ensure that there are no issues that contraindicate the application of any specific type of force.

8

    vi.    Prior to the Use of Force, a mental health care professional shall be summoned and shall attempt to persuade the Inmate to cooperate. The mental health care professional shall document his or her efforts to resolve the situation without the Use of Force, the extent to which those efforts were successful, and the length of time spent trying to resolve the situation without the Use of Force.

    vii.    The Anticipated Use of Force must be videotaped according to specified protocols, and the videotape must be properly secured and maintained.

    viii.    Where the Anticipated Use of Force is a cell extraction, the extraction may be conducted only by officers who have been trained on the proper procedures and protocols to ensure inmate and staff safety.

o.    Clear and adequate direction on how to reduce the risk of "positional asphyxia" during Use of Force Incidents, including but not limited to the following:

    i.    Staff shall attempt to monitor the breathing of any Inmate placed face down on the floor or ground in order to apply restraints, and, if an Inmate is observed having difficulty breathing, or reports not being able to breathe, Staff shall call for medical assistance immediately.

    ii.    As soon as an Inmate is restrained, Staff shall place the Inmate on his or her side on the floor or ground, or sitting up, until the Inmate is moved. Inmates carried by officers or transported by gurney or stretcher shall be placed on their sides if practicable or on their backs as a second choice if necessary.

    iii.    If an Inmate is face down on the ground or floor and resisting restraint, Staff shall not compress the Inmate's chest by placing weight on his or her upper back.

    iv.    An Inmate's ability to speak does not mean that he or she has adequate oxygen.

p.    Clear and adequate policy guidance on the proper use of security and therapeutic restraints, spit masks, hands-on-techniques, chemical agents, electronic immobilizing devices, kinetic energy devices used by the Department, batons, and lethal force, including the limited circumstances when such forms of force may be used and the precautions that must be taken to ensure the safety of Inmates, Staff, and other individuals.

q.    A requirement that Staff may use only equipment issued and authorized by the Department and that Staff must be trained in a particular piece of equipment or instrument of force in order to use that equipment or instrument of force, subject to the following exception: In a situation in which a Staff Member or other person is in imminent danger of death or serious bodily injury, and where Department-authorized types and instruments of force are unavailable or

inadequate, Staff Members may use any necessary means readily available to stop or control the situation.

r.   A definition of the term "Use of Force" that includes any instance where Staff use their hands or other parts of their body, objects, instruments, chemical agents, electric devices, firearms, or any other physical methods to restrain, subdue, or compel an Inmate to act in a particular way, or stop acting in a particular way. The term "Use of Force" does not include moving, escorting, transporting, or applying restraints to a compliant Inmate.

s.   The same definitions of Class A, Class B, and Class C Uses of Force included in the Use of Force Directive that existed prior to the Effective Date.

t.   A statement that "any failure to comply with any provision of the New Use of Force Directive may result in discipline up to and including termination."

4.   After the adoption of the New Use of Force Directive, the Department shall, in consultation with the Monitor, promptly advise Staff Members of the content of the New Use of Force Directive and of any significant changes to policy that are reflected in the New Use of Force Directive.

## V.   USE OF FORCE REPORTING AND TRACKING

<u>Staff Member Use of Force Reporting</u>

1.   Every Staff Member shall immediately verbally notify his or her Supervisor when a Use of Force Incident occurs.

2.   Every Staff Member who engages in the Use of Force, is alleged to have engaged in the Use of Force, or witnesses a Use of Force Incident, shall independently prepare and submit a complete and accurate written report ("Use of Force Report") to his or her Supervisor.

3.   All Use of Force Reports shall be based on the Staff Member's personal knowledge and shall include the following, to the extent the information is known by the reporting Staff Member:

a.   The date, time, and location of the Use of Force Incident.

b.   The date and time the Use of Force Report was completed.

c.   A list of all Staff Members who used force.

d.   A list of all persons on whom force was used.

e.   A list of all persons, including Non-DOC Staff Members, who were present when the Use of Force Incident occurred.

f.   A detailed description of the Use of Force Incident, the events preceding the Use of Force Incident including any attempts to de-escalate the situation and avoid the

Use of Force, and the reasons for engaging in the Use of Force. All reports must include a detailed description of the physical resistance exhibited by the Inmate; the type and level of force used by the Staff Member writing the report and by all other Staff who used force; whether any Staff used instruments or weapons, and if so, a description of the circumstances that led to their use; and a descriptions of the nature and extent of any visible or apparent injuries sustained by Inmates, Staff, or others.

g. As to reports prepared by the Captain and the Staff Member(s) responsible for escorting the Inmate to the clinic, the approximate time the Inmate was transported to receive medical care, and the name of the clinician or medical professional who provided care.

h. To the extent applicable, the name of any Staff Member who authorized and/or supervised the Use of Force Incident.

4. Staff Members shall prepare and submit their Use of Force Reports as soon as practicable after the Use of Force Incident, or the allegation of the Use of Force, and in no event shall leave the Facility after their tour without preparing and submitting their Use of Force Report, unless the Staff Member is unable to prepare a Use of Force Report within this timeframe due to injury or other exceptional circumstances, which shall be documented. The Tour Commander's permission shall be required for any Staff Member to leave the Facility without preparing and submitting his or her Use of Force Report. If a Staff Member is unable to write a report because of injury, the Staff Member must dictate the report to another individual, who must include his or her name and badge number, if applicable, in the report.

5. Staff Members shall not review video footage of the Use of Force Incident prior to completing their Use of Force Report. If Staff Members review video footage at a later time, they shall not be permitted to change their original Use of Force Report, but may submit a supplemental report upon request.

6. Staff Members shall independently prepare their Use of Force Reports based on their own recollection of the Use of Force Incident. Staff Members involved in a Use of Force Incident shall not collude with each other regarding the content of the Use of Force Reports, and shall be advised by the Department that any finding of collusion will result in disciplinary action. Staff Members involved in a Use of Force Incident shall be separated from each other, to the extent practicable, while they prepare their Use of Force Reports.

7. Use of Force Reports shall be reviewed by the individual assigned to investigate the Use of Force Incident to ensure that they comply with the requirements of Paragraphs 3 - 6 above, and that there is no evidence of collusion in report writing, such as identical or substantially similar wording or phrasing. In the event that there is evidence of such collusion, the assigned investigator shall document this evidence and shall undertake appropriate investigative or disciplinary measures, which shall also be documented.

8. Any Staff Member who engages in the Use of Force or witnesses a Use of Force Incident in any way and either (a) fails to verbally notify his or her Supervisor, or (b) fails to

11

prepare and submit a complete and accurate Use of Force Report, shall be subject to instruction, retraining, or appropriate discipline, up to and including termination.

9. The Department, in consultation with the Monitor, shall develop, adopt, and implement written policies and procedures regarding use of force reporting that are consistent with the terms of the Agreement.

### Non-DOC Staff Use of Force Reporting

10. The City shall require that Non-DOC Staff Members who witness a Use of Force Incident that results in an apparent injury report the incident in writing directly to the area Tour Commander or to a supervisor who is responsible for providing the report to the individual responsible for investigating the incident. The City shall clearly communicate in writing this reporting requirement to all Non-DOC Staff, and shall advise all Non-DOC Staff that the failure to report Use of Force Incidents that result in apparent injuries, or the failure to provide complete and accurate information regarding such Use of Force Incidents, may result in discipline.

11. Medical staff shall report either to the Tour Commander, ID, the ICO, the Warden of the Facility, or a supervisor whenever they have reason to suspect that an Inmate has sustained injuries due to the Use of Force, where the injury was not identified to the medical staff as being the result of a Use of Force. The person to whom such report is made shall be responsible for relaying the information to ID. ID shall immediately open an investigation, to the extent one has not been opened, into the Use of Force Incident and determine why the Use of Force Incident went unreported.

12. Medical staff shall advise a supervisor whenever they have reason to suspect that a Use of Force Incident was improperly classified, as those classifications are defined in the Department's Use of Force Directive. The medical staff member's supervisor shall then convey this information to the Tour Commander, who shall be responsible for providing the information to the Central Operations Desk ("COD").

13. Emergency matters involving an imminent threat to an Inmate's safety or well-being may be submitted at any time and shall be referred immediately to a Supervisor, who shall review the emergency matter with the Tour Commander as quickly as possible. If the Tour Commander determines that the safety or well-being of the Inmate may be in danger, the Department shall take any necessary steps to protect the Inmate from harm.

### Tracking

14. Within 30 days of the Effective Date, the Department shall track in a reliable and accurate manner, at a minimum, the below information for each Use of Force Incident. The information shall be maintained in the Incident Reporting System ("IRS") or another computerized system.

    a. Use of Force Incident identification number.

    b. Classification level of the Use of Force Incident, including any changes made to the classification level (*i.e.*, Class A, Class B, or Class C).

    c. Date, time, and location of the Use of Force Incident.

d.  Facility that houses each Inmate upon whom force was used or alleged to have been used.

e.  Names and identification numbers of all Inmates upon whom force was used or alleged to have been used.

f.  Names and identification numbers of all Inmates who were present in the area of the Use of Force Incident.

g.  Names and shield numbers of all Staff Members who used, or are alleged to have used, force.

h.  Whether the Use of Force Incident was an Anticipated Use of Force.

i.  Nature of any injuries sustained by Inmates, Staff Members, or anyone else.

j.  A brief description of the type of force (*e.g.*, chemical agent, single punch to body, control holds, punches to face or head, multiple blows, kicks, use of batons or other instruments, etc.) that was used and by whom.

k.  Whether force was used while the Inmate was in restraints.

l.  Whether video footage captured the Use of Force Incident and a brief description of the camera used (*e.g.*, fixed surveillance, handheld, or body-worn).

m.  Whether any Inmate was arrested as a result of the Use of Force Incident, and if so, a description of the new criminal charges.

n.  A brief description of the Staff Member's stated reasons for engaging in the Use of Force.

15.  Within 30 days of the Effective Date, the Department shall track in a reliable, accurate, and computerized manner, at a minimum, the following information for each Facility Investigation (as defined in Paragraph 13 of Section VII (Use of Force Investigations)): (a) the Use of Force Incident identification number and Facility; (b) the name of the individual assigned to investigate the Use of Force Incident; (c) the date the Facility Investigation was commenced; (d) the date the Facility Investigation was completed; (e) the findings of the Facility Investigation; (f) whether the Facility recommended Staff Member disciplinary action or other remedial measures; and (g) whether the Department referred the Use of Force Incident to DOI for further investigation, and if so, the date of such referral.

16.  The Department shall track in a reliable, accurate, and computerized manner, at a minimum, the following information for each Full ID Investigation (as defined in Paragraph 8 of Section VII (Use of Force Investigations)): (a) the Use of Force Incident identification number; (b) the name of the individual assigned to investigate the Use of Force Incident; (c) the date the Full ID Investigation was commenced; (d) the date the Full ID Investigation was completed; (e) the findings of the Full ID Investigation; (f) whether ID recommended that the Staff Member be subject to disciplinary action; and (g) whether the Department referred the Use of Force Incident to DOI for further investigation, and if so, the date of such referral. This information may be maintained in the Department's ID computer tracking systems until the development and

13

implementation of the computerized case management system ("CMS"), as required by Paragraph 6 of Section X (Risk Management).

17.   The Department shall track in a reliable, accurate, and computerized manner, at a minimum, the following information for each Use of Force Incident in which the Department's Trials & Litigation Division ("Trials Division") sought disciplinary action against any Staff Member in connection with a Use of Force Incident: (a) the Use of Force Incident identification number; (b) the charges brought and the disciplinary penalty sought at the Office of Administrative Trials and Hearings ("OATH"); and (c) the disposition of any disciplinary hearing, including whether the Staff Member entered into a negotiated plea agreement, and the penalty imposed. This information may be maintained in the computerized tracking system of the Trials Division until the development and implementation of CMS, as required by Paragraph 6 of Section X (Risk Management).

18.   All of the information concerning Facility Investigations, Full ID Investigations, and disciplinary actions set forth in Paragraphs 15, 16, and 17 above shall be tracked in CMS, which shall be developed and implemented by December 1, 2016, in accordance with Paragraph 6 of Section X (Risk Management). CMS shall be integrated with IRS or any other computerized system used to track the Use of Force Incident information set forth in Paragraph 14 above, and CMS shall have the capacity to access data maintained by that system. In addition, the Department shall track in CMS whether any litigation was filed against the Department or the City in connection with a Use of Force Incident and the results of such litigation, as well as whether any claim related to a Use of Force Incident was settled without the filing of a lawsuit.

19.   The Department also shall track information for each inmate-on-inmate fight or assault, including but not limited to the names and identification numbers of the Inmates involved; the date, time, and location of the inmate-on-inmate fight or assault; the nature of any injuries sustained by Inmates; a brief description of the inmate-on-inmate fight or assault and whether a weapon was used; and whether video footage captured the inmate-on-inmate fight or assault.

20.   Any computerized system used to track the information set forth in Paragraphs 14 – 19 above, including IRS and CMS, shall have the capability to generate aggregate reports. The Department shall utilize these computerized systems and their aggregate reports to determine whether there are ways to enhance the quality of inmate supervision or oversight of Staff Members, and to identify any systemic patterns associated with Use of Force Incidents or inmate-on-inmate fights or assaults, which the Department shall take appropriate steps to address in consultation with the Monitor.

21.   Within 60 days of the Effective Date, the Department, in consultation with the Monitor, shall review the definitions of the categories of institutional violence data maintained by the Department, including all security indicators related to violence (e.g., "allegations of Use of Force," "inmate-on-inmate fight," "inmate-on-inmate assault," "assault on Staff," and "sexual assault") to ensure that the definitions are clear and will result in the collection and reporting of reliable and accurate data.

Prompt Medical Attention Following Use of Force Incident

22.   All Staff Members and Inmates upon whom force is used, or who used force, shall receive medical attention by medical staff as soon as practicable following a Use of Force Incident. If the Inmate or Staff Member refuses medical care, the Inmate or Staff Member shall be asked to sign a form in the presence of medical staff documenting that medical care was offered to the individual, that the individual refused the care, and the reason given for refusing, if any.

23.   DOC shall record in the Department's Inmate Information System the time when Inmates arrive at the medical clinic following a Use of Force Incident, the time they were produced to a clinician, and the time treatment was completed. DOC shall record which Staff Members were in the area to receive post-incident evaluation or treatment.

## VI.   ANONYMOUS REPORTING SYSTEM

1.   The Department, in consultation with the Monitor, shall establish a centralized system pursuant to which Staff Members can anonymously report to ID information that Staff Members violated the Department's use of force policies. ID shall initiate a Preliminary Review in accordance with Paragraph 7 of Section VII (Use of Force Investigations) into any such allegations within 3 Business Days after receiving the anonymous report.

## VII.   USE OF FORCE INVESTIGATIONS

General Provisions

1.   As set forth below, the Department shall conduct thorough, timely, and objective investigations of all Use of Force Incidents to determine whether Staff engaged in the excessive or unnecessary Use of Force or otherwise failed to comply with the New Use of Force Directive. At the conclusion of the investigation, the Department shall prepare complete and detailed reports summarizing the findings of the investigation, the basis for these findings, and any recommended disciplinary actions or other remedial measures. All investigative steps shall be documented.

2.   *Inmate Interviews.* The Department shall make reasonable efforts to obtain each involved Inmate's account of a Use of Force Incident, including Inmates who were the subject of the Use of Force and Inmates who witnessed the Use of Force Incident. The Department shall not discredit Inmates' accounts without specifying a basis for doing so.

   a.   After an Inmate has been taken for a medical assessment and treatment following a Use of Force Incident, an Assistant Deputy Warden shall give the Inmate an opportunity to provide an audio recorded statement describing the events that transpired, which shall be reviewed as part of the investigation of the incident.

   b.   When requesting an Inmate's statement or interview, the Department shall assure the Inmate that the Inmate will not be subject to any form of retaliation for providing information in connection with the investigation. Requests for statements or interviews shall be made off the living unit and shall not be made

15

within sight or hearing of other Inmates or Staff involved in the Use of Force Incident. Inmate interviews shall be conducted in a private and confidential setting.

   c.     All efforts to obtain Inmate statements shall be documented in the investigation file, and refusals to provide such statements shall be documented as well.

3.     The Department shall promptly refer any Use of Force Incident to DOI for further investigation when the conduct of Staff appears to be criminal in nature.

4.     Any Staff Member found to have conducted a biased, incomplete, or inadequate investigation of a Use of Force Incident, and any Supervisor or manager who reviewed and approved such an investigation, shall be subject to appropriate discipline, instruction, or counseling.

5.     The Department shall properly classify each Use of Force Incident as a Class A, Class B, or Class C Use of Force, as those categories are defined in the Department's Use of Force Directive, based on the nature of any inmate and staff injuries and medical reports. Any Use of Force Incident initially designated as a Class P shall be classified as Class A, Class B, or Class C within five days of the Use of Force Incident. If not classified within 5 days of the Use of Force Incident, the person responsible for the classification shall state in writing why the Use of Force Incident has not been classified and the incident shall be reevaluated for classification every seven days thereafter until classification occurs.

6.     Within 60 days of the Effective Date, the Department, in consultation with the Monitor, shall institute a six-month pilot program to video record interviews conducted in connection with investigations of Use of Force Incidents ("Interview Video Recording Pilot"). Within 60 days of the completion of the Interview Video Recording Pilot, the Deputy Commissioner of ID ("DCID") shall prepare and provide to the Commissioner and the Monitor a report evaluating the results of the Interview Video Recording Pilot, including whether video recording interviews enhanced the quality of investigations, any logistical challenges that were identified, and any other benefits or weaknesses associated with the use of video to record the interviews. The Department, in consultation with the Monitor, shall then determine whether the Department shall require the video recording of interviews conducted in connection with investigations of Use of Force Incidents, instead of the audio recording of such interviews.

7.     Preliminary Reviews: Within two Business Days of any Use of Force Incident, a member of ID shall conduct a preliminary review into the incident ("Preliminary Review") to determine: (i) whether the incident falls within the categories set forth in Paragraph 8 below and thus requires a Full ID Investigation (as defined in Paragraph 8 below); (ii) whether other circumstances exist that warrant a Full ID Investigation of the incident; (iii) whether any involved Staff Member(s) should be re-assigned to positions with no inmate contact or placed on administrative leave with pay pending the outcome of a full investigation based on the nature of the Staff's conduct; (iv) whether the matter should be immediately referred to DOI due to the potential criminal nature of the Staff's conduct; (v) whether the matter should be immediately referred to DOI due to the potential criminal nature of the Inmate's conduct; and (vi) whether it is not necessary for the

Facility to take any additional investigative steps because the incident meets criteria set forth in subparagraph (c) below.

a.  The individual responsible for conducting the Preliminary Review ("Preliminary Reviewer") shall review the following: (i) the relevant video footage of the Use of Force Incident, including footage from fixed surveillance cameras and handheld or body-worn cameras; (ii) Use of Force Reports from Staff; (iii) interviews and/or written statements from the Inmate(s) subject to the Use of Force or alleged Use of Force; (iv) interviews and/or written statements from Inmates or civilian staff who witnessed the incident; (v) Injury-to-Inmate Reports; (vi) photographs of Inmates and Staff Members that were taken after the Use of Force Incident; and (vii) reports reflecting any injuries to Staff Members. In the event that the Inmate(s) subject to the Use of Force or alleged Use of Force has declined to provide a statement to the Facility, the Preliminary Reviewer shall attempt to interview the Inmate(s) concerning the Use of Force Incident.

b.  The Preliminary Reviewer shall confirm that the Use of Force Incident is properly classified as a Class A, Class B, or Class C Use of Force.

c.  To the extent any factual inaccuracies in the information required to be maintained under Paragraph 14(a) - (m) of Section V (Use of Force Reporting and Tracking) are identified during the course of the Preliminary Review, the information shall be corrected or updated in IRS.

d.  The Preliminary Reviewer shall document the results of the Preliminary Review.

e.  Under limited circumstances, the Preliminary Reviewer may determine that his or her review is sufficient and it is not necessary to take any additional investigative steps. The Preliminary Reviewer may make this determination only if the following criteria are clearly met and documented, and this determination is reviewed and approved by a supervisor in ID:

   i.  No Staff Member, Inmate, or other person sustained any injury, and the Inmate who was subjected to the Use of Force did not allege any pain.

   ii.  Any resistance by the Inmate was passive.

   iii.  Staff Members had only minimal physical contact with the Inmate, using only soft hand controls.

   iv.  The Use of Force Incident did not involve the use of weapons, including OC spray.

   v.  There was an immediate need for the Inmate to comply with Departmental or Facility rules, policies, regulations, or court orders, and non-force alternatives had proven ineffective.

   vi.  The descriptions of the Use of Force Incident included in the Use of Force Reports submitted by Staff Members were consistent with the affirmative statement by the Inmate who was subjected to the Use of Force and all other evidence.

17

vii.   Based on the Preliminary Review, the Use of Force was minimal, reasonably necessary, and clearly consistent with the New Use of Force Directive.

<u>Investigation Division</u>

8.   ID shall conduct a full investigation ("Full ID Investigation") into any Use of Force Incident that involves:  (a) conduct that is classified as a Class A Use of Force, and any complaint or allegation that, if substantiated, would be classified as a Class A Use of Force;  (b) a strike or blow to the head of an Inmate, or an allegation of a strike or blow to the head of an Inmate; (c) kicking, or an allegation of kicking, an Inmate; (d) the use, or alleged use, of instruments of force, other than the use of OC spray; (e) a Staff Member who has entered into a negotiated plea agreement or been found guilty before OATH for a violation of the Use of Force Policy within 18 months of the date of the Use of Force Incident, where the incident at issue involves a Class A or Class B Use of Force or otherwise warrants a Full ID Investigation; (f) the Use of Force against an Inmate in restraints; (g) the use of a prohibited restraint hold; (h) an instance where the incident occurred in an area subject to video surveillance but the video camera allegedly malfunctioned; (i) any unexplained facts that are not consistent with the materials available to the Preliminary Reviewer; or (j) a referral to ID by a Facility for another reason that similarly warrants a Full ID Investigation.  Such Use of Force Incidents shall be referred to ID within two Business Days of the incident.  In the event that information is obtained later establishing that a Use of Force Incident falls within the aforementioned categories, the Use of Force Incident shall be referred to ID within two days after such information is obtained.  ID shall promptly notify the Facility if it is going to conduct a Full ID Investigation of a Use of Force Incident, at which time the Facility shall document the date and time of this notification and forward any relevant information regarding the incident to ID.

9.   All Full ID Investigations shall satisfy the following criteria:

a.   *Timeliness.*

i.   Beginning on the Effective Date and for three years following the Effective Date, or until October 1, 2018, whichever is earlier:

1.   ID shall complete all Full ID Investigations by no later than 180 days from the date the Use of Force Incident was referred to ID ("Referral Date"), absent extenuating circumstances outside the Department's control that warrant an extension of this deadline. Any extension of the 180-day deadline shall be documented and subject to approval by the DCID or a designated Assistant Commissioner. Any Full ID Investigation commenced after the Effective Date that is open for more than 180 days shall be subject to monthly reviews by the DCID or a designated Assistant Commissioner to determine the status of the investigation and ensure that all reasonable efforts are being made to expeditiously complete the investigation.

18

    2.    The Department shall make every effort to complete Full ID Investigations of less complex cases within a significantly shorter period than the 180-day time frame set forth in the preceding subparagraph.

   ii.   Beginning on October 1, 2018, or three years after the Effective Date, whichever is earlier, and for the duration of the Agreement:

    1.    ID shall complete all Full ID Investigations by no later than 120 days from the Referral Date, absent extenuating circumstances outside the Department's control that warrant an extension of this deadline. Any extension of the 120-day deadline shall be documented and subject to approval by the DCID or a designated Assistant Commissioner. Any Full ID Investigation that is open for more than 120 days shall be subject to monthly reviews by the DCID or a designated Assistant Commissioner to determine the status of the investigation and ensure that all reasonable efforts are being made to expeditiously complete the investigation.

