# Exhibit R
## of the Proposed First Amended and Supplemental Complaint



## CORRECTION OFFICERS' BENEVOLENT ASSOCIATION, INC.
"PATROLLING THE TOUGHEST PRECINCTS IN NEW YORK"



## PROPOSALS TO REDUCE JAIL VIOLENCE IN
## THE NEW YORK CITY DEPARTMENT OF CORRECTION

A BRIEFING BOOKLET PREPARED BY:
THE CORRECTION OFFICERS' BENEVOLENT ASSOCIATION, INC.

**ELIAS HUSAMUDEEN**
President

2018

**VIOLENCE ON THE STREETS OF NEW YORK CITY IS DEALT WITH BY ARRESTING AND SEGREGATING THE PERPETRATORS FROM THE PUBLIC AND SENDING THEM TO JAIL.**

**BUT WHAT HAPPENS WHEN THESE PERPETRATORS CONTINUE TO COMMIT VIOLENCE IN JAIL?**

**PUNITIVE SEGREGATION IS A JAIL WITHIN IN A JAIL. IT ENABLES CORRECTION OFFICERS TO SEGREGATE VIOLENT OFFENDERS JUST AS THE POLICE SEGREGATE VIOLENT OFFENDERS ON THE STREETS OF NEW YORK CITY, WHEN THEY MAKE ARRESTS.**



**DAILY◎NEWS**

## 21-YEAR-OLD MAN FATALLY STABBED OUTSIDE OF VIOLENCE-RIDDEN BROOKLYN SHELTER

February 26, 2018

A man was stabbed to death Sunday outside a violence-ridden Brooklyn homeless shelter, cops and witnesses said.

Miguel Acosta, 21, was standing in front of the Atlantic Armory Shelter at Bedford and Atlantic Aves. in Crown Heights when the killer, armed with a knife and a grudge, approached him about 1 p.m., police said. The two men exchanged a few words before the assailant plunged a knife into the other man's chest and ran off.

Acosta, clutching his chest and gushing blood, limped half a block before stumbling facedown onto the rain-slicked pavement, a witness said.

Medics tried in vain to revive him before rushing him to Interfaith Medical Center, where he died.

A witness who lives in the shelter said it appeared the two men knew each other.

"I think he might have already had the knife in his hand. It was one of those double-bladed pocket knives," he said. "(The victim) was clutching his chest and saying, 'My bad! My bad!' His last words — he said 'my bad' four times. Those were his last words. It gave me goosebumps. "The

ambulance came with the paramedics and did everything they could to revive him," the witness added. "That dude is gone. That corner right there just turned into a murder scene."

The witness said he recognized the victim as a fellow shelter resident but said the killer was "not from around here."

A Department of Homeless Services official insisted the victim did not live at the shelter. Police listed his address as another homeless shelter — on Blake Ave. in Brooklyn. Durwin Adams, who has stayed at the 350-bed shelter since July, said it is plagued with violence.

"Just last week a man pulled a knife on me that was about 8 inches long," he said. "I was like, how the hell did you even get that through the metal detectors?" The suspect was described as a 5-foot-6 Hispanic man in his 20s, wearing a black wool cap, black jacket and blue jeans.

Earlier this month, Homeless Services officials said they had doubled the number of officers onsite and moved their training facility to the armory. There are a minimum of 11 security staffers on duty there at all times. Last week, the Daily News reported on an array of quality-of-life concerns surrounding the shelter in the rapidly gentrifying neighborhood.

# INTRODUCTION

# IT'S BEEN SAID THAT "THE DEFINITION OF INSANITY IS DOING THE SAME THING OVER AND OVER AGAIN AND EXPECTING A DIFFERENT RESULT"

The Department of Correction is still attempting to resolve the issue of jail violence through the creation of so-called specialized housing units/programs.  However, regardless of whether we call them restrictive housing units, enhanced supervision housing, enhanced housing, transitional-restorative units, secure units, or enhanced supervision re-start, they will not address the core issue at hand-jail violence.

The Department of Correction thinks that the mere creation of housing units/programs with elaborate names somehow means they are creating something new. They are not. They have not changed anything during the last four years and continuing these failed programs, while expecting a different result, is the definition of insanity.

Second, despite the fact that these units and other "reform policies" have been in place for four or more years, very little progress has been made to ensure jail safety (Mayor's Management Report 2013-2017).  Correction Officers, staff, and inmates continue to be assaulted at alarmingly high rates on a daily basis without accountability or sanctions placed upon violent offenders (Federal Monitor's Reports I-IV).

The Department of Correction has been unable to lower the jail violence across every major category (Mayor's Management Report 2013-2017).  Despite the failure of these policies, the Department of Correction continues to stand by them and has not developed any new or effective initiatives to effectively reduce jail violence.

Thus, the Department of Correction has failed to learn from recent history and it continues to repeat its mistakes at the expense of Correction Officers, staff, inmates, and the public.

The Mayor's continued failure to listen to these sound recommendations from law enforcement experts and the boots on the ground is directly connected to the continued increase in violence in our jails.



# RIKERS ISLAND
# & NEW YORK CITY JAILS

## 9 RIKERS ISLAND FACILITIES

1. RNDC: The Robert N. Davoren Center
2. EMTC: The Eric M. Taylor Center
3. GMDC: The George Motchan Detention Center
4. AMKC: The Anna M. Kross Center
5. NIC: The North Infirmary Command
6. OBCC: The Otis Bantum Correctional Center
7. WF: West Facility
8. RMSC: The Rose M. Singer Center
9. GRVC: The George R. Vierno Center

## IN ADDITION TO THE 9 JAILS RIKERS HAS:

- POWER PLANT
- GARAGE
- GAS STATION
- CAR WASH
- FIRE RESPONSE UNIT
- MEDICAL UNITS
- BAKERY
- CENTRAL LAUNDRY
- TAILOR SHOP
- PRINT SHOP
- A K9 UNIT
- STORE HOUSE
- APPROXIMATELY
  1500 PARKING SPACES

## BOROUGH FACILITIES

BROOKLYN DETENTION COMPLEX (BKDC)

MANHATTAN DETENTION COMPLEX (MDC)

BRONX COURTS (BXCTS)

VERNON C. BAIN CENTER (THE BARGE) (VCBC)

QUEENS COURTS QDC)

## HOSPITAL UNITS

ELMHURST HOSPITAL PRISON WARD (EHPW)  QUEENS

BELLEVUE HOSPITAL PRISON WARD (BHPD) MANHATTAN

# A GLIMPSE OF RIKERS ISLAND & NEW YORK CITY JAILS

|  | FY17 |
|---|---|
| 2017 ADMISSIONS | 58,226 |
| NUMBER OF REPEAT OFFENDERS | 41,545 |
| AVERAGE DAILY POPULATION | 9,000 |
| INMATES IN SECURITY RISK GROUP (% ADP) | 14.7% |
| JAIL-BASED RE-ARRESTS OF INMATES | 1,126 |
| POPULATION IS ON TRIAL | 85% |
| AVERAGE LENGTH OF STAY | 60.7 DAYS |
| PERCENT RELEASED TO THE COMMUNITY | 76% |
| RIKERS ISLAND | 420 ACRES |
| INMATES TRANSPORTED TO AND FROM COURT DAILY | 1,000 |
| INMATE VISITORS PER DAY | 1,600 |

# POPULATION DEMOGRAPHICS FY17

| AGE | NEW ADMISSIONS | AVG. DAILY POP | % OF ADP |
|---|---|---|---|
| 16-17 | 332 | 143 | 1.5% |
| 18-21 | 1,381 | 947 | 10.2% |
| 22-25 | 1,967 | 1,373 | 14.8% |
| 26-29 | 2,181 | 1,321 | 14.2% |
| 30-39 | 4,033 | 2,440 | 26.3% |
| 40-49 | 2,597 | 1,560 | 16.8% |
| 50-59 | 1,981 | 1,240 | 13.4% |
| 60-69 | 348 | 226 | 2.4% |
| 70+ | 39 | 21 | 0.2% |
| unknown | 86 | 5 | 0.1% |

# BOROUGH OF ARRAIGNMENT

|  | NEW ADMISSIONS | AVG. DAILY POP | % OF ADP |
|---|---|---|---|
| Brooklyn | 3,107 | 1,720 | 18.5% |
| Bronx | 2,304 | 1,458 | 15.7% |
| Manhattan | 4,538 | 3,010 | 32.4% |
| Staten Island | 728 | 319 | 3.4% |
| Queens | 2,606 | 1,571 | 16.9% |
| Other | 1,662 | 1,198 | 12.9% |

# NEW YORK CITY DEPARTMENT OF CORRECTION

## USE OF FORCE

### FY FEBRUARY 2017 - FEBRUARY 2018

| 2017 YEAR IN REVIEW | FYTD 2017 |
|---|---|
| INMATE VIOLENCE - SLASHINGS/STABBINGS | 133 |
| TOTAL USE OF FORCE "A" | 156 |
| TOTAL USE OF FORCE "B" | 1,239 |
| TOTAL USE OF FORCE "C" | 2,221 |
| TOTAL USE OF CHEMICAL AGENTS | 2,280 |
| ASSAULTS ON STAFF INCIDENTS | 642 |
| USE OF FORCE "A" | 28 |
| USE OF FORCE "B" | 295 |
| USE OF FORCE "C" | 319 |
| USE OF FORCE "A" –STAFF INJURIES | 24 |
| USE OF FORCE "A" –INMATE INJURIES | 27 |
| SERIOUS INJURY TO INMATE BY INMATE | 152 |
| TOTAL # OF INMATE FIGHTS | 4,702 |
| INFRACTIONS FOR INMATE ON INMATE ALTERCATIONS | 9,694 |
| ASSAULT ON STAFF W/O UOF | 438 |
| SPLASHING | 744 |
| SPITTING/SPAT | 268 |
| UOF STAFF - STOP INMATE FIGHT | 1,727 |
| CRIMINAL ACTS - ON CIVILIAN STAFF | 121 |

# 3 ACTUAL USE OF FORCE INCIDENTS

## *UOF (A)   REQUIRES MEDICAL ATTENTION BEYOND OVER THE COUNTER ANALGESICS
(LACERATION, PUNCTURE, FRACTURE, SUTURE, INTERNAL INJURIES)

| INCIDENT DATE | JAIL |
|---|---|
| 03-13-2018 | GRVC |

AT 1911 HOURS, IN HOUSING AREA 19B (ADULT/MO), INMATE MCMILLAN (BLOOD, ENH, REST CL23) WALKED UP TO OFFICER AND STRUCK HIM SEVERAL TIMES IN THE FA CIAL AREA. AS A RESULT, A USE OF FORCE OCCURRED WITH THE BELOW LISTED STAFF, THIS INCIDENT IS CLASSIFIED AS AN "A" USE OF FORCE. VIDEO SURVEILLANCE: YES/ CHEMICAL AGENT (OC) UTILIZES: YES. INJURIES TO CORRECTION OFFICERS (CO A) LACERATION TO THE FACE (CO B) SPRAIN WRIST, INJURY TO INMATE CONTUSION TO THE NOSE

## *UOF (B)   ADMINISTRATION OF MINOR FIRST AID
(SUPERFICIAL BRUISE, SCRAPE, SCRATCH, MINOR SWELLING)

| INCIDENT DATE | JAIL |
|---|---|
| 03-02-2018 | MNCTS |

AT 1625 HOURS IN MANHATTAN COURT NEW ADMISSION PEN #2, INMATE HUGGINS (SRG BLOOD, CL. 7, AMKC, NEW ADMISSION) WAS BEING ESCORTED BY OFFICER TO PEN #2. WHEN THE INMATE THREW PUNCHES TOWARDS THE OFFICER, NOT MAKING CONTACT. AS A RESULT, A USE OF FORCE OCURRED WITH THE BELOW LISTED STAFF, THIS INCIDENT IS CLASSIFIED AS A "B" USE OF FORCE. VIDEO SURVEILLANCE: NO/ CHEMICAL AGENT (OC) UTILIZED: NO INJURY TO CORRECTION OFFICER OR INMATE.

## *UOF (C)   NO INJURY

| INCIDENT DATE | JAIL |
|---|---|
| 03-12-2018 | OBCC |

AT 1515 HOURS, IN HOUSING AREA 5 SOUTH (ADULT/ GP), INMATES HENRY (NSRG, CL.19) AND COOPER (SRG-BLOOD, ICR, CL. 28) WERE INVOLVED IN A FIGHT, OFFICER ORDERED THE INMATES TO STOP AND WARNED CHEMICAL AGENT (OC) WOULD BE UTILIZED. THE INMATES DID NOT COMPLY. AS RESULT, A USE OF FORCE OCCURRED WITH THE BELOW LISTED STAFF. THIS INCIDENT IS CLASSIFIED AS A "C" USE OF FORCE, VIDEO SURVEILLANCE: YES/ CHEMICAL AGENT (OC) UTILIZED: YES. NO INJURY TO CORRECTION OFFICER OR INMATES.

# ANALYSIS OF VIOLENCE ON RIKERS ISLAND FOR FISCAL PERIOD FEBRUARY 2017 - FEBRUARY 2018

In 2017, Correction Officers had in its custody approximately 65,000 inmates who were housed on Rikers Island and other New York City jail facilities.  Out of the 65,000 approximately 41,000 were recidivist (arrested 2-9 times that same year).

THERE WERE APPROXIMATELY 3,616 USE OF FORCES (WHICH REPRESENTS LESS THAN 6 PERCENT FOR THE PERIOD IN QUESTION) WITH THE FOLLOWING BREAKDOWN: 156 CLASS (A) USE OF FORCES, 1,239 CLASS (B) USE OF FORCES, 2,221 CLASS (C) USE OF FORCES.

Correction Officers used Chemical Agents a total of 2,280 times which resulted in no injury to inmate or Correction Officers.  Between February 2017 and February 2018, there was a total of 642 Correction Officers assaulted by inmates. 28 of those assaults were Class "A" Uses of Forces resulting in Correction Officers being sent to the hospital for lacerations, punctures requiring sutures, fractures, internal injuries, broken orbitals, fractured jaws, broken/fractured noses, sprain of the hands, wrists, shoulders, ankles, back injuries, or missing teeth.  Some were the result of an out right attack on Correction Officers by an inmate or inmates, while most are assaults resulting from Correction officers intervening in inmate fights or altercations. A total of 1,727 Use of Force involved Correction Officers breaking up or stopping inmate fights.

There were a total 438 incidents of inmate assault against Correction Officers where no force was used by Correction Officers. Correction Officers were splashed a total of 744 times with urine, feces and other unknown liquids by inmates. Correction Officers were spit/spat on a total of 268 times by inmates. Inmates usually spit in the face of Officers. These numbers do not include civilians.  There was a total of 121 criminal acts (which includes assaults, splashing and spitting) against Civilians staff.

During this same period, there were 4,702 Inmate fights in total. Over 152 Inmate on Inmate Serious Injuries and 133 incidents of Inmate Slashing and Stabbings, mostly committed by adolescents, mentally ill and high custody inmates.

In FY2017, Adolescent inmates (16-21 year olds) who despite comprising only 1,713 of the total inmate population, are a group with higher than average lengths of stay in custody, more serious criminal charges (charged with one or more felonies), the top charges being (Robbery 1 and 2 and Murder 2) and a higher level of involvement in jail incidents. Since January 2018 to date there has been more than 150 Use of Force involving 16-17 year olds (mostly involved Correction Officers breaking up inmate fights).

In FY2017 Inmates identified as members of security risk groups (SRG), which include gangs, represent approximately 14.7% of the population and are involved in about a quarter of all jail incidents. High-custody inmates, identified as having a high propensity for institutional violence, but are involved in close to half of all jail incidents.

Correction Officers have been successful in running one the best operation in our profession. New jails and shutting down Rikers won't do anything to reduce the violence in the jails, if Correction Officers are not allowed to enforce the law behind bars.

USE OF FORCE "A"

# INMATE BURNS AND BEATS CORRECTION OFFICER



On March 17, 2018, J'von Johnson, an inmate housed in an Enhanced Supervision Housing unit at the Otis Bantum Correctional Center, who is charged with murder and three assaults, lashed out and attacked a Correction Officer as he was completing his tour.

The inmate threw scalding hot water on the officer and then proceeded to punch him repeatedly. The officer was transferred to the Emergency Room at New York Cornell Hospital and was treated for 1st and 3rd degree burns and a broken nose. **This same inmate was responsible for assaulting another Correction Officer just last year in the same exact housing unit.**



**J'VON JOHNSON** (Age 21)
INMATE

## DETAILS:

STREET CHARGE:
MURDER (A FELONY)

CHARGE:
ASSAULT-2ND DEGREE (D FELONY)

CHARGE:
ASSAULT-2ND DEGREE (D FELONY)



THIS INMATE CANNOT BE PLACED IN PUNITIVE SEGREGATION AND HIS PRIVILEGES CANNOT BE ELIMINATED BECAUSE HE'S 21. BUT WHEN HE WAS ARRESTED BY THE NYPD FOR HIS STREET CRIMES, HE WAS REMOVED AND SEGREGATED FROM THE GENERAL PUBLIC. WHEN SENT TO SURROUNDING COUNTIES IS PLACED IN SEGREGATION MORE RESTRICTED THAN NEW YORK CITY.

USE OF FORCE "A"

# MULTIPLE INMATES ASSAULT CORRECTION OFFICER FRACTURING HIS NECK



On February 10, 2018, the inmate and Bloods gang member, Steven Espinal, walked up to the uniformed officer in a vestibule of the George Motchan Detention Center and punched him, knocking him to the floor. Within moments, four other inmates rushed the officer, kicking and pummeling him for about eight seconds until two correction officers came to his aid, including one who used pepper spray, according to a video of the attack.

The injured officer, Jean Souffrant, 39, fractured his neck and was treated for bleeding on the right side of his brain.



## THE FOUR INMATES WHO ATTACKED OFFICER SOUFFRANT

   

**INMATE ESPINAL**
Age 18

DETAILS:
STREET CHARGE:
Attempted MURDER
B Felony

**INMATE BURNS**
Age 18

DETAILS:
STREET CHARGE:
Attempted MURDER
B Felony

**INMATE FRANCIS**
Age 18

DETAILS:
STREET CHARGE:
Attempted ROBBERY
3rd E Felony

**INMATE WATSON**
Age 18

DETAILS:
STREET CHARGE:
Crim Poss weapon-2nd Degree
C Felony

THIS INMATE CANNOT BE PLACED IN PUNITIVE SEGREGATION AND HIS PRIVILEGES CANNOT BE ELIMINATED BECAUSE HE'S 21. BUT WHEN HE WAS ARRESTED BY THE NYPD FOR HIS STREET CRIMES, HE WAS REMOVED AND SEGREGATED FROM THE GENERAL PUBLIC. WHEN SENT TO SURROUNDING COUNTIES IS PLACED IN SEGREGATION MORE RESTRICTED THAN NEW YORK CITY.

# INMATE ASSAULTED A FEMALE CORRECTION OFFICER, BREAKING HER NOSE

USE OF FORCE "A"



While attempting to break up a fight between multiple inmates at the George R. Vierno Center, on March 8, 2018, a Correction Officer was punched in the face by inmate Xavier Blount. She was sent to the Emergency Room and treated for a fractured nose.



## BLOUNT, XAVIER  (Age 21)

INMATE

### DETAILS:

STREET CHARGE:
CRIM POSS CONTRL SUBST-3RD B Felony

STREET CHARGE:
Court Order

STREET CHARGE:
ASSAULT -2ND D Felony



THIS INMATE CANNOT BE PLACED IN PUNITIVE SEGREGATION AND HIS PRIVILEGES CANNOT BE ELIMINATED BECAUSE HE'S 21. BUT WHEN HE WAS ARRESTED BY THE NYPD FOR HIS STREET CRIMES, HE WAS REMOVED AND SEGREGATED FROM THE GENERAL PUBLIC. WHEN SENT TO SURROUNDING COUNTIES IS PLACED IN SEGREGATION MORE RESTRICTED THAN NEW YORK CITY.

USE OF FORCE "A"

# INMATE ASSAULTED A CORRECTION OFFICER, SLASHING HIM ACROSS HIS FACE



After refusing to return a hot pot of water to a Correction Officer, inmate Benjamin McMillan assaulted the Correction Officer in a housing area at the George R. Vierno Center on March 13, 2018, The Correction Officer was slashed across his face and sent to the Emergency Room.



## MCMILLAN, BENJAMIN (Age 61)
INMATE



### DETAILS:
STREET CHARGE:
ASSAULT -2ND D Felony

STREET CHARGE:
OBSTRUCT GOVERNMENTAL ADMINIS
A Misdemeanor

STREET CHARGE:
Attempted ASSAULT-1ST C Felony

THIS INMATE CANNOT BE PLACED IN PUNITIVE SEGREGATION AND HIS PRIVILEGES CANNOT BE ELIMINATED BECAUSE OF HIS CLASSIFICATION AS A "MENTALLY ILL" INMATE. BUT WHEN HE WAS ARRESTED BY THE NYPD FOR HIS STREET CRIMES, HE WAS REMOVED AND SEGREGATED FROM THE GENERAL PUBLIC.

# HOW DOES NYC DOC HANDLE VIOLENT 16-21 YEAR OLD INMATES?

Since the elimination of punitive segregation in NYC jails for the Adolescent population, the Department's solution for handling this population is to transfer them to the surrounding counties such as Suffolk, Nassau and Albany.

Currently, the NYCDOC has approximately 40 inmates who are transferred to surrounding counties at a cost of approximately $150 per day.

