# Exhibit DD
## of the Proposed First Amended and Supplemental Complaint



STATE OF NEW YORK • EXECUTIVE DEPARTMENT
**STATE COMMISSION OF CORRECTION**
Alfred E. Smith State Office Building
80 S. Swan Street, 12th Floor
Albany, New York  12210-8001
(518) 485-2346
FAX (518) 485-2467

CHAIRMAN
Thomas A. Beilein

COMMISSIONERS
Phyllis Harrison-Ross, M.D.
Thomas J. Loughren

July 28, 2014

Honorable Joseph Ponte, Commissioner
New York City Department of Correction
75-20 Astoria Blvd.
East Elmhurst, NY 11370

Notice of Violation: 9 NYCRR Part 7006 - <u>Discipline</u>

Dear Commissioner Ponte:

It has come to the attention of the Commission of Correction that the New York City Department of Correction has a large number of inmates who, despite being found guilty of violating one or more rules of conduct and receiving a disposition that includes a period of punitive cell confinement, remain in the general population of various Department facilities well beyond the adjudication of their disciplinary charges.

For the purpose of clarification, the inmates being referenced here are those who have been afforded due process through a properly conducted disciplinary hearing, subsequently found guilty of one or more rule violations and given a disciplinary sanction that includes being placed and kept in their individual housing units apart from the general population of the facility.

<u>Violation</u>

The Commission views this situation to constitute a violation of 9 NYCRR Part 7006 <u>Discipline</u> which states in pertinent part:

§7006.1 **Policy.** In order to promote the safety, security and welfare of all inmates and staff within local correctional facilities . . . a system of inmate discipline (shall be maintained) . . . to set standards of appropriate behavior, encourage self-control and punish misbehavior fairly, impartially and consistently.

Delaying imposition of sanctions indefinitely undermines both the legitimacy of the Department's disciplinary program and the ability of staff to meaningfully enforce the Department's rules of inmate conduct. It by no means punishes misbehavior fairly, impartially or consistently. Allowing violent and otherwise serious rule offenders whose offense(s) warrant confinement away from the general population to continue at large in

the general population threatens the general safety and security of the facility and the well-being of inmates and staff alike.

While 9 NYCRR, §7006.9(b). does permit a hearing officer to hold the commencement of a sanction in abeyance for a period up to 30 days in order to assess the behavioral adjustment of the inmate, indefinite suspension clearly was not the intention of the hearing officers in the cases referred to here. The Commission interprets its regulation to mean that timeliness is an essential element of due process, fairness, impartiality and consistency. There can be no reasonable penological objective or administrative rationale that justifies the current practice of delaying the start of cell lock-in sanctions for over 800 inmates.

Please be advised that Correction Law §§137 (5) (6) and §500-k authorizes the Commissioner of the New York City Department of the Correction to house inmates in the manner necessary for purposes of maintaining order and discipline, including cell confinement. Moreover 9 NYCRR § 7006.7, Discipline, provides for administrative segregation (confinement) pending a disciplinary hearing for any inmate "who threatens the safety, security and good order of the facility . . ."

Please note that §§137 (5) (6) pertains to the treatment of inmates in a state facility and is incorporated by reference in §500-k as being applicable to inmates confined in jails. This latter section further stipulates that the reporting requirement contained therein appertains to the State Commission of Correction.

## Action Required

The New York City Department of Correction shall submit to the Commission of Correction a plan describing how inmates found guilty of violating Department rules of inmate conduct and subsequently given a sanction that includes punitive segregation cell confinement time shall immediately begin serving that portion of the sanction, except in cases where the hearing officer orders that the cell confinement portion of the sanction be held in abeyance in the manner prescribed in 9 NYCRR, §7006.9(b). Within the narrative of the plan, NYC DOC shall include the number of inmates currently in general population, or other forms of special housing, that also have a period of punitive cell confinement as part of a disciplinary sanction that is being delayed due to current departmental policy.

Department officials shall further ensure compliance with 9 NYCRR, section 7006.7 for all individuals charged with a rule violation and who are identified as being a threat to the safety and security of the facility during the period immediately following the alleged incident. Such individuals may be immediately confined pending a

3

disciplinary proceeding. Officials shall document with a written statement the reason(s) for such a determination.

Inmates cell-confined for a period in excess of 24-hours is entitled to:

- A shower and access to shaving facilities once every three days;
- one hour of daily exercise;
- a daily health check by medical staff, the findings of which the department must submit in a weekly report to the NYS Commission of Correction
- regular visitation pursuant to 9 NYCRR, section 7008.3 unless the imposed sanction includes the loss of up to one hour of visitation per week pursuant to 9 NYCRR, section 7006.9(a)(7). (*visitation shall mean contact visitation unless otherwise noted*)

The required plan for addressing the issue pertaining to the commencement of cell confinement time shall be submitted to the Commission on or before August 27, 2014.

The Commission of Correction shall continue to work with the New York City Department of Correction to further address this and other areas of compliance concern. Please feel free to contact my office if you have any further questions regarding this or any other matter.

Sincerely,

Thomas A. Beilein
Chairman

cc:   Errol Toulin, NYCDOC
      Ron Greenburg, NYCDOC
      William Benjamin, SCOC

To whom it may concern,

When responding to this letter, I am requesting that you enclose this tracking slip. This will assist my staff to direct this matter to the proper person for action and will help track the flow of information between the Commission and your agency so that all correspondence can be handled in a timely manner. Thank you for your cooperation in this matter.

Mailed   :7/28/2014
Required Return Date:  8/27/2014
Access Number: 5035
Agency: New York City Department of Correction
Ref:    Notice of Violation: 9 NYCRR Part 7006 - Discipline

Notes: Kinney

Thomas A. Beilein
Chairman

# Exhibit EE
## of the Proposed First Amended and Supplemental Complaint

# Correction Officers' Benevolent Association, Inc.

*"Patrolling the Toughest Precincts in New York"*



**ELIAS HUSAMUDEEN**
President

**JOSEPH BRACCO**
1st Vice President

**ELIZABETH CASTRO**
2nd Vice President

3rd Vice President

**MICHAEL MAIELLO**
Treasurer

**AMELIA WARNER**
Financial Secretary

**THOMAS FARRELL**
Legislative Chairman

**KENYATTA JOHNSON**
Corresponding Secretary

**KAREN BELFIELD**
Recording Secretary

**BENNY BOSCIO**
Sergeant At Arms

**ALBERT CRAIG**
First City-Wide Trustee

**ANGEL CASTRO**
Manhattan Borough Trustee

,NIEL PALMIERI
Bronx Borough Trustee

**FREDERIC FUSCO**
Queens Borough Trustee

**PAULETTE JOHNSON**
Brooklyn Borough Trustee

**BISHOP WILLIAM
RAYMOND WHITAKER II**
Chaplain

**VINCENT COPPOLA**
Retiree Consultant

**KOEHLER & ISAACS, LLP**
COBA Attorney

75 Broad Street, Suite 0810
New York, NY 10004
t. 212.274.8000
f. 212.274.8255

COBA Satellite Office
77-10 21st Avenue
East Elmhurst, N.Y. 11370
t. 718.545.COBA (2622)
f. 718.545.2668

