UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------------------X
CORRECTION OFFICERS' BENEVOLENT ASSOCIATION,
INC., ANTHONY ROMANO, individually
and on behalf of all others similarly situated, BRYAN ASHENDORF
individually and on behalf of all others similarly situated,
and JOHN and JANE DOES 1 – 2,000,

                              Plaintiffs,

**CLASS ACTION**
**FIRST AMENDED AND**
**SUPPLEMENTAL**
**COMPLAINT AND JURY**
**DEMAND**

Case No. 17-CV-2899 (LTS)

               -against-

THE CITY OF NEW YORK, MAYOR BILL DE BLASIO,
NEW YORK CITY DEPARTMENT OF CORRECTION, and
COMMISSIONER CYNTHIA BRANN,[1]

                       Defendants.
-------------------------------------------------------------------------------X

**First Amended and Supplemental Complaint for Declaratory Judgment, Injunctive Relief,**
**and Compensatory Damages**

     Plaintiff CORRECTION OFFICERS' BENEVOLENT ASSOCIATION, INC. ("COBA"), on behalf of its members, ANTHONY ROMANO ("Plaintiff Romano"), individually and on behalf of all others similarly situated, BRYAN ASHENDORF ("Plaintiff Ashendorf"), individually and on behalf of all others similarly situated, (collectively the "Individual Plaintiffs"), and Plaintiffs JOHN and JANE DOES 1 – 2,000 (all parties collectively "Plaintiffs"), by their attorneys, Koehler & Isaacs LLP, as and for a First Amended and

---

[1] By Opinion and Order dated May 30, 2018, which dismissed the Original Complaint in this action in part, this Court substituted Defendant Commissioner Joseph Ponte with current Department of Correction Commissioner Cynthia Brann.

Suplemental Complaint in the above captioned civil action, aver and allege that defendants have violated their Fourteenth Amendment due process right to be free from state created or increased danger and committed negligence under state law as follows:

## INTRODUCTION

1. In recent years, Defendants CITY OF NEW YORK ("City"), MAYOR BILL DE BLASIO ("de Blasio"), the NEW YORK CITY DEPARTMENT OF CORRECTION ("DOC"), and COMMISSIONER CYNTHIA BRANN ("Brann") (collectively "Defendants") and past DOC Commissioners Joseph Ponte ("Ponte") and Dora Schriro ("Schriro"), have been under intense public scrutiny for creating and condoning what the Federal Government called a "culture of violence" within the City Jails.[2]

2. Defendants' mismanagement of the Jails has caught the fervent attention of the Department of Justice, the media, politicians, and various inmate advocacy groups.

3. To quell their critics, Defendants embarked on a Reform Agenda that entailed the repeal or modification of long-standing jail management policies and implementing new practices. Most notably, Defendants negotiated and entered into the Nunez Consent Judgment in settlement of an inmate civil rights lawsuit. The Nunez Consent Judgment vastly altered DOC policies and adversely impacted the terms and conditions of employment of the nearly 12,000 uniformed employees staffing the City Jails.

4. Under Nunez, the nine jails on Rikers Island are now subject to the jurisdiction of the Southern District and the presiding judge in both the Nunez and the instant action, Judge

---

[2] Defendant DOC is an agency of the City of New York charged with the administration of the City's jail system, which includes nine facilities located on Rikers Island in addition to other facilities throughout the boroughs and within two City hospitals.

Laura Taylor Swain. This Court also approved the appointment of Federal Monitor Steve J. Martin to oversee the Consent Judgment's implementation.

5. Defendants justified their sweeping reforms as a means to reduce jail violence and increase safety for both inmates and staff. They claim their policies are sound and succeeding. However, nothing could be further from the truth.

6. Not only have Defendants' so-called reforms actually increased jail violence and compromised safety, but so too have Defendants' intentional attempts to cover-up the fact of this increased risk of harm and the true nature of violence occurring within the Jails.

7. The situation has become so dire that Correction Officers have, with greater frequency than ever before, been punched, kicked, slashed, splashed with urine, feces or saliva, stabbed, head-butted, held hostage, beaten severely, or sexually assaulted by inmates. Since the filin of the Original Complaint in April 2017, inmate assaults on Correction Officers resulted in several slashings as well as serious injuries like a broken back, broken nose, and first and third degree burns.

8. Defendants' so-called reform policies have empowered the most violent inmates and increased the threat they pose to Correction Officers far beyond what is considered a typical risk of exposure to violence inherent in this line of work. Defendants' policy, practice and/or custom[3] of concealing or covering up this increased risk and the true nature, magnitude and frequency of the on-going violence occurring within the City Jails, has increased the danger faced by Correction Officers in the workplace.

---

[3] The use of the word "practice" and its plural also includes the terms "custom and/or policy" and their respective plurals.

9. This increased risk of harm to Correction Officers and inmates alike has been confirmed by nearly every oversight entity or stakeholder --- including the Federal Monitor, the New York City Comptroller's office, New York City Board of Corrections, and Plaintiff COBA --- as well as by the significant increase in personal injury cases brought by inmates and the staggering rise of Workers' Compensation claims filed by injured staff.

10. Defendants' concealment practices, by design, seek to create the illusion that their efforts to reform the "culture of violence" are succeeding; however, their actions have succeeded only in violating Plaintiffs' constitutional rights.

11. The Fourteenth Amendment to the United States Constitution guarantees public employees a substantive due process right to be free from state created danger. That is, a right to be free from any governmental/employer policies, practices and/or customs that increase the risk of bodily harm or death from third parties like violent inmates.

12. As explained more fully below, Defendants' cover-up of violence in the City Jails takes many forms, increases the likelihood of serious bodily harm or even death to Correction Officers, and thus violates the Fourteenth Amendment.

13. From non-reporting, underreporting or misreporting violence against other inmates or Correction Officers, to downgrading violence incidents, to failing to hold inmates accountable for their violent actions, Defendants' "concealment practices" have empowered the most violent inmates and are the proximate cause of the increased risk of harm and the injuries described herein.

14. Indeed, these concealment practices increase the danger faced by Correction Officers because information regarding an inmate's violent institutional conduct directly impinges on inmate classification, inmate housing, whether or not inmate discipline is imposed, the

degree of inmate discipline that is imposed, and the custodial practices and management strategies applied to inmates.

15. Defendants' practices allow violent inmates to be classified as far less likely to cause injury and to be intentionally classified in ways that require less restrictive security measures, less restrictive observation practices, and housing decisions which in turn exposes staff and other inmates to unprecedented level of violent victimization.

16. Accordingly, when the true level of violence is masked and inmates are not subject to the appropriate and necessary institutional measures, Correction Officers are given a false sense of security, are being exposed to a greater level of danger, and are getting injured.

17. Plaintiffs COBA, the Individual Plaintiffs, and Plaintiffs John and Jane Does 1 – 2000, bring this civil action pursuant to 42 U.S.C. § 1983, seeking a declaratory judgment, injunctive relief, compensatory damages, an award of attorneys' fees and costs, and such other relief as this Court deems equitable and just, to remedy the ongoing and continuous violation of their due process right to be free from state created dangers.

18. To properly remedy these ongoing and continuous constitutional violations, the Individual Plaintiffs seek to represent a certified class of affected plaintiffs. The Individual Plaintiffs, individually and on behalf of the class, seek a class-wide judgment declaring that Defendants' concealment practices described herein have and continue to violate the constitutional rights of the class members. The Individual Plaintiffs further request a class-wide injunction preventing the Defendants from continuing to violate their rights.   In addition, Plaintiffs seek compensatory damages, an award of attorneys' fees and costs, and such other relief as this Court deems equitable and just.

## PARTIES

19. <u>Plaintiff</u> COBA is, at all times relevant to this matter, the duly authorized exclusive bargaining representative for the approximately <u>10,000-plus uniformed members</u> holding the title of "Correction Officer," <u>employed exclusively in "institutions under the jurisdiction of the commissioner of the Department of Correction for the safekeeping of persons committed to the Department of Correction."</u> See Section 9-101 of the NYC Administrative Code.

20. Plaintiff Romano is, at all times relevant to this matter, over the age of 18, a Correction Officer employed by the Defendants City and DOC, <u>and a member of Plaintiff COBA.</u>

21. Plaintiff <u>Ashendorf</u> is, at all times relevant to this matter, over the age of 18, a Correction Officer employed by the Defendants City and DOC, <u>and a member of Plaintiff COBA.</u>

22. Plaintiffs John and Jane Doe Nos. 1 to 2000 are individuals currently, formerly, and to be employed by Defendants City and DOC residing throughout the United States, and <u>who have or will</u> sustain harm as a result of the Defendants' unconstitutional practices as described herein.

23. Defendant <u>City is,</u> at all times relevant to this matter, <u>a municipal corporation duly organized and doing business under the laws of the State of New York.</u>

24. Defendant Bill de Blasio is, at all times relevant to this matter, <u>the chief executive officer of the City of New York under Chapter 1 of the New York City Charter and is sued in his official capacity. As such,</u> he is a final policy maker who has adopted, promulgated, implemented, sanctioned or continued the detrimental policies, practices and/or customs at issue here.

