# Exhibit A



# Serious Injury Reports in NYC Jails
# January 2019



# Table of Contents

Executive Summary .................................................................................................................... 3

Background ................................................................................................................................. 6

Current Serious Injury Reporting Procedures and Policies .......................................................... 6

Methodology .............................................................................................................................. 8

Findings ..................................................................................................................................... 9

Injury to Inmate Report Audit .................................................................................................. 12

Recommendations .................................................................................................................... 23

Appendix A: CHS Serious Injury Inclusion Criteria ................................................................... 24

Appendix B: DOC Serious Injury Categories & Policy Definitions ............................................. 25

Appendix C: DOC Injury to Inmate Report (Form #167R-A) ..................................................... 26

Appendix D: Injury Report Audit Template ............................................................................... 28

## Executive Summary

When serious injuries occur in New York City jails, their consequences are severe and wide-ranging.[1]   Serious injuries affect the short- and long-term physical and mental health of individuals and have a compounding negative impact on individuals' employment, education, housing, and general reintegration into the community.[2]   These incidents also place a significant burden on security and medical staff, as they require emergency response, follow-up medical treatment, investigations, and reporting.

This Board of Correction staff report reviews the aggregate data on serious injuries to people in custody over time and summarizes our in-depth audit of three months of serious injury reports. The report documents large discrepancies between the number of serious injuries diagnosed by NYC Health + Hospitals' Correctional Health Services (CHS, the office managing health and mental health services in the jails) and the number of serious injuries reported internally and publicly by the Department of Correction (DOC).  In 2017, DOC reported 81% fewer serious injuries than CHS (158 v 816).  This report is also the first public accounting of serious injuries over time and presents the number, type, cause, and facility of serious injuries for audited months.

> ### Serious Injury Definition
>
> Serious injuries, as defined by CHS, include: cuts requiring stitches, fractures (excluding fingers and toes), dislocations requiring a clinical procedure, permanent or temporary disabling of an organ, post-concussion syndrome, foreign object ingestion requiring removal via procedure at a hospital, and any injury judged serious by medical professionals.

The City must understand the rates, types, and circumstances related to serious injuries occurring in NYC jails in order to prevent them. Additionally, accurate reporting is necessary to maintain public accountability and trust in and engagement with government. When implemented, this report's recommendations will increase prevention of serious injuries to incarcerated people and promote problem-solving and transparency.

## Key Findings:

1. From 2008 to 2017, despite a 32% decline in the DOC population, the number of Injury to Inmate Reports (serious and non-serious) generated by DOC for people in custody increased 101%, from 15,629 in 2008 to 31,368 in 2017.[3]

---

[1] Ludwig, A., Cohen, L., Parsons, A. and Venters, H. (2012). "Injury Surveillance in New York City Jails." Am J Public Health, [online] 102(6), p. 1108. Available at: https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3483942/.
[2] Id.
[3] Not all injury reports generated by DOC result in the determination of an actual injury.  For example, an analysis of injury reports coded over four months in 2010 found that 65% of the 4,695 included a detectable medical injury based on a physical examination conducted by a clinical staff member.  Ludwig, A., Cohen, L., Parsons, A. and

2. From 2016 to 2018, CHS data show the rate of serious injuries declined from an average of 9.73 per 1,000 inmates in 2016 (Jun. – Dec.) to an average of 7.48 per 1,000 inmates in 2018 (Jan. – Sept.).

3. DOC is underreporting serious injuries, and it lacks a single metric from which to determine the actual number of serious injuries occurring to people in its custody. DOC consistently reports 80% fewer serious injuries than CHS.

4. Sixty-seven percent (67%, n=100) of the 149 serious injuries audited by BOC were never reported as any type of incident by the Department.[4]

5. Only 31% (n=46) of audited injury reports were complete.

6. DOC's investigation process for injuries is plagued by delays, poor accountability, and incomplete reviews.

7. CHS staff's requirement to document medical dispositions in injury reports is frequently unmet.

8. The Anna M. Kross Center (AMKC) had the highest number and rate of serious injuries.

9. On average, it took approximately two hours for seriously injured incarcerated people to receive medical attention after a DOC supervisor was notified of the injury.

10. Most serious injuries (90%) involved lacerations requiring sutures (n=79) or fractures (n=73).Facial trauma (such as lacerations, puncture wounds, fractures and burns to the face, as well as severe injuries to the eye) was the most common type of injury.  Fifty-three percent (53%, n=79) were at least partially caused by an "inmate-on-inmate altercation." Additionally, 80% of serious injuries occurred in housing areasand most events causing serious injuries were not witnessed by staff.

## Recommendations:

1. DOC and CHS should immediately begin jointly publishing monthly data on the number, type, cause, and location of injuries to people in custody (serious and non-serious), as these indicators are critical to prevention efforts.

2. Within the next three months, DOC should come into compliance with their existing policy for reporting serious injuries. DOC should report all injuries to people in custody determined to be serious by correctional health staff.

3. Within the next nine months, DOC and CHS should establish new protocols and take steps to increase accountability including: assessment of which supervisory reviews are needed and whether changes to the Injury to Inmate Report form are needed; development of an electronic injury-tracking system; and training to ensure that injury reports are complete and include accurate, final diagnoses and dispositions.

---

Venters, H. (2012). "Injury Surveillance in New York City Jails." Am J Public Health, [online] 102(6), p. 1108. Available at: https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3483942/.

[4] None of the UOF A (Injury to Inmate), or Slashing/Stabbing incidents reported by DOC in the three-month audit period involved multiple serious injuries.

