UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------x
CORRECTION OFFICERS'
BENEVOLENT ASSOCIATION, INC., et al.,

No. 17 CV 2899-LTS

                Plaintiffs,

-against-

CITY OF NEW YORK, et al.,

                Defendants.
--------------------------------------------------------x

<u>OPINION</u>

APPEARANCES:

| | |
|---|---|
| KOEHLER & ISAACS, LLP<br>  By: Cynthia Devasia, Esq.<br>61 Broadway<br>New York, NY 10006 | CORPORATION COUNSEL OF THE CITY OF NEW YORK<br>  By: Alan Maer Schlesinger, Esq.<br>100 Church St., Rm 2-187<br>New York, NY 10007-2601 |
| *Attorneys for Plaintiff* | *Attorneys for Defendant* |

LAURA TAYLOR SWAIN, United States District Judge

Plaintiff Correction Officers' Benevolent Association, Inc. ("COBA"), the exclusive bargaining representative for all employees of the New York City Department of Correction ("DOC") holding the title of "Correction Officer" ("CO"), and COs Tiffani Dublin, Anthony Romano, Matthew Hines, Francis Castro, and Bryan Ashendorf, individually and on behalf of others similarly situated (collectively "Plaintiffs"), bring this action against the City of New York (the "City"), its mayor, Bill De Blasio, the DOC, and Cynthia Brann, the DOC Commissioner (collectively "Defendants"). Plaintiffs claim that Defendants have violated 42 U.S.C. § 1983 ("Section 1983") by subjecting them to a state-created danger in derogation of their substantive due process rights guaranteed by the Fourteenth Amendment. (Proposed First Amended Complaint ("FAC"), Docket Entry No. 60, Exh. B.) On May 30, 2018, the Court dismissed Plaintiffs' original complaint in its entirety for failure to state a claim upon which relief could be granted. (Docket Entry No. 51.) Plaintiffs now move for leave to amend the complaint. (Docket Entry No. 56.) The Court has subject matter jurisdiction of this action pursuant to 28 U.S.C. sections 1331 and 1343(a)(3).

The Court has reviewed the parties' submissions carefully and, for the following reasons, denies Plaintiffs' motion for leave to amend the complaint.

## BACKGROUND

The Court presumes familiarity with its earlier decision in this action (Memorandum Opinion and Order dated May 30, 2018, Docket Entry No. 51) and summarizes here only the facts alleged in the proposed FAC that are newly added and relevant to this decision. The Court takes these facts as true for the purposes of this motion for leave to amend the complaint.

This action is focused on administrative practices and working conditions in City jails that plaintiffs contend subject COs and inmates to unreasonable levels of serious danger because inaccurate reporting of violent inmate conduct has led to institutional practices that have made conditions more dangerous than they would have been with accurate reporting. Individual plaintiffs were, at all relevant times, COs employed by the City. (FAC, at ¶¶ 19-22.) Defendant DOC is an agency of the City of New York charged with the administration of the City's jail system. (FAC, at ¶ 25.)

Defendants utilize a classification system that categorizes violence occurring within the City's jails. (FAC, at ¶ 88.) The classification system involves labeling incidents of violence according to their severity and nature; under this system, an incident classified as a "log book entry" is not reported or investigated beyond that notation. (FAC, at ¶ 89.) Plaintiffs allege that Defendants have an unofficial policy that increases the COs' exposure to physical danger or death, specifically a policy of "non-reporting, underreporting, misreporting, or downgrading violence statistics and failing to hold violent inmates accountable for their actions." (FAC, at ¶ 184.) Defendants allegedly use the classifications inaccurately and inconsistently, for instance by reporting violent incidents as "log book entries" when the incidents actually fit the more serious category of assault on staff. (FAC, at ¶¶ 90-91, 125.) This practice allows violent prisoners to be classified as less likely to cause injury than if reporting were accurate. (FAC, at ¶ 15.) Plaintiffs allege that the misclassification is undertaken to reduce the appearance of violence at the City jails and that it actually increases the exposure of COs and inmates to risk of injury and death by altering the institutional responses to serious incidents. (FAC, at ¶¶ 6, 8, 13, 72-73.)

