1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   MARK NUNEZ, *et al.*,

4                   Plaintiffs,

5           v.                          11 CV 5845 (LTS)

6   CITY OF NEW YORK, *et al.*,

7                   Defendants.         Conference
                                        (via Microsoft Teams)
8   ------------------------------x
                                        New York, N.Y.
9                                       September 24, 2021
                                        10:00 a.m.
10

11  Before:

12                    HON. LAURA TAYLOR SWAIN,

13                                      District Judge

14                          APPEARANCES

15  THE LEGAL AID SOCIETY
        Attorneys for the Plaintiff class
16  BY:  MARY LYNNE WERLAS
        DAVID BILLINGSLEY
17
    AUDREY STRAUSS
18      United States Attorney for the
        Southern District of New York
19      Attorney for Intervenor Plaintiffs
    JEFFREY K. POWELL
20  LARA K. ESHKENAZI
        Assistant United States Attorneys
21
    Also Present:  Steve J. Martin, Court Monitor
22                 Anna E. Friedberg, Deputy Court Monitor
                   Jonathan Abady
23                 Debra L. Greenberger
                   Nairuby Beckles
24

25

1              (Case called)

2              THE COURT:  Good morning.  We are here today for a

3    conference which was requested by plaintiffs' counsel with

4    defendants' consent to address grave concerns regarding

5    security, safety, and other conditions at Rikers Island that

6    are described in the monitor's August and September 2021 status

7    reports, plaintiff counsel's September 21, 2021 letter, and the

8    monitor's September 23, 2021 further status update.  Those are

9    docket entry numbers 378, 380, 383, and 387 respectively.

10             Last night the office of the New York State Attorney

11   General filed a letter in an amicus capacity calling for swift

12   remedial action with respect to the conditions at Rikers

13   Island.  That is docket entry No. 388.

14             Now I'll begin by asking the participants to state

15   their appearances, beginning with the members of the monitoring

16   team.

17             MR. MARTIN:  Good morning, your Honor.  My name is

18   Steve J. Martin, court monitor in the Nunez matter.

19             THE COURT:  Good morning, Mr. Martin.  Thank you.

20             Ms. Friedberg.

21             MS. FRIEDBERG:  Good morning, Judge Swain.  My name is

22   Anna Friedberg.  I'm a deputy court monitor in this case.

23             THE COURT:  Good morning, Ms. Friedberg.

24             Counsel for plaintiffs.

25             MS. WERLWAS:  Good morning, your Honor, I'm Mary Lynne

1    Werlwas from the Prisoner Rights Project of the Legal Aid

2    Society, counsel for the plaintiff class.

3              THE COURT:  Good morning, Ms. Werlwas.

4              Counsel for the intervenor plaintiffs.

5              MR. POWELL:  My name is Jeffrey Powell.  I'm here for

6    the government.  I'm here along with Lara Eshkenazi.  We

7    represent the government from the U.S. Attorney's Office.

8              THE COURT:  Good morning, Mr. Powell, and Ms.

9    Eshkenazi.

10             Counsel for defendants.

11             MS. JOYCE:  Good morning, your Honor, Kimberly Joyce

12   from the City of New York for the city defendants.

13             THE COURT:  Good morning, Ms. Joyce.

14             I greet other counsel, cocounsel, members of the

15   press, interested parties, and members of the public who may be

16   listening in.

17             I remind everyone that this is a public proceeding,

18   and I would ask that those who are listening in mute their

19   phones, if they are not already muted, on the AT&T line.  I

20   also ask that the video participants mute their phones when

21   they are not speaking so that we can minimize audio

22   interference.

23             I also remind everyone that, as provided in the

24   Court's January 19, 2021 standing order filed at docket entry

25   No. 21 MC 45, neither recording nor retransmission of any part

1     of this proceeding is permitted.

2              I'll be calling on each speaker during the conference.

3     Each time that you speak, please identify yourself by name for

4     clarity of the record and for the benefit of those who are

5     listening in.  Please don't interrupt each other or me during

6     the conference.  If we interrupt each other, it's difficult to

7     create an accurate transcript.  But having said that, I

8     apologize in advance for breaking this rule because I may

9     interrupt if I have questions.

10             I'll give the participants an opportunity to make

11    additional comments or ask questions at the end of the

12    conference.  But if anyone has any difficulty hearing me or

13    another participant, please say something right away.

14             The monitor whom I appointed pursuant to the consent

15    decree in this case in 2015, the deputy monitor, and their team

16    have been unsparing in their reports and unrelenting in their

17    work with the parties to achieve concrete, positive changes in

18    the use of force and safety conditions at Rikers Island.  The

19    most recent reports and the letters from plaintiffs' counsel

20    and the Attorney General describe deplorable conditions and

21    even failure to prevent self-harm by persons in custody.

22             The monitors' updated report filed yesterday includes

23    specific steps that the monitor has requested that defendants

24    undertake immediately.

25             I will now begin by calling on the monitoring team

representatives to begin this conference with an update on the

current status of conditions and discussions.

Mr. Martin.

MR. MARTIN:  Thank you, your Honor.

We continue to review information and data that comes

into our office daily from the Department of Corrections and,

they are very able and consistently do that, I might add.

The most recent data suggests that those concerns that

we have set out repeatedly over a long period of time now to

the defendants continue in various forms.

THE COURT:  Mr. Martin, for some reason your audio is

breaking up, at least for me.  I am not sure if the court

reporter is having the same problem.  But if you wouldn't mind

just starting again, I want to make sure that everybody can

hear every word.

MR. MARTIN:  I will, your Honor.

I had said that we continue to review on a daily,

almost hourly basis data reports, information coming in from

the Department of Corrections, which is, I would represent,

fairly comprehensive as to the state of affairs.  The

department, as I said, does a very able job in doing that, in

keeping us very much apprised as to even specific incidents

that I may want to scrutinize.  They are very cooperative in

accelerating and expediting that.

Having said that, the review of that data, those

1    materials, suggests that what the pattern that we have seen of

2    very serious security lapses continues and manifests.  Those

3    lapses manifest themselves through serious incidents of

4    inmate-on-inmate harm, staff-on-inmate applications of force,

5    the self-harm issue.

6            The suicide prevention issue is compelling in that

7    just two days ago I reviewed an incident in which officers

8    literally within six feet of a hanging inmate that was in their

9    direct line of sight did not detect that and, in fact, an

10   officer walked directly in front of the cell facing, did not

11   detect that, and they ultimately did turn around and look at

12   the hanging inmate and were able to get him down.  He was, of

13   course, in serious distress.

14           These matters of immediacy have been staff that either

15   failed to secure doors that must be secured, they failed to

16   control movement from ingress and egress into secured areas,

17   and we see too often officers or staff that literally abandon

18   their post inside a housing unit.  These things, when they are

19   done correctly, when you stay on post, when you control

20   movement, when you secure doors, it minimizes opportunities for

21   inmates to engage in untoward, sometimes violent behavior.  The

22   current state of operations are such that it's the polar

23   opposite of minimizing opportunities.  It's creating situations

24   in which inmates can very ably, quickly engage in behaviors

25   that cause harm.

1          So the two areas in which we are most concerned with

2     are those, what we call back to basics corrections 101

3     requirements to safely operate a system of the size of the New

4     York City Department of Corrections and the self harm

5     absolutely must be aggressively met with appropriate protocols.

6          What is so disturbing about the self-harm issue is not

7     the identification of an inmate that may be gesturing suicidal

8     acts.  It's their failure to intervene immediately when they

9     make such observations, in my experience, unprecedented, where

10    an officer will observe gesturing or the preparation of a

11    ligature or possession of a ligature and not immediately

12    intervene.  That must be stopped.  It must be stopped now.  If

13    it requires active, very, very active superintendents and

14    direction by supervisors and by personnel, they must do it.

15    They simply -- failure to will continue to see this pattern.

16    We have made a series of recommendations, the first being the

17    development of an interim security plan.  Again, that security

18    plan is going to have to address these areas of immediacy of

19    strengthening the suicide prevention control movement, etc.

20         We also believe they should very more aggressively be

21    utilizing their state-of-the-art video monitoring systems, and

22    we recommend that it be done 24/7 and that adequate staff be in

23    place to do that and that is supervised very vigorously by

24    supervisors with a plan of action of how they are to do that,

25    when they are to do it, and what they look at.

          1           We are also concerned and have had incidents in which

          2    inmates have seriously assaulted both staff and other inmates

          3    that are not immediately and properly secured so where for some

          4    period of time that judgments can be made that they are not the

          5    highest degree of threat, that they could then be moved from a

          6    secure cell to a secure area in which they are out of cell

          7    time, their congregate activity is limited.  We have had some

          8    incidents that are just, for lack of a better term, extremely

          9    frightening in which inmates were allowed to, after a violent

         10    act, quickly, or within days, engage in a subsequent violent

         11    act.

         12           So the postincident management protocols must, without

         13    fail, be put in place when they are necessary.  We are not

         14    talking about locking up a bunch of folks here.  We are talking

         15    about a relatively small number of actively violent offenders

         16    and only so long as it is necessary to protect staff and

         17    inmates.  And when you can make judgments that risk of harm has

         18    lessened, then that person should come out of that cell, of

         19    course.  No one favors long-term lockup.  I shouldn't say no

         20    one.  The monitor's office does not favor locking people up in

         21    a single cell for many hours of the day longer than necessary.

         22           We also believe that the agency could benefit from a

         23    top-flight expert consultant in management of security threat

         24    groups or a/k/a gangs.  The department has a methodology and

         25    they have their policies in place.  We are not confident that

1    they are being strictly adhered to, and adhered to in a very,

2    very reasoned fashion.  I don't believe that it's a question of

3    do you lock them all up together or you intersperse them.  It's

4    not that simple.  It's a more complicated process that has

5    always been an issue in this business, and there are those out

6    there that have had a tremendous amount of experience in other

7    systems that STG group is well managed.

8         Those are the things kind of that we consider to be of

9    an immediate nature.  We have two other recommendations that we

10   believe are equally important, but they are not immediate

11   implementation matters.

12        The second would be, we think the department should

13   have the authority to retain managers outside the current

14   uniform ranks.  That is, if there is a very qualified seasoned

15   manager that is willing to join DOC in a warden's position, a

16   deputy warden's position, that notwithstanding they have not

17   come up through the ranks, there should be no bar in bringing

18   that asset to bear on the agency, especially right now, or as

19   soon as that could be achieved.  So there are some apparent

20   impediments to that, whether they be regulatory or state law.

21        Ms. Joyce is working with us on that, but we have been

22   working on that for some number of months.  If there are

23   impediments, identify them, seek out the state authority or

24   local authority to see if they can be modified or moved.

25        The third recommendation is, we believe that the

1    agency should -- rather, I should say, that there should be in

2    place a security operations manager, again outside of the

3    uniform ranks, that has the authority to come in and identify

4    areas in security that need near-term, midterm attention and

5    development of appropriate protocols and be able to direct that

6    those be implemented in the agency.

7         I would be the first to acknowledge that such a

8    position has certain implications, consequences, but I would

9    envision that working in a fashion where they are not dictating

10   to the agency.  They are working in concert, in collaboration

11   with the agency to upgrade the security operations.  If you

12   join such an outside agent with uniform ranks that are willing

13   to engage in collaboration, there aren't going to be a lot of

14   differences.

15        A basic corrections in confinement operations is not

16   rocket science, but it does take diligence, it does take

17   adherence to identifiable operating procedures that are

18   embraced by the rank and file, and supervision models must be

19   in place to enforce those through the rank and file.

