M4QNNUNC

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   MARK NUNEZ, et al.,

 4                 Plaintiffs,

 5           v.                            11 Cv. 5845 (LTS)

 6   CITY OF NEW YORK, et al.,

 7                 Defendants.             Remote Conference

 8   ------------------------------x

 9                                         April 26, 2022
                                           2:00 p.m.
10
     Before:
11
                     HON. LAURA TAYLOR SWAIN,
12
                                           Chief Judge
13
                          APPEARANCES
14
     THE LEGAL AID SOCIETY
15        Attorneys for Plaintiff Class
     BY:  MARY LYNNE WERLWAS
16        KAYLA SIMPSON

17
     DAMIAN WILLIAMS
18        United States Attorney for the
          Southern District of New York
19   JEFFREY K. POWELL
     LARA K. ESHKENAZI
20        Assistant United States Attorneys

21

22

23

24

25
```

M4QNNUNC

                        APPEARANCES (Continued)

          New York City Law Department
BY:   KIMBERLY JOYCE
      SHERYL NEUFELD
      Assistants Corporation Counsel

STEVE J. MARTIN
      Court Monitor

ANNA E. FRIEDBERG
      Deputy Court Monitor

ALSO PRESENT:   Louis Molina, Commissioner, DOC

M4QNNUNC