    2.    The Department shall make every effort to complete Full ID Investigations of less complex cases within a significantly shorter period than the 120-day time frame set forth in the preceding subparagraph.

   iii.   In the event that a Use of Force Incident is referred to DOI, or following the further referral by DOI to the District Attorney's Office ("DA") or another outside law enforcement agency, for investigation or a decision on immunity, the time period for the Department to complete the Full ID Investigation shall be tolled while the other agency is investigating the matter or making a decision on immunity. ID shall on at least a monthly basis contact DOI to monitor the status of investigations referred to other law enforcement agencies.

b.   *Video Review.* The assigned ID Investigator ("ID Investigator") shall review all relevant video footage of the Use of Force Incident, including footage from fixed surveillance cameras and handheld or body-worn cameras, and shall summarize the relevant video footage and explain whether the footage is consistent with witness reports. The ID Investigator shall document any non-functioning cameras, any unavailable video footage, or any other barrier to reviewing all relevant video footage. In the event that no or only incomplete video surveillance can be located even though the Use of Force Incident took place at a location under video surveillance, ID shall investigate why no or only incomplete video surveillance can be located, and document its findings.

c.   *Witness Interviews.* The ID Investigator shall interview all relevant witnesses, including the Inmate(s) subject to the alleged Use of Force, Staff alleged to have been involved in the Use of Force Incident, and Inmates, Staff, or civilian staff who witnessed the incident. However, in situations in which there is a large number of witnesses and interviewing all such persons is likely to be duplicative and unduly burdensome, the ID Investigator shall interview a reasonable number

of such witnesses. All witness interviews shall be audio recorded or video recorded.

    i.   The Inmate(s) who were subject to the alleged Use of Force shall be interviewed within two weeks of the Referral Date, absent unusual circumstances that shall be documented in the investigation file and reviewed by a Supervisor. The ID Investigator shall attempt to interview the Inmate even if the Inmate declined to be interviewed previously, except if the Inmate has been criminally charged in connection with the Use of Force Incident and has declined to be interviewed for that reason.

    ii.   All interviews of Staff involved in the Use of Force Incident shall be completed within 30 days of immunity grants from the Trials Division, DOI, or DA, absent unusual circumstances that shall be documented in the file and reviewed by a Supervisor.

    iii.   Interviews shall be conducted of any Staff Member who submits a written report stating that he or she did not observe any Use of Force where there is reason to believe the Staff Member was in close proximity to the location of the incident and should have observed what occurred.

    iv.   If a decision is made not to interview a witness, the basis for that decision shall be documented in the investigation file.

    v.   ID shall conduct its own independent interview of a witness even if the Facility previously interviewed the witness.

d.   *Review of Medical Evidence.* The ID Investigator shall take reasonable steps to obtain in a timely manner relevant medical records for any Inmate or Staff Member injured during a Use of Force Incident. Such steps shall include timely seeking a medical release from the injured person(s). The ID Investigator shall review the medical records to determine whether they are consistent with video surveillance, witness accounts, and other evidence, and take reasonable steps to reconcile any inconsistencies. A report from the New York City Office of Chief Medical Examiner shall be obtained when necessary to determine the cause of an injury or address complex forensic questions.

e.   *Report.* At the conclusion of his or her investigation, the ID Investigator shall prepare a complete and detailed report summarizing the findings of the investigation, the basis for these findings, and any recommended disciplinary actions or other remedial measures ("ID Closing Memorandum"). The ID Closing Memorandum shall set forth all the evidence gathered during the investigation, state whether Staff engaged in excessive or unnecessary Use of Force or otherwise failed to comply with the New Use of Force Directive, and explain how any conclusions and recommendations are supported by the evidence. If an Inmate's prior infraction or criminal history, or a Staff Member's Use of Force or disciplinary history, is included in the ID Closing Memorandum, its effect, if any, on the conclusion in the ID Closing Memorandum shall be documented. Where there are inconsistencies between different pieces of

evidence such as witness statements, the report shall adequately explain the basis for crediting one source of evidence over another.

f.   *Supervisory Review.* All ID reports shall be reviewed by the ID Investigator's supervisor to ensure that they comply with the terms of this Agreement and other applicable Department procedures and requirements. The supervisor shall address any aspect of the ID Closing Memorandum or ID Full Investigation that does not comply with the terms of this Agreement and other applicable Department procedures and requirements. The name of the supervisor who conducts this review, the date of the review, and the findings of the review shall be documented in the file.

10.   The Department shall consult with the Monitor to develop a plan to effectively and efficiently complete all ID Use of Force investigations and reviews that are outstanding as of the Effective Date. Those ID Use of Force investigations and reviews involving the categories of Use of Force Incidents set forth in Paragraph 8 above that are outstanding as of the Effective Date and have been open for more than six months shall be completed within 120 days of the Effective Date. All other ID Use of Force investigations and reviews involving the categories of Use of Force Incidents set forth in Paragraph 8 above that are outstanding as of the Effective Date shall be completed within 180 days of the Effective Date. These deadlines may not be extended absent extenuating circumstances outside the Department's control.

a.   Any extension of these deadlines shall be documented and subject to approval by the DCID or a designated Assistant Commissioner. In the event a deadline is extended, the investigation shall be subject to monthly reviews by the DCID or a designated Assistant Commissioner to determine the status of the investigation and ensure that all reasonable efforts are being made to expeditiously complete the investigation.

b.   In the event that the Use of Force Incident that is the subject of an ID Use of Force investigation or review outstanding as of the Effective Date has been or is referred to DOI, or following the further referral by DOI to the DA or another outside law enforcement agency, for investigation or a decision on immunity, the time period for the Department to complete the investigation or review shall be tolled while the other agency is investigating the matter or making a decision on immunity.

11.   The Department, if necessary, shall hire a sufficient number of additional qualified ID Investigators to maintain ID Investigator caseloads at reasonable levels so that they can complete Full ID Investigations in a manner that is consistent with this Agreement, including by seeking funding to hire additional staff as necessary.

12.   Within 90 days of the Effective Date, in consultation with the Monitor, the Department shall develop and implement quality control systems and procedures to ensure the quality of ID investigations and reviews. These systems and procedures shall be subject to the approval of the Monitor.

Facility Investigations

13.   All Use of Force Incidents not subject to a Full ID Investigation shall be investigated by
the Facility where the incident is alleged to have occurred or where the Inmate(s) subject
to the Use of Force is housed.  All investigations conducted by the Facility ("Facility
Investigations") shall satisfy the following criteria, provided that the Facility may close
its investigation if the Preliminary Reviewer determines based on the Preliminary Review
that it is not necessary for the Facility to take any additional investigative steps because
all of the criteria set forth in Paragraph 7(e) above are satisfied, in which case the
Preliminary Reviewer's documented determination would serve as a substitute for the
Facility Report referenced in subparagraph (f) below.

   a.   *Objectivity.* The individual(s) responsible for investigating the Use of Force
Incident ("Facility Investigator") must be objective.  The Facility Investigator
must be a Captain (or higher ranking officer) who did not witness the Use of
Force Incident, participate in the Use of Force Incident, or authorize the Use of
Force.  In addition, the Facility Investigator may not be someone who directly
supervises any Staff alleged to have used force during the incident.

   b.   *Timeliness.* The investigation shall be completed within 25 Business Days of the
date the incident occurred, absent unusual circumstances warranting an extension
of this deadline.  In the event that such unusual circumstances exist, the Facility
Investigator shall document the circumstances and this documentation shall be
reviewed and approved by the Deputy Warden or Warden (or other official of
higher rank).  Any Facility Investigation commenced after the Effective Date that
is open for more than 25 Business Days shall be subject to weekly reviews by the
Deputy Warden (or other official of higher rank) to determine the status of the
investigation and ensure that all reasonable efforts are being made to
expeditiously complete the investigation.

   c.   *Video Review.* The Facility Investigator shall collect and review all relevant
video footage of the Use of Force Incident, including footage from fixed
surveillance cameras and handheld or body-worn cameras, and shall summarize
the video footage and explain whether the footage is consistent with witness
reports.  The Facility Investigator shall document any non-functioning cameras,
any unavailable video footage, or any other barrier to reviewing all relevant video
footage.  In the event that no video surveillance can be located even though the
Use of Force Incident took place at a location under video surveillance, the
Facility Investigator shall investigate why no video surveillance can be located
and document his or her findings.

   d.   *Witness Statements.* The Facility Investigator shall obtain written statements from
all relevant witnesses, including the Inmate(s) subject to the alleged Use of Force,
Staff alleged to have been involved in the Use of Force Incident, and Inmates,
Staff, or civilian staff who witnessed the incident.  In the event that Inmates are
unwilling to provide written statements but are willing to provide information
verbally, the Facility Investigator shall document whatever information is
provided verbally.  With the exception of Staff, the Facility Investigator also shall
seek to interview all relevant witnesses, including Inmates, as soon as practicable

22

after the Use of Force Incident. However, in situations in which there are a large number of witnesses and interviewing all such persons is likely to be duplicative and unduly burdensome, the Facility Investigator shall interview a reasonable number of such witnesses.

e.   *Collection and Review of Medical Evidence.* At least four color digital photographs of each Inmate involved in the Use of Force Incident, capturing any visible injuries, shall be taken shortly after the Use of Force Incident, unless the Inmate refuses to be photographed, in which case such refusal shall be documented. Color photographs also shall be taken of Staff Members who sustained injuries during the Use of Force Incident. Injury-to-Inmate Reports shall be completed by medical staff and included in the investigation file. The Facility Investigator shall determine whether the available medical information is consistent with video surveillance, witness accounts, and other evidence, and take reasonable steps to reconcile any inconsistencies. Based on the review of the medical evidence, the Facility Investigator shall confirm that the Use Force Incident is appropriately classified. To the extent that the Facility Investigator concludes that the Use of Force Incident is misclassified, or that subsequently obtained information warrants a different classification, the Facility Investigator shall notify the Tour Commander, who shall notify COD accordingly. COD shall reclassify the incident promptly upon notification. If the Facility Investigator determines that the Use of Force Incident merits a Class A classification, the Facility Investigator shall note this change in writing and promptly refer the matter to ID.

f.   *Report.* At the conclusion of his or her investigation, the Facility Investigator shall prepare a complete and detailed report summarizing the findings of the investigation and the basis for these findings ("Facility Report"). The Facility Report shall set forth all the evidence gathered during the investigation, state whether Staff engaged in excessive or unnecessary Use of Force or otherwise failed to comply with the New Use of Force Directive, and explain how any conclusions and recommendations are supported by such evidence. If an Inmate's prior infraction or criminal history, or a Staff Member's Use of Force or disciplinary history, is included in the Facility Report, its effect, if any, on the conclusion of the Facility Report shall be documented. Where there are inconsistencies between different pieces of evidence such as witness statements, the Facility Report shall adequately explain the basis for crediting one source of evidence over another or any other way in which inconsistencies have been reconciled.

g.   *Supervisory Review.* All Facility Reports shall be reviewed by the Deputy Warden and the Warden to ensure that they comply with the terms of this Agreement and other applicable procedures and requirements. The Deputy Warden and the Warden (or official of higher rank) shall document whether they concur with the conclusions of the Facility Investigator, and whether the Use of Force Incident has been appropriately classified, and shall document in the Facility Report whether they recommend disciplinary actions or other remedial measures.

23

h.   *Recommended Disciplinary Action.* In the event that the Facility Investigation determines that a Staff Member has engaged in excessive or unnecessary Use of Force or otherwise engaged in a material violation of the New Use of Force Directive, the matter shall be referred to the Trials Division for further action as required by Paragraph 3 of Section VIII (Staff Discipline and Accountability).

i.   *Referral to ID.* In the event that any information is gathered during the course of a Facility Investigation establishing that a Full ID Investigation is required pursuant to Paragraph 8 above, the matter shall be referred to ID within two Business Days.

j.   *Role of Integrity Control Officer.* An ICO from ID shall be assigned to each Facility. For each Facility, the ICO shall be responsible for reviewing all Facility Investigations of Class B Use of Force Incidents, and 20% of Facility Investigations of Class C Use of Force Incidents, to ensure that they are thorough and comply with the criteria set forth in this Paragraph. The ICO's review shall include a determination as to whether the Facility Investigator has collected all relevant material and evidence necessary for the Facility Investigation, and whether the Use of Force Incident was properly classified. The ICO shall also determine whether the Facility Investigator's findings are supported by the evidence, and whether additional investigatory steps are necessary. The ICO shall document the results of his or her review. The Department may assign additional investigators from ID to assist the assigned Facility ICO, as needed.

Investigation of Use of Force Incidents Involving Inmates Under the Age of 18

14.   The Department shall maintain a designated ID team ("Youth ID Team") to investigate or review all Use of Force Incidents involving Inmates who are under the age of 18 at the time of the incident. The Youth ID Team shall be staffed with one Supervisor, and an appropriate number of qualified and experienced investigators.

a.   The Youth ID Team shall conduct Full ID Investigations of all Use of Force Incidents involving Inmates under the age of 18 that fall within the categories specified in Paragraph 8 above.

b.   The Youth ID Team shall review all Facility Investigations of any other Use of Force Incidents involving Inmates under the age of 18 to ensure that they were conducted in a manner consistent with the requirements of Paragraph 13 above.

Policies and Training

15.   Within 60 days of the Effective Date, the Department, in consultation with the Monitor, shall review and revise any policies relating to the investigation of Use of Force Incidents to ensure that they are consistent with the terms of this Agreement.

16.   The Department shall develop and implement a standardized system and format for organizing the contents of investigation files. Each investigation file shall include at least the following: (a) all Use of Force Reports and witness statements; (b) written summaries, transcripts, and recordings of any witness interviews; (c) copies of any video footage and a written summary of video footage; (d) the Injury-to-Inmate Report; (e) relevant medical records (if applicable); (f) color photographs of any Inmate or Staff injuries; (g) the report summarizing the findings of the investigation, the basis for these

findings, and any recommended disciplinary or other remedial measures, as well as documentation reflecting supervisory review and approval of this report; (h) records reflecting any disciplinary action taken with respect to any Staff Member or Inmate in connection with the incident; and (i) records of any other investigative steps taken.

## VIII.   STAFF DISCIPLINE AND ACCOUNTABILITY

1.    The Department shall take all necessary steps to impose appropriate and meaningful discipline, up to and including termination, for any Staff Member who violates Department policies, procedures, rules, and directives relating to the Use of Force, including but not limited to the New Use of Force Directive and any policies, procedures, rules, and directives relating to the reporting and investigation of Use of Force Incidents and video retention ("UOF Violations").

2.    Within 60 days of the Effective Date, the Department shall work with the Monitor to develop and implement functional, comprehensive, and standardized disciplinary guidelines designed to impose appropriate and meaningful discipline for Use of Force Violations (the "Disciplinary Guidelines"). The Disciplinary Guidelines shall set forth the range of penalties that the Department will seek to impose for different categories of UOF Violations, and shall include progressive disciplinary sanctions. The Disciplinary Guidelines shall not alter the burden of proof in employee disciplinary proceedings or under applicable laws and regulations. The Department shall act in accordance with the Disciplinary Guidelines.

    a.    The Disciplinary Guidelines shall include the range of penalties that the Department will seek in discipline matters including those before OATH and the aggravating and mitigating factors to be taken into account in determining the specific penalty to seek.

    b.    The Disciplinary Guidelines shall include the range of penalties that the Department will seek in discipline matters including those before OATH against Supervisors in cases where, as a result of inadequate supervision, Staff Members are found to have engaged in UOF Violations. These penalty ranges shall be consistent with the Department's commitment to hold Supervisors, regardless of their rank, accountable for culpability in the chain of command.

    c.    The Disciplinary Guidelines shall state that the misconduct referenced in subparagraphs (i) and (ii) below will result in the Department taking all necessary steps to seek a penalty ranging from, at a minimum either a 30-day suspension without pay (a portion of the 30 days may consist of the loss of accrued vacation days), or a 15-day suspension without pay plus a one-year probation period as agreed to by the Staff Member, up to and including termination. If the penalty imposed is a 15-day suspension without pay plus a one-year probation period, the terms of the probation shall specify that any Use of Force Violation or significant policy violation will result in termination.

    i.    Deliberately providing materially false information in a Use of Force Report or during an interview regarding a Use of Force Incident.

    ii.    Deliberately failing to report Use of Force by a Staff Member.

    iii.    The Disciplinary Guidelines shall provide that the Department will take all necessary steps to seek such penalties against Staff Members who have engaged in the above-referenced misconduct unless the Commissioner, after personally reviewing the matter, makes a determination that exceptional circumstances exist that would make such a penalty an unjust sanction for the Staff Member. Any such determination shall be documented by the Commissioner and provided to the Monitor.

d.    The Disciplinary Guidelines shall state that the misconduct referenced in subparagraphs (i) - (iii) below will result in the Department taking all necessary steps to seek termination of the Staff Member.

    i.    Deliberately striking or using chemical agents on an Inmate in restraints, in a manner that poses a risk of serious injury to the Inmate, except in situations where the Staff Member's actions were objectively reasonable in light of the facts and circumstances confronting the Staff Member.

    ii.    Deliberately striking or kicking an Inmate in the head, face, groin, neck, kidneys, or spinal column, or utilizing choke holds, carotid restraint holds, or other neck restraints, in a manner that is punitive, retaliatory, or designed to inflict pain on an Inmate, and constitutes a needless risk of serious injury to an Inmate.

    iii.    Causing or facilitating an inmate-on-inmate assault or fight, or allowing an inmate-on-inmate assault or fight to continue where it is clearly safe to intervene, in order to punish, discipline, or retaliate against an Inmate or as a means to control or maintain order in any area of a Facility.

    iv.    The Disciplinary Guidelines shall provide that the Department will take all necessary steps to seek the termination of Staff Members who have engaged in the above-referenced misconduct unless the Commissioner, after personally reviewing the matter, makes a determination that exceptional circumstances exist that would make termination an unjust sanction for the Staff Member. Any such determination shall be documented by the Commissioner and provided to the Monitor.

e.    If the Preliminary Review set forth in Paragraph 7 of Section VII (Use of Force Investigations) results in a determination that a Staff Member has more likely than not engaged in the categories of misconduct set forth in subparagraphs (d)(i) –(iii) above, the Department will effectuate the immediate suspension of such Staff Member, and, if appropriate, modify the Staff Member's assignment so that he or she has minimal inmate contact, pending the outcome of a complete investigation. Such suspension and modification of assignment shall not be required if the

Commissioner, after personally reviewing the matter, makes a determination that exceptional circumstances exist that would make suspension and the modification of assignment unjust, which determination shall be documented and provided to the Monitor.

3.   In the event an investigation related to the Use of Force finds that a Staff Member committed a UOF Violation:

a.   If the investigation was conducted by the ID, the DCID or a designated Assistant Commissioner shall promptly review the ID Closing Memorandum and any recommended disciplinary charges and decide whether to approve or to decline to approve any recommended discipline within 30 days of receiving the ID Closing Memorandum. If the DCID or a designated Assistant Commissioner ratifies the investigative findings and approves the recommended disciplinary charges, or recommends the filing of lesser charges, he or she shall promptly forward the file to the Trials Division for prosecution. If the DCID or a designated Assistant Commissioner declines to approve the recommended disciplinary charges, and recommends no other disciplinary charges, he or she shall document the reasons for doing so, and forward the declination to the Commissioner or a designated Deputy Commissioner for review, as well as to the Monitor.

b.   If the investigation was not conducted by ID, the matter shall be referred directly to the Trials Division.

c.   The Trials Division shall prepare and serve charges that the Trials Division determines are supported by the evidence within a reasonable period of the date on which it receives a recommendation from the DCID (or a designated Assistant Commissioner) or a Facility, and shall make best efforts to prepare and serve such charges within 30 days of receiving such recommendation. The Trials Division shall bring charges unless the Assistant Commissioner of the Trials Division determines that the evidence does not support the findings of the investigation and no discipline is warranted, or determines that command discipline or other alternative remedial measures are appropriate instead. If the Assistant Commissioner of the Trials Division declines to bring charges, he or she shall document the basis for this decision in the Trials Division file and forward the declination to the Commissioner or designated Deputy Commissioner for review, as well as to the Monitor. The Trials Division shall prosecute disciplinary cases as expeditiously as possible, under the circumstances.

4.   The Department shall staff the Trials Division sufficiently to allow for the prosecution of all disciplinary cases as expeditiously as possible and shall seek funding to hire additional staff if necessary.

5.   The Trials Division shall negotiate plea dispositions and make recommendations to OATH judges consistent with the Disciplinary Guidelines. Negotiated pleas shall not be finalized until they have been approved by the DOC General Counsel, or the General Counsel's designee, and the Commissioner.

## IX.   VIDEO SURVEILLANCE

1.   Stationary Camera Installation

    a.    At least 7,800 additional stationary, wall-mounted surveillance cameras shall be installed in the Facilities by February 28, 2018.

        i.    At least 25% of these additional cameras shall be installed by July 1, 2016.

        ii.    At least 50% of these additional cameras shall be installed by February 1, 2017.

        iii.    At least 75% of these additional cameras shall be installed by July 1, 2017.

    b.    The Department shall install stationary, wall-mounted surveillance cameras in all areas of RNDC accessible to Inmates under the age of 18 and in all housing areas of Facilities that house 18-year olds in accordance with the timelines as set forth in Paragraphs 10 and 11 of Section XV (Safety and Supervision of Inmates Under the Age of 19).

    c.    The Department shall install stationary, wall-mounted surveillance cameras to ensure Complete Camera Coverage of all areas of all Facilities by February 28, 2018.  When determining the schedule for the installation of cameras in the Facilities, the Department agrees to seek to prioritize those Facilities with the most significant levels of violence.  The Department intends to prioritize the installation of cameras as follows:

        i.    First Wave: Robert N. Davoren Complex, George R. Vierno Center, and George Motchan Detention Center.

        ii.    Second Wave: Anna M. Kross Center, Vernon C. Bain Center, Otis Bantum Correctional Center, and Eric M. Taylor Center.

        iii.    Third Wave: Queens Detention Complex, West Facility, North Infirmary Command, Brooklyn Detention Complex, Manhattan Detention Complex, Rose M. Singer Center, and Donald J. Cranston Judicial Center.

        iv.    The Department may revise the order of the Facilities in which the additional stationary, wall-mounted cameras will be installed based on the operational and security needs of the Department.  Any such revisions shall be discussed during the meetings of the Department's internal working group referenced in subparagraph 1(e) below.

    d.    Beginning February 28, 2018, if the Department or the Monitor determines that a Use of Force Incident was not substantially captured on video due to the absence of a wall-mounted surveillance camera in an isolated blind spot, such information shall be documented and provided to the Monitor and, to the extent feasible, a wall-mounted surveillance camera shall be installed to cover that area within a reasonable period of time.

    e.    The Monitor and Plaintiffs' Counsel will be invited to participate in meetings of the Department's internal camera working group, which determines the prioritization and timeline for the installation of additional cameras in the Facilities.

2.   Body-worn and Handheld Cameras

   a.   Within one (1) year of the Effective Date, the Department shall institute a pilot project in which 100 body-worn cameras will be worn by Staff Members over all shifts.  They shall be worn by Staff Members assigned to the following areas: (i) intake; (ii) mental health observation; (iii) Punitive Segregation units; (iv) Young Inmate Housing Areas; and (v) other areas with a high level of violence or staff-inmate contact, as determined by the Department in consultation with the Monitor.

   b.   The 100 body-worn cameras shall be distributed among officers and first-line Supervisors in a manner to be developed by the Department in consultation with the Monitor.

   c.   The Department, in consultation with the Monitor, shall evaluate the effectiveness and feasibility of the use of body-worn cameras during the first year they are in use and, also in consultation with the Monitor, determine whether the use of such cameras shall be discontinued or expanded, and if expanded, where such cameras shall be used.

   d.   Within 120 days of the Effective Date, the Department, in consultation with the Monitor, shall develop, adopt, and implement written policies and procedures regarding the use of handheld video cameras.  These policies and procedures shall specify:

      i.   Handheld video cameras shall be used in the following situations, except when safety or security concerns require an immediate response that would preclude waiting for recording equipment: (1) responding to a Use of Force Incident; (2) all cell extractions; (3) all probe teams actions; and (4) Facility living quarter searches conducted by the Department's Emergency Services Unit ("ESU"), except Tactical Search Operations ("TSO"), random searches, and strip searches.  Inmate resistance during a TSO, random search, or strip search, however, would trigger video recording if it is reasonably believed that a Use of Force or assault on Staff is about to occur or occurs.

      ii.   Handheld video camera operators shall record the following:  (1) any attempts made to obtain the Inmate's compliance after the video camera operator has arrived in the area, (2) the Inmate's behavior, and (3) all Uses of Force by Staff.

      iii.   In cell extraction situations, the handheld video camera operator shall record: (1) a statement from the team leader summarizing the situation and the plan for resolution; (2) an introduction by each team member, describing the member's specific responsibilities in the plan for the Use of Force; and (3) a statement from the handheld video camera operator providing his or her name and explaining any impediments to obtaining a clear video recording of the incident.

    iv.    Handheld video camera operators shall receive appropriate training.

    v.    The video recording shall be continuous and any break in video continuity shall be documented and explained by the handheld video camera operator, to the extent the operator knows of such breaks, in an incident report or Use of Force witness report.

    vi.    Compliance with these policies and procedures is the responsibility of the onsite Supervisor, as well as the operator of the handheld video camera.

e.    There shall be trained operators of handheld video cameras at each Facility for each tour, and there shall be trained operators in ESU. Such operators shall receive training on how to properly use the handheld video camera to capture Use of Force Incidents, cell extractions, probe team actions, and ESU-conducted Facility living quarter searches. This training shall be developed by the Department in consultation with the Monitor. The Department shall maintain records reflecting the training provided to each handheld video camera operator.

f.    When there is a Use of Force Incident, copies or digital recordings of videotape(s) from handheld or body-worn video cameras that were used to capture the Use of Force Incident will be maintained and the ID Investigator or the Facility Investigator will have full access to such recordings. If, upon review by the Department of a handheld video camera recording made during a Use of Force Incident, such videotape does not reasonably and accurately capture the incident between the Staff Members and Inmates involved, and the failure was not due to equipment failure, the Staff Member who operated the handheld camera shall be sent for re-training. If a Staff Member repeatedly fails to capture key portions of incidents due to a failure to follow DOC policies and protocols, or if the Department determines the Staff Member's failure to capture the video was intentional, the Staff Member shall be made the subject of a referral to the Trials Division for discipline and the Monitor will be notified.

g.    The Department, in consultation with the Monitor, may re-evaluate and/or adjust the requirements for the use of handheld cameras if the Department determines that body-worn cameras could provide substantially similar coverage.