These surrounding counties all have punitive segregation, but most are called administrative segregation.

When DOC inmates are transferred to the outside counties they are placed in administrative segregation because these counties don't want to expose their population to this population of inmates.

THE BENEFITS OF NYCDOC TRANSFERRING INMATES TO OTHER JURISDICTIONS:

1. We can have them placed in punitive segregation but not by us.

2. It separates this violent population from NYC Correction Officers, Civilians and inmates.

3. This population becomes someone else's problem.

THE DOWNSIDE TO TRANSFERRING THIS POPULATION OF INMATES:

1. It costs the city approximately $150 per day that they're with the outside counties.
   In addition to the $247,000 it costs to incarcerate them annually.

2. It gives the appearance that NYCDOC and NYC cannot handle this population of violent inmates.

3. It creates a hardship for the family members to travel to visit them.

4. The additional costs involved with NYCDOC personnel who's responsible for ALL transportation of picking up and delivering these inmates for all hearings and court appearances in NYC and returning to them to the outside counties.

5. It forces their lawyers or legal representation to travel outside the city.



Mr. de Blasio said during his weekly appearance on NY1 that whatever validity there was to their claim about punitive segregation being a deterrent, "SOLITARY CONFINEMENT, UNFORTUNATELY, EATS AWAY AT THE HUMAN SOUL. SO I UNDERSTAND HOW FRUSTRATING IT MUST BE FOR OFFICERS WHO FEEL THAT SENSE OF DANGER, AND WE FEEL FOR THEM, WE WANT THEM TO BE SAFE AND THAT'S WHY WE'RE INVESTING AND WE'RE GOING TO MAKE SURE THEY'RE SAFE, BUT SOLITARY CONFINEMENT IS NOT THE ANSWER."

- BILL DE BLASIO, NEW YORK CITY MAYOR



Former DOC commissioner Martin F. Horn believes that the policy shifts and the recent spike in inmate violence are connected. "IT'S CERTAINLY PART OF THE STORY," he says, adding that de Blasio and his team "MAY HAVE TRIED TO ACCOMPLISH TOO MUCH, TOO FAST."

"In many jails throughout the U.S. and even within New York State, prisoners are not routinely out and about for more than an hour a day. New York City is an anomaly by providing that prisoners are allowed to "lock out" of their cell for up to 16 hours a day. The Minimum Standards of the State Commission on Corrections that govern the operation of the City's jails and those of all other jails in the State nowhere require that length of "lock out" time. Only New York City affords that "privilege" to its prisoners.

- MARTIN HORN, FORMER DOC COMMISSIONER



New York City Department of Correction "The first step to reducing UOF incidents is to reduce inmate-on-inmate violence. We still have significant improvements to make, particularly in preventing stabbings and slashings." "The Department has consulted with the Nunez Monitor throughout the implementation of the Young Adult plan and has advised the Monitor of the facts and circumstances set forth above. The Monitor and his team of experts - who have experience eliminating the use of punitive segregation in other jurisdictions - have continuously advised the Department on the need to be thoughtful and deliberate in our approach to punitive segregation reforms and have cautioned that moving too quickly towards the ultimate goal of ending punitive segregation can undermine the success the Department has already achieved through reforms to the management of this population. The Monitor has advised the Department the variance request is consistent with sound correctional practice and that he believes it represents the most reasonable and prudent approach in light of the current facts and circumstances."

- JOSEPH PONTE , FORMER DOC COMMISSIONER



"For all of the successes, we still have a long way to go. There are still too many officers being assaulted. There are still too many uses of force and fights. There are far too many stabbings and slashings."

"For every 10,000 Correction Officers across the country, there are 254 workplace assaults and violent injuries.  That is 36 times higher then the rate for all American workers.  How many of you in this room today would continue to go to your place of employment everyday if those numbers were associated with your profession?"

- CYNTHIA BRANN, CURRENT DOC COMMISSIONER



"An effective way to reduce uses of force is to reduce the number of inmates fights. We also realize that, as a Department, we need to be flexible enough to revisit policy decisions tha have been made in the past, determine WHAT IS WORKING well and WHAT IS NOT, and amend those policies as needed. This includes issues such as punitive segregation, managing the mentally ill and adolescents, and basic custody management practices."

- MARK CRANSTON, FORMER ACTING DOC COMMISSIONER



"Segregation has been and will continue to be a tool that is necessary to manage legitimate safety concerns. Reforms in the use of this practice will only be successful if the safety of inmates and staff is maintained or improved in the process."

- DAN PACHOLKE, FORMER CANDIDATE FOR DOC COMMISSIONER



"I understand that that minimum standards for incarcerated persons are necessary for the operation of a humane jail system, but I think it is time to determine if the opportunity exists to establish—within the framework of those minimum standards—graduated sanctions that are proven to increase public safety and reduce violence."

"Correction Officers must be empowered to prevent, reduce and stem violence on Rikers by employing swift, certain and immediate response to incidents that do not rise to the level of a criminal offense but still has the effect of disrupting order."

"HOWEVER, I CANNOT PROSECUTE OUR WAY OUT OF THE VIOLENCE AND DYSFUNCTION of Rikers Island jails. Prosecution should be the last resort."

- DARCEL CLARK, BRONX COUNTY DISTRICT ATTORNEY



"Protecting Inmates is our legal responsibility but protecting Correction Officers is our moral and ethical responsibility."

- JOSEPH BORELLI, CITY COUNCILMAN



"Let's not forget today, let's not forget tomorrow, let's not forget next year. Ten years from now sounds nice, but it may never happen and if it doesn't happen, what do we do about the safety in Rikers Island?"

PAUL VALLONE, CITY COUNCILMAN



SIMPLY PUT, PUNITIVE SEGREGATION IS A JAIL WITHIN A JAIL. It is a public safety imperative that punitive segregation be permitted as a disciplinary tool for repeatedly violent inmates who put correction officers and other inmates in harm's way, regardless of their age. Rather than completely removing it from the disciplinary toolkit, this punishment should be judiciously applied with oversight that takes mental health imperatives and violent behavior into account. We cannot and will not accept an either-or proposition between justice and safety. In the nation's second-largest jail system, we must have both!

ERIC ADAMS, BROOKLYN BOROUGH PRESIDENT



"If I'm going to choose between the good guys and the bad guys, I'm going with the good guys. Inmates should be treated humanely, but when they attack correction officers, there has to be very serious repercussions."

JOHN FLANAGAN, NEW YORK STATE SENATOR & SENATE MAJORITY LEADER

The city and agency went far beyond the court consent degree "Which includes the elimination of Punitive Segregation"

STEVE MARTIN, INDEPENDENT MONITOR

# THERE ARE FOUR PRIMARY WAYS TO REDUCE/CONTROL JAIL VIOLENCE

**FIRST** _____ ☐
Disciplinary Sanctions- penalties for inmates when
the rules are violated, regardless of their age.

**SECOND** _____ ☐
The ability to use punitive segregation for inmates
who are guilty of committing violence regardless of
their age.

**THIRD** _____ ☑
Re-arrest inmates who have committed criminal acts
while incarcerated in the city's jails.

**FOURTH** _____ ☑
Stronger charges issued by the District Attorneys, like
gang assault and gang- related violence, and if and
when convicted, consecutive sentencing.

Two of the four of the above policies are actually happening.
It is obvious that the jails in the surrounding counties already
implement recommendations #1 and #2 in order to keep the
violence down and the jails safe.



# CORRECTION OFFICERS' BENEVOLENT ASSOCIATION, INC.

"PATROLLING THE TOUGHEST PRECINCTS IN NEW YORK"

# PROPOSALS

**COBA PROPOSAL #1**
DISCIPLINARY SANCTIONS
ON INMATE PRIVILEGES

**COBA PROPOSAL #2**
RESTORATION OF PUNITIVE SEGREGATION
IN LIMITED CIRCUMSTANCES

**COBA PROPOSAL #3**
INMATE IDLENESS REDUCTION

**COBA PROPOSAL #4**
OTHER DISCIPLINARY SANCTIONS

**COBA PROPOSAL #5**
A SUMMIT OF ALL STAKEHOLDERS

**COBA PROPOSAL #1**

# DISCIPLINARY SANCTIONS ON INMATE PRIVILEGES

In an all-out effort to reduce violence while holding inmates accountable for committing crimes and infractions during incarceration, COBA recommends placing disciplinary sanctions upon inmate privileges. We recommend that the Department of Correction task managers effectively and judiciously utilizes the existing inmate discipline measures and analyzing their effectiveness. They should begin tracking COBA's proposed sanctions the same manner to those indicators tracked on the Monthly Facility Management Reports so that their effectiveness can be comparatively evaluated. The use of COBA's proposed inmate disciplinary sanctions will serve as a powerful deterrent - the sheer perception to the inmates that it is just not worth it to engage in such activity. If inmate disciplinary sanctions have their desired effect, we can envision a Department with less restrictive housing, greater compliance, fewer injuries to staff and inmates, and a real change in morale and culture. Implementing these disciplinary sanctions may even have an impact on recidivism.

## LIST OF INMATE PRIVILEGES

- To Watch television .................................................................................. ✔
- Utilize the telephone .................................................................................. ✔
- Shop in the commissary .............................................................................. ✔
- Receive a contact visit from family, friends and otherwise .............................. ✔
- Attend Recreation 1 hour each day ............................................................... ✔
- Attend Law Library ..................................................................................... ✔
- Access to Religious Affiliation and services .................................................. ✔
- Access to haircuts (Barbershop or Beauty pallor) ......................................... ✔
- Right to send and receive mail, publications, magazines and packages ........ ✔
- Opportunity for gainful Employment ............................................................ ✔
- Ability to have money placed into their account ............................................ ✔
- Mechanic Program ..................................................................................... ✔
- Cooking Program ....................................................................................... ✔
- Sports Programs ........................................................................................ ✔
- Officer Assistant ........................................................................................ ✔
- Maintenance .............................................................................................. ✔
- Religion ..................................................................................................... ✔
- Empowerment Groups ................................................................................ ✔
- Job Preparation ......................................................................................... ✔
- Gym .......................................................................................................... ✔

## A FEW EXAMPLES:

### VISITS

We must consider that certain aspects of the Board of Correction Minimum Standards and Directive 2007R-C, "Inmate Visit Procedures," effectively work against the Department and its efforts to deter violence and directly puts staff, visitors and members of the public at risk. The Department cannot limit or deny a visit to an inmate or visitor unless the criminal act is committed (or expected to be committed) in conjunction with a visit.

We can only limit or deny a visit if a litany of parameters is met and then there is the appeal process where the Board too often acts as an inmate/visitor advocate rather than an objective entity.

The Board must relax the constraints put on the Department and permit it to temporarily suspend visits even in cases where the inmates offending act is not directly or indirectly in conjunction with the visit. This type of inmate disciplinary sanction will serve as a powerful deterrent. This will help to send the message that it is just not worth it to engage in acts that violate inmate rules. It may even have an impact on recidivism. *That would be a great joint Board of Correction-Department of Correction initiative that would have a direct impact on safety. The impact we can have here is beyond measure.*

### TELEPHONES

Let's consider telephone use by the detainee population. The Board mandates that detainees be permitted one call per day at a minimum of six minutes per call. Beyond the right to speak by telephone to counsel, phone use is a privilege. This privilege should be curtailed when inmates commit acts of violence. Such actions would serve to deter violent criminal activity.

THE DEPARTMENT SHOULD BE ABLE TO DENY OR LIMIT ACCESS TO TELEPHONES FOR RULE VIOLATIONS.

### HAIRCUTS

Currently, the Board of Correction mandates that inmates must be afforded haircuts. It does not, however, stipulate where and when these haircuts take place. The Department of Correction should be able to remove the privilege of taking a trip to the barbershop.

WE RECOMMEND THAT WHEN FOUND GUILTY OF RULE VIOLATIONS, INMATES BE CHARGED FOR HAIRCUTS EXCEPT WHEN GOING TO COURT.

### COMMISSARY

Commissary access is a privilege. Immediate sanctions should be enforced to deny commissary access to any inmate who commits any act of violence, Commissary access should be limited to personal hygiene products. Such denial should be extended for violent acts committed during a denial period.

## RECREATION

Currently, the Board of Correction mandates, "recreation may only be denied only with an open conviction of an infraction for misconduct on the way to, from, or during recreation." This rule is outdated. As a deterrent to violence, the Department needs to have the ability to deny or limit recreation for any violation of inmate rules.

**WE RECOMMEND THE DEPARTMENT OF CORRECTION HAVE THE ABILITY TO DENY OR LIMIT RECREATION AS A DISCIPLINARY SANCTION FOR VIOLATION OF INMATE RULES AND REGULATIONS.**

## LAW LIBRARY

The COBA does not seek to limit or deny any inmate the right to legally defend him or herself. We believe the Board's current rule that inmates be permitted access for at least two hours each day the law library is open to be sufficient. Currently, the Department of Correction may only deny access to the Law Library for disrupting the orderly function of the Library or using it for a purpose other than for what it is intended. Even if an inmate is prohibited from physically accessing the Law Library, the Board permits the Department of Correction to develop alternate access to legal materials for effective legal research. The Department of Correction needs more latitude to effectively deter the violent inmate.

**WE RECOMMEND THE DEPARTMENT OF CORRECTION BE ABLE TO DENY OR LIMIT ACCESS TO THE LAW LIBRARY FOR RULE VIOLATIONS EVEN IF SUCH VIOLATIONS DO NOT OCCUR IN THE LIBRARY ITSELF.**

## DISCIPLINARY SANCTIONS FOR SPLASHING AND SPITTING INCIDENTS

While no crimes against a Correction Officer should be tolerated, particularly egregious and sadly frequent crimes are splashing and spitting incidents. To be clear, these are incidents where inmates assault Correction Officers with hot water, saliva, urine, semen, and feces. The Board and the Department must take these incidents seriously and impose serious deterrence measures like the above proposed inmate disciplinary sanctions. The Department of Correction needs to be able to sanction an inmate's use of telephone, recreation, visits, law library, and haircuts when an inmate subjects our staff to potential pathogens. *Inmates who splash or spit on staff should be denied everything except basic minimum standards for a finite period of time.* Only this way will the Department of Correction be able to truly stop the increasing incidents of spitting and splashing.

**COBA PROPOSAL #2**

# RESTORATION OF PUNITIVE SEGREGATION IN LIMITED CIRCUMSTANCES

The City of New York widely publicized its goal of "reforming" the Department of Correction. One of these "reform" measures was to eliminate the use of punitive segregation —— a tool widely misrepresented as solitary confinement —— for 16-21-year olds. The use of punitive segregation or the adult inmate population over age 21 was also severely limited. *We do not seek to debate the pros and cons of punitive segregation*. However, the elimination and limitation of punitive segregation has directly led to an increase in violence (as reported in the Mayor's Management Report 2013-2017). The problem is clear: **in an unbelievable display of poor management and oversight**, both the Department of Correction and Board of Correction eliminated punitive segregation — an effective violence deterrence tool — without a plan to fill the void that was left. The Department of Correction failed to implement any alternate measures that could effectively deter violence and violation of the rules. *Programs such as Secured Unit, ESH, the Transitional Restorative Unit (TRU) or Second Chance* are void of any real or effective disciplinary sanctions and fail to address the underlying reason for why an inmate is being placed in such programs or units. *Thus, the Department of Correction's mission to reduce the use of unitive segregation has actually empowered inmates to further commit crimes while incarcerated, because they know that there is no further penalty, accountability, or deterrent to their unlawful behavior beyond being detained in jail or criminally prosecuted.*

COBA recommends that the Department of Correction consider reinstating some form of punitive segregation for 19 to 21-year-old inmates in very limited circumstances — against those who commit serious offenses. We recommend this measure be used only when absolutely necessary and for the shortest duration and in the least restrictive manner possible. We also ask that its use be coupled with what we refer to above as "inmate disciplinary sanctions." For example, if inmate disciplinary sanctions don't work, then and only then, should punitive segregation be used on inmates 19-21 years of age. *Further, if punitive segregation doesn't work, inmates (regardless of age), should be removed from our custody and turned over to the DOH/MH or a separate facility should be created to house them.* This facility should be operated by the DOH/MH and other health care professionals with Correction Officers providing security and escort only.

**COBA PROPOSAL #3**

# INMATE IDLENESS REDUCTION

As an incentive and deterrent, COBA recommends that the Board of Correction consider standards for idleness reduction for inmates. Too often Department of Correction programs come and go with little measurable effect. In fact, the Department of Correction implements many of its programs in a bubble. Further, we understand that the Department of Correction has earned a less than optimal track record for submitting Monthly Management Reports in a timely and accurate manner and has been reluctant to enact measures to truly measure program effectiveness. We urge the Board of Correction to hold the Department of Correction accountable for that.

*If programs are to be continued, we need programs that will stand longer than any one administration and provide stability for staff and inmates.* The Department of Correction should mandate programs that foster teamwork and good sportsmanship.

**COBA PROPOSAL #4**

# OTHER DISCIPLINARY SANCTIONS

There are many other disciplinary sanctions such as 1. Being locked in their cells for 4, 6, 8 hours or an entire tour. 2. Receiving a non-contact visits for a specified number of times and other disciplinary sanctions to be explored by all parties involved.

**COBA PROPOSAL #5**

# A SUMMIT OF ALL STAKEHOLDERS

While we believe that our overview accurately reflects how to improve the security and safety for Corrections Officers, staff and inmates alike, it is time for all stakeholders to be in the same room, at the same time to discuss these issues of great importance. Through real conversation and dialogue, we are confident we can obtain great results and stop the insanity.

In closing, we urge you to say "YES" to true progress as embodied in COBA's proposals. These proposals are the real deterrents. These proposals are real measures that will effectively curb jail violence and increase safety. These proposals will, if given a chance to succeed, will have a tremendous positive impact on the New York City Department of Correction. Please give these proposals serious consideration.

# "EQUITY" BEFORE SECURITY
## ARE THE MAYOR'S CORRECTIONS POLICIES
## MAKING NYC JAILS LESS SAFE?



While the most recent Mayor's Management Report admits that reducing punitive segregation appears to correspond to a rise in inmate violence, the report argues, circularly, that the successful diversion of nonviolent offenders from jails has concentrated the population of violent inmates, thus leading to more violence: "There is an increasing share of people in custody who face felony charges and have gang affiliations. These inmates are significant drivers of jail violence.

The core function of city government is to maintain security. In city jails, that task falls to New York's Boldest, but the mayor's progressive policies have altered the conditions in which they work—and data show that these policies have failed. Will de Blasio heed the counsel of those doing the job and reverse course? Not as long as he puts "equity" before security.

*Rafael A. Mangual is the deputy director of legal policy at the Manhattan Institute for Policy Research, where he writes and researches in the areas of criminal justice reform and crime.*

## ADP BY TOP ARREST CHARGE BASED ON 1ST 6 MONTHS FY17 CROSS-SECTIONS

| CHARGE CATEGORY | ADP |
|---|---|
| ROBBERY | 1,273 |
| MURDER/ATT MURDER/MANSLTER | 1,080 |
| WARR/HOLDS | 902 |
| OTHER FELONIES | 916 |
| ASSAULT | 802 |
| DRUG FEL SALE | 790 |
| DRUG FEL POSSESS | 776 |
| BURGLARY | 741 |
| WEAPONS | 590 |
| OTHER MISD | 486 |
| GRAND LARCENY | 387 |
| MISD LARCENY | 242 |
| MISD ASSAULT | 234 |
| OTHER SEXUAL OFFENSES | 227 |
| DRUG MISD | 192 |
| RAPE/ATT RAPE | 153 |
| VEHICULAR | 144 |
| MISD WEAPONS | 74 |
| OTHER | 34 |
| MISSING | 27 |
| VIOLATIONS | 10 |
| LOITER/PROSTITU | 10 |

## LESS THAN 1% OF THE 9,100 INMATE POPULATION IS RESPONSIBLE FOR THE MAJORITY OF THE JAIL VIOLENCE COMMITTED THROUGHOUT THE NYC DEPARTMENT OF CORRECTION

Source NYC Department of Correction

# CORRECTION OFFICERS' BENEVOLENT ASSOCIATION, INC.
## "PATROLLING THE TOUGHEST PRECINCTS IN NEW YORK"



**SCAN TO VIEW OR DOWNLOAD**
**www.cobanyc.org/ReduceJailViolence**



**COBA HEADQUARTERS**

77-10 21ST AVENUE EAST ELMHURST, N.Y. 11370 · T 718.545.COBA (2622) · F. 718.545.2668

www.cobanyc.org

# Exhibit S

## of the Proposed First Amended and Supplemental Complaint

# The New York Times

# Report Found Distorted Data on Jail Fights at Rikers Island

By Michael Winerip, Michael Schwirtz and Benjamin Weiser

Sept. 21, 2014

After years of teenage inmates being slashed, stabbed and maimed, it appeared that the jail for adolescents at Rikers Island had finally been brought under control. In April 2011, a new warden and deputy warden were named, and almost immediately, official tallies of inmate fights fell by two-thirds.

The correction commissioner at the time hailed the accomplishment at a City Council hearing and gave the men an award for their "exceptional efforts." Within a month, both officials were promoted.

Then came the tip to Correction Department investigators: Violence wasn't down. The data was wrong.

A dozen investigators eventually produced a confidential report, obtained by The New York Times, which concluded that hundreds of inmate fights had been omitted from departmental statistics; that the warden, William Clemons, and the deputy warden, Turhan Gumusdere, had "abdicated all responsibility" in reporting the statistics and that both should be demoted.