COBANYC.ORG

August 3, 2016

Joseph Ponte, Commissioner
New York City Department of Correction
75-20 Astoria Boulevard
East Elmhurst, New York 11370

Dear Commissioner Ponte:

When three hundred ninety-four (394) Correction Officers are assaulted in a six (6) month period as the Department of Correction reported to the New York Times, this is not cause for celebration but a call to action. What the Department and City praise as substantial progress, we see as three hundred ninety four (394) officers, men and women, who every day put their life on the line without adequate protections to prevent these assaults. What adds insult to these injuries, is the Department's and City's failure to acknowledge its lack of a strategic plan to ensure these violent inmates are not allowed to repeat their actions by placing them back in the same situation that allowed them to be assaultive in the first place. What the Department and the City cannot see is crystal clear to the Correction Officers Benevolent Association (COBA). The Department's position, whether truly believed, or forced upon them by the Mayor's office and the Board of Correction, in regards to the use of punitive segregation is simply put, dangerous to Correction Officers.

The reduction of days, from ninety (90) to thirty (30), that an inmate can be placed in punitive segregation is ineffective to deter violent inmates from repeating their violent actions. To be clear, the COBA is not calling for the placement of inmates that violate Department rules into punitive segregation in every situation. While it is up to the Department to properly manage the agency and determine penalties for inmates who do not comply with the Department's rules, there are certain offenses, such as an assault on a Correction Officer that must result in the assaultive inmate being placed in punitive segregation for a significant period of time. If after up to ninety (90) days in punitive segregation the inmates behavior hasn't changed or been modified, he/she should be turned over to the Department of Mental Health for evaluation and treatment. Without a more effective change in the use of punitive segregation, the COBA demands the following action be taken.

Effective immediately, any inmate who assaults a Correction Officer must be removed from the custody of the DOC and housed in another jurisdiction. Furthermore, it is our position that that jurisdiction should be one that has, as a deterrent to violence, the full use of punitive segregation for assaultive inmates. Our demand is not made because the members of the COBA, the best Correction Officers in the nation, do not want to perform their sworn duties of care, custody and control of the inmates detained by the Department. Our demand is not made because the members of the COBA are not willing to adapt to new ideas or strategies in criminal justice reform. We are making this demand because the Department's policies have created a dangerous environment and the current policies in place have not been effective in stopping the violence, in fact the violence has even gotten worse.

As you are aware the Department has historically sent inmates to other jurisdictions for various reasons and they should do so now since providing either unwilling or unable to protect Correction Officers. By this action, the Department and City would be sending a clear message to inmates that they do not have free reign to assault Correction Officers.

Elias Husamudeen
President





**CORRECTION OFFICERS' BENEVOLENT ASSOCIATION, INC.**

"PATROLLING THE TOUGHEST PRECINCTS IN NEW YORK"

ELIAS HUSAMUDEEN

JOSEPH BRACCO

ELIZABETH CASTRO

MICHAEL MAIELLO

AMELIA WARNER

THOMAS FARRELL

KENYATTA JOHNSON

KAREN TYSON

BENNY BOSCIO

ALBERT CRAIG

ANGEL CASTRO

DANIEL PALMIERI

FREDERIC FUSCO

PAULETTE BERNARD

BISHOP WILLIAM
RAYMOND WHITAKER II

WILLIAM KWASNICKI

KOEHLER & ISAACS, LLP

February 9, 2018

Cynthia Brann
Commissioner
New York City Department of Correction
75-20 Astoria Blvd.
East Elmhurst, NY 11370

Dear Commissioner Brann,

    As President of the Correction Officers Benevolent Association, I have watched with, great disappointment, the continued struggles of the Department of Correction. I have listened to the constant rhetoric of government officials, outside consultants, federal monitors, corporations with their own agendas and the news media denigrate the officers of the New York City Department of Correction. While there has been much talk, there has been little accomplished. The time to end this cycle of insanity is now. The safety and security of every officer, every civilian and every inmate is at stake. The time has come to engage in serious conversations, to put egos and ideology aside, and act in the best interests of the citizens you have sworn to serve.

    I have attached to this letter an outline of what we believe to be a path to a safe and secure environment within every facility operated by the New York City Department of Correction. I hope you will take the time to carefully read our proposals. I also will be asking you, in the near future, to attend a summit of stakeholders so we can meet and discuss ways to improve the safety, security and the overall mission of the Department of Correction.

Sincerely,

Elias Husamudeen
President



# INTRODUCTION

*It's been said that the definition of insanity is doing the same thing over and over again and expecting a different result.*
*It's also been said that we reproduce what we don't resolve.*

The Department of Correction is guilty of both these principles. First, the Department of Correction is still attempting to resolve the issue of jail violence through the creation of so called specialized inmate housing units/programs. However, regardless of whether we call them restrictive housing units, enhanced supervision housing, enhanced housing, transitional-restorative units, secure unit, enhanced supervision-restart, these housing units have done nothing to decrease jail security during the last four years. Further, in many cases, these units and how they are run have led to an <u>increase</u> in jail violence. The Department of Correction thinks that the mere creation of housing units/programs with fancy names somehow means they are creating something different or new. <u>**They are not.**</u> They have changed <u>nothing</u> during the last four years and continuing these units/programs and expecting a change is the definition of insanity.

Second, despite the fact that these units and other "reform policies" have been in place for four or more years, very little progress has been made to ensure jail safety. (Mayor's Management Report 2013-2017). Correction Officers, staff and inmates continue to be assaulted at alarmingly increasing rates on a daily basis without accountability or sanctions placed upon the inmates committing these assaults (Federal Monitor's Reports I-IV). The Department of Correction has been unable to lower the violence across every major category. (Mayor's Management Report 2013-2017). Astoundingly, despite a clear record of these policies, the Department of Correction continues to stand by them and have not developed any new or effective initiatives. Thus, the Department of Correction has failed to learn from recent history and continues to repeat its mistakes --- at the expense of Correction Officers, staff, inmates, and the public.

Correction Officers have been doing this job for decades. We've been dealing with the same population for decades. We are dealing with an age-old problem (jail violence) that is not new to anyone, except to those who have never faced it. Thus, Correction Officers deserve leadership that understands how to deal with an age-old problem in different ways. The Department deserves leadership that can not only think outside of the box, but can also think inside of the box as well. It deserves leaders and managers who are not pre-programmed with an ideology that has accomplished zero results. It deserves leaders that will actually work to accomplish what should be the Department of Correction's number one priority:  safer jails.

We believe the foremost reason the Department of Correction has been unable to reduce the violence in the jails is because it has failed to implement deterrents to criminal behavior in the absence of punitive segregation, and continues to implement faulty policies that only serve to embolden those that would do us harm. Simply put, inmates should be held accountable when they violate the law or rules established to maintain safe jails.

So far, there's been a lot of talk about solving the problem and that's great; everyone's been great at talking about it. But, virtually **no one** has been able to actually fix the problem. More resolve must be shown for the Officers behind the gate. For four years, the Department of Correction has churned out policies that look good on paper and present good optics to those on the outside but it's been a living hell to those subject to these policies --- both Correction Officers, civilians and inmates alike.