25. Defendant DOC is, at all times relevant to this matter, <u>a Mayoral agency of the City organized and existing pursuant to Chapter 25 of the New York City Charter.</u> The DOC maintains jail facilities throughout the City including approximately nine facilities on Riker's Island, as well as facilities within the boroughs, county courts and two City hospitals.

26. <u>Defendant Brann ("Brann")</u> is, at times relevant to this matter, <u>DOC's Commissioner and is sued in her official capacity. She reports directly to the First Deputy Mayor and Mayor. Prior to her appointment as Commissioner, Defendant Brann served as the Deputy Commissioner of Quality Assurance and Integrity for the DOC. At all times relevant herein, Defendant Brann served under the executive direction of former Defendant and DOC Commissioner Ponte, and was provided broad latitude to exercise independent judgment.</u> In her current and prior capacities, she was and is a final policy maker who has adopted, promulgated, implemented, sanctioned or continued the detrimental policies, practices and/or customs at issue here.

## JURISDICTION AND VENUE

27. This action is brought pursuant to 42 U.S.C. § 1983 and the Fourteenth Amendment to the United States Constitution.

28. This Court possesses subject matter jurisdiction under 28 USC §§ 1331 and 1343(3) by virtue of the federal questions raised herein and supplemental jurisdiction pursuant to 28 USC § 1367.

29. This Court is authorized to grant declaratory and injunctive relief under 28 U.S.C. §§ 2201 and 2202, and Rules 57 and 65 of the Federal Rules of Civil Procedure.

7

30. Venue is proper under 28 USC § 1391(b) and (c) in the United States District Court for the Southern District of New York because the Defendants conduct business (and are subject to the court's personal jurisdiction) in such District, Plaintiff COBA conducts business in such District, and the events complained of are occurring in the City Jails, most of which are located in the Southern District of New York.

31. Over Plaintiffs' objections, Judge Swain exercised jurisdiction over this lawsuit. Judge Swain presided and continues to preside over the Nunez Consent Judgment which resolved civil rights violations claimed by inmates in Nunez, et al. v. City of New York, et. al., 11 Civ. 5845 (S.D.N.Y.).   Plaintiffs' allegations in the Original Complaint implicated that Consent Judgment in the violation of Plaintiffs' constitutional rights to be free from state created danger.

## GENERAL ALLEGATIONS

### Defendants' Reform Agenda

32. In August 2014, the United States Department of Justice ("DOJ") issued a bad "report card" to Defendants regarding their operation of the City Jails.   A two and one-half year investigation into the conditions of inmate confinement and treatment found rampant violations and a "deep seated culture of violence" within the Jails.

33. The DOJ also moved to intervene in a class action lawsuit pending at the time captioned Nunez, et al. v. City of New York, et. al., 11 Civ. 5845 (S.D.N.Y.), which was brought by several inmates alleging various violations of their federal constitutional rights while confined in the City Jails.

34. Defendants embarked on a Reform Agenda, repealing long standing institutional practices and implementing new protocols all purported to reduce jail violence and increase safety for

inmates and staff.

35. Starting in or about December 2014, Defendants eliminated the use of punitive segregation, a proven method of deterring inmate violence, for adolescent inmates aged 16 and 17 years in advance and anticipation of the Nunez Consent Judgment which was ultimately executed in October 2015.

36. In January 2015, the Department eliminated punitive segregation time owed by inmates from previous incarcerations.

37. In June 2016, in the post Nunez Consent Judgment era, Defendants eliminated punitive segregation for young adult inmates between and including the ages of 18 to 21 years old, going well beyond what Nunez mandated.

38. Defendants implemented additional restrictions on the use of punitive segregation on the over-21 inmate population.

39. Under the rubric of reform, Defendants altered their methods of housing inmates. For example, Defendants housed inmates with like gang affiliation together essentially giving them strength in numbers and facilitating their concerted activity when launching attacks on other officers or inmates.

40. Defendants also implemented a number of therapeutically oriented alternative housing models designed to manage the behavior of young inmates who are known to be the most violent segment of the inmate population. See attached as Exhibit A, a true and accurate copy of Ponte's Statement Regarding Violence by Young Adults dated 03/10/16. Despite the violent nature of this inmate demographic, these programs are not punitive in nature and have failed to deter continued Jail violence.

41. Upon information and belief, these programs include, but are not limited to, Transitional Restorative Unit ("TRU"), Second Chance Housing Unit ("Second Chance"), Secure Unit ("Secure Unit"), and Enhanced Security Housing ("ESH"). For inmates with mental illnesses there exists the Restricted Housing Unit ("RHU"), Clinical Alternatives to Punitive Segregation ("CAPS") and Program to Accelerate Clinical Effectiveness ("PACE").

42. In March 2015, Defendants, through de Blasio and then Commissioner Ponte, announced a formal fourteen point reform plan ("14 Point Plan") that promised to aggressively combat violence and promote a culture of safety on Rikers Island, including five main initiatives to target inmate-on-inmate violence." See attached as Exhibit B, a true and accurate copy of the Defendants' 14 Point Plan Statement dated 03/12/15.

43. In October 2015, Defendants settled the Nunez lawsuit by entering into a 60 plus page Consent Judgment that mandated further reforms in fourteen different areas. See attached as Exhibit C, a true and accurate copy of the Nunez Consent Judgment dated 10/15. One of the most significant changes of the Nunez Consent Judgment was the adoption of a new Use of Force Policy, Directive 5006R-D, purportedly drafted in accordance with the Consent Judgment terms, but it also included additional changes that were not required.

44. Plaintiffs were not a party to the Nunez Consent Judgment which also appointed a Federal Monitor tasked with evaluating Defendants' implementation and compliance with the mandated reforms. The Federal Monitor files periodic progress reports with this Court.

45. Defendants claim their reforms have reduced jail violence between inmates and between inmates and staff. See attached as Exhibit D, a true and accurate copy of 2017 Mayor's Management Report; See also attached as Exhibit E, a true and accurate copy of 2018

Mayor's Management Report; See also attached as Exhibit F, a true and accurate copy of DOC's Presentation to the BOC on the Young Adult Plan dated 06/13/17.

46. To the contrary, Defendants' reforms have empowered the most violent inmates, reduced accountability for their actions, and increased the likelihood of substantial bodily harm or even death to Correction Officers.

**Defendants' Reform Agenda Has Increased the Risk of Harm to Correction Officers**

47. In November 2016, roughly one year after Defendants entered into the Nunez Consent Judgment, the New York City Comptroller's office issued a scathing report confirming the jails "…are getting more violent by the day." See attached as Exhibit G, a true and accurate copy the Comptroller's Report dated 11/14/16 and Wall Street Journal Article Regarding Comptroller's Report dated 11/28/16.

48. In Spring 2017, a DOC issued report confirmed that stabbings and slashings increased 18% in the City Jails. See attached as Exhibit H, a true and accurate copy of the Daily News Article regarding spike in violence dated 03/09/17.

49. The 2017 Preliminary Mayor's Management Report ("Mayor's Report"), also acknowledged the increase in violence stating "the elimination of punitive segregation…has contributed to initial spikes in violence." See Exhibit D, 2017 Mayor's Report excerpt. This general increase in violence has also resulted in increased attacks[4] on Correction Officers and inmate on inmate violence. See attached as Exhibit I, a true and accurate copy of the NY Post Article Regarding Violence Increasing Under de Blasio dated 09/18/17.

50. By report dated April 13, 2017, the Third Report of the Federal Monitor confirmed that staff

---

[4] The term attacks used herein includes, but is not limited to, grabbing, punching, kicking, head-butting, slashing, stabbing, and splashing of urine, feces, saliva or other liquid, and sexual assault.

injuries were increasing. Specifically, approximately 1,337 Correction Officers were injured between November 2015 and December 2016. <u>See</u> attached as Exhibit J, a true and accurate copy of the Federal Monitor's Third Report excerpt dated 04/13/17.

51. <u>Civilian medical staff has reported that they are too scared to work in the City Jails – especially the specialized units/alternative programs where inmates are allowed to roam freely and act with impunity including threatening assaults and rape against these staff members or their families. In some cases inmates are actually committing assaults on the staff. See attached as Exhibit K, a true and accurate copy of the Daily News Article Regarding Scared Medical Staff dated 03/14/17</u>

52. <u>In an April 2017 letter, the State Commission of Correction issued a a "Notice of Violation" deeming Rikers Island failed to comply with minimum safety standards. It had become so dangerous, Rikers would no longer be allowed to accept inmates transfers from jails outside of New York City. One of the basis for the ban was Defendant DOC's failure to  meet its mandatory obligation to report reportable incidents. See attached as Exhibit L, a true and accurate copy of the SCOC Letter Banning Use of Rikers Island dated 04/28/17 and New York Post Article Regarding SCOC Ban dated 05/05/17.</u>

53. <u>The Fourth Report of the Federal Monitor, filed October 10, 2017, noted "…Staff injuries have been trending upward since the Effective Date [of the Consent Judgment], while…[the] number of inmate injuries has been trending slightly downward…" See attached as Exhibit M, a true and accurate copy of the Federal Monitor's Fourth Report excerpt dated 10/10/17. Supportive of this conclusion, the Monitor also noted:</u>

> <u>Use of Force rates at RNDC and GMDC [Young Adult Housing] have decreased, however, rates of violence during the current monitoring period were largely</u>

comparable to those witnessed in January-June 2016. **Some of this violence is very serious, involving stabbing or slashing Staff or other inmates**. Some inmates, particularly at RNDC, exhibit chronically violent behavior.