4. DOC and CHS should immediately begin providing the Board with monthly access to all DOC Injury Reports that CHS designates as associated with a serious injury. This will support DOC's and CHS's efforts to improve their process and increase accountability.

5. Within the next three months, DOC should review the conditions leading to the high number and rate of serious injuries at AMKC and implement a plan to reduce injuries there. DOC should use video review to inform this injury analysis, so that the locations and causes of serious injuries are better documented.

6. DOC should contract an independent auditor to assess reporting of serious injuries to staff. The audit's goals would include understanding who is getting injured (civilian v. uniform, DOC v. DOE v. CHS v. contractors v. volunteers, etc.); how (assault v. construction-related v. slip and fall, etc.); when and where injuries are occurring; and what types of injuries are sustained. Ultimately, these audits must inform injury prevention planning and public reporting.[5]

7. BOC should conduct an annual audit of Injury to Inmate Reports.

---

[5] Currently, DOC will not share any medical information or injury diagnoses related to staff injuries with the Board.

## Background

Since 2013, Correctional Health Services (CHS) has requested and the NYC Board of Correction (BOC or Board) has granted a variance to Minimum Standard § 3-08(c)(3) on privacy and confidentiality.[6] The variance allows CHS to provide the New York City Department of Correction (Department or DOC) with specific diagnoses related to injuries sustained by people while in custody (the reporting of diagnoses unrelated to injuries remains prohibited). CHS and DOC report that this communication is critical to DOC's investigations of injuries and facilitates appropriate follow-up care and safety measures on behalf of patients. Greater communication promotes more effective deployment of CHS and DOC resources toward the common goal of increased safety.[7] In granting this variance, the Board sought to promote stronger collaboration between CHS and DOC in the tracking, reporting, and prevention of injuries.

At its January public meeting, the Board will again consider a variance to Minimum Standard § 3-08(c)(3).[8] BOC staff conducted this study to understand how DOC and CHS respond to, track, and report serious injuries, to inform the Board's variance decision. While this study does not investigate or audit injuries to staff, BOC has recommended that a similar study of staff injuries be conducted.[9]

We must understand the rates, types, and circumstances related to serious injuries occurring in NYC Jails in order to prevent them.

## Current Serious Injury Reporting Procedures and Policies

Department policy requires that any incarcerated person who reports an injury or is suspected of being injured be referred to the jail's clinic for evaluation and treatment by CHS staff (regardless of type or severity of the suspected injury).[10] DOC uses an Injury to Inmate Report form to document reported or suspected injuries.

Once the injured person's medical evaluation is complete, CHS staff issue a medical disposition on the Injury to Inmate Report form and return the form to DOC.[11] DOC Captains are then required

---

[6] N.Y.C. Board of Correction, Health Care Minimum Standards § 3-08(c)(3).
[7] Best practices in the areas of safety and population health within a correctional setting detailed in Macdonald, R., Parsons, A., and Venters, H. (2013). "The Triple Aims of Correctional Health: Patient Safety, Population Health, and Human Rights." Journal of Health Care for the Poor and Underserved 24, no. 3 (2013): 1226-234. https://doi.org/10.1353/hpu.2013.0142.
[8] CHS Variance Renewal Request, December 26, 2018, https://www1.nyc.gov/assets/boc/downloads/pdf/BOC_Injury_Information_Variance_Renewal_January_2019_docx .pdf
[9] The Department of Correction does not provide the Board with documentation related to staff injuries.
[10] NYC DOC Directive 4516R-B ("Injury to Inmate Reports").
[11] Not all injury to inmate reports generated by DOC result in the determination of an actual injury. For example, an analysis of injury reports coded over a four month period in 2010 found that 65% of the 4,695 included a detectable medical injury based on a physical examination conducted by a clinical staff member. *Supra*, note 1.

to consult with CHS staff to confirm injury diagnoses and investigate the circumstances of the injury. Upon completion of the Captain's injury investigation, a Tour Commander reviews the injury report and upgrades injuries that meet the Department's definition of "serious injury." DOC defines serious injuries as: "a physical injury that creates a substantial risk of death or disfigurement; is a loss or impairment of a bodily organ; is a fracture or break to a bone, excluding fingers and toes; or is an injury defined as serious by a physician."[12]

Per DOC policy, serious injuries are considered "unusual incidents" and are required to be reported to the Department's Central Operations Desk (COD).[13]   In practice, Serious Injury COD reports are not generated by DOC staff when injuries are related to other reportable "unusual incidents" such as a Use of Force or Stabbing or Slashing incidents. This means the Department does not have a single metric from which to determine the actual number of serious injuries occurring to people in its custody, as the number of Serious Injury CODs is an underinclusive metric.

The number of Inmate Injury Reports and Serious Injury COD reports, along with other metrics, including Stabbings, Slashings, and Uses of Force (A, B, and C), are tracked in the Department's Monthly Security Report. The Department also publicly reports on rates of Serious Injury CODs in multiple ways such as in the Mayor's Management Report[14] and at BOC Public Meetings.