Plaintiffs further allege that COs rely on the accuracy of the classification system because they look at the institutional history of prisoners when requesting work assignments (FAC, at ¶ 143), choosing among custody practices and management strategies (FAC, at ¶ 140), and choosing whether to utilize safety precautions such as handcuffs, security mitts, or waist chains (FAC, at ¶ 142). The downgrading of violent incidents to "log book entries" also results in an institutional failure to discipline prisoners and/or change their housing assignments after they commit violent acts. (FAC, at ¶¶ 141, 147.) For all these reasons, Plaintiffs assert that the misclassification of violent incidents gives COs a false sense of security and exposes them to increased levels of danger and injury. (FAC, at ¶¶ 135, 143.) The misclassification of violent incidents in DOC facilities was publicly reported by news outlets as early as 2014. (FAC, at ¶ 75, Exh. S.) Subsequent reports from news sources such as the New York Times, the New York Post, and the New York Daily News covered the falsification of statistics and/or under- or non-reporting of violent incidents in articles covering such incidents in New York City jails. (FAC, at e.g., ¶¶ 75, 81, 101, 104, 127, Exh. T.) Plaintiffs also note that the Federal Monitor appointed in Nunez v. New York City Dept of Correction, et al., has flagged downgrading of incidents of violence as a "'troubling and confusing message to staff that there is a grey area or some discretion, in what is considered a use of force.'" (FAC, at ¶ 103 (citation omitted).)

Since at least August of 2016, Plaintiffs have repeatedly demanded that Defendants discontinue their unofficial policy of misclassifying violent incidents. (FAC, at ¶ 133.) Despite these demands, Defendants have "continued their concealment practices." (FAC, at ¶ 134.)

DISCUSSION

Leave to Amend Standard

Rule 15(a) of the Federal Rules of Civil Procedure provides that leave to amend should be freely granted when justice so requires. Fed. R. Civ. P. 15(a). While granting or denying such leave is within the discretion of the district court, see Reisner v. General Motors Corp., 511 F. Supp. 1167, 1171 (S.D.N.Y. 1981), leave to amend generally will be granted unless: (1) there is evidence of undue delay, bad faith, dilatory motive, or repeated failures to cure deficiencies by amendments previously allowed; (2) allowing amendment would cause undue prejudice to the opposing party; or (3) the amendment would be futile. See Foman v. Davis, 371 U.S. 178, 182 (1962). Defendants oppose Plaintiffs' motion, arguing that the proposed amendment would be futile. "A proposed amendment to a pleading would be futile if it could not withstand a motion to dismiss" pursuant to Federal Rule of Civil Procedure 12(b)(6). Oneida Indian Nation of New York v. City of Sherrill, 337 F.3d 139, 168 (2d Cir. 2003) (citation omitted). Thus, "[l]eave to amend may be denied on grounds of futility if the proposed amendment fails to state a legally cognizable claim or fails to raise triable issues of fact." AEP Energy Servs. Gas Holding Co. v. Bank of America, N.A., 626 F.3d 699, 726 (2d Cir. 2010) (citation omitted).

When considering a Rule 12(b)(6) motion, the Court accepts as true all nonconclusory factual allegations in the complaint and draws all reasonable inferences in the plaintiff's favor. See Roth v. Jennings, 489 F.3d 499, 501 (2d Cir. 2007). To survive such a motion, the complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)). A court is not, however, required to

accept "conclusory statements" as true, nor do "legal conclusion[s] couched as [] factual allegation[s]" merit such deference.  Twombly, 550 U.S. at 555.