20        That's what we are not presently seeing.  We, quite

21   frankly, have not seen that in the five years of our monitoring

22   and it is simply these matters have simply become more evident

23   and aggravated by the absenteeism that the agency has

24   experienced primarily since the April, May time period through

25   the present day.

1          So I don't want to be so dramatic as suggesting it's a

2     perfect storm, but when you have flawed security practices,

3     they are going to be magnified if you've got a simultaneous

4     staffing issue.  So you not only have a flawed management

5     system, you have officers that are not in place that should be.

6     What is happening, quite frankly, is what one would expect to

7     happen, given the totality of circumstances that have come

8     together this past number of months.

9          I hope, your Honor, that satisfies your direction to

10    me.

11         THE COURT:  That does answer the status and

12    recommendation part of my question.  Are there any

13    understandings at this point with respect to these matters that

14    you would like to front, or should I next call on Ms. Joyce?

15         MR. MARTIN:  I would defer to Ms. Joyce at this point.

16    We have been in close communication.  As of this morning early,

17    Ms. Friedberg and Ms. Joyce -- and I have been briefed on that

18    discussion, but I don't want to relay information that she is

19    here to give and may even clarify for me the discussion that

20    she had with my deputy monitor earlier today.

21         THE COURT:  Thank you, Mr. Martin.

22         Ms. Joyce, good morning.

23         MS. JOYCE:  Good morning, your Honor.  Thank you,

24    Mr. Martin.

25         Yes, Mr. Martin is correct, the city, the law

1    department, we are in constant contact with the monitoring team

2    about their concerns, about their recommendations, and we are

3    in continuing discussions about how best to address them.  We

4    share the monitoring team's concerns about the serious

5    conditions in the jails, and the city has taken a number of

6    steps to address those in the near future and some more long

7    term.

8           We have shared what the city and the department are

9    doing in the areas of staffing, population and conditions.  We

10   have shared that with the monitoring team, and also in advance

11   of this conference we shared a letter with the plaintiffs'

12   counsel, with both Legal Aid and Emery Celli, and the

13   Department of Justice, so that we are transparent in what we

14   are doing, and we wanted this to be a more efficient

15   conference.  We wanted everybody to be on the same page about

16   what the city was doing.

17          I can go more into that, if the Court would like, or I

18   can talk about the recommendations to clarify what Mr. Martin

19   was referring to as my conversations with Ms. Friedberg this

20   morning.  However the Court would like me to proceed.

21          THE COURT:  I would like you to tell me what is being

22   done now where something is being queued up on a timetable,

23   what you have shared as already in place or in progress, and

24   then I would like you to specifically respond with position and

25   status on the recommendations.

1          MS. JOYCE:  Sure.

2          Your Honor, we shared -- and just so that all the

3     parties are clarifying what I'm speaking about, we shared a

4     letter with the parties on September 22, 2021 with the city's

5     positions, which had certain responses to an appendix A and an

6     appendix B which the monitoring team attached their letter to

7     the Court, their status report.  We can go through that.

8          THE COURT:  That would be helpful.

9          MS. JOYCE:  To follow along.  It's docket entry No.

10    387, the monitoring team status report, and beginning page 9 of

11    14 discusses what the city's plan is, and then beginning on

12    page 13 is the city's responses to certain prior

13    recommendations of the monitoring team, and then we can go into

14    our immediate responses or immediate thoughts on the

15    recommendations.

16          But I did want to at some point ask the Court.  Since

17    these recommendations were shared officially with the parties

18    yesterday, I've been in contact with my clients.  We have

19    shared initial positions with the monitoring team.  But because

20    they are serious recommendations, some calling for consultants,

21    we would like to have, if possible, one week to respond to the

22    Court with our official positions.  In that time we would still

23    be having discussions with the monitoring team and proceeding

24    on certain recommendations that we don't have an issue with,

25    but there is some negotiation and some issues that we have that

1   would benefit from further conversation with the operational

2   folks and with myself and with the monitoring team.  That would

3   be the first ask.

4            THE COURT:  I understand the context.  I would prefer

5   to set the timetable after I've heard what's not controversial

6   and what's in place and then what would be outstanding, and

7   there is an opportunity to hear any comment on that and for me

8   to assess that before we set a firm timetable.

9            MS. JOYCE:  Completely understood.  Thank you, your

10  Honor.

11           I will begin on page 9.  The city has tried to address

12  conditions in the jail initially, A, by reducing idle time.  We

13  find it's really important that folks are engaged, less idle.

14  Busy hands -- I forget what the saying is.  But we are

15  expanding tablets fully to all facilities.  We have expanded

16  tablets.  They are fully deployed at VCBC at the Bronx; NIC and

17  RMFC, the female jail.  They will be fully deployed at RNDC,

18  the youth facility, GRVC, and AMKC by October 1 of this year,

19  with plans to fully deploy to the additional facilities in the

20  coming months.

21           In terms of recreation, the department is working with

22  external contract providers to provide programming to engage

23  the incarcerated individuals during the recreation time, and we

24  have already, I believe, brought in outside folks that are

25  already working with some of the inmates in the jail in terms

1   of recreation.

2          On the young adult front, we have reconstituted the

3   young adult task force, which is a group of DOC staff,

4   incarcerated youth and community members and other

5   stakeholders.  And the purpose is of developing recommendations

6   regarding the safety and programming for use to support them

7   and to reduce violence.

8          There were two overarching things that we did.  One

9   was the mayor passed an executive order on September 15 that

10  suspended certain minimum standards, allowed for certain

11  procurement.  One thing it permitted us to do was to commingle.

12  It's a B2, commingling of young adults and adults permitted in

13  certain circumstances.

14         We have now, under the executive order and something

15  we are going to be discussing with the monitoring team, as

16  Ms. Friedberg knows, restrictive housing.  The executive's

17  order also permitted enhanced provision housing to be utilized

18  for young adults, which is something that had been removed as

19  of the past couple of months for the young adult population.

20         Door repair.  We are expediting repairs of cell doors,

21  especially at RNDC.  We have repaired at least 500 doors to

22  date, and we are working directly with the vendor to complete

23  the repairs of doors in the coming months.  We, the department,

24  actually made a trip to the manufacturer, I believe it was last

25  week, to try to get them to understand the importance of

1    quickening the delivery of the doors.

2          THE COURT:  Ms. Joyce, you mentioned 500 doors as

3    already having been addressed, I believe.  What proportion of

4    the total number of problematic doors is 500?  Are we talking

5    30 percent, 50 percent, 70 percent?

6          MS. JOYCE:  Your Honor, I apologize.  I should have

7    that number for you.  I can get obtain that number.  I just

8    don't have it for you at the moment as to how many doors that

9    is.

10          I don't want to put Ms. Friedberg on the spot, but

11    sometimes she has information at the tip of her tongue that I

12    don't.  I see Mr. Martin laughing, so perhaps they know.  But I

13    can get that information.  I apologize for not having it right

14    now.

15          THE COURT:  Thank you.

16          Ms. Friedberg, do you know?

17          MS. FRIEDBERG:  I will look it up and get it for you

18    before the end of this conference, Judge.

19          THE COURT:  Thank you very much.

20          MS. JOYCE:  Thank you, Ms. Friedberg.

21          As to 1C, contraband recovery, we have special housing

22    to keep incarcerated individuals separated and monitored at

23    GRVC.  As the Court may know, sometimes inmates secrete

24    contraband that cannot be located, and we have access to body

25    scanners.  If someone doesn't clear the body scanner, they are

1    put into separation housing until they give up the contraband.

2    So we utilize that in certain few -- not widely utilize --

3    certain instances.

4         We are also working on digitizing the mail system at

5    Rikers to lessen the flow of contraband.  So we are working to

6    identify a vendor to use that would digitize the mail to reduce

7    the flow of contraband.

8         THE COURT:  So that would be scanning mail and

9    providing the written content of the mail electronically to the

10   person in custody rather than an envelope that might have

11   something in it?

12        MS. JOYCE:  Yes, your Honor.

13        THE COURT:  I'm assuming there would be separate

14   appropriate procedures for legal mail?

15        MS. JOYCE:  Yes.  That would definitely be taken into

16   account.  We will work with the vendor, the identified vendor,

17   on that aspect.

18        THE COURT:  Thank you.  Please go on.

19        MS. JOYCE:  Now on to section D, which is self harm.

20   We obviously recognize and agree with Mr. Martin's concerns

21   with self harm, and the department has updated its suicide

22   policies as part of its response to the current crisis, and we,

23   in terms of the recommendation, there is a recommendation that

24   the monitor made with regards to self harm, and that is one

25   that we do not take issue with.  We will adopt that

1   recommendation.

2          We are also, in terms of -- there is a job at the

3   department for inmates called suicide prevention aides, which

4   are individuals that apply to be a suicide prevention aide.

5   Their application is reviewed, and they are selected and

6   trained on how to identify unusual, strange behavior.  They are

7   then also tasked with one-on-one observation of inmates who are

8   on suicide watch.

9          So the department has posted that job posting at the

10  department.  It has received a number of applications for

11  suicide prevention aide, is in the process of reviewing those

12  applications and determining if there are any security reasons

13  why a person should be excluded, and they will be selecting

14  suicide prevention aides in the near future to assist with

15  observing those who are on suicide watch.  Those are the

16  initial things that we are doing on suicide prevention, but,

17  again, we will be working with the monitor on other self-harm

18  initiatives.

19         In terms of intake and medical wait times, we reopened

20  the Eric M. Taylor Center on Rikers Island, I believe, last

21  week, which is going to be the intake facility for all new

22  admissions to Rikers Island.

23         What used to be OBCC used to be the new admission

24  intake facility.  It will no longer be.  It will be a facility

25  where people go to quarantine until they are determined to be

1  negative for COVID and then can get their appropriate housing

2  assignments.  We have opened up a new -- I visited CMCC this

3  week.  There are two new admission housing areas, there is a

4  new intake, new medical clinic opened up, and that was

5  September 20, in an effort to decrease the intake processing

6  time and get people out of intake, out of medical to their new

7  admission housing area as soon as possible.  These are actions

8  that were taken to decrease medical and intake wait times.

9          We also opened a medical facility on the island that

10  would care for staff because staff needs to be seen in the same

11  clinics as inmates, and it would increase the inmate wait time

12  for medical, so staff going to a separate clinic will decrease

13  the medical wait time for inmates overall.

14          The department is also assessing the feasibility of

15  providing medical care to inmates on their actual housing unit

16  rather than requiring them to be brought to intake, which would

17  require escorts and just longer wait time.

18          I am so sorry.  I apologize for the barking of the

19  dogs.

20          THE COURT:  This is the pandemic.  We all have such

21  issues.  No worries.

22          MS. JOYCE:  That is what we are doing.

23          In terms of meal and sanitation, we also in that

24  executive order, we are working with outside cleaning firms to

25  come in and clean the facility.  So we were able to not get rid

1    of, but bypass certain procurement rules so that we could

2    immediately contract with vendors to come in and clean the

3    facilities because I know the conditions are of grave concern

4    to everyone on this call.

5         That's what we are doing in terms of addressing the

6    conditions in the jail in appendix A.

7         Department staffing.  Staffing obviously is a huge

8    issue.  When staff is absent, when staff don't report to work,

9    there are colleagues that are actually on the job.  It makes it

10   harder for all of them.  They have to work triple shifts.  When

11   you are tired, you make security mistakes.  So staff

12   absenteeism is really putting a big burden on those who are

13   doing the job and actually going to work.