```
 1              (The Court and parties appearing by videoconference)
 2              (Case called)
 3              THE COURT:  We are here today for a status conference.
 4     This conference was scheduled to give the parties an
 5     opportunity to address the grave urgent concerns identified by
 6     the monitoring team in the March 16, 2022, special report,
 7     which has since been updated by reports dated April 20 and
 8     April 25.
 9              The office of the United States Attorney has also
10     filed a letter expressing its concerns regarding communications
11     and action on the part of the department and the city.
12              The conference was also convened to address the status
13     of implementation regarding the monitoring team's
14     recommendations included on pages 67 to 74 of the special
15     report.
16              I thank the parties' counsel and the monitoring team
17     and particularly the commissioner of the Department of
18     Correction for attending this virtual conference today, and I
19     am now going to ask the video participants to state their
20     appearances for the record and for the benefit of those who are
21     listening.
22              I will begin with the monitoring team representatives.
23              Mr. Martin, you need to unmute yourself.
24              MR. MARTIN:  I appreciate that, your Honor.
25              My name is Steve Martin.  I am the monitor in the
```

M4QNNUNC

1   *Nunez* matter.

2          MS. FRIEDBERG:  Good afternoon, your Honor.  My name

3   is Anna Friedberg.  I am the deputy monitor of the *Nunez*

4   matter.

5          THE COURT:  Thank you.

6          And counsel for the plaintiffs.

7          MS. WERLWAS:  Good afternoon, your Honor.

8          Mary Lynne Werlwas, the Prisoners Rights Project of

9   The Legal Aid Society, counsel for the plaintiffs.

10          MS. SIMPSON:  Good afternoon, your Honor.  Kayla

11   Simpson Prisoner Rights Project of The Legal Aid Society, also

12   for the plaintiffs.

13          THE COURT:  Good afternoon.

14          And the office of the United States Attorney?

15          MR. POWELL:  Good afternoon, your Honor.  My name is

16   Jeffrey Powell.  I am representing the government.

17          Along with me is Lara Eshkenazi.

18          MS. ESHKENAZI:  Good afternoon, your Honor, Lara

19   Eshkenazi from the Southern District of New York.

20          THE COURT:  Good afternoon.

21          And for the city and the Department of Corrections?

22          MS. JOYCE:  Good afternoon, your Honor.  Kimberly

23   Joyce, from the New York City Law Department, as well as my

24   cocounsel Sheryl Neufeld, who is our chief assistant for

25   regulatory law and policy is joining me, as well as

M4QNNUNC

1    commissioner --

2              MR. MOLINA:  Louis Molina, your Honor.  I'm

3    commissioner, New York City Department of Correction.

4              MS. NEUFELD:  Good afternoon, your Honor.

5              THE COURT:  Good afternoon.

6              And, again, thank you all for being here.

7              For those who are listening in, if you are on a line

8    that has the ability to be heard, you must keep yourself muted

9    at all times.  And if we end up having interference in the

10   video feeds, just to avoid that if possible, I will ask the

11   video participants keep their video audio muted when they are

12   not themselves speaking.

13             I remind everyone that, as provided in the Court's

14   January 19, 2021 standing order filed in Docket No. 21-MC-45,

15   neither recording nor retransmission of any part of this

16   proceeding is permitted by any participant or listener,

17   including parties, counsel, the public, and the press.

18             I will be calling on each speaker during the

19   proceeding.  Each time that you speak, please identify yourself

20   by name for clarity of the record and for the benefit of those

21   who are listening in.

22             Please don't interrupt each other or me during the

23   conference.  If we interrupt each other, it's difficult to

24   create an accurate transcript.  But, having said that, I, as

25   usual, apologize in advance for breaking this rule, because I

M4QNNUNC

1    may interrupt if I have questions.  And I will give the

2    attorneys an opportunity to make additional comments or ask

3    questions at the end of the conference.

4         But if anyone has any difficulty hearing me or another

5    participant at any time, please say something right away or

6    raise the electronic hand.

7         I am going to make some introductory remarks before I

8    call on the parties to speak.

9         We've previously convened on September 24 and December

10   2 of last year for emergency conferences to discuss the myriad

11   of issues identified by the monitoring team in its status

12   reports that were issued in the summer and fall of 2021.

13        In response to the ongoing cries at Rikers Island, the

14   Court approved and entered a second remedial order on September

15   28, 2021, which is at docket entry No. 398, which focused on

16   the implementation of immediate security initiatives to improve

17   the extremely dangerous conditions at the jails.

18        The Court also approve and entered a third remedial

19   order on November 2, 2021, and that is filed at docket entry

20   No. 424.  That focused on the implementation of initiatives to

21   increase timely accountability for use of force violations.

22        The monitoring team's March 16, 2022, special report

23   states that so far these measures have failed to ameliorate the

24   crisis of what the monitoring team characterizes as patently

25   unsafe conditions in the jails.  In addition to providing a

M4QNNUNC

1     great level of detail on the foundational issues currently

2     facing the city and the department, including the persistent

3     levels of violence in the facilities, the March special report

4     provided a detailed update on the department's efforts to

5     achieve compliance with the second and third remedial orders.

6     Although efforts to implement the requirements of the third

7     remedial order focused on timely accountability appear to show

8     the most promise, many of the monitoring team's updates are

9     very disturbing in that they call out lack of progress across

10    the spectrum of identified issues.

11           I have also received and reviewed the April 19, 2022,

12    status update from the U.S. Attorney's Office and the monitor's

13    April 20 and April 25, 2022, status reports, which reemphasize

14    the level of gravity and urgency of the current security

15    situation and describe the status of ongoing negotiations.

16           I have also received and reviewed the city's April 25,

17    2022, status report that is from the city and the Department of

18    Corrections discussing the work undertaken by the commissioner

19    and the city thus far and a proposed approach for addressing

20    the critical state of conditions.

21           Today I expect to hear more about how the city and the

22    department plan to implement the recommendations proffered by

23    the monitoring team to improve safety, ensure humane

24    conditions, and work toward compliance with the second and

25    third remedial orders.

M4QNNUNC

1          The monitoring team has noted in its report that with

2     each new administration and/or leadership change the department

3     restarts the clock of reform, and initiatives built on solid

4     correctional practice are revised or abandoned before benefits

5     are ever realized.

6          This is a matter of very serious concern to the Court.

7     We are now six years into the effort to make Rikers a safe

8     place for detained individuals and staff.  The fact is that a

9     court order has been in place against the same institutional

10    and official defendants for six years.  The parties and the

11    Court have benefited from a wealth of information from the

12    Court-appointed monitoring team which includes subject matter

13    experts as to the conditions and potential steps forward.

14         Restarting the clock on reform because a new

15    administration has taken office isn't a simple answer, and it

16    really can't be the answer when a crisis such as this has been

17    inherited and legal standards and expectations have been put in

18    place by court orders, especially when thousands of hours of

19    expert analysis and advice have enabled the monitor to identify

20    root problems and develop specific recommended approaches that

21    are ripe for implementation.

22         And so today I do expect to hear about specific steps

23    and concrete timelines.

24         I thank you all for listening.  I wanted to be as

25    candid as possible in opening this proceeding about my

M4QNNUNC

1    understanding of the situation and my expectations.  It is one

2    in which every single day people are in danger, people who are

3    detained, people who are employed.  So it is my hope and

4    expectation that we'll come away from this conference with some

5    specific commitments and steps and timetables.

6          So, with that, I will turn to the agenda which I'm

7    grateful to the parties for collaborating on, and I will begin

8    with the opening status report from the monitor and the deputy

9    monitor.

10         MR. MARTIN:  Thank you, your Honor.  My name is Steve

11   Martin, the monitor in the *Nunez* matter.

12         I'm going to be brief, plain spoken, and direct in my

13   observations on the issues before the Court and the parties.

14         On March 16, 2022, my office filed the special report

15   detailing objective evidence of a very troubled and patently

16   unsafe confinement operation for both staff and detainees who

17   inhabit the facilities operated by the DOC.

18         My office, led by my deputy monitor, assembled a

19   treatise on the current state of affairs and, more importantly,

20   the impediments to the reforms required by the consent judgment

21   in three successive remedial orders.  I as the monitor stand by

22   this treatise and warrant it to be an informed and highly

23   credible, work product.

24         On April 20 my office filed a status report stating

25   that conditions remain troubled and patently unsafe.  We have

M4QNNUNC

1    also detailed our efforts in working with the DOC to develop an

2    implementation plan to address current conditions of

3    confinement and the means to find a pathway to address the

4    structural impediments to reform.

5          We concluded that status report with the following

6    statement that I would like to reiterate, and I quote,  "We are

7    at a crossroads and extraordinary remedies must be given

8    deliberate consideration.  An option that may offer a viable

9    pathway for the city and the DOC to retain management of the

10   city jails is to immediately begin taking concrete steps to

11   actually implement the monitoring team's recommendations and

12   for the city and the DOC to immediately and aggressively remove

13   all barriers to implementation of initiatives that are

14   necessary to bring safety and stability to the jails.  Given

15   the daily risk of harm to incarcerated individuals and staff,

16   nothing less should be tolerated."

17         Let me put this statement in context with an example

18   that will hopefully illustrate the real-world complexities of

19   managing 5,000 detainees and 7,000 staff.

20         On April 13, I initiated a phone call with the

21   commissioner due to my grave concerns over the high levels of

22   violence at RNDC.  He immediately made himself available and

23   allowed me to detail the basis for my concerns.  We set about

24   to discuss measures needed to address the violence at RNDC.

25   Less than 24 hours later he presented an emergency response

M4QNNUNC

1    plan.  The plan reflected a series of concrete actions that

2    could be taken within his authority to abate the violence.  He

3    began to immediately implement the plan.

4            This commissioner in my experience with him during his

5    first 120 days of service has demonstrated a strong command of

6    issues that must be addressed.  He's fully committed to reform

7    and is not risk averse to exercising his authority toward that

8    end.

9            But here's the rub, the most critical observation that

10   my staff and I can offer is this:  There are a number of

11   initiatives critical to reform that are within the

12   commissioner's authority but that heretofore have not been

13   fully exercised.  There are also initiatives critical to reform

14   that may not be within his current scope of authority that will

15   require action by other city governing authorities.  This is

16   what my deputy monitor and I referred to as "cutting the red

17   tape to reform."

18           Reform of the agency will necessitate not only voicing

19   a willingness to reform, but the taking of concrete action by

20   the city's leadership and the department and its leadership

21   staff and their representatives to address the four

22   foundational issues we have identified and to implement the

23   recommendations attendant thereto.

24           I fully acknowledge that if the city does not find a

25   way to cut the red tape that is impeding reform and the

M4QNNUNC

1   department and its leadership and staff and their

2   representatives do not embrace this effort, more extreme

3   measures will be necessary.

4        My years of experience in institutional reform have

5   taught me that the best pathway for achieving sustained reform

6   in any institution is when the agency, working in conjunction

7   with the necessary players from local government, is able to

8   implement the reforms itself.  Oversight and guidance by the

9   Court are equally important, but the agency and the local

10  government officials must own the reforms for those charges to

11  be sustained -- for those changes, excuse me, to be sustained

12  over time.

13       In this case the new administration will need to do

14  that hard, in-the-trenches work to achieve significant changes

15  in practices.  Whether the city and department in fact are

16  capable of making the changes is not yet known.  That said, our

17  recommendations are intended to provide a road map for what

18  they must do.  Such changes are not easy or quick, but I

19  believe if the city and the department take the swift and

20  aggressive actions that have been laid out that there is a

21  pathway for them to maintain management of this department.

22       To that end, if in the coming weeks the city and the

23  department working in conjunction with the monitoring team can

24  develop an implementation plan that can be embraced, then the

25  city and the department should be given the opportunity to

M4QNNUNC

1   execute it.  The monitoring team will be in a position to

2   provide routine assessments to the Court and the parties, who

3   will then be in a position to determine whether the city and

4   the DOC are meeting the challenge within six months.  If they

5   fail, the city and DOC clearly risk abdication of their

6   authority to external controls.

7          At this juncture I call upon my deputy monitor to

8   elaborate on a number of illustrative critical issues where

9   impediments to reform exist.

10          Thank you, your Honor.

11          THE COURT:  I said thank you, Mr. Martin.  I was

12  muted.  Ms. Friedberg.

13          And I will mute myself again.

14          MS. FRIEDBERG:  Thank you, your Honor.  I am Anna

15  Friedberg, the deputy monitor.

16          Before I provide a brief overview on the work we are

17  doing with the city and the department, I wanted to briefly

18  advise the Court on one update regarding the monitor team's

19  access to information from the department.

20          As you know, this has been an area of concern for us

21  of late.  But we have seen improvement in the last few weeks

22  and even in the last few days of the department's efforts to

23  proactively engage the monitoring team.

24          The city's letter that was submitted yesterday

25  provides the specific particulars.  If the department continues

M4QNNUNC

1   to faithfully engage the monitoring team, as it has now

2   committed to do, the department should be in a better position

3   to inform the monitoring team and engage in necessary

4   consultation.  We will advise the Court and the parties should

5   that change.

6          With respect to our work with DOC and the city on

7   addressing our recommendations, as the monitor just described,

8   the department's work is intrinsically intertwined with the

9   city in a number of ways, from city hall to OMB and budget, the

10  imposition of discipline and interplay with OATH, to

11  procurement, contracting rules, and various issues related to

12  labor via contracts, rules, regulations, and laws.

13         These, along with the various internal bureaucratic

14  and complicated rules, makes it difficult to reform the many

15  practices and procedures that must be changed and approved in

16  the agency.

17         The recommendations that we laid out in our special

18  report provide a pathway towards reform and are intended to

19  catalyze change in two important ways.

20         The first is intended to cut the red tape, as

21  Mr. Martin just described.

22         The second is to focus on four foundational issues

23  that must be the priority and focus of the work and the

24  department.

25         I will take each in turn.

M4QNNUNC

1          With respect to cutting the red tape, the monitoring

2     team's six years' of work has led us to learn in painstaking

3     detail the many rules regulations and laws that have worked to

4     create the morass of complicated and convoluted bureaucracy

5     that the department faces.  The city must immediately take

6     aggressive and dramatic action not previously taken before to

7     support the agency.

8          Time is of the essence, and there should be no greater

9     priority for the city than to determine how it can address