3.    <u>Maintenance of Stationary Cameras</u>

a.    The Department shall designate a Supervisor at each Facility who shall be responsible for confirming that all cameras and monitors within the Facility function properly.

b.    Each Facility shall conduct a daily assessment (*e.g.*, every 24 hours), of all stationary, wall-mounted surveillance cameras to confirm that the video monitors show a visible camera image.

c.    At least twice a month, the assigned Supervisor shall (i) review a substantial portion of the wall-mounted surveillance cameras in order to determine which cameras are not recording properly, and (ii) review the accuracy of the daily

assessments. The assigned Supervisor shall document the results of these reviews, including which daily assessments, if any, were inaccurate.

d.  Within 120 days of the Effective Date, DOC, in consultation with the Monitor, shall develop, adopt, and implement written procedures relating to the replacement or repair of non-working wall-mounted surveillance cameras. All replacements or repairs must be made as quickly as possible, but in no event later than two weeks after DOC learns that the camera has stopped functioning properly, barring exceptional circumstances which shall be documented. Such documentation shall be provided to the Warden and the Monitor. The date upon which the camera has been replaced or repaired must also be documented.

4.  Video Preservation

The Department shall preserve all video, including video from stationary, handheld, and body-worn cameras, for 90 days. When the Department is notified of a Use of Force Incident or incident involving inmate-on-inmate violence within 90 days of the date of the incident, the Department will preserve any video capturing the incident until the later of: (i) four years after the incident, or (ii) six months following the conclusion of an investigation into the Use of Force Incident, or any disciplinary, civil, or criminal proceedings related to the Use of Force Incident, provided the Department was on notice of any of the foregoing prior to four years after the incident.

## X.  RISK MANAGEMENT

1.  Within 150 days of the Effective Date, in consultation with the Monitor, the Department shall develop and implement an early warning system ("EWS") designed to effectively identify as soon as possible Staff Members whose conduct warrants corrective action as well as systemic policy or training deficiencies. The Department shall use the EWS as a tool for correcting inappropriate staff conduct before it escalates to more serious misconduct. The EWS shall be subject to the approval of the Monitor.

a.  The EWS shall track performance data on each Staff Member that may serve as predictors of possible future misconduct.

b.  ICOs and Supervisors of the rank of Assistant Deputy Warden or higher shall have access to the information on the EWS. ICOs shall review this information on a regular basis with senior Department management to evaluate staff conduct and the need for any changes to policies or training. The Department, in consultation with the Monitor, shall develop and implement appropriate interventions and services that will be provided to Staff Members identified through the EWS.

c.  On an annual basis, the Department shall review the EWS to assess its effectiveness and to implement any necessary enhancements.

2.  Whenever a Staff Member engages in the Use of Force three or more times during a six-month period and one or more of these Uses of Force results in an injury to a Staff Member or Inmate, the Facility Warden shall review the Staff Member's involvement in the Use of Force Incidents to determine whether it would be appropriate to meet with the

Staff Member to provide guidance concerning the Use of Force ("Counseling Meeting"). When making this determination, the Facility Warden also shall review records relating to the Staff Member's Use of Force history over the past five years, including the number of Use of Force Incidents the Staff Member has been involved in, the severity of injuries sustained by Inmates in connection with those Use of Force Incidents, and any disciplinary action that has been imposed on the Staff Member. If the Facility Warden decides not to conduct a Counseling Meeting, he or she shall document the basis for that decision in the Staff Member's personnel file. Counseling Meetings shall be required if any of the Use of Force Incidents during the six-month period involved an instance where the Staff Member used force that resulted in a Class A Injury to an Inmate. Counseling Meetings shall include guidance on how to utilize non-forceful methods to resolve conflicts and confrontations when circumstances do not require immediate physical intervention. A summary of the Counseling Meeting and any recommended corrective actions shall be documented and included in the Staff Member's personnel file. The Facility Warden's review and the Counseling Meeting shall be separate from any disciplinary actions taken. The EWS shall track whether Staff Members participated in Counseling Meetings, and, if so: (a) the name of the individual who provided such counseling, and (b) the date on which such counseling occurred.

3. The Department shall designate a UOF Auditor ("UOF Auditor") who shall report directly to the Commissioner, or a designated Deputy Commissioner.

   a. The UOF Auditor shall be responsible for analyzing all data relating to Use of Force Incidents, and identifying trends and patterns in Use of Force Incidents, including but not limited to with respect to their prevalence, locations, severity, and concentration in certain Facilities and/or among certain Staff Members, including Supervisors.

   b. The UOF Auditor shall have access to all records relating to Use of Force Incidents, except that: (i) the UOF Auditor shall have access to records created in the course of a Full ID Investigation only after such Full ID Investigation has closed; and (ii) the UOF Auditor shall have access to records created by the Trials Division only after the Trials Division's review and, where applicable, prosecution of a case has been completed.

   c. The UOF Auditor shall prepare quarterly reports which shall: (i) detail the UOF Auditor's findings based on his or her review of data and records relating to Use of Force Incidents; and (ii) provide recommendations to the Commissioner on ways to reduce the frequency of Use of Force Incidents and the severity of injuries resulting from Use of Force Incidents.

4. Within 120 days of the Effective Date, the Department, in consultation with the Monitor, shall develop and implement a method of tracking the filing and disposition of litigation relating to Use of Force Incidents. The Office of the Corporation Counsel shall provide to the Legal Division of the Department, quarterly, new and updated information with respect to the filing, and the resolution, if any, of such litigation. The Department shall seek information regarding the payment of claims related to Use of Force Incidents from the Office of the Comptroller, quarterly.

5. The Office of the Corporation Counsel shall bring to the Department's attention allegations of excessive use of force in a lawsuit that have not been subject to a Full ID Investigation. ID shall review such allegations and determine whether a Full ID Investigation is warranted.

6. By December 1, 2016, the Department, in consultation with the Monitor, shall develop CMS, which will track data relating to incidents involving Staff Members. The Monitor shall make recommendations concerning data fields to be included in CMS and how CMS may be used to better supervise and train Staff Members. The Department shall, in consultation with the Monitor, consider certain modifications to the EWS as it develops CMS. Such modifications shall incorporate additional performance data maintained by CMS in order to enhance the effectiveness of the EWS. CMS shall be integrated with the EWS, and CMS shall have the capacity to access data maintained by the EWS.

## XI.   STAFF RECRUITMENT AND SELECTION

1. The Department, in consultation with the Monitor, shall develop and maintain a comprehensive staff recruitment program designed to attract well-qualified applicants and keep the Department competitive with surrounding law enforcement and correctional agencies. The program shall provide clear guidance and objectives for recruiting Staff Members.

2. The Department, in consultation with the Monitor, shall develop and maintain an objective process for selection and hiring that adheres to clearly identified standards, criteria, and other selection parameters established by laws and regulations. The process shall include certain factors that will automatically disqualify an applicant for employment as a Staff Member.

3. The Department shall conduct appropriate background investigations before hiring any individual, which shall include assessment of an applicant's criminal history, employment history, relationships or affiliation with gangs, relationships with current Inmates, and frequency of appearance in the Inmate visitor database. The background investigation shall also include medical screening (including drug tests), reviews of state and local child abuse registries accessible to the Department, reference checks, and financial records/credit checks. Staff responsible for conducting these background investigations shall receive appropriate training. The submission of materially false information on a candidate's application may be grounds for the Department's seeking termination of the Staff Member's employment at any future date.

## XII.   SCREENING AND ASSIGNMENT OF STAFF

Promotions

1. Prior to promoting any Staff Member to a position of Captain or higher, a Deputy Commissioner shall review that Staff Member's history of involvement in Use of Force Incidents, including a review of the following (collectively the "Review"):

a.  The following data regarding the Staff Member's involvement in Use of Force Incidents during the prior 5 years, to the extent such data is electronically maintained by the Department in IRS or any other computerized system: (i) the number of Use of Force Incidents the Staff Member has been involved in, (ii) the type and severity of injuries sustained by Staff and Inmates; (iii) whether the conduct was classified as a Class A, B, or C Use of Force; (iv) whether the Use of Force Incident involved a strike or blow to the head or other vital area of an Inmate, kicking an Inmate, the use of a baton or other instrument of force against an Inmate, the use of a prohibited restraint hold on an Inmate, or an allegation of any such conduct; and (v) whether the Inmate was in restraints prior to the Use of Force incident.

b.  The Staff Member's disciplinary history during the prior five years, including whether the Staff Member has been found guilty or pleaded guilty in connection with charges relating to a Use of Force Incident and any command discipline imposed as a result of the Use of Force.

c.  Any ID Closing Memoranda issued during the prior 2 years for any Use of Force Incident where the Staff Member used or was alleged to have used force.

d.  The results of the Review shall be documented in a report that explains whether the Review raises concerns about the qualification of the Staff Member for the promotion, which shall become part of the Staff Member's personnel file.

2.  DOC shall not promote any Staff Member to a position of Captain or higher if he or she has been found guilty or pleaded guilty to any violation in satisfaction of the following charges on two or more occasions in the five-year period immediately preceding consideration for such promotion: (a) excessive, impermissible, or unnecessary Use of Force that resulted in a Class A or B Use of Force; (b) failure to supervise in connection with a Class A or B Use of Force; (c) false reporting or false statements in connection with a Class A or B Use of Force; (d) failure to report a Class A or Class B Use of Force; or (e) conduct unbecoming an officer in connection with a Class A or Class B Use of Force, subject to the following exception: the Commissioner or a designated Deputy Commissioner, after reviewing the matter, determines that exceptional circumstances exist that make such promotion appropriate, and documents the basis for this decision in the Staff Member's personnel file, a copy of which shall be sent to the Monitor.

3.  No Staff Member shall be promoted to a position of Captain or higher while he or she is the subject of pending Department disciplinary charges (whether or not he or she has been suspended) related to the Staff Member's Use of Force that resulted in injury to a Staff Member, Inmate, or any other person. In the event disciplinary charges are not ultimately imposed against the Staff Member, the Staff Member shall be considered for the promotion at that time.

Assignments to Special Units

4.  Prior to assigning any Staff Member to any Special Unit, the Department shall conduct the Review described in Paragraph 1 above. The results of the Review shall be documented in a report that explains whether the Review raises concerns about the

qualification of the Staff Member for the assignment, which shall become part of the Staff Member's personnel file.

5.  No Staff Member shall be assigned to any Special Unit while he or she is the subject of pending Department disciplinary charges (whether or not he or she has been suspended) related to the Staff Member's Use of Force that resulted in injury to a Staff Member, Inmate, or any other person. In the event disciplinary charges are not ultimately imposed against the Staff Member, the Staff Member shall be considered for the assignment at that time.

6.  If a Staff Member assigned to a Special Unit is disciplined for misconduct arising from a Use of Force Incident, the Warden, or a person of higher rank, shall promptly conduct an assessment to determine whether the Staff Member should be reassigned to a non-Special Unit. The Department shall reassign Staff Members when it determines that the conduct resulting in the discipline suggests that the Staff Member cannot effectively and safely perform the duties associated with the assignment. If a determination is made not to re-assign the Staff Member after the discipline, the basis for the determination shall be documented in a report, which shall become part of the Staff Member's personnel file.

Review of Assignments of Staff Disciplined Multiple Times

7.  The Department shall promptly review the assignment of any Staff Member who has been found guilty or pleaded guilty to any violation in satisfaction of the following charges on two or more occasions within a five-year period: (a) excessive, impermissible, or unnecessary Use of Force that resulted in a Class A or B Use of Force; (b) failure to supervise in connection with a Class A or B Use of Force; (c) false reporting or false statements in connection with a Class A or B Use of Force; (d) failure to report a Class A or Class B Use of Force; or (e) conduct unbecoming an officer in connection with a Class A or Class B Use of Force. The review shall include an assessment to determine whether the Staff Member should be reassigned to a position with more limited inmate contact. The Department shall reassign Staff Members when it determines that the conduct resulting in the discipline suggests that the Staff Member should have reduced inmate contact. The results of the review shall be documented and become part of the Staff Member's personnel file and a copy shall be sent to the Monitor.

XIII.   TRAINING

1.  Within 60 days of the Effective Date, the Department shall work with the Monitor to develop new training programs in the areas set forth in subparagraphs (a) - (c) below. These training programs shall include fully developed lesson plans and teaching outlines, examinations, and written materials, including written scenarios and exercises, to be distributed to students. The content of these training programs shall be subject to the approval of the Monitor.

a.  Use of Force Policy Training: The Use of Force Policy Training shall cover all of the requirements set forth in the New Use of Force Directive and the Use of Force reporting requirements set forth in this Agreement. The Use of Force Policy Training shall be competency- and scenario-based, and use video

35

reflecting realistic situations. The Use of Force Policy Training shall include initial training ("Initial Use of Force Policy Training") and refresher training ("Refresher Use of Force Policy Training"), as set forth below.

    i.    The Initial Use of Force Policy Training shall be a minimum of 8 hours and shall be incorporated into the mandatory pre-service training program at the Academy.

        1.    Within 6 months of the Effective Date, the Department shall provide the Use of Force Policy Training to all Supervisors.

        2.    Within 12 months of the Effective Date, the Department shall provide the Use of Force Policy Training to all other Staff Members.

    ii.    The Refresher Use of Force Policy Training shall be a minimum of 4 hours, and the Department shall provide it to all Staff Members within one year after they complete the Initial Use of Force Training, and once every two years thereafter.

    b.    <u>Crisis Intervention and Conflict Resolution Training</u>: The Crisis Intervention and Conflict Resolution Training shall cover how to manage inmate-on-inmate conflicts, inmate-on-staff confrontations, and inmate personal crises. The Crisis Intervention and Conflict Resolution Training shall be competency- and scenario-based, use video reflecting realistic situations, and include substantial role playing and demonstrations. The Crisis Intervention and Conflict Resolution Training shall include initial training for new Staff Members ("Initial Crisis Intervention Training"), in-service training for current Staff Members ("In-Service Crisis Intervention Training"), and refresher training ("Refresher Crisis Intervention Training"), as set forth below.

    i.    The Initial Crisis Intervention Training shall be a minimum of 24 hours, and shall be incorporated into the mandatory pre-service training program at the Academy.

    ii.    The In-Service Crisis Intervention Training shall be a minimum of 24 hours, unless the Monitor determines that the subject matters of the training can be adequately and effectively covered in a shorter time period, in which case the length of the training may be fewer than 24 hours but in no event fewer than 16 hours. All Staff Members employed by the Department as of the Effective Date shall receive the In-Service Crisis Intervention Training within 26 months of the Effective Date.

    iii.    The Refresher Crisis Intervention Training shall be a minimum of 8 hours, and the Department shall provide it to all Staff Members within one year after they complete either the Initial Crisis

Intervention Training or the In-Service Crisis Intervention Training, and once every two years thereafter.

c.   Probe Team Training:  The Probe Team Training shall cover the proper procedures and protocols for responding to alarms and emergency situations in a manner that ensures inmate and staff safety.  The Probe Team Training shall be a minimum of 2 hours, and shall be incorporated into the mandatory pre-service training at the Academy.  Within 12 months of the Effective Date, the Department shall provide the Probe Team Training to all Staff Members assigned to work regularly at any Intake Post.  Additionally, any Staff member subsequently assigned to work regularly at an Intake Post shall complete the Probe Team Training prior to beginning his or her assignment.

2.   Within 60 days of the Effective Date, the Department shall work with the Monitor to strengthen and improve the effectiveness of the existing training programs, as needed, for the topics set forth in subparagraphs (a) - (c) below.  These training programs shall include fully developed lesson plans and teaching outlines, examinations, and written materials, including written scenarios and exercises, to be distributed to students.

a.   Defensive Tactics Training: Defensive Tactics Training, including any revisions, shall cover a variety of defense tactics and pain compliance methods, and shall teach a limited number of techniques to a high level of proficiency. The Defensive Tactics Training shall be competency- and scenario-based, utilize video reflecting realistic situations, and include substantial role playing and demonstrations.  The Defensive Tactics Training shall include initial training ("Initial Defensive Tactics Training") and refresher training ("Refresher Defensive Tactics Training"), as set forth below.

i.   The Initial Defensive Tactics Training shall be a minimum of 24 hours, and shall be incorporated into the mandatory pre-service training program at the Academy.

ii.   The Refresher Defensive Tactics Training shall be a minimum of 4 hours, and shall be provided to all Staff Members on an annual basis.

b.   Cell Extraction Team Training:  The Cell Extraction Team Training, including any revisions, shall cover those circumstances when a cell extraction may be necessary and the proper procedures and protocols for executing cell extractions, and shall include hands-on practice.  The Cell Extraction Team Training shall be a minimum of 4 hours and shall be provided within 12 months of the Effective Date to all Staff Members regularly assigned to Special Units with cell housing.  The Cell Extraction Team Training also shall be incorporated into the mandatory pre-service training program at the Academy.

c.   Investigator Training:  There shall be two types of Investigator Training: ID Investigator Training and the Facility Investigator Training. ID Investigator Training shall cover investigative procedures, skills, and

techniques consistent with best practices and the terms of this Agreement. The Facility Investigator Training shall be based on relevant aspects of ID Investigator Training, and shall focus on those investigative procedures, skills, and techniques that are necessary to conduct effective Facility Investigations that are consistent with the terms of this Agreement.

    i.    ID Investigator Training, including any revisions, shall be a minimum of 40 hours, and shall be provided to any new ID investigators assigned to ID after the Effective Date before they begin conducting investigations.

    ii.    The Facility Investigator Training shall be a minimum of 24 hours. Within 9 months of the Effective Date, the Department shall provide such training to all Staff Members who serve as Facility Investigators. Staff Members who begin to serve as Facility Investigators more than nine months after the Effective Date shall complete the Facility Investigator Training prior to conducting Facility Investigations.

3.    The Department shall provide Young Inmate Management Training to all Staff Members assigned to work regularly in Young Inmate Housing Areas. The Young Inmate Management Training shall include fully developed lesson plans and teaching outlines, examinations, and written materials, including written scenarios and exercises, to be distributed to students. The Young Inmate Management Training shall provide Staff Members with the knowledge and tools necessary to effectively address the behaviors that Staff Members encounter with the Young Inmate population. This training shall be competency-based and cover conflict resolution and crisis intervention skills specific to the Young Inmate population, techniques to prevent and/or de-escalate inmate-on-inmate altercations, and ways to manage Young Inmates with mental illnesses and/or suicidal tendencies. The Young Inmate Management Training shall include initial training (the "Initial Young Inmate Management Training") and refresher training (the "Refresher Young Inmate Management Training"), as set forth below.

    a.    The Initial Young Inmate Management Training shall be a minimum of 24 hours. The Department shall continue to provide this training to Staff Members assigned to regularly work in Young Inmate Housing Areas. Within 60 days of the Effective Date, the Department shall provide the Initial Young Inmate Management Training to any Staff Members assigned to regularly work in Young Inmate Housing Areas who have not received this training previously. Additionally, any Staff Member subsequently assigned to work regularly in a Young Inmate Housing Area shall complete the Initial Young Inmate Management Training prior to beginning his or her assignment.

    b.    The Department will work with the Monitor to develop new Refresher Young Inmate Management Training, which shall be a minimum of 4 hours. For all Staff Members assigned to work regularly in Young Inmate Housing Areas who received this type of training before the Effective Date, the Department shall provide the Refresher Young Inmate Management Training to them

within 12 months of the Effective Date, and once every two years thereafter. For all other Staff Members assigned to work regularly in Young Inmate Housing Areas, the Department shall provide the Refresher Young Inmate Management Training within 12 months after they complete the Initial Young Inmate Management Training, and once every two years thereafter.

4. Within 60 days of the Effective Date, the Department shall work with the Monitor to develop a new training program in the area of Direct Supervision. The Direct Supervision Training shall cover how to properly and effectively implement the Direct Supervision Model, and shall be based on the direct supervision training modules developed by the National Institute of Corrections.

   a. The Direct Supervision Training shall be a minimum of 32 hours.

   b. Within 9 months of the Effective Date, the Department shall provide the Direct Supervision Training to all Staff Members assigned to work regularly in Young Inmate Housing Areas. Additionally, any Staff member subsequently assigned to work regularly in the Young Inmate Housing Areas shall complete the Direct Supervision Training prior to beginning his or her assignment.

5. Whenever a Staff member is found to have violated Department policies, procedures, rules, or directives relating to the Use of Force, including but not limited to the New Use of Force Directive and any policies, procedures, rules, or directives relating to the reporting and investigation of Use of Force Incidents and retention of any use of force video, the Staff member, in addition to being subject to any potential disciplinary action, shall undergo re-training that is designed to address the violation.

   a. Such re-training must be completed within 60 days of the determination of the violation.

   b. The completion of such re-training shall be documented in the Staff Member's personnel file.

6. After completing any training required by this Agreement, Staff Members shall be required to take and pass an examination that assesses whether they have fully understood the subject matter of the training program and the materials provided to them. Any Staff Member who fails an examination shall be given an opportunity to review the training materials further and discuss them with an appropriate instructor, and shall subsequently be required to take comparable examinations until he or she successfully completes one.

7. The Department shall require each Staff Member who completes any training required by this Agreement to sign a certification stating that he or she attended and successfully completed the training program. Copies of such certifications shall be maintained by the Department for the duration of this Agreement.

8.  The Department shall maintain training records for all Staff Members in a centralized location. Such records shall specify each training program that a Staff Member has attended, the date of the program, the name of the instructor, the number of hours of training attended, whether the Staff Member successfully completed the program, and the reason the Staff Member attended the program.

## XIV.  ARRESTS OF INMATES

1.  The Department shall recommend the arrest of an Inmate in connection with a Use of Force Incident only after an investigator with the Correction Intelligence Bureau or ID, with input from the Preliminary Reviewer, has reviewed the circumstances warranting the potential arrest and has determined that the recommendation is based on probable cause.

## XV.  SAFETY AND SUPERVISION OF INMATES UNDER THE AGE OF 19

General Provisions

1.  Young Inmates shall be supervised at all times in a manner that protects them from an unreasonable risk of harm. Staff shall intervene in a timely manner to prevent inmate-on-inmate fights and assaults, and to de-escalate inmate-on-inmate confrontations, as soon as it is practicable and reasonably safe to do so.

2.  Staff shall conduct daily inspections of all Young Inmate Housing Areas to ensure the conditions are reasonably safe and secure. The Department shall take reasonable steps to ensure that the locking mechanisms of all cells function properly, are adequate for security purposes, and cannot be easily manipulated by Inmates. In the event that a locking mechanism of a cell does not meet these criteria, the Department shall stop using the cell until the locking mechanism is repaired.

3.  A Warden or Deputy Warden shall tour all Young Inmate Housing Areas at least once each shift, unless the Warden or Deputy Warden is not in the Facility during that shift, making himself or herself available to respond to questions and concerns from Inmates. The tours shall be documented and any general deficiencies shall be noted.

4.  Within 90 days of the Effective Date, the Department, in consultation with the Monitor, shall develop and implement an age-appropriate classification system for 16- and 17-year olds that is sufficient to protect these Inmates from an unreasonable risk of harm. The classification system shall incorporate factors that are particularly relevant to assessing the needs of adolescents and the security risks they pose.