The series of events that followed, which extended into Mayor Bill de Blasio's administration and was pieced together by The Times through interviews and a review of internal agency documents, underscores the pervasive dysfunction of the city's Correction Department.

The commissioner at the time, Dora B. Schriro, did not demote the men. Instead, she ordered the removal from the report of any implication that the pair were culpable, current and former officials said.

Then city officials provided only the sanitized report to the United States attorney's office for the Southern District of New York, which was conducting its own investigation into potential civil rights violations in the handling of teenage inmates at Rikers. As part of its investigation, the office had made repeated requests to the Correction Department for all relevant documents and asked, in particular, for any materials associated with audits or reviews related to violence by staff on adolescent inmates or between the inmates themselves.

The city's failure to provide the original report, an omission that prosecutors were unaware of until it was discovered last week by The Times, raises questions about how forthcoming the agency was in responding to the federal inquiry. The omission could also have serious legal repercussions. In August, Preet Bharara, the United States attorney, released a scathing 79-page report on abuses at Rikers Island and gave the city until this week to agree to make significant changes, or face the prospect of being sued by the Justice Department. The Times's discovery could complicate any negotiations between the two sides.

**'Lack of Attentiveness'**

Mr. Clemons and Mr. Gumusdere now occupy some of the highest positions at the Correction Department. Joseph Ponte, who was appointed commissioner this year with a mandate to reform the troubled jail system, made Mr. Gumusdere warden of the largest jail on Rikers Island in May. At the same time, despite objection from the city's Department of Investigation, Mr. Ponte promoted Mr. Clemons to chief of department, the top uniformed position.

In a statement, the Correction Department acknowledged the findings of both the original and the final versions of the audit report, but said Mr. Ponte promoted both men based on his observations of their performance.

"Commissioner Ponte stands by his appointment of Chief Clemons and Warden Gumusdere, who have shown exemplary leadership in the current roles and are fully committed to the Department's reform agenda," the statement said.

In an interview, Ms. Schriro said she was not consulted about which documents would be turned over to federal authorities. She said she stood by her decision to make edits to the audit, saying that the excluded portions contained confidential disciplinary information. "I appreciated all the information, but for the purpose that I had in mind it needed to be removed," said Ms. Schriro, who after leaving the Correction Department earlier this year was appointed commissioner of the Department of Emergency Services and Public Protection in Connecticut.

"In all instances the report repeatedly indicated that there wasn't an indication of wrongdoing, but of a lack of attentiveness," she said in an interview.

The Correction Department has been under growing scrutiny this year over the abuse and neglect of inmates. A Times investigation published in July documented 129 cases of inmates who were severely injured in altercations with guards last year.

Mr. Clemons has been at the department for nearly three decades. According to an official biography, he was hired in 1985 and after 15 years received his first promotion, to captain.

Case 1:17-cv-02899-LTS   Document 57-5   Filed 09/07/18   Page 33 of 123



Joseph Ponte, commissioner of the city's Correction Department, left, appointed William Clemons chief of department.   Jake Naughton/The New York Times

On April 18, 2011, he was appointed warden of the Robert N. Davoren Center, which then housed inmates from the age of 16 to 18. Mr. Gumusdere was named as his deputy.

At the time, the department was under pressure to drive down violence following revelations that officers had directed gangs of inmates to beat and extort fellow inmates as a means of enforcing discipline on the cell blocks.

Mr. Clemons and Mr. Gumusdere immediately produced stunning results. From April to June 2011, the number of monthly fights reported by the jail decreased by 66 percent. And the number of fights continued to plummet. After just six months, Ms. Schriro, the commissioner, promoted Mr. Clemons to supervising warden and transferred Mr. Gumusdere to oversee a punitive segregation unit.

**Rarely Reviewed Reports**

The new warden of the jail housing adolescents, Raino Hills, almost immediately became suspicious. He concluded that if he "accurately reported" the statistics, "the facility's numbers would skyrocket," and he submitted his resignation, according to the audit report. He only agreed to stay when Ms. Schriro promised to investigate.

On Dec. 20, 2011, the department's investigative division raided the jail for adolescents. More than two dozen investigators arrived unannounced at the jail after dark, according to several former correction employees. They fanned out to the security office, housing areas and medical clinic, seizing log books, spreadsheets and security videos. The confiscated materials filled the trunks and back seats of about six cars.

The first version of the investigative division report was submitted to Ms. Schriro in September 2012.

According to the report, jail officials failed to include 375 incidents that should have been logged as fights.

The auditors found insufficient evidence to prove that the staff had deliberately manipulated the data. But, they said, "No legitimate explanation exists for the dramatic and inaccurate decreases," and noted that the period in question, "directly corresponds" to when Mr. Clemons and Mr. Gumusdere oversaw the facility for adolescents.

When interviewed by correction investigators on May 14, 2012, Mr. Clemons said he rarely reviewed reports on daily inmate fights, according to the audit. Though the data was delivered to him electronically, he said he found the spreadsheets difficult to read on his computer and could not figure out how to print them. He told investigators he had no reason to question the accuracy of the data, in part because he had "noticed fewer alarms over the course of his tenure," the report said.

Mr. Gumusdere told investigators that he had difficulty understanding the incident reports and rarely reviewed them. He said he delegated this to his subordinates, whom he described as "incompetent," according to the audit.

The audit's authors said that the testimony of both Mr. Clemons and Mr. Gumusdere pointed to a "complete abdication" of their obligations as managers, recommending that both be demoted "based on their admitted lack of attention to critical duties and responsibilities of jail management."

**Portions Not Revealed**

Then Ms. Schriro intervened. After consulting with the department's legal counsel, and being told she had the authority to alter the report, she ordered the reference to demotion removed, Ms. Schriro said. She also directed the investigative division to remove large portions of the most critical material involving Mr. Clemons and Mr. Gumusdere, including the statement that "it defies logic to think that they could have concluded that the number of fights RNDC reported during these months was accurate."

Other examples of the deletions she made:

"Clemons and Deputy Warden Gumusdere failed to appropriately supervise staff, review their monthly statistics with a critical eye, establish internal controls for the production of accurate data and that they abdicated responsibility for the inaccurate statistics reported by the jail."

Mr. Clemons "turned a blind eye to the key issue in this case." And: "he took no steps to ensure that his information was accurate, or to hold DW Gumusdere responsible."

Mr. Gumusdere "was unable to describe the specific tasks of security office staff and stated that he had no knowledge of the inmate fight tracking spreadsheet, which archived email records show he received daily during his tenure as deputy warden."

In February 2013, as part of their civil rights investigation, the federal authorities made a detailed request to the city for documents related to the use of force by guards on teenage inmates and violence between the adolescents. The request included "all" documents related to audits and reviews to assess the accuracy and integrity of reporting on such incidents, including, but not limited to, "working papers and any other documents reflecting findings or recommendations," according to one person who was told of the request.

A city Law Department official said on Friday that the first version of the report was not produced in response to the original federal requests because it was treated as a draft and seen as privileged. Last week, the United States attorney's office specifically requested it from the city, and the current corporation counsel, Zachary W. Carter, decided that it should be turned over — and it was, the official said.

In the end, the federal report, which described a "deep-seated culture of violence" against adolescent inmates at Rikers, made only passing reference to the inaccurate data.

The report was highly critical of the investigative division overall, but federal authorities were never informed of how one of the division's most ambitious investigations was effectively quashed.

And no one was ultimately disciplined over the problematic violence statistics, Ms. Schriro said.

Mr. Clemons was promoted by Ms. Schriro to assistant chief of administration in the midst of the internal investigation. "The deficiencies that had been noted in the report were not carried over into his performance in his assignment at that time," said Ms. Schriro. "And he expressed both insight and remorse."

Last May, Mr. Ponte named Mr. Clemons to be the department's top-ranking uniformed officer. The appointment came after the city's Department of Investigation, which routinely vets high-ranking staff members of city agencies, conducted a review of Mr. Clemons and recommended he not be appointed as chief of department, according to a former city official.

Case 1:17-cv-02899-LTS   Document 57-5   Filed 09/07/18   Page 36 of 123

A spokeswoman for the Department of Investigation said the agency had no comment.

In promoting Mr. Clemons, Mr. Ponte described him as a "superb corrections professional."

"In the few months we have worked together, he has proved himself a critical problem-solver and a man of great integrity," the commissioner said.

But Florence Finkle, the head of the investigation division who wrote the damning report recommending that Mr. Clemons be demoted, did not fare so well. On Aug. 22, she resigned under pressure from Mr. Ponte.

A version of this article appears in print on Sept. 22, 2014, on Page A1 of the New York edition with the headline: Report Found Distorted Data on Jail Fights

# Exhibit T
## of the Proposed First Amended and Supplemental Complaint

EXCLUSIVE: Rikers Island inmates save prison guard from rape - NY Daily News          Page 1 of 3

# EXCLUSIVE: Rikers Island inmates save prison guard from rape by fellow convict

BY REUVEN BLAU

NEW YORK DAILY NEWS   Tuesday, March 3, 2015, 5:30 AM



A group of inmates rescued a female correction officer who was nearly raped by a hulking prisoner inside a locked vestibule on Rikers Island Saturday night, The Daily News has learned.

The inmates helped responding correction officers frantically tear away Plexiglas on the outside of the bubble-like watch post inside the Anna M. Kross Center at 8:15 p.m., according to multiple sources.

A skinny inmate slipped inside the so-called "A station" bubble through the small crack and opened the security door. A team of inmates then took down the assailant, Raleek Young, 27, until other officers arrived.

During the attack, Young, who is 5-foot-9 and weighs 290 pounds, pulled down his pants and began masturbating while choking the officer, court records show.

SO SHE'S AT FAULT? RIKERS ISLAND BOSS APPEARS TO BLAME GUARD FOR GETTING SEXUALLY ASSAULTED (EXCLUSIVE)

'I HAD TO': INMATE TALKS SAVING GUARD FROM RAPE (EXCLUSIVE)

He dragged the officer into an adjacent bathroom and blocked her from opening the security door.

"The matter is under investigation," said Correction Department spokeswoman Eve Kessler.



The majority of the attack was caught on video, a source who watched the tape said.

Young was able to get inside the bubble area after he claimed he needed to pick up a mattress in another unit and had to pass through the watch post.

He's serving a five-to-10-year sentence for raping a 13-year-old girl in 2007, court records show.

Initially, jail brass labeled the attack a routine "use of force" incident, records show.

EDITORIAL: INMATES SAVE THE ASYLUM AS RIKERS RUNS OUT OF CONTROL

That infuriated officers at the facility, who demanded it be labeled a sexual assault.

On Sunday, officers at the facility refused to go to their posts at the start of the 3 p.m. shift, sources said.

Correction Officers Benevolent Association President Norman Seabrook came to the jail and persuaded his members to go back to work after he promised to take up their cause, sources said.

EXCLUSIVE: Rikers Island inmates save prison guard from rape - NY Daily News          Page 2 of 3





The union president is furious Young wasn't instantly rearrested and hit with added charges. He claims staff at the Bronx district attorney's office insisted the matter would be handled after the weekend was over.

"There must be accountability," Seabrook fumed Monday. "Officers are assaulted every day, and (Bronx DA Robert Johnson) has the audacity to say, 'Not today, bring him back at another time.' I will not tolerate it. I will not stand for it."

Young was arraigned Monday in Bronx Criminal Court. He is facing a slew of new charges, including: attempted rape, sexual abuse, forcible touching, and assault and harassment.



EXCLUSIVE: Rikers Island inmates save prison guard from rape - NY Daily News          Page 3 of 3



The criminal complaint says Young ripped off the correction officer's sweater and "placed his lips on her mouth and about her face."

She was treated at a hospital after the attack

The situation could have been a lot worse if it was not for the inmates' assistance, Seabrook admitted.

"I appreciate (them) helping a sister officer because that could have been their mother, wife or sister," Seabrook said, noting 90% of the inmates "are there to do their time and go home."

ON A MOBILE DEVICE? CLICK HERE FOR VIDEO

© 2016 New York Daily News

De Blasio blasted for 'fudging' Rikers assault numbers | New York Post    Page 1 of 3

METRO

# De Blasio blasted for 'fudging' Rikers assault numbers

By Tom Wilson and Yoav Gonen

December 5, 2015 | 2:15am



Rikers Island
AP

Mayor de Blasio on Friday touted an 11 percent drop in serious assaults against Rikers Island staffers — but was publicly contradicted at a ceremony in The Bronx by the head of the correction officers' union.

Speaking to a graduating class of nearly 600 correction officers, de Blasio said reforms of the city's trouble-plagued jails system had reduced serious inmate attacks on staffers to 69 incidents in the 12 months through Nov. 30 — down from 77 the year prior.

"We know the challenges of this job, and this is why we are deploying every tool we have to fulfill our obligation to protect New York's Boldest," Hizzoner said.

But Correction Officers' Benevolent Association President Norman Seabrook took the microphone shortly afterward and blasted the mayor – both for leaving the ceremony early and also for fudging the figures.

De Blasio blasted for 'fudging' Rikers assault numbers | New York Post                    Page 2 of 3

"I have a problem with the fact that he didn't even say 'I have to leave, would you excuse me for a minute.' How dare you!" said Seabrook. "The same way that you want respect you have to give respect."



Bill de Blasio at the Department of Corrections graduation.
Natan Dvir

His union says serious injuries to staffers by inmates are up nearly 30 percent through November compared to last year — from 216 to 280.

"I heard the mayor say violence is down 11 percent," said Seabrook. "You're entitled to your own opinion, but you're not entitled to your own facts."

A review of the city's own statistics for the first four months of the current fiscal year -- covering July through October -- shows a 35 percent increase in serious assaults against jail staffers by inmates, compared to the same term last year.

City Hall said those figures are wrong, even though they're produced by the city, and insisted the data shows a 19 percent drop.

Meanwhile, another attack took place on Rikers Friday night when an officer was assaulted by an inmate, who allegedly is a gang member, sources said.



Department of Corrections graduates.
Natan Dvir

FILED UNDER   ASSAULT, CRIME, RIKERS ISLAND

Recommended by





NEW YORK

# EXCLUSIVE: Rikers Island correction bosses routinely 'purge' unfavorable violence stats to create illusion of reform, review shows

By STEPHEN REX BROWN and REUVEN BLAU | NEW YORK DAILY NEWS | AUG 28, 2016 | 4:00 AM

Each of the last two fiscal years at Rikers has seen more than 100 stabbings and slashings, a threshold not passed since 1999 when the prison population of nearly 20,000 was about double its size today. (Anthony DelMundo/New York Daily News)

There's something hokey going on at the city's pokey.

As pressure mounts to reduce violence at the troubled jails, top correction bosses — seeking to create the impression they have turned matters around — repeatedly

order underlings to downgrade incidents, a Daily News review of scores of internal documents shows.

SALE! | 12 WEEKS FOR 99¢

Feds: Shelden fights and ugly brawls between inmates, surprise attacks on officers, often are 'motivated by greed, and all too often in the records as routinely logged under the Central Park 5, cannot process say.

The main culprit, critics say, is Security Chief Turhan Gumusdere, a man who has faced scandal in the past for distorting data in the jails by deleting hundreds of fights among inmates from the records when he was a deputy warden.

PAID POST

What Is This?



**Property Owners: Key Benefits of Installing Efficient Toilets**

How much could you save by switching to high-efficiency plumbing products?

SEE MORE

Sponsored Content by ⓝ NIAGARA

12 WEEKS FOR 99¢
SALE OFFER                                    LOG

**Feds: Sheldon Silver 'motivated by greed' and deserves stiffest sentence of all corrupt NY legislators**

NYC CRIME

**Exonerated, but not free: Raymond Santana Jr., one of the Central Park 5, cannot escape his past**
1h

NEW YORK

**Fifth Ave. to remain closed throughout weekend as city cleans up from steampipe explosion: officials**
1h

POLITICS

**'Manhattan Madam' Kristin Davis subpoenaed in Mueller probe**
2h

NEW YORK

**Cameraman who shot Central Park 5 interrogation videos speaks out for the first time**
3h

ADVERTISEMENT



Critics say the architect of the alleged scheme is security chief Turhan Gumusdere, a man with a history of cooking the books.                                                                    🐦  f

They also have questions, they say, about Correction Commissioner Joseph Ponte, a touted reformer who nonetheless promoted Gumusdere into his job, even after the jail investigator recommended he be demoted.

Case 1:17-cv-02899-LTS   Document 57-5   Filed 09/07/18   Page 46 of 123

TOPICS    SEARCH

12 WEEKS FOR 99¢
ADVERTISEMENT SALE OFFER          LOG

While vowing to alter the culture of violence, Ponte has done nothing to address flaws in the record-keeping process, either exerting pressure or looking the other SALE 12 WEEKS FOR 99¢

Feds: Sheldon Silver placace City Hall, several sources say                 Exonerated, but not free: Raymond Santana Jr., one of the Central Park 5, cannot     Fifth Ave. to remain closed throughout weekend as city cleans up from steampipe

'Manhattan Madam' Kristin Davis subpoenaed in Mueller probe

One officer, requesting anonymity, called the practice a "purging" of unfavorable stats.

Inmate Christian Sims says he injured his head on a bedpost, an account disputed by a medical review.

Gumusdere and the department strongly deny any wrongdoing. A department spokeswoman said Ponte declined to respond to the accusations.

The cases probed by The News seem to defy reason.

For example, a Rikers Island assault by four inmates leaving another inmate bloodied with severe gashes to his face is first depicted by front-line officers as a "violent incident."

ADVERTISEMENT

ADVERTISEMENT

TOPICS    SEARCH

SALE! | 12 WEEKS FOR 99¢

12 WEEKS FOR 99¢
ADVERTISEMENT SALE OFFER              LOG

Feds: Sheldon Silver
'motivated by greed' and
deserves stiffest sentence of

Exonerated, but not free:
Raymond Santana Jr., one of
the Central Park 5, cannot

Fifth Ave. to remain closed
throughout weekend as city
cleans up from steampipe

'Manhattan Madam' Kristin
Davis subpoenaed in Mueller
probe

cars.com

ADVERTISEMENT

The incident was deemed a "logbook entry" a day before the fiscal year was completed, records show

But an order arrives to downgrade the episode, and it is swallowed up in the ledger as another workaday footnote.

"They lie about the use of force statistics," charged an officer who asked to remain anonymous. "This is a practice to keep the stats down."

Now the City Council, citing computations that don't add up, is demanding answers, starting with Elizabeth Crowley, who heads the committee overseeing the jails. She is calling on city Controller Scott Stringer to run an audit of the records.

ADVERTISEMENT



TOPICS    SEARCH

SALE! | 12 WEEKS FOR 99¢

12 WEEKS FOR 99¢
ADVERTISE SALE OFFER

LOG

Feds: Sheldon Silver 'motivated by greed' and deserves stiffest sentence of

Exonerated, but not free: Raymond Santana Jr., one of the Central Park 5, cannot

Fifth Ave. to remain closed throughout weekend as city cleans up from steampipe

'Manhattan Madam' Kristin Davis subpoenaed in Mueller probe

Blood on the hand of a Department of Correction captain who intervened when two inmates began attacking each other. He documented the use of force but it was ultimately scrubbed because it didn't qualify. (Handout) 

This is not the first time jail brass, particularly Gumusdere, have come under fire for juking figures. The Correction Department's internal Investigation Division found in 2011 that Gumusdere, while running a Rikers facility for troubled teens, "abdicated all responsibility" in documenting incidents. A department investigator recommended he be demoted.

Instead, Ponte did the opposite, promoting Gumusdere, in a move requiring special City Hall permission, a source said.

In reviewing 11 specific cases, The News found nine downgrades. But according to several jails bosses, this number represents just a fraction of the cases that are skewed. Incidents are often not logged at all, with Gumusdere telling supervisors to "make it go away," the sources say.

TOPICS    SEARCH

You May Like                        12 WEEKS FOR 99¢
                                   SALE OFFER
                                   Sponsored Links by Taboola        LOG

SALE! | 12 WEEKS FOR 99¢           Peek Inside Steph & Ayesha Curry's
                                   Mediterranean-Style Home

Feds: Sheldon Silver          Exonerated, but not free:    Fifth Ave. to remain closed      'Manhattan Madam' Kristin
'motivated by greed' and      Raymond Santana Jr., one of  throughout weekend as city       Davis subpoenaed in Mueller
deserves stiffest sentence of the Central Park 5, cannot   cleans up from steampipe         probe

                                                           These Are The Most Wanted Dog Breeds For 2018
                                                           YourDailyDish

                                                           Here's Why Guys Are Obsessed With This
                                                           Underwear...
                                                           The Weekly Brief | Mack Weldon

                                                           The Various Luxury African Safaris That People
                                                           Rave About!
                                                           Top Luxury Safaris | Sponsored Links

Inmate Michael Bryant couldn't believe his stabbing was initially recorded as a fight. It was
upgraded two days later after he complained.

Experts agree that how the mayhem is chronicled is critical in a jail system rife with
chaos. Each of the last two fiscal years has seen more than 100 stabbings and
slashings, a threshold not passed since 1999 when the prison population of nearly
20,000 was about double its size today.

By all accounts, curbing the violence is a formidable challenge, complicated by the
detainees themselves, often loath to cooperate, lest they be seen as snitches.

In one case, an inmate said three gashes on his face came from a fall against a
bedpost. Another inmate said he injured his head falling on a "hot box."