Here are some of the other things the Department of Correction has failed to effectively address in the last four years:

- Making each individual jail accountable for its own problematic inmates.
- Empowering Wardens to be responsible for running their own facilities
- Creating more front-line supervisors, specifically Captains and ADWs

The one light of hope in these dark times is that the Department is now re-arresting inmates who commit criminal acts and the Bronx DA is now prosecuting inmates who commit acts of violence while in jail. **However, we cannot rely on the DA's office to address the root causes of the problem.** That responsibility falls on the Department of Correction and the solution begins with *disciplinary sanctions and restrictive measures for inmates when rules are broken or not adhered to.*

**Case in point:** *On January 21, 2018, inmate Kaymel Taylor, 20, was accused of slashing another inmate. He slashed former inmate Joseph Troiano, 28, who needed 22 stitches to close a 6-inch slash across his face. Inmate Taylor, 20, because of his age, cannot be placed in punitive segregation. Although he will be re-arrested, he can only be placed in programs such as ESH, TRU, Secured Unit and Second Chance which are void of any real disciplinary sanctions to address the reason for being placed in such a program. He will still be allowed Visits, Commissary, Barbershop, Law Library, Recreation, Property, Telephones, Television, Religious Rights, Attorney Access, Mail, Magazines, Newspapers and Packages. **The Board of Correction's Rules and the Department of Correction's own misguided policies are responsible for allowing him the opportunity to cut another inmate. Because OF HIS AGE, he can't be segregated from other inmates. It defies logic that there are more restrictions placed on Correction Officers rather than on violent inmates who commit crimes while incarcerated.***

## OVERVIEW

The Department should no longer look outside of itself to fix its problems. It shouldn't have to outsource the management, operations, and control of our agency to private companies exacting large price tags who don't know anything about jailing. The Commissioner and uniformed managers needs to take responsibility and ownership of the Department and not be bullied into doing something that fully jeopardizes the safety and security of the jails. It also needs to use what they have available to address the behavior of the inmates in our custody before we create more programs and policies that in the last four years have been proven unsuccessful in ensuring our number one priority: safer jails.

The Commissioner of the New York City Department of Correction is authorized by Sections 389, 623 and 1043 of the City Charter and Section 9-114 of the Administrative Code to adopt rules relating to the management of the Department of Correction facilities and the conduct of inmates in such facilities. However, a review of Directive 6500R-D entitled "Inmate Disciplinary Due Process" as well as a review of the "Inmate Rule Book "reveals that the department has failed to enforce its own written policies, thus leaving line staff without any means, support or recourse when dealing with inmates who commit infractions and violate Department rules.

Recently released **Directive 4495 "Solo Housing",** which sets forth the reasons an inmate may be placed into solo housing, <u>nowhere</u> mentions as a basis for placement into solo housing violent acts by adolescents and young adults who against Correction staff. The only criteria in regard to violence, addresses violence against other inmates, or fear of reprisals from violence from other inmates. See Section IV (A) (1) a-e.

**Former Department of Correction's policies expressly made clear that inmates would be accountable for violating the rules of conduct or law.** Use of Force policy #5005 dated 8/30/90 stated; *"The Department expects all inmates to obey the law and Department/Facility rules of conduct. Those inmates who do not comply with the rules face disciplinary sanctions including punitive segregation and/or the loss of good time. Those inmates who violate the law also face arrest and criminal prosecution".* For some reason this common-sense statement reflecting New York State Law was removed from the new Directive.

Although this policy has been superseded, in no way should anyone think the same expectations of accountability do not apply. However, the Department's ***current*** policies leave much to be desired in terms of inmate accountability.

3

When an inmate violates the jail rules, the process available to the department is detailed in Directive 6500R-D (Inmate Disciplinary Due Process), Section III "Procedures". Under this policy, if inmate infractions are proven, the recourse is the following:

1) Reprimand
2) Loss of privileges
3) Loss of good time if sentenced
4) Punitive Segregation for up to thirty (30) days per each applicable individual charge
5) Restitution for intentionally damaging or destroying city property, a twenty-five ($25) dollar disciplinary surcharge will be imposed on all inmates found guilty of a Grade I or Grade II offense, as found in Directive 6500R-D (page 20) and in Inmate Rule Book (10/12/2007) under penalties 1-05.

There are no other *disciplinary* sanctions placed upon inmates' privileges who commit infractions and crimes while incarcerated.   Inmates have the privileges of Law Library, Recreation, Property, Visits, Telephones, Television, Religious Rights, Attorney Access, Mail, Magazines, Newspapers, Packages and Commissary.  Thus, regardless of the violence or crimes an inmate commits while in jail, none of their privileges are revoked and if they are, it is done in only very narrow circumstances or with unreasonable stipulations *from the Board of Correction and at times the Department of Correction itself* that renders it an ineffective means of punishment. The clear lack of collaboration between the Board of Correction and the Department has resulted in a dilemma that has *increased* violence.

*Indeed, the New York State Commission on Correction has previously issued violation letters to the New York City Department of Correction for the failure to properly punish violent inmates.* This was during this very administration. And yet, the backlog of inmates who – after due process hearings- continues to owe time in segregation at staggering rates.

4

## PROPOSALS

### COBA PROPOSAL #1: Inmate Disciplinary Sanctions on Inmate Privileges

In an all-out effort to reduce violence while holding inmates **accountable** for committing crimes and infractions during incarceration, COBA recommends placing disciplinary sanctions upon inmate privileges. We recommend that the Department of Correction Task Managers with effectively and judiciously utilizing the existing inmate discipline measures and analyzing their effectiveness. They should begin tracking COBA's proposed sanctions in like manner to those indicators tracked on the Monthly Facility Management Reports so that their effectiveness can be comparatively evaluated. The use of COBA's proposed inmate disciplinary sanctions will serve as a powerful deterrent – the sheer perception to the inmates is that it is just not worth it to engage in such activity. *If inmate disciplinary sanctions have their desired effect, either in whole or in part, we can envision a Department with less restrictive housing, greater compliance, fewer injuries to staff and inmates, and a real change in morale and culture.* Implementing these disciplinary sanctions may even have an impact on recidivism.

#### By way of a few examples:

##### Visits

We must consider that certain aspects of the Board of Correction Minimum Standards and Directive 2007R-C, "Inmate Visit Procedures", effectively work against the Department and its efforts to deter violence and directly puts staff, visitors and members of the public at risk. The Department cannot limit or deny a visit to an inmate or visitor unless the criminal act is committed (or reasonably expected to be committed) in conjunction with a visit.

We can only limit or deny a visit if a litany of parameters is met and then there is the appeal process where the Board too often acts as an inmate/visitor advocate than an objective entity.

The Board must relax the constraints put on the Department and permit it to temporarily suspend visits even in cases where the inmates offending act of is not directly or indirectly in conjunction with the visit. This type of inmate disciplinary sanction will serve as a powerful deterrent. This will help to send the message that it is just not worth it to engage in acts the violate inmate rules. It may even have an impact on recidivism. *That would be a great joint Board of Correction-Department of Correction initiative that would have a direct impact on safety.* The impact we can have here is beyond measure.