Id. at 14. (emphasis added).

54. According to the 2017 and 2018 Preliminary Mayor's Management Report, (1) the number of "fights/assaults infractions" rose from 8,827 in 2014 to 12,650 in 2017 (id. at p. 78); (2) violent inmate-on-inmate incidents rose from 32.9 per 1000 inmates in 2014 to 55.2 in 2017 (id); (3) inmate assault on staff monthly rate rose from 5.9 per 1000 inmates in 2014 to 8.4 per 1000 inmates in 2017 (id.); (4) uses of force rose from 3,779 for 2014 to 4,673 for 2017 (id); (5) uses of force on adolescents rose from 378 in 2015 to 531 in 2017 (id); and (6) serious injury to staff from an inmate assault monthly rate rose from 0.38 per 1000 inmates in 2017 to 0.46 in 2017, for a period of four months (id.)." See Exhibits D and E, respectively the 2017 and 2018 Mayor's Report excerpts.

55. In May 2018, Daily News investigation specifically confirmed that violence also increased in the non-Rikers Island borough jails. The Brooklyn Detention Complex had only 1 stabbing/slashing in the six years prior to 2015, but from 2015-2018 there were 58 stabbings and slashings. The Manhattan Detention Center ("MDC") had 14 stabbings and slashing from 2009 to 2014; in contrast there were 41 from 2015 to 2018. The Vernon C. Bain Center ("VCBC") had five slashings and stabbings from 2009 to 2014 but had 16 from 2015 to 2018. From 2016 to 2017, the number of stabbings and slashings went up in both the Manhattan and Bronx Court facilities, rising from 13 to 17 and 3 to 8 respectively. See attached as Exhibit N, Daily News Article Regarding Violence Surge dated 05/20/18.

56. There has also been a significant increase in the filing of inmate personal injury lawsuits as well as the number of workers' compensation claims filed by Correction Officers. City Comptroller Scott Stringer has stated that there was no "measurable decrease in violence" and that the City Jails are a "system that is getting more and more out of control. See attached as Exhibit O, Newsday Article Regarding Spike in Personal Injury Lawsuits dated 03/02/16 and New York Post Article Regarding Soaring Comp Claims dated 07/28/18.

57. In February 2018, several years into Defendants' so-called Reform Agenda, the State Commission of Correction ("SCOC") issued a report entitled "The Worst Offenders Report: The Most Problematic Local Correctional Facilities of New York State and listed Rikers Island "after years of review" as a facility that "pose[s] an ongoing risk to the health and safety of staff and inmates" See attached as Exhibit P, SCOC Worst Offenders Report excerpt dated 02/18.

58. Characterizing Rikers as a "deeply disturbing and discouraging situation," the SCOC stated that Rikers Island fails to meet minimum standards, and violates constitutional protections and state laws. Notably, the number of significant incidents on Rikers Island is "considerably higher" compared to the county jails despite having a smaller inmate population. The Report states:

> Despite this population disparity, the number of incidents reported in each significant category are, in almost every instance, considerably higher for Rikers Island facilities than for county jails. Specifically, the number of inmate group/gang assaults and inmate/inmate assaults are more than double the corresponding totals of county jails, and the number of inmate/personnel assaults on Rikers Island is ten (10) times more. The number of both reported major and minor disturbances are more than double the amount reported in county jails. With regard to reported sex offenses, each category reflects a considerably greater

amount of incidents in Rikers Island facilities than county
jails.

Id. at p. 29.

59. Since the filing of the Original Complaint in April 2017 and in particular, 2018, there have
been numerous heinous attacks against Correction Officers resulting in severe injuries. See
attached as Exhibit Q, true and accurate copies of Various News Articles Regarding Attacks
on Correction Officers from September 2017 through August 2018.

60. In May 2017 the VCBC facility had to be locked down after three different inmate attacks
on Correction Officers, one of whom was stabbed in the arm. Id. at Daily News Article
Regarding Barge Lockdown dated 05/09/17.

61. In September 2017, a Correction Officer was slashed by an inmate using a 1.5-inch razor
inside Manhattan Criminal Court. Id. at Daily News Article Regarding CO Slashed in
Manhattan Court dated 09/07/17.

62. In November 2017, it was revealed that an inmate with a long history of viciously assaulting
officers called the City's 311 hotline twice, threatening to kill a Correction Officer. The
recording revealed that the inmate warned, "I am about to kill one of these officers; I am
about to murder somebody." Thereafter, the inmate violently attacked a Correction Officer
slamming a cell door into him and beating him senseless. Among other injuries, the officer
sustained a fractured jaw and teeth displacement. Id. at ABC 7 NY Article Regarding 311
Warning Prior to CO Attack dated 11/30/17.

63. In December 2017, a Correction Officer was attacked by three gang-affiliated inmates at
the Anna M. Kross Center. Id. at Daily News Article Regarding CO Attack dated 12/08/17.
Fifteen inmates joined together and severely beat a supervisory officer on Thanksgiving in a

gang related assault. Id. at Corrections One News Article Regarding Thanksgiving Attack dated 12/15/17.

64. In February 2018, Correction Officer Jean Souffrant was brutally attacked by five inmates affiliated with the Bloods gang at the George Motchan Detention Center, breaking his back. The officer also sustained a life threatening brain bleed. Id. at CBS News Article Regarding Brutal CO Attack 02/12/18.

65. March 2018 was open season on Correction Officers. A Correction Officer sustained a broken nose when inmate Xavier Blount punched her in the face when she tried to break up an inmate fight at the George R. Vierno Center. Id. at Daily News Article Regarding CO Assault Resulting in Broken Nose dated 03/12/18. Another Correction Officer was repeatedly punched in the face while escorting an inmate out of Bronx Criminal Court. Id. at ABC 13 News Article Regarding Burned, Punched COs dated 03/19/18.   Two other Correction Officers were assaulted inside the George R. Vierno Center, with one being slashed several times by inmate Benjamin McMillan who has a longstanding history of mental illness. Id. at NY Post Article Regarding CO Slashed dated 03/14/18. Inmate J'von Johnson, an inmate in the ESH – a unit for particularly dangerous inmates - with a track record of assaulting officers within that unit, attacked an ESH officer and threw scalding water on him causing the officer a broken nose and first and third degree burns. Id. at NY Post Article Regarding CO Ambush dated 03/18/18.

66. August 2018 was also a particularly brutal month for correction officers who were violently attacked in several incidents.  During the weekend of August 4, 2018, a Correction Officer at the Robert N. Davoren Center was assaulted by three inmates. Daily News Article Regarding CO Slashing dated 08/06/18. On August 7, 2018, a correction officer was beaten

unconscious by a gang affiliated inmate nearly twice his size at the Brooklyn Detention Center. Id. at ABC 7 NY Article Regarding CO Attacks in Brooklyn and Rikers Island dated 08/08/18. That same day, several other officers were assaulted in facilities on Rikers Island. Id. The next day on Wednesday, August 8, 2018, a Correction Officer was beaten at Anna M. Kross Center with a cane by five inmates also gang related. Id. at NY Post Article Regarding 5 Bloods Gang Assault dated 08/08/18. On August 15, 2018, three inmates assaulted a Correction Officer at the Otis Bantum Correctional Center, slashing his forehead and other parts of his body. Id. at ABC 7 NY Article Regarding Rikers Island CO Gang Assault dated 08/16/18.

67. Plaintiff COBA's own analysis of jail violence, issued in April 2018 and offering violence reduction proposals, confirms violence has increased in every major category whether inmate-inmate or inmate-correction officer related. Between February 2017 and February 2018, a total of 642 Correction Officer were assaulted by inmates. Nearly 30% of those assaults resulted in officers being sent to the hospital for "lacerations, punctures, requiring sutures, fractures, internal injuries, broken orbitals, fractured jaw, broken/fractured noses, sprain of the hands, wrists, shoulders, ankles, back injuries, or missing teeth." Many of these incidents were outright assaults on officers while most resulted from officers intervening in inmate on inmate violence. In at least 438 incidents, inmates rather than officers used force. See attached as Exhibit R, a true and accurate copy of COBA Publication "Reduce Jail Violence."

68. Additionally, during the same period, Plaintiff COBA confirmed that Correction Officers were splashed by inmates approximately 744 times with urine, feces and other unknown

17

liquids and spit/spat upon approximately 268 times. Id.; see also, Exhibit Y, BOC Splashing Report dated 02/17.

69. During this same period, there were also approximately 4,702 inmate on inmate fights, over 152 serious injuries to inmates and 133 incidents of inmate slashing and stabbings. Id.

70. Defendants' failure to reduce violence, as illustrated by the above reports and statistics, and their inability to ensure safety in the City Jails has been the object of immense public scrutiny.

71. Given the pressures from Plaintiff COBA, various inmate advocacy groups, local politicians, Governor Cuomo, the State Commission of Correction, the New York City Board of Corrections and others including the watchful eye of this Court and the Federal Monitor, Defendants are more desperate than ever to show that their reforms effectively reduce the violence in the Jails.