Independent of DOC reporting, CHS tracks and reports monthly aggregate statistics to the Board, including the number of serious injuries identified by CHS and the cause of injury as reported by patients to CHS staff.  CHS defines as serious: lacerations requiring suturing or stapling, fractures (excluding fingers and toes), dislocations requiring clinical reduction, permanent or temporary disabling of an organ, foreign body ingestion requiring removal by EGD in a hospital, any blow to the head resulting in post-concussive syndrome diagnosis, and any injury judged to be serious by medical professionals.[15]

---

[12] NYC DOC Directive 5000R-A (Reporting Unusual Incidents).
[13] DOC's Central Operations Desk, located on Rikers Island, is a centralized unit tasked with receiving reports of "unusual incidents" occurring in all NYC jails, as well as hospital prison wards, courtroom holding areas and transportation buses and vans operated by the Department.  The Central Operations Desk generates a 24-Hour Report daily, which is used to track unusual incidents, such as uses of force, serious injuries to inmates or staff, and other events that seriously affect normal operations of DOC facilities. The Department's policy on reporting requirements for unusual incidents defines "unusual incident" as "an event or occurrence that may affect or actually does affect the safety, security and well-being of the Department, its personnel, visitors and volunteers, as well as the inmates over whom it has custody and control." NYC DOC Directive 5000R-A (Reporting Unusual Incidents).
[14] https://www1.nyc.gov/assets/operations/downloads/pdf/mmr2018/2018_mmr.pdf
[15] Appendix A: CHS Serious Injury Inclusion Criteria, provided to the Board via email dated April 2, 2018.

## Methodology

Board Staff analyzed all available DOC and CHS policies relevant to serious injuries and met with Department and CHS leaders to understand current reporting procedures and policies.

BOC staff reviewed DOC injury and incident data from 2008 to 2017 and CHS serious injury data from June 2016 to September 2018.[16]   Board staff then audited DOC's Injury to Inmate Report forms for serious injuries from April, May, and June of 2018.

To complete the audit, Board staff requested and received a list of the 169 injuries CHS designated as serious between April and June of 2018 and requested all DOC Injury to Inmate Report forms associated with them.[18]   The Board received 149 Injury to Inmate Report forms from DOC (88% of the injuries designated as serious by CHS).   Board staff requested these reports from facility leadership and Bureau Chiefs and received them on a rolling basis. The first injury reports, relating to April serious injuries, were received on June 29, 2018. The remaining injury reports were received on October 19, 2018.

To execute the audit accurately and consistently, Board staff developed and applied an audit tool to review each injury report.[20]   The tool captures relevant injury data and records the absence of required entries. The categories found in the Board's injury report audit tool mirror fields found in the Injury to Inmate Report.

---

[16] Since April 2016, CHS has sent monthly reports containing the number of serious injuries sustained by people in custody by facility and cause. In March 2018, CHS started including injury types in this monthly serious injury reporting.
[18] See Appendix C, which shows the Injury to Inmate Report format.
[20] See Appendix D.

## Findings

**From 2008 to 2017, despite a 32% decline in the DOC population, the number of Injury to Inmate Reports (serious and non-serious) generated by DOC for people in custody increased 101%, from 15,629 in 2008 to 31,368 in 2017.[21]**

The Department's Monthly Security Reports classify injuries according to the following six "types of injuries": Use of Force (Excluding Allegations), Use of Force Allegations, Inmate on Inmate Incidents, Self-Inflicted Injuries, Accidents, and "Other." In general, most injuries were related to inmate on inmate fights, followed by uses of force (excluding allegations), accidents, and "other." Over the 2008 to 2017 period, injuries resulting from "Inmate on Inmate Incidents" grew by 71% (from 7,405 to 12,656). Injuries related to staff use of force (excluding allegations) grew by 260% (from 1,981 to 7,139), and injuries designated as being caused by "Other" increased by 527% (from 796 to 4,985).

Figure 1.



Source: DOC Monthly Security Reports.

---

[21] Not all injury reports generated by DOC result in the determination of an actual injury. For example, an analysis of injury reports coded over four months in 2010 found that 65% of the 4,695 included a detectable medical injury based on a physical examination conducted by a clinical staff member. Ludwig, A., Cohen, L., Parsons, A. and Venters, H. (2012). "Injury Surveillance in New York City Jails." Am J Public Health, [online] 102(6), p. 1108. Available at: https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3483942/.

**From 2016 to 2018, CHS data show the rate of serious injuries declined from an average of 9.73 per 1,000 inmates in 2016 (Jun. – Dec.) to an average of 7.48 per 1,000 inmates in 2018 (Jan. – Sept.).**

Figure 2.



Source: BOC calculation of Serious Injury Rate using CHS monthly Serious Injury Numbers and average daily population (ADP) calculated from the DOC daily census.

**DOC is underreporting serious injuries.** There is a significant disparity between the number of serious injuries reported by CHS and the number of serious injury incidents (Serious Injury CODs) reported by DOC. DOC's definition of serious injury outlined in policy appropriately includes "an injury defined as serious by a physician,"[22] yet DOC consistently reports ~80% fewer serious injuries than CHS. This discrepancy is not accounted for by including other DOC reportable incidents that may, but do not always, include serious injuries such as Stabbings or Slashings or Use of Force A (Injury to Inmate). For example, in 2017, even after accounting for all DOC reportable incidents potentially involving serious injuries (Serious Injury CODs, Stabbing and Slashings, and Use of Force A), DOC still reported 55% fewer serious injuries than CHS. Figure 3 and Table 1 compare serious injuries reported by CHS and DOC and highlight the disparities in reporting.[23]

---

[22] NYC DOC Directive 5000R-A (Reporting Unusual Incidents).
[23] See Appendix B for complete definitions of Serious Injury to Inmate, Slashing/Stabbing, and Use of Force A.

Figure 3.



Source: CHS Monthly Serious Injury Reports, DOC Monthly Security Reports.