Substantive Due Process – Governing Principles

Plaintiffs claim that Defendants have created or increased a risk of serious bodily harm or death from third parties in violation of the Due Process Clause of the Fourteenth Amendment.  The substantive component of the Due Process Clause "protects individual liberty against certain government actions regardless of the fairness of the procedures used to implement them."  Collins v. City of Harker Heights, 503 U.S. 115, 125 (1992) (internal quotation marks omitted).  It is well established, however, that "'nothing in the language of the Due Process Clause itself requires the State to protect the life, liberty, and property of its citizens against invasion by private actors.' DeShaney v. Winnebago County Department of Social Services, 489 U.S. 189, 195, 109 S. Ct. 998, 1002, 103 L.Ed.2d 249 (1989) ("*DeShaney*").  Thus, '[a]s a general matter, ... a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause.'  Id. at 197, 109 S. Ct. at 1004."  Ying Jing Gan v. City of New York, 996 F.2d 522, 533 (2d Cir. 1993).  Significantly, the right to substantive due process does not in and of itself impose any minimum standard of workplace safety for public employees.  Collins, 503 U.S. at 130.  A recognized exception to this general rule imposes a constitutional obligation upon a state actor to protect an individual where "the governmental entity itself has created or increased the danger to the individual."  Ying Jing Gan, 996 F.2d at 533.  Plaintiffs invoke this exception, claiming that Defendants' alleged failure to report violent incidents properly has led to dangerous institutional practices, making the resulting workplace conditions state-created dangers.

The state-created danger exception applies where (1) a "governmental official takes an affirmative act that creates an opportunity for a third party to harm a victim (or increases the risk of such harm)," Lombardi v. Whitman, 485 F.3d 73, 80 (2d Cir. 2007), and (2) the government action shocks the contemporary conscience. See Pena v. DePrisco, 432 F.3d 98, 112 (2d Cir. 2005). "It is not enough to allege that a government actor failed to protect an individual from a known danger of bodily harm or failed to warn the individual of that danger." Lombardi, 485 F.3d at 79. The complaint must allege "affirmative, risk-creating acts," Robischung-Walsh v. Nassau Country Police Dept., 421 F. App'x 38, 41 (2d Cir. 2011), that "actually contributed to the vulnerability of the plaintiff." Hemphill v. Schott, 141 F.3d 412, 419 (2d Cir. 1998).

If such an affirmative act is shown, the Court must determine whether the nature and creation of the risk are of a character that shocks the contemporary conscience. See County of Sacramento v. Lewis, 523 U.S. 833, 847 n.8 (1998). Conscience-shocking conduct may be found where government actors engage in conduct posing serious danger that is arbitrary and unjustified by legitimate concerns, but the concept is very narrow and courts defer to local officials' balancing of competing public policy goals. Collins, 503 U.S. at 128-29.

Affirmative Government Action

The Supreme Court addressed a government official's failure to train or warn an employee about a danger in the workplace in Collins. There, a sanitation worker employed by the defendant city died of asphyxia after entering a sewer that lacked ventilation. The decedent's widow brought a claim pursuant to 42 U.S.C. § 1983 against the city for providing an unsafe work environment, failing to train employees to manage the dangerous work, and failing to provide safety warnings and equipment at the work site. The Court dismissed the claim insofar

as it was based on maintenance of an unsafe work environment, concluding that the Due Process Clause does not guarantee minimal standards of workplace safety for public employees. 503 U.S. at 126. The Court dismissed the failure to train and warn claims as well, concluding that deliberate indifference to an employee's safety did not constitute conscience-shocking, arbitrary government action of a constitutional dimension, even where a local law required such measures. Id. at 128-130. The Court explained that it reached this conclusion for two reasons: first, the Court had "previously rejected claims that the Due Process Clause should be interpreted to impose federal duties that are analogous to those traditionally imposed by state tort law" and, second, omissions by officials administering government programs are presumptively the result of a rational decision-making process that takes account of competing obligations of the government. Id. at 128. For these reasons, the Court held, the Due Process Clause does not "guarantee municipal employees a workplace that is free of unreasonable risks of harm." Id. at 129. As noted earlier, the Court also rejected the plaintiff's argument that her substantive due process claim was substantiated by a Texas state law that required the city to warn employees of, and provide safety training regarding, the dangers of gases in the sewers. While the Court assumed that the state law created a liberty interest protected by the Due Process Clause, it held that, because the deprivation of Collins' life was not conscience-shocking, the deprivation of the lesser liberty interest was not one of constitutional dimension either. Id. at 129-130.