14        So what the city did this week is, we brought a *Taylor*

15   law action in state court against COBA, stating that they were

16   encouraging their staff to not report to work, to call in sick

17   when they weren't.  And that case was settled in that the city

18   withdrew it without prejudice because the attorneys for COBA

19   agreed to issue certain language to their staff saying that we

20   do not condone, we never did, people not reporting to work if

21   they are not sick.  I believe the actual -- I can get the

22   actual language to read to the Court in a moment.

23        THE COURT:  I just wanted to note, for all who are

24   listening, that there is quoted language in the last five lines

25   Roman II little i on page 10 of the ECF filing on 387.  Is that

1    the language that you are referring to?

2          MS. JOYCE:  Yes, your Honor.  Officers who are fit for

3    duty should show up for work as required by the law.  COBA has

4    never instructed anyone not to show up for work or walk off a

5    post for being sick or claim a personal emergency when that

6    correction officer is in fact not sick, nor experiencing a

7    personal emergency.  That was what was agreed to by the union,

8    in addition to the staff.

9          The department also amended its sick leave policy to

10   be more in line with NYPD and FDNY to close some loopholes.  If

11   you call in sick, you have to report to a certain medical

12   provider selected by the department, the health medical

13   division, to be assessed to see if you are actually sick or if

14   you can return to duty.

15         If you call in sick and you don't report to your next

16   tour, you don't report to the medical provider, you will be

17   deemed AWOL and suspended 30 days without pay and I believe, as

18   of today, we have at least 55 corrections officers who have

19   been suspended without pay for going AWOL, for not abiding by

20   the new sick leave policies.  Those are huge steps and changes

21   in the department in how they are treating sick leave and AWOL

22   to try to get people back to work.

23         We need more time to look at the data, but we have

24   seen a positive trend in people returning to work and in less

25   triple shifts being had, but we want to take a look at the data

1    to make sure that that's continuing.

2              We are also working with OATH to expedite certain AWOL

3    cases.  There are people on the department staff who have been

4    AWOL for a significant amount of time and should be terminated.

5    So we are working with OATH to expedite those cases.

6              We are also trying to increase staff.  This won't be

7    an immediate fix, but the department is hiring 600 additional

8    corrections officers.

9              We are also working with the NYPD to take over

10   pre-arraignment court operations, so certain corrections

11   officers who are working those court posts could return to

12   posts on Rikers Island dealing with inmates.

13             We are also trying to privatize certain jobs that do

14   not have inmate contact, so perimeter security, visitation,

15   commissary.  We are looking at getting private contracts to

16   staff those positions so that the corrections --

17             THE COURT:  Ms. Joyce, your sound cut out for just a

18   minute there.  I heard, we are working to get privatized to

19   staff and then it cut out, at least on me, after that.

20             MS. JOYCE:  Apologies.  We are looking to privatize

21   staff in certain areas that don't have inmate contact:

22   Perimeter security visits, commissary, and we are looking --

23   thinking outside the box of other areas where we could get

24   private contracts to bring in additional support and have those

25   corrections officers and supervisors who are working in those

posts return to inmate-facing posts at Rikers Island.

We are also engaging in trying to -- again, because we just want to staff up and get people back to work, the department has been calling people who have recently retired during COVID to see if they want to return to work. It wouldn't mean a very short retraining period and they could get back on the job. I believe about maybe about a dozen or so people have agreed. So there are recruitment of former staff and new staff that's happening as well. The department has also redeployed people who worked at headquarters and other areas back into the jails to take the inmate-facing posts.

To address overtime, we are incentivizing staff for their overtime, trying to increase morale because they have been doing a really hard job over the pandemic in these circumstances. So we have been providing monetary incentive for those who worked double and triple shifts, special assignment pay for those who work in certain housing areas, intake, or medical posts. We have been bringing food trucks onto the island for them so they can bring home food to their families because they have been working late hours. Sometimes if they have to work long shifts, we have given them ride homes. So we are trying to minimize the effects of the long working hours for the staff.

And then, lastly, in appendix A was reducing the population. The governor thankfully signed the Less Is More

1   Act last week, and we entered into a memorandum of

2   understanding with the state for the state to take certain

3   individuals out of our custody.  To date, 165 inmates have been

4   released under this framework.

5         We also expect about, I believe, by the end of this

6   week the state to take 200 city sentenced incarcerated

7   individuals under this memorandum of understanding.  They were

8   taking about 40 individuals per day.  So I believe by today or

9   tomorrow the 200 individuals should be out of city custody and

10  in state jails.

11        We have also asked -- we need a system -- not

12  everything is within our control, so we need some assistance

13  from the state courts.  We have asked the state to --

14        THE COURT:  Your sound just cut out again.  I heard we

15  asked the state to and then no sound after that.

16        MS. JOYCE:  Can you hear me now?

17        THE COURT:  Yes.  You are back now.

18        MS. JOYCE:  We have asked the courts in the state

19  courts in the city and the DAs to expedite about 500 cases of

20  inmates who have been on Rikers for longer than a year.  Rikers

21  Island is not supposed to be a long-stay institution.  And

22  because of the courts not operating during the pandemic, and I

23  don't know if they are operating at full capacity, it's just

24  increasing by the day people whose length of stay is over one

25  year and it causes issues, so we would ask to expedite those

1    cases.

2          I think that covers what the city had previously

3    stated under appendix A that they were doing.

4          Ms. Friedberg, I don't know if you think I've missed

5    anything that we have discussed that you want to address.

6          MS. FRIEDBERG:  Sure.  I believe, Ms. Joyce, you have

7    covered all of the initiatives that we are aware of.

8          I did just want to provide the judge and the Court

9    some additional information with respect to your question

10   regarding the doors at RNDC.  I believe that another

11   approximately 500 doors need to be fixed.  I'm working to get

12   the final confirmation, but I at least wanted to give you an

13   interim update to that.

14         I also just wanted to make one point of clarification

15   before Ms. Joyce continues with respect to the submission by

16   the monitoring team.  As you may have noticed, we are about to

17   get to appendix B, which is a much more detailed recommendation

18   with respect to security operations.  The city has already

19   responded, at least initially, with respect to how they would

20   address those issues.  Many of those require some

21   back-and-forth conversations with the monitoring team on how

22   best to operationalize those.  Those conversations have just

23   started.

24         With respect to our submission to the Court today, we

25   prioritized those issues that we believe must be prioritized

1    and triaged the most.  Those would be in item 1 of our

2    recommendations.  I realize there are many different moving

3    pieces.  That's because this is a dynamic process.

4          For the Court's better understanding, I just wanted to

5    clarify that, with respect to appendix B, we outlined the

6    submission that we shared with the department on the specific

7    operational initiatives.  We believe they need to undertake.

8    They have said that they will engage working with us on those.

9    For purposes of this conference and for the status report have

10   highlighted those that we believe require the most heightened

11   prioritization, and those are items 1 of our status report.

12         THE COURT:  Thank you, Ms. Friedberg.

13         Ms. Joyce.

14         MS. JOYCE:  Your Honor, I am not sure if the Court

15   wants me —— since there are overlapping items in appendix B and

16   of the recommendations that the monitor made on page 6, does

17   the Court want me to just go to the recommendations on page 6,

18   or to do —— to address all of appendix B?

19         THE COURT:  I guess I am not precisely clear on what

20   you are proposing to do.  Let me just say this and maybe it

21   will help you orient me.

22         Page Roman at V, which is 13 of the docket entry No.

23   387, is the beginning of appendix B on safety recommendations.

24   Ms. Friedberg said that item 1 is highest priority, which is

25   developing and implementing an interim security plan and that

1   covers some of the items that were specifically mentioned by

2   Mr. Martin, and Ms. Friedberg says that you are in discussions

3   about the recommendation, and I'm not sure whether speaking

4   about this at all is in your one-week-to-respond ask.  Then I

5   am going to go on for a minute before I ask you to respond to

6   me.

7           Then there are items 2, 3, and 4, which are more

8   granular as to security, the video observation, certain

9   specific steps on staff supervision, and addressing reliance on

10  probe teams.  And then turning the page, Roman at VI starts

11  with self-harm reduction and then goes on to certain other

12  matters, including intake and medical care, which you spoke

13  about in your remarks.

14          Having said all of that, what do you feel is

15  appropriate and feasible for you to discuss on the record now

16  in terms of what is agreed to or being implemented, what needs

17  to hold off pending further discussions, and what you think

18  you've already addressed?

19          MS. JOYCE:  Sure.

20          Ms. Friedberg, correct me if I'm wrong.  I think, your

21  Honor, if we focus on page 6, that appendix B is basically

22  subsumed into that, because appendix B is very much in the

23  weeds.  If we start at page 6, that will give us an overarching

24  view.

25          THE COURT:  Very good.  For those listening, page VI,

1      Roman at VI, the last page of the docket entry 387 filing.

2              So we will begin with talking about self-harm

3      reduction?  Am I following you?

4              MS. FRIEDBERG:  Your Honor, there are multiple

5      different pages.  We are actually talking about page No. 6 in

6      the body of the letter.

7              THE COURT:  Thank you.  I should have asked the

8      question better.

9              We are going back into page 6 in the body of the

10     letter where there is another list that begins with No. 1,

11     immediate security initiatives, rather than going through the

12     bullet -- the tighter bullet list in appendix B.

13             MS. JOYCE:  Correct.

14             THE COURT:  I'm with you now.  Thank you.

15             MS. JOYCE:  Your Honor, while I do still want the time

16     to respond in writing, because some of these recommendations

17     involve the hiring of external consultants that would have a

18     great deal of control over the operations of the department,

19     it's something that we still -- we have serious conditions

20     with.  I don't want anyone to -- it is just something that we

21     still want to talk about with the monitoring team, so that's

22     why we need additional time.

23             The things in No. 1 I've already conveyed to

24     Ms. Friedberg, that aside from perhaps the classification

25     recommendation 1F, that we don't have a problem with the

1   recommendations that Mr. Martin and Ms. Friedberg have made,

2   1A, 1B, 1C, 1D, 1E, with the caveat that we want to discuss

3   certain, perhaps, implementation dates or more granular details

4   about the recommendations, which is why a written submission

5   would be helpful so that I could put it all in writing, what

6   exactly the city and the department are agreeing to with regard

7   to the recommendations.

8            But for the Court's information, as I indicated to

9   Ms. Friedberg, 1A through E we are OK with.

10           THE COURT:  Good to hear.

11           You are not necessarily adopting or agreeing to the

12  timetable that is suggested in connection with those items and

13  there are some specifics of operationalization, if that's a

14  word, that you want to discuss with the monitoring team.  But

15  you accept that the steps that are listed in 1A through E are

16  appropriate and will be undertaken.  Is that fair?

17           MS. JOYCE:  That is a fair assessment, yes, your

18  Honor.

19           THE COURT:  Thank you.

20           For those listening -- I'm sorry.  Again, thinking of

21  those who are listening and may not have the paper in front of

22  them.  So 1A is the development of an interim security plan; 1B

23  is communicating to staff the obligations in connection with

24  the suicide prevention intervention policy by particular means;

25  1C is processing new admissions through intake within 24 hours;

d is the 24/7 video monitoring; and E is the postincident

management protocol.  F, which you have asked to address in the

first instance in the supplemental submission, is the

recommendation for retaining a classification consultant.

MS. JOYCE:  Yes, your Honor.

THE COURT:  Thank you.

MS. JOYCE:  In terms of No. 2, expanded criteria for

department leadership, this is something that we are completely

on board with.  As Mr. Martin said, we have been having

discussions with the monitoring team about how to go about

this.  I will say I am not a labor law attorney, but it is

quite complicated with the local laws and the state laws

concerning civil service, so we will need the state's

assistance.  We will be reaching out to the state for its

assistance, which may be in the form of a legislative ask to

amend certain state provisions so that we can hire from outside

the uniform ranks.