10    these issues and change practice.  We welcome the city's letter

11    that was filed with the Court last night, but we must emphasize

12    that many of the initiatives the city are evaluating are ones

13    that have been identified by the city before.  They are not

14    new.

15         As the monitor just mentioned, it is isn't about -- it

16    isn't just about identifying the issues that need to be

17    addressed or even necessarily identifying the solutions.  It

18    how the city is going to support the department in its efforts

19    to address these issues differently.

20         Last September, the monitoring team issued a status

21    report that identified a number of initiatives that the city

22    and the department had developed to address both the staffing

23    crisis and current conditions.  It is worth noting that many of

24    the creative initiatives that were proposed by the city were

25    then ultimately either abandoned or determined not to be

M4QNNUNC

1   feasible.

2           For example, the creation of a clinic on site to

3   address staff medical issues on island was ultimately

4   determined to be too expensive.

5           Another idea, providing medical care on the housing

6   units to avoid unnecessary escorts, was then ultimately

7   determined operationally unfeasible.

8           While we aren't suggesting that these two initiatives

9   must be revived, we use these as examples to illustrate why we

10  simply cannot continue with this same approach in which ideas

11  are proffered and later submissions report that they won't

12  work.

13          To that end, the monitoring team identified seven

14  steps that the city must take in the letter we submitted to the

15  Court yesterday in which we would expect to see the city to do

16  things differently so that the monitor's recommendations can

17  actually be implemented.

18          I would like to provide three illustrative examples

19  that will help highlight the type of changes that need to be

20  made.

21          First, with respect to our recommendation that the

22  department must have ability to hire external correctional

23  expertise, the monitor and the deputy monitor were provided a

24  briefing by the commissioner yesterday of a potential pathway

25  forward to address this recommendation.

M4QNNUNC

1    The particulars of that are still under development

2  and should be finalized shortly.  However, it's important to

3  note that there are a series of different rules, regulations,

4  and laws that may inhibit the ability for this particular

5  approach to be adopted.

6    Should those become barriers, the city immediately, at

7  once, must advise the parties and the monitoring team so that

8  other solutions can be devised, for instance, seeking an order

9  from the Court which would allow the department to ultimately

10  be able to retain and hire individuals outside of the uniform

11  rank to support the department.  As you know, many of our

12  recommendations hinge upon the fact that there's an infusion of

13  external expertise, which is why this is such a critical

14  initiative.

15    Another example is the need for additional staff for

16  the department to be able to impose timely accountability.  As

17  you know, there's a variety of different reasons and mechanisms

18  in which, must be in play for the department to impose

19  accountability, but there is one simple issue right now, and

20  that is capacity.

21    The department needs the staff in order to impose this

22  accountability.  In fact, the letter that they submitted

23  yesterday contemplates that they are now going to try to

24  expedite discipline related to staff absenteeism issues.  While

25  we certainly welcome that, the question is, how can that occur?

1          The department provided a plan to the monitoring team

2     last Friday about its staffing needs in which it advised us

3     that, despite significant recruitment efforts, it has been

4     unable to retain the necessary staff that they need for the

5     trials division.

6          In some ways it is not surprising.  It is certainly a

7     difficult labor market right now, and the issues facing the

8     department make it a tough one to recruit for, but neither of

9     those are excuses for which the department can use in order to

10    evade obtaining the necessary staff.

11         The department needs incentives.  They need ways to

12    encourage people to come and work for the agency.

13         We have proffered, for instance, the example that they

14    should be afforded the opportunity to allow individuals who

15    work for these units to work from home remotely at least for

16    some period of time every week, every month, something like

17    that.  We have been advised that unfortunately that the city

18    believes that they are unable to do that because their policy

19    related to remote work must apply to the city as a whole.

20         This is just one example of where the city must act

21    differently.  This agency cannot be treated like all of the

22    others.  Approaches like that are going to continue to inhibit

23    the department in implementing our many recommendations if we

24    come across these issues.

25         Finally, I just wanted to address another -- my third

M4QNNUNC

example is addressing the sick leave abuse.  As you know, and the department and the city have acknowledged, they need to address the loopholes related to sick leave abuse.  In fact, the letter yesterday submitted by the city proposed that as one initiative they are going to increase the use of checks for individuals to ensure that they are home, home confinement visits as they're referred to by the department.

Those are checks in which, if an individual is home for 12 days or more so that they are then placed on chronic sick leave status, they must be home.  And so a check is done to make sure they're home.  In order to do that check, every available door must be knocked on 20 times, and the phone must be called 40 times.

As you can hear, just in the myriad of steps that I have just described, that's certainly a convoluted and complicated way in order to enforce whether or not individuals are at home.  While I appreciate that the department or the city may try to engage in additional resources to have those checks done, the issue should actually be taking one step back: How can these procedures be more common sense, straightforward, not having 15 different ways in which staff might be able to abuse the system because one of those particular procedures have not been followed.

The City of New York has incredibly talented and creative people working for it, and they have significant

M4QNNUNC

1    resources.  It's the greatest city in the world.  The question

2    is whether they have both the will and ability to put those to

3    use right now to help the department.

4        I would like to just briefly touch upon the four

5    foundational issues of which we believe that the work of the

6    department needs to be focused as we all endeavor to make the

7    jails a safer place.  The department's focus must be on these

8    four foundational issues.

9        It bears emphasis that the department's plans to

10   operationalize the many recommendations for our special report

11   must be done thoughtfully, methodically, and in concert with

12   one another, because the department has a series of polycentric

13   problems -- some of which I just described, and many more have

14   been outlined in our reports -- that represent a complicated

15   set of dysfunctional practices unlike any jail system that the

16   monitoring team has had experience.

17       How best to address these issues is therefore even

18   more complicated because there is not one solution to the

19   problems, but also everything can't be addressed at once.  So

20   items must be appropriately prioritized and synchronized, and

21   some things must happen before others.

22       The monitoring team is currently working on an

23   implementation plan with the city to address this combination

24   of factors.

25       The areas of focus that we are looking at are:

M4QNNUNC

1           (1) Security

2           (2) Staffing

3           (3) Management of incarcerated individuals related to

4      classification, housing, and responses to violence and

5           (4) Accountability.

6           The thrust of our recommendations include dedicated

7      focus on specific foundational issues such that, given the

8      myriad of other things that are going on, the department must

9      focus on a few, the four I just mentioned.  But it's important

10     to note that at least one of these foundational issues is

11     quote-unquote new to the work of the monitoring team, and that

12     is related to staffing.

13          As you know, we have long focused on the issue and

14     concern related to *Nunez*, but the specific initiatives that we

15     are describing today are in fact new.

16          Two, there is a need for an infusion of expertise into

17     the agency.

18          And, finally, there must be an increased capacity to

19     actually do the work to bring people back.  That's certainly

20     going to include the need for additional civilian staff.  We

21     talked about it with respect to the trials division, but I

22     would be remiss if I did not note that additional individuals

23     are going to be needed throughout the department in particular

24     as the department moves away from utilizing uniformed staff in

25     civilian posts.

M4QNNUNC

1      So there's certainly going to be quite a large need

2  for individuals to come and work in the agency so that

3  uniformed staff can get back to the work that they have been

4  hired to do.

5      We are incredibly anxious to see the results of this

6  work and feel the frustration that many of the monitor's team's

7  recommendations have languished for far too long.  But neither

8  of these are reasons enough to shortchange the work that must

9  that happen to ensure that a thoughtful implementation plan is

10  developed, that provide for individuals who both have the

11  authority to cut the red tape and have the operational knowhow

12  to address our recommendations.

13      We plan to discuss in more detail the implementation

14  of the monitoring team's recommendations later in this

15  conference, but in advance we must note that we are still

16  actively working with the city and department on these.  And as

17  you will hear more today, because of the complexity of these

18  issues, more time is needed to finalize the plan.

19      It is for that reason that the monitoring team

20  recommends and requests that the Court convene another

21  conference in three weeks in order to present the final plan.

22  We appreciate it may be more prudent to discuss next steps at

23  the conclusion of this conference, but we wanted to highlight

24  this request at the outset.

25      We remain committed to doing all that we can to

M4QNNUNC

1    address these grave conditions in the jails, and please let us

2    know if you have any other questions.  We otherwise cede to our

3    colleagues at department and the City of New York.

4            THE COURT:  Thank you, Ms. Friedberg.

5            I will now turn to Ms. Joyce and the commissioner.

6            MS. JOYCE:  Good afternoon, your Honor.  Thank you for

7    giving me an opportunity to make a few brief remarks.

8            First, I wanted to state that the city and, as you'll

9    hear, the department are in general agreement with the

10   monitoring team about all of their recommendations.  And we are

11   actively working with them to develop an implementation plan

12   that we hope will be submitted to the Court for approval in the

13   coming weeks.

14           In a moment I will turn to Commissioner Louis Molina

15   of the New York City Department of Correction to discuss the

16   work he has done since he was appointed commissioner just a few

17   months ago and the work he will do, much in consultation with

18   the monitoring team, to bring lasting reform to the department.

19           This is not a restarting of the clock on reform.  We

20   are taking the aggressive, dramatic, and bold steps necessary

21   now to achieve lasting change.

22           If the Court should have questions for the city or the

23   department, I will be happy to answer those questions that are

24   legal or law related, and I will defer to the commissioner so

25   he can speak to the facts and the plans going forward.

M4QNNUNC

1          Thank you, your Honor, for your time and now I defer

2     to my colleague, the commissioner.

3          THE COURT:  Thank you, Ms. Joyce.

4          Mr. Commissioner.

5          MR. MOLINA:  Good afternoon, Judge Swain.  My name is

6     Louis Molina.  I am the commissioner for the New York City

7     Department of Corrections.

8          It's good to see you again.  The last time we met was

9     April 19, 2017, when I was first appointed to the department as

10    the chief internal monitor under the consent judgment.  I

11    accompanied you on a tour not only of John Jay College where

12    the department was using it for training, but we also toured

13    our then training academy on Metropolitan Avenue and we toured

14    our GMDC facility Rikers Island, when it was open.

15         Thank you for giving me a few minutes to make an

16    opening statement to the Court.  I want to first acknowledge

17    the frustration of the performance of the department since the

18    inception of the consent judgment.

19         While the record of poor performance is clear and well

20    documented by the monitor, I think it will be helpful for the

21    Court to learn about me and what I have done over the last

22    approximate three and a half months since I was appointed

23    commissioner of the New York City Department of Correction.

24         But, your Honor, before I get into what I have been

25    doing to date, let me first state up front that I am in total

1    agreement with the monitor's recommendations, and I intend to

2    adopt them pursuant to further discussions regarding timelines

3    and other details I intend to work out with the monitor for the

4    implementation plan that will be filed with the Court for

5    approval in the near future.

6          My vision, your Honor, is to create a culture of

7    discipline and service to persons experiencing incarceration

8    that ultimately, with the implementation of the monitor's

9    recommendations and additional business management improvements

10   will create an operational ecosystem of safety and

11   rehabilitation, replicating what I was able to achieve when I

12   was a first deputy commissioner of the Westchester County

13   Department of Corrections, which was under federal oversight

14   agreement with the United States and within the three years of

15   my appointment was successfully concluded.

16         It is important that I begin my stating that during my

17   transition assessment of the department and shortly after

18   becoming commissioner, it was clear to me, as it was back in

19   2016, that the exact same four foundational issues that the

20   monitor stated in its twelfth monitor's report has normalized

21   poor practices and produced poor outcomes.

22         Those issues, for clarity, are the department security

23   practices and procedures, which are deeply flawed and

24   inconsistent with and illogical even to those with no law

25   enforcement experience.  There was inadequate supervision at

M4QNNUNC

1    the facility level, and, quite frankly, this is an issue at

2    other business units.

3           Staffing practices and procedures do not allow us to

4    be effective operationally.  And while the monitor describes a

5    limited and extremely delayed accountability for staff

6    misconduct, I can tell you from what I have seen is there was

7    no accountability in a number of areas, even those not

8    connected to the consent judgment, but nonetheless impacted it

9    because the prior leaders of the department created an

10   environment where the discipline needed to operate a law

11   enforcement agency was absent.

12          I believe that what allowed these four foundational

13   areas to worsen year after year was a combination of two

14   things:  First, the prior administration's unwillingness to use

15   the full power that is inherent to the office of the

16   commissioner; and, secondly, the drive, which is unrelated to

17   the consent judgment, to advance the political argument that

18   Rikers Island needed to be closed.  And this viewpoint,

19   preimposed the borough-based jail plan, created what I think

20   was an environment of disinvestment in the department's human

21   capital and facility infrastructure as well as an intentional

22   dismantling of the department's ability to operate.

23          To make the case to this court that I as the

24   commissioner, with the support of Mayor Adams, can turn this

25   around, I share with you some of what I have done since my

M4QNNUNC

1    appointment.

2              While staffing is not where I want it to be, over 1300

3    officers have returned to work, which has allowed the

4    department to shift five out of eight facilities back to

5    eight-hour tours of duty.  We have welcomed back external

6    program providers and have reopened family visitation.

7              While it's been less than four months, as of April 24,

8    assaults on uniformed staff calendar year to date have

9    decreased 22 percent, assault on nonuniformed staff has

10   decreased 37 percent, and use of force department-wide has

11   decreased 25 percent calendar year to date.

12             I recognize the frequency of these assaults and force

13   incidences are still high, but a decreasing trend is welcome,

14   and my goal is to condition to sustain these trending levels.

15   Implementing best practices, sustaining minimum standards

16   cannot exist without a timely and meaningful discipline

17   process, which quite frankly has never existed in this

18   department.