5.  Consistent with best practices in United States correctional systems, the Department shall develop and maintain a sufficient level of programming for Young Inmates, especially in the evenings, on weekends, and in the summer months, to minimize idleness and the potential for altercations that result in inmate harm.

6.     The Department shall transfer any Young Inmate deemed to be particularly vulnerable or to be otherwise at risk of harm to an alternative housing unit, or take other appropriate action to ensure the Inmate's safety, and shall document such action.

7.     The Department shall promptly place Young Inmates who express concern for their personal safety in secure alternative housing, pending investigation and evaluation of the risk to the Inmate's safety and a final determination as to whether the Inmate should remain in such secure alternative housing, whether the Inmate should be transferred to another housing unit, or whether other precautions should be taken.  The Department shall follow the same protocol when a Young Inmate's family member, lawyer, or other individual expresses credible concerns on behalf of the Inmate.  The Department shall maintain records sufficient to show the date and time on which any Young Inmate expressed concern for his personal safety (or on which a family member, lawyer, or other individual expressed such concern), the date and time the Inmate was transferred to secure alternative housing, and the final determination that was made regarding whether the Inmate should remain in protective custody or whether other necessary precautions should be taken, including the name of the Staff Member making the final determination.

8.     With the exception of the Clinical Alternatives to Punitive Segregation ("CAPS"), Restricted Housing Units ("RHUs"), Punitive Segregation units, protective custody, Mental Observation Units, Transitional Restorative Units ("TRU"), and Program for Accelerated Clinical Effectiveness ("PACE") units, the Department shall continue to house high classification Young Inmates separately from low classification Young Inmates.

9.     All allegations of sexual assault involving Young Inmates shall be promptly and timely reported and thoroughly investigated.

Video Camera Coverage

10.     Within 90 days of the Effective Date, the Department shall install additional stationary, wall-mounted surveillance cameras in RNDC to ensure Complete Camera Coverage of all areas that are accessible to Inmates under the age of 18.  Within 120 days of the Effective Date, the Monitor shall tour RNDC to verify that this requirement has been met.

11.     By July 1, 2016, the Department shall install additional stationary, wall-mounted surveillance cameras in Facilities that house 18-year olds to ensure Complete Camera Coverage of all housing areas that are accessible to 18-year olds.  By August 1, 2016, the Monitor shall tour these areas to verify that this requirement has been met.

Direct Supervision

12.     The Department shall adopt and implement the Direct Supervision Model in all Young Inmate Housing Areas.

Staffing

13.     Young Inmate Housing Areas shall be staffed in a manner sufficient to fulfill the terms of the Agreement, and allow for the safe operation of the housing areas.  Staff assigned to

Young Inmate Housing Areas shall be appropriately qualified and experienced. To the extent that the Department assigns recently hired correction officers or probationary Staff Members to the Young Inmate Housing Areas, the Department shall use its best efforts to select individuals who have either identified a particular interest in or have relevant experience working with youth.

14. The Department shall make best efforts to ensure that no Young Inmate Housing Area on any tour shall be staffed exclusively by probationary Staff Members.

16. Staffing Levels.

    a. The ratio between Inmates and Direct Supervision floor officers shall be no more than 15:1 in Young Inmate Housing Area units used for Inmates under the age of 18, except during the overnight shift when the ratio may be up to 30:1. The maximum living unit size shall be 15 Inmates.

    b. The ratio between Inmates and Direct Supervision floor officers shall be no more than 25:2 in Young Inmate Housing Area units used to house high classification 18-year olds, except during the overnight shift when the ratio may be up to 25:1. The maximum living unit size shall be 25 Inmates.

    c. The ratio between Inmates and Direct Supervision floor officers shall be no more than 30:1 in Young Inmate Housing Area units used to house medium classification 18-year olds. The maximum living unit size shall be 30 Inmates.

    d. The maximum inmate-to-staff ratios and living unit sizes set forth in subparagraphs (b) and (c) above may be modified only if the following two conditions are met:

        i. The Department develops and submits to the Monitor for review a written comprehensive inmate management and housing plan for Young Inmate Housing Areas used for 18-year olds that, among other things, includes staffing levels, an array of appropriate programming, and alternative maximum inmate-to-staff ratio and/or living unit size requirements ("Proposed Housing Management Plan"). The Department shall include in the Proposed Housing Management Plan an explanation of how its implementation is as likely, or more likely, to achieve the goals of protecting Inmates from an unreasonable risk of harm and allowing for the safe operation of the Young Inmate Housing Areas than the maintenance of the maximum inmate-to-staff ratios and living unit sizes set forth in subparagraphs (b) and (c) above.

        ii. The Monitor makes a written determination that he agrees with the Department's assessment that the Proposed Housing Management Plan is as likely, or more likely, to achieve the goals of protecting Inmates from an unreasonable risk of harm and allowing for the safe operation of the Young Inmate Housing Areas than the maintenance of the maximum

inmate-to-staff ratios and living unit sizes set forth in subparagraphs (b) and (c) above.

e.     In the event the maximum inmate-to-staff ratios and living unit sizes set forth in subparagraphs (b) and (c) above are modified as provided for in subparagraph (d), the alternative maximum inmate-to-staff ratio and living unit size requirements included in the Proposed Housing Management Plan will apply and the Department shall be required to implement the Proposed Housing Management Plan.

i.     After the Proposed Housing Management Plan has been implemented, the Department may seek to modify it during the duration of the Agreement by submitting to the Monitor for review a written request explaining the proposed modification and how the modification will further the goals of protecting Inmates from an unreasonable risk of harm and allowing for the safe operation of the Young Inmate Housing Areas used for 18-year olds.

ii.     If the Monitor makes a written determination that he agrees with the Department's assessment that the proposed modification will further the goals of protecting Inmates from an unreasonable risk of harm and allowing for the safe operation of the Young Inmate Housing Areas used for 18-year olds, the modified version of the Proposed Housing Management Plan, including the maximum inmate-to-staff ratio and living unit size requirements included in the modified version, will apply and the Department shall be required to implement the Proposed Housing Management Plan as modified.

17.     The Department shall adopt and implement a staff assignment system under which a team of officers and a Supervisor are consistently assigned to the same Young Inmate Housing Area unit and the same tour, to the extent feasible given leave schedules and personnel changes.

18.     The Department, in consultation with the Monitor, shall continue to develop and implement measures, including financial incentives, to:  (a) encourage experienced and qualified Staff to work in the Young Inmate Housing Areas that are used for Inmates under the age of 18; and (b) retain qualified Staff in the Young Inmate Housing Areas that are used for Inmates under the age of 18 and limit staff turnover.  The Department shall maintain records sufficient to show the numbers of Staff transferring in and out of the Young Inmate Housing Areas that are used for Inmates under the age of 18, the years of experience with the Department of the Staff regularly assigned to these areas, and the qualifications of Staff regularly assigned to these areas.

## XVI.   INMATE DISCIPLINE

### Owed Punitive Segregation Time

1.  No Inmates under the age of 19 shall be placed in Punitive Segregation based upon the Punitive Segregation time they accumulated during a prior incarceration.

### Inmates Under the Age of 18

2.  The Department shall not place Inmates under the age of 18 in Punitive Segregation or Isolation.

3.  Within 60 days of the Effective Date, the Department, in consultation with the Monitor, shall develop and implement systems, policies, and procedures for Inmates under the age of 18 that reward and incentivize positive behaviors.  These systems, policies, and procedures shall be subject to the approval of the Monitor.  Any subsequent changes to these systems, policies, and procedures shall be made in consultation with the Monitor.

4.  Within 60 days of the Effective Date, the Department, in consultation with the Monitor, shall develop and implement systems, policies, and procedures to discipline Inmates under the age of 18 who commit infractions in a manner that is: (a) consistent with their treatment needs; (b) does not deprive them of access to mandated programming, including programming required by the Board of Correction, standard out of cell time, recreation time, and any services required by law; and (c) does not compromise the safety of other Inmates and Staff.

### 18-Year Old Inmates

5.  The Department shall not place 18-year old Inmates with serious mental illnesses in Punitive Segregation or Isolation.  Any 18-year old Inmate with a serious mental illness who commits an infraction involving violence shall be housed in an appropriate therapeutic setting staffed by well-trained and qualified personnel and operated jointly with the Corrections Health Care Provider.

6.  Within 120 days of the Effective Date, the Department, in consultation with the Monitor, shall develop and implement an adequate continuum of alternative disciplinary sanctions for infractions in order to reduce the Department's reliance on Punitive Segregation as a disciplinary measure for 18-year old Inmates.  These systems, policies, and procedures shall be subject to the approval of the Monitor.  Any subsequent changes to these systems, policies, and procedures shall be made in consultation with the Monitor.

7.  The Department shall not place any 18-year old Inmate in Punitive Segregation unless a mental health care professional determines that the confinement does not present a substantial risk of serious harm to the inmate given his health condition, including his mental health, and needs.  Such determination shall be documented and signed by the mental health care professional.

8.   To the extent that an 18-year old Inmate is placed in Punitive Segregation or Isolation, the Corrections Health Care Provider shall monitor the Inmate's medical and mental health status on a daily basis to assess whether the continued confinement presents a substantial risk of serious harm to the inmate's medical or mental health. The Corrections Health Care Provider will document its daily assessment in the Inmate's medical record. If the Corrections Health Care Provider's assessment indicates removing the Inmate from Punitive Segregation or Isolation based on the Inmate's medical or mental health condition, the Inmate shall be promptly transferred out of Punitive Segregation or Isolation.

9.   The conditions of any cells used for Punitive Segregation or Isolation housing for 18-year old Inmates shall not pose an unreasonable risk to Inmates' safety. This provision does not address issues covered in a separate ongoing lawsuit *Benjamin v. Ponte*, 75 Civ. 3073, including but not limited to maintenance of ventilation systems or lighting, or the sanitation of the units.

De-escalation Confinement

10.   Nothing in the section shall be construed to prohibit the Department from placing Young Inmates in a locked room or cell as a temporary response to behavior that poses a risk of immediate physical injury to the Inmate or others ("De-escalation Confinement"). The Department shall comply with the following procedures when utilizing De-escalation Confinement:

   a.   Prior to the confinement, the Department shall attempt to control the Inmate's behavior through less severe measures, time and circumstances permitting. Such measures shall be documented.

   b.   The Tour Commander of the Facility shall be notified within 30 minutes of the confinement and provided with the circumstances and facts that justify the confinement.

   c.   The Inmate shall remain in confinement for only so long as he or she continues to pose a risk of immediate physical injury to the Inmate or others. A mental health care professional shall assess the Inmate at least once every three hours to determine whether the Inmate continues to pose a risk of immediate physical injury to the Inmate or others. The period of confinement shall not exceed 24 hours, except in extraordinary circumstances which shall be documented, approved in writing by the Warden of the Facility, and approved in writing by the Corrections Health Care Provider supervising psychiatrist or supervising clinical psychologist.

Disciplinary Process Review

11.   Within 120 days of the Effective Date, the Department shall retain a qualified outside consultant to conduct an independent review of the Department's infraction processes and procedures to evaluate whether: (a) they are fair and reasonable; (b) Inmates are afforded due process; and (c) infractions are imposed only where a rule violation is supported by a preponderance of the credible evidence. Within 240 days of the Effective Date, the outside consultant shall issue a report setting forth the methodology used, the findings of the review, the bases for these findings, and any recommendations, which the Department shall implement unless the Commissioner determines that doing so would be unduly burdensome.

## XVII.   HOUSING PLAN FOR INMATES UNDER THE AGE OF 18

1.   The Department and the Mayor's Office of Criminal Justice shall make best efforts to search for and identify an alternative site not located on Rikers Island for the placement of Inmates under the age of 18 ("Alternative Housing Site"). The Department and the Mayor's Office of Criminal Justice shall consult with the Monitor during the search process. The Alternative Housing Site shall be readily accessible by public transportation to facilitate visitation between Inmates and their family members, and shall have the capacity to be designed and/or modified in a manner that provides: (a) a safe and secure environment; (b) access to adequate recreational facilities, including sufficient outdoor areas; (c) access to adequate programming, including educational services; (d) the capacity to house Inmates in small units; and (e) a physical layout that facilitates implementation of the Direct Supervision Model.

2.   The Department shall include in its Compliance Reports a summary of the efforts made during the Reporting Period to identify an Alternative Housing Site, a description of any site(s) under consideration, the anticipated next steps in the search process, and, if an Alternative Housing Site has been identified, the timeline for completion of any retrofitting or other work that is necessary before the site may be used to house Inmates.[1]

3.   The Department shall make best efforts to place all Inmates under the age of 18 in an Alternative Housing Site, unless, after conducting a diligent search, the Department and the Mayor's Office of Criminal Justice determine that no suitable alternative site exists.

---

[1] Compliance Reports and Reporting Periods are referenced and defined in Paragraph 1 of Section XIX (Reporting Requirements and Parties' Right of Access).

## XVIII.   IMPLEMENTATION

1.  To the extent necessary and not otherwise explicitly required by this Agreement, within 6 months of the Effective Date, the Department shall review and revise its existing policies, procedures, protocols, training curricula, and practices to ensure that they are consistent with, incorporate, and address all provisions of this Agreement. The Department shall advise the Monitor of any material revisions that are made. The Department also shall notify Staff Members of such material revisions, and, where necessary, train Staff Members on the changes. The 6-month deadline may be extended for a reasonable period of time with the Monitor's approval.

2.  The Department shall revise and/or develop, as necessary, other written documents, such as logs, handbooks, manuals, and forms, to effectuate the terms of this Agreement.

3.  The Department shall designate a Department employee whose primary responsibility is to serve as Compliance Coordinator. The Compliance Coordinator shall report directly to the Commissioner, a designated Deputy Commissioner, or a Chief. The Compliance Coordinator shall be responsible for coordinating compliance with this Agreement and shall serve as the Department's point of contact for the Monitor and Plaintiffs' Counsel.

## XIX.   REPORTING REQUIREMENTS AND PARTIES' RIGHT OF ACCESS

1.  The Department shall submit periodic compliance reports to the Monitor and Plaintiffs' Counsel ("Compliance Reports"). The Compliance Reports shall be provided to the Monitor and Plaintiffs' Counsel within 30 days after the end of each Reporting Period during the Agreement. The first Reporting Period shall begin on the Effective Date and end four months after the Effective Date. For the first year after the Effective Date, each subsequent Reporting Period shall be a four-month period of time beginning on the day following the end of the previous Reporting Period. Thereafter, the length of the Reporting Period shall be a six-month period of time beginning on the day following the end of the previous Reporting Period.

2.  The Department may redact Staff Member names in the version of the Compliance Report provided to Plaintiffs' Counsel. The version of the Compliance Report provided to the Monitor shall include actual Staff Member names.

3.  The Compliance Reports shall not be admissible against Defendants in any proceeding other than a proceeding related to the enforcement of this Agreement.

4.  Each Compliance Report shall at a minimum include the following:

    a.  A description of the actions that the Department has taken during the Reporting Period to comply with each provision of this Agreement. The Compliance Report shall also include a description of any instances during the Reporting Period when the Department was unable to comply with a provision of the Agreement that required compliance during the Reporting Period.

47

b.    The below categories of data, broken down by Facility, for each month, quarter, and year end that falls within the Reporting Period. The data shall be reported separately for: the inmate population overall (where applicable), Inmates under the age of 18, and 18-year old Inmates.

    i.    The number of Use of Force Incidents, by category (*i.e.*, Class A, Class B, or Class C).

    ii.    The average daily inmate population.

    iii.    The average total number of Staff, by rank, assigned to each Facility.

    iv.    The average total number of Staff on probationary status, by rank, assigned on a regular basis to Young Inmate Housing Area units used for Inmates under the age of 18.

    v.    The number of Inmates who were injured in a Use of Force Incident and the number of Inmates who suffered Class A Injuries in a Use of Force Incident.

    vi.    The number of inmate-on-inmate assaults and fights involving Young Inmates, the number of Young Inmates who were injured in such assaults or fights, and the number of Young Inmates who suffered Class A Injuries in such assaults or fights.

    vii.    The number of staff injuries resulting from Use of Force Incidents.

    viii.    The number of cell extractions involving use of chemical agents only and no other Use of Force.

    ix.    The number of cell extractions involving Use of Force other than chemical agents.

    x.    The number of Use of Force Incidents referred to ID for a Full ID Investigation.

    xi.    The number of Full ID Investigations completed.

c.    The following data for the Reporting Period.

    i.    The number of open Full ID Investigations as of the last day of the Reporting Period, and the dates of the underlying Use of Force Incidents.

    ii.    A list of each Use of Force Incident where, during the Reporting Period, a Facility Investigation or ID investigation concluded that a Staff Member engaged in a UOF Violation. The list also shall include and continue to track any Use of Force Incident that had been included in the previous Compliance Report pursuant to this subparagraph, but where the

48

disciplinary process for that incident was still pending in the Trials Division at the time the previous Compliance Report was submitted.

1. The list shall include: the assigned Use of Force Incident identification number; the date and location of the Use of Force Incident; the name of the Staff Member who committed the violation; the date the Use of Force investigation was completed; the nature of the UOF Violation; the nature of any injuries sustained by Inmates, Staff Members, or anyone else (if applicable); and a brief description of any corrective, remedial, disciplinary, or other actions recommended and/or taken against the Staff Member who committed the UOF Violation. The list shall also identify whether any Inmate involved in the Use of Force Incident was an 18-year old or under the age of 18.

2. If the matter was referred to the Trials Division, the list shall also include: the date the matter was referred to the Trials Division; the charge(s) brought (if applicable); the date charges were served (if applicable); the status of the prosecution of the matter (if applicable); the disciplinary penalty sought at OATH (if applicable); and the disposition of the charges and the penalty imposed (if applicable). In the event a decision was made not to prosecute the matter, the Compliance Report shall set forth the basis for that decision.

iii. A list of all Staff Members who participated in Counseling Meetings with Facility Wardens after engaging in the Use of Force three or more times during a six-month period, as referenced in Paragraph 2 of Section X (Risk Management).

iv. The number of additional video surveillance cameras installed during the Reporting Period, and the areas covered, by Facility.

v. A list of those cameras out of service for more than two weeks, and the length of time that they were out of service, by Facility.

vi. A list of each Young Inmate placed in Punitive Segregation or Isolation. For each such Inmate, the Compliance Report shall include the period of the Inmate's confinement in Punitive Segregation or Isolation, the reason for the confinement (*i.e.*, the nature of the Inmate's infraction), and whether the Inmate suffers from a mental illness.

vii. A summary of the training provided to Staff Members pursuant to this Agreement, including the name of each training course provided and the number of Staff who successfully completed the course.

viii. Any quarterly reports prepared by the UOF Auditor and referenced in Paragraph 3(c) of Section X (Risk Management).

49

ix.　A list of the names and rank of Staff Members who were assigned to work regularly in Young Inmate Housing Areas on the first day of the Reporting Period, and a list reflecting the same information on the last day of the Reporting Period.

d.　A summary of the efforts made during the Reporting Period to identify an Alternative Housing Site for Inmates under the age of 18 as set forth in Paragraph 2 of Section XVII (Housing Plan for Inmates Under the Age of 18).

5.　At the end of each month, the Department shall provide the Monitor and Plaintiffs' Counsel with the documented results of all Preliminary Reviews conducted in the preceding month pursuant to Paragraph 7(d) of Section VII (Use of Force Investigations). (For example, the results of Preliminary Reviews concluded in January would be provided at the end of February.)

6.　The Department shall promptly notify the SDNY of any Use of Force Incident where the conduct appears to be criminal in nature.

7.　The Department shall maintain sufficient records to document that the requirements of this Agreement are being properly implemented, including any records required by or developed pursuant to this Agreement. The Department shall maintain and provide to the Monitor, upon request, all records or other documents relevant to verify that it has taken the actions described in the Compliance Reports (e.g., policies, procedures, protocols, training materials, Use of Force Reports, use of force investigation files, etc.). The Department shall make any such records available to the Monitor within 14 days of a request; if more time is needed, the Department shall explain when the records can be made available.

8.　If Plaintiffs' Counsel in good faith believe that Defendants may not be in compliance with any obligation under this Agreement, Plaintiffs' Counsel shall have the ability to obtain information and/or documents relevant to Plaintiffs' Counsel's particular concerns regarding Defendants' compliance. In such circumstance, prior to requesting the information and/or documents from Defendants, Plaintiffs' Counsel shall first seek such information and/or documents from the Monitor. In the event that the Monitor does not have the requested information and/documents, Plaintiffs' Counsel may direct the request to Defendants, who shall provide the requested information and/or documents to Plaintiffs' Counsel as soon as practicable, subject to Defendants' ability to withhold privileged information. Defendants may object to any such request on the grounds that it is unduly burdensome. If Plaintiffs' Counsel continue to believe that Defendants may not be in compliance with any obligation under this Agreement, Plaintiffs' representatives, including their attorneys, consultants, and agents, shall be granted such access to all Facilities, Inmates, Staff Members and contracted staff (subject to the employee's right to representation under certain circumstances as set forth in Section 75 of the New York Civil Service Law and subject to Mayor's Executive Order 16 ("MEO-16")) as is reasonably necessary to assess Plaintiffs' Counsel's particular concerns regarding Defendants' compliance with an obligation of the Agreement. Plaintiffs' representatives will be accompanied by Department representatives during visits.

50

## XX.   MONITORING

### Selection and Replacement

1.   The Parties agree that Steve J. Martin will serve as the Monitor and shall be responsible for assessing the Department's compliance with this Agreement.

2.   If at any time during the Agreement the Monitor is unable to serve, the Parties shall make a good faith effort to promptly agree on a replacement. In the event the Parties cannot agree on a replacement, the Parties shall recommend candidates to the Court, and the Court shall appoint a new Monitor from the names submitted by the Parties.

3.   The Monitor will be subject to the supervision and Orders of the Court.

4.   The Monitor will not, and is not intended to, replace or assume the duties of the Commissioner, any of his staff, or any other City officials.

### Funding and Staff

5.   The City shall bear all reasonable fees, costs, and expenses of the Monitor, including payments to the Monitor's staff. Such fees, costs, and expenses shall be sufficient to allow the Monitor to fulfill his duties pursuant to this Agreement in a reasonable and efficient manner. The Monitor may hire or consult with such additional qualified staff as is reasonably necessary to fulfill his duties pursuant to this Agreement without duplication of effort. The Monitor shall submit an invoice for his services, and the services of his consultants and staff, to the City on a monthly basis. Those invoices will include charges for fees, costs, and expenses. Payment on such invoices will be made within 60 days of receipt. If the City objects to any fees, costs, or expenses as unreasonable, unnecessary, or duplicative, the City shall submit the invoice to the Court for a determination of reasonable fees, costs, and expenses.

6.   The Monitor and his staff shall have appropriate experience and education or training related to the subject matters covered in this Agreement. The Parties reserve the right to object for good cause to any member of the Monitor's staff.

7.   The Monitor shall enter into an appropriate confidentiality agreement. The Monitor's staff shall be subject to the same access rights and confidentiality limitations as the Monitor.

### Monitor's Access to Information

8.   In order to perform his responsibilities under this Agreement, the Monitor shall have access to: (a) the buildings and grounds of all Facilities; (b) Department Staff Members, agents, and contractors; (c) Inmates; (d) non-privileged Department documents and records; and (e) all records relating to Inmate injuries sustained as a result of a Use of Force Incident. The Monitor shall have the right to conduct confidential interviews of Inmates, to speak to Staff Members outside the presence of other Staff Members, including Supervisors, and to observe training courses required by this Agreement. The

Monitor's ability to interview Staff Members shall be subject to the employee's right to representation under certain circumstances as set forth in Section 75 of the New York Civil Service Law and MEO-16. To the extent that the Monitor discusses an individual Use of Force Incident with an Inmate or Staff Member, the purpose of such interview shall be solely to gather information to allow the Monitor to assess compliance with the Agreement and perform his responsibilities under the Agreement, and not for the purpose of investigating the specific Use of Force Incident.

9.    Defendants shall permit Plaintiffs' Counsel, including their consultants and agents, to accompany the Monitor on site visits. Plaintiffs' Counsel shall confer with the Monitor in advance of the site visit to ensure that their participation will not interfere with the Monitor's ability to effectively conduct the visit.

10.   Upon request to the Monitor, Plaintiffs' Counsel shall have access to information and other materials related to the provisions of this Agreement that have been provided to the Monitor, provided that privileged information shall not be shared with Plaintiffs' Counsel absent Defendants' consent and provided that the provision of this information will not interfere with the Monitor's ability to effectively monitor this Agreement.