TOPICS   SEARCH

12 WEEKS FOR 99¢
SALE OFFER

LOG

SALE! | 12 WEEKS FOR 99¢

Feds: Sheldon Silver
'motivated by greed' and
deserves stiffest sentence of

Exonerated, but not free:
Raymond Santana Jr., one of
the Central Park 5, cannot

Fifth Ave. to remain closed
throughout weekend as city
cleans up from steampipe

'Manhattan Madam' Kristin
Davis subpoenaed in Mueller
probe

"Everything is on video," Gumusdere said. "Everything is on the up and up. I don't know where all
this is coming from. I can tell you one thing. Everything you have is wrong." (Todd Maisel/New York
Daily News)

Doctors doubted their accounts, noting the injuries indicated a blade was used.

Correction officers labeled the incidents as "slashings" only to see them later
downgraded. That catch-all category, a holdover from precomputer times, is not
included in data on violence.

The Correction Department vehemently denies any wrongdoing.

Jail administrators routinely change reports issued by correction officers on violence within the
jail. (Todd Maisel/New York Daily News)

"Any claim that our numbers are manipulated is absolutely false," said
spokeswoman Dina Montes. "We have a rigorous process for capturing and
reporting incidents."

The allegations, though, are not a surprise to former warden Raino Hills, who
succeeded Gumusdere as head of the juveniles complex. He blew the whistle
against Gumusdere in 2011, telling DOI there were scores of cases left open to make
it appear violence was down.

"Gumusdere is Gumusdere," Hills told The News. "That's his MO. That's what he does."

TOPICS   SEARCH

SALE! | 12 WEEKS FOR 99¢

12 WEEKS FOR 99¢
SALE OFFER

LOG

Feds: Sheldon Silver
'motivated by greed' and
deserves stiffest sentence of

Exonerated, but not free:
Raymond Santana Jr., one of
the Central Park 5, cannot

Fifth Ave. to remain closed
throughout weekend as city
cleans up from steampipe

'Manhattan Madam' Kristin
Davis subpoenaed in Mueller
probe

The Correction Department vehemently denies any incidents have been wrongly classified. (Todd Maisel/New York Daily News)

In an interview with The News last Tuesday, Gumusdere denied any broad attempt to downgrade cases. He said that since he became security chief in February, there have been only 14 such examples — a number hotly disputed by the several sources who spoke to The News.

"Everything is on video," Gumusdere said. "Everything is on the up and up. I don't know where all this is coming from. I can tell you one thing. Everything you have is wrong."

Department rules are clear — when an inmate suffers a "serious injury" a report must be filed and an investigation launched. Similarly, when an inmate resists restraint by an officer, it must be recorded as an official use of force.

TOPICS    SEARCH

12 WEEKS FOR 99¢
SALE OFFER

LOG

SALE! | 12 WEEKS FOR 99¢

Feds: Sheldon Silver
'motivated by greed' and
deserves stiffest sentence of

Exonerated, but not free:
Raymond Santana Jr., one of
the Central Park 5, cannot

Fifth Ave. to remain closed
throughout weekend as city
cleans up from steampipe

'Manhattan Madam' Kristin
Davis subpoenaed in Mueller
probe

The examination by The News of nearly a dozen "24-hour reports" glaringly reveals a pattern in
which high-ranking jail officials override the judgment of correction officers and doctors on the
ground. (Todd Maisel/New York Daily News)

The examination by The News of nearly a dozen "24-hour reports" reveals a pattern
where high-ranking jail officials override the judgment of correction officers and
doctors.

After a Jan. 21 fight, Christian Sims was found on the floor of the Otis Bantum
Correctional Center at Rikers.

He suffered a slice to his forehead 6 centimeters deep and cuts on the nose and
upper lip, documents show. From the start, Sims said he fell on his face, slamming
his head on the edge of the bed.

TOPICS    SEARCH

12 WEEKS FOR 99¢
SALE OFFER    LOG

SALE! | 12 WEEKS FOR 99¢

Feds: Sheldon Silver
'motivated by greed' and
deserves stiffest sentence of

Exonerated, but not free:
Raymond Santana Jr., one of
the Central Park 5, cannot

Fifth Ave. to remain closed
throughout weekend as city
cleans up from steampipe

'Manhattan Madam' Kristin
Davis subpoenaed in Mueller
probe

In the cases looked at by The News, many of the reclassifications include low-level confrontations
that were suddenly downgraded after Gumusdere reviewed them, records show. (Todd
Maisel/New York Daily News)

Citing a medical review, front-line jail staff deemed it a slashing, records show.

But a day before the end of the fiscal year on June 29, the incident was
"downgraded" to "a logbook" entry.

Sims, now in an upstate New York prison for a drug sale conviction, downplayed
the episode, saying in a jailhouse interview that although he was jumped by four
men, he hurt his head on a metal bedpost.

☰ TOPICS    🔍 SEARCH

12 WEEKS FOR 99¢
SALE OFFER

→] LOG

SALE! | 12 WEEKS FOR 99¢

Feds: Sheldon Silver
'motivated by greed' and
deserves stiffest sentence of

Exonerated, but not free:
Raymond Santana Jr., one of
the Central Park 5, cannot

Fifth Ave. to remain closed
throughout weekend as city
cleans up from steampipe

'Manhattan Madam' Kristin
Davis subpoenaed in Mueller
probe

A bus carrying inmates leaves Rikers Island in Elmhurst, Queens, June 30. (Anthony
DelMundo/New York Daily News)                    🐦  f

A jail source familiar with the case maintains the downgrade six months later was
pure politics.

"It smells of manipulation," the source said.

Gumusdere defended the recasting.

"That was an inmate who was running around his dorm. All the phone
conversations say that he tripped," Gumusdere said, referring to secretly recorded
phone exchanges.

Department officials insist incident upgrades are actually more frequent than
downgrades, citing statistics largely compiled before Gumusdere took over as
security chief. They said since January 2011, there have been only 62 downgrades,
along with 108 upgrades. But the department declined to share details of any of the
cases — including the 14 Gumusdere said were downgraded since he stepped into
the security chief role early this year.

In one instance on June 12, Lesane Tyquan slashed another inmate, Michael Bryant,
21, on his side and back in the George Motchan Detention Center at the lockup by
the East River.

The incident was initially recorded as a logbook entry because of pressure from
Gumusdere, a source familiar with the case says.

But Chief Hazel Jennings reviewed the case and took the unusual step of ordering
staff to upgrade it, according to email obtained by The News.

EXCLUSIVE: Rikers Island correction bosses cover up spurt of violence statistics: so...

For example, on June 8, inmate Ricardo Wright "attempted to assault another inmate" and a captain "utilized control holds" to restrain him, an internal report says.

12 WEEKS FOR 99¢
SALE OFFER

LOG

Feds: Sheldon Silver 'motivated by greed' and deserves stiffest sentence of

Exonerated, but not free: Raymond Santana Jr., one of the Central Park 5, cannot

Fifth Ave. to remain closed throughout weekend as city cleans up from steampipe

'Manhattan Madam' Kristin Davis subpoenaed in Mueller probe

The incident — with no video surveillance — was initially classified as a low-level use of force. But it was later "downgraded ... on behalf of bureau chief of security Gumusdere," records show.

Critics say Gumusdere cherry-picks portions of video that does not reveal what really happened.

"Gumusdere is up to his old tricks," a July 1 anonymous letter sent to Manhattan U.S. Attorney Preet Bharara and The News alleges. "Please scrutinize this agency further."

With Graham Rayman, Laura Dimon, Byron Smith, Tyler Foggat

---

### Stephen Rex Brown

CONTACT

Stephen Rex Brown is a reporter covering New York City courts for the New York Daily News.

### Reuven Blau

CONTACT

Reuven Blau has been a reporter in New York City for 13 years with a special focus on the city's jails, Brooklyn politics and the growing Jewish community. He grew up in Denver, Colorado and graduated from Brooklyn College.

Mel Gibson's Son Is Now 28 & Looks Exactly Like Him
TummyTuckHipo

13 Hysterical Cat Shaming Moments
Give It Love

The One WD40 Trick Everyone Should Know About
Boredom Therapy

Sponsored Links

Sponsored Links

### You May Like

Take A Peek Inside Prince Harry & Meghan's New Mansion
WeightLossGroove

Stephon Marbury Just Made History In China
SportsChew

Michael Oher Tells A Whole Different Story About 'The Bli...
IcePop

Discover These Affordable And Beautiful Walk In Tubs For S...
Bathtubs | Sponsored Links

EXCLUSIVE: Rikers Island correction bosses routinely 'purge' violence ... Page 13 of 14

Worlds First Surviving Septuplets. Look At Them 20 ...
DomesticatedCompanion

SALE! | 12 WEEKS FOR 99¢

12 WEEKS FOR 99¢
SALE OFFER

LOG

Feds: Sheldon Silver 'motivated by greed' and deserves stiffest sentence or

Exonerated, but not free: Raymond Santana Jr., one of the Central Park 5, cannot

Sponsored Links
Fifth Ave. to remain closed throughout weekend as city cleans up from steampipe

'Manhattan Madam' Kristin Davis subpoenaed in Mueller probe

Recommended For You
Greg Bird gets more bad injury news as foot inflammation has Yankees concerned

SEE IT: Waitress slams male customer against wall for grabbing her inappropriately

77° New York City, NY

More

Sponsored Links by Taboola
Here's Why Guys Are Obsessed With This Underwear...
The Weekly Brief | Mack Weldon

Barbara Eden Turns 86 & Is Definitely Not Like We Reme...
Greeningz

7 Yoga Poses You Should Do First Thing In The Morning
Work + Money

Steve Harvey Burst Into Tears When He Realized Why This ...
EternalLifeStyle

Sponsored Links

Recommended For You
Teen arrested for smashing Long Island war hero's memorial

Two Miramar SWAT officers suspended for heading to Parkland massacre

Severe Asthma Is Difficult To Treat And Usually Requires L...
Asthma Management | Sponsored Links

How Turmeric Affects RA
HealthCentral.com

He Places A Toilet Paper Roll In A Flower Pot. The Results? G...
HealthyPanda.net

Sponsored Links

ADVERTISEMENT

**Download** our mobile app

Contact Us          Careers

TOPICS    SEARCH

**Subscribe** for unlimited access
SALE! | 12 WEEKS FOR 99¢

Site Map
Place an Ad
Contests

Feds: Sheldon Silver 'motivated by greed' and deserves stiffest sentence of

Exonerated, but not free: Raymond Santana Jr., one of the Central Park 5, cannot

Fifth Ave. to remain closed throughout weekend as city cleans up from steam pipe

The Daily Meal
Privacy Policy

12 WEEKS FOR 99¢
SALE OFFER

Feds FOR 99¢
Media Kit

LOG

Special Sections

'Manhattan Madam' Kristin Davis subpoenaed in Mueller probe
Subscription

The Active Times

Terms of Service

Copyright © 2018, New York Daily News

## 2 Rikers Island correction officers assaulted by inmate; incident reflects ongoing violence at jail

POSTED 10:25 PM, OCTOBER 4, 2016, BY ALYSSA ZAUDERER, DAN MANNARINO AND PAIGE LESKIN, *UPDATED AT 06:58PM, OCTOBER 5, 2016*





RIKERS ISLAND — Two Rikers Island correction officers were assaulted by an inmate Tuesday evening -- the latest incident in a trend of ongoing violence that has plagued the troubled jail.

The assault happened at the Otis Bantum Correction Center around 6:30 p.m. when officers had to break up a fight between inmates during mealtime, authorities said. One of the inmates, a member of the Bloods gang, slashed one of the officers in the ear and punched the other in the face multiple times.

The officer that was slashed received six sutures to his right ear. The other officer was treated for injuries on the right side of his face.

Correction Officers' Benevolent Association President Elias Husamudeen released a statement on the attack:

"We thank the Bronx DA's Office for immediately indicting this inmate. However, because this administration has eliminated the use of punitive segregation, this inmate and others who commit crimes while behind bars, will be given another opportunity to do just that. We call on City Hall, the City Council, and the Board of Correction to correct this dangerous flaw in our criminal justice system before another one of our officers is attacked again."

The inmates were arrested again and charged, but the incident was not classified as a slashing. Instead, the Department of Corrections listed the incident as a serious assault.

"He was cut on his ear," Husamudeen said. "He was cut with something. His ear didn't just split open from a punch."

The incident comes at a time when recent reports have accused top correctional leaders of fudging the number of reported assaults to make it seem like reforms against violence have been working.

City Hall recently released numbers showing a 40 percent decrease in serious assaults at Rikers. The Corrections Department has denied allegations it had changed the numbers.

But to add to the pattern of violence, PIX11 obtained pictures from another recent serious incident at Rikers.

According to a source, three inmates trashed their cells Sept. 22, tearing things from the walls and shattering glass windows. The prisoners refused to listen to officers, who repeatedly yelled at them to stop.

Sources estimate the incident resulted in more than $4,000 worth of damage.



📷 VIEW GALLERY (4 IMAGES)

City Council Speaker Melissa Mark-Viverito said the city would have to review the numbers of violent assaults to verify their accuracy.

"We have to look at it," Mark-Viverito said. "We will have our analysis as to whether or not there are questions raised."

The speaker has been backing legislation that demands more specific information on how these violent incidents are reported. She says these numbers are expected in the coming weeks.

RELATED STORIES

Correction officers sentenced for ordering beating of Rikers Island inmate

Rikers Island inmate indicted after 2 officers are attacked, 3rd requires stitches: DA

Certain emergency responders can use Tasers at Rikers Island: source



g.co/staticmaperror/billing

12 WEEKS FOR 99¢
SALE OFFER

LOG IN

TOPICS

SALE! | 12 WEEKS FOR 99¢

Man, 21, charged in fatal
shooting in Bronx park



Cops seek perv who groped
Bronx teen as she waited for
elevator



Why 20 years wasn't enough
time for NYC to upgrade this
Staten Island storm sewer



Field of

‹                                                                                                              ›

ADVERTISEMENT

NEW YORK

# Jail official accused of manipulating data on violent Rikers assaults retires amid investigation

 By REUVEN BLAU
NEW YORK DAILY NEWS   |   AUG 29, 2017

  



On April 26, the city's Board of Correction noted that there were six assaults by inmates in a specialized unit that appear to have been questionably downgraded. (Todd Maisel/New York Daily News)



A top city jail official accused of ordering underlings to minimize serious attacks on or by inmates has quietly retired

Case 1:17-cv-02899-LTS   Document 57-5   Filed 09/07/18   Page 61 of 123

as the investigation against him drags on.

Security Chief Turhan Gumusdere directed officers to manipulate reports of violent assaults by listing them as routine "log book entries," according to multiple jail sources and records obtained by the Daily News.

inRead invented by Tea



ADVERTISEMENT

ADVERTISEMENT

Gumusdere has denied the charges, saying all the downgrades were appropriate following close reviews of surveillance videos.

His last day on the job was Aug. 11, records show.

Gumusdere is seeking a disability pension equal to three-quarters of his final salary, citing an injury suffered on the job, jail sources say.

Last August, the Daily News detailed nine downgrades that appeared to defy logic. In one instance, a correction

captain was photographed with blood all over his hand.



Security Chief Turhan Gumusdere directed officers to manipulate reports of violent assaults by listing them as routine "log book entries," according to multiple jail sources and records obtained by the Daily News.

The incident was first classified as a low-level use of force. But it was later "downgraded ... on behalf of bureau chief of security Gumusdere," internal records show.

The Department of Investigation launched a probe after the allegations surfaced in The News.

It remains open with no end in sight.

Case 1:17-cv-02899-LTS   Document 57-5   Filed 09/07/18   Page 63 of 123

7/24/2018                    Jail official accused of manipulating data on violent Rikers assaults retires amid investigation - NY Daily News

Critics say DOI commissioner Mark Peters isn't serious about investigating the allegations.

The unions representing city corrections officers and jail captains say none of their members have been questioned by investigators about the issue.

"I don't think they really care," said Elias Husamudeen, president of the Correction Officers Benevolent Association.

"In my opinion, DOI picks and chooses who they want to investigate," added Correction Captains Association President Patrick Ferraiuolo. "A lot of high ranking officials slip through the cracks when it comes to full-fledged investigations. They pick and choose who they want to prosecute."

"When you are high-ranking and do something wrong they call it a mistake," he said. "But when you are an officer or a captain its considered a violation."

DOI officials strenuously denied that accusation, noting that a report released in April highlighted how many top correction officials, including former commissioner Joseph Ponte, used city vehicles for personal use. Ponte resigned days after the report's release.

Meanwhile, two independent bodies have cited concerns over the potentially phony reports.

ADVERTISEMENT

On April 3, a federal monitor overseeing the city's jail system noted The News' investigation into the alleged juked statistics.

The report concluded that some of those incidents were properly listed but did not address the remaining cases. The monitor, Steve Martin, instituted a new biweekly procedure for studying figures on serious incidents that are downgraded to log book entries.

Blood appears on the hand of a Department of Correction after two inmates were attacking each other, an incident downgraded to a log book entry. (Handout)

On April 26, the city's Board of Correction noted that there were six assaults by inmates in a specialized unit that appear to have been questionably downgraded.

The incidents "did not meet the department's definition of a 'reportable incident,' but nevertheless occurred, and appear to involve assaults on or harm to staff," the report said.

"For example, in one incident, an inmate in Enhanced Supervision Housing is said to have exited his cell without authorization and, without warning or provocation, punched a correction officer in the face," the review of the department's unit for troubled inmates said.

The unnamed officer suffered a broken nose, according to the report said.

Critics point out Gumusdere was found guilty of a similar allegation before he was inexplicably promoted by former Correction Commissioner Joseph Ponte in 2014. (Joe Marino/New York Daily News)

The oversight board also cited a case where an inmate tossed a dayroom table and punched a correction officer in the face after he was ordered to stop.

Despite their violent nature, all the incidents were listed as log book entries, the report said.

Critics point out Gumusdere was found guilty of a similar allegation before he was inexplicably promoted by former Correction Commissioner Ponte in 2014.

In 2011, the Correction Department's internal Investigation Division found that he "abdicated all responsibility" in

documenting incidents of violence.

Inmate Christian Sims says he injured his head on a bedpost, an account disputed by a medical review. The incident was deemed a "logbook entry" a day before the fiscal year was completed, records show. (Handout)

A department investigator recommended he be demoted.

Instead, Ponte did the opposite, elevating him to one of the top positions in the department. The move required the approval of City Hall, according to a jail source.

The department has been under intense pressure to reduce all violence in city jails.

Gumusdere was not immediately available for comment.

7/24/2018     Jail official accused of manipulating data on violent Rikers assaults retires amid investigation - NY Daily News

Case 1:17-cv-02895-LTS   Document 57-5   Filed 09/07/18   Page 67 of 123

## Reuven Blau



Reuven Blau has been a reporter in New York City for 13 years with a special focus on the city's jails, Brooklyn politics and the growing Jewish community. He grew up in Denver, Colorado and graduated from Brooklyn College.

**New York: Assisted Living: The Cost Might Surprise You**

Assisted Living | Sponsored Links

**Julia Roberts' Daughter Is All Grown Up & Looks Gorgeous**

TummyTuckHipo

**This Picture of Prince Harry & Father at The Same Age Will Shock You**

Trading Blvd

Sponsored Links

## You May Like

Sponsored Links

**The Various Luxury African Safaris That People Rave About!**

Top Luxury Safaris | Sponsored Links

**Why Is This Never Mentioned About The Brady Bunch?**

Activly

**Discover The Incredible New 2019 Vehicles That Are Already Released And On Sale!**

Auto Enthusiasts | Sponsored Links

**Here's Why Guys Are Obsessed With This Underwear…**

The Weekly Brief | Mack Weldon

**Conjoined Twins Abbey And Brittany Hensel Look Unrecognizable Now**

WorldLifestyle

Sponsored Links

 **Recommended For You**

**Three arrested after 3-year-old's face burned in acid attack**

**Battle erupts over estate of wealthy recluse who froze to death inside his Upper East Side mansion**

80°   New York City, NY     More

7/24/2018
Case 1:17-cv-02899-LTS  Document 57-5  Filed 09/07/18  Page 68 of 123
Jail official accused of manipulating data on violent Rikers assaults retires amid investigation - NY Daily News

OU  New York City, NY                                                    More

Sponsored Links by Taboola

**Cardiologist: "This Is What Happens When You Eat A Steak"**
Gundry MD

**How Turmeric Affects RA**
HealthCentral.com

**These Are The Most Wanted Dog Breeds For 2018**
YourDailyDish

**Loni Anderson Turns 72 & Is Unrecognizable Today**
Travelfuntu

Sponsored Links

ADVERTISEMENT

**LATEST**

NYC CRIME

**Man, 21, charged in fatal shooting in Bronx park**
JUL 23, 2018



NYC CRIME

**Cops seek perv who groped Bronx teen as she waited for elevator**
JUL 23, 2018



NEW YORK

**Why 20 years wasn't enough time for NYC to upgrade this Staten Island storm sewer**
JUL 23, 2018



NEW YORK

**Field of Dreams winner, 13, gearing up for another legendary Yankees experience**
JUL 23, 2018



NYC CRIME

**EXCLUSIVE: Bronx robbery victim furious her assailant won $3.9 million from city over Rikers Island beatdown**
JUL 23, 2018





7/24/2018    Jail official accused of manipulating data on violent Rikers assaults retires amid investigation - NY Daily News

## You May Like

Sponsored Links by Taboola

**Discover These Affordable And Beautiful Walk In Tubs For Seniors!**
Bathtubs | Sponsored Links

**Parents Leave Four Daughters Home For A Week, Only To Return To An Unimaginable Surprise**
BridesBlush

**Barbara Eden Turns 86 & Is Definitely Not Like We Remembered**
Greeningz

**Moments at the Royal Wedding You Didn't See on TV**
Weight Loss Groove

ADVERTISEMENT



6 years after losing his daughter, this father invented a safety device that could save women and children who are in danger of being attacked.

safepersonalalarm.com

Download our mobile app
Subscribe for unlimited access

Contact Us
Site Map
Place an Ad
Contests
BestReviews
The Daily Meal
Privacy Policy

Careers
Feeds
Media Kit
Special Sections
Manage Subscription
The Active Times
Terms of Service

Copyright © 2018, New York Daily News

# Exhibit U
## of the Proposed First Amended and Supplemental Complaint

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

CHARLES DANIELS, KEITH TAYLOR,
ERROL TOULON, JR., HAKIM S. EL-QUHIR,
CLEMENT GLENN, ANTHONY TOULON,
individually and on behalf of all others similarly
situated,

                         Plaintiffs,

          -against-

THE CITY OF NEW YORK, NEW YORK CITY
DEPARTMENT OF CORRECTIONS, CYNTHIA
BRANN, Commissioner, JOSEPH PONTE, former
Commissioner, JEFF THAMKITTIKASEM, Chief
of Staff, and MARTIN MURPHY, former Chief of
Department.