5

Telephones

Let's consider telephone use by the detainee population.  The Board mandates that detainees be permitted one call per day at a minimum of six minutes per call.  Beyond arguably the right to speak by telephone to counsel, phone use is a privilege.  This privilege should be curtailed when inmates commit acts of violence. Such action would serve to deter violent criminal activity.

**The Department should be able to deny or limit access to telephones for rule violations.**

Haircuts

Currently, the Board of Correction mandates that inmates must be afforded haircuts. It does not, however, stipulate where and when these haircuts take place. The Department of Correction should be able to remove the privilege aspect of taking a trip to the barbershop.

**We recommend that when found guilty of rule violations, inmates be charged for haircuts except when going to court.**

Commissary

Commissary access is a privilege.  Immediate sanctions to deny commissary access to any inmate who commits any act of violence should be implemented or commissary being limited to personal hygiene products.  Such denial should be extended for violent acts committed during a denial period.

**We recommend that the Department implement disciplinary sanctions to deny commissary access for inmates that violate Department rules and regulations.**

Recreation

Currently, the Board of Correction mandates, "recreation may only be denied only upon conviction of an infraction for misconduct on the way to, from, or during recreation." This rule is outdated. As a deterrent to violence, the Department needs to have the ability to deny or limit recreation for any violation of inmate rules.

**We recommend the Department of Correction have the ability to deny or limit recreation as a disciplinary sanction for violation of inmate rules and regulations.**

<u>Law Library</u>

The COBA does not seek to limit or deny any inmate the right to legally defend him or herself. We believe the Board's current rule that inmates be permitted access for at least two hours each day the law library is open to be sufficient. Currently the Department of Correction may only deny access to the Law Library for disrupting the orderly function of the Library or using it for a purpose other than for what it is intended. Even if an inmate is prohibited from physically accessing the Law Library, the Board permits the Department of Correction to develop alternate access to legal materials for effective legal research. The Department of Correction needs more latitude to effectively deter the violent inmate.

**We recommend the Department of Correction be able to deny or limit access to the Law Library for rule violations even if such violations do not occur in the Library itself.**

<u>Disciplinary Sanctions for Splashing and Spitting Incidents</u>

While no crimes against a Correction Officer should be tolerated, particularly egregious and sadly frequent are splashing and spitting incidents. To be clear these are incidents where inmates assault Correction Officers with hot water, saliva, urine, semen, and feces. The Board and the Department must take these incidents seriously and impose serious deterrence measures like the above proposed inmate disciplinary sanctions. The Department of Correction needs to be able to sanction an inmate's use of telephone, recreation, visits, law library, and haircuts when an inmate subjects our staff to potential pathogens. *Inmates who splash or spit on staff should be denied everything except basic minimum standards for a finite period of time.* Only this way will the Department of Correction be able to truly stop the increasing incidents of spitting and splashing.

## COBA PROPOSAL #2: Restoration of Punitive Segregation in Limited Circumstances

The City of New York widely publicized its goal of "reforming" the Department of Correction. One of these "reform" measures was to eliminate the use of punitive segregation --- a tool widely misrepresented as solitary confinement ---- for 16-21-year olds. The use of punitive segregation for the adult inmate population over age 21 was also severely limited. *We do not seek to debate the pros and cons of punitive segregation.* However, the elimination and limitation of punitive segregation has directly led to an increase in violence (as reported in the Mayor's Management Report 2013-2017). The problem is clear: in an unbelievable display of poor management and oversight both the Department of Correction and Board of Correction eliminated punitive segregation – an effective violence deterrence tool --- **without a plan to fill the void** that was **left**. The Department of Correction failed to implement any alternate measures that could effectively deter violence and violation of the rules. *Programs such as Secured Unit, ESH, the Transitional Restorative Unit (TRU) or Second Chance* are void of disciplinary sanctions and fail to address the underlying reason for why an inmate is being placed in such programs or units. *Thus, the Department of Correction's mission to reduce the use of punitive segregation has actually empowered inmates to further commit crimes while incarcerated because they know that there is no further penalty, accountability or deterrent to his/her unlawful behavior beyond being detained in jail or criminally prosecuted.*

COBA recommends that the Department of Correction consider reinstating some form of punitive segregation for 19 to 21-year-old inmates in very limited circumstance – against those who commit serious offenses. We recommend this measure be used only when absolutely necessary and for the shortest duration and in the least restrictive manner possible. We also ask that its use be coupled with what we refer to above as "inmate disciplinary sanctions". For example, if inmate disciplinary sanctions don't work then and only then should punitive segregation be used on inmates 19-21 years of age. *Further, if punitive segregation doesn't work inmates (regardless of age), should be removed from our custody and turned over to the DOH/MH or a separate facility should be created to house them.* This facility should be operated by the DOH/MH and other health care professionals with Correction Officers providing security and escort only (Los Angeles has a model of such a facility).

8

## COBA PROPOSAL #3: Inmate Idleness Reduction

As an incentive and deterrent, COBA recommends that the Board of Correction consider standards for idleness reduction for inmates. Too often Department of Correction programs come and go with little measurable effect. In fact, the Department of Correction implements many of its programs in a bubble. Further, we understand that the Department of Correction has earned a less than optimal track record for submitting Monthly Management Reports in a timely and accurate manner and has been reluctant to enact measures to truly measure program effectiveness. We urge the Board of Correction to hold the Department of Correction accountable for that.

*If programs are to be continued, we need programs that will stand longer than any one administration and provide stability for staff and inmates.* The Department of Correction should mandate programs that foster teamwork and good sportsmanship.

## COBA PROPOSAL #4: Other Disciplinary Sanctions

There are many other disciplinary sanctions such as 1.) Being locked in their cells for 4, 6, 8 hours or an entire tour 2.) Receiving a non-contact visit for a specified number of times and other disciplinary sanctions to be explored by all parties involved.

## COBA PROPOSAL #5: A Summit of all Stakeholders

While we believe that our overview accurately reflects how to improve the security and safety for Correction Officers, staff and inmates alike, it is time for all the stakeholders to be in the same room, at the same time to discuss these issues of great importance. Through real conversation and dialogue, we are confident we can obtain great results and stop the insanity. In the near future we will be inviting each of you to attend a meeting of all stakeholders to address these issues.