72. To further that end, Defendants have engaged in shocking tactics. Specifically, they have adopted a policy, practice and/or custom of concealing the true nature, frequency and magnitude of the on-going violence that actually occurs in the City Jails.

73. Defendants' cover-up takes many forms. From non-reporting, underreporting or misreporting inmate violence against inmates or Correction Officers, to downgrading violence incidents, to failing to hold inmates accountable for their violent actions, Defendants concealment practices have increased the threat of significant bodily harm or death to Correction Officers.

**Defendants' Concealment Practices Designed to Cover-up the True Levels of Jail Violence**

74. Defendants have a long-standing and well-documented history of covering up the true nature, frequency and magnitude of violence that occurs in the City Jails.

18

75. In 2014, a New York Times ("Times") investigation revealed that top DOC officials falsified or distorted violence statistics and that former Commissioner Dora Schriro tried to cover up this information. See attached as Exhibit S, a true and accurate copy of Times' Article Regarding the Falsification of Violence Data dated 09/21/14.

76. According to the Times, in late 2011, Defendant DOC's own Investigation Division investigated the reporting practices at RNDC, the jail housing adolescent inmates. Id.

77. In September 2012, the Investigation Division presented the first draft of its report ("the ID Report") to then Commissioner Schriro. The ID Report detailed many examples of non-reporting, underreporting and misreporting of violence including the fact that "jail officials failed to include 375 incidents that should have been logged as fights." Id.

78. The ID Report also identified Turhan Gumusdere, who had been Deputy Warden at RNDC in 2011, as one of the main culprits in the cover-up. The report concluded that Gumusdere had "...abdicated responsibility for the facility's reporting of inmate fights and failed to supervise, manage or oversee the facility's reporting of violence statistics" and further recommended that he be demoted. Id.

79. Commissioner Schriro ordered heavy redactions to the ID Report deleting all references to any non-reporting or misreporting of violence statistics and statements that questioned the accuracy of reported incidents. She also deleted any reference to alleged misconduct on the part of DOC officials, including the recommendation for demotion.

80. In 2013, as part of the Federal Government's investigation into conditions of inmate confinement, Defendants produced a copy of the heavily redacted ID Report instead of the original that detailed the misreporting and falsification of violence in the jails. Id.

81. Since then, there have been numerous published reports of Gumusdere and other top DOC officials actively suppressing the reporting of violence in the DOC facilities. See attached Exhibit T, a true and accurate copy of Various Articles Regarding Falsification of Violence Statistics.  At the time of Gumusdere's retirement, the City Department of Investigation even had an open investigation into his alleged concealment practices. Id., at NY Daily News' Article regarding falsification of violence stats dated 08/29/17.

82. In 2017, Charles Daniels, a former senior deputy commissioner, and several other current and former African-American correction employees, filed a discrimination lawsuit in the Court against the same Defendants herein (including Commissioners Ponte and Brann) and other top DOC officials. The Daniels suit, Civil Index #17-cv-09960, detailed Defendants' concealment practices and the length to which they went to cover up the violence occurring in the City Jails. See Attached as Exhibit U, a true and accurate copy of the Daniels Amended Complaint.

83. Daniels alleges "corruption, manipulation and falsification was instituted, promoted and required by Defendants." Id. Not only did then Commissioner Ponte know that Turhan Gumusdere lied about downgrading and failing to report violence within the jails, but that Ponte too was part of the cover-up. Id.

84. Daniels alleges that he and Ponte met weekly at City Hall to report on jail violence to the Mayor's Office in four categories: 1) inmate on inmate violence; 2) slashings and stabbings; 3) assaults on staff; and 4) fights. At one particular weekly meeting, Ponte became very irate at Daniels for accurately reporting that violence was increasing and berated him "for not covering up the violence..". Id.

85. The Daniels suit also alleges that several other DOC officials also participated in the

20

violence cover-up, including Defendant Brann and Martin Murphy, former Chief of Department. According to the lawsuit, Shirvana Gobin, Deputy Commissioner for Strategic Planning and Management, also claims that Chief of Staff Jeff Thamkittikasem "knowingly provided inaccurate and skewed information regarding the violence within Rikers Island jails to the Mayor's Office …" Id.

86. Defendant de Blasio's own statements have also confirmed that Defendants' reporting of violence statistics is inaccurate. In December 2015, de Blasio claimed that serious assaults against officers were down 11%, from 77 to 69 attacks from the previous year. See Exhibit T, at New York Post's Article Regarding "Fudging" of Statistics dated 12/05/15. Upon information and belief, this is untrue. At that time, serious injuries to staffers by inmates were up nearly 30% from 216 to 280 incidents. Id.

87. Adding to the confusion, Defendant City later stated that the drop in incidents was 19%, which, even if true, contradicts what Defendant de Blasio originally claimed. Id.

88. At the center of Defendants' cover-up, is the classification system used to categorize violence occurring within the Jails. Upon information and belief, this system is designed to give an illusion of increased safety in the Jails because it downgrades the severity of violence incidents.

89. Upon information and belief, Defendants cover-up the violence occurring in the Jails by downgrading and misclassifying incidents involving clear assaults on staff or other inmates under the administrative label of "log book entry", a notation made in the relevant log book with no further reporting or investigation, or other more innocuous label, instead of a label that accurately represents the violence that occurred or the injuries that were sustained.

90. New York Penal Law Section 120.05 states that a person is guilty of assault in the second degree when "with intent to cause serious physical injury to another person, he causes such injury to such person or to a third person...".  Penal Law Section 120.00 states that a person is guilty of assault in the third degree, a Class A misdemeanor, when:  "1. With intent to cause physical injury to another person, he causes such injury to such person or to a third person; or 2. He recklessly causes physical injury to another person."

91. Despite these unambiguous definitions, Defendants intentionally misreport clear assaults on Correction Officers as something less violent.   From a period of 2015 through June 2018, there were, at minimum, 74 incidents where inmates punched Correction Officers, clearly committing an assault.  However, those 74 assaults were labeled as "log book entry" instead of "assaults on staff" --- even the ones resulting in injuries requiring medical attention. There were approximately 18 additional incidents where inmates slapped Correction Officers and these too were given the dead end label of "log book entry."

92. These incidents could also be reported as another crime, harassment in the second degree. Under New York Penal Law Section 240.26, as person is guilty of, harassment in the second degree, a violation, if with "intent to harass, annoy or alarm another person: 1. He or she strikes, shoves, kicks or otherwise subjects  such  other person to physical contact, or attempts or threatens to do the same. However, again Defendants intentionally cover up these crimes by downgrading them.

93. By way of a specific example, in October 14, 2016, inmate Jose Hernandez attacked Correction Officer Tiffani Dublin in the Eric M. Taylor Center ("EMTC"). Hernandez came up to Officer Dublin, and without any provocation attacked her and knocked her out by

throwing multiple punches hitting her above the left eyebrow, above the right eye, on her left cheek, her right check, her mouth and chin.

94. As a result of this attack Officer Dublin, sustained two black eyes, a concussion and permanent injuries to her cervical and thoracic spine including several bulging discs and inversion of the cervical spine. According to Officer Dublin's doctors, Hernandez's punches "shook her brain" and they have warned that if she is hit again she will become paralyzed.

95. Despite the heinous nature of this attack – a clear assault on Officer Dublin --- Defendants astoundingly categorized it as a mere "log book entry" instead of "assault on staff."

96. Upon information and belief, Defendants' misreporting of assaults against Correction Officers is intentional and confirmed by the fact that they report inmate assaults against civilian staff accurately. For example, during the same period of time described above when 74 assaults against Correction Officers were inaccurately reported as mere "log book entries" (2015 through June 2018),  there were, at minimum 47 incidents of inmates punching other correctional staff such as mental health counselors etc. Unlike the assaults perpetrated by inmates against Correction Officers, each of those incidents was accurately labeled a "Criminal Act."

97. Despite the fact that Plaintiff COBA has demanded that Defendants correct this illegal practice, Defendants have refused and have offered no rationale for the flagrant misreporting of assaults on Correction Officers while assaults on civilian staff are reported accurately. In fact, at a recent meeting regarding workplace violence between Defendant DOC and various City unions, Plaintiff COBA again questioned this blatant misclassification and demanded an explanation. DOC representatives could not explain why this distinction exists.

98. This position simply defies logic and, further, violates Defendants' legal obligations to report crime occurring within its Jails. Indeed, the NYPD CompStat system provides "up-to-date crime-related statistics in the seven major crime categories on the citywide, borough, and precinct levels, as well as historical crime data." CompStat records also provide information regarding additional "minor" crimes as well. As of January 2013, Department of Correction crimes are reported separately from borough and precinct reports on a separate Department of Correction CompStat page. See attached as Exhibit V, a true and accurate copy of sample of DOC specific CompStat report.

99. Upon information and belief, Defendants do not investigate at all or conduct thorough investigations into incidents that are categorized as "log book entry" when compared to incidents that are given a more serious label such as "assault on staff." Notably, other types of incidents that are classified as "log book entries" are mundane and administrative matters such as a leak or loss of equipment. Moreover, designating assaults on Correction Officers as mere "log book entries" means these assaults do not fall into the reportable categories of jail violence like "assaults on staff" or "slashings."