Table 1.

| Serious Injuries Reported by DOC & CHS June 2016 -September 2018 | | | | |
|---|---|---|---|---|
| | **DOC** | | **CHS** | **Difference** |
| **Jun – Dec 2016** | **Serious Injuries** | 132 | **660** | From June through December 2016, DOC reported 80% (528) fewer serious injuries than CHS, 61% (405) fewer when including all reportable incidents. |
| | Slashings/Stabbings | 99 | | |
| | Use of Force A | 24 | | |
| | **Total Combined** | **255** | | |
| **Jan – Dec 2017** | **Serious Injuries** | 158 | **816** | In 2017, DOC reported 81% (658) fewer serious injuries than CHS, 57% (463) fewer when including all reportable incidents. |
| | Slashings/Stabbings | 131 | | |
| | Use of Force A | 64 | | |
| | **Total Combined** | **353** | | |
| **Jan – Sep 2018** | Serious Injuries | 113 | **572** | From January through September 2018, DOC reported 80% (459) fewer serious injuries than CHS, 59% (339) fewer when including all reportable incidents. |
| | Slashings/Stabbings | 60 | | |
| | Use of Force A | 60 | | |
| | **Total Combined** | **233** | | |

Source: CHS Monthly Serious Injury Reports, DOC Monthly Security Reports.

## Injury to Inmate Report Audit

To investigate discrepancies in the aggregate data reported by DOC and CHS and better understand DOC and CHS responses to serious injuries, BOC audited Injury to Inmate Reports for April, May, and June 2018. CHS identified 169 serious injuries to people in custody during these three months. By contrast, during the same period, DOC reported a total of 38 Serious Injury CODs to people in custody,[24] 16 UOF A (Injury to Inmate) incidents,[25] and 18 slashing/stabbing incidents during the same audit.[26] The following reflects findings from the BOC's audit.

**Due to missing or incomplete documentation, only 149 (88%) of the 169 serious injuries identified by CHS in the audit period could be audited by BOC.** BOC staff attempted to obtain all injury reports corresponding to the 169 serious injuries reported by CHS for April, May and June of 2018, but received only 157 forms from the Department. DOC confirmed that staff did not generate Injury to Inmate Report forms for 7% (n=12) of the serious injuries identified by CHS. In nine (9) of those cases no reason was specified, for two (2) DOC reported that the individual was seen at sick call, and for one (1) DOC reported the injury was related to a medical emergency. BOC received eight (8) injury reports from DOC related to individuals identified by CHS, but BOC could not conclusively confirm DOC provided the correct corresponding Injury to Inmate Report for these individuals.[27] Therefore, BOC staff could only audit 149 Injury to Inmate Report forms.

**Sixty-seven percent (n=100) of the 149 serious injuries audited by BOC were never reported by the Department.** Board staff reviewed each of the 149 Injury to Inmate reports associated with CHS designated serious injuries in the audit period. Board staff searched manually and reviewed all DOC data on reportable incidents occurring in the audit period and found only 32 reported by DOC as serious injuries, 11 reported as stabbing or slashings, and six reported as Use of Force A (Injury to Inmate).

---

[24] For the purposes of this audit, BOC recalculated the April, May and June Serious injury COD totals based upon incident date rather than the date the injury was upgraded by the Department and reported to the Central Operations Desk. DOC reported that 42 Serious Injury CODs took place during the three-month period, but only 38 of those injuries occurred within this period.

[25] Of the 16 UOF A (Serious Injury to Inmate) events reported by DOC during the audit period, CHS designated eight serious injuries relating to those events. DOC's UOF A injury criteria is more inclusive than CHS's serious injury criteria, including injuries such as chipped or cracked teeth and multiple abrasions/contusions (for a full definition of UOF A, see Appendix B.) Based on an audit of injury reports, of the eight CHS designated serious injuries resulting from UOF A events, the injuries included five lacerations, one puncture wound, one fracture of the wrist and one unknown injury. UOF A injuries not resulting in a CHS designated serious injury include superficial lacerations, contusions, abrasions, and swelling.

[26] Of the 18 slashing/stabbing events reported by DOC, CHS designated 11 serious injuries. This indicates that 11 of the 18 slashing events occurring during the audit period resulted in a laceration to an individual that required sutures to repair.

[27] Either because the report indicated that the incarcerated person refused treatment or the injury was superficial in nature.

Figure 4.



Source: BOC review of Injury to Inmate Reports and DOC Reportable Incident Data (COD 24 Hour Reports).

**None of the UOF A (Injury to Inmate) or Slashing/Stabbing incidents reported by DOC in the three-month audit period involved multiple serious injuries.** Per DOC policy, serious injuries are considered "unusual incidents" and are required to be reported to the Department's Central Operations Desk (COD).[28] In practice, Serious Injury COD reports are not generated by DOC staff when injuries are related to other reportable "unusual incidents" such as a Use of Force or Stabbing or Slashing incidents. This means the Department does not have a single metric from which to determine the actual number of serious injuries occurring to people in its custody, and the number of Serious Injury CODs is an underinclusive metric. While use of force incidents and stabbing or slashing incidents could involve multiple injuries, none of the incidents reported by DOC in the audit period did.