Plaintiffs argue that the viability of their claim is not controlled by Collins' "well-established principle that the Due Process Clause does not guarantee public employees a workplace free of risks of harm," Kaucher v. County of Bucks, 455 F.3d 418, 425 (3d Cir. 2006), because the increased risk of harm to Plaintiffs allegedly results from Defendants' affirmative act of adopting a policy, practice, or custom of non-reporting, underreporting, misreporting, or

downgrading violence statistics in the jails. (FAC, at ¶ 184.) Plaintiffs allege that COs rely on the accuracy of violence reports when interacting with prisoners and that inaccurate reports subject them to an increased risk of being attacked by prisoners who are documented as less dangerous than the classification system would reflect if reporting were accurate. (FAC, at ¶¶ 15, 143.) Additionally, Plaintiffs allege that, as a result of inaccurate reporting of incidents of violence, prisoners are not disciplined for violent acts that they commit, a practice that implicitly condones violent actions and thereby increases the risk of further violence. (FAC, at ¶ 147.)

The Second Circuit has addressed the argument that a government official's failure to punish wrongdoing is an affirmative act that increases the risk of future violence under the state-created danger exception, in the context of official endangerment of civilians. In Pena v. DePrisco, the plaintiff alleged that police officers encouraged an off-duty officer to drive while intoxicated, creating a risk of serious injury. 432 F.3d 98. The Pena court examined the alleged encouragement by the different police supervisors involved and held that, "to the extent that the plaintiffs allege that [the officer's] supervisors 'stood by and did nothing' to punish [his] previous [similar] misconduct, we think those allegations are . . . inadequate to state a substantive due process claim." Id. at 110. The circuit court held that the complaint stated a claim only to the extent it alleged "more than a failure to prevent misbehavior and to reprimand or punish . . . [and also alleged] that prior assurances of impunity were actually, albeit implicitly communicated." Id. at 112. The circuit court addressed the issue of implicit condonation of private violence again in Okin v. Village of Cornwall-On-Hudson Police Dept. when it was confronted with allegations of "repeated, sustained inaction" by police officers and department supervisors in the face of multiple complaints by the female plaintiff that her male partner was physically abusive. 577 F.3d 415, 428 (2d Cir. 2009). Okin alleged that, when the defendant

officers responded to her complaint that her partner had beaten and tried to choke her, the partner told them he could not "help it sometimes when he smacks [the plaintiff] around" and, rather than arrest him, the officers discussed football with the partner and were "very derogatory" towards Okin.  Id. at 420-21, 430 ("the officers openly expressed camaraderie with [the assailant] and contempt for Okin," and on "numerous occasions. . . responded to Okin's complaints without filing a domestic incident report, interviewing [the partner], or making an arrest.")  The circuit court held that this evidence presented a dispute of material fact as to whether the officers increased the threat of danger to the plaintiff, because "once [the male partner] was aware of the officers' dismissive and indifferent attitude toward Okin's complaints, . . . such awareness nullifie[d] the deterrent capacity of police response."  Id.

Courts in this district have interpreted Okin and Pena to require that a defendant actually communicate, either explicitly or implicitly, their approval of private violence to the private actor, and one district court has required that the communication be intended to signal such approval.  See Diruzza v. Village of Mamaroneck, New York, No. 14-CIV-1776 (VB), 2016 WL 796863, at *7 (S.D.N.Y. Feb. 22, 2016) (collecting cases); see e.g., Dwares v. City of New York, 985 F.2d 94, 97 (1993) (holding that police officers increased the danger of private violence towards flag-burning protestors when they told assailants "that unless they got completely out of control the police would neither interfere with their assaults nor arrest them.")  Here, though Plaintiffs have described two incidents in which unnamed personnel failed to discipline or transfer prisoners who then made second attacks on COs, Plaintiffs have not alleged that Defendants actually communicated "prior assurances of impunity" to prisoners in advance of violent incidents.  Nor have Plaintiffs alleged that Defendants intended to convey such