We want to be able, as Mr. Martin said, pick the best

people for the job.  If that so happens to be a warden or a

captain or whatever they are called in Illinois and that person

wants to come and work in New York City, we want to be able to

hire that person.

But there are a lot of considerations and questions

that go along with that.  For example, does the person just get

to come on the job, or do they have to take a test, like the

1   rest of the people that want to apply to the job and be chosen

2   from a list.  So there are things that the department needs to

3   work out in terms of what exactly they want to do in terms of

4   the external hiring, and then the law department will have to

5   likely draft legislation.

6            We are working on this.  We are currently working on

7   this.  So it's not something that we are going to be working on

8   in the future, saying this is something that we want to get

9   done.  We want to get done as soon as possible.  We want the

10  department to be able to hire who they want to hire who is best

11  for the job.

12           So we will be continuing to engage with Ms. Friedberg

13  and Mr. Martin and the relevant stakeholders in the city from

14  City Hall, the Department, DCAS, Office of Labor Relations, my

15  office of legal counsel division, just to make sure we are

16  covering all bases, and we can hopefully -- the monitoring team

17  in this recommendation wants to provide an update to the Court

18  by October 11, and that's something that's fine with us.  We

19  hope to have a lot to report to the Court by then.

20           MS. FRIEDBERG:  Ms. Joyce, I wanted to make one point

21  of clarification with respect to the monitoring team's

22  representations.  We also recommend that the city and the state

23  consider whether there is any emergency actions, they may be

24  able to take such that this recommendation can be addressed as

25  expeditiously as possible.

1          We understand some of these considerations may take a

2     long period of time, and perhaps longer than any of us would

3     like, so we just want to clarify that we are also recommending

4     any emergency procedures that the city or state can take would

5     be very encouraged.

6          MS. JOYCE:  Yes.  I'm sorry.  I also meant to say that

7     we will look at any -- if there is any actions that the city

8     can take through a mayoral executive order, we will look into

9     those.  While I don't control the state, we will look into what

10    the state could do and suggest that they do it, and we will

11    report to you, and then you can report to the Court by October

12    11 as to that as well.  Yes.  I'm sorry.  I left that out.  I

13    mention that as well.

14         I am not sure if your Honor has questions on No. 2, or

15    if you just want me to move on to No. 3.

16         THE COURT:  Moving on to No. 3 will be fine.  Thank

17    you.

18         MS. JOYCE:  Your Honor, this is one that we have

19    serious concerns with, bringing in an external consultant to

20    basically come in and tell the jails how to do security 101.

21    We feel like we have people there to do this.  Obviously, the

22    discussion can continue.  We are not saying outright no.

23    That's why we want until next Friday to respond so that we can

24    give thought to this and maybe there can be clarifying

25    conversations had with the monitoring team and the operational

1   folks.  But this is one that we do have serious concerns with.

2           MS. FRIEDBERG:  Your Honor, I just wanted to clarify

3   one point about our recommendation.

4           THE COURT:  Yes, please, Ms. Friedberg.

5           MS. FRIEDBERG:  We believe that this recommendation is

6   going to require not only conversations with the city, but with

7   the government and plaintiffs as well.  We had proposed that

8   those conversations begin immediately and that we have until

9   October 28 to complete those conversations.

10          So just to clarify, the focus of our recommendation,

11  we recognize what a large endeavor this may be and, obviously,

12  we have not had an opportunity yet to speak with plaintiffs or

13  the government either with respect to this recommendation.

14          So just to be clear as to what we were intending to do

15  with our recommendation here, was to initiate the conversation,

16  initiate them as soon as possible, and be able to report back

17  to the Court by October 28.

18          Our hope is, and it sounds like Ms. Joyce agrees, that

19  they will at least engage in conversations with that which then

20  will allow us to determine what everyone's position is with

21  respect to this recommendation and what I may look like, should

22  it be adopted.

23          THE COURT:  Thank you.

24          Again, for clarity, Ms. Friedberg, to the extent

25  Ms. Joyce is asking for additional time to report, the

1    monitoring team would not encourage me to expect any sort of

2    final position statement or indeed position statement in the

3    one-week, short-term supplemental report, that you envision a

4    process that would go through pretty much the end of October

5    with a report forthcoming at that point.  Is that correct,

6    Ms. Friedberg?

7            MS. FRIEDBERG:  Correct.  If all of the parties can do

8    and meet faster, we would certainly get back to you faster.

9    Our hope is, actually, that we would be engaging with the city

10   as early as today, if not on Monday, to begin these

11   conversations along with plaintiffs and the government.

12           So I'm not necessarily sure perhaps in the week -- I

13   don't want to speak for the city with respect to what they are

14   seeking for within a week, but I think with respect to this

15   third recommendation, there will be an opportunity for the city

16   and the parties to work together to determine what their

17   positions may be.

18           So I don't know if that in some way might also clarify

19   with respect to Ms. Joyce what her ask may be, but ultimately

20   our goal is that by October 28, and sooner if possible, we

21   would be advising the Court with respect to everyone's position

22   on this recommendation and have the opportunity to flesh out

23   what, if anything, this particular individual may be

24   responsible for doing, again, after consultation with all of

25   the parties on this call.

 1             THE COURT:  Thank you, Ms. Friedberg.

 2             Ms. Joyce.

 3             MS. JOYCE:  Thank you.

 4             Understanding that it's the beginning of conversations

 5    that they are asking for, we agree to speak.  I just would

 6    still like until Friday to respond to the entirety of the

 7    recommendations, and then perhaps I'll just, in addressing No.

 8    3, just say, we are engaging in conversations of some sort,

 9    knowing that Ms. Friedberg is going to provide a more full

10    report to the Court no later than October 28.

11             THE COURT:  Very good.  I appreciate your response on

12    the record today, and you would like to make a supplemental

13    written response by a week from today, which would be October

14    1, correct?

15             MS. JOYCE:  Yes, your Honor.

16             THE COURT:  Thank you.

17             Does the monitor have any concerns about waiting the

18    week for that supplemental response?

19             MR. MARTIN:  Your Honor, we do not.

20             THE COURT:  Thank you.

21             Does plaintiffs' counsel have any concerns about

22    waiting the week for the supplemental response, Ms. Werlwas?

23             MS. WERLWAS:  Yes, your Honor, we do.  This may lead

24    us into some bigger considerations, but we do.

25             The reason, your Honor, is this, and I'll be happy to

1   explain in more detail.

2           We think that it's very clear that the record before

3   your Honor is very clear that the Court could and should enter

4   the relief that -- enter as relief the recommendations that

5   were just described in the body of the monitor's report, the

6   pages in the narrative part that we have just been going

7   through, Nos. 1, 2, and 3, that those should be entered as

8   relief today.  And we can address some of the concerns that the

9   city raised about why they thought some of them might --

10  whether they are not ripe or should not be entered today, but

11  we think it's very clear that they are and that they should

12  because I will say --

13          THE COURT:  Ms. Werlwas, I didn't mean to interrupt

14  you midsentence, but it seems to me that you are kind of

15  previewing a more fulsome position statement and application

16  that you want to make.

17          So I will put a pin in the one-week supplemental

18  report ask and now turn to you for your comments and any

19  application that you may wish to make.  I'll then ask counsel

20  for the government, Mr. Powell, to respond to the reports and

21  to whatever statement and application that you are making and

22  hear from the monitor and anybody else I need to hear from

23  rather than having you do the preview and then do your

24  presentation.  Is that acceptable?  You have nodded yes.  So I

25  turn the floor to you, Ms. Werlwas.

1          MS. WERLWAS:  Thank you, your Honor.

2          To start and say more specifically with where this

3    began and what we should do here today, we will explain what we

4    can do and why we should do it.  We do know that the Court

5    appreciates the gravity of what brought us all here today, and

6    we appreciate the Court convening this conference on very short

7    notice.

8          Indeed part of why we wanted a conference rather than

9    initial motion proceedings is because this is a highly dynamic

10   process involving many actors and it has been dynamic even

11   since we put in our application to the Court.  The docket

12   certainly doesn't reflect the level of activity that has been

13   happening among the participants and other stakeholders and our

14   clients on this call.

15          In light of that, what brings us to where we are today

16   is the following.  This is an urgent matter of life and death

17   and it needs relief today.  Since we wrote our letter to you,

18   your Honor, earlier this week, two or more of our class members

19   have died in DOC custody.  There have been four class members

20   who have died in the one month since the monitor put in its

21   August 24 report to you and where we are now.  I'm not

22   suggesting this is due to any dilatory conduct on anyone's

23   part.  What it suggests is the extreme harm that the conditions

24   that have been described to you are causing to class members,

25   to the children who are losing parents in the jails.

1          Although we understand, certainly as lawyers, the

2  complexity of what's involved, and while much of this case, for

3  many years, as we believe your Honor is aware, we have engaged

4  in very detailed negotiations to try to get to very considered

5  positions for everything that comes before this Court, that is

6  reflected in the monitor's report today, the provisions about

7  which the city now seeks further time to either respond in

8  writing, confer with clients, I say are all on matters that

9  have been extensively discussed in this matter, previewed in

10 monitor's reports after monitor's reports.

11         In short, none of this is a surprise.  If it does,

12 however -- and the level -- if there are consultations with the

13 client that the city wishes to have based on the fact that this

14 particular document, this particular way of encapsulating these

15 recommendations was filed last night, then we would ask that

16 those principals, if possible, be brought onto this call, for

17 example.

18         This is a matter of such concern, and everyone knows

19 that this is about life or death, that having the clients,

20 having people who can speak for the agency on this call, or as

21 soon as possible in the room, is what is required in this

22 crisis.

23         Again, this can't be business as usual.  It's not.

24 It's not business as usual in the jails.  It's not business as

25 usual for our clients.  When I say business as usual, I mean

1    even with the horrible conditions that this consent judgment

2    and this Court, through its remedial order, have sought to

3    remedy.

4         To some of the specifics, I'd like to separate out two

5    things, which is a view on what we can do today to redress this

6    public safety crisis and humanitarian crisis and seek

7    collaboratively or get your Honor's guidance on the next steps.

8         What we can do today, among other things is, No. 1,

9    enter as relief the recommendations put forth in the narrative

10   portions of the monitor's report.  It is the fact that the city

11   has helped explain today that they do not disagree in substance

12   with being what I will call 1A through 1E although, as your

13   Honor noted, there are some questions about the timing.  It is

14   extremely helpful and I think we should take that.

15        The fact that we all agree that 1A, 1B, 1C, 1D, and 1E

16   are necessary to solve the problem, that they are the

17   government's agreement that these are appropriate responses to

18   the problem, addresses concerns about intrusiveness into

19   government operations and that these are very discrete, limited

20   forms of relief.  I think, as your Honor can see, what I'm

21   somewhat referencing is, and we would be prepared to discuss

22   the ways in which the record supports, more than amply supports

23   the requisite PLRA findings that govern prospective relief.

24        With respect to whether or not the city would like to

25   work to consider different timetables for implementation or

1   details or operational details, we would suggest that is

2   exactly the kind of thing that should not hold up a federal

3   court order to enforce relief.  These are very tightly drafted

4   by the monitoring team and can be ordered now.

5          We think that if there is a concern about some

6   timeliness issue or some detailed implementation issue, those

7   are the things that are typically subject to any court order,

8   worked out, and if there is a problem and it can't be worked

9   out, we come back to your Honor with the specifics.  But those

10  should not hold up the relief.