19             For all the public rhetoric of the prior

20   administrators, when caring my same initial time in office to

21   the prior two commissioners, I have closed out and administered

22   final disciplinary dispositions in 725 disciplinary cases.  The

23   prior two commissioners closed only 322 and 208 disciplinary

24   cases respectively in the same time frame.

25             If leadership at its highest level does not hold

M4QNNUNC

persons accountable, then the same mediocre attitude when it comes to accountability trickles down to all supervisory ranks and does nothing but normalize exhausted mediocrity.  Slashings have been increasing since the calendar year 2021 because facility and tactical search operations for too long were just not being done.

         In response to the violence, I initiated increased facility search operations for contraband weapons and reinstituted tactical search operations.  In calendar year to date department-wide, 2,297 contraband weapons have been seized.  12 out of the 20 tactical search operations alone were conduct at RNDC and recovered 685 contraband weapons.  And the department has stopped the practice of housing individuals solely by their gang affiliation and broke up and rebalanced gang housing that was the past practice of the department.

         I have also changed the department's policy that previously prevented credible messengers access to department facilities.  With the change, they now have the opportunity to engage with our troubled young adults in an effort to cease the ongoing violence.

         Lastly, as I have alluded to before, leadership matters.  And I want to respectfully remind this Court that it was I who recommended back in 2016 as the department's chief internal monitor in my Q3 2016 use of force orders report, dated December 5, 2016, I recommended then, in writing, in my

M4QNNUNC

1    first 100 days as then the chief internal monitor, and I quote,

2    "If the department continues to manage operations under the

3    current structure, it is likely that our current rate of force

4    would either remain the same or increase."

5        I would not have thought back then that the department

6    would have reached the state that it did in calendar year 2021,

7    having over 8,000 use of force incidents.

8        I went on to recommend a change in leadership that

9    would allow the then commissioner to externally hire executive

10   staff to perform operational functions.  And I can assure you

11   this position did not endear me to my colleagues and was not an

12   easy recommendation for me to put in writing.

13       But given the prior administration's unwillingness to

14   seriously consider the idea, it had to be officially documented

15   in my auditor's report.  I knew then, like I know now, that it

16   was what was needed to be done, but the prior administration

17   lacked the will to do it, and this placed the department in the

18   state that it is in today.

19       The difference between today, your Honor, and calendar

20   year 2016 is that now I am the commissioner.  And I can assure

21   this Court that I will exercise my power as commissioner to the

22   maximum to address the ongoing issues in this agency.  I have

23   shown in the short time that I as commissioner am willing to do

24   so.  From taking immediate action to issues raised by the

25   monitor to ensuring that all discipline cases are handled not

M4QNNUNC

1   only as expeditiously as possible, but departing upward when I

2   do not agree with the OATH judges and believe that termination

3   is warranted for the offense and the good order of the

4   department, to also terminating nonuniformed staff that, either

5   through their inability or willingness to be bystanders,

6   allowed through their collective inaction the department to

7   continue to deteriorate while talking a good game publicly and

8   taking no action despite being in executive positions of

9   authority.

10          Your Honor, that is not me.  And I am asking that I be

11   given the time to work with the monitor, as I did with the

12   monitor in Westchester County, which allowed Westchester County

13   DOC to be released from federal oversight agreement.

14          The monitor has stated in his most recent status

15   report and I quote, "An option that may offer a viable pathway

16   for the city and the department to retain management of the

17   city's jails is to immediately begin taking concrete steps to

18   actually implement the monitor's team's recommendations and for

19   the city and the department to immediately and aggressively

20   remove all barriers to the implementation of initiatives that

21   are necessary to bring safety and stability to the jails."

22          Your Honor, that is exactly what I am doing and intend

23   to continue to do through my powers as the commissioner.  These

24   barriers will be removed.

25          In closing, I add that I truly believe that the

M4QNNUNC

1   monitor and I are aligned.  We may debate processes and

2   implementation strategies, but what I think of what he did as

3   young lawyer fighting internally against the state of Texas

4   prison system starting back in 1972, your Honor, that was me in

5   2016 when I first entered the New York City Department of

6   Corrections as a chief internal monitor.

7           I am fortunate that with a new mayor I was given the

8   honor to be appointed commissioner and lead the heroic

9   Department of Corrections staff, the majority of whom came to

10  work during the height of pandemic and continue to do so today.

11          The women and men of our department that stayed in the

12  fight deserve to be recognized, and I am here as their

13  commissioner fighting for them too.  They deserve to be treated

14  with dignity and respect, and every day I fight for them

15  because they too deserve to work in a place that values them as

16  people.

17          Your Honor, let the monitor and I implement the reform

18  that has been long overdue.  I assure this Court you will see

19  change.

20          I hope I'm not speaking out of turn, Mr. Martin, when

21  I state matter of fact that we have not crossed a point of no

22  return.  You and I together can get this done.

23          Thank you, your Honor, for giving me a few minutes

24  just to make an opening statement.  I am available for

25  questions if you have any.

M4QNNUNC

1          THE COURT:  Thank you, Mr. Commissioner.

2          I just have two specific follow-up questions for you

3     right now.  You indicated that you have broken up gang-based

4     housing.  It is my understanding that has developed into a

5     pervasive problem across facilities.  Are you saying that that

6     has been eliminated across facilities?

7          MR. MOLINA:  Yes.

8          So what I would tell you, ma'am, is that the

9     recommendation made by the classification consultant that was

10    recommended by the monitor recommended, one, that we

11    discontinue use of the hub that was part of the contributor to

12    created gang-affiliated housing.

13         And what we've done is I have ordered the custody

14    management team to rebalance the housing units starting with

15    RNDC and not house individuals by gang affiliation.  That has

16    been done at RNDC and is being undertaken at other facilities

17    as well.

18         THE COURT:  So that has been accomplished at RNDC?

19         MR. MOLINA:  Yes, your Honor.

20         THE COURT:  And it's currently in progress at the

21    other facilities?

22         MR. MOLINA:  Yes, your Honor CHECK.

23         THE COURT:  Thank you.

24         When you refer to credible messengers who are able to

25    get access, would you explain that to me?  I'm sorry.  I just

M4QNNUNC

1    can't correlate your terminology.

2            MR. MOLINA:  Yes, ma'am.

3            So credible messengers are individuals that have

4    similar and alike lived experiences, to include having been

5    justice involved, and in many cases individuals that spent a

6    good part of your young adult life incarcerated up to as long

7    as 20 years.

8            Based on the department's prior policy, these

9    individuals, because of their criminal records, were not

10   allowed access to the facilities, but have done a tremendous

11   amount of work in turning around their lives and are quite, I

12   think, inspirational to the young men that are in our custody.

13           So what I did was, when I heard about the situation

14   from nonprofits that are providing services, I immediately

15   changed the policy allowing for 17 credible messengers

16   specifically to do work at RNDC so that they can engage with

17   young men, because they have the same, similar, and alike lived

18   experiences and come from the same communities that many of

19   these young men come from.

20           THE COURT:  Is this a specific program of mentoring,

21   meetings, or is this that the workers from the nonprofits who

22   come in to do various things can include people who were

23   formerly incarcerated?

24           MR. MOLINA:  So, your Honor, I would say that it is

25   both right.  So we have nonprofits that are doing ongoing work,

M4QNNUNC

1    and now the inclusion of these credible messengers in that work

2    I think adds a lot of value.

3            In addition to allowing the credible messengers access

4    to engage with the young men either as groups or when necessary

5    one on one, to sort of, to sort of be mentors and navigators

6    for them as they're going through their justice involvement.

7            THE COURT:  Thank you, Mr. Commissioner.  That is all

8    I have for questions at the moment.

9            Ms. Joyce, did you wish to say something further?

10           MS. JOYCE:  No, your Honor.  Thank you.  Not at this

11   time.

12           THE COURT:  Thank you.

13           So I will now turn to Ms. Werlwas.

14           MS. WERLWAS:  Good afternoon, your Honor.

15           Although the experiences of the plaintiff class and

16   the harm and injuries that they are suffering under the current

17   practices of this administration are truly at the heartland of

18   what we're doing here today, I am not going to restate the

19   facts of the harms and the violence in the interest of time

20   because those are very well detailed in the monitor's reports.

21   We know that your Honor appreciates the gravity of the danger,

22   and that's why you've called this conference.

23           The city's letter of last night was helpful in

24   clarifying the city's commitments to change and in beginning to

25   answer some of the questions that we have raised both in the

M4QNNUNC

1    discussions the last six weeks since the March 16 report and

2    indeed for about the last seven months, since these are in

3    essence, in great part issues that we all began to address last

4    year.

5            We understand the monitor and the city will have more

6    refinements and ideas to propose.  And to be sure these are

7    likely beneficial steps to improve the agency.  We would like

8    to be optimistic that these measures will yield fruit.

9            But unfortunately what has transpired in 2022 alone

10   seriously constrains the reasonableness of optimism.  In short,

11   what the city describes in its letter last night is too little

12   too late.

13           We can't do anything about too late, but we can do

14   something about too little, and we can learn not to repeat the

15   mistakes going forward of waiting too long to meet the moment.

16           What we have seen so far, and this is based upon the

17   articulation of the city's commitments and their understanding

18   of the monitor's recommendations, tells us that these steps are

19   not sufficient to protect the plaintiff class at this juncture.

20           And here's why:  The processes that are described

21   here, while again important, are variations of themes that we

22   have encountered in the past and business as usual,

23   articulating policies, schemes, timelines, and plans on

24   discrete tasks, all of which are of course part of decision

25   making.  But they avoid the fundamental, large-scale failure of

M4QNNUNC

1   political will and capacity that has doomed these same efforts,

2   the same excellent timelines for years.

3          The heartland, but certainly not the entirety of the

4   monitor's proposals, and, as best we can tell, the city's

5   response to them, advance in useful ways some of the measures

6   for reform that were articulated in the second remedial order

7   and to a lesser degree in the third remedial order.

8          But that was seven months ago that we negotiated and

9   entered those orders for what was meant to be at the time the

10  most feasible jump start to reform and not the longitudinal

11  answer.  So here we are, seven months later, being asked to

12  give more time to hear, for example, about the city's view of

13  what impediments may lie in the way of external hiring.  We are

14  asked to give 30 days to commit to developing a proposed

15  timeline for a plan.

16         But these staffing deficiencies, deployment, security

17  lapses, these have been identified by the monitor months if not

18  years ago.  While, of course, all action must be based on

19  planning, it is simply too late for us to be agreeing to long

20  timelines for developing policies or proposals or timelines to

21  deal with legal impediments.

22         The second, though, area in which, what raises great

23  concerns for us about the ability of the current proposals on

24  the table whether articulated robustly or narrowly is that,

25  most critically, the city's plans lack a fundamental agreement

M4QNNUNC

1    or commitment to give authority to accompany the expertise that

2    is sought to be imported into this agency.

3         The city has had some of the benefit of technical

4    expertise from some of the top professionals nationwide, with

5    Pelly Datol, Emmet Smartman, Patrick Hurley among the subject

6    matter experts giving expertise to our city not to mention the

7    monitoring team members who are on this call and not on this

8    call.

9         There is no question whatsoever that introducing

10   expertise and professional and technical competence to the

11   department is of utmost authority.  But what we have not seen

12   articulated in the city's plans and what frankly we see read

13   out of them is the authority for these individuals to enact the

14   necessary scopes of reform in these respective areas.

15        We do not see what authority a staffing manager would

16   have to get individuals from their homes and into the

17   workplace.  Would a staffing manager have the authority to do

18   away with this nonsensical requirement that the deputy monitor

19   described of demonstrating that an employee has not come to

20   work?

21        Right now, it is our understanding -- and, please, the

22   commissioner could correct me if I'm wrong -- there are

23   unstaffed posts in these jails, and there are housing areas --

24   our clients called us yesterday from housing areas where they

25   are not being let out of their cells because there is no one

M4QNNUNC

1    there to do it.

2              This is a fundamental, immediate problem that we do

3    not see the authority to answer these questions, to say we need

4    someone on that post, forget about 40 knocks, forget about 20

5    knocks.  We need something fewer.

6              Nor do we think the process of negotiating -- I think

7    that gives a great example, that there is not time and the harm

8    is too great for us to go from 40 knocks.  Let's try 30.  Let's

9    try 20.  Let's try 10.  Who can do that?

10             That is no longer reasonable, given the facts of this

11   situation.  What we need is relief that can address these

12   structural problems in the way city government runs, that

13   create impediments for even the best willed commissioner of

14   correction to implement reform.

15             We can discuss the specific proposals as needed as we

16   go down the agenda, but I wanted to make just two final global

17   comments.

18             We are deeply concerned about the lack of any clarity

19   on where these individuals who might be hired would fall in the

20   chain of command in New York City.  Our understanding of the

21   monitor's recommendations over the years has been about the

22   need to increase the expertise and authority of uniformed

23   leadership.

24             These are paramilitary organizations.  Uniforms

25   matter.  Rank matters.  We were deeply distressed in fact to

M4QNNUNC

1    see the city's letter last night describing what we had hoped

2    to be a discussion about hiring wardens externally has devolved

3    into something that is akin to a consultant to the commissioner

4    to give advice but not to supervise a uniformed staff.

5           It is pointless to negotiate authority about the names

6    and scope of positions if those individuals' responsibilities

7    are not clear or who they answer to is not clear.  If these

8    individuals can be fired when political winds change, then

9    we're wasting our time in even negotiating further about their

10   jobs.

11          We already have seen and we cannot ignore that this

12   already has been our experience with last November, negotiating

13   for the position of a disciplinary manager, which was to be a

14   new infusion of a role and a realignment of roles.  Within six

15   weeks after that order, that person was dismissed for no bona

16   fide reason.

17          We absolutely cannot leave silent those questions that

18   we can see have already hampered reform and are part of why

19   we're in the circumstances we are today.

20          And those are not just details missing from these

21   plans, but these are the fundamental questions that we don't

22   see evidence the city has grappled with or is prepared to

23   grapple with.  There's not an easy answer, which we want to be

24   clear that there is not a simple fix, that there are actual

25   operational changes that must be made, given the intransigence

M4QNNUNC