11.   Plaintiffs' Counsel shall not disclose the names or other individual-identifying information of Staff Members obtained from the Department or the Monitor pursuant to this Agreement, unless such information is necessary to enforce this Agreement or for any law enforcement purpose. This paragraph does not apply to information that Plaintiffs' Counsel obtains from any other sources.

   a.    Plaintiffs' Counsel, other than the SDNY, shall limit access and use of such information to staff directly assigned to work on this action. Such assigned staff shall not use that information for any purpose other than to enforce the explicit terms of this Agreement.

   b.    Plaintiffs' Counsel shall redact all individual-identifying information with the exception of Staff names from any pleading, motion, or other document to be filed with the Court to enforce this Agreement. Additionally, Plaintiffs' Counsel shall inform Defendants if they intend to include Staff names in any such filing. If Defendants assert a good faith basis for also withholding Staff names from public disclosure, Plaintiffs' Counsel shall either redact Staff names from the filing, or file the pleading, motion, or document under seal. In the event the filing is made under seal, the filing will be unsealed after 10 Business Days unless Defendants submit an application to keep the filing sealed, in which case the filing shall remain sealed pending the Court's resolution of that application. Where possible, only the portions of the filings that contain names of Staff Members shall be filed under seal.

   c.    This Paragraph 11 is not intended to prevent or in any way limit or impair the right of the SDNY or DOJ to disclose to any agency or department of the United States, or any division of any such agency or department, any information obtained from the Monitor or the Defendants pursuant to this Agreement for

purposes of reporting any potential violation of law or regulation, or in any proceeding relating to any potential violation of law or regulation.

d.    The protective order entered on May 23, 2013 (Dkt. 89) remains in full force and effect. However, the SDNY and DOJ may use any materials designated as confidential pursuant to the Protective Order as is necessary to enforce this Agreement or for any law enforcement purpose.

12.    The Department shall have access to any records relating to inmate injuries sustained as a result of a Use of Force Incident that are provided to the Monitor.

13.    The Department shall encourage all Staff Members to cooperate fully with the Monitor.

Monitoring Plan

14.    Within 30 days of the Effective Date, the Monitor shall provide the Parties with a draft monitoring plan that sets forth the methodology the Monitor intends to use to assess the Department's compliance with the terms of this Agreement ("Monitoring Plan"). The Monitoring Plan shall be provided to the Parties in draft form for comment at least 30 days prior to its issuance. The Monitor shall consider the Parties' comments, and make any changes he or she deems appropriate, before issuing a final Monitoring Plan. The Monitoring Plan may be revised by the Monitor, as needed and after consultation with the Parties, in order to facilitate the Monitor's assessment of the Department's compliance with the terms of the Agreement. Nothing in this Paragraph or in the Monitoring Plan shall in any way limit the scope of the Monitor's access to information, documents, and individuals as otherwise set forth herein.

15.    The Monitor's methodology shall include, but is not limited to, the following:

a.    Periodic visits and tours of the Facilities.

b.    Interviews of Inmates, Staff Members, and other persons.

c.    Periodic meetings with stakeholders, including advocacy groups and employee representatives.

d.    Development of protocols for sampling and reviewing records relating to Use of Force Incidents to evaluate compliance with the terms of this Agreement, including but not limited to compliance with the New Use of Force Directive, provisions of this Agreement relating to the reporting and investigation of Use of Force Incidents, and provisions of this Agreement relating to staff discipline and accountability.

e.    Development of protocols for sampling and reviewing records relating to matters referred to the Trials Division as a result of a Use of Force investigation.

f.    The review of all policies, procedures, protocols, and training curriculum materials adopted by the Department pursuant to this Agreement.

g.  Attending a number of the Staff training programs identified in this Agreement to evaluate the programs, and reviewing records reflecting attendance at and completion of such trainings.

h.  The review of the installation, functioning, and maintenance of the wall-mounted, stationary video surveillance cameras required by this Agreement.

i.  The review of complaints from Inmates or their family members, attorneys, or other representatives relating to the subject matters of this Agreement.

j.  Analyses of data relating to the subject matters of this Agreement available from the Department's management and information systems, including any data available on IRS, current legacy databases and reporting systems, and CMS (once it becomes operational).

k.  The review of other Department reports and other documents that are pertinent to monitoring compliance with this Agreement.

Monitor's Report

16.  For each Reporting Period, the Monitor shall file with the Court and provide the Parties a report describing the efforts the Department has taken to implement the requirements of this Agreement and evaluating the extent to which the Department has complied with each substantive provision of this Agreement (the "Monitor Report").

17.  The Monitor shall issue a Monitor Report within 90 days following each Reporting Period. The Monitor Reports shall be provided to the Parties in draft form for comment at least 30 days prior to their issuance, and the Parties shall provide the Monitor with their comments, if any, within 21 days after receipt. The Monitor shall consider the Parties' comments, and make any changes he or she deems appropriate, before issuing the final report. The Monitor Reports shall be written with due regard for the privacy interests of individual Inmates and Staff Members; federal, state and local laws regarding the privacy of such information; and the interest of the Department in protecting against the disclosure of non-public or privileged information. Consistent with such interests and laws, the Monitor shall redact individual-identifying information from Monitor Reports and any documents submitted with those reports, and shall give due consideration to the Department's requests to redact any other information. To the extent the Monitor declines to make redactions requested by the Department, the Monitor Report and any documents submitted with those reports shall be submitted to the Court under seal for the Court to consider the Department's proposed redactions before making the Monitor Report public.

18.  In each Monitor Report, the Monitor shall evaluate the status of compliance with each substantive provision of the Agreement using the following standards:  (a) Substantial Compliance,[2] (b) Partial Compliance,[3] and (c) Non-compliance.[4]  To the extent a

---

[2] "Substantial Compliance" shall mean that the Department has achieved a level of compliance that does not deviate significantly from the terms of the relevant provision.

54

provision includes a deadline that is subsequent to the end of the Reporting Period, the Monitor Report shall not assess the status of compliance with that provision and will instead report on the City's progress towards implementing the provision. Non-compliance with mere technicalities, or temporary failure to comply during a period of otherwise sustained compliance, will not constitute failure to maintain Substantial Compliance. At the same time, temporary compliance during a period of sustained Non-compliance shall not constitute Substantial Compliance. In order to assess compliance, the Monitor shall follow the methodologies and steps set forth in the Monitoring Plan. The Monitor shall be responsible for independently verifying any representations from the Department regarding its progress toward compliance, including but not limited to any representations included in Compliance Reports, and examining any supporting documentation where applicable. Each Monitor Report shall describe in detail the steps taken by the Monitor and/or the Monitor's staff to assess compliance with each substantive provision of the Agreement, and the factual basis for the Monitor's findings concerning the extent to which the Department has complied with each provision.

19. The Monitor Report may include recommendations from the Monitor for ways to address areas of Partial Compliance or Non-compliance, such as recommendations to modify policies, procedures, protocols, staffing, and training.

20. The Monitor Reports filed with the Court shall be public documents. In the event that the Department requests that redactions be made to parts of the filed Monitor Report or any documents attached to the Monitor Report, such material shall not be made public until the Court resolves those redaction requests, as set forth in Paragraph 17 of this section.

21. The Monitor Report shall not be admissible against Defendants in any proceeding other than a proceeding relating to the enforcement of this Agreement.

Other Monitoring Provisions

22. The Monitor shall be permitted to initiate and receive *ex parte* communications with all Parties.

23. No Party, or any employee or agent of any Party, shall have supervisory authority over the Monitor's activities, reports, findings, or recommendations.

24. The Monitor may provide technical assistance or perform consultative tasks in connection with the implementation of the terms of this Agreement as requested by the Department.

25. Upon the receipt of written questions from Plaintiffs' Counsel or the Department concerning the Monitor's activities in assessing compliance with this Agreement and/or the Department's compliance with this Agreement, the Monitor shall provide Plaintiffs'

---

[3] "Partial Compliance" shall mean that the Department has achieved compliance on some components of the relevant provision of this Agreement, but significant work remains.
[4] "Non-compliance" shall mean that the Department has not met most or all of the components of the relevant provision of this Agreement.

Counsel or the Department a written response within 30 days, or, if the question is time-sensitive, within a shorter reasonable period of time. The Monitor may decline to answer the question or defer answering the question until submission of the next Monitor Report.

26. With respect to provisions of this Agreement that require the Monitor's approval, the Monitor's approval shall not be unreasonably withheld. Mere disagreement as to how best to achieve compliance with the terms of the Agreement is not enough to withhold approval; such approval may only be withheld when the Monitor reasonably believes that the Department's proposal is not consistent with the terms of the Agreement or the purpose of the relevant provision(s) and the requirements set forth in such provision(s). The Monitor shall indicate in writing whether the Monitor approves the Department's proposal within 30 days of receiving the Department's proposal.

27. Except as required or authorized by the terms of this Agreement or by the Parties acting together, the Monitor shall not make any public statements, including statements to the press, with regard to the status of the Department's compliance with this Agreement or any act or omission of the Department or the Department's agents, representatives, or employees. Nor shall the Monitor disclose any non-public information provided to the Monitor pursuant to this Agreement. Any press statement made by the Monitor regarding his employment must first be approved in writing by all Parties.

28. The Monitor shall not testify in any other litigation or proceeding brought on behalf of or against the Department with regard to any act or omission of the Department or any of the Department's agents, representatives, or employees related to this Agreement, nor testify regarding any matter or subject that he may have learned of as a result of his performance under this Agreement, nor serve as a non-testifying expert regarding any matter or subject that he may have learned as a result of his performance under this Agreement, without the Court's authorization. If the Monitor is subpoenaed or ordered to appear in any other litigation or proceeding, the Monitor shall notify the Court and the Parties immediately.

29. Unless such conflict is waived by all Parties, the Monitor shall not accept employment or provide consulting services that would present a conflict of interest with the Monitor's responsibilities under this Agreement, including being retained (on a paid or unpaid basis) by any current or future litigant or claimant, or such litigant's or claimant's attorney, in connection with a claim or suit against the Department or the Department's officers, agents, or employees.

30. The Monitor is an agent of the Court and is not a federal, State, or local agency or an agent thereof. Accordingly, the records maintained by the Monitor shall not be deemed public records subject to public inspection, except that nothing in this provision shall be construed as prohibiting public access to the Monitor Reports or any other documents the Monitor files with the Court in accordance with Paragraph 16 of this Section.

### XXI.   COMPLIANCE, TERMINATION, AND CONSTRUCTION

1. This Court shall have continuing jurisdiction over this action to ensure compliance with the terms of this Agreement until the Agreement terminates. The Parties consent to the jurisdiction of this Court over any proceedings seeking to enforce the terms of this Agreement.

2. If Plaintiffs' Counsel believe Defendants are not in compliance with any obligation under this Agreement, Plaintiffs' Counsel shall, before seeking judicial action, give written notice of the failure to Defendants and the Monitor. Within 30 days of receipt of such notice, Defendants shall respond in writing to Plaintiffs' Counsel and the Monitor setting forth their position with respect to whether they are in compliance with the relevant terms of the Agreement and what actions, if any, they propose to take to address the alleged lack of compliance. The Parties shall engage in good faith negotiations to attempt to resolve the dispute. If, within 45 days of written notice from Plaintiffs' Counsel (or a longer period as agreed upon by the Parties), the Parties have been unable to resolve the dispute, the Parties may seek relief from the Court. The Parties commit to work in good faith to avoid enforcement actions.

3. In the case of an emergency related to the provisions in this Agreement posing an immediate threat to the safety or well-being of Inmates, Plaintiffs' Counsel may seek judicial action without regard to the notice and negotiation requirements set forth in Paragraph 2 above.

4. Plaintiffs' Counsel agree not to seek judicial relief in this action for isolated or *de minimis* violations of this Agreement.

5. This Agreement shall terminate only upon a finding by the Court that Defendants have achieved Substantial Compliance with the provisions of this Agreement and have maintained such Substantial Compliance for a period of twenty-four months. The burden shall be on Defendants to demonstrate such compliance by a preponderance of the evidence.

6. Defendants shall implement all reasonable measures to avoid or minimize any failure to timely carry out any requirements of this Agreement. If any unforeseen circumstances occur that cause such a failure, Defendants shall notify Plaintiffs' Counsel and the Monitor in writing within 20 days after Defendants become aware of the unforeseen circumstances and their impact on Defendants' ability to comply with a requirement of this Agreement. The notice shall describe the cause of the failure to perform and the measures taken to prevent or minimize the failure. With respect to any deadlines in Sections IV through XVII, if the unforeseen circumstances cause a delay of 14 days or fewer, the deadlines shall automatically be extended for the period of the delay. If the unforeseen circumstances cause a delay of greater than 14 days, the Parties and the Monitor shall meet in good faith to agree upon a reasonable extension of time.

7. The City shall not be liable for any failure to perform its obligations in connection with any action described in this Agreement if such failure results from an act of God, riot, war, civil unrest, flood, earthquake, fire, or strike.

8. This Agreement shall constitute the entire integrated Agreement of the Parties. No prior or contemporaneous communications, oral or written, will be relevant or admissible for purposes of determining the meaning of any provisions herein in this litigation or in any other proceeding.

9. Paragraph and section headings do not and are not intended to have any effect on the construction of this Agreement.

10. This Agreement shall be applicable to, and binding upon, all Parties, and their officers, agents, employees, assigns, and successors in office.

11. Failure by any Party to enforce this entire Agreement or any provision thereof with respect to any deadline or other provision herein shall not be construed as a waiver of the Party's right to enforce other deadlines or provisions of this Agreement.

12. If any provision of this Agreement is declared invalid for any reason by a court of competent jurisdiction, said finding shall not affect the remaining provisions of this Agreement.

13. The Parties agree to defend any action challenging any provision of this Agreement. The Parties shall notify each other of any court challenge to this Agreement. In the event any provision of this Agreement is challenged in any local or state court, removal to federal court shall be sought, to the extent that removal is available under applicable law.

14. The Parties agree not to assert any challenge to the validity, lawfulness, or enforceability of any provision of this Agreement.

15. This Agreement may be executed in counterparts, including by signatures delivered by facsimile or scanned signatures.

## XXII.  STIPULATION PURSUANT TO THE PRISON LITIGATION REFORM ACT, 18 U.S.C. § 3626

1. The Parties stipulate and agree, and the Court finds, that this Agreement complies in all respects with the provisions of 18 U.S.C. § 3626(a). The Parties further stipulate and agree, and the Court finds, that the prospective relief in this Agreement is narrowly drawn, extends no further than is necessary to correct the violations of federal rights as alleged by the United States and the Plaintiff Class, is the least intrusive means necessary to correct these violations, and will not have an adverse impact on public safety or the operation of a criminal justice system. Accordingly, the Parties agree and represent that the Agreement complies with the provisions of 18 U.S.C. § 3626(a). Except to enforce

this Agreement, this section shall not be admissible against Defendants in any court for any purpose.

### XXIII.    RELEASE BY THE PLAINTIFF CLASS

1.  As of the Effective Date, all members of the Plaintiff Class hereby release and waive any and all claims for, and any and all rights to pursue, initiate, prosecute, or commence any and all causes of action for, class-wide injunctive and declaratory relief based on the claims that were asserted in the Second Amended Complaint against Defendants and their predecessors, successors, assignees, together with past, present, and future officials, employees, representatives, and agents of the Department. Provided, however, that this release does not prevent an individual member of the Plaintiff Class from filing or prosecuting a claim or action on his/her own behalf seeking equitable relief tailored to the specific circumstances of that individual or prevent Plaintiff Class's Counsel from enforcing the terms of this Agreement. This release shall remain in effect until this Agreement is terminated.

2.  Nothing in this Agreement resolves or bars any claims for damages or rights of action for damages by or on behalf of any individual(s).

3.  Any release of individual claims or rights of action for monetary damages in connection with any settlement of any Named Plaintiff's claims shall be addressed in separately executed agreement(s).

### XXIV.    ATTORNEYS' FEES, COSTS, AND DISBURSEMENTS

1.  In full satisfaction of any and all claims for attorneys' fees, costs, and disbursements incurred in this action by the Named Plaintiffs and/or Plaintiff Class's Counsel in prosecuting claims for injunctive and declaratory relief on behalf of the Plaintiff Class up to and including the Effective Date, the City shall pay $6,500,000 in attorney time and expenses to Plaintiff Class's Counsel.

<u>XXV.  NOTIFICATIONS</u>

1.  Notices and other written communications pursuant to this Agreement shall be in writing and shall, unless expressly provided otherwise herein, be given by hand delivery, express courier, or email followed by postage prepaid mail, and shall be addressed as follows:

FOR THE UNITED STATES:

Jeffrey K. Powell, Esq.
Lara Eshkenazi, Esq.
United States Attorney's Office
Southern District of New York
86 Chambers Street, 3rd Floor
New York, NY 10007
*Telephone*: (212) 637-2706/2758
*Email*:  Jeffrey.Powell@usdoj.gov
          Lara.Eshkenazi@usdoj.gov

FOR THE PLAINTIFF CLASS:

Jonathan S. Chasan, Esq.                        Jonathan S. Abady, Esq.
Mary Lynne Werlwas, Esq.                        *Emery Celli Brinckerhoff & Abady LLP*
*Legal Aid Society*                             600 Fifth Avenue, 10th Floor
199 Water Street, 3rd Floor                     New York, NY 10020
New York, New York 10038                        *Telephone*: (212) 763-5000
*Telephone*: (212) 577-3530                     *Email*: jabady@ecbalaw.com
*Email*:  jchasan@legal-aid.org
          mlwerlwas@legal-aid.org

FOR DEFENDANTS:

Celeste Koeleveld, Esq.                         Heidi Grossman, Esq.
Arthur G. Larkin, Esq.                          Brenda Cooke, Esq.
Kimberly Joyce, Esq.                            General Counsel
*Corporation Counsel of the*                    *New York City Department of Correction*
   *City of New York*                           75-20 Astoria Blvd.
100 Church Street                               East Elmhurst, NY 11370
New York, New York 10007                        *Telephone*:  (718) 546-0955
*Telephone*: (212) 356-2300                     *Email*: Heidi.Grossman@doc.nyc.gov
*Email*:  ckoeleve@law.nyc.gov                           Brenda.Cooke@doc.nyc.gov
          alarkin@law.nyc.gov
          kjoyce@law.nyc.gov

2.  All counsel shall be informed promptly in the event that any substitution is to be made in counsel to receive communications under this Agreement, and the name and contact information for substitute counsel shall be promptly provided.

60

FOR THE UNITED STATES:

PREET BHARARA
United States Attorney for the
Southern District of New York

By:    *Jeffrey Powell*
‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾
       JEFFREY K. POWELL
       EMILY E. DAUGHTRY
       LARA K. ESHKENAZI
       Assistant United States Attorneys
       86 Chambers Street, 3rd Floor
       New York, NY  10007
       Telephone: (212) 637-2706/2777/2758
       Email: Jeffrey.Powell@usdoj.gov
              Emily.Daughtry@usdoj.gov
              Lara.Eshkenazi@usdoj.gov

FOR PLAINTIFF CLASS:

ROPES & GRAY LLP

By: _____
      WILLIAM I. SUSSMAN
      CHRISTOPHER P. CONNIFF
      ANNA E. FRIEDBERG
      CHRISTINA G. BUCCI
      1211 Avenue of the Americas
      New York, NY 10036
      Telephone: (212) 569-9000
      Email:    William.Sussman@ropesgray.com
                Christopher.Conniff@ropesgray.com
                Anna.Friedberg@ropesgray.com
                Christina.Bucci@ropesgray.com

THE LEGAL AID SOCIETY

By: _____
      JONATHAN S. CHASAN
      MARY LYNNE WERLWAS
      199 Water Street, 6th Floor
      New York, New York  10038
      Telephone: (212) 577-3530
      Email:    jchasan@legal-aid.org
                mlwerlwas@legal-aid.org

EMERY CELLI BRINCKERHOFF & ABADY LLP

By: _____
      JONATHAN S. ABADY
      600 Fifth Avenue, 10th Floor
      New York, NY 10020
      Telephone:  (212) 763-5000
      Email:    jabady@ecbalaw.com

FOR DEFENDANTS CITY OF NEW YORK AND DEPARTMENT OF CORRECTION:

ZACHARY W. CARTER
Corporation Counsel for the City of New York

By:   _____

CELESTE KOELEVELD
ARTHUR G. LARKIN
KIMBERLY JOYCE
100 Church Street
New York, New York 10007
Telephone: (212) 356-2300
Email: ckoeleve@law.nyc.gov
       alarkin@law.nyc.gov
       kjoyce@law.nyc.gov

SO ORDERED this 21st day of October , 2015

_____
LAURA TAYLOR SWAIN
UNITED STATES DISTRICT JUDGE

63

# Exhibit D
## of the Proposed First Amended and Supplemental Complaint

# DEPARTMENT OF CORRECTION
### Joseph Ponte, Commissioner



## WHAT WE DO

The Department of Correction (DOC) provides for the care, custody and control of inmates, persons 16 years of age and older, accused of crimes or convicted and sentenced to one year or less of incarceration. The Department operates 14 correctional facilities, including 10 jails on Rikers Island and four borough houses of detention (Brooklyn, the Bronx, Queens and Manhattan), as well as court pens in each of the five boroughs, and two hospital prison wards; processes nearly 64,000 admissions and releases annually; and manages an average daily inmate population of approximately 9,800 individuals.

## FOCUS ON EQUITY

DOC is committed to enhancing safety, improving jail conditions and promoting better reentry outcomes for inmates, which advances equity for all New Yorkers. For the past two years, the DOC has been undertaking a shift in culture, guided by a transformative 14-point Anti-Violence Reform Agenda, which seeks to reduce jail violence, increase safety for and better address the needs of staff and inmates and improve long-term inmate outcomes. In support of this agenda, the DOC tailors housing, staffing and programming to the age-, gender- and health-specific needs of the unique populations in custody. The Department is restructuring housing to ensure improved safety, offer alternatives to punitive segregation and ensure age-appropriate services. Employing enhanced and amplified recruitment efforts, DOC has also been securing improved staffing levels for each housing area to ensure better staff to inmate ratios and appropriate staffing for intensive programming efforts. The past three graduating classes of the DOC Academy have been the largest in history, with over 700 graduates in the most recent class. The Department is also implementing targeted training efforts including Mental Health First Aid to provide officers with the skills needed to better identify and address the needs of unique populations. By moving away from one-size-fits-all responses and offering targeted training and services to DOC staff and inmates, the Department is successfully reducing serious violence in its restart areas and better meeting the needs of those in DOC custody.

## OUR SERVICES AND GOALS

**SERVICE 1**  **Provide a safe and secure environment for inmates, staff and host communities.**

Goal 1a  Ensure the security and safety of inmates in DOC custody.

Goal 1b  Ensure that use of force is authorized and appropriate.

Goal 1c  Provide inmates with timely access to health services.

Goal 1d  Maximize bed capacity and address cell maintenance and repairs in a timely manner.

Goal 1e  Ensure timely transport of inmates to courts throughout the City.

**SERVICE 2**  **Prepare inmates for return to their neighborhoods as civil and contributing members.**

Goal 2a  Prepare as many inmates as possible for successful release through participation in skills-building programs including educational opportunities, jobs training, behavioral interventions and mental health services.

Goal 2b  Reduce idleness by increasing inmate participation in mandated and other programs, services and activities.

**SERVICE 3**  **Provide correction-related services and information to the public.**

Goal 3a  Provide timely notifications to crime victims.

# HOW WE PERFORMED

- In order to enhance safety for both staff and inmates, DOC has continued to roll out reforms and trainings to improve responses to maladaptive behavior through crisis management and de-escalation. Through training in Mental Health First Aid, Cognitive Behavioral Therapy, Dialectical Behavior Therapy and other interventions, Correctional Officers working with special populations are now better equipped to respond to incidents. Through targeted training, the Department has achieved improved staff-inmate interactions in terms of crisis management, de-escalation, conflict resolution and general communication. These have combined to stabilize inmate assaults on staff, as the number and rate of assaults on staff remained unchanged at 341 and 8.8 per 1,000 ADP, respectively, during the first four months of Fiscal 2017.

- While inmate assaults on staff have stabilized, jail-based arrests of inmates increased by three percent from last year. The Department is committed to disciplining inmates who assault staff members and pursuing their arrest and prosecution by the District Attorney. The most common reasons for jail-based arrests of inmates involved possession of contraband and assaults on staff. While searches continued to drop (by eight percent), the effectiveness of searches continues to improve, with 43 percent more weapons recovered than in the same timeframe last year. The Department has been working to address the smuggling of contraband by both inmates and visitors through the addition of new surveillance cameras, improved technology and heightened front gate procedures including more searches and new search tactics. In particular, the use of contraband detectors for inmate searches as well as the use of more canine searches for both visitor and inmate searches have contributed to a higher contraband recovery rate. However, the detection of small blades and other hard-to-find weapons can best be accomplished through the utilization of body scanner technology, which currently remains prohibited for non-medical use by New York State law.