                     Defendants.

**Case No.** 17 Civ. 9960 (LGS)


**AMENDED COMPLAINT
WITH JURY DEMAND**

Charles Daniels, Keith Taylor, Errol Toulon, Jr., Hakim S. El-Quhir, Clement Glenn, and Anthony Toulon (collectively, "Plaintiffs"), individually and on behalf of all others similarly situated, for their Amended Complaint against Defendants the City of New York, New York City Department of Corrections, Cynthia Brann, Commissioner, Joseph Ponte, former Commissioner, Jeff Thamkittikasem, Chief of Staff, and Martin Murphy, former Chief of Department (collectively, "Defendants"), allege as follows:

### INTRODUCTION

1.    This action seeks to vindicate the rights of Plaintiffs, African American Executive Staff and/or supervisory employees, both current and former, of the New York City Department of Corrections ("DOC"), who have been denied or delayed promotions, and/or were terminated or forced to resign, and/or were subject to adverse employment conditions based upon their race and color, as well as their staunch

1

refusal to engage in the prevalent corruption, falsification and manipulation of incidents of violence within Rikers Island, for which the Plaintiffs suffered a disparate impact when compared with similarly situated non-African American employees.

2.     As set forth more fully below, Plaintiffs allege in this action that Defendants the City of New York ("City") and the individually-named Defendants, as current and former DOC Executive Staff, have engaged in a pattern and practice of race discrimination and retaliation based upon, *inter alia*: 1) failure to promote African American supervisors within the DOC; 2) failure to provide African American supervisors with the appropriate equipment, fiscal, and personnel resources that were provided to similarly-situated, non-African American employees; 3) the marginalization of African American supervisors; 4) forcing several African American supervisors to resign or retire in lieu of threatened termination or demotion; and 5) the disparate impact upon the African American plaintiffs who all refused to take part in the systemic corruption and falsification tactics undertaken by Defendants.

3.     For years, Defendants have engaged in a pattern and practice of systemic, continuous, and intentional discrimination against African American administrative and management employees in job placement, advancement opportunities, and compensation decisions. Defendants have denied African Americans the same advancement opportunities as have been afforded to non-African Americans, resulting in a *severe underrepresentation* of African Americans on the DOCS Executive Staff. This broad pattern of racial discrimination has resulted in a far less percentage of African American Executive Staff members at the DOC as compared to other City government agencies.

4.     Despite repeated attempts by Plaintiffs, and numerous other similarly situated African American supervisory employees, 1) to curtail this severe and pervasive discrimination, and 2) refusal to undertake in the falsification and manipulation of facts regarding violence within Rikers Island by, *inter alia*, reporting the repeated instances of discrimination and corruption to their supervisors, the Office of

Equal Employment Opportunity, and DOC Executive Staff, Defendants utterly failed to take appropriate corrective actions and permitted the hostile work environment to persist unabated during their employment.

5.     The African American Plaintiffs all suffered a similar fate when they voiced their concerns to Defendants: Their complaints were wholly ignored, their authority and decision-making responsibilities were removed, their equipment, fiscal, and personnel resources were severely restricted, and/or their voices were completely stifled as they were forced to retire or resign.

6.     Plaintiffs bring this action on behalf of themselves and all other similarly situated supervisory employees. Plaintiffs herein claim that the DOC's pattern and practice of discrimination based upon race and color, violates Title VII, 42 U.S.C. § 2000e *et seq.,* 42 U.S.C. § 1983, Section 296 of the New York Executive Law, and Section 8-107 of the New York City Administrative Code.

**PARTIES**

*__Named Plaintiffs__*

7.     Plaintiff Charles Daniels served as Senior Deputy Commissioner of the DOC from January 2017 until his forced resignation in April 2017. At all times relevant to the factual allegations contained within in this Amended Complaint, Charles Daniels lived in Long Island City, New York.

8.     Plaintiff Keith Taylor was employed by the DOC from February 2015 until his forced resignation on February 28, 2017. Prior to his resignation, he served as Assistant Commissioner. He currently resides in New York, New York.

9.     Plaintiff Errol Toulon, Jr. served as Deputy Commissioner of Operations of the DOC from July 2014 until his forced resignation in January 2017. He currently resides in Lake Grove, New York.

10.     Plaintiff Hakim S. El-Quhir is a twenty-eight (28) year veteran of the DOC. He was forced to retire in April 2017. He currently resides in Wyandanch, New York.

11.     Plaintiff Clement Glenn has been employed by the DOC in a supervisory capacity since June 2004. He currently serves as Warden of the Rikers Island West Facility. He resides in St. Albans, New York.

12.     Plaintiff Anthony Toulon has been employed by the DOC since July 29, 1984 and currently holds the rank of Deputy Warden. He resides in Pomona, New York.

### *Defendants*

#### The City of New York

13.     The City of New York ("City") is a municipal corporation existing by the virtue of the laws of the State of New York. The City, through the Department of Corrections ("DOC"), maintains a policy and practice of discrimination against African American employees, including the creation of a disparate impact against the African Americans Plaintiffs who have refused to partake in the corruption and falsification/manipulation of statistics within DOC.

14.     The City is liable for the discrimination suffered by Plaintiffs and similarly situated African American employees.

#### Defendant Cynthia Brann

15.     Cynthia Brann is a white female and was named Commissioner of the DOC in October 2017. Prior to her appointment, Defendant Brann served as the Deputy Commissioner of Quality Assurance and Integrity for the DOC. At all times relevant herein, Defendant Brann served under the executive direction of Defendant Ponte, the former Commissioner of DOC, and was provided broad latitude to exercise independent judgment.

16.     Specific to the allegations contained herein of discrimination, including disparate impact, Defendant Brann was responsible for reviewing and evaluating compliance issues within the DOC and ensuring that subordinate supervisory staff, management, and employees were in compliance with the rules

4

and regulations of regulatory agencies, including but not limited to the Federal government oversight implemented by the United States Attorney's Office for the Southern District of New York, and the DOC's policies and procedures. Defendant Brann was also responsible for responding to alleged violations of DOC rules, regulations, policies, procedures, and standards of conduct by evaluating and/or recommending the initiation of investigative procedures, developing and overseeing a system for handling compliance violations, and monitoring and coordinating compliance activities.

17.     It is alleged herein that Defendant Brann willfully, wantonly and/or negligently failed to carry out the aforementioned duties and responsibilities, thereby resulting in the existence and proliferation of a pattern and practice of race and color discrimination, retaliation, and a hostile work environment within DOCS, including disparate impact.

Defendant Joseph Ponte

18.     Joseph Ponte is a white male and was the Commissioner of the DOC from April 2014 until May 2017.

19.     As Commissioner, Defendant Ponte was responsible for the development, implementation, and enforcement of all DOC practices and policies. Defendant Ponte was likewise responsible for the training and supervision of DOC personnel and the overall administration of DOC facilities.

20.     Specific to the allegations contained herein of discrimination, including disparate impact, Defendant Ponte was responsible for reviewing and evaluating compliance issues within the DOC and ensuring that subordinate supervisory staff, management, and employees were in compliance with the rules and regulations of regulatory agencies, including but not limited to the Federal government oversight implemented by the United States Attorney's Office for the Southern District of New York, and the DOC's policies and procedures. Defendant Ponte was also responsible for responding to alleged violations of DOC rules, regulations, policies, procedures, and standards of conduct by evaluating and/or recommending the

initiation of investigative procedures, developing and overseeing a system for handling compliance violations, and monitoring and coordinating compliance activities.

21.     It is alleged herein that Defendant Ponte willfully, wantonly and/or negligently failed to carry out the aforementioned duties and responsibilities, thereby resulting in the existence and proliferation of a pattern and practice of race and color discrimination, retaliation, and a hostile work environment within DOCS, including disparate impact.

22.     Defendant Ponte retired in May 2017 amid an investigation by the Department of Investigation into allegations of corruption, *inter alia*, that he and his aides misused City vehicles and spied on City investigators.

<u>Defendant Jeff Thamkittikasem</u>

23.     Jeff Thamkittikasem is an Asian male who is currently the Chief of Staff of the DOC, a position he has held since November 2014 per assignment from Mayor Bill de Blasio, despite having no prior corrections experience.

24.     As Chief of Staff, Defendant Thamkittikasem acts as the Commissioner's representative to the uniformed Command Staff, the members of DOC's Executive Staff and to external personnel within the New York City Mayor's Office, specifically First Deputy Mayor Anthony Shorris. Defendant Thamkittikasem advises the Commissioner on program and policy matters, manages high priority projects, and oversees the day to-day operations of the Office of the Commissioner.

25.     It is alleged herein that Defendant Thamkittikasem willfully, wantonly and/or negligently failed to carry out the aforementioned duties and responsibilities, thereby resulting in the existence and proliferation of a pattern and practice of race and color discrimination, retaliation, and a hostile work environment within DOCS, including disparate impact.

6

Defendant Martin Murphy

26.    Martin Murphy is a white male and was the Chief of the Department of the DOC from February 2015 until June 2017 when he retired.

27.    As Chief of the Department, Defendant Murphy supervised the uniformed members of service in the DOC, including Assistant Chiefs, Wardens, Deputy Wardens-In-Command, Deputy Wardens, Assistant Deputy Wardens, Captains, and Correction Officers. Defendant Murphy also was responsible for approving promotions and job assignments of the uniformed staff throughout the DOC.

28.    Specific to the allegations contained herein of discrimination, including disparate impact, Defendant Murphy was responsible for reviewing and evaluating compliance issues within the DOC and ensuring that subordinate supervisory staff, management, and employees were in compliance with the rules and regulations of regulatory agencies, including but not limited to the Federal government oversight implemented by the United States Attorney's Office for the Southern District of New York, and the DOC's policies and procedures. Defendant Murphy was also responsible for responding to alleged violations of DOC rules, regulations, policies, procedures, and standards of conduct by evaluating and/or recommending the initiation of investigative procedures, developing and overseeing a system for handling compliance violations, and monitoring and coordinating compliance activities.

29.    It is alleged herein that Defendant Murphy willfully, wantonly and/or negligently failed to carry out the aforementioned duties and responsibilities, thereby resulting in the existence and proliferation of a pattern and practice of race and color discrimination, retaliation, and a hostile work environment within DOCS, including disparate impact.

## JURISDICTION AND VENUE

30.    This Court has jurisdiction over Plaintiffs' Federal claims pursuant to 28 U.S.C. § 1331 and 42 U.S.C. §§ 2000e-5(f)(1), 5(f)(3) and supplemental jurisdiction over the state and city law claims pursuant

to 28 U.S.C. § 1367.

31.     As the Southern District is the District wherein a substantial part of the events giving rise to the instant claims occurred, venue is proper pursuant to 28 U.S.C. § 1391(a)(2).

32.     Plaintiffs each filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") against the City, the DOC, and the individually named Defendants, complaining of race and color discrimination, retaliation, and creation of a hostile work environment, *inter alia*, as further alleged in this Amended Complaint.

### FACTUAL ALLEGATIONS - GENERAL

33.     At all relevant times, the DOC comprised approximately ten thousand four hundred (10,400) employees, eighty (80) of which were administrators and managers.

34.     The supervisory positions of administrators and managers are divided into uniformed titles and civilian titles.

35.     The uniformed titles include Chief of Department, Warden, Deputy Warden-In-Command, and Deputy Warden, *inter alia.*

36.     The civilian titles include Commissioner, First Deputy Commissioner, Deputy Commissioner, Associate Commissioner, and Assistant Commissioner.

37.     The Executive Staff is comprised of the Commissioner, First Deputy Commissioner, Senior Deputy Commissioner, Chief of Staff, Deputy Commissioner of Financial, Facility and Fleet Administration, Deputy Commissioner for Legal Matters/General Counsel, Deputy Commissioner of Public Information, First Deputy Commissioner of Human Resources, Deputy Commissioner of Youthful Offender and Young Adult Programming, Deputy Commissioner for the Office of Classification and Population Management, Deputy Commissioner of Adult Programming and Community Partnerships, Deputy Commissioner of Quality Insurance and Integrity, Chief Information Officer/Deputy Commissioner of

8

Information Technology, Deputy Commissioner of Health Affairs, and Deputy Commissioner for Investigation Division.

38.    At all relevant times, a disproportional percentage of African Americans were afforded the opportunity of obtaining Executive Staff positions.

39.    Unlike non-African American supervisors, the few African Americans who do hold supervisory positions have their authority circumvented, marginalized, and usurped, are denied promotions and the opportunity to move up in the ranks, and/or are threatened with demotion if they fail to resign.

40.    Furthermore, the African American Plaintiffs suffered a disparate impact at the hands of Defendants, all because Plaintiffs refused to acquiesce to the corruption, manipulation and falsification of DOCS statistics, in particular, jail violence. Said corruption, manipulation and falsification was instituted, promoted and required by Defendants. Any deviation resulted in adverse employment actions by Defendants.

41.    A New York City Government Workforce Profile Report shows that, at times relevant to this Amended Complaint, "Black" employees held only approximately thirty (30%) of the managerial positions within the DOC, despite over seventy-five percent (75%) overall "Black" employment.

42.    At all relevant times, the prestigious upper ranks of the DOC (*i.e.* Commissioner, First Deputy Commissioner, Senior Deputy Commissioner, Chief of Staff, Deputy Commissioner, Chief of Department, and Bureau Chief) employed only one (1) African American male. This practice of appointing minimal African Americans to the prestigious upper ranks has permeated the DOC for years.

43.    The high-ranking officers of the DOC have substantial discretion in the job selection decisions of the DOC. These officers overwhelmingly have participated or acquiesced in a culture that favors non-African American employees and fosters resistance to, and discrimination against, African Americans.

44.      The culture, policies, and practices that have caused the DOC to under-promote and marginalize African Americans has resulted in systemic and continuing racial discrimination, including disparate impact, in hiring, advancement, and pay decisions against African Americans employed by the DOC.

## FACTUAL ALLEGATIONS - INDIVIDUALLY NAMED PLAINTIFFS

### Plaintiff Charles Daniels

45.      Charles Daniels, an African-American male, was employed by the DOC as Senior Deputy Commissioner from January 17, 2017 to April 6, 2017, when he was forced to retire rather than be terminated.

46.      Prior to his tenure with the DOC, Charles Daniels served with distinction in a supervisory capacity at several Federal correctional facilities for over a period of twenty (20) years. Charles Daniels served as the Complex Warden at both the Federal Correctional Complex ("FCC") at Terre Haute, Indiana, and the FCC at Beaumont, Texas, where he oversaw high, medium, and low security facilities with several hundred staff members, housing thousands of inmates.

47.      Throughout his career as a Complex Warden, Warden, and Associate Warden, Charles Daniels directed and controlled the spending of operating budgets in excess of one million dollars ($1,000,000.00). Charles Daniels achieved and maintained American Correctional Association accreditation at four (4) separate correctional facilities.

48.      As a Federal employee, Charles Daniels earned the distinction of Senior Executive Service, a rank earned by only 0.2% of all Federal employees. Charles Daniels served as a primary instructor for the Board of Prisons Leadership and Management Training Program, and as Incident Commander with the National Incident Management System/Incident Command System.

49.     Despite his extensive experience and multiple distinctions, Charles Daniels had his duties and responsibilities stripped from him by Defendants Ponte, Thamkittikasem, and Murphy, was forced to endure a constant barrage of unwarranted, disparaging comments, critiques, and criticisms from less qualified, non-African American subordinates including Defendants Thamkittikasem, Brann, and Murphy, had his authority circumvented and usurped by less qualified, non-African American subordinates at the direction of Defendants Thamkittikasem, Brann, and Murphy, was denied the personnel and fiscal resources enjoyed by less qualified, non-African American subordinates, such as Defendants Thamkittikasem, Brann, and Murphy, and was unfairly denied the official designation as Senior Deputy Commissioner by Defendant Commissioner Ponte.

50.     Charles Daniels worked far more extensive hours than his less qualified, non-African American counterparts, namely Defendants Thamkittikasem, Brann and Murphy, and was forced to perform substantially more tasks than his these non-African American individuals.

51.     Upon his "appointment" to Senior Deputy Commissioner on January 17, 2017, Charles Daniels *held higher rank* than several supervisory officials, including Defendants Thamkittikasem, Brann, and Murphy. On or about January 18, 2017, Charles Daniels met with Joseph Ponte, former Commissioner, who informed him that a dissemination regarding his designation to all DOC personnel was forthcoming. Defendant Ponte also informed Charles Daniels of the major issues he was to address, including lack of integrity at the DOC, excessive violence in the jail system, poor leadership at every level, poor training and communication, and low morale, *inter alia*. Defendant Ponte explicitly instructed Charles Daniels to pay specific attention to Defendant Murphy and warned him of Defendant Murphy's practice of directing his uniformed subordinates to disregard directives from other supervisory officials.

52.     On or about February 13, 2017, Defendant Ponte instructed Charles Daniels to review the Central Operations Desk ("COD") reports, identify entries that required attention, and describe the actions

that should be taken and how they will be performed. Charles Daniels was then to provide a verbal report to the Executive Staff, including Defendant Murphy, Defendant Thamkittikasem, Chief of Staff, Defendant Brann, Deputy Commissioner, Shirvana Gobin, Deputy Commissioner for Strategic Planning and Management, and Heidi Grossman, Deputy Commissioner for Legal Matters/General Counsel, all of whom are white and held *lower rank* than Charles Daniels. Upon completion of his report, Charles Daniels was disparaged and told by Defendants Thamkittikasem and Brann that he "did not know what he was doing," even though Defendants were less qualified and held lower rank than him.

53.   Defendants Thamkittikasem, Brann, and Murphy also unfairly and unjustifiably labeled Charles Daniels as "arrogant."

54.   Defendant Ponte failed to address this unprofessional behavior, but rather, allowed the other Defendants to usurp Plaintiff Daniels' authority.

55.   After the meeting, Defendant Murphy immediately ordered his uniformed subordinates to disregard the training provided, and the directives issued, by his superior, Plaintiff Daniels. Defendant Murphy also ordered his uniformed subordinates to cease cooperating with Daniels and his Senior Advisors, and had Daniels' Senior Advisors removed from their posts.

56.   Defendant Murphy would often cancel meetings with Plaintiff Daniels and his Senior Advisors and reschedule them without any notice, even though he had been admonished previously for this behavior.

57.   Plaintiff Daniels reported Defendant Murphy's behavior of insubordination and marginalization to Defendant Ponte, yet Defendant Ponte wholly failed to reprimand Defendant Murphy, allowing this unacceptable behavior to continue unabated. Similarly situated non-African Americans were not subjected to such discriminatory conduct and hostile working conditions.

58.   Not only was Plaintiff Daniels forced to endure the circumvention of his authority as Senior

12

Deputy Commissioner, but he was also forced to endure other employment conditions that his non-African American subordinates were not subject to.

59.     Plaintiff Daniels was assigned to mentor Wardens, while Defendant Murphy bore no such responsibility.

60.     Plaintiff Daniels was also required to train the Wardens, Deputy Wardens, Assistant Chiefs, and Restrictive Housing staff on a myriad of topics, a task not required of Defendant Murphy.

61.     Many of the tasks Plaintiff Daniels was required to perform, including drafting incident and response checklists and tour inspection checklists, were outside of his job specifications and were not required of Defendant Murphy.

62.     Similarly situated non-African Americans were not subjected to such discriminatory conduct and hostile working conditions.

63.     Even though Plaintiff Daniels was designated Senior Deputy Commissioner on January 17, 2017, Defendant Ponte never officially announced Daniels' appointment to DOC personnel. Similarly situated non-African Americans were not subjected to such discriminatory conduct and hostile working conditions.

64.     Plaintiff Daniels was supposed to be in charge of the "Senior Advisors" who were hired from other correctional organizations to assist DOC Wardens with professional growth, development, guidance, managerial decision making, etc. There would be two regularly scheduled meetings with the Advisors, Chiefs and Wardens. Plaintiff Daniels discovered that Defendant Murphy would cancel all the meetings and then re-schedule them about an hour later without notifying Daniels or any of the African American Senior Advisors. Similarly situated non-African Americans were not subjected to such discriminatory conduct and hostile working conditions.

65.     Despite being a subordinate to Plaintiff Daniels, Defendant Murphy continued to hold

meetings without advising Daniels and the African American Senior Advisors, causing them to be marginalized.