**In closing, we urge you to say "NO" to the current slate of failing programs and policies, and say "YES" to true progress as embodied in COBA's proposals. These proposals are the real deterrents. These proposals are real measures that will effectively curb jail violence and increase safety. These proposals will, if given a chance to succeed, have a tremendous positive impact on the New York City Department of Correction. Please give these proposals serious consideration.**

9

References:

Operations Order #04/14 (effective 4/25/14)

Directive 4104R-C (effective 3/24/17)

Directive 6500R-D (effective 10/5/16)

Directive 2007R-C (effective 7/14/17)

Directive 4016R

SCOC Minimum Standards

Board of Correction, Minimum Standards- Section 10

Board of Correction, Title 40 Chapter 1 Correctional Facilities

Federal Monitor's Reports I-IV

COBA's NIC Proposal July 2017

Mayor's Management Reports (2013-2017)

Directive 4495 – Solo Housing

# Exhibit FF
## of the Proposed First Amended and Supplemental Complaint



**CORRECTION OFFICERS' BENEVOLENT ASSOCIATION, INC.**
"PATROLLING THE TOUGHEST PRECINCTS IN NEW YORK"

August 22, 2018

**ELIAS HUSAMUDEEN**
President

**JOSEPH BRACCO**
1st Vice President

**ELIZABETH CASTRO**
2nd Vice President

**KAREN TYSON**
3rd Vice President

**MICHAEL MAIELLO**
Treasurer

**AMELIA WARNER**
Financial Secretary

**FREDERIC FUSCO**
Legislative Chairman

**KENYATTA JOHNSON**
Corresponding Secretary

**DANIEL PALMIERI**
Recording Secretary

**BENNY BOSCIO**
Sergeant-At-Arms

**ALBERT CRAIG**
First City-Wide Trustee

**ANGEL CASTRO**
Manhattan Borough Trustee

**PAULETTE BERNARD**
Brooklyn Borough Trustee

**TYSON JONES**
Bronx Borough Trustee

**MARK MACK**
Queens Borough Trustee

**BISHOP WILLIAM
RAYMOND WHITAKER II**
Chaplain

**WILLIAM KWASNICKI**
Retiree Consultant

**KOEHLER & ISAACS, LLP**
COBA Attorney

Maria Guccione, Esq.
Executive Director
New York City Department of Correction
75-20 Astoria Blvd – Suite 110
East Elmhurst, NY   11370

Re:  WVPL Meeting for 2017

Dear Ms. Guccione:

On behalf of COBA I write as a follow-up to our workplace violence discussion. As in 2017 and 2016 the meeting in July failed to meet the statutory mandate under the workplace violence law, which requires a meaningful discussion between management and labor representatives about workplace violence incidents.

While COBA and other exclusive bargaining representatives from six unions (and District Council 37) were present, conspicuously missing were representatives from other unions traditionally impacted by the excessive violence perpetrated by inmates in the jails.  This may be because they rightfully dreaded the same unhelpful format as in prior years:

1) An arbitrarily abbreviated meeting time period giving the Department time to present but not receive information;
2) A failure to provide any files showing the investigation of even those few cases the DOC wished to discuss;

    a.    there are several entries in the spreadsheet where the "incident type" makes no sense such as "conduct unbecoming" (see entries for 1/5, 2/21,5/13, 6/14,7/13, 10/4, 12/5) or "Adult/GP" (see entry for 11/19) or "UOF Allegation" (see entry for 3/15/17).
    b.    use of force classifications are downgraded (i.e laceration listed as "B" instead of "A" UOF; see entries for 8/8, 9/11, 9/12)
    c.    use of force classifications are still listed as "P" for pending (i.e. entries for 3/18, 7/22, 7/31).
    d.    uses of force are not classified at all (i.e. listed simply as "UOF" see entries for 1/4, 1/25).



**COBA MAIN OFFICES**
75-01 31st Avenue, Lower Level, East Elmhurst, N.Y. 11370  •  t (718) 545-COBA (2622)  •  f (718) 545-2668

www.cobanyc.org





3) thousands of incidents of inmate violence in an impossible to read spreadsheet; b-a reductionist approach to workplace violence that only deals with "employee on employee" incidents- in contravention of the law and regulations; c-the conspicuous failure to deal with the small percentage of inmates responsible for the largest percentage of violence including "splashing" (throwing or projecting bodily fluids, toilet water or body waste);

As you know, COBA has long held serious concerns regarding the information presented by your office both in form and content. In 2017 you indicated at the meeting that the Workplace Violence program would be revamped - it has not been (and upon information and belief training has not been "refreshed" as called for by the law). You also indicated data capture and collection would improve – it has not (see below). In prior years the uniformed unions have insisted on seeing a correlation between incidents reported to COMPSTAT and the assaults of staff claimed by the Department (i.e. per the DOC 841 in 2017 and 943 in 2016– figures disputed by the unions). DOC continues to ignore this request and has continued to log entries of violence on staff as other than "Criminal Acts" unless that assault involves a non-uniformed member of staff, visitor or contractor. Indeed, many assaults in the COD reports obfuscate the nature of the incidents when listed as "log book entries" rather than even given a number *other than* a UOF tracking number. Since instituting the program the DOC has continued to starve the few doing this important work of resources and support staff. The Department continues to ignore incidents that are not uses of force but are reportable incidents under the law.

In the past COBA has recommended to the DOC Workplace Violence coordinator the restriction of inmate access to boiling water. This was ignored. The classification of inmates by SRG group has long been pointed out as a flash point for violence against staff and similarly has been ignored for years in order to allegedly keep inmate-on-inmate violence down (and who cares if 50 bloods are able to assault and hospitalize COs assigned to their housing unit?). COBA has demanded better evidence gathering and chain of custody involving splashing, a request that has gone ignored. So, too, the prosecution of the inmates who engage in this sort of behavior as the Bronx DA cannot prosecute without evidence that is not collected by the Department. (This, as well as the failure to timely replace uniforms as previously negotiated in the parties' last contract). Indeed, last year we were promised a liaison uniquely to deal with informing members of service of the prosecution stages in assaults of staff – this has not materialized nor the much needed staff in simply keeping track of inmate violence (let alone mitigating it).

COBA MAIN OFFICES
75-01 31st Avenue, Lower Level, East Elmhurst, N.Y. 11370  •  t (718) 545-COBA (2622)  •  f (718) 545-2668

www.cobanyc.org





Finally, although this year we did not get to the DOC's agenda items of "trends" and "mitigation" as summarized in years past, the fact is that the DOC only indicates increases or decreases in violence in abstract "places" – percent increases and decreases across all facilities in the intake, clinic, corridors, visits, mess, law library, CPAS, MO, GP, etc.   These arbitrary designations ignore that it is not a "place" that generically needs to be analyzed by EACH place.  Each clinic.  Each housing unit.  Each MO unit.  After all the Department hardly is analyzing mitigating factors that could be utilized to reduce violence by the most volatile 4% -- thus ignoring the low hanging fruit that should be easy to review.  **We therefore respectfully request results from the information of last years request to review files of named individuals still unanswered, and add thereto the "top 100"** (i.e. by number of listings entered) **from your 2017 spreadsheet.**  Under separate cover we will also list (without copy to other unions for the sake of confidentiality) the names of particular offenders who COBA knows are taking advantage of the lack of repercussions previously faced when punitive segregation existed.

Turning to the data presented: you indicated that the purpose of the meeting was to discuss workplace violence incidents, identify trends in violence, and review the effectiveness of mitigating actions taken.  It is impossible to accomplish this objective when the information presented is a data dump of a year's worth of workplace violence incidents, presented in an illegible spreadsheet, and without any written analysis or written explanation of your findings (something COBA has asked for repeatedly in past WPV meetings).  Moreover, the validity of the data presented is suspect.  As indicated, we found a number of inconsistencies and inaccuracies in your record keeping.  Simply put, presenting a verbal report based on bad information is useless and a waste of our time and yours.