100. Several other examples exist of Defendants concealing Jail violence by downgrading assaultive incidents as mere "log book entries." In fact, Gumusdere was a notorious proponent of this practice.

101. Daily News sources confirmed that Gumusdere "...directed officers to manipulate reports of violent assaults by listing them as routine 'log book entries.'" See Exhibit T, at NY Daily News' Article regarding falsification of violence stats dated 08/29/17. Indeed, "Knife fights and ugly brawls between inmates, even attacks on officers, often end up airbrushed in the records as routine 'log book entries.'" Id. at NY Daily News' Article entitled "correction

24

bosses routinely 'purge' unfavorable violence stats to create illusion of reform, review shows" dated 08/28/16.

102. The Daily News' investigation reviewed 11 different violence incidents and found that 9 of them were downgraded in severity as "log book entries" in ways that defied logic and clearly intended to downplay the violence that actually occurred. Id.

103. The Federal Monitor has also confirmed that Defendants do not accurately report or classify violence incidents in the City Jails. It its Fourth Report, the Monitor reviewed uses of force that were downgraded to routine "log book entries." The Monitor disagreed with 7 out of the 10 downgrades and noted "the process of downgrading...incidents sends a troubling and confusing message to staff that there is a grey area or some discretion, in what is considered a use of force." See Exhibit M at p. 48.

104. Upon information and belied, Defendants' underreporting and misreporting is especially prevalent in the special housing units/alternative programs because they have a particularly vested interest in demonstrating these programs are effective in reducing violence (when in reality they do not).   In 2017, the New York City Board of Corrections ("BOC"), tasked with oversight over the administration of the City Jails, also confirmed that Defendants have failed to accurately report/classify violence in such a unit. See attached as Exhibit W, a true and accurate copy of the BOC ESH Report excerpt dated 04/17.

105. In a report assessing DOC's Enhanced Supervision Housing, the BOC observed that there were "six log book entries noted in the Department's 24 Hour Reports that did not meet the Department's definition of a 'reportable incident' but nevertheless occurred, and appeared to involve assault on or harm to staff." Id.

106. The BOC noted that in one incident an ESH inmate "exited his cell without authorization, and without warning or provocation, punched a correction officer in the face, resulting in a contusion to the face and closed fracture to the correction officer's nasal bone." Id. This incident was listed as a "log book entry."

107. The BOC also noted that in another incident an inmate "flipped a dayroom table and punched a correction officer in the face after being ordered to cease his aggression." Id. This incident was also listed as a "log book entry."

108. Two months later, the BOC again confirmed that assaults on Correction Officers in ESH were still being underreported as a "log book entry." It observed:

> In addition there were eight log book entries noted in the Department's 24 Hour Reports that did not meet the Department's definition of reportable incident and appear to involve assault on or harm to staff. For example, in one incident, a young adult in ESH refused to comply with a search and threatened staff with a weapon. While being searched, the young adult stuck his hands down his pants and the weapon **punctured the officer in the hand**. In a separate incident, a young adult **kneed an officer in the head** while the officer was removing leg irons.

See attached as Exhibit X, a true and accurate copy of the BOC ESH Report excerpt dated 07/17.

109. Upon information and belief, Defendants cover-up the violence in the Jails by misreporting the incidences of inmate splashings of known and unknown liquids on Correction Officers. Under New York Penal Law Section 240.32 it is a Class E felony for an inmate to cause a Correction Officer to come into contact with blood, seminal fluid, urine, feces, or the contents of a toilet bowl. Non-bodily fluid or toilet bowl related splashings arguably fall

within Penal Law Sections 120 and 120.05, assault in the second and third degree respectively, discussed supra at para 85.

110. Despite these prohibitions under the Penal Law, Defendants fail to treat splashings of any kind ---whether related to bodily fluids or not --- as the criminal acts that they are.

111. Further, Defendants fail to track and report splashings in accordance with their own Operations Order which mandates that "any incident in which an employee is splashed with any unknown substance(s) shall be documented as an **Assault on Staff** Logbook Entry..." (emphasis supplied).

112. Defendants, however, omit the "assault on staff" part of the required designation for splashings. This ensures splashings do not fall into a reportable incident category --- even though under Defendants' Workplace Violence Prevention Program Directive, as revised by the June 26, 2015 Teletype, recognizes splashings as workplace violence.

113. Further, the Board of Correction (BOC) has recognized the assaultive nature of splashings and even conducted a study of splashings occurring in all DOC facilities during 2017. The report indicates that in 2017, there were a total of 1,335 splashings committed by 744 unique individuals, that 96% of the splashings were against Correction Officers and more than a quarter of splashings (26%) were committed by repeat splashers. See attached Exhibit Y, as true and accurate copy of the BOC Splashing Report dated 02/17.

114. Plaintiff COBA's own analysis of splashings during the period from January through July 2018 confirmed that several inmates are repeat, habitual splashers, sometimes having more than 10 splashing incidents within the seven (7) month period. See attached Exhibit Z, a true and accurate copy of the COBA Splashing Report for 01/18 – 07/18.

115. <u>Similarly, upon information and belief, Defendants cover-up the violence in the Jails by</u> <u>misreporting the incidences of inmates spitting on Correction Officers.</u> From a period of 2015 to April 2017, there were at least 374 incidents of inmates spitting on officers (without a physical altercation). These were designated under the misleadingly innocuous label of "Log Book Entry" instead of "Assaults on Staff."

116. Inmates spitting on Correction Officers is no less abhorrent than these other forms of "splashings." Often spitting is the first step of aggression employed by an unruly inmate or one who is looking to bait officers into a physical confrontation.

117. Despite the obvious violent nature of spitting, Defendants wholly ignore these incidents and mischaracterize the true level of danger they pose by downgrading them as "log book entries." By letter dated February 2, 2016 – Plaintiff COBA requested Defendants to provide statistics on spitting incidents and use of spit masks on inmates who are chronic offenders. The Defendants' response was that they do not even keep this information because it is too "labor intensive."

118. <u>The practice of downgrading violent attacks occurring against Correction Officers is also</u> <u>confirmed by the Defendants' own records.</u>

119. <u>Under state law, Defendants are required to maintain records of all workplace violence</u> <u>incidents. Defendants' 2015, 2016 and 2017 Workplace Violence Reports are rife with</u> <u>misreported and inaccurately reported violence incidents, including several where clear</u> <u>assaults on Correction Officers are listed as mere "log book entries." See attached as</u>

Exhibits AA, BB and CC, respectively true and accurate copies of DOC's Workplace Violence Reports for 2015, 2016, and 2017.[5]

120. Defendants' misreporting and cover-up of Jail violence is not limited to downgrading of violence incidents to "log book entries." Defendants also engage in other types of misreporting or misclassification that masks the true, nature of violence incidents in the Jails.

121. Upon information and belief, Defendants cover-up the violence in the Jails by misreporting slashings of Correction Officers. For example, on October 4, 2016, Defendant DOC listed the slashing of a Correction Officer by a gang affiliated inmate as "serious assault" instead of "slashing." See Exhibit T at WPIX News 11's Report on Misclassification dated 10/05/16. Slashings are one of the main and separate reportable incident categories monitored by oversight agencies.

122. Upon information and belief, Defendants cover-up the violence in the Jails by non-reporting or misreporting sexual assaults on Correction Officers. On March 3, 2015, inmate Raleek Young, who was convicted for raping a 13 year old girl broke into the "control bubble," physically assaulted a female correction officer and attempted to rape her. Ultimately, the officer was rescued by other inmates. See Exhibit T at NY Daily News Article Regarding Attempted Rape dated 03/03/15.

123. This brutal and heinous incident was caught on videotape and despite the clear sexual nature of the attack, the Defendants initially labeled it as a "use of force" instead of a "sexual assault." A "use of force" label is given to document when an officer has to use

---

[5] Notably, among what may be intentional and unintentional "errors" in DOC's Workplace Violence Reports is the fact that the header for years 2016 and 2017 still state "2015."

force in an interaction with an inmate. It fails to acknowledge whether the inmate attacked or assaulted the officer. It was only after Plaintiff COBA demanded a correction that the attack was properly re-designated. Id.

124. Upon information and belief, Defendants cover-up the violence in the Jails by misreporting the violent nature of Uses of Force. Uses of Force are to be categorized according to the severity of injuries sustained. Defendants own Workplace Violence records for 2015, 2016 and 2017 show several entries where they have failed to state whether the incident was an "A", "B" or "C" Use of Force. Where a letter classification is used, it is often downgraded. For example, a Use of Force resulting in a laceration injury should be listed as an "A" UOF but is instead listed as a "B" Use of Force suggesting the violence was not as serious as what actually occurred. See Exhibits AA, BB, and CC.

125. Upon information and belief, Defendants conceal the violence occurring in the Jails by also using classifications inconsistently. Defendants' Workplace Violence records for 2015, 2016 and 2017 show that splashings are sometimes listed as "AOS" meaning "assault on staff," other times as "log book entry," and yet other times as "criminal acts." Id.

126. Upon information and belief, Defendants cover-up the violence in the jails by engaging in non-reporting (where violence incidents are wholly excluded from the records) or underreporting (where if an incident is reported, certain key details are left out so the true level of violence is covered up).