**Only 31% (n=46) of audited injury reports were complete.[29]** Board staff reviewed each of the 149 audited injury reports for content and completeness. Among the sections that are completed

---

[28] DOC's Central Operations Desk, located on Rikers Island, is a centralized unit tasked with receiving reports of "unusual incidents" occurring in all NYC jails, as well as hospital prison wards, courtroom holding areas and transportation buses and vans operated by the Department. The Central Operations Desk generates a 24-Hour Report daily, which is used to track unusual incidents, such as uses of force, serious injuries to inmates or staff, and other events that seriously affect normal operations of DOC facilities. The Department's policy on reporting requirements for unusual incidents defines "unusual incident" as "an event or occurrence that may affect or actually does affect the safety, security and well-being of the Department, its personnel, visitors and volunteers, as well as the inmates over whom it has custody and control." NYC DOC Directive 5000R-A (Reporting Unusual Incidents).

[29] An "incomplete" injury report is here defined as lacking the completion of an essential, required component of the Injury to Inmate report form. For DOC, this might include critical missing information such as the time of injury,

by DOC, the most common cause of incomplete injury reports was lack of review by Deputy Wardens (n=27) or Commanding Officers (n=34). Among the sections to be completed by CHS, the most common causes of incomplete reports were failures by clinicians to indicate a final disposition (n=69) or indicate the time (n=20) or date (n=15) of medical disposition.

Figure 5.



Source: BOC review of 149 Injury to Inmate Reports.

## Missing Information from Injury to Inmate Reports

Table 2.

| CHS | |
|---|---|
| **Missing Information** | **Total** |
| No Medical Disposition | 69 |
| No Time of Medical Disposition | 20 |
| No Date of Medical Disposition | 15 |
| No Time Entry for "Reported For Medical Attention" | 12 |
| No "Visible Injury" Entry | 5 |
| No Date of Injury | 4 |

Source: BOC Review of 149 Injury to Inmate Reports.

Table 3.

| DOC | |
|---|---|
| **Missing Information** | **Total** |
| No Commanding Officer's Review | 34 |
| No Deputy Warden's Review | 27 |
| No Tour Commander's Review | 9 |
| No Injury Time | 9 |
| Missing Investigation/Review Date | 7 |
| No Time of Supervisor Notification | 6 |
| No Witness Entry | 5 |

indication whether the injury was witnessed by a staff person, or the failure of a captain to complete an investigation. For CHS, this might include the absence of an entry indicating the time the incarcerated person was presented for medical treatment, failure to indicate a final disposition on the form, as well as the date and time of the disposition.

| | |
|---|---|
| No "Injuries Resulted From" Entry | 4 |
| No Captain's Investigation | 3 |
| Injury Investigation Completed Prior to Medical Disposition | 2 |

Source: BOC Review of 149 Injury to Inmate Reports.

The Eric M. Taylor Center was the facility with the highest percentage of fully completed injury reports (83%, n=15). The Robert N. Davoren Complex (11%, n=1), the Brooklyn Detention Complex (11%, n=1), and the Otis Bantum Correctional Center (14%, n=3) had the lowest rate of fully completed injury reports.

Figure 6.



Source: BOC Review of 149 Injury to Inmate Reports.

**DOC's investigation process for injuries is plagued by delays, poor accountability, and incomplete reviews.** Department policy requires that all reported or suspected injuries be investigated promptly, and that each injury investigation be completed by a Captain and then reviewed by three levels of facility leadership, under specific timelines.

- BOC found that 6% (n=9) of Tour Commander Reviews, 18% (n=27) of Deputy Warden Reviews, and 23% (n=34) of Commanding Officer Reviews were not completed.
- Despite a requirement that Captains submit their injury investigation to Tour Commanders within 72 hours of the medical disposition, Captain's investigations were completed after 18 days, on average.
- Tour Commanders must review completed injury investigations within 72 hours of the medical disposition, yet they took, on average, 31 days from the date of medical disposition to complete their reviews.

- Deputy Wardens for Security must complete their reviews within five business days of the incident, yet they took, on average, 41 business days from the incident date to complete their reviews.
- DOC policy does not provide a timeline for the final review by the Commanding Officer (facility warden). These reviews were completed, on average, 46 business days from the incident date.

Finally, the Board found that 26% of Deputy Warden's Reviews (n=38) and 28% of Commanding Officer's Reviews (n=42) were only completed after the Board requested the injury reports for the audit, months after the date of injury.

Table 4.

| Time (Days) to Complete Injury Investigation and Review | | | | | |
|---|---|---|---|---|---|
| | Stage: | Captain's Injury Investigation | Tour Commander's Review | Deputy Warden's Review | Commanding Officer's Review |
| | Timeframe for completion required by policy: | Within 72 hours of final medical disposition | No more than 72 hours after final medical disposition | Acceptable reports completed within five business days of incident (report or injury) | Not specified in policy |
| | Number of Reports Included in Calculation (n=) | 124 | 125 | 119 | 113 |
| Days | Average | 18 | 31 | 41* | 46* |
| | Median | 3 | 10 | 28* | 37* |
| | Min | 0 | 0 | 1* | 2* |
| | Max | 163 | 164 | 117* | 117* |
| | Number of Injury to Inmate Reports with an Incomplete Investigation/Review | 3 | 9 | 27 | 34 |

*Indicates business days

Source: BOC Review of 149 Injury to Inmate Reports.

**CHS staff's requirement to document medical dispositions in the Injury to Inmate Report is frequently unmet.** Board staff found 59 reports (40%) in which the clinician signed and entered the date of medical disposition without providing a disposition. An additional 10 injury reports (7%) contained no disposition and no date of disposition.