assurances through their failure to discipline violence.[1]  In terms of facts, all Plaintiffs have alleged is that Defendants have not always disciplined violent prisoners as required by DOC policies and that, consequently, the institution did not respond to violence on a policy level in a safer fashion and violent prisoners may have been emboldened by the inconsistent reporting and response behavior.  (FAC, at ¶¶ 130, 131, 132, 147.)  The conclusory allegation that Defendants have "fail[ed] to punish inmates for alleged misconduct" is insufficient to plead plausibly that Defendants engaged in affirmative conduct upon which a claim of state-created danger can be stated.  (FAC, at ¶ 147.)

The decision of the D.C. Circuit in Estate of Phillips v. D.C. is instructive in the analysis of whether Plaintiffs have alleged an affirmative act.  455 F.3d 397, 406 (D.C. Cir. 2006).  There, firefighters employed by the defendant District were killed while fighting a fire because the fire chief failed to train them and failed to follow the department's standard operating procedure when he ventilated the building improperly and failed to keep in radio contact.  The plaintiff estate argued that these failures constituted a policy which shocked the conscience, the adoption of which was affirmative conduct.  The D.C. Circuit disagreed, characterizing the allegation as one of inaction because the complaint alleged that the defendant "deliberately and knowingly failed to follow . . . established mandatory Standard Operating Procedures."  Id. at 404.  Courts in other circuits have also dismissed complaints alleging that a government actor's failure to follow a policy or practice that would have increased employee safety renders the government's non-compliant conduct a viable basis for a state-created danger claim.  See Witkowski v. Milwaukee County, 480 F.3d 511 (7th Cir. 2007) (affirming dismissal

---

[1]   In fact, Plaintiffs allege that Defendants intended to project a false appearance of safety within the facilities, precisely the opposite of an intent to encourage more violence.  (FAC, at ¶¶ 10, 88.)

of a claim that courthouse guards committed a substantive due process violation by knowingly failing to use a stun belt required by the trial court on a defendant who had threatened violence if convicted); Estate of Carrigan v. Park Cty. Sheriff's Office, 381 F. Supp. 3d 1316 (D. Colo. Mar. 29, 2019) (granting summary judgment dismissing a substantive due process claim based on failure by a county sheriff's office captain to follow the office's plan for evicting a violent individual). Similarly, the instant allegation that the City Defendants have knowingly adopted a policy of misreporting violence that leads to adverse safety outcomes is, fundamentally, an allegation that the City Defendants knowingly fail to follow the DOC's own incident classification system for reporting violence by prisoners. The Due Process Clause is a "limitation on the State's power to act," DeShaney, 489 U.S. at 195, but the failure to abide by the incident classification system is "inaction rather than action." Estate of Phillips, 455 F.3d at 404. Thus, Plaintiffs have failed to allege the requisite affirmative action.

Conscience-shocking Conduct

Even if Plaintiffs' allegations of affirmative action were sufficient to establish the first element of the state-created danger cause of action, their proposed amendment would still be futile because their allegations fail to satisfy the second prong of the state-created danger exception in that the conduct alleged does not shock the contemporary conscience. "[T]he measure of what is conscience shocking is no calibrated yard stick," Lewis, 523 U.S. at 847, and "[d]etermining whether the conscience is shocked by lesser levels of culpability than intentional infliction of physical harm requires [the Court] to make 'closer calls.'" Pena, 432 F.3d at 113 (quoting Lewis, 523 U.S. at 849). Those "closer calls" require a careful evaluation of the particular circumstances of the case, including the nature of the state action, the magnitude and

form of the harm inflicted on the plaintiff, and the state of mind of the defendants.  Lewis, 523 U.S. at 850-54; cf. Pena, 432 F.3d at 114 (finding that police officials' implicit condonation of heavy off-duty drinking and driving by officers shocked the conscience because it extended over a long period of time, presented an obvious risk, and resulted in grave danger to the public).