11         I was addressing just now the parts of the order that

12  the city agreed that they would -- would go to things that they

13  agree to do already.

14         As to the parts that require outside hiring, 1F, and

15  potentially 2 or 3, the fact that these may require a hiring

16  process that may be expensive, that the city may not like, is,

17  again, not a reason to delay relief that's necessary and that

18  the monitor has highlighted and put in some of the most stark

19  terms that I could see in a report, highlighted the immediate

20  necessity of beginning these processes.  Yet nothing in this

21  monitor's report says who is going to be hired or when, and

22  it's very clear about the processes that are being initiated to

23  lead to a result.

24         And we particularly take issue with some of the views

25  that the fact that this may require outside hiring is a topic

1    of concern that the parties should discuss.  We are here today

2    not at the beginning of a case.  We are here on a five-year

3    record that shows that successive administrations in this city,

4    it's not about specific individuals, have been unable to do the

5    things the monitor is saying have to be done to implement

6    relief.  It's clear that the agency has been given time, time,

7    resources, technical assistance to implement these basic

8    security functions that time and again the monitor's reports

9    before the Court have recommended and have asked to be done.

10            It's clear that recommendations from the monitor alone

11    don't work and haven't worked, and we have five years to show

12    that.  It's clear that the existing cadre of problem solvers in

13    the department cannot or will not solve the problem.

14            And this extremely modest suggestion of the monitors

15    that New York City expand the available resources and expand

16    the cadre in which we are willing to look for guidance on how

17    to operate our jails, how to solve a crisis that makes our

18    jails one of the embarrassments in the nation, that's

19    offensive.

20            To the extent that there is the suggestion about --

21    actually, we think that it should go with the appointment of a

22    security operations manager.  Could go further.  I believe that

23    Mr. Martin's suggestion, and I'm paraphrasing, to be clear, but

24    was suggesting the nature of such a relationship, whether it

25    should be consultative or directive.  We would suggest that the

1   record and the need for relief would more than support

2   appointing a person who is not simply recommending matters to

3   the department, but is ordering them.  And we say that fully

4   knowing the gravity of that position.

5        If I may, there are, however -- there are a few

6   aspects of that recommendation and application which we are now

7   making verbally, which is to enter as relief the language that

8   begins beginning from where the monitor recommends the

9   following and to enter that today.

10        There are one or two specifics to address with that,

11   and I want --

12        THE COURT:  Ms. Werlwas, just for, again, clarity of

13   the record, the stem that you just referred to, considering

14   these findings, the monitoring team recommends the following,

15   that's the line on page 6 that precedes the numbered list 1, 2,

16   and 3, correct?

17        MS. WERLWAS:  Correct, your Honor.

18        THE COURT:  Thank you.

19        MS. WERLWAS:  And through the conclusion of the

20   report.

21        THE COURT:  Yes.

22        MS. WERLWAS:  That is correct.

23        With a few modest suggestions in this connection.  The

24   first is the timetable we were just discussing about the

25   conversations regarding appointment of a security operations

1   manager.  We are certainly prepared to discuss anything --

2   engage in the process that this paragraph suggests immediately.

3          We would, however, suggest a much earlier date for

4   reporting on progress to the Court than October 28 because we

5   would want to be able to be in a position to have either an

6   agreed-upon order, if one is necessary, or some other form of

7   agreement, but relief no later than the end of October.  So it

8   is suggesting that the interim date of reporting on what has

9   happened happen earlier than October 28.

10          In that connection, we would also ask that the city,

11   including the principals for the city, come and report back to

12   the Court on the progress with -- and implementation of this

13   recommendation.  In other words, not simply the monitor in a

14   written recommendation, but we would like to have the city

15   report on the implementation as well.  We understand this is a

16   process that requires some discussion, but we need it to get to

17   resolution faster.

18          There are, however -- this is the conundrum that I say

19   we face in the quickly moving circumstances of obtaining this

20   report last night and saying this is what we can do today in

21   that there are some other -- there is some other aspects of

22   what needs to be done that it leaves untouched or

23   insufficiently addressed.

24          We do not think that that should inhibit entry of this

25   relief as Court-ordered relief right now, but it would be

1  remiss if we didn't address a few matters about which we would,

2  when we welcome some further explication.

3        This is, in particular, two things.  This is in some

4  ways responsive to some of the concerns the city raised about

5  what it is doing.

6        But I want to address first, though, self harm.  This

7  is our concern.  We do not oppose what the monitor recommended

8  in this report about -- that the department do to prevent self

9  harm.  But it is clear, and I don't think there is any dispute

10  about this, it's not enough and nowhere near enough, and we are

11  not suggesting the monitoring team presented this as an

12  ultimate solution, that we know they did not.

13        But, nonetheless, because of the intensity and the

14  gravity of the risks of suicide and self harm right now in

15  these jails, we think more immediate intervention is needed,

16  that what the monitor suggested here and the measures that the

17  city has said it has taken do not, in our view, adequately

18  protect individuals.  I don't see anything in those proposals

19  that would prevent the incident that the monitoring team very

20  disturbingly related from this morning.  I don't think a roll

21  call and some of the other training and supervision will make a

22  person who is standing in front of someone who is hanging in

23  front of them, the fact that they act with not just ordinary

24  human decency, but the professional obligation.  Those are

25  necessary.  They are not sufficient.

1          THE COURT:  What do you believe would be sufficient

2     and appropriate at this point in time where you are making an

3     oral application?

4          MS. WERLWAS:  With respect to the self harm in

5     particular or more generally?  We could do both.

6          THE COURT:  You've said that what has been proposed by

7     the monitor at this point on self harm is inadequate and could

8     not prevent what was described.  It seems to me you have in

9     mind something that you think could be implemented right away

10    that would prevent, so I'd like to hear what that is.

11         MS. WERLWAS:  Your Honor, we have spent enormous time

12    trying to come up with the answers to that of what would

13    protect our clients.  We think there is still a lot more to be

14    learned.  That is what led us not just about self harm, but, to

15    be clear, about some of the other areas of immediate urgency

16    that need to be addressed.

17         We do not see paths short of beginning the proceedings

18    that lead to release that will protect our clients.  We want to

19    see those.  We would like there to be some other measures that

20    would prevent this rash of suicides in the jails, and we are

21    entirely open to hearing from the correctional professionals in

22    the city, those on the call and others, what further measures

23    could be taken to do this.

24         Just to address one of them, the city's

25    recommendations with respect to hiring more suicide prevention

1    aides, again, while laudable, I do need to step back and say,

2    talk about the perversity of that being their front-line

3    defense against staff refusing to appropriately respond to

4    people in self harm.  Suicide prevention aides are incarcerated

5    workers.  They take their jobs seriously and they do them well.

6          They are people who nonetheless are subject to these

7    same conditions, the same living with nonworking toilets, with

8    not getting adequate food in unsafe areas, with no corrections

9    officer, that those are the people -- our front-line defense

10   against suicide in this system.  On this record and right now

11   that is just perverse.

12         As to what further steps to be taken, that's where we

13   are, your Honor, where we come to on this issue and some of the

14   other ones that would address the not seeing a correctional

15   response that can be implemented immediately to protect people

16   from self harm and from the violence that is running rampant in

17   the facilities short of release.  That is the immediate

18   concerns.

19         With all of our support for the recommendations in the

20   monitoring report and the basis of our application today, as

21   well as our ongoing engagement in Nunez, recognizes that

22   systemic reform takes time and that even these measures that

23   are intended to, and we think if implemented will, materially

24   improve the safety of our clients, are, by their nature,

25   necessarily not measures that will do so next week or the week

 1    thereafter.

 2            When we are having, unfortunately, class members dying

 3    by the week, we cannot sort of come to this court, even when we

 4    frankly wish we knew more of the perfect answers and could give

 5    you a perfect kit of saying, this is exactly what we would want

 6    to do, because one died even since we sent our letter, frankly,

 7    that's why wanted to all come together and find out what we can

 8    do right now for the immediate harm that is happening on Rikers

 9    Island.  We would welcome having.  And if others need to be

10    part of the conversation, the principals of the agency, then we

11    would welcome that.  But that's just somewhat -- the emergency

12    is the position that has us coming to your Honor being frankly

13    candid about the things we think will work and wanting to be

14    candid about what we still don't know and are trying to figure

15    out but think that we should not all leave this room today

16    before we figure out because of the urgency of what's happening

17    on the island.

18            THE COURT:  Is there anything further that you want to

19    say now before I call on Mr. Powell?

20            MS. WERLWAS:  One quick glance at some of my notes,

21    but I generally think -- I think I would welcome sort of

22    hearing from our colleagues in the government at this point.

23            THE COURT:  Mr. Powell, before I ask you to speak, I

24    do want to pose a couple of issues for reflection by

25    Ms. Werlwas and perhaps also comment by Mr. Powell and the

1    others as people respond.

2          Rikers Island is clearly in a state of danger and

3    crisis on the safety front and with respect to many other

4    related issues, and the monitor has recommended steps now and

5    they were -- to be clear, those steps were presented to the

6    Court as recommendations under discussion in a letter that was

7    filed yesterday.  The monitor didn't make an application for a

8    court order requiring them and the letter that you and your

9    colleagues, Ms. Werlwas, wrote a couple of days ago requesting

10   the emergency conference did not specifically lay out anything

11   as a proposed order of this sort either and spoke in terms of

12   the potential release application under 3626(f).

13         So there is a record of findings and recommendations

14   by the monitor, but not an evidentiary record.  We have expert

15   assessments and opinions, not an evidentiary record.  The case

16   is in, I'll call it, a unique, but certainly a particular

17   procedural position.

18         The case was originally brought, I think, in 2011 as

19   individual actions relating to use of force and consequences of

20   use of force, ultimately evolved into a class action in which

21   the government intervened on behalf of young offenders focusing

22   on isolation confinement issues and confinement with adults,

23   and there was a settlement that involved the certification of a

24   settlement clause and a consent decree directed to use-of-force

25   policies, the housing of youthful offenders.  I realize that is

a term of art in New York, so I don't mean it in the term of

art sense.  I mean young adults, detainees, and inmates and

specific obligations under a consent decree which the Court

approved and upon which the Court enter judgment.

        The consent decree has particular powers and

obligations of the monitor whom the Court appointed pursuant to

that consent decree, and it also has mechanics within it for

queuing up applications with respect to violation of the

consent decree over which the Court has retained jurisdiction.

        We don't have an operative pleading in this case

because it has been subsumed by events and the judgment is what

is of record here.

        So in talking about 3626, 3626 goes to relief in a

civil action with respect to prison conditions -- I am not

trying to be overly intellectual here, but there is a question

as to whether we have a civil action pending at all at this

point for relief specifically or generally with respect to

prison conditions that would implicate 18 U.S.C. Section 3626

or ongoing intensive activity and obligations to comply with

the settlement decree and subsequent amendments and remedial

orders, again, primarily focused on use-of-force policies.  And

for a prisoner release order, statutory predicates are orders

for less-intrusive relief that have failed to remedy the

deprivation of the federal rights sought to be remedied through

the prisoner release order having previously been entered and

1   essentially failed.

2        Talking today about the specific living conditions and

3   this horrible, horrible situation of self harm, we have not, I

4   believe, had orders specifically directed to those.  I think

5   that you are trying to remedy that to a certain extent by

6   asking for an order today to do the things that the monitor has

7   recommended.  I think I may be reading you in that way.  But

8   that's an issue.

9        And 3626(a)(3) requires that even if that process is

10  initiated and there is a three-judge court, that court has to

11  find by clear and convincing evidence that crowding is the

12  primary cause of the violations sought to be remedied in that

13  no other relief would remedy the violation.