```
 1   and unwillingness of this agency to follow this Court's orders
 2   must be addressed.
 3         The reforms that are underway absolutely should
 4   continue, but parallel tracks are necessary.  For any remedy to
 5   have a chance at being effective, it must be given the
 6   requisite authority and competence and resources to perform
 7   this essential function of city government that we are being
 8   asked to do.
 9         And a reasonable reading of the record of these last
10   six years tells us that business as usual, that timelines and
11   proposals that defer facing the very difficult questions of
12   labor law, of employment law, and the civil service law simply
13   kick the can further down the road and can no longer be
14   tolerated.
15         It is time in this conference right now to address
16   those issues.  We should be talking about labor law.  We have
17   to be talking about labor law.
18         We should be talking about civil service law.  We have
19   to be talking about civil service law.
20         Very important policies.  Very important laws.  But
21   this has been known for a long time, and it's far too late to
22   say let's see what those impediments can be and how we can work
23   around them.  That was long ago.
24         These are stubborn facts.  They're difficult facts.
25   But they are the reason why we are all discussing what options
```

M4QNNUNC

1    must be considered.  That's why a receivership remedy is on the

2    table as a meaningful and effective possibility to address the

3    problems of reform that have not been redressable over these

4    last six years.

5         We need to break the stalemate.  We think that many of

6    the ideas and the incredible contributions the monitor has

7    proposed and continues to work on with the city are incredibly

8    beneficial to New York City, and it is essential that they be

9    allowed and empowered to continue this work because the city

10   needs it.  And this department needs it.

11        It also, however, needs the ability to make this

12   happen in our city.

13        Thank you.

14        THE COURT:  Thank you, Ms. Werlwas.

15        In speaking of these specific statutory types of

16   impediments, do you have particular ideas as to how to deal

17   with those barriers short of receivership?

18        MS. WERLWAS:  I think, your Honor, that depends upon

19   the nature of receivership, as I say, when using that

20   receivership, which is itself a flexible remedy that can look

21   many different ways.

22        So I want to be careful in answering that.  It sort of

23   implies a shared understanding of what receivership is that we

24   have all not explored at this point.  In exploring it, it would

25   have to be responsive to the needs of this case, this city,

M4QNNUNC

1       this agency right now.

2               I will say this:  We have long sought and looked for

3       the answers to whether this workforce can be managed in a way

4       to allow the Court's orders to be implemented within the

5       confines of the current collective bargaining agreements and

6       the many layers of paint that I think they have surrounding

7       them by city practice.

8               We have sought time and again the city's view, because

9       we think frankly that's the most important one.  What is their

10      view of their powers as -- the city as employer.  And those

11      have been poorly articulated to us or poorly understood.

12              We think that we can't wait any longer for that.  As

13      we understand it, however, our view is that implementing some

14      of these reforms and curbing abuse of sick leave, for example,

15      and allowing proper deployment of the staff does necessarily

16      require changing some settled labor practices.  I'm not in the

17      position to get into the minutiae of labor law, of what a state

18      court's view might be on that.

19              I think what we all agree is that we simply cannot be

20      bogged down in waiting for or let the delay inherent in waiting

21      for adjudications about is the 40-day requirement a requirement

22      of labor law or just a practice that can be jettisoned?  Is

23      unlimited sick leave impeding the federal court review?  These

24      cannot be done on a case-by-case basis.  For this reason we

25      think that the -- I don't think we can say the -- I don't want

M4QNNUNC

1   to have such a failure of imagination as to claim the exclusive

2   path is receivership.

3          I can tell you that, having given enormous thought to

4   what other path there is through this thicket, that it is not

5   just a question of will, but that that is the only path that we

6   can see based on our understanding of labor law, and nothing

7   about our extensive discussions with the city over the years

8   has given us a vision that shows a path that goes elsewhere.

9          THE COURT:  Thank you, Ms. Werlwas.

10         Now, I will turn to Mr. Powell for the U.S. Attorney's

11  Office.

12         MR. POWELL:  Thank you, your Honor.

13         I am not going to get into this in so much detail, but

14  we of course share everybody's concerns and continue to be

15  gravely concerned about the unsafe conditions at the jails and

16  the extremely high level of violence at the facilities,

17  including not only the use of excessive force by correction

18  officers against inmates, but also the attacks by inmates on

19  staff and the utterly brutal inmate-and-inmate altercations

20  that the monitor continues to report to us, which often involve

21  the use of dangerous weapons.

22         Inmates in the jails currently have access, seem to

23  have ready access to weapons and other contraband.  In their

24  submission yesterday, the department referred to the recovery

25  of over 2,000 weapons since February, which is definitely a

M4QNNUNC

1    great thing, but it begs the question of how are these weapons

2    getting into the facilities, and what is being done to address

3    that.

4             Housing units continue to be unmanned.  The staff

5    absenteeism rates continue to remain at alarming levels, and

6    correction officers are reportedly scared to show up at their

7    assigned posts.

8             I think we all agree -- and that's not why I am not

9    going to spend so much time on this -- the system is in a very

10   dangerous and unsafe condition.

11            While the problems at Rikers have never been worse in

12   our view, the systemic deficiencies that the monitor has

13   identified are nothing new.

14            They have been reported almost the same way in each of

15   the last several reports that were submitted with the Court,

16   and the Department of Correction has been a dysfunctional

17   agency for decades.

18            Over the years commissioners and mayors have come and

19   gone. While well meaning, all set forth plans to try to make

20   changes, but all have largely failed to implement lasting and

21   sustainable reforms.

22            We have no doubt that Commissioner Molina is dedicated

23   to reform.  This is not about his will, his credentials, or his

24   desire.  This isn't about the administration's desire to make

25   change.  The concern here is that there is a deep seated

M4QNNUNC

culture of violence and incompetent management that has

persisted over decades at this agency.

It is not an issue of resources we know.  The monitor

has reported that this department has more resources than any

other correctional system he's ever dealt with.  They have

2,000 more uniformed staff than inmates.  They spent over

$550,000 per inmate on average in the last fiscal year, more

than three times the next highest city.  And yet the average

number of fights and staff assaults are seven or eight times

more than other systems.

We understand that Commissioner Molina and the mayor

have only been in their current positions for a few months, but

as you said earlier on, we just can't agree to continue to hit

the reset button on reform efforts each time an administration

turns and wait for the development of a new written plan the

rollout of a new initiative.

The city must now take a very new and different

approach to the obstacles that have clearly impeded very

similar plans to what Commissioner Molina and Mr. Martin have

talked about today.

Like the monitor said, we have to deal with the

bureaucratic red tape, but more specifically, we have to -- the

city has to, not the monitor, but the city has to and the

department address the perceived legal limitations, the labor

rules and the absence of a sufficient number of top uniformed

M4QNNUNC

 1   staff with the necessary corrections experience and management

 2   experience to get these reforms done.

 3           I want to just talk about a few specific questions and

 4   issues that relate to that issue of addressing the underlying

 5   obstacles, and we would love to hear responses from the city or

 6   their counsel today.  But we have talked today about everyone

 7   seems to agree the department needs to hire outside external

 8   folks, nonuniformed staff with necessary correctional and

 9   management expertise to oversee the jails.

10           The city's position since the monitor made this

11   recommendation back in last May, almost a year ago -- and we

12   talked -- this was the main topic, I think, at the last

13   conference before your Honor back in December.  The city's

14   position has been we perceived some legal limitations.  There

15   are laws that prevent us from doing this.

16           We asked them, as your Honor is aware, to consent to

17   an order that your Honor would sign to basically allow the

18   commissioner to hire these folks notwithstanding any law that

19   may be viewed to prohibit it.  That is possible under the PLRA.

20           The city under this commissioner's administration in

21   late January refused to consent to that order.  The monitor

22   continued to push for the hiring of these external candidates.

23   And here we are in late April and in the submission yesterday

24   we hear about for the first time a plan that was presented to

25   the monitor yesterday that talks about these new hires who

M4QNNUNC

1    won't directly manage matters of care, custody, and control but

2    will instead be able to make recommendations.

3           We don't understand, you know, what that means.  It

4    hasn't been presented to us.  But this doesn't sound like the

5    type of setup where we will bring in people and attract the

6    best candidates to come in and address what are clear security

7    deficiencies and unsafe corrections practices.

8           There is this response to your Honor's last question

9    to Mr. Werlwas, is there are other way besides a receiver,

10   right?  The Court could issue an order.  The city can consent

11   to an order to direct them to make these hires notwithstanding

12   any law that may impede them.

13          So far the city hasn't consented to that order.  If

14   they can do it in a legal way without putting aside that law,

15   then so be it.  That would be great.  But here we are almost a

16   year after the recommendation, there's no candidates who are

17   being lined up, there's no method really to find these people,

18   and, you know, we're still waiting.

19          This is a core part of the reform.  Nothing that the

20   monitor recommended in our view can happen if -- competent,

21   qualified, experts come in and an infusion of talent to run

22   this system in a far different way than it's been run over the

23   last decades.

24          Another issue that we would love to hear from the city

25   on is the monitor has found a culture that allows staff to

M4QNNUNC

1    circumvent assignments to particular housing units.  In plain

2    out language that means the commissioner, Commissioner Molina

3    and his predecessors don't have the discretion to assign their

4    staff where they need them.  They don't have absolute

5    discussion to do that.

6         I assume and I know Commissioner Molina wants that

7    discretion.  Any commissioner would.  We know from the

8    monitor's report, the most senior and experienced staff are

9    often not assigned to housing units at all.

10        A large percentage of captains, the frontline

11   supervisors at this agency, are assigned to positions that

12   don't involve supervising housing areas.  That can't work.

13        The question for the city is, how are they going to

14   make sure that the commissioner has the power and authority

15   within the current system to assign staff where they're needed.

16        There is an issue that we have talked about with the

17   city about the awarding of posts, to have to bid to get awarded

18   posts.  Does that mean that these staff cannot be reassigned

19   based on the clear need?  Many, many unmanned staffs every day,

20   when the monitor went out to one of the facilities I think last

21   week, maybe early this week, he found unstaffed posts.

22        Can the commissioner, does he have the discretion now

23   to assign senior staff or captains to those posts?  And, if

24   not, what specifically can be done to avoid any labor rule or

25   other legal or bureaucratic obstacle to getting that kind of

M4QNNUNC

common-sense authority?

A couple more points, and then I don't want to take up too much time.  There are hundreds of staff currently on extended sick leave, or on what's called medical restriction status, so they can't be assigned to housing posts where they interact with inmates, right?

The city has more than 2,000 officers and inmates. Many can't be assigned where they're needed.

So what is the department going to do specifically to scrub those lists of unavailable staff?  They have some issues. They have a CBA that requires unlimited sick leave.  They have a very bureaucratic and lengthy procedural process to discipline staff.

They can't suspend any staff for more than 30 days without pay.  They then have to come back then and then they have to go through a lengthy disciplinary process that the monitor's detailed can take two, three years.

What is the city -- more the city than the department in this case -- going to do to remove those obstacles so officers and captains who are medically able to work come back and work?

A fourth issue is how is the department going to promptly hold staff accountable when they abandon their posts, which we know they do, or use excessive or unnecessary force?

Most officers don't do that.  Most officers are doing

M4QNNUNC

1    their best in an extremely dangerous condition.  They are

2    working doubles, sometimes triples.  We are talking about the

3    staff that don't.  How can the monitor, given the limitations

4    on how he can discipline folks, deal with that issue so that

5    those folks are disciplined and potentially removed from the

6    workforce and that their brother and sister correction

7    officers, you know, don't feel like they are the only ones

8    coming to work.

9          Lastly, procurement issues.

10          How is the department going to promptly address the

11   clear disrepair in these very old facilities that are resulting

12   in basic security risks to inmates and staff?

13          As you probably know and everyone here knows, the

14   city's processes for securing supplies and repairs is extremely

15   lengthy.

16          Is that an impediment to getting things done, like

17   fixing nonworking cell doors?  And, if so, what can be done to

18   address it?

19          One option that we raised in our submission to the

20   Court on April 29 to deal with bureaucratic red tape, to deal

21   with perceived legal and regulatory obstacles, is the

22   appointment of a federal receiver, who would have broad and

23   independent authority to implement the reforms and take the

24   necessary actions to finally deal with the systemic issues and

25   bring this department into compliance with the six-year-old

M4QNNUNC

1    consent judgment.

2          There may be other options.  We would be happy to hear

3    from the city how they can deal with maybe those four or five

4    issues that I just flagged.  Maybe there is a way through other

5    court -- for a court order to remove some of these legal

6    impediments.  But we need to deal with the realities.  It's not

7    about the Commissioner Molina's desire, his competence, his

8    qualifications, his commitment.  We don't doubt any of that.

9    We need to deal with what's been an obstacle to reforming this

10   deeply troubled agency for decades.

11         The government is currently giving serious

12   consideration to a receivership option, including the

13   authorities and powers that a potential receiver would need to

14   have to effectively take all steps to achieve compliance and

15   address what amounts to an ongoing daily constitutional injury

16   to the inmate in these jails.

17         We would ask -- and the monitor or the deputy monitor

18   mentioned this early on, that we understand they are working on

19   a plan, an implementation plan.  Again, we hope that that is

20   going to specifically address these issues that I flagged today

21   and the others in our submission.

22         We would respectfully request that that implementation

23   plan or whatever the monitor proposed after the deliberations

24   and discussions over the next three weeks be submitted to the

25   Court and that a status conference be scheduled in three weeks

1    or as soon as your Honor is available to discuss what is in

2    that plan.  We still don't know.

3              We also would request that, to the extent their

4    resources permit, and their resources are stretched because the

5    department is relying tremendously on the monitor and his team

6    to develop this plan, which says something in and of itself,

7    but we would respectfully request that if the monitor is able

8    to and has the resources that they continue what they have been

9    doing recently, going out to the facilities, touring the jails,

10   and seeing -- or at least plans that are written on paper or at

11   least things that we are hearing about in these court

12   conferences, these things that we are being told about at

13   meetings.  Are they being translated into actual operational

14   practices?  Are posts adequately staffed?  Are security

15   protocols being followed?  And whether these dangerous horrific

16   conditions in these jails are being addressed.  We think that

17   that type of insight would be invaluable to determining what

18   are the appropriate next steps here.

19             Thank you very much, your Honor.

20             THE COURT:  Thank you, Mr. Powell.

21             Ms. Joyce, Mr. Commissioner, did you wish to say

22   anything before I turn back to the monitor and deputy monitor?

23             MS. JOYCE:  Just a few quick points to just address

24   some things that Mr. Powell and Ms. Werlwas said.

25             One, the receivership word has gotten bandied about.

M4QNNUNC

1    Receivership restarts the clock, and that is not something that

2    any of us wants.  A receivership is not a panacea to the ills

3    that are occurring at the department right now.

4            Your Honor, we will address the Department of

5    Justice's concerns in the implementation plan that is being put

6    together between the monitoring team and the department and the

7    city of New York.

8            One other point I want to make is that the labor

9    experts of the city of New York here at the law department and

10   at the office of labor relations, we have thoughtfully

11   considered greatly all of monitor's recommendations, and they

12   can be accomplished, each one can be accomplished within the

13   city of New York and the Department of Correction

14   commissioner's authority, and a receiver is not needed.

15           It is because this administration, this mayor of New

16   York and this commissioner have the will to do the things that

17   need to be done that the dramatic changes and reform that need

18   to happen are going to happen and a receiver is not necessary.

19           The commissioner has nothing to add, your Honor, at

20   this time.  We will turn it back to your Honor.

21           THE COURT:  Thank you, Ms. Joyce.

22           And I will now turn to the monitor and deputy monitor

23   to provide a more specific picture of what's going on and

24   what's contemplated and what I am being asked to do today.

25           MR. MARTIN:  Yes, your Honor.

M4QNNUNC

1          As I think has been set out, we are in virtual daily

2     communication with DOC and the law department to develop more

3     specific remedies.

4          As Mr. Powell I think rightfully called out in very

5     practical terms, such as the ability to assign officers where

6     they are needed, those things have to be fleshed out.

7          And I would add this:  I think the commissioner is

8     going to be listening very carefully to this, because it's -- I

9     don't know that I am ahead of him on this.  There are actions

10    that he could take and/or announce between now and three weeks,

11    when we present a plan, just as he did with the RNDC emergency

12    action plan, that I believe would move toward real serious

13    concerns of the LAS plaintiff class and the Southern District

14    of New York.

15         What they want is performance.  They want things put

16    into place that will have some immediate -- you know, abatement

17    a measurable effect on the conditions.

18         The commissioner is very I think adept and quite

19    frankly attuned to that approach.  So I guess what I am doing

20    is making a plea to him, and if he and I need to confer on

21    these -- I believe there are things he could do with some

22    greater immediacy, even while we are talking about this

23    implementation plan, that would give some confidence to the

24    plaintiffs and SDNY that this is a new day.

25         I don't know whether, Commissioner, you want to

M4QNNUNC

1   respond to that or not or whether what I have just suggested

2   resonates with you or not.

3          MR. MOLINA:  Yes.  Thank you, Mr. Martin.

4          Like I said in my statement, we are in alignment, and

5   I don't need to wait three weeks to take some action.  As you

6   and I talk over the next coming days, there are some of those

7   things that we are going to be taking action on that are going

8   to be meant to be part of the implementation plan.  But I am

9   not going to be waiting around for that plan to be shared with

10  the Court in order to do it.

11         MR. MARTIN:  Yes.  That's what I am talking about.

12  Yeah.

13         So, to the extent that that can occur, I think it

14  gives some credence to the new administration that this is a

15  different approach than we heretofore have seen.  I can only

16  say every time I have called on the commissioner for some

17  specific attention or remedy or attention, he has stepped up.

18         Now, obviously, the agency can't sustain necessary

19  reform with a monitor calling to the attention of the

20  commissioner things that he's seen.  But I think the

21  commissioner is well on his way to getting up to speed to be

22  ahead of me.

23         That is where he needs to be.  He needs to be ahead of

24  me.  He needs to be more attuned and more aggressive and more

25  able because he is in a position to effectuate these changes.

M4QNNUNC