- While staff-inmate incidents have improved, the Department faces challenges in regards to inmate-on-inmate incidents. Stabbings and slashings increased by 21 percent while inmate fights increased by 27 percent compared to the same time period last year.  The percentage of the population in a Security Risk Group (SRG) has increased to 14.4 percent, compared to 12.4 percent last year. Historically, SRG-associated inmates are involved in disproportionately more violent incidents and were involved in nearly 70 percent of jail incidents during the reporting period in Fiscal 2017. There has also been an increase in the use of difficult-to-detect titanium and ceramic blades, contributing to more stabbings and slashings. Challenges related to inmate-inmate interaction have also emerged from the Department's ambitious new reforms, which include eliminating punitive segregation for adolescents and drastically reducing its usage for the remainder of the population. On October 11, 2016, it was eliminated for young adults as well. The elimination of punitive segregation for these populations has contributed to initial spikes in violence. However, as the DOC continues to develop its therapeutic alternative housing options, the Department expects to see positive outcomes. In an attempt to offer age-appropriate services and programs to the young adult population, DOC undertook an initiative to house the majority of young adults in the George Motchan Detention Center (GMDC). Historically, young adults have also been involved in disproportionately more violent incidents, and as such, this housing structure resulted in higher rates of violence. The Department is adjusting this model to implement young adult housing only for those who are in lower-risk classifications, interested in programming and education and/or are in alternative housing units for infractions. For the remainder, the Department has continued to explore the use of blended housing (a mix of adults and young adults), which has shown more success in reducing violence. While the number and rate per 1,000 ADP of violent inmate-on-inmate incidents increased during this time period, the number of serious injuries to inmates as a result of assaults and fights decreased by nine percent due to the implementation of the Incident Command System (ICS), which has led to improved response.

- Since the implementation of the Department's anti-violence reform agenda, there has also been a focus on staff training in behavioral interventions, de-escalation and better response protocols that focus on immediate engagement and avoiding prolonged physical altercation. These trainings aim to minimize use of force that involves physical altercations, ensure that use of force is only applied when necessary and assure that the most appropriate means are used to resolve situations, while reducing risk of injury to staff and inmates alike. Where force is warranted, the Department uses the least restrictive means possible to achieve compliance; notably, handheld chemical agents. These measures have resulted in significant reductions in uses of force resulting in serious and minor injury. Compared to the same time period last year, uses of force with serious injury and uses of force with minor injury per 1,000 ADP declined by 17 percent and 18 percent, respectively. Uses of force with no injury per 1,000 ADP increased by three percent while total uses of force declined by six percent. DOC has also finalized new use of force policies and trainings in line with

US Department of Justice recommendations. The new policy will be effective in September 2017. During the first four months of Fiscal 2017, DOC began training staff in the new policy and defensive tactics.

- While the number of inmate health clinic visits decreased by only 2.6 percent from the same time period last year, the average clinic waiting time decreased by 24 percent, from 33 minutes to 25 minutes. In September, the facilities' clinics implemented daily shift meetings between DOC and NYC Health + Hospitals (H + H) that enable the communication of priority as well as the staffing support required, with the goal of identifying the individuals that need to be seen and ensuring they are seen as quickly as possible. Through these efforts, as well as shifting to a no-escort policy for certain areas and classifications to go to the clinics, waiting times have improved by 24 percent. In addition to services provided in the clinic, DOC and H + H continue to focus on developing and expanding collaborative programs that promote preventive and ongoing care such as the Program to Accelerate Clinical Effectiveness (PACE), Clinical Alternatives to Punitive Segregation (CAPS), and substance misuse treatment through A Road Not Taken (ARNT).

- Through intensive efforts to improve the timely transport of inmates to court, DOC achieved a 10.7 percentage point improvement in on-time court delivery, up to 98.3 percent. While there have been court production challenges over the past few years, the Department placed a major focus on production beginning in late Fiscal 2016, dedicating a Bureau Chief to the initiative. Through improved monitoring of on-trial inmates and communication with facility managers, surveillance of on-trial inmates and more buses, the Department exceeded its target of 95 percent on-time court arrivals. During times when it is anticipated that an inmate will be late for a scheduled court appearance, DOC notifies judges to allow for other business to proceed before the inmate arrives.

- A key component of the Department's reform agenda is developing vocational, educational and mental health programming to improve reentry outcomes. In line with this goal, the Department, in collaboration with the Fortune Society and Osborne Association, expanded the I-CAN program in October 2015. The program now plays a major role in the Anna M. Kross Center (AMKC), George R. Vierno Center (GRVC), and GMDC, where staff members have been added to provide services in newly created I-CAN housing areas. This expansion has resulted in a 107 percent increase in enrollments and a 113 percent increase in workshops compared to the same timeframe last year. Higher incident levels in the Robert N. Davoren Complex (RNDC) and GMDC contributed to a 9.8 percent decrease in the average daily attendance in school programs. As the Department continues to develop its alternatives to punitive segregation for the adolescent and young adult populations, incident levels are expected to stabilize, enabling higher daily school attendance.

- Compared to July through October of Fiscal 2016, there was a 153 percent increase in the average daily number of inmates in vocational skills training programs. This can be attributed to the I-CAN expansion as well as two new departmental initiatives - Industry Recognized Training (IRT) and Trading Futures. IRT offers adolescents and young adults certification courses such as OSHA, food handler and CPR, while Trading Futures offers inmates introductory courses in various trades such as carpentry, cosmetology, culinary arts, and basic electric work. In addition to expanding programming, the Department is working to ensure that programs are tailored to the age- and health- specific needs of the populations in custody. Through the housing of young adults in GMDC, the Department has developed program-specific housing that addresses the unique developmental, educational and vocational needs of young adults. These housing units offer up to 40 hours per week in programming, such as high school diploma or equivalency education, higher education, animal training and horticultural education. Individuals in Mental Observation (MO) housing are also offered clinical and trauma-informed programming including art therapy, pet therapy and acting and writing classes.

# SERVICE 1  Provide a safe and secure environment for inmates, staff and host communities.

## Goal 1a  Ensure the security and safety of inmates in DOC custody.

| Performance Indicators | Actual | | | Target | | 4-Month Actual | |
|---|---|---|---|---|---|---|---|
| | FY14 | FY15 | FY16 | FY17 | FY18 | FY16 | FY17 |
| Admissions | 77,141 | 67,672 | 63,758 | * | * | 22,081 | 19,944 |
| Average daily population | 11,408 | 10,240 | 9,790 | * | * | 9,694 | 9,744 |
| Average daily population - adolescent inmates | 489 | 216 | 187 | * | * | 181 | 197 |
| Inmates in Security Risk Group (% ADP) | 8.2% | 11.8% | 13.3% | * | * | 12.4% | 14.4% |
| Fight/assault infractions | 8,827 | 9,424 | 11,240 | * | * | 3,562 | 4,518 |
| Jail-based arrests of inmates | 995 | 795 | 1,538 | * | * | 468 | 480 |
| Searches | 251,343 | 255,776 | 237,757 | * | * | 85,060 | 78,010 |
| Weapons recovered | 2,348 | 2,240 | 3,396 | * | * | 1,055 | 1,507 |
| ★ Violent inmate-on-inmate incidents (monthly rate per 1,000 ADP) | 32.9 | 37.8 | 47.8 | ⇩ | ⇩ | 48.2 | 58.3 |
| ★ Serious injury to inmate(s) as a result of violent inmate-on-inmate incidents (monthly rate per 1,000 ADP) | 1.8 | 2.5 | 2.5 | ⇩ | ⇩ | 2.8 | 2.9 |
| ★ Inmate assault on staff (monthly rate per 1,000 ADP) | 5.9 | 8.6 | 7.9 | ⇩ | ⇩ | 8.8 | 8.8 |
| ★ Serious injury to staff as a result of inmate assault on staff (monthly rate per 1,000 ADP) | 0.39 | 0.35 | 0.20 | ⇩ | ⇩ | 0.31 | 0.38 |
| ★ Escapes | 0 | 0 | 0 | ⇩ | ⇩ | 0 | 0 |
| ★ Non-natural deaths of inmates in custody | 2 | 0 | 0 | ⇩ | ⇩ | 0 | 0 |

★ Critical Indicator   "NA" - means Not Available in this report   ⇩ ⇧ shows desired direction

## Goal 1b  Ensure that use of force is authorized and appropriate.

| Performance Indicators | Actual | | | Target | | 4-Month Actual | |
|---|---|---|---|---|---|---|---|
| | FY14 | FY15 | FY16 | FY17 | FY18 | FY16 | FY17 |
| Incidents of use of force - total | 3,779 | 4,409 | 4,756 | * | * | 1,718 | 1,621 |
| Incidents of use of force - adolescent inmates | 624 | 378 | 594 | * | * | 189 | 282 |
| ★ Department use of force incidents with serious injury (rate per 1,000 ADP) | 1.18 | 1.14 | 0.66 | ⇩ | ⇩ | 0.77 | 0.64 |
| Department use of force incidents with minor injury (rate per 1,000 ADP) | 13.23 | 15.59 | 15.40 | * | * | 18.29 | 14.91 |
| Department use of force incidents with no injury (rate per 1,000 ADP) | 13.19 | 19.14 | 24.42 | * | * | 25.25 | 26.04 |
| Incidents and allegations of use of force | 4,221 | 4,822 | 5,269 | * | * | 1,871 | 1,752 |

★ Critical Indicator   "NA" - means Not Available in this report   ⇩ ⇧ shows desired direction

## Goal 1c  Provide inmates with timely access to health services.

| Performance Indicators | Actual | | | Target | | 4-Month Actual | |
|---|---|---|---|---|---|---|---|
| | FY14 | FY15 | FY16 | FY17 | FY18 | FY16 | FY17 |
| Inmates with a mental health diagnosis (% ADP) | 38.0% | 41.0% | 42.0% | * | * | 42.0% | 42.0% |
| Inmates with a serious mental health diagnosis (% ADP) | 10.2% | 11.1% | 11.0% | * | * | 10.9% | 11.0% |
| Inmate health clinic visits | 77,825 | 81,873 | 78,499 | * | * | 28,084 | 27,345 |
| ★  - Average clinic waiting time (minutes) | 41 | 34 | 28 | ⇩ | ⇩ | 33 | 25 |

★ Critical Indicator   "NA" - means Not Available in this report   ⇩ ⇧ shows desired direction

**Goal 1d**   Maximize bed capacity and address cell maintenance and repairs in a timely manner.

| Performance Indicators | Actual | | | Target | | 4-Month Actual | |
|---|---|---|---|---|---|---|---|
| | FY14 | FY15 | FY16 | FY17 | FY18 | FY16 | FY17 |
| Jail-cells unavailable (short-term repair) (%) | 2.8% | 2.3% | 2.3% | 1.0% | 1.0% | 2.7% | 2.1% |
| ★ Population as percent of capacity (%) | 86% | 80% | 80% | 96% | 96% | 77% | 82% |

★ Critical Indicator   "NA" - means Not Available in this report   ⇩⇧ shows desired direction

**Goal 1e**   Ensure timely transport of inmates to courts throughout the City.

| Performance Indicators | Actual | | | Target | | 4-Month Actual | |
|---|---|---|---|---|---|---|---|
| | FY14 | FY15 | FY16 | FY17 | FY18 | FY16 | FY17 |
| ★ On-trial inmates delivered to court on-time (%) | 94.2% | 90.9% | 84.0% | 95.0% | 95.0% | 87.6% | 98.3% |

★ Critical Indicator   "NA" - means Not Available in this report   ⇩⇧ shows desired direction

## SERVICE 2   Prepare inmates for return to their neighborhoods as civil and contributing members.

**Goal 2a**   Prepare as many inmates as possible for successful release through participation in skills-building programs including educational opportunities, jobs training, behavioral interventions and mental health services.

| Performance Indicators | Actual | | | Target | | 4-Month Actual | |
|---|---|---|---|---|---|---|---|
| | FY14 | FY15 | FY16 | FY17 | FY18 | FY16 | FY17 |
| I-CAN Referrals | 4,117 | 3,588 | 6,194 | * | * | 1,363 | NA |
| ★ I-CAN Enrollments | 2,408 | 2,321 | 4,278 | * | * | 1,019 | 2,106 |
| I-CAN Workshops | 1,580 | 2,065 | 6,505 | * | * | 1,522 | 3,238 |

★ Critical Indicator   "NA" - means Not Available in this report   ⇩⇧ shows desired direction

**Goal 2b**   Reduce idleness by increasing inmate participation in mandated and other programs, services and activities.

| Performance Indicators | Actual | | | Target | | 4-Month Actual | |
|---|---|---|---|---|---|---|---|
| | FY14 | FY15 | FY16 | FY17 | FY18 | FY16 | FY17 |
| Average daily number of inmates in vocational skills training programs | 216 | 256 | 226 | * | * | 239 | 605 |
| Average daily attendance in school programs | 526 | 330 | 256 | * | * | 255 | 230 |
| ★ Inmates participating in skills-building activities/discharge planning (%) | 10.3% | 10.5% | 8.7% | 10.0% | 10.0% | NA | NA |

★ Critical Indicator   "NA" - means Not Available in this report   ⇩⇧ shows desired direction

# SERVICE 3  Provide correction-related services and information to the public.

**Goal 3a**  Provide timely notifications to crime victims.

| Performance Indicators | Actual | | | Target | | 4-Month Actual | |
|---|---|---|---|---|---|---|---|
| | FY14 | FY15 | FY16 | FY17 | FY18 | FY16 | FY17 |
| Victim Identification Notification Everyday (VINE) system registrations | 15,291 | 15,159 | 15,440 | * | * | 4,899 | 5,475 |
| VINE confirmed notifications | 18,445 | 19,330 | 21,993 | * | * | 6,710 | 7,964 |

\* Critical Indicator    "NA" - means Not Available in this report    ↕ ↕ shows desired direction

# AGENCY-WIDE MANAGEMENT

| Performance Indicators | Actual | | | Target | | 4-Month Actual | |
|---|---|---|---|---|---|---|---|
| | FY14 | FY15 | FY16 | FY17 | FY18 | FY16 | FY17 |
| Collisions involving City vehicles | 104 | 103 | 107 | * | * | 27 | 31 |
| Workplace injuries reported | 3,599 | 2,417 | 2,222 | * | * | 722 | 1,045 |
| Accidents involving inmates | 38 | 44 | 43 | * | * | 16 | 19 |

# AGENCY CUSTOMER SERVICE

| Performance Indicators | Actual | | | Target | | 4-Month Actual | |
|---|---|---|---|---|---|---|---|
| Customer Experience | FY14 | FY15 | FY16 | FY17 | FY18 | FY16 | FY17 |
| Letters responded to in 14 days (%) | 99.6% | 99.4% | 99.3% | * | * | 98.1% | 100.0% |
| E-mails responded to in 14 days (%) | 100.0% | 100.0% | 100.0% | * | * | 100.0% | 100.0% |

# AGENCY RESOURCES

| Resource Indicators | Actual | | | Sept. 2016 MMR Plan | Updated Plan | Plan | 4-Month Actual | |
|---|---|---|---|---|---|---|---|---|
| | FY14 | FY15 | FY16 | FY17 | FY17[1] | FY18[1] | FY16 | FY17 |
| Expenditures ($000,000)[2] | $1,103.1 | $1,162.1 | $1,307.6 | $1,392.3 | $1,402.5 | $1,440.8 | $430.6 | $469.3 |
| Revenues ($000,000) | $21.8 | $20.8 | $22.9 | $20.5 | $20.5 | $20.5 | $7.4 | $7.0 |
| Personnel (uniformed) | 8,922 | 8,756 | 9,832 | 10,336 | 10,336 | 10,420 | 9,057 | 9,477 |
| Personnel (civilian) | 1,397 | 1,491 | 1,676 | 2,232 | 2,238 | 2,238 | 1,499 | 1,680 |
| Overtime paid ($000,000) | $139.1 | $196.3 | $275.2 | $137.6 | $139.4 | $171.4 | $83.1 | $90.8 |
| Capital commitments ($000,000) | $124.8 | $153.6 | $81.5 | $316.5 | $579.8 | $989.2 | $7.6 | $13.3 |

[1] January 2017 Financial Plan    [2] Expenditures include all funds    "NA" - Not Available in this report

# NOTEWORTHY CHANGES, ADDITIONS OR DELETIONS ✏️

- As of September 1, 2016, the Department completed expansion of the I-CAN program and no longer directly refers inmates to discharge planning services. Service providers now determine eligibility for inmates in the bulk of the jail population and all inmates in Accelerated Program Unit (APU) housing are referred for I-CAN reentry services. Four-month Fiscal 2017 referral figures are not yet available. Reporting for I-CAN program referrals will be revised in the full-year Fiscal 2017 Mayor's Management Report.

## ADDITIONAL RESOURCES

- Select annual indicators:
  http://www1.nyc.gov/site/doc/about/doc-statistics.page

For more information on the agency, please visit: www.nyc.gov/doc .

# Exhibit E
## of the Proposed First Amended and Supplemental Complaint

# DEPARTMENT OF CORRECTION Cynthia Brann, Commissioner



## WHAT WE DO

The Department of Correction (DOC) provides for the care, custody, and control of inmates, persons 16 years of age and older, accused of crimes or convicted and sentenced to one year or less of incarceration. The Department operates 14 correctional facilities, including 10 jails on Rikers Island and four borough houses of detention (Brooklyn, the Bronx, Queens, and Manhattan), as well as court pens in each of the five boroughs, and two hospital prison wards; processes over 58,000 admissions and releases annually; and manages an average daily inmate population of 9,200 individuals.

## FOCUS ON EQUITY

DOC is committed to enhancing all facets of its role in providing care, custody, and control for inmates. Utilizing a multi-pronged approach to improve staff, inmate, and public safety, the Department is working to reduce violence, create targeted management approaches for the diverse populations in its care and offer opportunities that promote positive reentry outcomes. Guided by its 14-Point Anti-Violence Reform Agenda, as well as ongoing work with the Nunez Federal Monitor, the Department has implemented substantive reforms informed by, and contributing to, correctional best practice. These reforms include significant reduction in the use of punitive segregation and development of holistic approaches to behavior management; improved staff to inmate ratios; enhanced staff training in Mental Health First Aid, Safe Crisis Management, and de-escalation; and expansion of inmate programming designed to reduce idleness and promote skills development towards post-release success. As a result, the first four months of Fiscal 2018 have shown a considerable decrease in inmate-on-inmate violence, which represented a challenge for the Department in recent years. This reduction in violence contributes to improved facility safety and ensures that individuals in custody have greater access to opportunities that promote beneficial long-term outcomes. The Department will work to refine, expand, and sustain those policies and programs that have demonstrated a positive impact for staff and inmates.

## OUR SERVICES AND GOALS

| | |
|---|---|
| **SERVICE 1** | **Provide a safe and secure environment for inmates, staff and host communities.** |
| Goal 1a | Ensure the security and safety of inmates in DOC custody. |
| Goal 1b | Ensure that use of force is authorized and appropriate. |
| Goal 1c | Provide inmates with timely access to health services. |
| Goal 1d | Maximize bed capacity and address cell maintenance and repairs in a timely manner. |
| Goal 1e | Ensure timely transport of inmates to courts throughout the City. |
| **SERVICE 2** | **Prepare inmates for return to their neighborhoods as civil and contributing members.** |
| Goal 2a | Prepare as many inmates as possible for successful release through participation in skills-building programs including educational opportunities, jobs training, behavioral interventions and mental health services. |
| Goal 2b | Reduce idleness by increasing inmate participation in mandated and other programs, services and activities. |
| **SERVICE 3** | **Provide correction-related services and information to the public.** |
| Goal 3a | Provide timely notifications to crime victims. |

# HOW WE PERFORMED

- DOC is committed to ensuring the safety and security of its facilities. While inmate on inmate violence has presented a challenge in recent years, the first four months of Fiscal 2018 showed improvement in this area. Violent inmate on inmate incidents (monthly rate per 1,000 ADP) declined by 6.4 percent compared to the same period last year. This includes a 41.3 percent decrease in stabbings and slashings and an 11 percent decrease in inmate fights. Staff training in de-escalation and conflict resolution and efforts to mediate conflicts have played a major role. Additionally, inmate programs to address problematic behavior including counseling, anger management, and community meetings have fostered healthier relationships.

- The Department also increased searches by 21 percent, deterring possession and use of weapons. DOC continues to prioritize the elimination of contraband from its facilities, enhancing search tactics through the addition of new surveillance cameras, improved technology and heightened front gate procedures. A 6.8 percent decrease in weapons recovered indicates a reduction in the smuggling of contraband into facilities. However, the detection of small blades and other hard-to-find weapons remains a challenge and can best be accomplished through body scanners, which remain prohibited for non-medical use by New York State law. The Department continued to refine housing strategies for targeted populations. In order to address safety challenges related to young adult co-location, the Department now houses only those young adults with lower risk classifications, interested in programming or in alternative housing for infractions in the George Motchan Detention Center (GMDC). Additionally, collaboration of uniformed, programming and clinical staff in specialized units, focusing on problematic individuals who account for a high percentage of departmental violence, has yielded positive results. Alongside this reduction in violence, there was a 21.1 percent decrease in serious injuries to inmates as a result of inmate on inmate incidents.

- These departmental improvements have also contributed to a 4.4 percent decline in the number of assaults on staff, with a 2.9 percent decrease in inmate assaults on uniformed staff and a 20 percent decrease in inmate assaults on civilian staff. Increased staffing levels in program areas have significantly reduced assaults on civilian staff, while better staff to inmate ratios department-wide have improved safety overall. Additionally, enhanced training in topics such as Mental Health First Aid, de-escalation, and crisis management has equipped staff with tools to better respond to maladaptive behavior, improving staff-inmate interaction. There were more cases of serious injuries to staff as a result of inmate assaults compared to last year, accounting for a 21.1 percent increase. Recognizing the importance of providing quality medical treatment to staff and mitigate risk of injury due to assaults, the Department opened Officer Treatment Areas in the majority of its jails in September, affording officers safe, secure environments for treatment.

- Through ongoing work with the Nunez Federal Monitor, the Department has continued its efforts to minimize unnecessary and excessive use of force by providing extensive training to staff and updating its policies to better align with best practice. Staff trainings in behavioral interventions, de-escalation and response protocols aim to ensure that use of force is only applied when necessary, assure that the most appropriate means are used to resolve situations, minimize use of force that involves physical encounters, and, when force is warranted, ensure that the least restrictive means possible are used to achieve compliance. While overall uses of force remained stable, there was an increase in uses of force resulting in injury. The Department is addressing this issue through its new use of force policy, which became effective at the end of this reporting period, on September 27, 2017. The majority of the Department's active duty staff have now received Special Tactics and Responsible Techniques (START) training, which consists of one day training on the new Use of Force policy, and three days of interactive Defensive Tactics training. START training reinforces the continuum of force options and the necessity of proportional responses to inmate resistance. Throughout the life of the Consent Judgment, the Department has focused on two types of force: (1) use of chemical agents and (2) control holds and soft hand techniques. Through revisions to the Use of Force and Chemical Agents policies, and new and revised training curricula, the Department has reinforced that at times, control holds or soft hand techniques may be more appropriate to the type and level of resistance than the use of chemical agents. As such, the Department saw a 28 percent decrease in uses of force involving chemical agents. Working with the Nunez Federal Monitor, the Department has prioritized reductions in uses of force involving adolescents and young adults. As a result, there was a 49 percent decrease in uses of force involving adolescents. GMDC, which houses approximately 50 percent of DOC's young adults, experienced a 61 percent reduction in uses of force.

- During this period, the number of health clinic visits decreased by 5.7 percent. While this decrease is in part attributed to the decreasing in-custody population, it has also coincided with an increased production in connections to medical

and mental health services. DOC and Health + Hospitals (H + H) established the Consolidated List Initiative in August 2017, enabling patients to schedule appointments with multiple specialists during one visit. This has driven down the number of clinic visits, decreased waiting times, and improved operational efficiency. The Department has also continued to enhance its preventive services. As a part of the ThriveNYC initiative, in collaboration with the Department of Health and Mental Hygiene, DOC has been training officers as well as inmates in Mental Health First Aid. The training helps participants grow their knowledge of mental illnesses, learn how to identify resources for those in need, increase their likelihood to help individuals in distress, and show increased mental wellness themselves.