66.     The Senior Advisors of African descent, including Plaintiff Daniels, were never given the authority to perform the work they were hired to do because of Defendants Thamkittikasem, Brann, and Murphy's refusal to follow the African American Plaintiffs' recommendations, and the fact that Defendants always kept the African American supervisors "out of the loop" and "in the dark" on matters that occurred within the jails.

67.     Because Defendants Thamkittikasem, Brann, and Murphy intentionally tried to cover up the violence within Rikers Island and keep African American supervisors "in the dark" regarding occurrences of violence, Plaintiff Daniels and the other African American Senior Advisors where forced to listen to "radio traffic" for notification of violent incidents in order to properly document violent incidents.

68.     Unlike his non-African American counterparts such as Defendant Murphy, *inter alia*, Plaintiff Daniels was required to mentor several Wardens, stay late and come to work early every day, go to Rikers Island during emergencies, work on weekends, train Restrictive Housing Staff, train Wardens and Deputy Wardens on incident management, do on-site leadership and supervision training, and brief the First Deputy Mayor on incidents, all despite having no operational authority over response protocols. Defendant Murphy was never required to perform such tasks despite being Chief of Department.

69.     Turhan Gumusdere, a white male, was the Bureau Chief of Security and responsible for the Duty Officer Program. Chief Gumusdere was never held accountable for failing to have Administrative Duty Officers come in for incidents or failing to report for weekend tours of duty. Despite Plaintiff Daniels having no authority to order unformed staff to report to duty and execute duties as he would direct, Defendant Ponte would blame Daniels for lack of effectiveness of the uniformed leadership. Similarly situated non-African Americans were not subjected to such discriminatory conduct and hostile working

14

conditions.

70.     Defendant Ponte told Plaintiff Daniels that Chief Gumusdere was caught lying about down-grading or failing to report violence within the jails, yet Ponte never reprimanded Chief Gumusdere.

71.     During Plaintiff Daniels employment with the DOC, he was asked to attend meetings at City Hall with Defendant Ponte and the First Deputy Mayor to discuss violence statistics at Rikers Island. At one of the meetings, Daniels made a presentation to the First Deputy Mayor that the violence was increasing at Rikers Island. Defendant Ponte became very angry at Mr. Daniels, berating him outside the room after the meeting for not covering up the violence in the meeting at City Hall. Daniels was never allowed to attend the City Hall meetings from that point on because he refused to inaccurately depict the numbers of violent incidents to the Mayor's Office as Defendants Ponte and Thamkittikasem wanted. Similarly situated non-African Americans were not subjected to such discriminatory conduct and hostile working conditions. This was witnessed by one of the Deputy Commissioners.

72.     On or about April 5, 2017, Plaintiff Daniels was summoned to a meeting with Defendants Ponte, Thamkittikasem, Brann, and Heidi Grossman, at which time Defendant Ponte told Daniels that he was "ineffective" and that "things weren't working out."

73.     To this point, Plaintiff Daniels was *still never* officially announced as Senior Deputy Commissioner by Defendant Ponte who refused to do so.

74.     Plaintiff Daniels advised Defendant Ponte that he had never been provided operational authority and had never been officially introduced to the personnel. Plaintiff Daniels was told that he had failed to turn in several assignments given to him by Defendant Thamkittikasem, even though Defendant Ponte specifically told him to disregard any directive given by Defendant Thamkittikasem. There was no discussion of terminating Plaintiff Daniels at this meeting.

75.     It became clear to Plaintiff Daniels that the non-African American Defendants were

15

colluding to have him removed. As a result of the aforementioned conduct, *inter alia*, Daniels filed an Office of Equal Employment Opportunity ("OEEO") complaint on April 5, 2017, alleging unlawful discriminatory practices relating to his employment, based upon race and the creation of a hostile work environment.

76.     After filing his OEEO complaint, Plaintiff Charles Daniels was immediately forced to resign from his position as Senior Deputy Commissioner, in retaliation for exercising his rights.

77.     On or about April 6, 2017, Charles Daniels received a telephone call from Defendant Thamkittikasem, directing him to report to Defendant Ponte's office. Defendant Ponte and Heidi Grossman were both present at the meeting. Defendant Ponte commanded Charles Daniels to "resign or be fired." Left with no other option, Plaintiff Daniels unwillingly offered his resignation and departed the office. Similarly situated non-African Americans were not subjected to such discriminatory conduct and hostile working conditions.

78.     On June 21, 2017, Plaintiff Charles Daniels filed an EEOC Charge of Discrimination against the DOC, alleging that the DOC had discriminated against him based upon his race and color, and that he was subjected to a hostile work environment and retaliation. Daniels received a Right to Sue letter from the EEOC on or about December 11, 2017.

**Plaintiff Keith Taylor**

79.     Keith Taylor, an African American male, was employed by the DOC as the Assistant Commissioner from February 4, 2015 until his forced resignation on February 28, 2017.

80.     Prior to his employment with the DOC, Plaintiff Taylor served as an officer for the NYPD for over twenty-four (24) years, earning the rank of Sergeant with the Emergency Medical Unit.

81.     Upon his appointment as Assistant Commissioner, Plaintiff Taylor was assigned to the Correction Intelligence Bureau ("CIB"). While at CIB, Keith Taylor created the Evidence Collection/Crime

Scene Unit, the Intelligence Analysis Unit, the Social Media Monitoring Unit, and the Phone Monitoring Unit. Plaintiff Taylor implemented these new units in order to address the shortcomings of CIB that had been detailed in an administrative report.

82.     Throughout his tenure as Assistant Commissioner, Plaintiff Taylor repeatedly requested additional support, personnel and equipment resources that his non-African American colleagues routinely had been provided. However, as of the date of his forced resignation, those requests had all been unmet by Defendants Murphy. Plaintiff Taylor had also been denied a budget for those resources while other non-African American Assistant Commissioners were granted such a budget.

83.     In or about April 2016, CIB was transferred back under uniform command following an incident where an inmate splashed a Correction Officer in the face with an unknown liquid. Plaintiff Taylor was removed from his supervisory position at CIB even though he was told that he had done nothing wrong.

84.     Chief Gumusdere advised Plaintiff Taylor that he would be supervising all uniformed staff activities. However, the uniformed staff stopped taking directives from Plaintiff Taylor and stopped reporting to him. Plaintiff Taylor was excluded from all Executive meetings. Similarly situated non-African Americans were not subjected to such discriminatory conduct and hostile working conditions.

85.     Upon information and belief, Defendants Thamkittikasem, Brann, and/or Murphy directed uniformed staff to disregard Plaintiff Taylor's directives.

86.     Upon information and belief, Defendants Thamkittikasem, Brann, and/or Murphy advised representatives from outside government agencies to discontinue their working relationships with Plaintiff Taylor.

87.     Plaintiff Taylor's Administrative Assistant transferred to another command after hearing officers within CIB disparage Taylor.

88.     In essence, Plaintiff Taylor was stripped of all authority and responsibilities within CIB by

17

Defendants Ponte, Thamkittikasem, Brann, and Murphy. Similarly situated non-African Americans were not subjected to such discriminatory conduct and hostile working conditions.

89.    In addition to the loss of his supervisory powers, Plaintiff Taylor had his parking space rescinded and his portrait removed from its proper place in the Fusion Center. Similarly situated non-African Americans were not subjected to such discriminatory conduct and hostile working conditions.

90.    On February 24, 2017, Plaintiff Taylor reported to Defendant Thamkittikasem's office and was asked for his letter of resignation, despite having not received any written or verbal notice that the work he performed was inadequate or deficient in any way. Similarly situated non-African Americans were not subjected to such discriminatory conduct and hostile working conditions.

91.    On June 21, 2017, Plaintiff Taylor filed a Charge of Discrimination with the NYSDHR and the EEOC, alleging that the DOC discriminated against him based upon its unlawful and intentional pattern and practice of race and color discrimination, retaliation, and the creation of a hostile work environment.

92.    On or about September 22, 2017, Keith Taylor received a Right to Sue Letter from the EEOC.

### Plaintiff Errol Toulon, Jr.

93.    Errol Toulon, Jr., an African-American male, was employed by the DOC as Deputy Commissioner of Operations from on or about July 2014 until his forced resignation on January 5, 2017. Errol Toulon, Jr. currently serves as Sheriff of Suffolk County, New York, a position he was elected to for a four year term.

94.    Prior to his tenure with the DOC, Errol Toulon, Jr. served with distinction as the Suffolk County Assistant Deputy County Executive for Public Safety from September 2012 to July 2014. As Assistant Deputy County Executive, he was required to report and advise directly to the County Executive on all matters of public safety and security. During his career in Suffolk County, Errol Toulon developed

18

initiales and policies to combat drug addiction and gang violence, created and managed new security procedures and surveillance systems, and created initiatives to reduce recidivism and increase organizational accountability, *inter alia*. He was appointed to oversee all security procedures and protocols for all County facilities and was appointed Incident Commander for any natural disaster or terrorist attack within Suffolk County.

95.     Errol Toulon, Jr. also served the DOC with distinction for over twenty-two (22) years until his retirement at the rank of Captain in 2004. During his career with the DOC, Errol Toulon, Jr. handled all aspects of Department operations, including budgeting, recruiting, training, resource management and relationships with law enforcement groups and government offices. Errol Toulon, Jr. directed and controlled the spending of operating budgets in excess of two million five hundred thousand dollars ($2,500,000.00). Errol Toulon, Jr. received numerous awards and citations for his performance.

96.     Upon re-entering the DOC as Deputy Commissioner of Operations in 2014, Errol Toulon, Jr. immediately began to experience discrimination based upon his race and color.

97.     Errol Toulon, Jr. was denied both a residency and pension waiver while other non-African American subordinates were approved.

98.     Errol Toulon, Jr. was forced to choose one (1) location for his office, while his non-African American predecessor was afforded two (2) office locations in order to better carry out his supervisory duties.

99.     Despite his extensive experience and multiple distinctions, Errol Toulon, Jr.'s authority was constantly questioned and usurped by non-African American staff members, namely Defendants Thamkittikasem, Brann, and Murphy. Similarly situated non-African Americans were not subjected to such discriminatory conduct and hostile working conditions.

100.     Errol Toulon, Jr.'s command, the Central Intelligence Bureau (CIB), was given exorbitant

19

responsibilities, but was denied adequate personnel and fiscal resources to fulfill the responsibilities. Such *was not* done to non-African American supervisors.

101. Errol Toulon, Jr. had his office space and staff greatly diminished, while other non-African American executives' staffing needs were *increased*. When he requested additional staff resources, Errol Toulon, Jr. was told by Defendants Ponte and Murphy that the vetting process was extensive. However, during this period, non-African American Deputy Commissioners, such as Heidi Grossman and Greg Kuczinski, Timothy Farrell and James Walsh requested, and were promptly provided, additional staff resources.

102. After being given additional responsibilities with the Quality Assurance and Integrity Unit, Errol Toulon, Jr. was yet again denied the requisite staffing resources. When he was relieved of these responsibilities, his replacement, a non-African American female, was in fact afforded the staffing resources that Errol Toulon, Jr. had previously been denied.

103. The DOC then transferred Errol Toulon, Jr.'s Executive Officers to other commands per Defendants Ponte and Murphy. Non-African American Deputy Commissioners were *not* forced to relinquish executive members to lower ranking officers in this manner.

104. Following an incident where the Bronx District Attorney declined to prosecute an inmate who had accosted a corrections officer, Errol Toulon Jr. was made the scapegoat and was retaliated against by the non-African American Executive Staff Defendants (Defendants Thamkittikasem and Murphy) who stripped him of his responsibilities overseeing the CIB. Similarly situated non-African Americans were not subjected to such discriminatory conduct and hostile working conditions.

105. Errol Toulon Jr. was banished to an office separate from the non-African American Deputy Commissioners and had his staff displaced. Similarly situated non-African Americans were not subjected to such discriminatory conduct and hostile working conditions.

106.    On January 5, 2017, Errol Toulon Jr. was forced to resign by Defendant Thamkittikasem. Errol Toulon Jr. was unfairly made the scapegoat for the DOC's failure to hire the number of correction officers mandated by the Mayor of New York City, even though Toulon had not been provided the appropriate resources to make this a reality. Similarly situated non-African Americans were not subjected to such discriminatory conduct and hostile working conditions.

107.    Errol Toulon Jr. was blacklisted by Defendant Ponte and Defendant Thamkittikasem from meetings related to hiring and had the hiring candidate list withheld from him for months, making meeting City Hall's hiring goals a virtual impossibility. Similarly situated non-African Americans were not subjected to such discriminatory conduct and hostile working conditions.

108.    Errol Toulon Jr. was forced to resign, despite never receiving a performance evaluation or being informed that he was not performing at a satisfactory level. Similarly situated non-African Americans were not subjected to such discriminatory conduct and hostile working conditions.

109.    On June 21, 2017, Errol Toulon Jr. filed a Charge of Discrimination with the NYSDHR and the EEOC and received the Right to Sue letter on or about October 16, 2017.

**Plaintiff Hakim S. El-Quhir**

110.    Hakim S. El-Quhir, an African American male, was employed by the DOC from December 8, 1998 to April 17, 2017, when he was forced to retire under duress, rather than face demotion and a significant reduction in pay.

111.    On February 1, 2016, Hakim S. El-Quhir was designated Warden of the DOC Transportation Division, where he served until his removal from the command on March 31, 2017.

112.    Defendant Ponte threatened Hakim S. El-Quhir with demotion to Assistant Deputy Warden, a Civil Service title that is three (3) rank positions lower than Warden, with a substantially reduced salary. Similarly situated non-African Americans were not subjected to such discriminatory conduct and hostile

working conditions.

113.    Defendant Ponte's ultimatum came after Hakim S. El-Quhir was reprimanded along with several other white supervisors for non-satisfactory performance; however, Hakim S. El-Quhir, an African American, was the *only* supervisor forced to retire in lieu of demotion.

114.    Prior to the commencement of the instant action, Hakim S. El-Quhir filed an EEOC Charge of Discrimination against the DOC on May 1, 2015. Two weeks after the statute of limitations to file a lawsuit expired, Plaintiff El-Quhir was retaliated against by Defendant Commissioner Ponte for filing this EEOC. Defendant Ponte told Plaintiff El-Quhir to either retire or be demoted back to his last Civil Service Rank of ADW by the end of the day.

115.    Similarly situated non-African Americans were not subjected to such discriminatory conduct and hostile working conditions.

116.    On at least one occasion, Plaintiff El-Quhir witnessed a white supervisor, Warden William Barnes, being reprimanded for non-satisfactory performance. Warden Barnes was removed from his command for said non-satisfactory performance; however, unlike Hakim S. El-Quhir, Barnes *was not* posed with the ultimatum to retire or face demotion. Rather, Barnes was simply re-assigned and sent to a newly created post, even though he had significantly less experience than Plaintiff Hakim S. El-Quhir.

117.    On September 8, 2017, Hakim S. El-Quhir filed a second EEOC Charge of Discrimination against the DOC, alleging that the DOC discriminated against him based upon his race and color, subjected him to a hostile work environment, and retaliated against him. He received a Right to Sue letter on or about February 26, 2018.

**Plaintiff Clement Glenn**

118.    Clement Glenn, an African-American male, has been subjected to promotional delays, increased work hours and responsibilities, significant decreases in both personnel and fiscal resources, and

an extreme loss of overtime compensation -- all adverse conditions that his similarly situated, non-African-American colleagues were *not* forced to endure.

119.    In or about June 2004, Clement Glenn was designated as Assistant Deputy Warden. In or about 2007, he was assigned as a Court Executive Officer, a position he held until his promotion to Deputy Warden in or around August 2011.

120.    Clement Glenn's non-African American colleague, namely Asst. Deputy Warden DiBernadino, consistently received cash overtime opportunities and compensation that Clement Glenn was denied.

121.    During his tenure as a Court Executive Officer, Clement Glenn was denied cash overtime compensation by Defendants, even though he consistently worked well over eight (8) hours a day. Similarly situated non-African Americans were not subjected to such discriminatory conduct and hostile working conditions.

122.    Clement Glenn's overtime was allocated as compensatory time, of which he accrued approximately two (2) years and six (6) months' time. Similarly situated non-African Americans were not subjected to such discriminatory conduct and hostile working conditions.

123.    As such, when he retires, Clement Glenn *will not* be properly compensated for his time and his pay-out will be capped at one (1) year compensatory time. The remaining time will be *fortified*. Similarly situated non-African Americans were not subjected to such discriminatory conduct and hostile working conditions.

124.    Clement Glenn's promotion to Deputy Warden was unfairly delayed seven (7) years, a delay his non-African American Assistant Warden colleagues did *not* experience, including Defendant Murphy, Brian Sullivan, and retired Dep. Warden Tatusco.

125.    During those seven (7) years, Clement Glenn consistently saw numerous non-African

American Assistant Wardens promoted to Deputy Warden within two (2) years of their designation as Assistant Warden, including Defendant Murphy, Brian Sullivan, and retired Dep. Warden Tatusco.

126.    When he finally was promoted to Deputy Warden, Clement Glenn spent the entirety of his tenure assigned to the jails, while numerous non-African American Deputy Wardens and their non-African American subordinates were either quickly promoted to, or transferred into, high levels of management with little to no inmate interaction. One example of this discrimination is Defendant Murphy. Despite these restrictions, Clement Glenn still received numerous accolades from the Executive Staff for his performance as a Deputy Warden.

127.    Upon his promotion to Warden, Clement Glenn was immediately subjected to personnel and fiscal restrictions by Defendant Murphy that his non-African American predecessors and contemporaries were not subjected to.

128.    Clement Glenn's staff was reduced significantly while his responsibilities continued to increase.

129.    Clement Glenn experienced an intensified level of scrutiny and tactics by Defendant Murphy, aimed at marginalizing him. Said scrutiny and tactics were not experienced by his non-African American predecessors and contemporaries.

130.    Such unfair and discriminatory restrictions and increased responsibilities culminated in the imposition of a housing violation against Clement Glenn in or about March 2016.

131.    Following the undeserved housing violation, Clement Glenn was immediately transferred to the Criminal Justice Bureau and then to the Hospital Prison Ward. Similarly situated non-African Americans were not subjected to such discriminatory conduct and hostile working conditions.

132.    In or about August 2016, Clement Glenn was transferred to the West Facility, where he again was afforded only minimal staff, resources, and support, unlike his non-African American counterparts,

24

namely William Barnes and Brian Sullivan. Similarly situated non-African Americans were not subjected to such discriminatory conduct and hostile working conditions.

133.    Clement Glenn took Family Medical and Leave Act ("FMLA") leave in or about December 2016.

134.    Upon Clement Glenn's return from FMLA leave, resources were *immediately removed* from his command. Despite the continued increase in the inmate population at Clement Glenn's command, his staff resources were, and continue to be, consistently reduced disproportionately to non-African American counterparts.

135.    During his tenure with the DOC, Clement Glenn has experienced an environment where his non-African American subordinates wield significant power and control *over him,* including Brian Sullivan and Roy Miller. Non-African American subordinates like Brian Sullivan were promoted more quickly and into more prominent positions than Clement Glenn and his African American contemporaries.

136.    The non-African American subordinates were provided more overtime opportunities and receive significantly more compensation than Clement Glenn and his African American contemporaries.

137.    Clement Glenn is required to work longer hours and take on substantially more responsibilities with less resources and compensation than his non-African American subordinates and contemporaries such as Asst. Dep. Warden DiBernadino, Brian Sullivan, Defendant Murphy.

138.    On September 8, 2017, Clement Glenn filed a Charge of Discrimination against the DOC with the NYSDHR and the EEOC, alleging that the DOC subjected him to discrimination based upon unlawful and intentional patterns and practices of race and color discrimination, retaliation, and creation of a hostile work environment. The Right to Sue letter is pending.

**Plaintiff Anthony Toulon**

139.    Anthony Toulon is a thirty-two (32) year member of DOCS, holding the rank of Deputy Warden for over five (5) years before he reported sick for the 9/11-related illness Neurosardcoidosis.

140.    Prior to his illness, in October of 2015, he had obtained seven (7) years of "Perfect Attendance."

141.    Plaintiff Anthony Toulon's Performance Evaluations as a Deputy Warden, ranged from "GOOD" to "OUTSTANDING," with recommendations by his supervisors that he be considered for "Promotion."

142.    During his tenure as Deputy Warden, he has managed all three (3) disciplines: first, as the Deputy Warden of Security at the Robert N. Davoren Center, second as the Administration Deputy Warden at the Vernon C. Bain Center, and third as the Security & Programs Deputy Warden of the Vernon C. Bain Center. Thereafter, he managed all three disciplines, as well as being required to be the "Acting Warden" of the Vernon C. Bain Center.

143.    Plaintiff Anthony Toulon was then transferred to the Manhattan Detention Complex, where he managed the Administration Discipline for the facility, and jointly acted as Warden along with, then Deputy Warden Lisa Cooper.

144.    He was subsequently transferred to the Eric M. Taylor Center, where he again, at different time periods, managed all three disciplines.

145.    After applying for and being interviewed for promotion to the rank of Warden Level III, in February 25, 2013, Plaintiff Anthony Toulon made an inquiry to then Deputy Commissioner of Human Resources, Alan Vengersky, as to whether Toulon made the list of qualified candidates for Promotion to Warden Level III. Vengersky stated "yes."

146.    Plaintiff Anthony Toulon then proceeded to await further notifications for future interviews.

Plaintiff Anthony Toulon fulfilled all of his qualifications for promotion.