Your team indicated it would review the spreadsheet data, present a revised version with a written summary of your findings (i.e., observations, trends in violence, mitigation steps taken etc.) and meet with us again after Labor Day.  To ensure the concerns raised at the table today are addressed, below is a brief summary of what is necessary and useful to having a productive conversation the next time we meet. <u>**I have cc'd the other participants from the meeting so they can add to this list in case anything has been left out.**</u>

1.  Have representatives from PESH present at the next meeting.
2.  Identify the bargaining units involved in each violence incident.
3.  Identify the criteria for each type of incident classification that you use.
4.  Ensure the classification is accurate. For example:





    a.   there are several entries in the spreadsheet where the "incident type" makes no sense such as "conduct unbecoming" (see entries for 1/5, 2/21,5/13, 6/14,7/13, 10/4, 12/5) or "Adult/GP" (see entry for 11/19) or "UOF Allegation" (see entry for 3/15/17).

    b.   use of force classifications are downgraded (i.e laceration listed as "B" instead of "A" UOF; see entries for 8/8, 9/11, 9/12)

    c.   use of force classifications are still listed as "P" for pending (i.e. entries for 3/18, 7/22, 7/31).

    d.   uses of force are not classified at all (i.e. listed simply as "UOF" see entries for 1/4, 1/25).

5.   Ensure classification is consistent. For example, splashings are sometimes listed as "AOS", other times as "Log book entry", other times as "criminal acts".

6.   Ensure information is entered in correct column. (i.e. injuries are listed in the wrong column in entries for 5/8, 5/9, and 5/10).

7.   Ensure incidents are sufficiently described so there is a clear understanding of the nature of the violence. For example 2/18/17 entry listed as "AOS" states in one box "conducting a tour" then jumps to "officer walked away." This begs the question – what happened?

8.   Address the issue of treating all assaults on staff as a complaint of workplace violence, rather than those who only use a specific form.

    We look forward to having a more efficient and productive conversation with you and your team. We are available to meet again in the second week of September 2018 depending on the availability of other unions and especially a representative of the DOL. In the interim we anticipate meetings with the other unions and the DOL to address some repeated failings shown by the DOC in missing the statutory and regulatory mark in this important pursuit of safer jails.

                            Very truly yours,

                              /s/

                            Marc Alain Steier
                            Director of Legal Affairs

Cc: Department of Correciton Unions

COBA MAIN OFFICES
75-01 31st Avenue, Lower Level, East Elmhurst, N.Y. 11370  •  t (718) 545-COBA (2622)  •  f (718) 545-2668

www.cobanyc.org





NEW YORK CITY DEPARTMENT OF CORRECTION
**Cynthia Brann, Commissioner**

**Maria A Guccione,**
**Executive Director of Labor Relations**
75-20 Astoria Boulevard, Suite110
East Elmhurst, New York. 11370
718 • 546 • 0857
Fax 718 • 278 • 6421

August 30, 2018

**VIA EMAIL**
Marc Alain Steier, Esq.
Correction Officers' Benevolent Association, Inc.
75-01 31st, Lower Level
East Elmhurst, NY 11370

RE: WVPL Meeting for 2017

Dear Mr. Steier,

I write to you in response to your letter dated August 22, 2018, regarding the workplace violence meeting, which I received via email on August 27, 2018. As you know, 12 NYCRR Part 800.6 requires the employer with the participation of the Unions to "conduct a review of the Workplace Violence Incident Reports at least annually to identify trends in the types of incidents in the workplace and review of the effectiveness of the mitigating actions taken"

At both the 2016 and 2017 annual workplace violence meetings the Department presented the trends in the types of incidents and a review of mitigating actions taken that met the statutory mandate under the law. At this year's annual workplace violence meeting, held on August 9, 2018, the Department's representatives started a presentation of the analysis of trends and the review of mitigating actions taken but the union refused to let them proceed due to various issues raised and asked to continue the meeting in September.

Pursuant to 12 NYCRR Part 800.6 the workplace violence incident reports can be in any format as long as they contain certain specified information. The spreadsheet you have already received contains all of the information, redacted as necessary, in accordance with the regulations. The Workplace Violence Coordinator's Office compiled the data and listed it in an Excel spreadsheet and it was provided to you in April, well in advance of the annual meeting, pursuant to your request. The spreadsheet is in a searchable, sortable and legible format. At the meeting on August 9, 2018, the Department agreed to review the spreadsheet for accuracy and completeness and revise the spreadsheet as necessary. With regard to the columns on the spreadsheet, the Department will keep the current columns, including the one with incident types that are routinely tracked by the Department, but at your request, a column for workplace violence category will be added. It is important to note that, regardless of how an incident is categorized or recorded, workplace violence matters are tracked and appropriately investigated by the Department.

Although the COBA did not send a list of specific incidents that it wanted to discuss, prior to the annual workplace violence meeting that was held on August 9, 2018, as the Department previously requested, at the meeting we agreed to provide information if the union sent such a list sufficiently in

advance of the next meeting in order to afford us ample time to gather it. You indicated that, by Tuesday August 14, 2018, you would forward it to us. To date, you have not provided us with a list of specific incidents, but in your letter you request additional information for the top 100 incidents from the 2017 spreadsheet. It is unclear which 100 incidents you are referring to, but please understand that it is not a manageable number of cases to review at the meeting. The Department has continuously offered to meet with the union and discuss workplace violence incidents. If you wish to discuss specific cases from 2016 that you requested last year, we will be happy to schedule a separate meeting with you.

We share the union's goal of looking at issues and trends to ensure a safe workplace. We will provide a revised spreadsheet and schedule a meeting with the COBA and the other unions in the upcoming weeks to continue our annual workplace violence meeting. With regard to the other issues that you have raised, we are always willing to discuss any workplace violence issues with you at the annual workplace violence meeting or at any other time.

Very truly yours,

Maria A. Guccione
Executive Director, Labor Relations



**CORRECTION OFFICERS' BENEVOLENT ASSOCIATION, INC.**
"PATROLLING THE TOUGHEST PRECINCTS IN NEW YORK"

September 2, 2018

ELIAS HUSAMUDEEN
President

JOSEPH BRACCO
1st Vice President

ELIZABETH CASTRO
2nd Vice President

KAREN TYSON
3rd Vice President

MICHAEL MAIELLO
Treasurer

AMELIA WARNER
Financial Secretary

FREDERIC FUSCO
Legislative Chairman

KENYATTA JOHNSON
Corresponding Secretary

DANIEL PALMIERI
Recording Secretary

BENNY BOSCIO
Sergeant-At-Arms

ALBERT CRAIG
First City Wide Trustee

ANGEL CASTRO
Manhattan Borough Trustee

PAULETTE BERNARD
Brooklyn Borough Trustee

TYSON JONES
Bronx Borough Trustee

MARK MACK
Queens Borough Trustee

BISHOP WILLIAM
RAYMOND WHITAKER II
Chaplain

WILLIAM KWASNICKI
Retiree Consultant

KOEHLER & ISAACS, LLP
COBA Attorney

**Via Email**
Maria Guccione, Esq.
Executive Director, Labor Relations
New York City Department of Correction
75-20 Astoria Blvd – Suite 110
East Elmhurst, NY  11370

**Re:  Failed Workplace Violence Program**

Dear Ms. Guccione:

I write to correct claims in your letter to me of August 30, 2018.  First, I note the disturbing lack of particularized responses to particular allegations from my letter of August 30, 2018 to your office.  As I have previously noted with your predecessors in that office – Isardi, King and Santangelo- (as well as Captain Brown and Patricia Feeney in their various titles) the mitigating actions taken by the Department have been without any impact and essentially are smoke and mirrors.  Hence – the increase of violence against staff in the years since your failed WVPL program by those in the care custody and control of COBA's members.