127. In addition to downgrading, the Daily News identified that violence incidents were often "not logged at all, with [according to sources] Gumsdere telling supervisors to "'make it go away.'" See Exhibit T, at NY Daily Article Regarding Purged Stats dated 08/28/16.

128. Upon information and belief, Gumusudere would also bully medical staff into

underreporting by writing sanitized versions of their reports so altercations between inmate and inmate as well as inmate and officers would appear less violent than they were.

129. An example of non-reporting: upon information and belief, on or about August 6, 2016, Correction Officer Ernest Fong intervened in a fight between three inmates and sustained injuries to his shoulders, arms, wrist, leg and feet requiring medical attention. Despite a very clear use of force and assault on staff with injuries, upon information and belief this incident was never reported to the Central Operations Desk, nor was it logged in the Inmate Information System ("IIS").

130. Upon information and belief, Defendants cover-up the violence in the jails by failing to hold inmates accountable for their violent actions.  In 2014, the SCOC found Defendant DOC minimum standards when they failed to hold over 800 inmates accountable for their violent actions. The inmates in question had already received due process, were adjudicated as being guilty of violating institutional rules, but still remained in general population. The SCOC noted that holding inmates accountable is essential to securing the safety of inmates, staff and facilities. The failure to do so "undermines both the legitimacy of the Department's disciplinary program and the ability of staff to meaningfully enforce the Department's rules of inmate conduct." Notably, the SCOC cuationed that when violent, serious rule offenders are not housed properly, it "threatens the general safety and security of the facility and the well being of the inmates and staff alike." See attached as Exhibit DD, SCOC Violation Letter dated 07/28/14. Upon information and belief, the backlog of delayed punishment continues even today where nearly upwards of 600 inmates still owe punitive segregation time.

31

131. Despite this history, Defendants still fail to wholly or meaningfully, hold inmates accountable for misconduct. Yet now, it is worse. Defendants fail to hold inmates accountable from the very beginning when, upon information and belief, they discourage Correction Officers from reporting violence incidents. Further, if incidents are reported, they fail to investigate and process an infraction against an inmate. This signals to the inmates that they can act with impunity; that Defendants sanction their violence against officers. This happens so often that sometimes Correction Officers are often discouraged from writing infractions they know the Department will just ignore.

132. For example, after Plaintiff COBA's demands, Defendants implemented a splashing Operations Order. Upon information and belief, DOC does not implement the safety measures contained therein against the inmates. Furthermore, DOC does not collect the uniforms from victimized Correction Officers to conduct the required evidence preservation and serology testing. This lack of enforcement signals to the inmates that Defendants condone their violence against officers. Thus, the habitual spitters and splashers continue spewing with impunity.

133. Plaintiff COBA has, on several occasions, requested Defendants stop engaging in their concealment practices (non-reporting, underreporting, misreporting, downgrading and failure to hold accountable) and submitted several proposals to help reduce jail violence including suggestions related to inmate accountability. See attached as Exhibit EE, a true and accurate copies of E. Husamudeen Letters to DOC Commissioners Regarding, Violence, Proposals dated 08/03/16 and 02/09/18. The most recent entreaty for accurate reporting was issued after a workplace violence meeting where the continued inaccuracies in DOC's violence statistics report prevented the parties from having a meaningful discussion.

See attached as Exhibit FF, a true and accurate copy of COBA Workplace Violence letters dated 08/22, 08/30 and 09/02/18.

134. Despite Plaintiff COBA's pleas on behalf of its members, Defendants have continued their concealment practices which are the direct and proximate cause of increased danger and injuries to Plaintiffs.

## Defendants' Concealment Practices Increase the Risk of Harm and Danger to Correction Officers

135. Defendants' concealment practices detailed above increase the danger faced by Correction Officers because misinformation regarding an inmate's violent institutional conduct directly impinges on inmate classification, inmate housing, whether or not inmate discipline is imposed, the degree of inmate discipline that is imposed, and the custodial practices and management strategies applied to inmates.

136. According to DOC Directives 4100R-D and 4104R-D, Defendants utilize an inmate classification system that is "designed to minimize the potential for violence, escape and institutional misconduct based upon objective criteria predictive of behavior." All inmates are classified upon initial admission and re-classified after 60 days. The system establishes a custody score and custody level as well as determines whether an inmate has special housing needs or requires a special designation. Discretionary overrides to the classification score may be applied as needed.

137. Inmates are generally classified into one of three custody levels: minimum, medium, or maximum custody. See Directive 4100R-D. In certain facilities such as GMDC, GRVC, AMKC, OBCC, and BKDC inmates above age 22 are classified into four custody levels categories: low, low-medium, medium-high, and high. See Directive 4104R-D. According

33

to Directive 4518R-C, there are also more specific classifications known as "Red ID" or "Enhanced Restraint Status" for inmates who exhibit specific types of violent behavior. Depending on the assigned classification, particular inmates may be subjected to enhanced restraints when moving within or outside of the facility.

138. Inmate classification is very important as it determines the type of housing, custody level and management strategies that are used on an inmate. For example, inmates are housed in accordance with their custody level and any applicable restrictions. Inmates in general population who are classified as maximum custody cannot be housed with minimum custody or medium custody inmates. Special population inmates are housed in accordance with their special housing needs, medical and mental health requirement, and custody level.

139. Under both Directives 4100R-D and 4104R-D, classification and reclassification are based on a number of criteria. Notably, an inmate's conduct while incarcerated plays a factor. Thus the lynchpin of the classification system is the incorporation of "the most current, objective and relevant information available" about an inmate.

140. Defendants' concealment practices increase the danger faced by Correction Officers as unreported and misreported incidents impact the accuracy of an inmate's classification which, in turn, affects not only where inmates are housed but also the custody practices and management strategies used on them.

141. For example, if an inmate's institutional conduct is not accurately reported, a more dangerous inmate may be housed in open, communal dorm housing when he or she should really be restricted to cell housing. Or, an inmate may be left in general population when they should be in one of the specialized housing units or receiving necessary therapeutic and behavioral services.

142. When DOC intentionally underreports or misreports an inmate's violence history, Correction Officers will not have the information necessary to take the appropriate precautions when interacting with the inmate. For example, if an inmate's institutional conduct is not accurately reported, he or she may be transported without using appropriate handcuffs, security mitts, and waist chains.

143. The accuracy of an inmate's institutional history is important because Correction Officers rely on that information. If a Correction Officer wants to work only with minimum-security inmates and makes a decision to get assigned to a particular post, inaccurate inmate violence data means they are unknowingly working with more dangerous inmates. Inaccurate classification causes a Correction Officer to stay in a more dangerous assignment or believe an inmate is not as dangerous as he or she really is.

144. Unreported or misreported violence incidents within the specialized housing units also increases danger to Officers as it keeps an inmate within a program, when he or she should be discharged or a program may inadvertently discharge an inmate who should not be comingling with the general population.

145. Unreported or inaccurately reported violence incidents result in a failure to impose punitive segregation under circumstances that warrant punitive segregation.

146. Unreported or inaccurately reported violence incidents result in a failure to provide the additional equipment, staffing, and financial resources that are needed to ensure the safety and security of the jails. Conversely, unreported or inaccurately reported violence incidents, results in a reduction of necessary safety measures like use of OC spray. Further, inaccurate

inmate violence history deprives inmates from receiving the correct type of therapeutic or behavioral programming.

147. Defendants' failure to punish inmates for alleged misconduct or investigate infractions increases the danger to Correction Officers because it signals to inmates that they can act with impunity no matter how many times they assault a Correction Officer.

**Correction Officers Injured by Defendants' Concealment Practices**

148. There are several examples of how Defendants' concealment practices, as described above, have caused injury to Correction Officers.

149. On or about June 9, 2016, Plaintiff Romano was assaulted by inmate Sentwali Laviscount at the Manhattan Detention Center ("MDC"). Plaintiff Romano attempted to conduct a search of Laviscount prior to a court appearance. However, Laviscount ignored multiple orders and became hostile, striking Plaintiff Romano in the face. Romano then grabbed onto the inmate and wrestled him down to the ground. As a result, Plaintiff Romano sustained lacerations to his arm, neck, and face, a knot on forehead (contusion) and ultimately had to be treated for concussion-like symptoms.

150. Despite this assault on staff with injuries, Defendants did not classify the incident for the truly heinous act that it was. Instead, Defendants gave it the administrative designation of "log book entry."

151. Upon information and belief, the misreporting of this incident impacted the institutional response to this inmate. No punitive or remedial action was taken against the inmate within MDC; discipline was not imposed; neither his classification nor housing status was altered. Defendants could have immediately processed Laviscount under Pre-Hearing Detention -- for having committed an assault on staff --- which would have meant the inmate would be

transferred out of MDC to Rikers. Instead, Laviscount was still allowed to attend court and stay in MDC.

152.  This decision directly led to a second and more serious assault by Laviscount on Romano just a few days later.

153. On or about June 13, 2016, Plaintiff Romano was leaving the MDC clinic while Laviscount was being evaluated by a doctor. Upon seeing Romano, Laviscount ran up to him and punched him in the face. Plaintiff Romano fell to the ground and the inmate continued to assault him. As a result, Plaintiff Romano sustained a fractured nose, laceration to lip requiring 8 stitches, and a head contusion.