The Injury to Inmate Report contains an area, designated specifically for CHS clinicians, that serves three distinct functions. The first section asks clinicians to record their initial patient

encounter. The second section requires them to document medical findings from any medical referrals, if the injured patient requires a higher level of diagnostic or treatment care than can be afforded in the jail's medical clinic. The third section asks clinicians to indicate the final disposition of the patient, as CHS policy also requires.[30] The Board's variance allows CHS to share these sections of the Injury to Inmate Report with DOC.

Figure 7.



For the vast majority of injuries occurring in jails, which are non-serious in nature,[31] the second section of the injury report form is not utilized, and the initial treating clinician also marks the disposition upon completion of the initial encounter.

---

[30] CHS Policy #Med 7, Procedure 8 (April 1, 2008): "Upon completion of the evaluation, the practitioner will make a determination as to the disposition of the patient and notify DOC by checking the appropriate box on the bottom of Form 167R."

[31] In 2017, DOC generated 31,368 Injury to Inmate Reports and CHS designated a total of 816 serious injuries, an approximate serious injury rate per report of 2.6%.

However, because nearly all serious injuries result in referrals to either the West Facility (where urgent care and radiology services are available) or Bellevue and East Elmhurst Hospitals,[32] the second section is typically required in cases of serious injury.

The audit found that CHS clinicians frequently (n=88, 59%) signed off on the initial patient encounter (section 1) and then signed off on the final disposition (section 3) during the same initial encounter, even if urgent medical referral services were ordered and still pending. In those 88 cases, the final medical disposition was signed within one hour of the initial evaluation. In 64 cases (42%), the final medical disposition was signed within 30 minutes of the initial evaluation.

**In 79 of 149 (53%) audited injury reports, DOC indicated in the injury investigation that the cause was at least partially due to an "inmate-on-inmate altercation."** Similarly, 54% of serious injuries (91/169) occurring during April, May, and June 2017 were caused by fights between incarcerated people, as reported by CHS.[33] Accidents were the next common cause of serious injury (28%, n=42), as reported in DOC injury investigations.

Figure 8.



Source: BOC Review of 149 Injury to Inmate Reports.

---

[32] In its review of 149 injury reports relating to serious injury, BOC found that 98% (n=146) resulted in referrals to medical services outside of the jail's clinic.
[33] CHS data tracks causes of injury based on CHS clinical staff's encounter with the patient, a determination made independently from the Department's injury investigation.

**CHS data over the three-month audit period show 90% of all serious injuries involved lacerations requiring sutures (n=79) or fractures (n=73).**

Figure 9.



CHS - Types of Serious Injuries* - April, May & June 2018
n=169

Source: CHS Monthly Serious Injury Reports.
* Types of serious injuries as reported by CHS.

**Facial trauma (such as lacerations, puncture wounds, fractures and burns to the face, as well severe injuries to the eye) was the most common type of serious injury.** Board staff review of Injury to Inmate Reports identified 76 CHS-designated serious injuries associated with the facial area during the audit period. These represented 51% of all Board-audited serious injury reports. In its review of injury reports, the Board noted ten nasal fractures, six mandible fractures and three orbital fractures. Top facial laceration sites included the lip (n=19) and the eyebrow (n=9).

Metacarpal fractures[34] (n=10) and ankle fractures related to slip-and-falls and basketball (n=6) were also prevalent.

---

[34] Metacarpal fractures are frequently associated with closed-fist strikes: https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3088367/.

**The Anna M. Kross Center (AMKC) had the highest number and rate of serious injuries.[35]**
AMKC confines 25% of the City's incarcerated people and is the largest jail in the City. CHS
reported 34% of all serious injuries systemwide occurred to people incarcerated at AMKC during
the audit period. This amounts to the highest number of injuries (n=58) and the highest monthly
rate of serious injuries per 1000 incarcerated people (9.45). West Facility (9.01) and Robert N.
Davoren Center (RNDC, 8.58) had the next highest rates.

The rates of serious injuries were lowest at the Rose M. Singer Center (RMSC, .66) and the Vernon
C. Bain Center (VCBC, 3.05). Only one serious injury (fractured nose) occurred at RMSC during
the three-month period.

Figure 10.



CHS - Serious Injuries By Facility - April, May, June 2018
n=169

Source: CHS Monthly Serious Injury Reports.

---

[35] Monthly rate per 1,000 incarcerated people.

Table 5.

| Serious Injuries by Facility (April - June 2018) | | | | |
|---|---|---|---|---|
| Facility | Number of Serious Injuries | % of Average Monthly Census | % of Serious Injuries | Monthly Rate per 1,000 Incarcerated People |
| AMKC | 58 | 25% | 34% | 9.45 |
| EMTC | 18 | 14% | 11% | 5.41 |
| OBCC | 21 | 11% | 12% | 7.84 |
| MDC | 12 | 9% | 7% | 5.65 |
| GRVC | 17 | 8% | 10% | 8.50 |
| VCBC | 6 | 8% | 3% | 3.05 |
| BKDC | 13 | 7% | 8% | 7.59 |
| RNDC | 13 | 6% | 8% | 8.58 |
| RMSC | 1 | 6% | 1% | 0.66 |
| NIC | 6 | 3% | 3% | 7.35 |
| GMDC | 3 | 3% | 2% | 3.70 |
| WF | 1 | 0% | 1% | 9.01 |
| TOTAL | 169 | 100% | 100% | 6.71 |

Source: CHS Monthly Serious Injury Reports, DOC Facility Census Data.