The nature of the state action alleged here is Defendants' failure to abide by the safety enhancing procedures they themselves adopted.  See discussion supra.  In analyzing whether the nature of state action was conscience-shocking, the Supreme Court held in Collins that Collins' claim was "analogous to a fairly typical state-law tort claim."  Collins, 503 U.S. at 128.  The Court held that the alleged failure to train was not conscience-shocking because to hold otherwise would be to impose a federal duty to provide a safe work environment, which was a duty traditionally imposed by state tort law.  Id.; see also Lewis, 523 U.S. at 848 (holding that the Fourteenth Amendment is not a "font of tort law").  While recognizing that a state-law safety standard could create a liberty interest for a public employee, the Collins Court found that the deprivation of that interest by mere noncompliance was not conscience-shocking in light of its finding that the deprivation of the Plaintiff's life by reason of unsafe working conditions was insufficient to support a substantive due process claim.  See Collins, 503 U.S. at 129-130 (describing a Texas statute which required safety training for public employees).

Collins suggests that that a failure to act in a way that generally increases public employee safety is not conduct regulated by the federal constitution because substantive due process does not impose minimum safety requirements.  503 U.S. at 126-127 (citing DeShaney, 489 U.S. at 195).  The Due Process Clause does not require Defendants to institute any incident classification system to increase employee safety at all and, consequently, it does not constitutionalize any particular system by requiring officials to abide by the system once one is

instituted.  See Donohue v. Wing, 773 F. App'x 18, at *21 (2d Cir. 2019) (rejecting argument that a failure to adopt a policy that could have mitigated harm was an affirmative act).

Plaintiffs also allege that the risk of injury from prisoner violence is increased by Defendants' failure to abide by the classification system because COs "rely on that information" when making decisions about which work assignments to accept and what safety precautions to take.  (FAC, at ¶ 143.)  However, COs' reliance on compliance with a classification system that is not itself guaranteed by the Due Process Clause cannot logically form the basis of a Due Process violation.  COs are not entitled as a constitutional matter to the elevated level of safety that the classification system promises.  Instead, the claim based on breach of the DOC's own standards is analogous to a state-law tort claim and consequently does not plead an offense of constitutional dimension.  See Collins, 503 U.S. at 128.  Furthermore, Plaintiffs' own factual allegations undermine the plausibility of their allegations of reliance on the accuracy of incident reports to predict safety risks, in that the FAC cites numerous public reports of improper classifications and jailhouse violence against correction officers, and COBA's years-long complaints of such practices to DOC officials.  (FAC, at ¶¶ 75, 81, 101, 104, 127, Exh. S, Exh. T.)

The diffuse and generalized nature of the alleged risk of harm also distinguishes the instant case from ones in which courts have found sufficient allegations of state-created danger arising from a government employer's conduct.  The Pena court addressed the risk of harm arising from specific supervisors encouraging drunk driving by a specific police officer. 432 F.3d 98.  The Okin court addressed the risk of harm arising from physical violence by a specific assailant against a known victim.  577 F.3d 415.  The Lombardi court addressed the known danger posed by poor air quality to people in a specific geographic area.  485 F.3d 73.

These cases demonstrate that conduct which creates a risk of harm can be conscience-shocking where the risk and potential victims are specified and known to the governmental actor. This pattern is also reflected in L.W. v. Grubbs, where a single prisoner posed a known risk of sexual assault and the administrator's action placed an employee alone with that specific prisoner despite prior assurances to the employee that she would not be put in such a situation. 974 F.2d 119 (9th Cir. 1992). Likewise, the court in Kowaleski v. Lewis permitted a state-created danger claim based on complaints of harassment to go forward where supervisors had expressed approval of harassment by specific coworkers. 643 F. Supp. 2d 259 (N.D.N.Y. 2009).