14       Insofar as you are relying on the findings in the

15  report of the monitor with respect to the predicate for a

16  release order, the monitor's most recent filing includes

17  observations that express skepticism as to whether crowding is

18  at the root of the problem or other things are at the root of

19  the problem.

20       So those are issues of concern to me specifically in

21  terms of looking to 3626, in addition to or as opposed to

22  continued work towards specific commitments in a context and on

23  a platform in which there has been some progress made on a

24  consensual basis.  The city is undertaking to take specific

25  steps that might A, lead to immediate action and, B, to perhaps

L9CAUNI1

1   some stipulated relief that might or might not be relief that

2   the Court is immediately in a position to order.

3         The other thing that I need you all to know is that

4   there are so many unique features about the situation that we

5   are in, but one of them is that I have been the judge -- it has

6   been my privilege and concern of my head and my heart over the

7   past ten years now, and specifically since we entered into the

8   consent decree to preside over this action and work with the

9   monitor and work with the parties.  I do that in my capacity as

10  a judge and now the chief judge of the district court for the

11  Southern District of New York, which has a number of judges.

12        I was appointed in 2017, two years after this consent

13  decree, to be the sole judge in the United States responsible

14  for and empowered to preside over the financial restructuring

15  of Puerto Rico and its instrumentalities.  It's under a statute

16  that gave the chief justice the obligation to appoint one judge

17  and that's me.  I have no one I can transfer those powers to to

18  make substantive decisions, and I have been committed to a

19  timetable and a very heavy litigation schedule for months now

20  that points to a trial about confirmation of a proposed plan of

21  adjustment for the Commonwealth of Puerto Rico that is

22  scheduled to begin in early November with a very heavy

23  litigation schedule in October.

24        All of which is to say that if there is going to be a

25  need for evidentiary proceedings and proceedings that could

1   lead to or would require the immediate engagement in litigation

2   activity of a judge here, I am going to have to transfer the

3   case to one of my colleagues so that it can get the appropriate

4   immediate attention and availability that it is my great, great

5   frustration that I would not be able to provide if we needed to

6   go to days and days of proceedings and legal filings and that

7   sort of litigation.  I have to put that out there for you.

8          I'm not necessarily asking you, Ms. Werlwas, to

9   respond to these points right away right now, but it's

10  important, both the legal and procedural considerations that I

11  outlined and the practical consideration that I have just

12  shared with you, it's important for you all to know that as you

13  consider what you want to ask, what you want to do, and what

14  you want to say further today.

15         MS. WERLWAS:  Your Honor, may I just respond very

16  briefly?

17         THE COURT:  Yes.

18         MS. WERLWAS:  I'll keep it brief.

19         Thank you, by the way, for those comments.  It's in

20  part why we styled this as a conference because we know there

21  are a lot of moving parts and actors involved in achieving

22  justice in this case.

23         Rest assured, we are not going to lay out for you here

24  our arguments or sort of the theories under 3626(a)(3), but

25  would give us the confidence that those procedural steps with

1    which we are indeed very familiar, why we think we can more

2    than meet our burden to establish those in this case.

3         We would be happy to address in writing the threshold

4    question, the one that would be before your Honor, which is

5    that your Honor would have to find -- about very less intrusive

6    relief has failed and that there has been a prior order.

7         To be clear, we think that those jurisdictional

8    questions that you raised of whether 3626 could be triggered in

9    this process, we would be happy to address in writing, should

10   that be the appropriate path in this case.  But we think that

11   this case could be ripe for that proceeding and that there are

12   the prior -- the consent judgment and the remedial order serve

13   as the requisite remedial order.

14        But leaving that aside, we will just say we are also

15   open to discussions sort of with the Court in ways of building

16   an evidentiary record and the means of doing so in the unusual

17   posture of remedial proceedings where we have the unusual fact

18   repository of what must now be probably 3,000 pages of

19   monitor's reports and data.  We have agreed that those are not

20   act of factual findings of the reports.  Those are the

21   monitor's reports.  The parties might work out, suggest more

22   streamlined measures for achieving factual findings in this

23   matter.

24        But we do appreciate sort of the guidance that the

25   Court of the giving and don't want to detain the United States

 1    from getting their views heard.

 2            THE COURT:  Thank you, Ms. Werlwas.

 3            Let's all take close our cameras and put ourselves on

 4    mute for ten minutes and reconvene here at -- by my clock, it

 5    will be 12:02.  Thank you.

 6            (Recess)

 7            THE COURT:  I think we are ready to proceed.

 8            Mr. Powell, I turn to you.

 9            MR. POWELL:  Thank you very much, your Honor.  This is

10    Jeffrey Powell on behalf of the government.

11            The government is, of course, alarmed at the

12    extraordinary level of violence and disorder in the jails.

13    Many years and ongoing failure to comply with the core

14    provisions of the consent judgment, that's been well documented

15    and for which we needed to go and get a remedial order, which

16    is not being complied with either, and the overall current

17    state of affairs and chaos at Rikers Island.

18            We think that today we do support Ms. Werlwas'

19    application that the Court should direct today that the city

20    and the department implement the very specific and narrow

21    recommendations that the monitor has set forth on pages 6

22    through 8 of the letter he submitted last night.

23            We think that there is ample evidence in the record

24    through the monitor's reports, his monitor reports.  There are

25    three submissions since August 24 to support the imposition of

1   those remedies.  We think that much of the record also is

2   reflected in what has been openly acknowledged by the

3   department as a crisis, even by the commissioner himself.  We

4   don't think there is a need for an evidentiary hearing to order

5   and direct the department to implement these very specific

6   narrow recommendations that are now before the Court.

7         We are happy to go through each one and explain and

8   ask the city for its position on them now.  We believe that

9   they are directly related to and narrowly drawn to address the

10  ongoing noncompliance and the excessive levels of use of force

11  and violence that is going on in the facilities right now.

12        We are happy again to go through them, and I'd like to

13  do that, focusing this time on the actual language that the

14  monitor has crafted and which we are asking the Court to direct

15  the city to implement and follow.  We are still a little bit

16  unclear.  It seems like the city is consenting to much of this.

17  So given the emergency crisis, the emergency application that

18  Ms. Werlwas submitted, we still think that today is the time to

19  direct the city to implement these recommendations.

20        Looking at them specifically, on page 6, on the

21  immediate security initiatives, just a larger point on this, I

22  know the submission came in last night to the Court, and

23  Mr. Martin can certainly fill in the details here, but there is

24  very little new here that has not been raised with the

25  department before.  Months and months have gone by, years,

1   where Mr. Martin and his very detailed monitoring reports has

2   detailed these problems, the same problems that have been

3   detailed in the last few weeks, although they have certainly

4   gotten worse with the staffing issues.  But these

5   recommendations have been raised before.  They have been

6   provided to the department before.  It's simply a fact that

7   they haven't been implemented.  They are not new.

8        So going through them in turn, looking on page 6, at

9   the immediate security initiatives, the first one, develop in

10  consultation with the Monday an interim security plan that

11  describes in detail how various security breaches will be

12  addressed by October 4, 2021.  It's my understanding that the

13  city is consenting to that.  If that's not the case, we are

14  happy to hear it.

15       But this is basically what the monitor -- and

16  Mr. Martin can speak for himself, but is looking for a plan to

17  address what he has detailed in report after report, the basic

18  security breaches that are going on and leading to the

19  excessive violence that's in the jails, not ensuring that doors

20  are closed, that inmates are not free to roam around the

21  facility, that staff and corrections officers don't leave their

22  posts.  If they do, there is someone there to direct them back.

23  These are basic core security protocols.  So the recommendation

24  to develop a plan by October 4 to address these I think is

25  certainly reasonable, it's narrow, and I think the department

1    and the city is consenting to that today.

2          THE COURT:  Mr. Powell, if I can interject for a

3    moment, I think I heard Ms. Joyce, who will be able to speak

4    for herself, but I think I heard her say that they are

5    consenting to this, but may have issues with the timetable and

6    some refinements.

7          What I'll ask, Mr. Powell, is for you to go through

8    your position on each of them.  There has been a lot of

9    discussion of the problems and the recommendations, so to the

10   extent that you can focus on particular issues or questions

11   that have not been brought out in earlier remarks before I turn

12   to Ms. Joyce for responses or something that you specifically

13   want her to speak to, that would be helpful.  I appreciate that

14   you have been patient for two hours.  I am not trying to cut

15   you short.  I am just trying to make sure that we all stay

16   focused on what we specifically need to address together.

17         MR. POWELL:  Sure.  We will do that.  I will do that,

18   your Honor.

19         As far as the deadline, I think that's what Mr. Martin

20   recommended and thought was reasonable.  If there is a

21   different deadline that the city wants to propose now, we are

22   happy to hear that.  I had planned to go through the specific

23   relief and recommendations as outlined by the monitor and why

24   we think they are reasonable and that the record supports the

25   adoption of those recommendations.  Do you want me to proceed

1    with that?

2            THE COURT:  Let me ask Ms. Joyce right now.

3            Ms. Joyce, do you have issues with the reasonableness

4    of recommendations 1A through E, leaving aside for a moment the

5    timetable which I expect you may want to speak to?  If you have

6    issues with the reasonableness of them, I will ask Mr. Powell

7    to make his arguments on them.

8            MS. JOYCE:  Your Honor, we don't have an issue with

9    the reasonableness of 1A through E, but I do want to just

10   briefly respond in that we received the status report with the

11   recommendations last night, and I gave my initial positions on

12   the recommendations to Ms. Friedberg this morning out of

13   respect for her relationship because I wanted her to have a

14   heads-up as to what the city's thinking was.  I gave the Court

15   our initial thoughts on the position because the Court asked.

16           But I did not in any way mean, as Mr. Powell is

17   apparently taking it, that the city was consenting right now to

18   the language, which is why I asked the Court for a week to

19   respond in writing with the exact language and dates that we

20   are agreeing to.

21           I don't agree with Mr. Powell's -- to negotiate these

22   things on the phone.  I think it's really important that

23   everything be put in writing and that's why I asked for next

24   week.  If Mr. Powell was understanding that we were just

25   consenting to everything right now, that was not what I meant.

1    I meant what I said when I said that we want more time to

2    continue discussing certain provisions with the monitor, but

3    that we agree to 1A through E, the overarching recommendation.

4    We need to work out some of the logistics.  To No. 2 we agreed.

5              I hope I answered the Court's question.

6              THE COURT:  Thank you for that clarification.

7              MS. JOYCE:  Your Honor, if I just may, I do also have

8    problems with the verbal applications that Ms. Werlwas and

9    Mr. Powell are now making.  I just wanted to put that on the

10   record that the city would request, respectfully, that they put

11   their requests in writing and that the city have an opportunity

12   to respond to their requests, and also just one final thing

13   because I don't want the Court to think that this is anything

14   about the city's objection.

15             Ms. Werlwas said something to the extent that it's

16   about the money.  This has nothing to -- the consultant has

17   nothing to do with money and with the city paying for

18   consultants.  We pay the monitoring team.  We pay their

19   staffing consultant that they just hired.  It's not about

20   payment or money.  So I don't want the Court to think that's in

21   any way a consideration that is going into our responses to

22   these recommendations.

23             That's all I have to say at this point.

24             THE COURT:  Thank you, Ms. Joyce.

25             Mr. Powell, please proceed as you believe appropriate,

in light of Ms. Joyce's response.

MR. POWELL:  Sure.  Just in light of that response, also, I point to the fact that, again, I understand the letter was submitted yesterday, but in that letter the monitor references how he is, I think, rebuffed by the city on some of these discussions and his recommendations over the last month, up until this court conference was scheduled.