```
 1          I can only give you one example, that back in February
 2   I was very concerned with RNDC and the violence there.  And as
 3   I was contemplating what to do, when to reach out, before I
 4   could do that, he initiated a plan of his own accord without me
 5   calling him out to address that.
 6          That's impressive.  That heretofore has been a rare
 7   instance where I have had a commissioner be ahead of me.  I
 8   want to be behind the commissioner.  I don't want to be ahead
 9   of the commissioner.  And I think that he wants that too.
10          While he's open to conferring and welcomes my input, I
11   know him well enough already to know he wants to run the
12   agency.  But he's going to have to put things in place that
13   give some confidence that he knows what the hell he's doing.
14   Thus far I think he does.
15          So I think he's -- I am just making a pitch for -- the
16   next three weeks I think are going to be very critical, you
17   know, extremely critical not only for the plan but what occurs
18   between now and three weeks.
19          Because the plaintiffs' attorneys are first and
20   foremost, as they should be, concerned with immediate harm to
21   their clients, people that are suffering from unchecked
22   violence etc.  They cannot wait for plans to be implemented.
23   That's what we're hearing from both of them.  They have been
24   very consistent.
25          I wouldn't take issue with anything that Mary Lynne or
```

M4QNNUNC

1    Jeff has said.

2                I apologize, your Honor, for that rant.

3                Thank you.

4                THE COURT:  Thank you, Mr. Martin.

5                I hear quite clearly that I am being asked to set a

6    submission date and conference shortly thereafter in the time

7    frame of about the next three weeks.  I am going to have to

8    flip out screens and look at my calendar, but are there other

9    specific things that we can discuss today.

10               Ms. Friedberg's hand is up, so you have the floor.

11               MS. FRIEDBERG:  I am happy, your Honor, to go.  I was

12   just going to discuss logistics with you to share specific

13   dates, but I do not want to interfere with any substantive

14   questions you have first.  But I am happy to share with you the

15   specific date request that the monitoring team has when we come

16   to that.

17               THE COURT:  If that is the next step that you are

18   prepared to give us today, and you are asking that we -- well,

19   let me put it this way.  Are there any more details of the

20   subject matter or structure of the discussions contemplated

21   over the next three weeks that you're willing to share?

22               For instance, in the letter that was filed, I think it

23   was yesterday, on the 25th, you had particular data points on

24   what you believed needed to be done right away on maximizing

25   staff.  You had a discussion of how to get and what sort of

M4QNNUNC

1    highly qualified staff ought to be retained.

2            Is it fair and appropriate for us to expect that these

3    seven points in your April 25 letter will be the principal

4    subjects of the discussions leading to a plan that will be

5    proposed in the next three weeks, or is there some other

6    conceptual or specific issue platform that you are expecting to

7    work with?

8            MS. FRIEDBERG:  Your Honor, it is a combination.

9            So the letter that we submitted yesterday with the

10   seven points were intended to focus the city of New York on the

11   issues that we believe are important to address with the

12   department.

13           It would be in conjunction with what I would call a

14   plan for the various operational components that the department

15   is going to take.  In some ways it's so interrelated that it

16   can be hard to separate, but we recognize with this group and

17   the complicated nature of all of the various moving pieces, we

18   were trying to focus the city on those seven items.

19           They are definitely complimentary, if not entirely

20   consistent with a more detailed plan of the work that the

21   department is going to be doing.  The work that the department

22   is doing is connected to our recommendations in the special

23   report.

24           I am certainly happy at this juncture to walk you

25   through kind of the subject headings of what we are working on

M4QNNUNC

1    and how it would look.  But with respect to that particular

2    letter, and it may just be a finer point on Mr. Martin's just

3    last statement, which is in the next three weeks we certainly

4    look forward what the commissioner is going to do, but we are

5    also equally interested in seeing what the city of New York is

6    going to do.

7         We are no longer interested in hearing conversations

8    from the city about how they cannot do things.  So I just

9    want -- and I know that Mr. Martin was intending to make that

10   very point as well.

11        MR. MARTIN:  Thank you.

12        MS. FRIEDBERG:  I am bringing it together and taking

13   it a home run as our team effort here.  But I will say that

14   that letter in particular was intended yesterday to go right to

15   the heart of the city of New York.

16        If there are no impediments to these issues that we

17   now are learning, then they should be doing them forthwith and

18   we should no longer be on phone calls where I have multiple

19   lawyers telling me that our ideas cannot be implemented with no

20   reasonable alternative.

21        MR. MARTIN:  We are exhausted of that.  We are

22   exhausted.  The plaintiffs are exhausted.  We are all exhausted

23   of that.  Quite frankly, if that's what I hear between now and

24   three weeks from now, I am going to be before your Honor with a

25   definite recommendation as to that.  Because -- well, enough

1    said.  Thank you.

2         MS. FRIEDBERG:  So, your Honor, the implementation

3    plan would be a combination.  What we expect to see is

4    commitments and work from the city with respect to how it's

5    going to support the work of the department.

6         You know, the commissioner obviously reports to the

7    mayor.  How can the commissioner be empowered to do the work

8    that he needs to do?  The implementation plan at this juncture,

9    it is a draft.  It is 18 pages long.  It enumerates the variety

10   of different issues that are raised in our special report

11   recommendation.  So I will just run down the big headings so

12   that you have a sense of what we are looking at.

13        Section 1, addressing immediate harm.  How can we

14   implement things now to address the immediate harm?

15        Section 2 is related to uniformed staffing practices.

16   That has two components to it.  The first component are things

17   that can be taken right now to address staffing issues that we

18   believe the commissioner and his staff can address immediately.

19        The second sort of component of staffing certainly is

20   going to take longer.  There are some longer term initiatives

21   that are going to require them to bring in some expertise, and

22   so we've tried to synchronize those with what can start now,

23   what can be done later -- or not later, beginning now, but we

24   know cannot have an immediate impact.

25        Section No. 3 is with respect to overarching security

M4QNNUNC

1    practices.  That relates to the security operations manager and

2    the work that falls under the security operations manager.  And

3    in the particular security initiatives, I will give you one

4    example because you probably are very familiar with it, which

5    is a focused effort with respect to search, the department's

6    policies and procedures related to searches and probe teams.

7    Those have been two driving forces of the issues that we have

8    seen here.

9         Those are just two examples I would like to give you,

10   as well as a corresponding requirement that the able work

11   that's been done by the department's *Nunez* compliance unit is

12   started to be better utilized in terms of -- for them to be

13   able to proactively identify security issues.

14        Section No. 4 is the department's ability to

15   prioritize management of people in custody.

16        There's three large headings under that.

17        The first is with respect to classification and

18   dispersing SRG affiliates.  The commissioner today already

19   described some of the work that is being done in that regard.

20   That flows from the recommendations of Dr. James Austin, who is

21   retained pursuant to the second remedial order.

22        The second heading with respect to this is the work

23   with respect to intake and the department's utilization of

24   intake that flows both from various different security

25   practices, but also from some of the housing practices.

1          The third and final kind of component under this

2     heading relates to the management of incarcerated individuals

3     following various violent incidents.

4          Section No. 5 -- hopefully I've gotten these numbers

5     correct -- does focus on different work that the department

6     might be capable of doing in order to identify those

7     individuals that have been incarcerated for a year or longer,

8     have been engaged in violent incidents and such that their

9     cases may need to be expedited such that they can be moved

10    through the system more quickly or quicker than where they

11    currently are.

12         The final substantive section relates to staff

13    accountability.  I addressed this very briefly in my remarks

14    before, which is with respect to obtaining necessary staffing

15    for accountability.

16         The third remedial order has developed a workable --

17    from what we can see to date as a preview and you have heard,

18    has developed a workable structure for them to get through

19    discipline.  They are moving through discipline faster than

20    they have ever been before, probably through a combination of a

21    variety of things, but certainly the fact that they are

22    moving -- they have better capacity.  The problem is staffing.

23         And that certainly is going to be one of which we are

24    going to be harkening on and we truly believe that the city of

25    New York needs to help the department identify qualified

M4QNNUNC

1    candidates to come to the trials division as soon as possible.

2    We live in the land of lawyers in this city, so I can't imagine

3    why -- they have to be able to find people and bring them into

4    this agency to help.

5            And then the final component is working through

6    reporting.  As the monitor mentioned at the very beginning of

7    this conversation, we believe at least in the near term the

8    monitoring team's reporting structure must be altered at least

9    slightly so that we are in a position to provide more

10   contemporaneous reporting to the Court that is also equally

11   focused on these issues that I have just described today such

12   that the monitoring team and the department are firmly aligned

13   in terms of how we spend our time and where we do our work.

14           So that's a really -- I am just mindful of time, which

15   is the reason I am trying to rush through this.  I'm certainly

16   happy to take any questions you may have with kind of both the

17   interplay of what we are looking for with respect from the city

18   of New York as well as the work with the department.

19           We have been working through these items with the

20   department and the city.  They have asked reasonable questions

21   in terms of how to work through it.  So that is kind of a short

22   summary of where we are to date on the development of that

23   work.

24           THE COURT:  That was very helpful.

25           Mr. Powell, has been raising his electronic hand so

M4QNNUNC

1    before you go to your next topic, I will call on him.

2              MR. POWELL:  I was just seeking clarification either

3    from your Honor or from the city or the monitor.  This plan

4    that we are aware that it is being developed, is it

5    contemplated that this will be submitted to the Court to be so

6    ordered by the Court as remedial relief?

7              And I guess that the second, more general point is,

8    you know, to be clear with the Court, you know, I think we are

9    at the point where it's about outcomes and results.  And so we

10   would hope that some part of that plan or the reporting -- we

11   know the monitor will include, he always does, and the team

12   always does plenty of data.  But the results and the outcomes

13   are what matters most to us and innovative ways to address the

14   impediments that have prevented these reforms from happening.

15             But I would be interested in kind of the vision here

16   if we are going to appear before your Honor in the next three

17   or so weeks.

18             Is this going to be something that is going to be

19   presented to be so ordered by the Court?

20             THE COURT:  Ms. Friedberg, what is the concept here?

21             MS. FRIEDBERG:  Our proposal, your Honor -- of course,

22   we are hope to what the Judge desires -- would that we would

23   submit a plan within three weeks for the Court should the Court

24   deem it appropriate.

25             We would anticipate that it would be so ordered by the

M4QNNUNC

 1    Court or with any modifications that you deem appropriate.

 2              THE COURT:  Thank you.  That would be my preference.

 3              To the extent we are going to talk about dates after

 4    Ms. Werlwas gets to speak in a moment, I would prefer for us to

 5    have a date for filing of the proposed plan and then at least

 6    say three days, four days between then and the conference so

 7    that you can confer with counsel for the plaintiffs and counsel

 8    for the U.S. Attorney's Office so that you are in a position to

 9    tell me at the next conference whether this is a joint proposal

10    or whether there are issues with respect to the specifics of it

11    that you haven't been able to work out in that interim period.

12    So I would expect some very focused meet-and-confer activity in

13    that time gap.

14              And so let me call on Ms. Werlwas and then I will come

15    back to Ms. Friedberg.

16              MS. WERLWAS:  Thank you, your Honor.

17              We certainly would look forward to hearing about the

18    city's ideas or plans that they did not articulate already for

19    how they can accomplish these reforms within the existing

20    constraints that they identify.

21              We have seen the benefit of a court conference and

22    don't wish to deprive the monitor, the parties of those

23    benefits.  For example, the details we got last night were

24    probably, you know, more detail than we have gotten in the