- On-time court delivery remained stable at 98.2 percent, exceeding the Department's target of 95 percent. DOC continued practices such as surveillance and monitoring of on-trial inmates, ongoing communication between the Transportation Division and facility managers, and high frequencies of bus departures to maintain this level of timely court transportation.

- The Department continues to strengthen programming to improve reentry outcomes. As such, the average daily number of participants in vocational skills training increased by 39.1 percent. Through the Workforce Development unit of the Division of Youthful Offender Programming, adolescents and young adults earned 380 industry-recognized certifications such as Occupational Safety and Health Administration (OSHA), Food Handler, and CPR, and 371 certificates for completion of introductory training in courses such as Plumbing, Culinary Arts, and Digital Literacy. Since August 2016, youth programming has been coupled with reentry services offered by Friends of Island Academy, facilitating in-custody engagement and connection to post-release services. DOC's Adult Programming Division rolled out its Specialized Model for Adult Reentry and Training (SMART) initiative in Fall 2017, offering pre- and post-release programming and services in work readiness, behavioral interventions, housing, and job placement, as well as targeted services for women and veterans. Individuals participating in SMART also have access to industry-recognized certifications in OSHA, Flagging, and CPR, as well as hands-on classes such as electrical and plumbing. The I-CAN program continues to provide comprehensive reentry services including job readiness, hard-skills training, and post-release employment assistance.

- As idleness reduction plays a significant role in minimizing violence, the Department is committed to offering five hours of programming for all inmates by the end of Calendar 2018. Thus far, 90 percent of all youthful offender houses and 89 percent of adult General Population units have achieved this goal. In Fiscal 2018, there has been a 10.9 percent increase in I-CAN enrollments and 51.4 percent increase in I-CAN workshops. New workshops introduced recently include Building Relationships, Community Violence, and 24-7 Dads. There was a 10 percent reduction in average daily attendance in school programs, alongside a 30.5 percent decrease in the average daily population of adolescents. In addition to high school education offered through the Department of Education, inmates are also offered college coursework through Manhattan College and St. John's University. DOC's institution of an incentive system for young adults and adolescents has strongly encouraged program participation for these two groups.

## SERVICE 1   Provide a safe and secure environment for inmates, staff and host communities.

**Goal 1a**   Ensure the security and safety of inmates in DOC custody.

| Performance Indicators | Actual | | | Target | | 4-Month Actual | |
|---|---|---|---|---|---|---|---|
| | FY15 | FY16 | FY17 | FY18 | FY19 | FY17 | FY18 |
| Admissions | 67,672 | 63,758 | 58,226 | * | * | 19,944 | 18,459 |
| Average daily population | 10,240 | 9,790 | 9,500 | * | * | 9,744 | 9,180 |
| Average daily population - adolescent inmates | 216 | 187 | 167 | * | * | 197 | 137 |
| Inmates in Security Risk Group (% ADP) | 11.8% | 13.3% | 14.7% | * | * | 14.4% | 14.9% |
| Fight/assault infractions | 9,424 | 11,240 | 12,650 | * | * | 4,518 | 3,997 |
| Jail-based arrests of inmates | 795 | 1,538 | 1,126 | * | * | 480 | 345 |
| Searches | 255,776 | 237,757 | 246,822 | * | * | 78,010 | 93,979 |
| Weapons recovered | 2,240 | 3,396 | 3,976 | * | * | 1,507 | 1,405 |
| ★ Violent inmate-on-inmate incidents (monthly rate per 1,000 ADP) | 37.8 | 47.8 | 55.2 | ⇩ | ⇩ | 58.3 | 54.6 |
| ★ Serious injury to inmate(s) as a result of violent inmate-on-inmate incidents (monthly rate per 1,000 ADP) | 2.5 | 2.5 | 2.7 | ⇩ | ⇩ | 2.9 | 2.3 |
| ★ Inmate assault on staff (monthly rate per 1,000 ADP) | 8.6 | 7.9 | 8.4 | ⇩ | ⇩ | 8.8 | 8.9 |
| ★ Serious injury to staff as a result of inmate assault on staff (monthly rate per 1,000 ADP) | 0.35 | 0.20 | 0.24 | ⇩ | ⇩ | 0.38 | 0.46 |
| ★ Escapes | 0 | 0 | 0 | ⇩ | ⇩ | 0 | 1 |
| ★ Non-natural deaths of inmates in custody | 2 | 2 | 0 | ⇩ | ⇩ | 0 | 0 |

★ Critical Indicator       "NA" Not Available       ⇧⇩ Directional Target       * None

**Goal 1b**   Ensure that use of force is authorized and appropriate.

| Performance Indicators | Actual | | | Target | | 4-Month Actual | |
|---|---|---|---|---|---|---|---|
| | FY15 | FY16 | FY17 | FY18 | FY19 | FY17 | FY18 |
| Incidents of use of force - total | 4,409 | 4,756 | 4,673 | * | * | 1,621 | 1,631 |
| Incidents of use of force - adolescent inmates | 378 | 594 | 531 | * | * | 282 | 143 |
| ★ Department use of force incidents with serious injury (rate per 1,000 ADP) | 1.14 | 0.68 | 0.75 | ⇩ | ⇩ | 0.77 | 1.55 |
| Department use of force incidents with minor injury (rate per 1,000 ADP) | 15.59 | 15.39 | 14.70 | * | * | 14.88 | 16.89 |
| Department use of force incidents with no injury (rate per 1,000 ADP) | 19.14 | 24.41 | 25.52 | * | * | 25.94 | 25.98 |
| Incidents and allegations of use of force | 4,822 | 5,269 | 5,070 | * | * | 1,752 | 1,786 |

★ Critical Indicator       "NA" Not Available       ⇧⇩ Directional Target       * None

**Goal 1c**   Provide inmates with timely access to health services.

| Performance Indicators | Actual | | | Target | | 4-Month Actual | |
|---|---|---|---|---|---|---|---|
| | FY15 | FY16 | FY17 | FY18 | FY19 | FY17 | FY18 |
| Inmates with a mental health diagnosis (% ADP) | 41% | 42% | 42% | * | * | 42% | NA |
| Inmates with a serious mental health diagnosis (% ADP) | 11.1% | 11.0% | 10.3% | * | * | 11.0% | 11.8% |
| Inmate health clinic visits | 81,873 | 78,499 | 79,844 | * | * | 27,345 | 25,782 |
| ★ – Average clinic waiting time (minutes) | 34 | 28 | 22 | ⇩ | ⇩ | 25 | 21 |

★ Critical Indicator       "NA" Not Available       ⇧⇩ Directional Target       * None

**Goal 1d**   Maximize bed capacity and address cell maintenance and repairs in a timely manner.

| | | Actual | | Target | | 4-Month Actual | |
|---|---|---|---|---|---|---|---|
| Performance Indicators | FY15 | FY16 | FY17 | FY18 | FY19 | FY17 | FY18 |
| Jail-cells unavailable (short-term repair) (%) | 2.3% | 2.3% | 2.6% | 1.0% | 1.0% | 2.1% | 3.8% |
| ★ Population as percent of capacity (%) | 80% | 80% | 81% | 96% | 96% | 82% | 79% |

★ Critical Indicator       "NA" Not Available       ⇧⇩ Directional Target       * None

**Goal 1e**   Ensure timely transport of inmates to courts throughout the City.

| | | Actual | | Target | | 4-Month Actual | |
|---|---|---|---|---|---|---|---|
| Performance Indicators | FY15 | FY16 | FY17 | FY18 | FY19 | FY17 | FY18 |
| ★ On-trial inmates delivered to court on-time (%) | 90.9% | 84.0% | 98.4% | 95.0% | 95.0% | 98.3% | 98.2% |

★ Critical Indicator       "NA" Not Available       ⇧⇩ Directional Target       * None

## SERVICE 2   Prepare inmates for return to their neighborhoods as civil and contributing members.

**Goal 2a**   Prepare as many inmates as possible for successful release through participation in skills-building programs including educational opportunities, jobs training, behavioral interventions and mental health services.

| | | Actual | | Target | | 4-Month Actual | |
|---|---|---|---|---|---|---|---|
| Performance Indicators | FY15 | FY16 | FY17 | FY18 | FY19 | FY17 | FY18 |
| ★ I-CAN Enrollments | 2,321 | 4,278 | 7,569 | * | * | 2,106 | 2,335 |
| I-CAN Workshops | 2,065 | 6,505 | 12,002 | * | * | 3,238 | 4,902 |

★ Critical Indicator       "NA" Not Available       ⇧⇩ Directional Target       * None

**Goal 2b**   Reduce idleness by increasing inmate participation in mandated and other programs, services and activities.

| | | Actual | | Target | | 4-Month Actual | |
|---|---|---|---|---|---|---|---|
| Performance Indicators | FY15 | FY16 | FY17 | FY18 | FY19 | FY17 | FY18 |
| Average daily number of inmates in vocational skills training programs | 256 | 226 | 419 | * | * | 261 | 416 |
| Average daily attendance in school programs | 330 | 256 | 203 | * | * | 230 | 207 |
| ★ Inmates participating in skills-building activities/discharge planning (%) | 10.5% | 8.7% | 14.0% | 10.0% | 10.0% | NA | NA |

★ Critical Indicator       "NA" Not Available       ⇧⇩ Directional Target       * None

## SERVICE 3   Provide correction-related services and information to the public.

**Goal 3a**   Provide timely notifications to crime victims.

| | | Actual | | Target | | 4-Month Actual | |
|---|---|---|---|---|---|---|---|
| Performance Indicators | FY15 | FY16 | FY17 | FY18 | FY19 | FY17 | FY18 |
| Victim Identification Notification Everyday (VINE) system registrations | 15,159 | 15,440 | 17,288 | * | * | 5,475 | 5,772 |
| VINE confirmed notifications | 19,330 | 21,993 | 25,250 | * | * | 7,964 | 8,661 |

★ Critical Indicator       "NA" Not Available       ⇧⇩ Directional Target       * None

# AGENCY-WIDE MANAGEMENT

| | | | Actual | | Target | | 4-Month Actual | |
|---|---|---|---|---|---|---|---|---|
| Performance Indicators | | FY15 | FY16 | FY17 | FY18 | FY19 | FY17 | FY18 |
| Collisions involving City vehicles | | 103 | 107 | 116 | * | * | 31 | 45 |
| Workplace injuries reported | | 2,417 | 2,222 | 3,435 | * | * | 1,045 | 1,194 |
| Accidents involving inmates | | 44 | 43 | 35 | * | * | 19 | 11 |

★ Critical Indicator       "NA" Not Available       ⇧⇩ Directional Target       * None

# AGENCY CUSTOMER SERVICE

| | | | Actual | | Target | | 4-Month Actual | |
|---|---|---|---|---|---|---|---|---|
| Performance Indicators | | FY15 | FY16 | FY17 | FY18 | FY19 | FY17 | FY18 |
| Customer Experience | | | | | | | | |
| Letters responded to in 14 days (%) | | 99.4% | 99.3% | 100.0% | * | * | 100.0% | 100.0% |
| E-mails responded to in 14 days (%) | | 100.0% | 100.0% | 100.0% | * | * | 100.0% | 100.0% |

★ Critical Indicator       "NA" Not Available       ⇧⇩ Directional Target       * None

# AGENCY RESOURCES

| Resource Indicators | Actual | | | Sept. 2017 MMR Plan | Updated Plan | Plan | 4-Month Actual | |
|---|---|---|---|---|---|---|---|---|
| | FY15 | FY16 | FY17 | FY18 | FY18[1] | FY19[1] | FY17 | FY18 |
| Expenditures ($000,000)[2] | $1,162.1 | $1,307.6 | $1,368.6 | $1,444.5 | $1,449.7 | $1,404.5 | $469.3 | $479.7 |
| Revenues ($000,000) | $20.8 | $22.9 | $22.7 | $20.5 | $20.5 | $20.5 | $7.0 | $7.1 |
| Personnel (uniformed) | 8,756 | 9,832 | 10,862 | 10,420 | 10,427 | 9,967 | 9,477 | 10,495 |
| Personnel (civilian) | 1,491 | 1,676 | 1,830 | 2,243 | 2,264 | 2,281 | 1,680 | 1,849 |
| Overtime paid ($000,000) | $196.3 | $275.2 | $266.4 | $171.4 | $171.4 | $157.2 | $90.8 | $74.7 |
| Capital commitments ($000,000) | $153.6 | $81.5 | $60.6 | $1,411.3 | $1,739.5 | $233.4 | $13.3 | $4.2 |

[1]February 2018 Financial Plan       [2]Expenditures include all funds       "NA" – Not Available

# SPENDING AND BUDGET INFORMATION

Where possible, the relationship between an agency's goals and its expenditures and planned resources, by budgetary unit of appropriation (UA), is shown in the 'Applicable MMR Goals' column. Each relationship is not necessarily exhaustive or exclusive. Any one goal may be connected to multiple UAs, and any UA may be connected to multiple goals.

| Unit of Appropriation | Expenditures FY17[1] ($000,000) | February 2018 Financial Plan FY18[2] ($000,000) | Applicable MMR Goals[3] |
|---|---|---|---|
| Personal Services - Total | $1,182.7 | $1,260.3 | |
| 001 - Administration | $107.7 | $104.5 | All |
| 002 - Operations | $1,075.0 | $1,155.8 | All |
| Other Than Personal Services - Total | $185.9 | $189.4 | |
| 003 - Operations | $172.1 | $171.7 | All |
| 004 - Administration | $13.9 | $17.7 | All |
| Agency Total | $1,368.6 | $1,449.7 | |

[1]Comprehensive Annual Financial Report (CAFR) for the Fiscal Year ended June 30, 2017. Includes all funds.   [2]Includes all funds.   [3]Refer to agency goals listed at front of chapter.

## NOTEWORTHY CHANGES, ADDITIONS OR DELETIONS 🖎

- Fiscal 2017 figures for the indicators 'Department use of force incidents with serious injury (rate per 1,000 ADP),' 'Department use of force incidents with minor injury (rate per 1,000 ADP)' and 'Department use of force incidents with no injury (rate per 1,000 ADP)' have been revised to reflect current data.

- Following an internal audit, adjustments were made to Fiscal 2017 figures for the indicator 'Average daily number of inmates in vocational skills training programs.' The initial numbers overstated participation in vocational training as they were based on total participation in I-CAN hard skills as opposed to average daily participation.

## ADDITIONAL RESOURCES

- Select annual indicators:
  http://www1.nyc.gov/site/doc/about/doc-statistics.page

For more information on the agency, please visit: www.nyc.gov/doc .

# Exhibit F
## of the Proposed First Amended and Supplemental Complaint

# NYC Department of Correction

## PRESENTATION TO THE BOARD OF CORRECTION ON THE YOUNG ADULT PLAN

June 13, 2017



NYC DEPARTMENT OF CORRECTION

# Our data and analysis underlies the need for our 14-point anti-violence reform agenda to address DOC on all fronts

## Reducing Violence

  Keep weapons and drugs out of Rikers

 Create an integrated classification and housing strategy

Comprehensive security camera coverage

Design effective inmate education opportunities and services

Redefine First Line Incident Response

## Supporting the Culture Change at Rikers

Improve leadership development and culture

 Redefine Investigations Division

    Design a recruitment, hiring, and staff selection plan

Design a staff performance management plan

Implement operational performance metrics and analysis

  Create a well-defined supply distribution process

 Improve custody management processes

Expand targeted training

 Raise Facilities to a state of good repair

Implement immediate improvements

Improve internal & external communications

 

NYC DEPARTMENT OF CORRECTION

2

# Mission of Young Adult Plan

*To provide all young adults in DOC custody with comprehensive, individualized, outcome-oriented jail, and community based services in safe environments that are conducive to learning.*

## Goals

**Eliminate punitive segregation**

**Expand programming in housing units**

**Reduce violence**



NYC

DEPARTMENT OF
CORRECTION

# Goal 1: Elimination of Punitive Segregation for 16-21 year olds and Dramatic Decrease for Adults

- Adolescents – 4/2014 to 12/2014 – 100 to 0
- 18 year olds – 4/2014 to 7/2016 – 57 to 0
- 19-21 year olds – 4/2014 to 10/2016 – 113 to 0
- 22+ year olds – 4/2014 to today – 300 to 107
- Overall Reduction – 6.7% to 1%
- National average is 4.4%
- Established maximum sentences of 30 days and no more than 60 days in a 6 month period



Average Daily Population of Inmates in Segregation

NYC ❹ DEPARTMENT OF CORRECTION

# Young Adults in DOC Custody

*Denotes the number of individuals



General Population, Protective Custody and Mental Observation 93% (882)*

Other, 7% (65)*

*14 in ESH Level 1

ESH 3% (31)*

SCH, 1% (10)*

TRU, 2% (17)*

Secure, 1% (7)*



NYC DEPARTMENT OF CORRECTION

# Goal 2: Expand Programming in Separate Housing Units

✓ ~1,000 young adults between the ages of 18-21

✓ GMDC – established as the Young Adult facility with average daily population of 409 as of June 12, 2017

✓ Overall program participation rate is 60% for the period of January 2016 to May 2017.

✓ Other facilities – 19-21-year-olds co-mingled with adults





NYC 6 DEPARTMENT OF CORRECTION

# Goal 3: Department-Wide Improvements in Young Adult Incidents

- Incidents involving 18-21 year olds:
  - ▼ UOF with serious injury down 58% between FY15 and FY16
  - ▼ UOF with minor injury down 10% between FY15 and FY16
  - ▼ AOS down 27% between FY15 and FY16



NYC DEPARTMENT OF CORRECTION

# Co-mingled Housing Units With Young Adults

- Throughout other facilities, young adults between the ages of 19 and 21 are co-mingled with adults ages 22 and older

- Preliminary analysis - co-mingling young adults in houses with adults had a meaningful impact on in-unit violence compared to housing units with only young adults

  - Lower proportions of young adults decreased UOF and fights compared to housing units with higher proportions of young adults

  - 1% increase in YA population = 1.3% increase in UOF and 1.1% increase in fights

- Ongoing analysis for young adults

  - Young Adults in ESH analysis to be presented in July 2017



# Decrease in Critical GMDC Security Indicators



## ADOLESCENT/YOUNG ADULT HOUSING UNIT RULES



**Keep Living Space Clean**
(Including Making Beds Daily)

**Keep A Neat and Well-Groomed Appearance**
(including wearing uniforms appropriately and practicing good hygiene)



**Should Participate Fully In All Groups/Trainings/workshops Assigned To Housing Area**
· Attend the programming with complete attention and refrain from using Television, Radios, Or Telephone Calls During Groups



RESPECT

**Treat Staff, Service Providers, And Peers With Respect**
· Use respectful and appropriate language and behavior towards Staff, Service Providers, Or Volunteers at all times
· Use respectful and appropriate behavior and language towards peers at all times



**Line Up For School On Time And Participate Fully**
(If Applicable)



**Follow All DOC Regulations**
· Engage in safe, peaceful behavior and respect personal space of staff and peers
· Treat property of DOC and property of others respectfully
· Refrain from carrying non-permissible items



Failure To Comply With Rules And Regulations May Result In Disciplinary Actions And Removal From The Housing Area

---

∨ Programming in 34 housing area units

∨ 3 hours daily, 5 days per week

∨ Plans for expansion to 5 hours daily are underway.

∨ Custody management model changes include utilization of Program counselors

∨ Collaborative programming model: DOC Program Counselors, H+H, and DOC Contracted Providers

NYC DEPARTMENT OF CORRECTION

# Responsive Programming With Community-Based Providers

**Goal:**

To provide high quality programming in seven areas of services responsive to criminogenic needs aimed to support **behavior modification** during incarceration and **reentry** to the community.



**Sample of Current Providers/Partners:**

○ Columbia University Center for Justice
○ CUNY Next Steps
○ DOE
○ Friends of Island Academy/Youth
○ Reentry Network
○ Giant Thinking
○ G-MACC
○ H & H
○ Horticultural Society of New York
○ I-CAN Fortune/Osborne
○ Manhattan College
○ SCO
○ St. John's University
○ Stella Adler



NYC DEPARTMENT OF CORRECTION



DOC Workforce Program Components

# Workforce Development Milestones
## (July 2016- May 2017)



### training program

- 1499 completions
- 1335 IRT certifications have been earned
- 164 IRT Digital Literacy and Barista certificates have been earned



### TRADING FUTURES

### vocational training program

- 440 completions
- 440 Trading Futures certificates have been earned



NYC 13 DEPARTMENT OF CORRECTION

# Snapshot on Reentry

Youth Reentry Network Advocacy Services
November 1, 2016 - May 30, 2017

| Facility | Youth Intakes in Youth Custody | Youth Discharged into Community | Youth Engagements in Community | Percentage Engaged in the Community |
|---|---|---|---|---|
| RMSC (from 12/1/2016) 16- to 21-year-old females | 156 | 60 | 30 | 50% |
| EMTC (from 3/1/2017) 18- to 21-year-old males | 123 | 36 | 27 | 75% |
| GMDC (from 4/3/2017) 18- to 21-year-old males | 149 | 33 | 26 | 79% |



NYC 14
DEPARTMENT OF
CORRECTION

# Expansion in Funding for Youth Centered Programming



Funding

■ Funding

# Number of Youth-Centric Service Providers for Young Adults (2017)



■ Number of Service Providers





# Adoption of Best Practices

| | 2014 | 2017 |
|---|---|---|
| Use of punitive segregation for 16-21 year olds | Yes | No |
| Use of cell-based study model for the educational services | Yes | No, all youth who want to attend school, receive educational services out of cell |
| Staff to Young Adult ratio | 1:50 | 1:30 or 1:25 |
| Funding for programming for 16-21 year olds | $250,000 | $19 million annually |
| Number of providers for youth centric programming (for adolescent and young adults) | 2 | 50 |
| Use of tablet-based programming | No | By July 2017, 350 tablets will be deployed |
| Reentry services | Only for high-risk adults | Currently available for all adolescents and young adults in EMTC, GMDC, RNDC, and RMSC, regardless of risk level |
| DOC funded career and technical education opportunities | No | Over 16 vocational training modules and courses available at EMTC, GMDC, RNDC, and RMSC |
| Average hours of enhanced programming daily | <1 hour | 3 hours expanding to 5 hours by the end of summer |

NYC DEPARTMENT OF CORRECTION

**Thank You**



NYC
DEPARTMENT OF
CORRECTION

# Exhibit G
## of the Proposed First Amended and Supplemental Complaint

# Spending Soars for City Inmates, Comptroller Says

## Rate of fights and assaults also spiked; de Blasio administration said assaults on officers have decreased



ENLARGE

A New York correction department officer checked cells at Rikers Island in March 2015. Photo: Claudio Papapietro for The Wall Street Journal

By
Corinne Ramey
Updated Nov. 28, 2016 9:40 p.m. ET
2 COMMENTS

New Yorkers are spending about as much on every jail inmate as an aerospace engineer makes in a year, yet violence keeps climbing, a new city comptroller's analysis shows.

The cost per inmate stood at just over $132,000 in fiscal 2016, 17% more than the year before and nearly double what it was a decade ago, according to the office of Comptroller Scott Stringer.

At the same time, the rate of fights and assaults increased 25%, city data show.

"The fact is, today's jails are failing to protect inmates and officers alike, while soaking up more and more tax dollars every year," Mr. Stringer, a Democrat, said in a statement.

Mayor Bill de Blasio's administration disputed the findings, citing 2016 Department of Correction data through October that show assaults on staff members have declined from the same period last year.

# Cost of Containment

New York City spends about 50% more per inmate annually than it did five years ago



Source: New York City Comptroller's Office

ENLARGE

"Our investments in safety and skills development for staff and inmates cost money but have been key in improving conditions in our jails," said Natalie Grybauskas, a spokeswoman for Mr. de Blasio.

By comparison, New York City's fiscal 2015 per-inmate cost was nearly triple the $38,161 that Los Angeles County spent. Chicago's Cook County spent $55,636 and the figure was $51,815 for Miami-Dade County, the analysis showed.

Mr. Stringer's office attributed the increased spending primarily to more employee overtime; more expensive ways of housing inmates, such as having fewer in a unit; and a high officer-to-inmate ratio.

For the first time since 1977, the analysis found, there was one officer for each jail inmate. The hiring of more officers was driven by violence-reduction programs and initiatives, Mr. Stringer's office said.

The total number of inmates in the city jail system has declined sharply.


ENLARGE
A solitary confinement cell at Rikers Island. Photo: Bebeto Matthews/Associated Press

The average daily population of city jails stands at 9,790, down from nearly 14,000 in 2007, according to city data. It reached a peak of more than 21,000 in 1992.

Despite the population decrease, the analysis showed, the correction department's annual budget has increased steadily over the past decade. The fiscal 2016 budget was $1.29 billion, a 12% increase over the year before.