147.    However, at some point, a different list of qualified candidates appeared and Plaintiff Anthony Toulon was inexplicably removed from the list.

148.    After supplying documentation that he completed the process to be on the qualified list, the agency promoted several non-African American individuals ahead of Plaintiff Anthony Toulon.

149.    White individuals, namely Brian Sullivan, Martin Murphy, and Turhan Gumusdere, who had recently gone through the first stages of the interview process, had less tenure and seniority in the rank of Deputy Warden than Plaintiff Anthony Toulon, had less experience, and did not perform in all the disciplines as Plaintiff Toulon had, received promotions.

150.    White individuals, namely Brian Sullivan and Martin Murphy, as per the Directive, did not even serve in a jail for one year.

151.    Meanwhile, Plaintiff Anthony Toulon served in this capacity for over three (3) years, as well as serving as Acting Warden.

152.    On or about January 2015, then Deputy Warden Charlton Lemon, Deputy Warden Hayes, Deputy Warden Blackmon, and Plaintiff Anthony Toulon, all African Americans, met with Commissioner Ponte, who wanted to "tap into" their knowledge of the Disciplines for Deputy Warden.

153.    Defendant Commissioner Ponte, specifically and emphatically stated to these four, that they were the *best* at their disciplines (Lemon at Security, Hayes and Toulon at Administration, and Blackmon at Programs). The Commissioner requested that the four draft the ideology they apply to their disciplines, the methods they utilize, and a description of their jobs.

27

154.     The Commissioner further stated that all four African Americans would be promoted.

155.     After completing the task, no further words of "promotion" were mentioned to Plaintiff Toulon.

156.     As of the date of this Amended Complaint, Charlton Lemon, was *the only one* out the four African Americans, who was given a promotion to Warden.

157.     As previously stated, the Department has promoted numerous non-African American individuals with less credentials, experience, knowledge, tenure and seniority in rank. One example of this William Barnes, a white male.

158.     On September 16, 2017, Anthony Toulon filed an EEOC Charge of Discrimination against the DOC, alleging that the DOC discriminated against him based upon his race and color, subjected him to a hostile work environment, and retaliated against him. He received a Right to Sue letter on or about April 13, 2018.

## FACTUAL ALLEGATIONS – NON-AFRICAN AMERICAN COMPARATORS

159.     The existence of non-African American comparators employed by DOCS who, unlike Plaintiffs, *did not* suffer from disparate treatment and/or impact in their employment at the DOC, is well-documented. In fact, many of these non-African American comparators received promotions and/or continued employment despite being less-qualified than Plaintiffs and having disciplinary issues.

Defendant Cynthia Brann

160.     Plaintiffs Charles Daniels, Errol Toulon, and Keith Taylor are African American males who were members of the DOC Executive Staff. These Plaintiffs were forced to resign for baseless allegations of "poor performance," "failure to move the bar" or "overall ineffectiveness."

161.     Charles Daniels was employed from January 17, 2017 through April 6, 2017. The employment range encompassed eighty (80) calendar days, which consisted of fifty-eight (58) work days.

28

162.    Defendant Cynthia Brann, Deputy Commissioner, Quality Assurance (white female) during that same time frame was head of the Office of Policy and Compliance. The State Commission of Correction SCOC, charged with regulatory over site of corrections within the State of New York, reviewed, audited and assessed NYC DOC compliance with State laws, regulations and directives. In all audits, reviews, assessments to include follow-ups during Defendant Brann's tenure, the DOC failed 100% of the time. The highest score achieved in any and all of the aforementioned audits, reviews, assessments or follow-ups was a numerical score of 38.

163.    Despite the foregoing, Defendant Deputy Commissioner Brann, unlike Plaintiffs Daniels, Toulon, and Taylor, was *not* forced to resign or be fired for poor performance, failure to move the bar and overall ineffectiveness. In fact, Defendant Brann was subsequently *promoted* to Acting First Deputy Commissioner, then Acting Commissioner, then to the highest position in NY DOC - Commissioner.

164.    Additionally, Defendant Commissioner Brann was fined $6,000 for improper use of her official City vehicle, which she drove to chic suburban shopping malls and Kennedy Airport.  Specifically, Defendant Commissioner Brann admitted to the serious ethics violations of taking sixteen (16) personal trips (13 to shopping malls and 3 to airports) in a Department car, which was supposed to be used while performing Official duties or commuting between home and work.

165.    As part of the disciplinary action, Defendant Commissioner Brann was required to reimburse the agency $493.67 for the mileage on the vehicle and forfeit eight (8) days of personal leave, worth $5,824.00.

166.    After being fined, forced to reimburse the agency and forfeit personal leave, Defendant Commissioner Brann was then cited for *yet another ethics violation*. Defendant Commissioner Brann also admitted to <u>misusing her DOC position</u> when she attempted to pay the Board-imposed fine she had received. Board fines must be paid with bank check, money order, cashier's check or certified check. After

29

complaining to her subordinate that this form of payment would be difficult for her because she did not have a New York bank account, her subordinate offered to obtain a cashier's check for her to pay the fine to the Board. Defendant Brann provided the subordinate with her personal check and he provided her with a cashier's check purchased though funds drawn from his personal bank account. *COIB v. Brann*, COIB Case No. 2017-156b (2017).

167.    Despite the foregoing, Defendant Brann, unlike Plaintiffs Daniels, Toulon, and Taylor was *not* forced to resign or be fired.

168.    In summary, Defendant Commissioner Brann has failed at every level of leadership within the DOC, repeatedly violated ethics laws at the expense of subordinates and taxpayers, and when caught, claimed ignorance of the rules. Additionally, Defendant Commissioner Brann's performance as Commissioner has been horrific. By any measurement standards, Defendant Commissioner Brann has failed. Serious inmate-on-staff and inmate-on-inmate violence has increased under Defendant Commissioner Brann's tenure although staffing has increased and the inmate population has declined.

169.    Despite the foregoing, Deputy Commissioner Brann, unlike Plaintiffs Daniels, Toulon, and Taylor was not forced to resign or be fired, in fact, she was rewarded with a promotion to the top position within DOCS.

170.    In comparison to Defendant Brann, Plaintiff Daniels, former Senior Deputy Commissioner, is a highly credentialed and experienced leader who served as Complex Warden and Senior Deputy Assistant Director during his tenure in the Justice Department Federal Bureau of Prisons. Plaintiff Daniels was forced to resign under duress even though he was the most experienced executive at the agency, specific to managing predatory, violent and gang directed inmates. Defendant Commissioner Brann had *no experience* dealing with volatile inmates, and never acquired institutional experience at any level. This led directly to Defendant Commissioner Brann's inability to lead as Deputy Commissioner or Commissioner. Defendant

Commissioner Brann is a failed administrator as evidenced by the State Commission of Correction and the Federal Monitor specific to the Nunez Consent Order. A review of any reports published regarding any and all areas for which Defendant Commissioner Brann maintained charged post, during and after Plaintiff Daniels' tenure will demonstrate her well-documented failed leadership.

171.    Despite the foregoing, Deputy Commissioner Brann, unlike Plaintiffs Daniels, Toulon, and Taylor was not forced to resign or be fired for poor performance, failure to move the bar and overall ineffectiveness. In fact, Defendant Brann was given the highest position within the DOC – Commissioner, by the City.

Defendant Jeff Thamkittikasem

172.    Similar to Defendant Brann, Defendant Thamkittikasem's tenure with DOCS has been marred with corruption and violations of ethics standards and polices, including an increase in inmate violence.

173.    Defendant Thamkittikasem was disciplined by the NYC Conflicts of Interest Board, similar to Defendant Brann. The Board fined Defendant Thamkittikasem $4,000.00 for using his take home DOC vehicle for fourteen (14) personal trips, including numerous trips to New York City and New Jersey airports, as well as one trip to Washington, D.C. and one trip to Virginia for personal matters. Defendant Thamkittikasem was also forced to reimburse DOC $1,484.97 for the mileage incurred and forfeited six (6) days of personal leave to DOC valued at $4,800.00.

174.    It has been corroborated by Shirvana Gobin, Deputy Commissioner for Strategic Planning and Management, who worked directly for Defendant Commissioner Ponte, that Defendant Thamkittikasem was knowingly providing inaccurate and skewed information regarding the violence within Rikers Island jails to the Mayor's Office, and inaccurately skewed information regarding the DOC to the Mayor's Office to meet his own agenda.

175.    Despite the foregoing, Defendant Thamkittikasem, unlike Plaintiffs Daniels, Toulon, and Taylor was not forced to resign or be fired for poor performance, failure to move the bar and overall ineffectiveness. In fact, Defendant Thamkittikasem has remained in his Executive Staff position of Chief of Staff, reporting directly to the Mayor's Office.

Defendant Martin Murphy

176.    Similar to Defendants Brann and Thamkittikasem, Defendant Murphy also faced corruption and ethics standards violations.

177.    During Defendant Murphy's tenure as Chief of Department from February 2015 until the time of his resignation in 2017, it is well-documented that violence within Rikers Island increased exponentially, yet Defendant Ponte and Defendant Thamkittikasem continued to keep Murphy on as the Chief of Department, the highest ranking uniform of the DOC.

178.    Unlike Defendant Murphy, Plaintiff Daniels, an African American, was forced to resign for "failure to reduce violence" after serving only approximately eighty (80) days in DOC.

179.    Unlike Defendant Murphy, Plaintiff Daniels had to work on weekends, and responded to emergency situations on Rikers Island throughout his tenure.

180.    Unlike Defendant Murphy, Plaintiff Daniels had his authority usurped since he was never officially introduced in his management title to DOCS personnel.

181.    During his tenure, Plaintiff Daniels personally took the time to train Wardens and Deputy Wardens on incident management, restrictive housing staff, and Assistant Chiefs on quality sanitation and security inspections consistent with American Correctional Association Standards, while Defendant Murphy failed to train said individuals.

182.    Unlike Defendant Murphy, Plaintiff Daniels was told to brief the First Deputy Mayor on violence incidents on Rikers, despite not having any operational authority over the response protocols and incident follow-up.

Turhan Gumusdere

183.    When Plaintiff Keith Taylor was first hired by the DOC, his very first Post-Incident Review meeting concerning a February 26, 2015 stabbing at AMKC occurred on March 5, 2015 at 12:00 pm. At the invitation of Chief Mark Scott, an African-American male executive, Plaintiff Taylor observed the meeting and its attendees. Warden Turhan Gumusdere (white male uniformed executive with an equivalent rank) who was responsible for AMKC security, arrived very late and was completely unprepared for the meeting. Chief Scott was visibly angry and dismissed Gumusdere from the meeting out of what appeared to be disgust for Gumusdere's unprofessionalism, and he gave Gumusdere a verbal reprimand for his lateness and unprofessionalism. Plaintiff Taylor witnessed at this post-incident review meeting how Gumusdere only received a verbal reprimanded with no other repercussions for severely unprofessional behavior.

184.    On March 10, 2015, Gumusdere was reassigned out of AMKC due to a sexual attack of a female officer by a hulking inmate. It further stated that "Turhan Gumusdere was transferred out of the Anna M. Kross Center to supervise the several units including the new Enhanced Supervision Unit, where some of the jail's worst behaving inmates will be housed." Warden Gumusdere was not fired or demoted for the operational deficiencies which allowed the sexual attack on the officer to occur while he was the Warden-in-Charge of AMKC at the time. These facts were also reported in a New York Daily News article dated March 10, 2015 entitled, "EXCLUSIVE: Inmate who helped save Rikers Island prison guard from rape gets beaten by group of fellow convicts for not giving them proper credit."

185.    Prior to this incident, the New York Times, in a September 21, 2014 article titled "Report Found Distorted Data on Jail Fights at Rikers Island," reported the following about then-Assistant Deputy

Warden Gumusdere's performance as a manager at AMKC: "A dozen investigators eventually produced a confidential report, obtained by The New York Times, which concluded that hundreds of inmate fights had been omitted from departmental statistics; … the deputy warden, Turhan Gumusdere, had 'abdicated all responsibility' in reporting the statistics and …should be demoted."

186.   On October 28, 2014, the New York Daily News, in an article titled "Top prison guard prepares to retire as de Blasio appoints 3 to oversight board" stated: "…and another top jail boss, Turhan Gumusdere, [was] promoted despite [his] prominent role[] running the Rikers facility where federal investigators found 'appalling treatment of adolescents.'"

187.   On October 30, 2014, in an article titled "'Infamous' graffiti vandal to head Rikers jail," the New York Post reported: "Turhan Gumusdere, 53, was promoted by DOC Commissioner Joseph Ponte to the top spot at the Anna M. Kross Center — even though Ponte knew about his past" as a "notorious graffiti artist."

188.   Despite the foregoing, Warden Gumusdere continued to be rapidly promoted to Bureau Chief of Security, second only to Chief of Department, the highest ranking uniformed position, even though the violence numbers continued to skyrocket amidst published reports that now-Bureau Chief of Security Gumusdere was actively suppressing the reporting of violent incidents in DOC facilities: "As pressure mounts to reduce violence at the troubled jails, top correction bosses — seeking to create the impression they have turned matters around — repeatedly order underlings to downgrade incidents, a Daily News review of scores of internal documents shows. Knife fights and ugly brawls between inmates, even attacks on officers, often end up airbrushed in the records as routine 'log book entries,' sources familiar with the process say. The main culprit, critics say, is Security Chief Turhan Gumusdere, a man who has faced scandal in the past for distorting data in the jails by deleting hundreds of fights among inmates from the records when he was a deputy warden." New York Daily News, August 28, 2016, "EXCLUSIVE: Rikers

Island correction bosses routinely 'purge' unfavorable violence stats to create illusion of reform, review shows."

189.    After his meteoric rise up the DOC ranks, Gumusdere was eventually allowed to retire, even though the New York City Department of Investigation had an active investigation into his alleged manipulation of violent assault incident numbers in DOC facilities: "A top city jail official accused of ordering underlings to minimize serious attacks on or by inmates has quietly retired as the investigation against him drags on. Security Chief Turhan Gumusdere directed officers to manipulate reports of violent assaults by listing them as routine "log book entries," according to multiple jail sources and records obtained by the Daily News." New York Daily News, August 29, 2017, "Jail official accused of manipulating data on violent Rikers assaults retires amid investigation."

190.    Gumusdere, a male white executive, enjoyed the white privilege and entitlement that allowed him to continually be *promoted six (6) times* from Assistant Deputy Warden all the way up to Bureau Chief of Security, despite the irrefutable fact that violent incidents skyrocketed within DOC facilities during that time, and despite allegations that he was simultaneously engaging in corrupt actions to suppress the actual number of violent incidents occurring within DOC facilities.

191.    During this very same time period, the African American Plaintiffs were *not* promoted for their positive work efforts or performance, and were instead forced to resign.

<u>Gregory Kuczinski</u>

192.    Plaintiff Keith Taylor was hired by DOC in February 2015 to run the Correction Intelligence Bureau, and Gregory Kuczinski (white male executive) was hired as an Assistant Commissioner one month later to work in the Investigation Division.

193.    In many ways, Plaintiff Taylor and Kuczinski have similar backgrounds: Kuczinski retired after 15 years as a Sergeant from the Warrants Division of the NYPD; Plaintiff Taylor retired after 24 years

as a Sergeant Special Assignment from the NYPD's Emergency Service Unit; Kuczinski completed his law degree while working for the NYPD; Plaintiff Taylor completed two masters and a doctorate while he worked in the NYPD.

194.   However, Kuczinski was hired even though he "had little investigative and no internal affairs experience from his police tenure" as compared to Plaintiff Taylor's seventeen (17) years' experience as a decorated Detective supervisor, NYPD management and policy analyst supervisor, Internal Affairs supervisor, and supervisor in the Emergency Service Unit (Special Weapons and Tactics/heavy rescue/hazardous materials/open water rescue/high angle rope rescue/emergency medical technician/trench and building collapse response/ etc.).

195.   Additionally, Plaintiff Taylor had certifications as a FEMA Urban Search and Rescue Planning Team Manager, FEMA Master Exercise Practitioner, and IAEM Certified Emergency Manager.

196.   Within a few months of his hire, Kuczinski distinguished himself with the abuse of Departmental resources, with his subsequent Conflicts of Interest Board ruling noting that "members of the Department found guilty of violating the rules and regulations and engage in conduct unbecoming an employee may be dismissed from the Department or suffer such other punishment as the Commissioner may direct."

197.   According to the NY Times, Commissioner Ponte's punishment was to promote Mr. Kuczinski "to the division's top position… just days after he was rebuked and fined $1,500 for assigning an on-duty subordinate to drive him and his family to the airport for a summer vacation."

198.   In comparison, during Plaintiff Taylor's entire two-year DOC tenure, he violated no departmental, ethical, or criminal rules, regulations or laws. Plaintiff Taylor did this both due to his own moral character and his determination to provide an example of appropriate leadership for the individuals working for and with him.

199.    During this time period, Kuczinski had Departmental financial and personnel resources available to him that Plaintiff Taylor did not have, even though the two were of equivalent ranks with similar roles.

200.    Plaintiff Taylor had to repeatedly ask Kuczinski to sponsor various purchases for the CIB in order to get the specialized investigative items needed.

201.    Additionally, in September 2015, Kuczinski brought the NYC DOI Inspector General to tour the evidence collection and preservation facility that Plaintiff Taylor had recently created in order to, which Kuczinski explained to Plaintiff Taylor later, avoid the release of a damning DOI report which would have exposed the poorly run evidence preservation practices of DOC, which would include the Investigation Division that Kuczinski was responsible for.

202.    According to the NY Times, during Mr. Kuczinski's leadership, the Investigation Division "still suffered from many of the same deficiencies outlined in Mr. Bharara's report three years ago. In a report last month, a federal monitoring team responsible for overseeing the reform effort at Rikers harshly criticized the division, accusing it of failing 'to pursue disciplinary action in cases where there was objective evidence of wrongdoing.'"

203.    In comparison, during the same time period, Plaintiff Taylor's unit had a record number of inmate re-arrests and unprecedented bail amounts of up to and including one million dollars given to inmates for assaults on staff.

204.    Additionally, Plaintiff Taylor created, implemented and accredited the evidence collection facility and hired a forensically trained crime scene team to run the facility. The unit collected and preserved a record amount of over 2,300 pieces of evidence (contraband, weapons, narcotics, uniforms, sexual assault kits, etc.) from Department facilities within its first three months of existence.

205.   Plaintiff Taylor revised CIB protocols that had last been updated fourteen years prior, or created new ones to reflect modern "best practices" investigative protocols.

206.   Plaintiff Taylor created and implemented a joint NYPD-NYCD arrest processing training course, which all CIB arrest officers completed.

207.   Plaintiff Taylor re-established a DOC presence and successful working relationship with a Federal law enforcement multi-agency drug-prohibition program, and created an intelligence analysis team by hiring data scientists, purchasing advanced analytical analysis programs such as STATA, SAS with Enterprise Miner and SPSS, and producing analytical products for executive staff; creating investigator/supervisor/civilian periodic evaluations and procedures, and multiple civilian position tasks and standards both for NYC DOC and submitted for approval by the NYS Civil Service Commission.

208.   Plaintiff Taylor successfully created and implemented a Request for Proposal for forensics laboratory testing services, which resulted in an agency three-year contract worth $2.1 million dollars.

209.   Plaintiff Taylor created a Social Media Team by purchasing specialized software and providing specialized training to CIB investigative personnel to monitor public social media networking venues to uncover criminal activities of inmates who use virtual communities or other social mediums to conspire to or actually commit crimes within DOC facilities.

210.   Plaintiff Taylor created a weekly CIB activity report to provide baseline unit metrics and allow DOC executives to better gauge CIB's arrest and intelligence activity, started a daily phone conference between CIB personnel and facility security staff to share intelligence from a common operating picture, thus allowing for better awareness of and coordination of efforts to fight gang activity, and produced an annual CIB State of Command Report which established unit metrics regarding its arrest, intelligence and investigative activities.

211.    All of the aforementioned efforts, and various others, undertaken by Plaintiff Taylor were conducted even though he had no control over budgetary decisions, including personnel decisions. In contrast, Kuczinski, a male white executive, enjoyed the white privilege and entitlement that allowed him to be promoted from Assistant Commissioner to Deputy Commissioner even though the Investigation Division continued to suffer from the "same deficiencies… [and failed to] pursue disciplinary action in cases where there was objective evidence of wrongdoing."

212.    In September 2016, Plaintiff Taylor was tasked to work with retired NYPD Bureau Chief Douglas Zeigler, an African-American male executive hired by Commissioner Ponte to become a Deputy Commissioner of Intelligence. Zeigler tasked Plaintiff Taylor to work with him to create an expanded mission and role for CIB, which would be given a new title of Analytical Intelligence Department. Zeigler asked Plaintiff Taylor to continue to work as his Executive Officer. By the end of September 2016, the PowerPoint presentation and organization charts were completed for submission to OMB for funding approval.

213.    While awaiting OMB funding, Commissioner Ponte requested that a supervisor and two investigators each from ID and CIB be utilized to start conducting investigations, primarily through the use of phone monitoring. A sixty-day strategic plan was formulated and implemented.

214.    One of the first phone monitoring investigations uncovered a DOI anti-corruption investigation, which was brought to the attention of Defendant Commissioner Ponte to make him aware that the phone monitoring investigation was shut down once it was clear that a DOI investigation was uncovered.