The first and second paragraphs of your letter concern "trends" the Department has identified in the past.  Contrary to your claims that "the" union "refused to let [the puppet show] to proceed" – the other unions at the meeting had valid questions that your abbreviated meeting could not contain.  One and a half hours to deal with hundreds of assaults on staff?  Ridiculous.

As for your "trends analyses"—they are nonsense; they are false identifiers.  For several years going back to 2015 your most basic trend analyses data points are reduced to such unhelpful "things" as generalized locations ("law libraries" or "clinics").  To be clear, in order to be useful the analyses should focus on granular issues and particular failed policies – i.e. those housed together by Security Risk Groups[1]; Individuals prone to violently act and react[2]; and, the continued failure of the DOC to implement protocols to halt the violence. [3]

---

[1] See AMKC gang assault on a CO in December 2017 and that of CO Souffrant at GMDC in February 2018 – **nothing has changed.**
[2] As we have discussed *ad nauseum*, a small percentage of individuals in custody are responsible for a disproportionate amount of assaults on staff, especially the more egregious ones.
[3] See COBA reducing violence publication, April 2018.

COBA MAIN OFFICES
75-01 31st Avenue, Lower Level, East Elmhurst, N.Y. 11370  •  t (718) 545-COBA (2622)  •  f (718) 545-2668

www.cobanyc.org





Let me attempt to pull back the delusional veil under which the DOC continues to operate.  There is no need for you to respond to these facts and figures as the Billion-plus dollar agency seems not to have an ability to meet the limited resources of this union in doing analysis of violence trends nor stop them.  Moreover, subject to the DOL becoming involved, it has come clear over the past 3 years that the DOC lacks the will to do what it takes to stem the inmate violence without outside intervention.

In 2017 and early 2018 the City DOC was flagged as so violent that the State of New York would not use the jails[4]!  See February 2018 publication of the SCOC: THE WORST OFFENDERS REPORT: THE MOST PROBLEMATIC LOCAL CORRECTIONAL FACILITIES OF NEW YORK STATE[5].  Note the conclusion that (d)espite the prolonged delay in responding to the Commission's evaluation reports, it does not appear on their face that the DOC substantially commenced remedial action . . ..

Also in 2017 Charles Daniels, former senior Deputy Commissioner, and several other current and former high ranking correction employees, filed a federal lawsuit against the City and DOC.  The <u>Daniels</u> suit, Civil Index #17-cv-09960, detailed the DOC's concealment practices and the length to which they went to cover up the violence occurring in the City Jails.  The Daniels suit alleged "corruption, manipulation and falsification was instituted, promoted and required by Defendants." <u>Id.</u> Daniels alleges that he and disgraced Commissioner Ponte met weekly at City Hall to report on jail violence to the Mayor's Office in four categories: 1) inmate on inmate violence; 2) slashings and stabbings; 3) assaults on staff; and 4) fights. At one particular weekly meeting, Ponte became very irate at Daniels for *accurately* reporting that violence was increasing and berated him "for not covering up the violence... ."

Between February 2017 and February 2018, a total of 642 Correction Officers were assaulted by inmates.  Nearly 30% of those assaults resulted in officers being sent to the hospital for "lacerations, punctures, requiring sutures, fractures, internal injuries, broken orbital, fractured jaw, broken/fractured noses, sprain of the hands, wrists, shoulders, ankles, back injuries, or missing teeth."  Although most resulted from officers intervening in inmate on inmate violence—therefore *arguably* a byproduct of "the job" -- many of these incidents were outright assaults on officers.  That is undeniably **not** part of "the job" and what the Workplace Violence Law was enacted to reduce and mitigate.

According to the 2017 and 2018 Preliminary Mayor's Management Report, inmate assault on staff rates rose from 5.9 per 1000 inmates in 2014 to 8.4 per 1000 inmates in 2017 and uses of force rose from 3,779 for 2014 to 4,673 for 2017.   More importantly, serious injury to staff from an inmate assault rose from 0.38 per 1000 inmates in 2017 to 0.46 for a period of four months.

---

[4] https://www.nytimes.com/2017/05/05/nyregion/rikers-island-transferred-inmates.html
[5] www.scoc.ny.gov/pdfdocs/Problematic-Jails-Report-2-2018.pdf

**COBA MAIN OFFICES**
75-01 31st Avenue, Lower Level, East Elmhurst, N.Y. 11370  •  t (718) 545-COBA (2622)  •  f (718) 545-2668

www.cobanyc.org






The Board of Correction (BOC) has recognized the assaultive nature of splashings and even conducted a study of splashings occurring in all DOC facilities during 2017. The report indicates that in 2017, there were a total of 1,335 splashings committed by 744 unique individuals, that 96% of the splashings were against Correction Officers and more than a quarter of splashings (26%) were committed by repeat splashers. However the DOC has not addressed this simple statistical fact even though presented with the BOC's findings in *February 2018 !*[6].

Similarly the DOC has covered-up the violence in the Jails by misreporting the incidences of inmates spitting on Correction Officers. From 2015 until April 2017 Correction Officers have had to endure 374 incidents of spitting. Only when done to a non-uniformed member of staff—such as those incidents occurring on August 2, 2018 involving Nurse Koak and inmate Fonseca or August 16, 2018 involving EMT Stone and Inmate Grant – are they are properly categorized as "Criminal Acts." Does the DOC acknowledge this (possibly criminal) falsification of records to achieve a political result? **No.**

In borough jails alone the numbers have jumped to dangerous levels. According to a May 2018 Daily News article Brooklyn Detention Complex had only 1 stabbing/slashing occurred in the six years prior to 2015, but from 2015-2018 there were 58 stabbings and slashings. The Manhattan Detention Complex had 14 stabbings and slashing from 2009 to 2014; in contrast there were 41 from 2015 to 2018. VCBC had five slashings and stabbings from 2009 to 2014 but had 16 from 2015 to 2018. Indeed in May 2017, VCBC had to be locked down after three different inmate attacks on Correction Officers, one of whom was stabbed in the arm. From 2016 to 2017, the number of stabbings and slashings went up in both the Manhattan Detention Center and Bronx Court facilities, rising from 13 to 17 and 3 to 8 respectively. Has the DOC done anything to mitigate this jump in stabbing and slashing cases? **No.**