154. But for the Defendants' failure to report and categorize the first assault on Romano as an "assault on staff" and treat it with the severity it deserved, including the imposition of remedial measures on Laviscount such as a facility transfer, the second assault on Romano would not have occurred.

155. Further, upon information and belief, the matter was not investigated, reported or treated with the seriousness that an incident labeled as "assault on staff" would be.

156. August 6, 2016, inmate Mathew Whittington, who was incarcerated on several charges including assault and arson, assaulted Correction Officer Brian Nurse at the West Facility, punching him and causing his face to hit the cell door. This incident was also listed as a "log book entry" and not as an "assault on staff."

157. As a result, and upon information and belief, no punitive or remedial measures were taken against Whittington; discipline was not imposed, neither his classification nor housing status

was altered. See attached as Exhibit GG, a true and accurate copy of NY Daily News'
Article Regarding the Hughes' Slashing dated 09/01/16.

158. The next day, Whittington, now having been emboldened by DOC's failure to hold him
accountable for the assault on Officer Nurse, attacked two more Correction Officers in West
Facility. First, he punched Correction Officer Malik Medina and knocked him unconscious.
Then, when Correction Officer Corey Hughes arrived to assist, Whittington slashed Hughes
across his right arm with a scalpel creating a gash requiring at least 16 stitches. Id.

159. But for the Defendants' failure to report and categorize the first assault on Correction
Officer Nurse as an "assault on staff" and treat it with the severity it deserved, including the
imposition of remedial measures, the assault on Correction Officer Medina and slashing of
Correction Officer Hughes should not would not have occurred.

160. Further, upon information and belief, the matter was not investigated, reported or treated
with the seriousness that an incident labeled as "assault on staff" would be.

161. On June 6, 2018, inmate Sebastian Colin came out of his cell at BKDC and choked
Correction Officer Eric Li. This incident was listed as a "log book entry" and not as an
"assault on staff."

162. Upon information and belief, DOC took no remedial or punitive measures against inmate
Colin; did not impose discipline, or alter his classification or housing status.

163. Thereafter, on June 24, 2018, Colin was being disruptive in the RNDC gymnasium and
Plaintiff Ashendorf attempted to apply restraints on him. Colin punched Plaintiff Ashendorf
on the left side of his head, requiring a trip to the clinic to tend to injuries in his neck and
headaches.

164. But for the Defendants' failure to report and categorize the first assault on Officer Li as an

"Assault on Staff" and treat it with the severity it deserved, including the imposition of remedial measures, the assault on Plaintiff Ashendorf would not have occurred.

165. Further, upon information and belief, DOC did not investigate, report or treat the matter with the seriousness that an incident labeled as "assault on staff" warrants.

## CLASS ALLEGATIONS

166. The individual Plaintiffs Romano and Ashendorf bring this action individually and on behalf of all others similarly situated, pursuant to Rule 23 of the Federal Rules of Civil Procedure.

167. This action is properly maintained as a class action because the requirements of Rules 23(a) and 23(b) of the Federal Rules of Criminal Procedure are met, as explained in further detail below.

168. **Numerosity –** This action  is brought on behalf of a class that is so numerous that joinder of all class members is impracticable. The number of Correction Officers, who are, were or will be employed by Defendants who have been or, during the course of this suit, will be harmed pursuant to the Defendants' policies, practices and/or customs complained of within, is difficult to ascertain and, upon information and belief, will number in the thousands.

169. **Commonality -** There are questions of law and fact common to the class that predominates over any questions affecting only the individual members. Questions of fact and law include, but are not limited to:

   a. Whether Defendants' policies, practices and/or customs have collectively created or increased workplace danger.

b.   Whether the Individual Plaintiffs and class members are at imminent risk of irreparable harm (i.e. serious bodily injury or death) if Defendants are allowed to continue the aforedescribed policies, practices, and/or customs.

c.   Whether the Individual Plaintiffs and class members are entitled to a declaration that Defendants have, through their continuous and ongoing actions, violated their constitutional right to be safe from state created danger.

d.   Whether the Individual Plaintiffs and class members are entitled to a declaration that Defendants have, through their continuous and ongoing actions, violated their constitutional right to be safe from governmental policies that increase the risk of harm including possible death.

e.   Whether the Individual Plaintiffs and class members are entitled to injunctive relief restraining Defendants from continuing the afore-described policies, practices, and/or customs.

f.   Whether the Individual Plaintiffs and class members are entitled to compensatory damages.

g.   Whether the Individual Plaintiffs and class members are entitled to attorneys fees under Section 1983.

170. **Typicality -** The claims of the Individual Plaintiffs are typical of the claims of the class. All members of the class sustained, or are in substantial and imminent risk of sustaining, injuries and damages arising out of and caused by common course of conduct arising from Defendants' ongoing and continuous policies, practices, and/or customs that have either created or enhanced danger in the workplace.

171. **Adequacy** –The Individual Plaintiffs will fairly and adequately protect the interests of the class. The Individual Plaintiffs are committed to the prosecution of this action and, to that end, the Individual Plaintiffs are represented by a law firm competent and experienced in representing the interests of Correction Officers for over twenty years.

172. Additionally, class certification is proper because the criteria set forth under Rule 23(b) is met in whole or, at minimum, in part.

173. This action is properly maintained as a class action under Rule 23(b)(1) of the Federal Rules of Civil Procedures because prosecuting separate actions by or against individual class members would create a risk of (1) inconsistent or varying adjudications that would establish incompatible standards of conduct for the party opposing the class; and (2) adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests.

174. This action is also properly maintained as a class action under Rule 23(b)(2) of the Federal Rules of Civil Procedure because Defendants have acted or refused to act on grounds generally applicable to the class, thereby making appropriate injunctive relief or corresponding declaratory relief with respect to the Individual Plaintiffs and the class as a whole. The class members are entitled to injunctive relief to end Defendants' policies, practices, and/or customs.

175. This action is also properly maintained as a class action under Rule 23(b)(3) of the Federal Rules of Civil Procedure because questions of law or fact common to class members overwhelmingly predominate over any questions affecting only individual members. A class

41

action is superior to other available methods for fairly and efficiently adjudicating the issues raised herein.

176. Specifically, the individual claims of the class members may be relatively modest compared with the expense of litigating the claim, thereby making it impracticable, unduly burdensome, and expensive—if not totally impossible—to justify individual actions.

177. Class action treatment will allow a large number of similarly situated persons to prosecute their common claims in a single forum, simultaneously, efficiently, and economically without the unnecessary duplication of effort and expense if these claims were brought individually.

178. Individual joinder of the parties is impracticable and  class members' interests in individually controlling the prosecution of separate actions is outweighed by their interest in efficient resolution by single class action.

179. There are no unusual difficulties that are likely to be encountered in this class action's management because all the legal and factual questions are common to the class members.

180. Finally, if class treatment of these claims is not available, Defendants will not be deterred. Defendants will continue their wrongful conduct, and will continue to harm Correction Officers by forcing them to work in an environment where the public employer has created and/or enhanced the risk of serious bodily harm or death to Correction Officers.

## AS AND FOR A FIRST CLAIM FOR RELIEF
### (Against Defendant City and DOC For Violation of Substantive Due Process)

181. Plaintiffs repeat and re-allege, as if stated in full herein, the allegations contained in paragraphs "1" through "180" above.

182. The Fourteenth Amendment guarantees a substantive due process right to be free from state created dangers.

183. This constitutionally guaranteed right includes the consequential right to be free from governmental policies that create or increase the risk of serious bodily harm or death from third parties.

184. At all times relevant herein, Defendant City and DOC, as described above, <u>knowingly and intentionally adopted policies, practices, or customs, of non-reporting, underreporting, misreporting, or downgrading violence statistics and failing to hold violent inmates accountable for their actions as a means of covering up the true nature, frequency and magnitude of violence occurring in the Jails. These practices directly result in the misclassification and mismanagement of violent inmates who attack and injure staff and other inmates on a regular basis.</u>

185. <u>Said policies, practices, and/or customs exhibit an intent to harm COBA's members and the individual Plaintiffs inasmuch as Defendants have, by design, intentionally engaged in the afore-described concealment practices and knew that covering up the true nature, magnitude and frequency of violence occurring in the Jails would result in misclassification and an increased likelihood of injuring, and actually did injure, Plaintiffs.</u>

186. <u>Alternatively,</u> said policies, practices, and/or customs exhibit a deliberate indifference to the safety of COBA members and the individual Plaintiffs inasmuch as they knew the risk of harm in engaging in the afore-described concealment practices to cover up the <u>true nature, magnitude and frequency of violence occurring in the Jails</u> violence and disregarded it.

187. As a direct and proximate result of these policies, practices, and/or customs, Plaintiffs have suffered a constitutional deprivation, resulting in serious and permanent injuries, damages and losses as specified herein.

188. Accordingly, Defendant City and DOC have violated COBA members' and the individual Plaintiffs' safety and constitutional right to be from dangers in the workplace that are created or increased by the public employer in violation of the due process clause of the Fourteenth Amendment to the United States Constitution for which the City and DOC are liable under Section 1983.