**Close to 80% (n=114) of serious injuries occurred in housing areas.** In 53% (n=60) of the reports of serious injuries that occurred in a housing area, it was not possible to tell, based on the narrative details available in the report, where in the housing area the injury occurred—i.e., whether it occurred in the dayroom, bathroom, or cell.

Figure 11.



Source: BOC Review of 149 Injury to Inmate Reports.

**Most events causing serious injuries were not witnessed by staff.** Thirty-two percent (32% n=48) of all serious injuries were witnessed by staff, as indicated in the injury reports. Among serious injuries stemming from violent encounters, officers witnessed 45% (n=43) of the incidents.

**On average, it took approximately two hours for seriously injured incarcerated people to receive medical attention after a DOC supervisor was notified of the injury.** BOC found 13 UOF/fight-related serious injuries for which a four-plus-hour lapse occurred between time of injury and the time the injured individual was presented for medical attention.[36]

Table 6.

| Time from DOC Supervisor Notification of Injury and Time Reported for Medical Attention | |
|---|---|
| n=120 | |
| Average | 1 Hour & 56 Minutes |
| Median | 1 Hour & 2 Minutes |
| Minimum Time | 4 Minutes |
| Maximum Time | 13 Hours & 45 Minutes |

•Time could not be determined for 21 injury reports due to missing entries/illegible entries by DOC or CHS staff.
• 8 Injury Reports ruled out due to a 0:00 lapse between time of injury and time reported for medical attention.

Source: BOC Review of 149 Injury to Inmate Reports.

---

[36] DOC Directive 4516R-B was updated with new requirements on 6/22/2018, including one that orders: "Inmates must be afforded medical attention by medical staff as soon as practicable, but no more than four (4) hours following a Use of Force incident or inmate-on-inmate fight, barring certain circumstances." The Sixth Report of the Nunez Independent Monitor, filed on October 17, 2018, analyzed medical wait times experienced by incarcerated people following use of force incidents. The Nunez Compliance Unit (NCU) found significant improvements in this area. In January 2018, 57% of incarcerated people included in their audit waited less than four hours for medical treatment following a use of force. By June 2018, 79% were afforded medical treatment within four hours. The NCU's complete analysis relating to their work tracking medical treatment times can be found at: https://www1.nyc.gov/assets/doc/downloads/pdf/6th_Monitor_%20Report-10-17-18%20.pdf#page=59.

## Recommendations

1. DOC and CHS should immediately begin jointly publishing monthly data on the number, type, cause, and location of injuries to people in custody (serious and non-serious), as these indicators are critical to prevention efforts.

2. Within the next three months, DOC should come into compliance with their existing policy for reporting serious injuries. DOC should report all serious injuries to people in custody determined to be serious by correctional health staff.

3. Within the next nine months, DOC and CHS should establish new protocols and take steps to increase accountability including: assessment of which supervisory reviews are needed and whether changes to the Injury to Inmate Report form are needed; development of an electronic injury-tracking system; and training to ensure that injury reports are complete and include accurate, final diagnoses and dispositions.

4. DOC and CHS should immediately begin providing the Board with monthly access to all DOC Injury Reports that CHS designates as associated with a serious injury. This will support DOC's and CHS's efforts to improve their process and increase accountability.

5. Within the next three months, DOC should review the conditions leading to the high number and rate of serious injuries at AMKC and implement a plan to reduce injuries there. DOC should use video review to inform this injury analysis, so that the locations and causes of serious injuries are better documented.

6. DOC should contract with an independent auditor to assess reporting of serious injuries to staff. The audit's goals would include understanding who is getting injured (civilian v. uniform, DOC v. DOE v. CHS v. contractors v. volunteers, etc.); how (assault v. construction-related v. slip and fall, etc.); when and where injuries are occurring; and what types of injuries are sustained. Ultimately, these audits must inform injury prevention planning and public reporting.[37]

7. BOC should conduct an annual audit of Injury to Inmate Reports.

---

[37] Currently, DOC will not share any medical information or injury diagnoses related to staff injuries with the Board.

## Appendix A: CHS Serious Injury Inclusion Criteria

**"Serious Injury" Inclusion Criteria**
**Correctional Health Services**

| SERIOUS INJURY CATEGORY | INCLUDES | EXCLUDES |
|---|---|---|
| Lacerations | Any laceration that requires suturing or stapling | Any laceration that is closed with tissue adhesive or bandages, not requiring suturing or stapling |
| Fractures | | Any fracture of the phalanges |
| Dislocations | Any dislocation if seen by medical providers and reduced in the clinic/hospital | Any dislocation of the phalanges, any dislocation if self-reduced outside of the clinic/hospital |
| Permanent or temporary disabling of an organ | Temporary disabling of the eyes | Temporary disabling of the skin |
| Foreign body ingestion (judged to be serious by medical professionals involved) | Any foreign body ingestion if removed by EGD in the hospital | Any foreign body ingestion that passes through the digestive system without removal by EGD |
| Blow to the head (judged to be serious by medical professionals involved) | Any blow to the head with post-concussive syndrome diagnosis | Any blow to the head without a post-concussive syndrome diagnosis |
| Any injury judged to be serious by medical professionals involved | | |