   Here, the alleged inconsistency of the reporting and potential inaccuracy of prisoner records and placement decisions is much more widespread and the actual danger to any given CO is much less clear. This factual dissimilarity from the controlling cases within, and persuasive cases without, the circuit weighs heavily against finding that the instant alleged creation of risk shocks the contemporary conscience. See Kallstrom v. City of Columbus, 136 F.3d 1055, 1066 (6th Cir. 1998) ("because many state activities have the potential to increase an individual's risk of harm, we require… [that] the state's actions place the victim specifically at risk, as distinguished from a risk that affects the public at large.")

   Case law also guides the Court to consider whether the type of risk alleged is one that is inherent in public employment as a corrections officer. Professions such as firefighting, law enforcement, and corrections inevitably require public employers to knowingly place employees in danger. See Estate of Carrigan, 381 F. Supp. 3d at 1324. Exposure to such inherent dangers, even when intentional, is not conscience-shocking within the meaning of the substantive due process doctrine. See, e.g., Robischung-Walsh, 421 F. App'x at 41 (affirming dismissal on merits of claim that police department's failure to train employees about suicide

prevention was conscience-shocking conduct because training decisions concern "the allocation of limited resources"); Donohue, 773 F. App'x 18, at *21 (affirming dismissal on merits of claim that police department's policy of residence restrictions for injured officers was conscience-shocking because the policy "may very well serve a legitimate and necessary purpose").

A public employment-related state-created danger claim based on dangers inherent in the workplace must be evaluated with due regard to the basic premise of Collins – that the substantive due process doctrine does not create minimum safety requirements for public employment. See Collins, 503 U.S. at 129. Consistent with this basic principle, several circuit courts have recognized that the due process clause does not protect public employees from the types of dangers inherent in their professions. See Witkowski v. Milwaukee County, 480 F.3d at 512 (observing that "no decision in . . . any circuit after Collins . . . has awarded damages under § 1983 to a public employee injured in the line of duty");[2] see also, Estate of Phillips, 455 F.3d at 407 ("the District is not constitutionally obliged by the Due Process Clause to protect public employees from inherent job-related risks"); Hunt v. Sycamore Community School Dist. Bd. of Educ., 542 F.3d 529, 543-44 (6th Cir. 2008) (holding that "conduct endangering the victim will not shock the conscience if the victim has voluntarily undertaken public employment involving

---

[2] Plaintiffs point to L.W. v. Grubbs as a Ninth Circuit decision upholding a claim under the state-created danger exception notwithstanding any danger inherent in prison work. There, a nurse working in a prison had been sexually assaulted by a prisoner with a known history of sexual violence who had been assigned to work in her office without supervision. 974 F.2d 119. The factual particulars of that decision are not indicative of a determination that a general failure to maintain best safety practices in prisons may trigger liability under the state-created danger exception. Rather, when the plaintiff nurse had been hired, she had been led "to believe that she would not be required to work alone with violent sex offenders." Id. at 120. Therefore, the risk encountered by the Plaintiff was one she had been told was not inherent to her medical job. Here, by contrast, potentially violent contacts with prisoners are inherent in prison security work, and Plaintiffs allege that noncompliance with the DOC's classification system is longstanding and well known.

the kind of risk at issue and the risk results from the governmental actor's attempt to carry out its mandatory duties to the public"); Uhlrig v. Harder, 64 F.3d 567 (10th Cir. 1995) (determining that the decision to release a member of the state hospital's mental health unit reserved for the criminally insane into the general hospital population did not shock the conscience where "the hospital staff members all were warned of the general risks inherent in their jobs"); Estate of Carrigan, 381 F. Supp. 3d at 1331 (holding that the death of an officer at the hands of an evictee which resulted from a county sheriff's office captain's deviation from the eviction plan was "part of the inherent risks that law-enforcement officers agree to take on when they take up their badge.")