So, again, I just would like to make it clear, having been involved in the discussions with the monitor, and we appreciate his candor with us and his updates to us on the status of kind of his dialogue with the city, that what's in here in this letter is not new, and we just are looking to move forward with a directive that the city and the department implement these fairly narrow and limited recommendations, and we'd also ask that the city be directed to report to the court and the monitor on a periodic basis the status of implementing these recommendations as well as the status of the various items that are outlined in appendix A to the monitor's letter from yesterday.  That report, in our view, should include specific data showing whether there has been progress made on these initiatives.

Specifically, we think that there should be reporting to show whether there is any more progress in limiting and reducing the absenteeism levels at the department which have grown, everyone agrees, to an unacceptable level.  We would

1     request and we did request the monitor provide this, and we did

2     receive it for last week.

3          But they would be reporting on the number of staff who

4     are out sick or AWOL or on medically modified leave on at least

5     a weekly basis in order to track when there is actually real

6     process that is being made.  The data that we received from the

7     monitor last week showed that approximately one-third of the

8     department's current uniformed staff fell into one of those

9     three categories.  Indeed, the data that we got showed that

10    there was a slight worsening or increase in those numbers

11    between September 1 and I think it was September 13 or 14, when

12    we got the numbers.  We would request that in that reporting

13    that there be specific data showing whether these initiatives

14    are working or not working.

15         One other example with respect to the monitor's

16    recommendation that the city process new admissions through

17    intake within 24 hours.  Again, this, my understanding, is the

18    city's policy.  The monitor is just recommending that they

19    follow their own policy, and we are here asking that the Court

20    direct them to follow their own policy.  Again, it's not

21    groundbreaking.  This intake problem has been well documented

22    in the record, in the press, and the commissioner has

23    acknowledged that.

24         We would ask that in the periodic reports to the

25    report the city report out how many instances are inmates

1    staying in intake for longer than 24 hours and, if so, why is

2    that?

3            Again, we think there is a crisis on the island.  It's

4    very important that there be transparency and accountability,

5    not just plans and words and letters back and forth.  We think

6    that the public and the Court and the monitor has a right to

7    know, is there progress being made on these initiatives.  We

8    can go back and file a written application and have the city

9    respond, but, again, these immediate security initiatives are

10   things that have been raised with the city before.  They go to

11   basic corrections practice.  We want to get the immediate

12   relief and have the city implement the recommendations as soon

13   as possible.  We are very disappointed hearing, and Mr. Martin

14   can speak for himself, about the lack of responses he was

15   getting over the last few weeks on some of these basic

16   recommendations.

17           As to, just briefly, the second and third

18   recommendations, categories of recommendations in Mr. Martin's

19   letter from yesterday, expanded criteria for department

20   leadership, we are very happy to see that the city fully agrees

21   with this recommendation.  But, again, we note that this

22   recommendation was laid out in detail in the monitor's report

23   that was filed in May.  Exact same recommendation directing the

24   city to consider it and figure out whether they can hire people

25   outside the department to fill what is clearly a gap in

leadership, and it's been well documented in each and every

report that Mr. Martin has submitted.

Here we are, on September 24 at a court conference

and, again, we are hearing, we will look into it.  We agree

with the idea.  I think it is time and the record sufficiently

supports that the Court direct the department to do what

Mr. Martin is recommending, which is only report back by

October 11, after conferring with the state, regarding how they

can implement this recommendation and a proposed solution.

That's all the recommendation is.  It's not requiring them to

do it.  It's putting a timeline and accountability on the

recommendations that Mr. Martin made four or five months ago

and which they say is a great idea.

The third category, appointment of security operations

manager, it's very clear from the record that the current

management of the department is incapable or unable to ensure

the basic security protocols are being followed by their staff.

Mr. Martin and his team are intimately familiar with

the system.  They review almost every incident.  They see the

video.  They come up with examples.  They write 300-plus page

reports.  It's very clear from the record that that the current

leadership of the department cannot implement what the monitor

is saying must be done.

Bringing in someone from outside, I know either

Mr. Martin or Ms. Joyce said that we want to talk to the

plaintiffs and the government about it.  Their position, our

position is that we agree with this recommendation.  This

should be done as soon as possible.  We don't want to hold up

the discussion in any way.  We agree that, obviously, the

details of what this person will do and their job function and

who they report to has to be worked out.

Again, all that Mr. Martin is recommending here is

that the parties provide an update by October 28 on the status

of discussions.  We think that deadline, we agree with

Ms. Werlwas, that should be moved up.  That's all that's being

directed here, is that they engage in discussions, don't rebuff

the monitor again, and report back to the Court on where they

are on this very important recommendation.

It's clear from the recent reports and submissions

from the monitor that he has lost faith in the ability of the

current leadership to implement basic security protocols and

make sure that the inmates and staff are safe.  So we think

this type of recommendation to bring in some outside assistance

is long overdue, and we think it's very reasonable at this

point to require the city to report back next month, more than

a month from now, on the status of discussions on efforts to

create this position.

A couple more things.  I know we have been going for a

long time this morning.  But just putting this all in a little

bit of context, and I think your Honor understands the context,

1   but this consent judgment was entered in 2015.  Report after

2   report has found that the department is in noncompliance with

3   the core provisions of the agreement, including implementing

4   their use-of-force policy, which basically means not engaging

5   in excessive and unnecessary force.  They have been found in

6   noncompliance with not timely disciplining their staff who

7   engage in excessive and unnecessary use of force.  They have

8   been repeatedly found in noncompliance with the failure to

9   comply with the requirement to properly supervise their young

10  inmates in a way to protect them from unreasonable risk of

11  harm.  That all happened well before this crisis.

12        There was a remedial order, as your Honor is aware and

13  noted, more than a year ago, last August, addressing -- trying

14  our best, after negotiating with the city for months and months

15  about what is the proper relief to address that noncompliance.

16  We reached an agreement.  We submitted it.  Your Honor approved

17  it last August.

18        Then the monitor reported they are not in compliance

19  with many provisions of that, including, notably, provisions

20  that directly link to the representations that you are hearing

21  now.  They were required under that order to implement a new

22  deescalation protocol to limit the use of intake areas.  Now we

23  are hearing people staying days and days in intake areas and it

24  being a source of disproportionate use of forces and absolute

25  chaos in those intake areas.  Here we are, a year later,

1    hearing that the situations that we tried to address on consent

2    with the city in a remedial order, addressing noncompliance

3    with the original court order, and it is getting worse.

4            We think that, in our view, and the government's view,

5    that the record is super clear and that the very narrow and

6    specific relief that the monitor is recommending here, most of

7    which has been presented to the city, is narrowly drawn and

8    supported by the record, and we are happy to address any

9    concerns that the Court has with the PLRA.  We think, again,

10    that is satisfied.  We would ask the city, if they consent,

11    that those conditions be satisfied when we come back to the

12    Court.  But we think that this has to be considered in the

13    context of long-standing noncompliance with multiple court

14    orders by the city and the department.

15            Some of the initiatives that the city and Ms. Joyce

16    went through, while laudable, don't deal with the issues that

17    Mr. Martin is raising.  He is talking about basic corrections

18    101, security protocols, closing doors, making sure shifts are

19    not unstaffed.

20            Some of what they are talking about is giving out

21    tablets to inmates, which we get it.  We get that occupied

22    inmates are going to less likely to engage in violence, and we

23    don't take a position on whether that's a good initiative.  But

24    what they are not addressing is his core kind of concerns.

25            I think our ask, just to be very, very clear here

1    today, is that the Court direct the city and the Department of

2    Corrections to implement the recommendations set forth in pages

3    6 through 8 of the letter submitted by Mr. Martin yesterday,

4    No. 1.  And, No. 2, that the Court direct the city and the

5    department to submit periodic reports to the Court on their

6    efforts to implement these recommendations, their efforts to

7    implement what is set forth in appendix A, which are their

8    initiatives that they have announced, and to include specific

9    data showing progress, including a number of inmates who are in

10   intake longer than 24 hours, the number of staff who are out

11   sick, medically modified, or AWOL, and the number of shifts

12   that are being left unstaffed due to staff shortages.  That is

13   our request today.

14          I'm happy to answer any questions your Honor has.

15          THE COURT:  Thank you.  I am going to turn to

16   Ms. Joyce at this point, and then I am going to ask the monitor

17   to comment as well.

18          Ms. Joyce.

19          MS. JOYCE:  Yes, your Honor.  Again, for the record, I

20   object to Mr. Powell's verbal request on the record to enter

21   the monitor's recommendations today into an order.

22          To be clear, the city consented to a status conference

23   at the request of Legal Aid.  If the parties had wanted the

24   Court to consider issuing an order, they should have raised it

25   with us or put it in writing to the Court so that we have

1  proper time to consider.  I don't agree to Mr. Powell's

2  request, and I really don't -- just to address some comments

3  that he made, the specific recommendations that we have issue

4  with, the one requiring the hiring of external consultants,

5  these are not things that have been -- correct me if I'm wrong,

6  Mr. Martin, Ms. Friedberg, the consultant requests haven't been

7  in the works or mentioned for months.  I think the first I

8  heard of it was Monday, this past Monday.

9            In terms of Mr. Powell's statement that we rebuffed

10  the monitor, I take offense to that.  I don't think anybody in

11  the city has been rebuffing Mr. Martin.  I myself, and I know

12  the operational team at the department and the folks at City

13  Hall have been working very diligently just on the operations

14  of the department, but also to get the monitor and his team

15  information that he needs.  So I hope Mr. Martin doesn't feel

16  like he was rebuffed.  If he does, I want to have a discussion

17  with him.  But I take offense to Mr. Powell's characterization

18  of our response or lack thereof to Mr. Martin.

19            Also, if Mr. Powell wants certain information, certain

20  reports, I don't know in theory -- we report all the time to

21  the monitor and his team, so they have this information.  But

22  if Mr. Powell and Ms. Werlwas want certain information, whether

23  it be informally to them directly or reported to the Court,

24  this was the first I'm hearing of it.  I really wish that these

25  requests could be made in writing to us.  It doesn't need to be

1    to the Court.  Send an e-mail to the city saying, could you

2    give us this information on such and such basis so we can

3    consider it.

4            But, again, in response to Mr. Powell's direct ask and

5    Ms. Werlwas' direct ask, we object to it and we just reiterate

6    our ask for one week to make a written submission to the Court,

7    after discussions with the monitoring team, about what the

8    specific language is and dates are that we are going to be

9    agreeing to.

10           To the extent that anyone thinks work will stop

11   between now and when we would submit a written response, that's

12   not the case, that the department is working on these very

13   issues.  If we can get working on them more between now and the

14   submission date, we will.  Work will not stop.  It's just we

15   received this.  Me and the principals, who I speak for, who

16   have been indirectly in the conversation, just want one

17   additional week from today to have further conversations with

18   the monitoring team to put our response in writing and respond

19   to any requests that Ms. Werlwas and Mr. Powell choose to put

20   in writing.

21           MR. POWELL:  If I can just respond to two points

22   quickly on that, Judge.

23           Just with respect to the term rebuff, I'm taking that

24   from Mr. Martin's letter.  On page 5, he says:  The monitoring

25   team has made multiple attempts to implore the department to

immediately address the security failures.  These attempts were
essentially rebuffed and ignored for almost a month with the
city and department claiming that the initiatives underway were
sufficient to address the monitoring team's concerns.  I am not
trying to characterize.  Mr. Martin can discuss that back and
forth or any frustrations that he has had before this
conference was scheduled.  I was just citing from the monitor's
own report.