25    negotiations thus far.

M4QNNUNC

1          However, we do think it would be remiss to point out

2     that we are very concerned that a plan that essentially builds

3     out what we saw in the letter and does not address the

4     identifying with specificity the cutting edge of where the city

5     thinks it is bound by law, custom, or political will in

6     satisfying its political constituencies to constrain relief,

7     that if that is not outlined right now at this point in the

8     case, then we are also wasting our time, that this is not a

9     question of the commissioner's will or desire, that what we

10    must engage and must resolve finally is the contours of the

11    structures of city governance, of what's permitted, what's not

12    permitted.  What, if any, legal constraints do we all have to

13    be aware of?  Because it's sort of too late, I think, to do

14    anything less.

15          That doesn't need to await three weeks.  These are the

16    conversations that we have been having.  We would strongly

17    encourage the city to identify the constraints that it is

18    operating under, such as in its external hiring proposal, in

19    getting staff back to work.

20          Perhaps the way to frame it might be saying what

21    prohibits this very well meaning commissioner, who

22    unquestionably wants every housing area staffed, from getting

23    those areas staffed next week.  And there are answers to those

24    questions.  But those are the ones that we should know the

25    answers to.  And, if not, and if in three weeks we hear a plan

M4QNNUNC

1    to get answers to those questions, I do fear that these three

2    weeks will have been in vain.

3        THE COURT:  Let me ask you something, Ms. Werlwas,

4    before I turn to Ms. Joyce.  I think I am hearing two things.

5    One is a question of whether the plan that is going to be

6    presented will be a plan that the city and the department say

7    they are able to deliver on within the understanding of current

8    constraints.  So that's one thing I think I'm hearing, one

9    possibility.

10        I also think that I may be hearing a request in

11    addition for one of two things.  One might be where might the

12    city be able to go, the city and the department be able to go

13    farther than whatever is going to be proposed, sort of, "Well,

14    this is your offer, but what would be your highest and best

15    offer?" or something like that.

16        If that's what you are asking for, I would like you to

17    put a little more flesh on that, because I am not sure how that

18    works in this context of negotiated plans.

19        The other is, do you want a list of the statutes,

20    regulations, practices that the city has concluded create some

21    sort of boundaries in each of the areas, or is it something

22    else entirely?

23        Long question, but the floor is back to you,

24    Ms. Werlwas.

25        MS. WERLWAS:  Well, thank you.

M4QNNUNC

1          I apologize if I misspoke as to the latter question.

2     No, certainly a list of statutes and labor laws is not helpful.

3     I think that what we see threaded throughout these suggestions

4     is saying we will exercise, you know, all of our power under

5     the law or we will discipline subject to Civil Service Law 75.

6     Understandable, by the way, to identify these constraints.

7          But what they operationally mean, saying how quickly

8     can you discipline somebody?  Who will you discipline?  What

9     will you do and what won't you do?

10          Without having this, you know, we will take any

11    measure within the law.  It's just sort of -- we understand

12    that, that that's where they're operating, but we need to no

13    longer have any vagueness about where they think that boundary

14    lies with respect to each of these operational areas.

15          And, secondly, while the question was not so much of

16    a -- I don't -- we certainly anticipate good-faith negotiations

17    and we know that this monitoring team will also press the city

18    to give its best plans, and I didn't want to suggest that we

19    thought they might come back with something different.

20          What it's about is appreciating the issues we

21    identified in our opening remarks, which is, for any changes,

22    what is the authority that individuals will have and to whom

23    are they answerable, to address whether or not we have made --

24    those are going to be dispositive of us viewing whether a plan

25    has legs and has sort of potential to offer a remedy.

M4QNNUNC

1          Honestly, we are not certain that -- well, the ones we

2     have seen so far would not, but I wanted to highlight that

3     those would be essential.  We are happy to not leave that a

4     mystery, to discuss with the city what we mean if they are

5     interested in coming to an agreement.

6          But we would be remiss if we left the conference

7     thinking that continuing to refine the details of the plan that

8     was put in front of us would meet the moment.

9          THE COURT:  Ms. Joyce, would you like to respond?

10          MS. JOYCE:  Very briefly, your Honor.  Only that the

11     recommendations that the monitor and the monitoring team have

12     put forth that are before -- that will be before the Court that

13     we have agreed to can be accomplished within the legal

14     framework that the city and the department need to operate

15     under.

16          We have already provided a list of statutes and laws

17     and regulations that are applicable to this area to the

18     monitoring team and to plaintiffs, so we can keep being asked

19     what our legal constraints are by the parties, but as to the

20     recommendations that are before you and we're being asked to do

21     and what we think we need to do, that is within the city's

22     legal authority and the department commissioner's legal

23     authority, and it is because we have the will to take these

24     steps that now these things are going to be happening.

25          We are going to take the next three weeks to work out

M4QNNUNC

1    the specifics of the language and the timeline so that your

2    Honor will have a fulsome report with details before her in the

3    next three weeks and the parties as well to feel confident that

4    this plan is going to take the immediate and drastic steps

5    that's necessary to effect change.

6            THE COURT:  Thank you.

7            Ms. Werlwas, is there anything else you would want to

8    say now by way of clarification of the difference between what

9    you have in mind and what Ms. Joyce has described?

10           MS. WERLWAS:  Thank you.

11           I do have concerns that the scope of the, quote, plan

12   may be under a process of being sort of winnowing down even as

13   we speak.  For example, the recommendations that we had

14   understood are on the table for discussion as a possible remedy

15   were the recommendations of the monitor that for lateral hires

16   as wardens, to put it summarily, but that external hires could

17   be made to serve in uniformed leadership.

18           The proposal that the city has come back with is a

19   different and a more narrow proposal of an external hire in a

20   different capacity.  We can certainly talk about the merits of

21   one versus the other.  But I am very concerned that even in

22   front of us we see a gap between what I hear the city promising

23   to be working on the details of and what we understood the

24   recommendations to be, and we don't want that process to be

25   repeated.

M4QNNUNC

1          So too with the role of a staffing manager.  What we

2     see is unsettled questions as to what the scope of that

3     person's authority is inside the agency and outside the agency,

4     outside city hall, that person's authority vis-a-vis OLR --

5          THE COURT:  Office of Labor Relations?

6          MS. WERLWAS:  I'm sorry, yes.  I deeply apologize for

7     devolving into acronym land.

8          -- are examples of the questions that we think need to

9     be resolved.

10         I am saying this because we don't want to be -- we

11    want to be as clear as possible about the expectations for the

12    kind of relief that we think is necessary at this moment and

13    that it is not about further details of the city's, you know,

14    letter of last night, but going back to resolving the

15    fundamental questions of will the city exercise political, you

16    know, and legal authority to make the changes in the broader

17    way the monitor has recommended?

18         THE COURT:  Thank you.

19         Ms. Friedberg has put her hand up.

20         MS. FRIEDBERG:  I just thought it might help for

21    clarity's sake that the implementation plan the monitoring team

22    has worked on is not necessarily limited to items in the city's

23    letter.  I had nothing to do with the city's letter certainly.

24    But to the extent it appears there's some confusion of whether

25    or not the city's letter is the framework for the

M4QNNUNC

1    implementation plan, the framework is what I just reiterated

2    and certainly focused on with respect to what we outlined in

3    our special report.

4          We've taken copious notes and been listening to what

5    the parties have said in terms of their expectations of this.

6    You certainly know our position on these items, and we have

7    made that clear to the city.  I certainly anticipate, given our

8    six-year record and the volume of times that we speak with

9    everyone that those conversations will be happening over the

10   next three weeks.

11         So I think with respect to these items we've heard

12   everyone.  Certainly to the extent the monitoring team can help

13   move that forward, we will.  But I just wanted to clarify that

14   with respect to the plan itself, it is not limited to what the

15   city provided in the letter.

16         I can't speak for the city as to why they itemized

17   those particular items because I don't work for the city, but

18   certainly our plan is broader than that, and the recitation I

19   gave is intended to be the scope of that document and should

20   hopefully address the items the parties have raised today.  And

21   if it does not, we certainly are going to have an opportunity

22   to talk about it, but our intention is to do the best that we

23   can to try to usher those and address the very serious concerns

24   that we have highlighted in our various communications to all

25   of you as well as the very thoughtful positions that the

M4QNNUNC

1   plaintiffs and the Southern District shared today on this call.

2           THE COURT:   Thank you.

3           So let's move on to specifics of timing now.  Since I

4   am hearing undertakings from the city and the commissioner and

5   the monitoring team to work in a very focused and specific way

6   on both immediate term and somewhat longer term measures to

7   effectively address crisis conditions that we have in the jails

8   now and report those back to the Court and to the plaintiffs in

9   a way that is actionable within the three or so week time

10  frame, I am going to give the opportunity to do that and come

11  up with what is concrete.

12          If there are issues at the meet-and-confer stage that

13  can't be resolved before the conference, we will be talking at

14  the conference about what issues the other parties may have

15  with direction or scope or robustness of whatever is proposed.

16  But it is important to get something that is specific enough,

17  that is committed to enough, that could be actionable in the

18  short term, and to be able to look forward to developments even

19  before that conference, as the commissioner and Mr. Martin have

20  spoken about, that will be moving us in the right direction

21  rather than talking more abstractly and conceptually about

22  whether particular structures will be consistent with earlier

23  articulated goals.

24          So, with that, Ms. Friedberg, what do you have in mind

25  to propose as a timetable?  Then I can start looking at my

M4QNNUNC

1    calendar.

2            MS. FRIEDBERG:  Your Honor, we would respectfully

3    request that we would file a proposed implementation plan by

4    Tuesday, May 17.  So that's three weeks from today.

5            Given your suggestion of some time for the parties to

6    meet and confer, given that's a Tuesday, perhaps a status

7    conference could be convened the week of the 23rd.

8            Assuming that works for the Court, I think that would

9    give some time for us to meet and confer between then, that

10   submission.  That certainly will not stop us.  To the extent we

11   need to speak with the parties even before there is a

12   submission, we would certainly do that as well.

13           So that would be my proposal, the 17th as the

14   submission date and a status conference the week of the 23rd to

15   the extent it could be accommodated by the Court.  My final

16   request, to the extent it could be accommodated by the Court,

17   would be that the next status conference be convened virtually.

18           THE COURT:  So, Ms. Ng, what do we have the week of

19   the 23rd.  I know the 23rd itself –– I'm sorry.  Ms. Werlwas

20   put her hand up.  Do you want to speak before we start looking

21   at dates?

22           MS. WERLWAS:  It is part of the looking at dates.  If

23   you want to finish looking at your dates sort of first, it was

24   to address some of the dates.

25           THE COURT:  Do you have blackout dates during the week

M4QNNUNC

1   of the 23rd?

2          MS. WERLWAS:  No, it's the week prior.  Our

3   availability for meeting and conferring, as we would hope to

4   do, would be severely constrained on say the 18th through the

5   20th.  So getting the report on May 13, for example, is one

6   proposal, so that we could discuss it at the beginning of the

7   following week, even if your Honor's conference is the week of

8   the 23rd.

9          We understand it is a shorter time to file the report,

10  but in our experience also we all inevitably need to discuss

11  these matters anyway and will be refining them before.  So we

12  would ask that the report come May 13 and the parties meet and

13  confer the 16th or the 18th.

14         THE COURT:  Ms. Joyce has raised her hand and is

15  shaking her head no.

16         So Ms. Joyce.

17         MS. JOYCE:  Thank you, your Honor.  I believe not to

18  call out Ms. Friedberg, but I believe she too was shaking her

19  head no.

20         MR. MARTIN:  Yes.

21         MS. JOYCE:  And Mr. Martin at the implication that the

22  date be moved earlier due to Ms. Werlwas' schedule.

23         We need, the parties and the monitor need the time to

24  insure we get this right, and we should not be rushing a few

25  days due to anybody's except the Court's schedule.

M4QNNUNC