Department officials have said more inmates today are difficult to handle. More than 14% are affiliated with gangs, up from 12% in fiscal 2015, and more than 40% are mentally ill, up from 37% in fiscal 2013, according to city data.

On Monday, Mr. Stringer renewed his call to close Rikers Island, a proposal that has been embraced by some inmate-rights advocates and backed by elected officials including Council Speaker Melissa Mark-Viverito and New York Gov. Andrew Cuomo.

"We must continue to explore smarter, and more humane, ways to tackle this issue—and work toward closing Rikers Island once and for all," Mr. Stringer said.

Mr. de Blasio has called closing the jail complex "a noble idea," but said it would cost billions of dollars and face "immense logistical moves."

Said Ms. Grybauskas: "We're proud of the reforms that have helped to make Rikers safer for staff and inmates."



NEW YORK CITY COMPTROLLER
**SCOTT M. STRINGER**

# NYC Department of Correction

FYs 2007-16 OPERATING EXPENDITURES,
INMATE POPULATION, COST PER INMATE,
STAFFING RATIOS, PERFORMANCE MEASURE
OUTCOMES, AND OVERTIME

New York City Comptroller's Office
Budget Bureau
November 2016

# Department of Correction

## Department of Correction Budget and Inmate Population



— Expenditures ($billions)*    —— Average Daily Inmate Population (ADP)

**DOC Expenditures ($billions)** axis: $1.40, $1.20, $1.0, $0.80, $0.60, $0.40, $0.20, $0.0

**Inmate Population** axis: 14,000, 12,000, 10,000, 8,000, 6,000, 4,000, 2,000, 0

| Year | ADP | Expenditures |
| --- | --- | --- |
| 2007 | 13,987 | $0.95B |
| 2008 | 13,850 | $0.95B |
| 2009 | 13,352 | $1.10B |
| 2010 | 13,049 | $1.01B |
| 2011 | 12,790 | $1.04B |
| 2012 | 12,287 | $1.07B |
| 2013 | 11,827 | $1.08B |
| 2014 | 11,408 | $1.10B |
| 2015 | 10,240 | $1.15B |
| 2016 | 9,790 | $1.29B |

ADP FELL TO 33-YEAR RECORD LOW IN FY16

*Expenditures exclude costs of fringe benefits, pensions, debt service, and judgments and claims.
Source: Comprehensive Annual Financial Reports of the Comptroller for FYs 2007- 2016, NYC Financial Management System, Mayor's Management Reports for 2007 through 2016.

# Department of Correction



## Cost per Inmate

— Avg Daily Inmate Population   — Cost Per Inmate

Source: Comprehensive Annual Financial Reports of the Comptroller for FYs 2007- 2016, NYC Financial Management System, Mayor's Management Reports for 2007 through 2016.

NEW YORK CITY COMPTROLLER SCOTT M. STRINGER

Budget Bureau | 3

# Department of Correction

## Correction Officers to Inmate Ratio



Legend: Uniformed Employee to Inmate Ratio — Number of Uniformed Employees

OFFICER TO INMATE RATIO WAS 1:1 IN FY16

| Year | Number of Uniformed Employees | Uniformed Employee to Inmate Ratio |
|------|-------------------------------|-------------------------------------|
| 2007 | 9,203 | 0.66 |
| 2008 | 9,149 | 0.66 |
| 2009 | 9,068 | 0.68 |
| 2010 | 8,772 | 0.67 |
| 2011 | 8,456 | 0.66 |
| 2012 | 8,540 | 0.70 |
| 2013 | 8,991 | 0.76 |
| 2014 | 8,922 | 0.78 |
| 2015 | 8,756 | 0.86 |
| 2016 | 9,832 | 1.00 |

Source: : NYC Comptroller's Comprehensive Annual Financial Report FYs 2007 - 2016, Mayor's Management Report for FYs 2007- 2016.

# Department of Correction



## Agency-wide Overtime Cost Relative to Inmate Population

■ Agency-Wide Overtime (OT) Expense ($millions)  —OT Expense per Inmate

**OVERTIME HAS ALMOST DOUBLED SINCE FY14**

| Year | Overtime ($millions) | OT Expense per Inmate |
|------|----------------------|-----------------------|
| 2007 | $101M | $7,199 |
| 2008 | $107M | $7,755 |
| 2009 | $99M | $7,398 |
| 2010 | $97M | $7,465 |
| 2011 | $114M | $8,900 |
| 2012 | $145M | $11,773 |
| 2013 | $155M | $13,071 |
| 2014 | $139M | $12,189 |
| 2015 | $196M | $19,166 |
| 2016 | $275M | $28,074 |

Overtime per inmate represents the total overtime expense divided by the average daily inmate population. The average overtime payment earned by uniformed DOC employees was $26,000 in FY16. Source: Comprehensive Annual Financial Reports of the Comptroller for FYs 2007- 2016, NYC Financial Management System, Mayor's Management Reports for 2007 through 2016.

NEW YORK CITY COMPTROLLER SCOTT M. STRINGER

Budget Bureau | 5



# Department of Correction

## Fight/Assault Infractions
(per 1,000 Average Daily Population)

Source: Mayor's Management Reports for FYs 2007 through 2016.

# Department of Correction

## Inmate Assaults on Staff
(per 1,000 Average Daily Population)



Source: Mayor's Management Reports for FYs 2007 through 2016.

NEW YORK CITY COMPTROLLER SCOTT M. STRINGER

Budget Bureau | 7

# Department of Correction

## Use of Force by Correction Officer on Inmates
(Incidents and Allegations per 1,000 Average Daily Population)



Source: Mayor's Management Reports for FYs 2007 through 2016.

NEW YORK CITY COMPTROLLER SCOTT M. STRINGER

Budget Bureau | 8

# Department of Correction

## Tort Claims Filed for Personal Injury at a City Correction Facility*



| Tort Claims Filed | | |
|---|---|---|
| 989 | 1,060 | 1,043 | 1,188 | 1,183 | 1,595 | 1,655 | 2,241 | 2,792 |

CLAIMS FOR PERSONAL INJURY AT A CORRECTION FACILITY MORE THAN DOUBLED FROM FY11 TO FY15

*Includes claims by inmates or employees of City correction institutions or facilities who were allegedly injured by the actions of City employees or inmates.
Source: NYC Comptroller's Office, Claims Report: Fiscal Year 2015.

NEW YORK CITY COMPTROLLER SCOTT M. STRINGER

Budget Bureau | 9

# Department of Correction

## Cost per Inmate in Nation's Five Largest City Jail Systems

(Data for year ending in 2015)

Avg. Daily Inmate Population | Avg. Yearly Cost per Inmate

Avg. Inmate Population/Avg. Annual Cost per Inmate

| | Avg. Daily Inmate Population | Avg. Yearly Cost per Inmate |
|---|---|---|
| Philadelphia | 8,254 | $29,823 |
| Miami-Dade County | 4,301 | $51,815 |
| Cook County | 7,879 | $55,636 |
| Los Angeles County | 19,041 | $38,161 |
| New York | 10,240* | $112,665* |

*Data is for fiscal year 2015 in this chart because fiscal year 2016 data is not available yet for all cities.
Source: Individual cities' 2015 Financial Statements and Comprehensive Annual Reports.

# Exhibit H
## of the Proposed First Amended and Supplemental Complaint

TOPICS    SEARCH

SUBSCRIBE
8 weeks for only 99¢

TRIAL OFFER | 8 weeks for 99¢

Alleged gangbanger busted in
Bronx crackdown now
charged in teen's 2011

Cuomo continues to spend big
against Nixon even with huge
lead in the polls
ADVERTISEMENT

NYC public school
students head back to
class

Long Isl
outfit i
possess

NYC CRIME    NEW YORK

# Correction Commissioner Joseph Ponte reports 18% spike in NYC jail stabbings even as attacks on guards drop

BY ERIN DURKIN    |    NEW YORK DAILY NEWS    |    MAR 09, 2017    |    6:54 PM

ADVERTISEMENT

"There's still too much violence," Correction boss Joseph Ponte told reporters
Thursday after a City Council hearing. "There's still too many assaults on staff,
and we need to get better in all those categories. But we're seeing some good
trends." (James Keivom/New York Daily News)

The number of stabbings and slashings at city jails jumped 18% last
year, officials revealed Thursday.

There were 155 slashings and stabbings, primarily at problem-plagued Rikers Island, in 2016 — up from 131 the year before. That's on top of a 9% jump in 2015.

SUBSCRIBE
8 weeks for only 99¢

TOPICS    SEARCH

TRIAL OFFER | 8 weeks for 99¢

Alleged gangbanger busted in
Bronx crackdown now
charged in teen's 2011

Cuomo continues to spend big
against Nixon even with huge
lead in the polls

LATEST

Read invented by Teads

Long Isl
outfit in
possess

NYC public school
students head back to
class
Alleged gangbanger busted
in Bronx crackdown now
charged in teen's 2011
murder
28m



ADVERTISEMENT

NYC CRIME
Cops seek sicko who raped
a woman as she crossed
Washington Heights bridge
12:35 AM

NYC CRIME
Ex-con held without bail
after East Village
attempted rape arrest
SEP 4, 2018

NEW YORK
Financial hustler who
ran $6.5M investment
scam blamed judge, DA
in Rikers Island phone
calls
SEP 4, 2018

NYC CRIME
BUSTED: Andre
Neverson, on the run
since 2002 in his sister
and ex-girlfriend's
slaying in Brooklyn, is
caught in Connecticut
SEP 4, 2018

Department of Correction Commissioner Joseph Ponte stressed in testimony to the City Council that other types of violence at Rikers have gone down.

"We have substantially driven down critical violence indicators," he said.

PAID POST                                          What Is This?



Got the rent day blues?
This might cheer you up.

Home ownership may be within financial reach.

SEE MORE

Sponsored Content by   CLASSIC QUALITY HOMES

Assaults on staff fell by 11%, to 841, and assaults that seriously injured the employee dropped 31%. Use of force by guards was down 3%, and use of force incidents that caused a serious injury dropped 35%.

But the number of fights between inmates jumped 21%, to 6,005. Serious injuries from fights or assaults fell 8%.

"There's still too much violence. There's still too many assaults on staff, and we need to get better in all those categories. But we're seeing some good trends," Ponte told reporters after the hearing.

Councilwoman Elizabeth Crowley, chair of the fire and criminal justice committee, said she didn't buy the argument the troubled jail complex is becoming a less violent place.

"It's hard for me to believe what you're saying," she said. "Violence is out of control. It's not getting better."

One reason for the uptick in slashings and stabbings is that officials can't detect all the weapons that get snuck into jails, Ponte said. The city is barred by state law from using ionizing scanners, which he called the "most effective tool to find these types of weapons."



SUBSCRIBE
Newsstand for only 99¢

"The New Pillow Everyone is Talking About"

PANCAKE PILLOW

ADVERTISEMENT

Some councilmembers weren't buying Ponte's claim that jail violence was improving. (Anthony DelMundo/New York Daily News) 

Officials found 37% more weapons in 2016 than 2015, but found 20% fewer scalpel blades, a common weapon used in slashings.

DOC also said Thursday that it's expected to take six years to move 16- and 17-year-old prisoners off Rikers Island to a new facility in the Bronx.

When Mayor de Blasio announced the plan to put teen inmates at a new jail, which would require City Council and City Planning Commission approval, he said it would take four years or more. Officials are conducting a feasibility study.

"It will be as quickly as we can," Ponte said.

TOPICS    SEARCH                                                                    SUBSCRIBE
                                                                                  Act now for only 99¢

Sixteen- and 17-year olds are in the custody of DOC, but that would
change if a proposal to raise the age of criminal responsibility passes.

Alleged gangbanger busted in    Cuomo continues to spend big    NYC public school          Long Isl
Bronx crackdown now             against Nixon even with huge     students head back to      outfit ir
charged in teen's 2011          lead in the polls               class                      possess

Glenn Martin of JustLeadershipUSA — who was himself locked up at
Rikers at 16 and stabbed four times — said the move could happen
faster with pressure from de Blasio to end the "systemic abuse" young
people face at the jail.

"It will take six years if the mayor doesn't invest political capital into
making it happen," he said.

A spokesman for Gov. Cuomo sounded optimistic his raise the age
proposal would pass, making the situation on Rikers moot.

"Within months of the governor signing his executive order, the state
was able to construct a suitable facility and remove these 16 and 17
year olds from adult prisons," spokesman Rich Azzopardi said.

---

**The Daily News Flash Newsletter**
Weekdays

Catch up on the day's top five stories every weekday afternoon.

| ENTER YOUR EMAIL ADDRESS | > |

ADVERTISEMENT

**Erin Durkin**                                    CONTACT    

Erin Durkin is a reporter in the Daily News City Hall bureau, covering city government
and politics, the de Blasio administration and the City Council. She previously
covered urban development and local issues in the paper's Brooklyn bureau.



Couple Confused When Photo Goes Viral, Till They Look Lo...
The Buzz Tube

High Interest Savings Accounts In New York Might Surprise Y...
Savings Accounts | Sponsored Links

US Obesity Doctor Reveals the No.1 Worst Carb You're Eating
Nucific

Sponsored Links

**You May Like**

Forget Your 401k if you Own a Home (Do This Instead)
LendingTree Mortgage Quotes

SUBSCRIBE
8 weeks for only 99¢

TRIAL OFFER | 8 weeks for 99¢

These Sedans Are The Cream Of The Crop!
Yahoo Search

Alleged gangbanger busted in Bronx crackdown now charged in teen's 2011

Cuomo continues to spend big against Nixon even with huge lead in the polls

NYC public school students head back to class

Long Isl outfit in possess

Sponsored Links

Cardiologist: "This Is What Happens When You Eat A Ste...
Gundry MD

7 Reasons Why People Are Buying Tecovas Boots
Tecovas

Diddy's Twin Girls Are All Grown Up & Look Gorgeous
Finance Nancy

Sponsored Links

### Recommended For You

SEE IT: Oklahoma bail agent fatally shoots client in her office

Police officer in Argentina hears baby crying, so she nursed him — and now she's being promoted

88° New York City, NY            More

Sponsored Links by Taboola

He Transformed His Belly With One Thing
Gundry MD

Watch: Famous US Doc: "These Vegetables Are Destr...
Gundry MD

Jackie Kennedy's Granddaughter Looks So Mu...
Miss Penny Stocks

New York Seniors Can Finally Claim These 27 Discounts
Senior Discounts Club

Sponsored Links

### Recommended For You

Delaware woman fatally shoots husband's alleged mistress in Pennsylvania home before killing self

Most infamous traitors

Everyday Golfers Are Using This Driver to (Finally) Win
GX7 Golf

The One Weird Trick Everyone Should Know About
Boredom Therapy

SUBSCRIBE
8 weeks for only 99¢
Sponsored Links by Taboola

TRIAL OFFER | 8 weeks for 99¢

Alleged gang members charged in teen's 2011

Discover The Incredible New 2019 Vehicles That Are Almost Here
Sponsored Links

Bronx crackdown not

Vehicles | Search Ads

big against Nixon even with huge lead in the polls

Sponsored Links

**You May Like**  Sponsored Links by Taboola

3 Ways Your Dog Asks For Help
Dr. Marty

NYC public school students head back to class

Long Island outfit in possess

Stephon Marbury Just Made History In China
SportsChew

Chunking Chip Shots? You Need This Straight Back Wedge
Square Strike Wedge Golf

How To Easily Kill 98% Of All Mold In Your Home
NatureFresh Air Purifier

ADVERTISEMENT

## Download our mobile app
## Subscribe for unlimited access

Contact Us
Site Map
Place an Ad
Contests
BestReviews
The Daily Meal
Privacy Policy

Careers
Feeds
Media Kit
Special Sections
Manage
Subscription
The Active Times
Terms of Service

Copyright © 2018, New York Daily News

# Exhibit I
## of the Proposed First Amended and Supplemental Complaint

METRO

# Jail violence is increasing under de Blasio's watch

By Yoav Gonen

September 18, 2017 | 10:36pm



Getty Images

The city's jails have grown more dangerous every year under Mayor de Blasio, according to figures released Monday.

The inmate-on-inmate violence rate, inmate assaults on staff and the number of fights behind bars are all increasing, the Department of Correction said in the Mayor's Management Report released on Monday.

The surges came under former jails chief Joseph Ponte, who retired in June amid questions about his misuse of a city vehicle and the significant time he was spending out of state.

Despite having de Blasio's backing to the end, Ponte oversaw a 68 percent jump in the monthly rate of violent inmate-on-inmate incidents during his three-year tenure — from 32.9 per 1,000 inmates in fiscal 2014 to 55.2 in fiscal 2017.

The rate of incidents increased every single year under Ponte, including a 15 percent bump through June 30 of this year.

Serious injuries per 1,000 inmates grew to 2.7 in fiscal 2017 — a 50 percent increase from the 1.8 rate three years earlier.

The rate of inmate assaults on staff also rose, to 8.4 per 1,000 inmates in the latest fiscal year — up 42 percent from the rate of 5.9 in fiscal 2014.

"The latest jail violence statistics reaffirm the warnings we've made year after year for the past four years. We said that inmate assaults would go up when punitive segregation was eliminated for inmates 21 and under while failing to impose any restrictions for the same individuals who commit violent crimes behind bars," said Correction Officers Benevolent Association president Elias Husamudeen.

"Unless this administration starts focusing on how to make the jails safer immediately, instead of closing Rikers in the distant future, these numbers are never going to go down. In fact, they will only get far worse."

City officials argue that they've reduced the number of nonviolent, low-level crime offenders in the system, which has raised the concentration of inmates who are more likely to cause trouble.

They have repeatedly pointed to a decrease in the number of assaults, even though the number of inmates has also dropped — by 20 percent — since fiscal 2014.

"Our reforms are working even while DOC is managing a more difficult population," said agency spokesman Peter Thorne.

"We have more people in custody with felony charges and gang affiliations, who are significant drivers of violence."

The mayor has yet to appoint a replacement for Ponte.

FILED UNDER   BILL DE BLASIO, DEPARTMENT OF CORRECTIONS, INMATES, JAIL, JOSEPH PONTE, PRISONS







View this document on Scribd

Recommended by

# Exhibit J
## of the Proposed First Amended and Supplemental Complaint

# Third Report of the
# *Nunez* Independent Monitor

**Third Monitoring Period**
**August 1, 2016 through December 31, 2016**

Team expects that these things will reduce Inmate misconduct and the consequent use of force. While many of these tools are available for the 16- to 17-year-old Inmate population as well, the development of some of them lags behind (*e.g.*, the group incentive program has not yet been implemented at RNDC; Direct Supervision training has not yet begun), also discussed in subsequent sections of this report. Furthermore, a review of quarterly use of force data with Inmates involved in five or more uses of force in each quarter confirmed that incidents involving a UOF are concentrated among a relatively small number of Inmates. In 2016, just 97 inmates accounted for 846 uses of force, which is 18% of the total 4,652 uses of force. These data suggest that Department's UOF reduction efforts should include strategies to address chronic behavior problems among Inmates who are involved in disproportionate numbers of uses of force.

The Department's UOF reduction efforts will also benefit from examining Staff characteristics to identify subgroups of Staff who should be prioritized for training or for more intensive skill-building efforts. Characteristics could include probationary status, tenure, shift, and overtime, among others. If Staff in these groups are involved in disproportionate numbers of uses of force, specific training or coaching to address key gaps in knowledge or to enhance techniques could be deployed. This is the same strategy used in the Department's efforts to develop an Early Warning System, with the fruits of that analysis used in a proactive, rather than reactive, fashion.

*Reasons for the Use of Force*

Understanding the reason that Staff use physical force with an Inmate is a key facet of the effort to identify strategies to reduce the use of excessive and unnecessary force. As an initial matter, physical force by Staff in a correctional setting is at times necessary to maintain order,

year-old Inmates, but may also be due to differences in the way the referral process operates at the two Facilities. For example, it is possible that RNDC casts a wider net when referring Inmates to the programs, admitting Inmates who would not be considered for the programs at GMDC. Furthermore, a significantly larger proportion of Inmates at RNDC had multiple exposures to the programs than at GMDC (36% versus 17%, respectively). The reasons for these multiple admissions should be examined more closely by the Department as they suggest that the Inmate's violent behavior persisted, even after exposure to the SCHU and TRU programs' services.

The Monitoring Team conducted several analyses to assess whether Inmates with violent infractions were being properly referred to the alternative programs. First, a list of Inmates with three or more violent infractions between March 1 and August 31, 2016 and a list of Inmates who had been admitted to SCHU and TRU during the same time period were compared. Given the more recent tenure of the Secure and YA-ESH programs, a similar analysis on the target population was not conducted. The TRU/SCHU comparison revealed that, for the most part, Inmates who engaged in repeated violent misconduct were being identified and placed in the programs, in accordance with stated eligibility criteria. Of the 29 Inmates aged 16, 17 and 18 with three+ violent infractions, 24 (83%) had been admitted to either SCHU or TRU.

The Department also provided the Monitoring Team with a list of Inmates with repeated uses of force for a similar time period (five+ uses of force between March 1 and September 30, 2016). Among the 92 adolescents and young adults on this list, only 49 (53%) had been in either SCHU or TRU. While they may have been exposed to some other sort of intervention (*e.g.*, mental health services), it was surprising to the Monitoring Team that so many of the "high-fliers" had not been exposed to either of the two programs. Given what is known about the reasons for the use of force discussed in the introduction to this report, it is very possible that Inmates were involved in a use of force for a behavior that would not make them eligible for either SCHU or TRU (*e.g.*, disobeying a direct order). Notably, five of the 43 Inmates who had not been exposed to the program accounted for 73 uses of force over a six-month period.

In summary, the SCHU and TRU programs appear to be admitting most of the Inmates who are exhibiting frequent violent misconduct. However, the Department is encouraged to examine the group of Inmates with repeated violent misconduct and/or frequent uses of force to identify why they were not referred to the alternative programs and/or whether they were exposed to other interventions designed to address this behavior (*e.g.*, mental health treatment; other interventions provided by Program Counselors; Punitive Segregation, while it was operational).

- *Program Fidelity*

Programs designed to modify Inmates' behavior must be guided by a plan for the delivery of services. Most often, the guide takes the form of an individualized plan that identifies problem behaviors, specifies goals, and prescribes services to assist the Inmate in meeting those goals. In the

- Creating a service plan for youth that describes the services the youth will receive while solo housed and the specific steps to be taken to return to a unit where the Inmate can interact with peers;
- Articulating how the release/transfer decision from the unit is made.

To the extent that the Department wants to continue to use Solo Housing, the Monitoring Team will continue to work with the Department to refine the policy. Furthermore, the number of Inmates placed in solo housing, the reasons for it, and the duration will continue to be tracked.

- *Mid-level Infractions*

As discussed in both the First and Second Monitor's Reports, the Department's continuum of responses to infractions requires expansion to address mid-level misconduct, such as threatening Staff, episodic aggression or horseplay where no one is seriously injured, property destruction or theft, or continuous disruption to Facility operations such that services to other Inmates are compromised. Data from the Inmate Fight Tracker suggests that episodic aggression is a frequent occurrence—that many Inmates engage in a single fight and thus may not warrant the intervention of SCHU or TRU, but still require some form of accountability. Currently, the only options to address these behaviors are a reprimand and/or surcharge of $25 from the Adjudication Captain, and these are only imposed *if* the Staff write an infraction and it navigates the adjudication process. Otherwise, it appears that many Inmates do not face meaningful accountability measures for their mid-level misconduct, which contributes to the overall lack of safety at the Facilities. The Monitoring Team emphasizes this recommendation yet again, both to ensure proper accountability and order in the Facility, and as part of an overall strategy to address Inmate misconduct before it escalates to a level that would lead to placement in one of the alternative disciplinary programs. The Monitoring Team's experience suggests that responses that involve both a skill-building element and a restorative element are most effective in catalyzing behavior change and sending a message to both Staff and Inmates that misconduct is not tolerated. The Monitoring Team supports the Department's concept of *Repairs* and has also discussed a variety of other ideas in-person and in writing. The Monitoring Team encourages the Department to accelerate progress in this area.

The Department has made clear progress in expanding the range of disciplinary options to replace Punitive Segregation. Quality implementation of programs to change Inmates' behavior is a complex, incremental process. Now that the Department has implemented the core strategies, it will need to finalize policies, improve the goal-focus of the various programs, monitor implementation and program fidelity, and assess effectiveness. Furthermore, the Department needs to continue to address the practice of solo housing and to develop a range of mid-range accountability measures for behaviors that do not warrant placement in one of the alternative programs.

| COMPLIANCE RATING | ¶ 4. Partial Compliance |
| | ¶ 6. Partial Compliance |