215.    The New York Times reported that "Mr. Ponte had learned of the surveillance in February, after another official [Zeigler/Taylor] had shut it down… but Mr. Ponte did not report the surveillance to the investigation agency [DOI]." Kuczinski was then inexplicably given control of CIB, even though Plaintiff

Taylor had never received any verbal or written notice by Defendant Commissioner Ponte or anyone else in any leadership position of any deficiencies in his performance or the performance of CIB.

216.    In comparison, Mr. Kuczinski was retained as the Deputy Commissioner of Investigations and Intelligence (CIB) by Defendant Commissioner Ponte, even after a subsequent DOI investigation uncovered "DC Kuczinski's vehicle usage for 2016 revealed widespread misuse of his take-home vehicle privileges" for which Kuczinski was fined $1,500.00 for misusing his position and Department resources by having an on-duty Correction Officer transport him and his family in an agency vehicle from DOC Headquarters to JFK Airport for a family vacation, as well as assist with unloading the luggage.

217.    This repeat offense was still not enough for Defendant Commissioner Ponte to remove Kuczinski as Deputy Commissioner of Investigations (and Intelligence).

218.    In comparison, on February 24, 2016 Plaintiff Taylor was told to submit his letter of resignation by Defendant Thamkittikasem, solely because "the Department is going in a different direction; we are giving CIB to Kuczinski."

219.    A few months later, the New York Times reported that "in a long letter to Mayor Bill de Blasio, the Department of Investigation said Mr. Kuczinski and his subordinates violated city rules and regulations by repeatedly listening in on telephone calls between an investigator with the agency and inmates who were serving as informants, several people with knowledge of the letter said… but Mr. Ponte did not… take any action against Mr. Kuczinski, whom he had promoted into his current job."

220.    DOI's public statement about the matter stated the following: "A DOI investigation has revealed that members of Department of Correction ("DOC") staff, including Deputy Commissioner for the Investigation Division and Correction Intelligence Bureau Gregory Kuczinski, engaged in unauthorized surveillance of DOI undercover operations. Specifically, over a period of months this year, DOC staff, including at the direction of DC Kuczinski, used DOC technology to listen to calls placed between DOI and

certain confidential informants.  DOI's investigation demonstrated that this was not inadvertent, but that DOC staff deliberately targeted DOI investigators for surveillance, and that they continued the surveillance even after written directives that such surveillance was to end."

221.   The New York Times reported at the time that "Mr. Ponte, in the face of the accusations against Mr. Kuczinski, defended his deputy commissioner's actions several times. He did so when the investigations agency made the spying allegations and again after Mr. Kuczinski was removed from his internal affairs post and placed on modified duty."

222.   In comparison, Plaintiffs Daniels, Toulon, Taylor, and El-Quir's forced resignations were not prompted by any actions taken by Plaintiffs. The stark comparison between Kuczinki's tenure and dismissal from DOC and Plaintiffs is a prime example of adverse employment treatment and impact and actions based upon race and color, and part of a larger pattern and practice of discrimination, retaliation and hostile work environment against African American male executives.

### FACTUAL ALLEGATIONS - CONCLUSION

223.   Plaintiffs attempted to ignore the discriminatory practices within the DOC. They believed that if they simply continued to excel and receive outstanding evaluations, their accomplishments would eventually be recognized. But after years of being passed over for promotions while less qualified non-African American employees were advanced before them, and having their authority and decision-making power marginalized, circumvented, and usurped, Plaintiffs have come to the painful realization that their race and color matters more to the DOC than their achievements or records of service. The African American Plaintiffs also came to the stark realization that if and when they did not partake in the corruption, cover-up and falsification of statistical data within DOC, their days within the agency became numbered.

224.   Every time Plaintiffs were passed up for desirable assignments, denied transfers into desirable units, given low-visibility positions, had their authority removed from them, and denied the rank

and prestige that comes with promotions, they paid a price. The Plaintiffs endured humiliation, embarrassment and degradation to otherwise stellar careers in law enforcement.

225.    Plaintiffs suffered a powerful emotional toll. Plaintiffs devoted significant time and energy into the DOC and took tremendous pride in their work. However, they have been forced to acknowledge the humiliating and degrading reality that ultimately, their records of achievement, integrity, and lengthy years of service mattered less to the DOC than the color of their skin.

226.    The monetary loss that Plaintiffs and other African American employees in the DOC suffered is great. They lost tens of thousands of dollars each year when they were not promoted, and hundreds of thousands of dollars after being forced to either resign or retire, resulting in significantly smaller pensions.

227.    There is a stark and unjustifiable under-representation of African Americans in the managerial ranks of the DOC. The pervasively discriminatory environment in which Plaintiffs and other African Americans were forced to work has caused them substantial harm and will continue to harm all other African American members of the DOC who are never given the opportunity to advance within it.

**FIRST CAUSE OF ACTION**
(Unlawful Discrimination – Title VII, 42 U.S.C. § 2000e *et seq.*)

228.    Plaintiffs repeat, reallege, and incorporate by reference the allegations set forth in all preceding paragraphs, as if fully set forth herein.

229.    Defendant City is an employer as defined in Title VII, and at all relevant times herein, employed Plaintiffs.

230.    Defendant City discriminated against Plaintiffs in violation of 42 U.S.C. § 2000-e2(a), based upon race and color by denying or delaying promotions, and/or forcing them to resign, therefore giving them less pay and rank as compared to less qualified, non-African American employees.

231.    This discrimination was the result of intentional actions by Defendants, deliberate indifference by Defendants, and/or the result of Defendants maintaining a policy or practice that has a

disparate impact on African American employees, namely a standard-less process that allows non-African American supervisors to retain all power and control, to refuse to promote deserving African American employees, and to relegate African American employees to positions with little to no autonomy.

232. As a result of Defendant City's discrimination, Plaintiffs suffered and continue to suffer damages, including but not limited to lost income, and mental anguish, pain and suffering. They are also entitled to attorneys' fees and costs in the amount of not less than TEN MILLION DOLLARS ($10,000,000.00).

## SECOND CAUSE OF ACTION
### (Unlawful Discrimination – New York Executive Law § 296)

233. Plaintiffs repeat, reallege, and incorporate by reference the allegations set forth in all preceding paragraphs, as if fully set forth herein.

234. The acts described above constitute unlawful discriminatory employment practices that violate Section 296 of the New York Executive Law.

235. Defendant City discriminated against Plaintiffs by failing to promote them, marginalizing them, and forcing them to resign or retire due to their race and color.

236. This discrimination was the result of intentional actions by Defendants, deliberate indifference by Defendants, and/or the result of Defendants maintaining a policy or practice that has a disparate impact on African American employees, namely a standard-less process that allows non-African American supervisors to retain all power and control, to refuse to promote deserving African American employees, and to relegate African American employees to positions with little to no autonomy.

237. As a result of Defendants' discrimination, Named Plaintiffs have been damaged and are entitled to compensatory damages, and attorneys' fees and costs in the amount of not less than TEN MILLION DOLLARS ($10,000,000.00).

## THIRD CAUSE OF ACTION
(Unlawful Discrimination-N.Y.C. Admin. Code §§ 8-101 *et seq.*)

238.    Plaintiffs repeat, reallege, and incorporate by reference the allegations set forth in all preceding paragraphs, as if fully set forth herein.

239.    The New York City Administrative Code is explicit that the City Human Rights Law "be construed liberally for the accomplishment of the uniquely broad and remedial purposes thereof" and that exceptions and exemptions "be construed narrowly in order to maximize the deterrence of discriminatory conduct." N.Y.C. Admin. Code § 8-130(a)-(b).

240.    The acts described above constitute unlawful discriminatory employment practices that violate Section 8-107 of the New York City Administrative Code.

241.    All Defendants unlawfully discriminated against Plaintiffs by denying them promotions due to their race, removing their power and authority as supervisors due to their race and color, providing them less resources due to their race and color, and ultimately forcing them to either resign or retire due to their race and color, therefore giving them less pay, authority, and/or rank as compared to less qualified non-African American supervisors.

242.    This discrimination was the result of intentional actions by Defendants, deliberate indifference by Defendants, and/or the result of Defendants maintaining a policy or practice that has a disparate impact on African American employees, namely a standard-less process that allows non-African American supervisors to retain all power and control, to refuse to promote deserving African American employees, and to relegate African American employees to positions with little to no autonomy.

243.    As a result of Defendants' discrimination, Plaintiffs have been damaged and are entitled to compensatory damages, punitive damages, and attorneys' fees and costs in the amount of not less than TEN MILLION DOLLARS ($10,000,000.00).

## FOURTH CAUSE OF ACTION
### (42 U.S.C. §1983 Against All Individual Defendants)

244.    Plaintiffs repeat, reallege, and incorporate by reference the allegations set forth in all preceding paragraphs, as if fully set forth herein.

245.    All of the acts and conduct of the Individual Defendants and Defendant CITY, by and though its agents, herein stated were done under color of state law, while in the performance of their duties as Supervisors for the DOC.

246.    The facts and circumstances cited above are in violation of Plaintiffs' Fourteenth Amendment right under the Equal Protection Clause of the United States Constitution to be free from retaliation, discrimination and harassment in his employment with the CITY and DOC.

247.    That Individual Defendants actions, as alleged herein, were committed under color of State law.

248.    That Individual Defendants did conspire to violate Plaintiffs' Constitutional rights by actually depriving them of entitlement to promotions, overtime, staffing and to be free of harassment and retaliation within the work place, and other pension rights.

249.    That Individual Defendants did willfully and knowingly make false claims against the Plaintiffs with the intent of causing Plaintiffs to be marginalized, constructively discharged and/or demoted.

250.    That Defendants maliciously and vindictively evaluated Plaintiff's performance in a negative matter solely because of their race and color so that they would be denied an executive staff position within DOC.

251.    That despite Defendants' knowledge that Plaintiffs were well qualified to perform their responsibilities within DOC they nevertheless forced them to endure the aforementioned employment conditions under duress knowing that they were capable of performing the duties of an executive officer

within DOC, Plaintiffs were the victims of wrongful constructive discharge and/or demotion from the DOC and denied the benefits of working for the DOC.

252.    Plaintiffs were denied their Constitutional rights pursuant to the Fourteenth Amendment in violation of their equal protection and due process.

253.    That as a direct and proximate result of the aforementioned conduct of the Individual Defendants, Plaintiffs were deprived of their property rights, all in violation of their rights under the Fourteenth Amendment rights to equal protection and due process under 42 U.S.C. §1983 to the United States Constitution.

254.    That as a direct and proximate result of the foregoing, Plaintiffs sustained injury and damage consisting of loss of property, economic damages, legal expenses and emotional distress for which Defendants are liable.

255.    By reason of the foregoing, Individual Defendants have violated §1983, and Plaintiffs are entitled to economic, emotional and compensatory damages in the amount of not less than TEN MILLION DOLLARS ($10,000,000.00); and punitive damages against the individual Defendants in the amount of not less than TEN MILLION DOLLARS ($10,000,000.00). .

**JURY DEMAND**

256.    Plaintiffs hereby demand a trial by jury in this action.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs request that this Court enter a judgment against Defendants and in favor of Plaintiffs and award the following relief:

(1)    A judgment declaring that Defendants have committed the violations of law alleged in this action;

(2)    An order granting appropriate injunctive relief and declaratory relief for a period of

46

time to be determined by the Court;

(3)     Actual or compensatory damages against all Defendants in an amount not less than

TEN MILLION DOLLARS ($10,000,000.00) for each cause of action;

(4)     Punitive damages against Individual Defendants in an amount TEN MILLION

DOLLARS ($10,000,000.00);

(5)     Reasonable attorneys' fees and costs; and

(6)     Such other and further relief as the Court may deem just and proper.


Respectfully submitted,

*Christopher F. Bellistri*

Christopher F. Bellistri
AVALLONE & BELLISTRI, LLP
*Attorneys for Plaintiffs*
3000 Marcus Avenue
Suite 3E07
Lake Success, New York 11042
(516) 986-2501


TO:   **VIA ECF**
Matthew J. Connahan, ACC
Corporation Counsel of the City of New York
100 Church Street, Room 2-112
New York, New York 10007

# Exhibit V
## of the Proposed First Amended and Supplemental Complaint



# Police Department
# City of New York



Bill de Blasio
Mayor

James P. O'Neill
Police Commissioner

Volume 25  Number 34

*CompStat*

Department of Correction
Citywide

Report Covering the Week
8/20/2018 Through 8/26/2018

### Crime Complaints

| | Week to Date | | | 28 Day | | | Year to Date* | | | 2 Year | 8 Year | 25 Year |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2018 | 2017 | % Chg | 2018 | 2017 | % Chg | 2018 | 2017 | % Chg | % Chg | % Chg | % Chg |
| Murder | 0 | 0 | ***.* | 0 | 0 | ***.* | 0 | 0 | ***.* | ***.* | ***.* | ***.* |
| Rape | 0 | 0 | ***.* | 0 | 0 | ***.* | 0 | 0 | ***.* | -100.0 | ***.* | ***.* |
| Robbery | 0 | 0 | ***.* | 0 | 1 | -100.0 | 1 | 4 | -75.0 | ***.* | ***.* | ***.* |
| Fel. Assault | 2 | 3 | -33.3 | 18 | 32 | -43.8 | 138 | 264 | -47.7 | -61.0 | ***.* | ***.* |
| Burglary | 0 | 0 | ***.* | 0 | 0 | ***.* | 0 | 0 | ***.* | ***.* | ***.* | ***.* |
| Gr. Larceny | 0 | 0 | ***.* | 0 | 0 | ***.* | 3 | 1 | 200.0 | -40.0 | ***.* | ***.* |
| G.L.A. | 0 | 0 | ***.* | 0 | 0 | ***.* | 0 | 0 | ***.* | ***.* | ***.* | ***.* |
| *TOTAL* | *2* | *3* | *-33.33* | *18* | *33* | *-45.45* | *142* | *269* | *-47.21* | *-60.56* | *****.** | *****.** |
| Transit | 0 | 0 | ***.* | 0 | 0 | ***.* | 0 | 0 | ***.* | ***.* | ***.* | ***.* |
| Housing | 0 | 0 | ***.* | 0 | 0 | ***.* | 0 | 0 | ***.* | ***.* | ***.* | ***.* |
| Petit Larceny | 0 | 0 | ***.* | 0 | 2 | -100.0 | 7 | 5 | 40.0 | -12.5 | ***.* | ***.* |
| Misd. Assault | 1 | 0 | ***.* | 1 | 0 | ***.* | 2 | 0 | ***.* | -33.3 | ***.* | ***.* |
| Misd. Sex Crimes | 0 | 2 | -100.0 | 1 | 3 | -66.7 | 8 | 11 | -27.3 | -42.9 | ***.* | ***.* |
| Shooting Vic. | 0 | 0 | ***.* | 0 | 0 | ***.* | 0 | 0 | ***.* | ***.* | ***.* | ***.* |
| Shooting Inc. | 0 | 0 | ***.* | 0 | 0 | ***.* | 0 | 0 | ***.* | ***.* | ***.* | ***.* |

### Historical Perspective

(Historical perspective is a complete calendar year of data.)

| | 1990 | 1993 | 1998 | 2001 | 2017 | %Chg '17 vs '01 | %Chg '17 vs '98 | %Chg '17 vs '93 | %Chg '17 vs '90 | |
|---|---|---|---|---|---|---|---|---|---|---|
| Murder | | | | | | ***.* | ***.* | ***.* | ***.* | Murder |
| Rape | | | | | | ***.* | ***.* | ***.* | ***.* | Rape |
| Robbery | | | | | 4 | ***.* | ***.* | ***.* | ***.* | Robbery |
| Fel. Assault | | | | | 390 | ***.* | ***.* | ***.* | ***.* | Fel. Assault |
| Burglary | | | | | | ***.* | ***.* | ***.* | ***.* | Burglary |
| Gr. Larceny | | | | | 1 | ***.* | ***.* | ***.* | ***.* | Gr. Larceny |
| G.L.A. | | | | | | ***.* | ***.* | ***.* | ***.* | G.L.A. |
| *TOTAL* | | | | | *395* | *****.** | *****.** | *****.** | *****.** | *TOTAL* |

All figures are subject to further analysis and revision. All degrees of rape are included in the rape category.
As of January 2013, complaints occurring within the jurisdiction of the Department of Correction have been disaggregated from the borough and precinct crime totals and are displayed separately on the Department of Correction CompStat page.
Crime statistics reflect New York State Penal Law definitions and differ from the crime categories used by the FBI Uniform Crime Reporting Program. All Crime statistics are translated to Uniform Crime Reporting categories for submission to the UCR Program.

Prepared by
NYPD CompStat Unit

*CompStat*

# Exhibit W
## of the Proposed First Amended and Supplemental Complaint

# AN ASSESSMENT OF ENHANCED SUPERVISION HOUSING



April 2017

New York City Board of Correction

An Assessment of the New York City Department of Correction's
Implementation of Adult Enhanced Supervision Housing

New York City Board of Correction

## DISRUPTIVE ACTIVITY AND OTHER VIOLENCE

Between February 2015 and December 2016, in addition to uses of force, adults in ESH were also involved in other disruptive activities, as recorded in the Department's incident reporting system. [106] Some of these activities came within the Department's definition of "unusual incidents." [107] Others that did not were still logged in Department records made by staff. But because they are not "unusual incidents" they were not deemed reportable under DOC policy.

The most common incident type in ESH were splashings. [108] In all, there were 24 occurrences of splashings associated with ESH inmates during this period. While four of them occurred in conjunction with other reportable incidents, [109] the other 20 splashings occurred independent of reportable incidents, such as a use of force. [110] Of those 20 splashings, half happened in the last four months of 2016 (September through December), and eight occurred in ESH Level 1 units, where inmates were restrained during lockout. None of the 20 splashings happened prior to June 2016.

As of December 31, 2016, there were seven slashing incidents involving adults in ESH, two serious injuries, and zero stabbings. [111] One of the reported slashings in ESH occurred in a new ESH Level 1 unit where inmates are restrained to restraint desks during lockout. In this incident, two inmates got out of their restraints and attacked another inmate who was restrained while using the phone. The victim sustained an abrasion to the right side of his face and right ear and a laceration to his right back side. No weapon was recovered.

In addition, there were five occurrences of spitting and three occurrences of inmates throwing objects. [112] There were also six logbook entries noted in the Department's 24 Hour Reports that did not meet the Department's definition of a "reportable incident," but nevertheless occurred, and appear to involve assaults on or harm to staff. For example, in one incident, an inmate in ESH is said to have exited his cell without authorization and, without warning or provocation, punched a correction officer in the face, resulting in a contusion to the face and a closed fracture to the correction officer's nasal

---

[106] *See supra* note 101 and *infra* note 108.

[107] *See supra* note 101.

[108] "Splashing or [s]plashing [i]ncident: A splashing is any incident wherein an inmate(s) intentionally causes an employee to come in contact with any fluid or fluid like substance." N.Y.C. DEP'T OF CORRECTION, OPERATIONS ORDER 03/17, SPLASHING INCIDENTS, sec. III(D), at 1 (eff. Feb. 15, 2017). Splashing incidents do not come within the definition of unusual incidents. However, unlike other occurrences not classified as "unusual incidents," splashings are unique in that all splashing incidents are documented in the Department's Incident Reporting System (IRS). Splashings are documented as a characteristic of other incidents, not a unique record in their own right. Splashings that occur under circumstances that meet the definition of a stand-alone reportable incident, such as a use of force or other unusual incidents, are documented in the IRS record for that incident. Splashings that occur absent any circumstance that meet the definition of a reportable incident are documented as part of a logbook entry in the IRS.

[109] *See supra* note 101.

[110] These 20 splashings were recorded as logbook entries in the Department's 24 Hour Reports generated from the Inmate Reporting System.

[111] Slashings, serious injuries, and stabbings are defined as unusual incidents and are uniformly reported by the Department.

[112] Spitting and throwing objects do not rise to the level of "unusual incidents" under department policy and are not required to be uniformly reported. The counts presented here were reported as logbook entries in the Department's 24 Hour Reports and may be fewer than the actual number of these occurrences.

bone. [113] In a separate incident, an inmate is said to have flipped a dayroom table and punched a correction officer in the face after being ordered to cease his aggression. These incidents were deemed non-reportable and recorded as logbook entries.

Correction officers working in ESH have expressed concern that inmates in ESH act with impunity. Several correction officers have stated that they are sometimes reluctant to act, even where it is necessary to restore order, because they are afraid action will result in a use of force and employee disciplinary charges. Others reported that the available disciplinary sanctions are insufficient to deter inmate misconduct.

For example, on a recent visit to ESH, a member of the Board's staff was present as several correction officers watched inmates in one of the ESH houses openly smoke marijuana while restrained to desk restraints. Correction officers indicated that their only recourse is notifying the Tour Commander, making relevant entries in the housing area logbooks and behavior logbook, and writing infractions. A correction officer explained that they prefer not to approach the inmates and seize the marijuana cigarettes because it will lead to a use of force. Another commented that correction officers are inconsistent in how they respond to such situations and that sometimes the misconduct is not entered in the behavior logbook, and the infraction paperwork is not generated.

## INMATE INJURIES

Data reported by Correctional Health Services indicate that 43% of all placements in ESH (n=157) had one or more injuries reported during their ESH placement period. Incarcerated people in ESH sustained 346 injuries from February 2015 to November 2016. Nearly one third of injuries were due to DOC use of force (n=100), 15% were a result of self-injury (n=53), and 14% were a result recreational activity (n=49).

---

[113] It appears that because bone fractures do not come within the definition of "serious injuries" to staff, this incident was deemed non-reportable and therefore recorded as a logbook entry. See also supra note 102.