In November 2017, it was revealed that an inmate with a long history of viciously assaulting officers called the City's 311 hotline twice, threatening to kill a Correction Officer. The recording revealed that the inmate warned, "I am about to kill one of these officers; I am about to murder somebody." Thereafter, the inmate violently attacked a Correction Officer slamming a cell door into him and beating him senseless. Among

---

[6] "While the Department tracks and publicly reports data on assaults on staff in general, splashings as a distinct type of assault on staff are not currently tracked in a manner that easily facilitates routine reporting or review."
https://www1.nyc.gov/assets/boc/downloads/pdf/Reports/BOC-Reports/Splashing%20Report%20FINAL%20Feb%202018.pdf

COBA MAIN OFFICES
75-01 31st Avenue, Lower Level, East Elmhurst, N.Y. 11370 · t (718) 545-COBA (2622) · f (718) 545-2668

www.cobanyc.org





other injuries, the officer sustained a fractured jaw and teeth displacement.  Has the DOC done anything to mitigate cases where inmates themselves tell you what they intend?  **No.**

The DOC does not investigate assaultive incidents that are categorized as "log book entries."  This is especially true in units such as TRU and other so-called "rehabilitative" housing units.  Notably, other types of incidents that are classified as "log book entries" are mundane and administrative matters such as a leak or loss of equipment.  Moreover, designating assaults on Correction Officers as mere "log book entries" means these assaults do not fall into the reportable categories of jail violence like "assaults on staff" or "slashings."  Again – this has repercussions beyond the DOC as those reporting out to COMPSTAT may be committing false reporting – a crime.  From the COMPSTAT webpage: "(a)s of January 2013, complaints occurring within the jurisdiction of the Department of Correction have been disaggregated from the borough and precinct crime totals and are displayed separately on the Department of Correction CompStat page."

Supporting the Daniels' suit was an expose concerning now retired (on an unlikely ¾ disability pension) Turham Gumusdere.  The *Daily News* confirmed that Gumusdere "...directed officers to manipulate reports of violent assaults by listing them as routine 'log book entries.' " See NY Daily News' Article regarding falsification of violence stats dated 08/29/17.   Indeed, "(k)nife fights and ugly brawls between inmates, even attacks on officers, often end up airbrushed in the records as routine 'log book entries.' " Id. The *Daily News'* investigation reviewed 11 different violence incidents and found that 9 of them were downgraded in severity as "log book entries" in ways that defied logic and clearly intended to downplay the violence that actually occurred.  Id.

Turning back to letter of August 30, 2018 for a moment, it seems you are still misunderstanding the categories of mandated reporting and the requirements of a proper program.  I'll leave you with the actual **REQUIR**ED categories that you claim are covered in that spreadsheet– which are **not** – and in your program – which are **not**:

(2) The Workplace Violence Prevention Program shall include the following:
(i) a **list of the risk factors** identified in the workplace examination;
(ii) the **methods** the employer will use **to prevent** the incidence of workplace violence incidents;
(iii) a **hierarchy of controls** to which the program shall adhere as follows: engineering controls, work practice controls, and finally personal protective equipment;
(iv) the **methods and means** by which the employer shall address each specific hazard identified in the workplace evaluation;






(v) a **system designed** and implemented by the employer to report any workplace violence incidents that occur in the workplace. **The reports must be in writing and maintained for the annual program review;**
(vi) a written outline or **lesson plan** for employee program training;
(vii) a **plan for program review and update on at least an annual basis**. Such review and update shall set forth any **mitigating steps taken in response to any incident** of **workplace violence;**

. . . .

3) Systems for reporting instances of workplace violence.

(i) The employer shall develop and maintain a Workplace Violence Incident Report that can be in any format but, at a minimum, shall contain the following relating to the incident being reported:

(*a*) workplace location where incident occurred;
(*b*) time of day/shift when incident occurred;
(*c*) a **detailed description** of the incident, including events leading up to the incident and how the incident ended;
(*d*) names and job titles of involved employees;
(*e*) name or other identifier of other individual(s) involved;
(*f*) nature and extent of injuries arising from the incident; and
(*g*) names of witnesses.

N.Y. Comp. Codes R. & Regs. tit. 12, § 800.6

I look forward to a Department of Labor audit of this so-called Workplace Violence Program that fails your staff—even as you have millions of dollars to pursue litigation against Correction Officers who seek nothing more than to keep care and custody of jails that are increasingly out of the "control" of you and your fellow managers.

Very truly yours,

/s/

Marc Alain Steier
Director of Legal Affairs

Encl.

Cc:     Department of Correction Uniformed and Non-Uniformed Unions
         Cutrone, DOL

**COBA MAIN OFFICES**
75-01 31st Avenue, Lower Level, East Elmhurst, N.Y. 11370  •  t (718) 545-COBA (2622)  •  f (718) 545-2668

www.cobanyc.org




# Exhibit GG
## of the Proposed First Amended and Supplemental Complaint

# Rikers Island inmate indicted after attacking 3 officers

BY BEN KOCHMAN

NEW YORK DAILY NEWS      Thursday, September 1, 2016, 5:36 PM



Matthew Whittington, 26, has been indicted for
attacking three New York City Department of
Correction officers. (BRONX DISTRICT ATTORNEY)

A Rikers Island inmate has been indicted for attacking three correction officers — sending one to the hospital with a massive
slash wound on his arm, authorities said Thursday.

Matthew Whittington, 26, sucker-punched Officer Malik Medina as he retrieved the prisoner's breakfast tray from his cell at
the jail's West Facility on Aug. 7, the Bronx District Attorney's Office said.

The blow knocked Medina unconscious.

When Officer Corey Hughes heard Medina's hit the ground and went over to help, Whittington whipped out a scalpel and
slashed him across the right arm, authorities said.

The wound required 16 stitches, the DA said.

Officers punched Whittington in the face several times, internal jail records show. They later discovered a scalpel blade
wrapped in black electrical tape in front of the cell.

The night before, Whittington — who jail sources say is a ranking member of the Bloods gang — had punched a third correction officer, causing him to hit his face on a cell door, authorities said.



Officer Corey Hughes required 16 stitches after being slashed by Whittington. (HANDOUT)

Whittington pleaded not guilty in Bronx Supreme Court Thursday to assault, weapons possession and promoting contraband charges. He faces up to seven years in prison if convicted.

The alleged jail menace has been at Rikers for three years, facing several charges, including assault and arson, for incidents in Manhattan, the Bronx and Brooklyn.

Rikers bosses have long struggled to stop contraband from getting into the city's main jail complex. In May, a 17-person crew of inmates, correction officers and even a jail cook were indicted for allegedly running a ring sneaking drugs and weapons into Rikers.

The charges come as Mayor de Blasio was expected to announce Thursday that an elite group of jail officers would be armed with Tasers in a bid to reduce violence at the jail.

Bronx DA Darcel Clark, who has pledged to open an office on Rikers aimed at speeding up justice there, called Whittington's attacks "vicious" and "unprovoked."

"Our public servants should not have to face danger when they go to work each day," Clark said in a statement announcing the charges. "We will not tolerate jailhouse violence."

**WITH REUVEN BLAU**

© 2016 New York Daily News