### AS AND FOR A SECOND CLAIM FOR RELIEF
**(Against Defendant Bill de Blasio For Violation of Substantive Due Process Rights)**

189. Plaintiffs repeat and re-allege, as if stated in full herein, the allegations contained in paragraphs "1" through "188" above.

190. At all times relevant herein, Mayor de Blasio is the Chief Executive Officer of Defendant City. Accordingly, he is a final policy maker imbued with the authority to promulgate rules, regulations, or directives relative to the administration and management of Defendant City including its agencies like Defendant DOC.

191. At all times relevant herein, Defendant, as described above, knowingly and intentionally adopted policies, practices, or customs, of non-reporting, underreporting, misreporting, or downgrading violence statistics and failing to hold violent inmates accountable for their actions as a means of covering up the true nature, frequency and magnitude of violence occurring in the Jails. These practices directly result in the misclassification and mismanagement of violent inmates who attack and injure staff and other inmates on a regular basis.

192. Said policies, practices, and/or customs exhibit an intent to harm COBA's members and the individual Plaintiffs inasmuch as Defendant de Blasio has, by design, intentionally engaged in the afore-described concealment practices and knew that covering up the true nature, magnitude and frequency of violence occurring in the Jails would result in misclassification and an increased likelihood of injuring, and actually did injure, Plaintiffs.

193. Alternatively, said policies, practices, and/or customs exhibit a deliberate indifference to the safety of COBA members and the individual Plaintiffs inasmuch as Defendant knew the risk of harm in engaging in the afore-described concealment practices to cover up the true nature, magnitude and frequency of violence occurring in the Jails violence and disregarded it.

194. As a direct and proximate result of these policies, practices, and/or customs, Plaintiffs have suffered a constitutional deprivation, resulting in serious and permanent injuries, damages and losses as specified herein.

195. Accordingly, Defendant de Blasio has violated Plaintiff COBA members' and the individual Plaintiffs' constitutional right to be state created or increased dangers in violation of the due process clause of the Fourteenth Amendment to the United States Constitution for which Defendant de Blasio is liable under Section 1983.

### AS AND FOR A THIRD CLAIM FOR RELIEF
#### (Against Defendant Cynthia Brann For Violation of Substantive Due Process)

196. Plaintiffs repeat and re-allege, as if stated in full herein, the allegations contained in paragraphs "1" through "189" above.

197. At times relevant herein, Commissioner Brann is the Chief Executive Officer of the DOC. Defendant Brann, as Commissioner and in her prior managerial roles under Commissioner

Ponte, was and is a final policy maker imbued with the authority to promulgate rules, regulations, or directives relative to the administration and management of Defendant DOC.

198. At all times relevant herein, Defendant Brann, as described above, knowingly and intentionally adopted policies, practices, or customs, of non-reporting, underreporting, misreporting, or downgrading violence statistics and failing to hold violent inmates accountable for their actions as a means of covering up the true nature, frequency and magnitude of violence occurring in the Jails. These practices directly result in the misclassification and mismanagement of violent inmates who attack and injure staff and other inmates on a regular basis.

199. Said policies, practices, and/or customs exhibit an intent to harm COBA's members and the individual Plaintiffs inasmuch as Defendant Brann has, by design, intentionally engaged in the afore-described concealment practices and knew that covering up the true nature, magnitude and frequency of violence occurring in the Jails would result in misclassification and an increased likelihood of injuring, and actually did injure, Plaintiffs.

200. Alternatively, said policies, practices, and/or customs exhibit a deliberate indifference to the safety of COBA members and the individual Plaintiffs inasmuch as Defendant knew the risk of harm in engaging in the afore-described concealment practices to cover up the true nature, magnitude and frequency of violence occurring in the Jails violence and disregarded it.

201. As a direct and proximate result of these policies, practices, and/or customs, Plaintiffs have suffered a constitutional deprivation, resulting in serious and permanent injuries, damages and losses as specified herein.

202. Accordingly, Defendant Brann has violated Plaintiff COBA members' and the individual Plaintiffs' constitutional right to be state created or increased dangers in violation of the due process clause of the Fourteenth Amendment to the United States Constitution for which Defendant de Blasio is liable under Section 1983.

<h3 align="center">AS AND FOR A FOURTH CLAIM FOR RELIEF</h3>

<h3 align="center">(Against Defendants for Negligence in Breach of Special Duty)</h3>

203. Plaintiffs repeat and re-allege, as if stated in full herein, the allegations contained in paragraphs "1" through "202" above.

204. Defendants have assumed an affirmative duty to protect Correction Officer members of Plaintiff COBA, the individual Plaintiffs and Plaintiffs John and Jane Doe 1 - 2000.

205. Indeed, Defendant DOC's Mission Statement says: As part of the criminal justice system, the New York City Department of Correction is dedicated to enhancing public safety by maintaining a safe and secure environment for our staff, while providing inmates with the tools and opportunities they need to successfully re-enter their communities.

206. Defendants have also made numerous public statements and proclamations to Correction Officers regarding their intent, desire and goal to ensure staff safety especially in connection with their Reform Agenda.

207. Accordingly, there exists a special relationship between Defendants and the Plaintiff-Correction Officers and members of Plaintiff COBA, such that Defendants owe a duty to use due care and maintain a safe and secure environment for their benefit.

208. Plaintiffs have justifiably relied on Defendants' assurances of safety.

209. Defendants breached this duty of care when they implemented policies that increased the risk of harm to Correction Officers.

210. Defendants also breached this duty of care by engaging in concealment practices of non-reporting, underreporting, misreporting, or downgrading of violence statistics, failing to hold violent inmates accountable for their actions as a means of covering up the true nature, frequency and magnitude of violence occurring in the Jails.

211. Defendants are aware that their actions described herein would harm the Plaintiffs.

212. Defendants' actions described above are or were the direct and proximate cause of Plaintiffs' injuries.

## AS AND FOR A FIFTH CLAIM FOR RELIEF
### (Against Defendants for Negligence in Breach of Special Duty)

213. Plaintiffs repeat and re-allege, as if stated in full herein, the allegations contained in paragraphs "1" through "212" above.

214. Under the Workplace Violence Act, NY state has promulgated certain occupational safety and health standards for the protection of the lives, safety and health of public employees." N.Y. Comp. Codes R. & Regs. tit. 12, § 800.1. Pursuant to this Act, public employers are required to develop and implement programs to prevent and minimize the hazards of workplace violence to public employees.

215. Thus, Defendants are/were subject to an affirmative, statutory duty to protect Correction Officer members of Plaintiff COBA, the individual Plaintiffs and Plaintiffs John and Jane Doe 1 - 2000.

216. Accordingly, there exists a special relationship between Defendants and the Plaintiff-Correction Officers and members of Plaintiff COBA, such that Defendants owe a duty to

use due care for their benefit and maintain a safe and secure environment where workplace hazards are minimized.

217. Plaintiffs have justifiably relied on this duty of care.

218. Defendants breached this duty of care when they implemented policies that increased the risk of harm to Correction Officers.

219. Defendants also breached this duty of care by engaging in concealment practices of non-reporting, underreporting, misreporting, or downgrading of violence statistics, failing to hold violent inmates accountable for their actions as a means of covering up the true nature, frequency and magnitude of violence occurring in the Jails.

220. Defendants are aware that their actions described herein would harm the Plaintiffs.

221. Defendants' actions described above are or were the direct and proximate cause of Plaintiffs' injuries.

## IRREPARABLE HARM

222. If Defendants' ongoing and continuous policies, practices, and/or customs of non-reporting, underreporting, misreporting, or downgrading of violence statistics and failure to hold violent inmates accountable for their actions as a means of covering up the true nature, frequency and magnitude of violence occurring in the Jails, as described above, continue, then Plaintiff COBA's members and class members will be subjected to real, immediate and irreparable injury for which no adequate remedy at law exists in that members of the plaintiff class will suffer continued violations of their rights under the Fourteenth Amendment to the United States Constitution.

223. Plaintiffs hereby demand a jury trial.

**WHEREFORE**, Plaintiff COBA, on behalf of its members, and Plaintiffs Romano and Ashendorf, individually and on behalf of class members, and Plaintiffs John and Jane Does 1 - 2000, respectfully pray that this Court:

  a. Certify this action as a class action on behalf of the proposed class pursuant to Rules 23(a) and 23(b) of the Federal Rules of Civil Procedure, consisting of a class of all persons who are subject to Defendants' constitutionally impermissible policies, practices, and/or customs described herein;

  b. Declare that the Defendants' policies, practices, and/or customs described herein have deprived the Individual Plaintiff and class members of their rights under the Fourteenth Amendment to the United States Constitution;

  c. Award compensatory damages as is deemed appropriate;

  d. Order all appropriate injunctive relief as warranted, including but not limited to, ordering Defendants to immediately cease violations of all Plaintiffs' rights and the monitoring of Defendants' conduct going forward;

  e. Award reasonable attorneys fees and costs to be paid by Defendants pursuant to 42 U.S.C. § 1983; and

  f. Grant such other and further relief as the Court deems just and equitable.

Dated: September 7, 2018
       New York, New York

KOEHLER & ISAACS LLP
*Counsel for Plaintiffs*

By: _____
     Cynthia Devasia, Esq. (CD0320)
     61 Broadway - 25th Floor
     New York, New York 10006
     Office: (917) 551-1325