24

# Appendix B: DOC Serious Injury Categories & Policy Definitions

| Serious Injury COD | Slashing/Stabbing COD | UOF A |
|---|---|---|
| "i. Creates a substantial risk of death or disfigurement; ii. Is a loss or impairment of bodily organ; iii. Is a fracture or break to a bone, excluding fingers and toes; or iv. Is an injury defined as serious by a physician." | Not formally defined in policy, but taken to mean any laceration or puncture wound inflicted on one person by another with a "weapon." | "Class A Use of Force: a classification used to describe Use of Force Incidents that require medical treatment beyond the prescription of over-the-counter analgesics or the administration of minor first aid, including those resulting in one or more of the following treatments/injuries: multiple abrasions and/or contusions, chipped or cracked tooth, loss of tooth, laceration, puncture, fracture, loss of consciousness, concussion, suture, internal injuries (e.g., ruptured spleen, perforated eardrum, etc.), or admission to a hospital." |
| Source: Directive 5000R-B ("Reporting Unusual Incidents") | Source: Directive 5000R-B ("Reporting Unusual Incidents") | Source: Directive 5006R-D ("Use of Force") |

## Appendix C: DOC Injury to Inmate Report (Form #167R-A)



CORRECTION DEPARTMENT
CITY OF NEW YORK

INJURY TO INMATE REPORT

Page 1 of 2 Pages

Form: #167R-A
Rev.: 01/31/08
Ref.: Dir. #4516R-B

INSTRUCTIONS: Original Report to Security, One copy to Clinic Lock Box, One Copy to Inmate Medical File.

Command: | Date: | COD/UOF #: | Injury #:

TO BE COMPLETED BY EMPLOYEE (PLEASE PRINT CLEARLY)

Inmate Name (Last Name, First Name)

Location: | Work | NYSID # | Book & Case/Sent #:

Details:

Supervisor Notified (Print Last Name, First Name, Rank, Shield #) | Date | Time: Hrs

Employee: (Did) (Did Not) Witness This Injury: | Employee Signature | Rank/Title: | Shield ID#

TO BE COMPLETED BY MEDICAL STAFF ONLY - (PLEASE PRINT CLEARLY)

Date of Injury: | Reported for Medical Attention: Date Hrs. | Inmate Refused Medical Attention: Yes No | Visible Injuries: Yes No

Medical Staff Must Note Location of Injury:

Nature of Injury and Cause:

Treatment:

Treated By/Examined By (Print and Sign Full Name) | Title:

Referrals to Other Medical Services (If Yes, Document Medical Findings) Yes No

Treated By/Examined By (Print and Sign Full Name) | Title:

Please Check Disposition: Return to Housing Area | Work Release ___ Days | Light Duty ___ Days | Return to Work Assignment | Re-Exam ___ Dept | Refer to Clinic | Return to School | Life Threatening Emergency | Minor

Transfer to Hospital (Indicate Name of Hospital)

Other (Please Specify)

Treated By (Print Full Name and Title, Sign Name): | Date | Time Hrs

I certify that the cause of injury as stated herein is to my knowledge true and medical attention was provided:

Inmate Signature: | B&C / Sentence # | | Date

Witnessed By (Signature): | Rank/Title: | Shield / I.D. #: | Date

Page 1 of 2

26

| | **CORRECTION DEPARTMENT**<br>**CITY OF NEW YORK** | | |
|---|---|---|---|
| | **INJURY TO INMATE REPORT** | Page 2<br>of<br>2 Pages | Form: #167R-A<br>Rev.: 01/31/08<br>Ref.: Dir. #4516R-B |

INSTRUCTIONS: Original Report to Security, One copy to Clinic Lock box, One copy to Inmate Medical File.

Inmate Name (Last Name, First Name)

| Injury # | NYSID # | Book & Case-Sent # |
|---|---|---|

TO BE COMPLETED BY THE INVESTIGATING OFFICER. PLEASE PRINT CLEARLY.

Investigator's Report:

Injuries Resulted From: ☐ Use of Force ☐ Allegation of a Use of Force ☐ Inmate on Inmate Altercation ☐ Self Inflicted ☐ Accident ☐ Other (Explain)

| Investigating Officer (Signature): | Rank/Title: | Shield-ID#: | Date: |
|---|---|---|---|

Tour Commander's Review:

| Tour Commander's (Signature): | Rank/Title: | Shield/ID#: | Date: |
|---|---|---|---|

Deputy Warden's Review:

| Signature: | Rank/Title: | Date: |
|---|---|---|

Commanding Officer's Remarks:

| Signature: | Rank/Title: | Date: |
|---|---|---|

*Page 2 of 2*

# Appendix D: Injury Report Audit Template

| Injury Report Information - Correctional Health Services | |
|---|---|
| Date of Injury | |
| Date Reported for Medical Attention | |
| Time Reported for Medical Attention | |
| Refusal of Medical Attention | ☐ Yes  ☐ No |
| Visible Injuries | ☐ Yes  ☐ No |
| Nature of Injury and Cause | |
| Treatment | |
| Referrals to Other Medical Services | |
| Medical Findings from Referrals | |
| Medical Disposition | ☐ Return to Housing    ☐ Return to Work Assignment<br>☐ Work Release __ Days    ☐ Re-Exam __ Days<br>☐ Light Duty __ Days    ☐ Refer to Clinic<br>☐ Return to School    ☐ Transfer to Hospital<br>☐ Other (Please Specify): _____ |
| Date of Medical Disposition | |
| Time of Medical Disposition | |
| Medical Disposition Signature | |
| Injury Report Information - Department of Correction | |
| Facility/Command | |
| Date Injury Report Generated | |
| COD/UOF # | |
| Injury Report # | |
| Location | |
| Work | |
| Details/Time of Injury | |
| Time of Supervisor Notification | |
| Employee Witness | ☐ Did  ☐ Did Not |
| Investigator's Report | |