The Second Circuit has not addressed the relationship between inherently dangerous public employment and the state-created danger doctrine.[3] In considering Plaintiffs' contention that distorting the classification element of a system designed to improve safety can produce consequences that constitute a state-created danger violative of the Due process Clause, the Court has been mindful of the Supreme Court's recognition that "the doctrine of judicial self-restraint requires. . . [the] exercise [of]. . . utmost care" when a court is asked to break new ground in the field of substantive due process. Collins, 503 U.S. at 125 (observing "the Court has always been reluctant to expand the concept of substantive due process because guideposts for responsible decisionmaking in this unchartered area are scarce and open-ended").

---

[3] The Second Circuit has stated that the Due Process Clause "imposes no affirmative duty on the government to guarantee a minimal level of safety or well-being, except in cases of a 'special relationship' or 'state-created danger.'" Leland v. Moran, 80 F. App'x 133, 136 (2d Cir. 2003) (citing DeShaney, 489 U.S. at 196-197). However, the Second Circuit has not addressed the question of whether a general failure to maintain heightened safety practices in inherently dangerous public employment can constitute a state-created danger.

This Court finds the guidance of other circuits persuasive insofar as they have held that an increase in a risk that is inherent to a public employee's job does not shock the conscience. See Uhlrig v. Harder, 64 F.3d at 574 (holding that the shock the conscience standard requires a "high level of outrageousness, because the Supreme Court has specifically admonished that a substantive due process violation requires more than an ordinary tort and that merely allowing unreasonable risks to persist in the workplace is not necessarily conscience shocking") (citing Collins, 503 U.S. at 128). Due process does not impose minimal safety requirements on public employers; exposing COs to a risk of violence by prisoners cannot shock the conscience because such a risk is one reason the job of CO exists. See Wallace v. Adkins, 115 F.3d 427, 430 (7th Cir. 1997). A failure to effectively mitigate the baseline level of risk thus does not shock the conscience either. Here, Plaintiffs have alleged the existence of a policy that would, if complied with, mitigate the risk of repeat or unmanageable violence by prisoners, and that Defendants' intentional or deliberately indifferent conduct has led to an increase in the level of such risk beyond that which would presumably exist were the policy implemented accurately. The Court concludes that such an increase in the risk of violence by prisoners, which is inherent in Plaintiffs' profession, does not, as a matter of law, frame a set of circumstances that shocks the conscience, because the increased risk arises from failure to comply with a risk-mitigation policy.[4]

---

[4] Plaintiffs' argument that inherent danger should be assessed by reference to particular types of CO work is not supported by the case law and is illogical in the context of the claim asserted. Plaintiffs argue that, because someone hired as a CO could be assigned to a desk or supervisory position, any distortion of danger in other assignments is not inherent in CO work. (Docket Entry No. 87, at 6.) Plaintiffs do not, however, allege that applicants can take CO employment with any guarantee that they will never be exposed to encounters with prisoners. Furthermore, the class they purport to represent consists of persons who have been injured, and are subject to risk of injury, by prisoners. Thus, the factual allegations of the

For the foregoing reasons, the allegation that Defendants increased the risk of violence posed to COs by misreporting incidents of violence fails to present either an affirmative act or conscience-shocking conduct framing a viable Substantive Due Process claim under the state-created danger exception.  Therefore, Plaintiffs' proposed first amended complaint fails to state a claim upon which relief can be granted and, consequently, leave to amend would be futile.  The motion for leave to further amend the complaint is denied.

## CONCLUSION

Plaintiffs' motion for leave to amend the complaint is denied.

This Memorandum Opinion and Order resolves Docket Entry Number 56.  The Clerk of Court is directed to enter judgment dismissing the complaint pursuant to Federal Rule of Civil Procedure 41(b) for the reasons set forth here and in the Court's opinion at Docket Entry Number 51, and to close this case.

SO ORDERED.

Dated: New York, New York
November 20, 2019

/s/ Laura Taylor Swain
LAURA TAYLOR SWAIN
United States District Judge

---

FAC and their own class definition, viewed in the light most favorable to Plaintiffs, show that the risk of injury through encounters with prisoners is inherent in their employment as COs.