          I remain a little unclear as to what the city's
position is.  Is it in a week they will submit a written
response, or is it that they are going to report back on what
they agree to or a proposed order for the Court to direct?
What is the course that they are proposing?  Where our goal is
to have some Court-directed relief here that basically the
monitor will then be able to report back to the Court on
whether the things that are being ordered are being done.  I
just would like a little more clarity on what Ms. Joyce is
proposing.

          As far as the data request, we did request the data on
staff absenteeism.  The monitor, I think, conveyed that request
to the city, gathered data, reported back to us.  That is data
we have requested.  Our ask here today is that the data be
submitted to the Court, also, so the Court can engage and see
whether there is actually being progress made on this crisis of
shortage of staff at the island.  Our ask is that this data,

1   and it's limited, be reported out to the Court so we can see

2   whether these initiatives outlined by the city are actually

3   having an impact on the island.

4            THE COURT:  Thank you.

5            Ms. Werlwas, you have your hand up, so I will call on

6   you.

7            MS. WERLWAS:  I just want to state that plaintiffs'

8   position on Mr. Powell's requests, so that the others can

9   respond, just to be clear, plaintiffs support the government's

10  requests for relief today and the reporting requests that were

11  made.

12           In terms of moving forward, we do have a proposal to

13  address the city's concerns.  What I would suggest is that

14  while we certainly can put exactly what we said in writing, we

15  could do so within an hour of this conference because what we

16  will do is cut and paste exactly the language in the monitor's

17  report in the e-mail and say, do you consent to this?  So there

18  is no ambiguity here, that is exactly what we want, is already

19  in writing, and all of us on the call have that in front of us

20  right now.  If it need to be in an e-mail, we can do that.

21           We could confer with the city today.  We could confer

22  with the city over the weekend or on Monday.  If there are any

23  parts of this that the city does not agree to, then we would

24  ask to come back to the Court on Tuesday and with the

25  principals whom are the decision makers, have the commissioner

1    here, and we could then go through what, if any, of the

2    remaining problems are as a control.  But we could get back to

3    the Court with an agreement on Monday night.

4              THE COURT:  Thank you, Ms. Werlwas.

5              Ms. Joyce.

6              MS. JOYCE:  Your Honor, just to respond briefly to

7    some points that Ms. Werlwas made, I am not sure why she keeps

8    pushing for the appearance of the principals.  The commissioner

9    is involved in all of these conversations.  I am speaking for

10   the commissioner and his position.  He doesn't need to be on a

11   call for the Court to hear exactly the same thing.  I speak for

12   the city, I speak for the principals, and the commissioner has

13   a jail to run.  So I am not sure why Ms. Werlwas keeps

14   insisting for the appearance of the principals.

15             Second, yes, I do want Ms. Werlwas and Mr. Powell to

16   have to, in writing, articulate their requests.

17             Third, in response to Mr. Powell's question for

18   clarification, as the Court noted, the monitor's letter is not

19   seeking a court order.  It is issuing recommendations and

20   asking whether or not the city accepts or rejects the

21   recommendations.

22             So what I thought I had been clear about to the

23   parties, and I apologize if I wasn't, my request would be for

24   one week to submit a letter to the Court stating our positions

25   about whether we accept or reject each recommendation, the

1    exact language and date that we are accepting, and if we are

2    rejecting, the reasons why and any steps that we have taken in

3    regards to No. 2.  That is what the city's ask is.

4          I am not sure if the Court has any clarification

5    questions.

6          THE COURT:  Not at this moment.  I would first like to

7    hear from the monitor again.

8          MR. MARTIN:  Yes, your Honor.

9          I would first reference something that Mr. Powell said

10   that I want to maybe expand on or put in even more context.

11   It's at the crux of what I think we are dealing with and

12   addressing here.  He made reference to the city providing

13   laptops or app ads.  I don't know exactly what the reference

14   was.

15         The city has taken actions of significant magnitude in

16   many critical areas.  I know it's the product of a tremendous

17   amount of work by a lot of folks.  I don't wish to diminish

18   that at all.

19         The crux of the matter is, I'd like to draw on page 5

20   of our report toward the top of the page where -- this is a

21   sentence that I specifically wrote and insisted be in there

22   because I believed it crystallized the difficulty that we have

23   been having in seeking real immediate remedies from the city

24   where I say:  For instance, while repairing broken doors is

25   critical, of equal importance is requiring staff to secure

1    those doors once repaired.

2          To me, that illustrates what we are dealing with here

3    is two major tracks.  One, the depopulation, staff absenteeism,

4    those things are necessary and will have some effect.  But it

5    is the issue of what does the agency do and how they can

6    articulate what they are going to do now, once they get a

7    repaired door, of securing that when appropriate, to control

8    and limit movement of inmates.

9          As I said in my opening remarks, it's not complex in

10   the sense of these basic security operations we are talking

11   about.  It's diligence and commitment of upper management

12   through their supervisory chain of command to demand of their

13   staff that they stay on post, that they only open a door when

14   they should, and that they control unchecked movement by

15   inmates.  I can go on with a longer list, which may be the

16   product of some discussion, and will be, between my office and

17   the city and the agency.

18          But, for instance, systems have used what basically is

19   referred to as pin mapping in their institutions where they are

20   able to, in real time, identify the areas that are generating

21   the serious problems.  Again, this is not complicated.  Once

22   you identify those, then you sure up, through your personnel,

23   to address those high-incident areas.

24          I have not heard a single concrete response from the

25   Department of Corrections to date and still today of how they

1    are going to address these immediate security needs.  Not one.

2    Nothing.  That this should have to come from the monitor speaks

3    for itself about leadership in that agency.

4            Do we make a recommendation lightly of retention of an

5    external agent with demonstrated expertise?  No.  Your Honor

6    knows how I feel about intrusion.  She has always given me the

7    liberty to respect that.  But this is, so to speak, a red line

8    where intrusion is not an issue.  It's a compelling need.

9    Thank you, your Honor.

10           THE COURT:  Thank you, Mr. Martin.

11           These are immediate and pressing problems.  We did not

12   come here today to this conference with a specific request for

13   an order queued up.

14           What I am going to require is that the plaintiffs and

15   the government file their application for an order this

16   afternoon by 5:00, at the latest, that the parties meet and

17   confer immediately, including over the weekend, and that the

18   city respond –– that they meet and confer in an effort to craft

19   a consensual order with deadlines as to as many aspects of the

20   recommendations as can be consented to, with alterations in

21   language as may be necessary or appropriate, and that any

22   agreed language and the city's response to any aspects that are

23   not consented to be filed by noon on Tuesday and any necessary

24   reply be filed by noon on Wednesday.

25           I will set for 2:30 on Thursday, as long as Ms. Ng

1  doesn't tell me that doesn't work, a further conference and

2  hearing on the application for an order requiring compliance

3  with any aspects of the monitor's recommendations that are not

4  agreed.

5          The parties, to the extent there remain aspects of

6  these recommendations that are disputed, the parties must meet

7  and confer as to the procedures and content of the hearing and

8  the extent to which factual predicates can be stipulated and

9  filed by 5:00 on Wednesday.  I am just trying to make sure that

10  this all works mechanically for me so that I can be properly

11  prepared.  4:00 on Wednesday their proposal for the proceedings

12  on Thursday at 2:30, which will also be virtual, unless they

13  jointly request otherwise.

14          I think that that schedule covers an accelerated means

15  of addressing the issues that have been queued up, and I am

16  requiring you to be meeting and conferring about the specifics

17  of an order, but I do require and I expect that, as Ms. Joyce

18  has represented, there is undertaking of work and progress of

19  work on the substantive issues that are facing the individuals

20  who are confined at Rikers Island and that particularly

21  measures with respect to direction to the officers who are in

22  the units that it is absolutely unacceptable not to intervene

23  in observed self-harm behavior and it is unacceptable to be

24  willfully ignorant of self-harm behavior, to ignore self-harm

25  behavior or signs of it be communicated immediately.  There is

1   no good reason for anybody to think that that's acceptable.  To

2   the extent anybody misunderstands that, that has to be

3   communicated immediately.

4          Ms. Joyce, do you have any questions?

5          MS. JOYCE:  No, your Honor.  I completely understand

6   the Court's order.

7          I just have a question for Mr. Martin and

8   Ms. Friedberg, if you can --

9          THE COURT:  You're breaking up.  Start that again.

10          MS. JOYCE:  I would just ask if Mr. Martin and Ms.

11   Friedberg could send me the information about that incident,

12   the self-harm incident where the officers willfully ignored the

13   gesture.  If they could just send that to me offline, I'd

14   greatly appreciate it.

15          Yes, I understand the Court's order.

16          MS. FRIEDBERG:  Your Honor, we could send that to

17   Ms. Joyce within five minutes.

18          MS. JOYCE:  Thank you.

19          MR. POWELL:  Your Honor, just seeking some

20   clarification of what your Honor expects by 5:00 today.  Is

21   your Honor seeking a proposed order that we can submit?  I

22   understand that will be then discussed with the city.  But is

23   that the application that your Honor seeks, the language of a

24   proposed order?

25          THE COURT:  A proposed order with any further legal

1   justification or reference to evidentiary record on which -- or

2   documentary record on which the plaintiffs and the government

3   are relying in requesting that order.  You have made oral

4   remarks today.  You have made an oral application today.  But

5   this is essentially an expedited motion on the schedule that I

6   have set for entry of an order with the specific elements that

7   you have laid out, and our local rules speak to the content of

8   a motion, and you need to document that motion as thoroughly

9   and as clearly as you can in the time that I have provided to

10  you.

11          Is there anything else that we all need to address

12  together this afternoon?

13          I'll just, for benefit of the record and the people

14  who are on audio, I will go one by one.

15          Mr. Martin, anything further?

16          MR. MARTIN:  No, your Honor.

17          THE COURT:  Thank you.

18          Ms. Werlwas, anything further?

19          MS. WERLWAS:  No.  Thank you, your Honor.

20          THE COURT:  Thank you.

21          Mr. Powell, anything further?

22          MR. POWELL:  No.  Thank you, your Honor.

23          THE COURT:  Ms. Joyce, anything further?

24          MS. JOYCE:  No.  Thank you, your Honor, for so much of

25  your time today.

1             THE COURT:  Ms. Friedberg, anything further?

2             MS. FRIEDBERG:  Nothing further, your Honor.

3             THE COURT:  I thank you all, and I thank the monitor

4    again and the deputy monitor for their candor, for their focus,

5    for their documentation of the issues and conditions and their

6    very specific consideration and proposal of steps, and I thank

7    the parties' representatives and their clients for undertaking

8    seriously to have movement and results here that will change

9    the lives and conditions of the people who are confined in

10   Rikers Island.

11             This needs to be done now, needs to be done seriously,

12   and results need to be shown.  I believe there are, among the

13   listeners, representatives of staff at Rikers Island and it

14   will need the undertaking of everyone involved here to make a

15   difference in lives.  So that should be the goal, for safety,

16   for proper conditions, for people who are in custody and the

17   people who are charged with their care and safety at all

18   levels.

19             Again, thank you, all.  I will look forward to the

20   submissions.  I will expect and be hopeful that we will not

21   have to have a contested hearing next week.  I will be watching

22   the filings and my e-mail box for courtesy copies or any other

23   communications that may be appropriate through the e-mail box.

24             Thank you, all.  Strength and stamina for the hard

25   work that you have between now and next Thursday, and success

1    in those endeavors for the benefit of those whose lives are in

2    our collective care.

3                We are adjourned.  Good afternoon.

4                (Adjourned)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Footer.