```
1            THE COURT:  So, Ms. Werlwas, given the strongly

2   articulated need for that period of time, at least that period

3   of time through the 17th and your expectation that you're out

4   of pocket from the 18th to the 20th, that leads me to a couple

5   of questions:  One, whether we can give some more flexibility

6   to the monitor and the city within the week of the 16th in

7   terms of filing.

8            The second is, if we do that and the report has to be

9   filed by say the 19th or 20th, which would at least give the

10  U.S. Attorney's Office time to start looking at it if

11  Mr. Powell is not out of pocket at the same time.

12           We then should be looking at a -- could productively

13  look at a conference date that's toward the very end of the

14  week of the -- oh, let's see.  The end of the week of the 23rd

15  I am not in the country from Wednesday --

16           MR. MARTIN:  I hear that.

17           THE COURT:  -- from Wednesday evening until, I think

18  it's the following -- I think I am back -- the following Monday

19  is Memorial Day I think.  So I know that I am back in the

20  country by Memorial Day, so it would have to be after that

21  weekend.

22           And Mr. Powell is shaking his head.

23           MR. POWELL:  Not to object to that.  I think our

24  strong preference would be to go with the three-week deadline

25  and try to find a way to make it work.  We really would
```

M4QNNUNC

1    strongly prefer not pushing off any conference until after

2    Memorial Day.

3         MS. WERLWAS:  We agree, your Honor.  Given the

4    difficulties, we do not want the conference later.  We should

5    take advantage of your Honor's availability during the week of

6    the 23rd.

7         However -- and if the monitoring team and the city are

8    unable to, you know, produce it before Court before the May 17

9    then so be it.  But we want to propose this model of what

10   sounds like it can be radio silence for us between now and the

11   17th and then a report dropped, and then a scurry before court

12   conference doesn't seem to make sense to us given the nature of

13   this case and that what we think would be far more effective of

14   having all parties ideas, views, objections surfaced in the

15   process would be if we -- about specific issues or certain

16   ideas or portions of the report were shared with us as

17   suggestions before it's presented as a fait accomplis on the

18   17th.  We actually think that might also lead to a better

19   product rather than being sort of kept in the dark while these

20   concerns are articulated.

21        And so a process whereby the city could inform us of

22   some of the progress along the way would, we think, hasten

23   matters.  If that's not possible and there is no willingness to

24   sort of engage between now and the 17th, then so be it.

25   certainly, we would ask all parties to hold the 18th, and we

M4QNNUNC

1    will talk all day on that day and that when we will confer.

2               MS. FRIEDBERG:  Your Honor, the record in this case is

3    clear that we've never kept any of the parties in the dark.  So

4    the suggestion that somehow the parties are going to be kept in

5    the dark for the next three weeks is unreasonable.

6               That said, we need to be able to work.  I have

7    negotiated with this group for over six years.  We need some

8    time to have a concrete response, or, quite frankly, it is

9    going to devolve into something that we have no plan for you on

10   the 17th.  We need to of some structure to this.

11              We are proposing three weeks.  I understand there

12   might be some scheduling constraints, but that cannot create a

13   dynamic in which nothing concrete can even be developed to be

14   responded to.

15              The parties have been heard for a long time.  We have

16   met with them for hours upon hours.  The monitoring team has

17   almost met weekly with everybody for them to articulate their

18   concerns and their issues.  We need to then have something for

19   folks to react to.

20              If there is a reasonable basis and time allows, I am

21   sure the city and the department will, the monitor certainly

22   will, but we need to be given the flexibility to produce

23   something within three weeks.  It is just three weeks we are

24   talking about here.

25              We cannot overcomplicate this issue.  It is already

M4QNNUNC

1   complicated enough.  We are asking to produce something to you

2   on the 17th.  We will do our best to endeavor conversations,

3   and then we can have a conference the week of the 23rd.

4          Anything more is going to be creating the very issues

5   that have brought us here over six years.  We need to have some

6   time to work on these issues, to have concrete proposals.  We

7   understand the parties then may have feedback.  They have given

8   a lot now.  They may still have it.  But we need the time to

9   develop it first.  We can't finish it if all we are doing is

10  talking all the time.

11         MR. MARTIN:  Amen.

12         MS. WERLWAS:  We've got to give people something to

13  react to.

14         MR. MARTIN:  Amen.  Amen.  Amen.

15         THE COURT:  Thank you.

16         Ms. Joyce?

17         You have your hand up.

18         MS. JOYCE:  I apologize, your Honor.  I have nothing

19  to add other than what Ms. Friedberg just said.

20         THE COURT:  Mr. Powell your hand is up?

21         MR. POWELL:  I didn't mean to put my hand up.  We have

22  no objection to the monitor's proposal to give them three

23  weeks.  I am sure, given history, we will be in some contact,

24  and we have no objection to their proposal.

25         THE COURT:  Thank you.

M4QNNUNC

1          I will not require the floating of potential ideas

2     within the three weeks, although I do expect that there will be

3     appropriate communications and not complete radio silence, as

4     Ms. Friedberg has said.  And as I understand from my years of

5     conferring with you all, there are communications, and at least

6     that sort of level communication I will expect to be going on.

7          So, as you might expect, in a week when I am going to

8     be gone for half of it and trying to jam things up in the front

9     end of it, the windows of time I have are limited.  I can offer

10    you 2:30 to 4:00 on Tuesday, the 24th.

11         MS. FRIEDBERG:  Your Honor, that works for the

12    monitoring team.  To the extent it could be a virtual

13    conference, we would appreciate that.

14         THE COURT:  Yes, we will do it virtually.

15         MR. POWELL:  That is fine for the government, your

16    Honor.

17         MS. JOYCE:  And for the city as well, your Honor, and

18    for the department.

19         THE COURT:  Thank you.

20         So the proposed plan must be filed on the ECF docket

21    by 5 o'clock on May 17.  Actually, we'll make that 3 o'clock so

22    that there is more time for at least the initial review of it,

23    if in fact the meet-and-confer has to be occurring on the 18th.

24    And I will also expect that everybody will make their best

25    efforts to be available for and engage in as much meeting and

M4QNNUNC

1   conferring and can be productive before we come together for

2   the conference.

3           And then we will hold another conference virtually on

4   Tuesday, the 24th of May, from 2:30 to 4.

5           MR. MARTIN:  Thank you, your Honor.

6           THE COURT:  I thank you all, and I expect real

7   progress.  I am looking forward to a concrete plan that is

8   going to make a difference in the operation of the institution,

9   and that because it needs to make a difference in the safety

10  and quality of life of the people who are in custody there and

11  of all of the people who work there.  And that is for the

12  benefit not only of them but for our community of the city of

13  New York.

14          So I thank you for your undertakings, for the

15  seriousness of those undertakings, and I look forward to

16  extraordinary progress on the extraordinary measures that are

17  necessary.

18          MR. MARTIN:  Thank you, your Honor.

19          MS. FRIEDBERG:  Thank you, your Honor.

20          MS. WERLWAS:  Thank you, your Honor.

21          MR. POWELL:  Thank you, your Honor.

22          THE COURT:  So stay safe, be well, work hard.

23          We are adjourned.  Thank you, all.

24          (Adjourned)

25